# EXHIBIT 2

**INTEL CORPORATION**
2200 Mission College Blvd.
Santa Clara, CA 95052-8119
(408) 765-8080



March 29, 2005

Dear Stockholder:

We will hold our 2005 Annual Stockholders' Meeting at 8:30 a.m. Pacific Time on May 18, 2005 at the Santa Clara Convention Center in Santa Clara, California, and we look forward to your attendance either in person or by proxy. For your convenience, we are pleased to offer a live webcast of the annual meeting at *www.intc.com*.

If you received your annual meeting materials by mail, the notice of annual meeting, proxy statement and proxy card from our Board of Directors are enclosed. If you received your annual meeting materials via e-mail, the e-mail contains voting instructions and links to the annual report and the proxy statement on the Internet, which are both available at *www.intel.com/intel/annualreports/2004*.

We encourage you to conserve natural resources, as well as significantly reduce printing and mailing costs, by **signing up for electronic delivery of our stockholder communications**. For more information, see "Electronic Delivery of Our Stockholder Communications."

At this year's annual meeting, the agenda includes the annual election of directors, ratification of our independent registered public accounting firm, approval of amendment and extension of the 2004 Equity Incentive Plan, and approval of amendment and extension of the Executive Officer Incentive Plan. The Board of Directors recommends that you vote **FOR** election of the director nominees, **FOR** ratification of appointment of the independent registered public accounting firm, **FOR** approval of amendment and extension of the 2004 Equity Incentive Plan, and **FOR** approval of amendment and extension of the Executive Officer Incentive Plan. Please refer to the proxy statement for detailed information on each of the proposals and the annual meeting.

Your Intel stockholder vote is more important than ever in 2005. Each share of our stock that you own represents one vote. If you do not vote your shares, you will not have a say in the important issues to be voted on at the annual meeting. The 10 nominees receiving the most votes "for" election will be elected as directors; and to pass, each other proposal included in this year's proxy statement will require a majority of votes present or represented at the annual meeting. Many of our stockholders do not vote, so the stockholders who do vote influence the outcome of the election in greater proportion than their percentage ownership of the company. In addition, banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, which further reduces the number of votes cast.

If you have any questions concerning the annual meeting or the proposals, please contact our Investor Relations department at (408) 765-1480. For questions regarding your stock ownership, you may contact our transfer agent, Computershare Investor Services, LLC, by e-mail through their web site at *www.computershare.com/contactUS* or by phone at (800) 298-0146 (within the U.S. and Canada) or (312) 360-5123 (outside the U.S. and Canada). You can view your Intel stock holdings electronically and perform other transactions by enrolling in Computershare's Investor Center at *www.computershare.com*. For questions related to voting, you may contact D. F. King & Co., Inc., our proxy solicitors, at (800) 290-6431 (within the U.S. and Canada) or (212) 269-5550 (outside the U.S. and Canada).

Sincerely yours,

Andrew S. Grove

Andrew S. Grove
*Chairman of the Board*



# INTEL CORPORATION

---

**Notice of Annual Stockholders' Meeting**
**May 18, 2005**
**8:30 a.m. Pacific Time**

---

Dear Stockholder:

You are cordially invited to attend our 2005 Annual Stockholders' Meeting, which will be held at 8:30 a.m. Pacific Time on May 18, 2005 at the Santa Clara Convention Center, Santa Clara, California. Driving directions and a map are on the back cover of this proxy statement. For your convenience, we are pleased to offer a live webcast of the annual meeting at *www.intc.com*. For further details, see "Attending the Annual Meeting."

We are holding the annual meeting for the following purposes:

1.  To elect a board of directors to hold office until the next annual stockholders' meeting or until their respective successors have been elected or appointed.

2.  To ratify the appointment of Ernst & Young LLP as our independent registered public accounting firm for the current year.

3.  To approve amendment and extension of the 2004 Equity Incentive Plan.

4.  To approve amendment and extension of the Executive Officer Incentive Plan.

5.  To transact other business that may properly come before the annual meeting or any adjournment or postponement of the meeting.

The proxy statement, which follows this notice, fully describes these items. We have not received notice of other matters that may be properly presented at the annual meeting.

Only stockholders of record at the close of business on March 21, 2005 will be entitled to vote at the annual meeting and any postponements or adjournments of the meeting. For 10 days prior to the annual meeting, a list of stockholders entitled to vote will be available for inspection at our principal executive offices, 2200 Mission College Blvd., Santa Clara, California 95052-8119. If you would like to view the stockholder list, please call our Investor Relations department at (408) 765-1480 to schedule an appointment.

To ensure that your vote is recorded promptly, please vote as soon as possible, even if you plan to attend the annual meeting. Most stockholders have three options for submitting their vote: (1) via the Internet, (2) by phone or (3) by mail. For further details, see "Submitting and Revoking Your Proxy" on page 2. If you have Internet access, **we encourage you to record your vote on the Internet.** It is convenient, and it saves your company significant postage and processing costs.

The Board of Directors

By: Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
March 29, 2005

**DOORS WILL OPEN AT 8:00 A.M.**

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Electronic Delivery of Our Stockholder Communications | 1 |
| Attending the Annual Meeting | 1 |
| Proxy Statement | 2 |
| Proposal 1: Election of Directors | 3 |
| The Board, Board Committees and Meetings | 6 |
| Corporate Governance Guidelines | 9 |
| Policy on Poison Pill Plans | 10 |
| Directors' Compensation | 11 |
| Security Ownership of Certain Beneficial Owners and Management | 12 |
| Stock Price Performance Graph | 14 |
| Report of the Compensation Committee on Executive Compensation | 14 |
| General Compensation Philosophy | 15 |
| Performance-Based Compensation | 17 |
| Stock Options | 20 |
| Stockholding Guidelines | 21 |
| Personal Benefits | 21 |
| Company Performance and CEO Compensation | 21 |
| Employment Contracts and Change in Control Arrangements | 22 |
| Certain Relationships and Related Transactions | 23 |
| Compensation Committee Interlocks and Insider Participation | 24 |
| Executive Compensation | 25 |
| Summary Compensation Table | 25 |
| Option Grants in Last Fiscal Year | 26 |
| Aggregated Option Exercises in Last Fiscal Year and Fiscal Year-End Option Values | 26 |
| Pension Plan Table | 27 |
| Report of the Audit Committee | 27 |
| Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm | 29 |
| Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan | 31 |
| Proposal 4: Approval of Amendment and Extension of the Executive Officer Incentive Plan | 38 |
| Additional Meeting Information | 42 |
| Other Matters | 42 |
| Communicating with Us | 43 |
| Stockholders Sharing the Same Last Name and Address | 43 |
| Exhibit A: Intel Corporation 2004 Equity Incentive Plan, as Amended and Restated | A-1 |
| Exhibit B: Intel Corporation Executive Officer Incentive Plan, as Amended and Restated | B-1 |
| Exhibit C: Charter of the Audit Committee, as Amended and Restated | C-1 |
| Directions to the Santa Clara Convention Center | Back Cover |

## ELECTRONIC DELIVERY OF OUR STOCKHOLDER COMMUNICATIONS

If you received your annual meeting materials by mail, we encourage you to conserve natural resources, as well as significantly reduce your company's printing and mailing costs, by **signing up to receive your stockholder communications via e-mail**. With electronic delivery, we will notify you via e-mail as soon as the annual report and the proxy statement are available on the Internet, and you can easily submit your stockholder votes online. Electronic delivery can also help reduce the number of bulky documents in your personal files and eliminate duplicate mailings. To sign up for electronic delivery:

1. If you are a registered holder (you hold your Intel shares in your own name through our transfer agent, Computershare Investor Services, LLC, or you have stock certificates), visit *www.computershare.com/us/sc/intel* to enroll.

2. If you are a beneficial holder (your shares are held by a brokerage firm, a bank or a trustee), visit *www.icsdelivery.com/intel* to enroll.

Your electronic delivery enrollment will be effective until you cancel it. If you have questions about electronic delivery, please call our Investor Relations department at (408) 765-1480.

## ATTENDING THE ANNUAL MEETING

We are pleased to offer two options for participating in our 2005 annual meeting: (1) viewing a live webcast at *www.intc.com* or (2) attending in person. We will hold the annual meeting at 8:30 a.m. Pacific Time on Wednesday, May 18, 2005 at the Santa Clara Convention Center, Santa Clara, California, located at the corner of Great America Parkway and Tasman Drive. Driving directions and a map to the Convention Center are on the back cover of this proxy statement. When you arrive at the Convention Center, signs will direct you to the appropriate meeting rooms. Please note that the doors to the meeting rooms will not open until 8:00 a.m., and due to security measures, all bags will be subject to search, and all persons who attend the meeting will be subject to a metal detector and/or a hand wand search. We will be unable to admit anyone who does not comply with these security procedures. We will not permit cameras and other recording devices in the meeting hall. If you choose to view the webcast, go to *www.intc.com* shortly before the meeting time, and follow the instructions for downloading the webcast. During the webcast, you will be able to submit questions by following the instructions on the web site. If you miss the annual meeting, you can view a replay of the webcast at *www.intc.com* until June 17, 2005. You need not attend the annual meeting in order to vote.

1



**INTEL CORPORATION**
**2200 Mission College Blvd.**
**Santa Clara, CA 95052-8119**

### PROXY STATEMENT

Our Board of Directors (the "Board") solicits your proxy for the 2005 Annual Stockholders' Meeting to be held at 8:30 a.m. Pacific Time on Wednesday, May 18, 2005 at the Santa Clara Convention Center in Santa Clara, California, and at any postponement or adjournment of the meeting, for the purposes set forth in "Notice of Annual Stockholders' Meeting."

*Record Date and Share Ownership*

Only stockholders of record at the close of business on March 21, 2005 will be entitled to vote at the annual meeting. The majority of the shares of common stock outstanding on the record date must be present in person or by proxy to have a quorum. As of the close of business on February 25, 2005, we had 6,180,500,358 outstanding shares of common stock. We made copies of this proxy statement available to stockholders beginning on March 29, 2005.

*Submitting and Revoking Your Proxy*

If you complete and submit your proxy, the persons named as proxies will vote the shares represented by your proxy in accordance with your instructions. If you submit a proxy card but do not fill out the voting instructions on the proxy card, the persons named as proxies will vote the shares represented by your proxy as follows:

- **FOR** the election of the director nominees set forth in "Proposal 1: Election of Directors."

- **FOR** ratification of the independent registered public accounting firm set forth in "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm."

- **FOR** approval of amendment and extension of the 2004 Equity Incentive Plan set forth in "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan."

- **FOR** approval of amendment and extension of the Executive Officer Incentive Plan set forth in "Proposal 4: Approval of Amendment and Extension of the Executive Officer Incentive Plan."

In addition, if other matters are properly presented for voting at the annual meeting, the persons named as proxies will vote on such matters in accordance with their best judgment. We have not received notice of other matters that may properly be presented for voting at the annual meeting.

Your stockholder vote is more important than ever in 2005. Each share of our stock that you own represents one vote. If you do not vote your shares, you will not have a say in the important issues to be voted upon at the annual meeting. To pass, each proposal included in this year's proxy statement other than the election of directors requires a majority of votes present or represented at the annual meeting. Many of our stockholders do not vote, so the stockholders who do vote influence the outcome of the election in greater proportion than their percentage ownership of the company. In addition, banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, further reducing the number of votes cast.

To ensure that your vote is recorded promptly, please vote as soon as possible, even if you plan to attend the annual meeting in person. Most stockholders have three options for submitting their votes: (1) via the Internet, (2) by phone or (3) by mail. If you have Internet access, **we encourage you to record your vote on the Internet.** It is convenient, and it saves your company significant postage and processing costs. In addition, when you vote via the Internet or by phone prior to the meeting date, your vote is recorded immediately and there is no risk that postal delays will cause your vote to arrive late and therefore not be counted. If you attend the annual meeting and are a registered holder, you may also submit your vote in person, and any previous votes that you submitted, whether by Internet, phone or mail, will be superseded by the vote that you cast at the annual meeting. At this year's annual meeting, the polls will close at 10:00 a.m. Pacific Time, and no further votes will be accepted after that time. We intend to announce preliminary results at the annual meeting and

publish final results on our Investor Relations web site at *www.intc.com* shortly after the meeting and also in our quarterly report on Form 10-Q for the second quarter of fiscal 2005. If you have any questions about submitting your vote, call our Investor Relations department at (408) 765-1480.

You may revoke your proxy at any time prior to the close of the polls at 10:00 a.m. Pacific Time on May 18, 2005 by: (1) submitting a later-dated vote, in person at the annual meeting, via the Internet, by telephone or by mail, or (2) delivering instructions to our Corporate Secretary prior to the annual meeting via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, at M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. If you hold shares through a bank or brokerage firm, you must contact that firm to revoke any prior voting instructions.

If you participate in the Intel Stock Fund through our 401(k) Savings Plan for current and former employees, your proxy will serve as a voting instruction for Fidelity Investments, the plan's record keeper. If Fidelity does not receive voting instructions for shares in your plan account, Fidelity will vote those shares in the same proportion as other plan participants' shares for which it has received voting instructions. You must submit your voting instructions for your Intel Stock Fund shares to Fidelity by May 13, 2005 to allow Fidelity time to receive your voting instructions and vote on behalf of the plan.

*Votes Required to Adopt Proposals*

Each share of our common stock outstanding on the record date will be entitled to one vote on each matter. The 10 nominees for election as directors who receive the most votes "for" election will be elected. Ratification of our appointment of our independent registered public accounting firm, approval of amendment and extension of our 2004 Equity Incentive Plan, and approval of amendment and extension of our Executive Officer Incentive Plan will each require an affirmative vote of the majority of the shares of common stock present or represented at the annual meeting.

For the election of directors, withheld votes do not affect whether a nominee has received sufficient votes to be elected. For the purpose of determining whether the stockholders have approved matters other than the election of directors, abstentions are treated as shares present or represented and voting, so abstaining has the same effect as a negative vote. Shares held by brokers that do not have discretionary authority to vote on a particular matter and that have not received voting instructions from their customers are not counted or deemed to be present or represented for the purpose of determining whether stockholders have approved that matter, but they are counted as present for the purpose of determining the existence of a quorum at the annual meeting. Please note that banks and brokers that have not received voting instructions from their clients cannot vote on their clients' behalf on "non-routine" proposals, such as approval of amendment and extension of the 2004 Equity Incentive Plan and the Executive Officer Incentive Plan, but may vote their clients' shares on the election of directors and the ratification of Ernst & Young LLP as our independent registered public accounting firm.

## PROPOSAL 1: ELECTION OF DIRECTORS

Our nominees for the upcoming election of directors include eight independent directors, as defined in the applicable rules for companies traded on The NASDAQ Stock Market* ("NASDAQ"), and two members of our senior management. Each director serves a one-year term, as described below, with all directors subject to annual election.

At the recommendation of the Corporate Governance and Nominating Committee, the Board has nominated the persons listed below to serve as directors for the term beginning at the annual meeting on May 18, 2005. Unless proxy cards are otherwise marked, the persons named as proxies will vote all proxies received **FOR** the election of each nominee named in this section.

If any director nominee is unable or unwilling to serve as a nominee at the time of the annual meeting, the persons named as proxies may vote either (1) for a substitute nominee designated by the present Board to fill the vacancy or (2) for the balance of the nominees, leaving a vacancy. Alternatively, the Board may reduce the size of the Board. The Board has no reason to believe that any of the following nominees will be unwilling or unable to serve if elected as a director. Such persons have been nominated to serve until the next annual meeting following the 2005 annual meeting or until their successors, if any, are elected or appointed. This section contains the names and biographical information for each of the nominees.

3

*Director Changes in 2005.* In November 2004, we announced that Andrew S. Grove, our Chairman of the Board, will not stand for reelection at the annual meeting and that Craig R. Barrett will succeed Dr. Grove as Chairman and Paul S. Otellini will succeed Dr. Barrett as Chief Executive Officer effective following the annual meeting. The Board's Corporate Governance and Nominating Committee is presently considering possible candidates to take the Board seat to be vacated by Dr. Grove. The Committee and the Board have not yet chosen a candidate, and so have acted to temporarily reduce the size of the Board from 11 to 10 directors, effective with this upcoming election of directors. Accordingly, at the annual meeting, proxies may not be voted for more than 10 director nominees. The Board expects to identify and appoint a new director at some time in 2005 following the annual meeting, and the Board presently expects that the new director will be independent. With the addition of an independent director, the Board would consist of nine independent directors and two management directors. We will make a public announcement if and when a new director is appointed.

### Recommendation of the Board

**The Board recommends that you vote "FOR" the election of each of the following nominees.**

**Craig R. Barrett**
65 Years Old
Director Since 1992
Chief Executive Officer of Intel

*Craig R. Barrett* has been Chief Executive Officer since 1998 and a director of Intel since 1992. Dr. Barrett joined Intel in 1974. In 1984, he became Vice President, and then in 1985 General Manager of the Components Technology and Manufacturing Group. Dr. Barrett became a Senior Vice President in 1987 and General Manager of the Microcomputer Components Group in 1989. He was an Executive Vice President from 1990 to 1997, Chief Operating Officer from 1993 to 1997 and President from 1997 to 2002.

**Charlene Barshefsky**
54 Years Old
Director Since January 2004
Senior International Partner at
Wilmer Cutler Pickering Hale and Dorr LLP

*Ambassador Charlene Barshefsky* has been a director of Intel since January 2004 and is Senior International Partner at the law firm of Wilmer Cutler Pickering Hale and Dorr LLP. Formerly the United States Trade Representative, Ambassador Barshefsky was the chief trade negotiator and principal trade policy maker for the United States from 1997 to 2001 and a member of the President's cabinet. Ambassador Barshefsky is a director of the American Express Company, The Estée Lauder Companies Inc., Idenix Pharmaceuticals, Inc. and Starwood Hotels & Resorts Worldwide, Inc.

**E. John P. Browne**
57 Years Old
Director Since 1997
Group Chief Executive of BP plc

*E. John P. Browne*, formally known as The Lord Browne of Madingley, has been a director of Intel since 1997. He has been a Managing Director of BP plc, a provider of energy and petrochemicals, since 1991 and Group Chief Executive since 1995. Lord Browne is also a non-executive director of the Goldman Sachs Group, Inc.

**D. James Guzy**
69 Years Old
Director Since 1969
Chairman of Arbor Company

*D. James Guzy* has been a director of Intel since 1969 and is Co-Chairman of the Corporate Governance and Nominating Committee of the Board. Since 1969, he has been Chairman of Arbor Company, a limited partnership engaged in the electronics and computer industry. Mr. Guzy is also Chairman of the Board of PLX Technology, Inc. and a director of Cirrus Logic Inc., LogicVision, Inc., Tessera, Inc., and Alliance Capital Management Technology Fund. He also holds three directorships within the Davis Funds complex. Mr. Guzy is retiring from the boards of LogicVision and Tessera in May 2005.

**Reed E. Hundt**
57 Years Old
Director Since 2001
Principal of Charles Ross Partners

*Reed E. Hundt* has been a director of Intel since 2001 and is Chairman of the Compensation Committee of the Board. Since 1998, Mr. Hundt has been a principal of Charles Ross Partners, a private investor and business advisory service. Since 1998, he has served as an independent adviser on information industries to McKinsey & Company, Inc., a management consulting firm, and, since 2000, to The Blackstone Group, a private equity firm. From 1993 to 1997, Mr. Hundt was Chairman of the Federal Communications Commission.

**Paul S. Otellini**
54 Years Old
Director Since 2002
President and
Chief Operating Officer of Intel

*Paul S. Otellini* has been a director of Intel and Intel's President and Chief Operating Officer since 2002. Mr. Otellini joined Intel in 1974 and has held a number of positions, including General Manager of Intel's Peripheral Components Operation and the Folsom Microcomputer Division. In 1990, Mr. Otellini became the General Manager of the Microprocessor Products Group, leading the introduction of the Intel® Pentium® processor. He was elected a corporate officer in 1991, a Senior Vice President in 1993 and Executive Vice President in 1996. From 1994 to 1998, Mr. Otellini served as General Manager of the Sales and Marketing Group, and from 1998 to 2002, he served as General Manager of the Intel Architecture Group. Mr. Otellini is a director of Google, Inc.

**David S. Pottruck**
56 Years Old
Director Since 1998
Managing Director of
The Pottruck Group

*David S. Pottruck* has been a director of Intel since 1998 and is Chairman of Intel's Retirement Plans Investment Policy Committee. Since July 2004, Mr. Pottruck has been Managing Director of The Pottruck Group, a San Francisco private equity firm. Mr. Pottruck also serves as a Senior Fellow in the Wharton School of Business Center for Leadership and Change Management. In July 2004, Mr. Pottruck resigned from the Charles Schwab Corporation, a financial services provider, after a 20-year career, having served as President, Chief Executive Officer and a member of the board of directors.

**Jane E. Shaw**
66 Years Old
Director Since 1993
Chairman and
Chief Executive Officer
of Aerogen, Inc.

*Jane E. Shaw* has been a director of Intel since 1993 and is Chairman of the Audit Committee of the Board. Dr. Shaw is Chairman and Chief Executive Officer of Aerogen, Inc., a company developing drug-device combination aerosol products for patients with respiratory disorders. She was President and Chief Operating Officer of ALZA Corporation, a pharmaceutical company, from 1987 to 1994. Dr. Shaw is a director of McKesson Corporation and OfficeMax Incorporated.

**John L. Thornton**
51 Years Old
Director Since 2003
Professor and Director of
Global Leadership,
Tsinghua University, Beijing

*John L. Thornton* has been a director of Intel since 2003 and is Chairman of the Finance Committee of the Board. He is Professor and Director of Global Leadership at Tsinghua University in Beijing. Mr. Thornton retired in 2003 as President and Co-Chief Operating Officer, and as a member of the board of directors, of the Goldman Sachs Group, Inc. Mr. Thornton is a director of China Netcom Communications Group Corporation, the Ford Motor Company, News Corporation and The Pacific Century Group, Inc.

**David B. Yoffie**
50 Years Old
Director Since 1989
Professor of International
Business Administration,
Harvard Business School

*David B. Yoffie* has been a director of Intel since 1989. He is Lead Independent Director, Co-Chairman of the Corporate Governance and Nominating Committee of the Board and Chairman of the Executive Committee of the Board. Dr. Yoffie has been the Max and Doris Starr Professor of International Business Administration at the Harvard Business School since 1993 and has been on the Harvard University faculty since 1981. He is also a director of The Charles Schwab Corporation.

Intel stock ownership information for these individuals is shown under the heading "Security Ownership of Certain Beneficial Owners and Management" and is based on information furnished by the respective individuals.

**Retiring Director**

**Andrew S. Grove**
68 Years Old
Director Since 1974
Chairman of the Board of Intel

*Andrew S. Grove* has been a director of Intel since 1974 and Chairman of the Board since 1997. Dr. Grove participated in founding Intel in 1968 and served as Vice President and Director of Operations through 1974. He became an Executive Vice President in 1975 and was Chief Operating Officer from 1976 to 1987. Dr. Grove was President from 1979 to 1997 and Chief Executive Officer from 1987 to 1998.

5

**Director Emeritus**

The Board has elected Gordon Moore as Chairman Emeritus and Director Emeritus. We do not have any other directors emeriti. Dr. Moore is invited to attend Board and Board committee meetings, but he does not have voting rights. Director emeritus is an unpaid position. We will reimburse Dr. Moore for his attendance-related expenses, although he has not to date requested any reimbursement.

| | |
|---|---|
| **Gordon E. Moore**<br>76 Years Old<br>Director Emeritus Since 2001<br>Chairman Emeritus of the Board<br>of Intel Since 1997 | *Gordon E. Moore* was a director of Intel from 1968 to 2001 and has been Chairman Emeritus of the Board since 1997. Dr. Moore co-founded Intel in 1968 and served as Executive Vice President until 1975. From 1975 to 1987, he served as Chief Executive Officer; and from 1979 to 1997, he served as Chairman. Dr. Moore is a director of Gilead Sciences, Inc. |

## THE BOARD, BOARD COMMITTEES AND MEETINGS

Corporate governance is typically defined as the system that allocates duties and authority among a company's stockholders, board of directors and management. The stockholders elect the board and vote on extraordinary matters; the board is the company's governing body, responsible for hiring, overseeing and evaluating management, particularly the Chief Executive Officer; and management runs the company's day-to-day operations. Our Board of Directors currently consists of eleven directors. The Board believes that there should be a substantial majority of independent directors on the Board. The Board also believes that it is useful and appropriate to have members of management, including the Chief Executive Officer, as directors. The current Board members include eight independent directors and three members of our senior management. The Board also has one director emeritus who may participate in Board meetings but does not vote.

*"Independent" Directors.* Each of our directors other than Messrs. Grove, Barrett and Otellini qualifies as "independent" in accordance with the published listing requirements of NASDAQ. The NASDAQ independence definition includes a series of objective tests, such as that the director is not an employee of the company and has not engaged in various types of business dealings with the company. In addition, as further required by the NASDAQ rules, the Board has made a subjective determination as to each independent director that no relationships exist which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, the directors reviewed and discussed information provided by the directors and the company with regard to each director's business and personal activities as they may relate to Intel and Intel's management.

In addition, as required by NASDAQ rules, the members of the Audit Committee each qualify as "independent" under special standards established by the U.S. Securities and Exchange Commission (the "SEC") for members of audit committees. The Audit Committee also includes at least one independent member who is determined by the Board to meet the qualifications of an "audit committee financial expert" in accordance with SEC rules, including that the person meets the relevant definition of an "independent director." E. John P. Browne is the independent director who has been determined to be an audit committee financial expert. Stockholders should understand that this designation is a disclosure requirement of the SEC related to Lord Browne's experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Lord Browne any duties, obligations or liability that are greater than are generally imposed on him as a member of the Audit Committee and the Board, and his designation as an audit committee financial expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board. The Board has also determined that each Audit Committee member has sufficient knowledge in reading and understanding the company's financial statements to serve on the Audit Committee.

*Board Responsibilities and Structure.* The primary responsibilities of the Board are oversight, counseling and direction to our management in the long-term interests of the company and our stockholders. The Board's detailed responsibilities include: (a) selecting and regularly evaluating the performance of the Chief Executive Officer and other senior executives; (b) planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other senior executives; (c) reviewing and, where appropriate, approving our major financial objectives and strategic and operating plans, business risks and actions; (d) overseeing the conduct of our business to evaluate whether the business is being properly managed; and (e) overseeing the processes for maintaining our integrity with regard to our financial statements and other public disclosures and compliance with law and ethics. The Board has instructed our Chief Executive Officer, working with our other executive officers, to manage our business in a manner consistent with our standards and practices, and in accordance with any specific plans, instructions or directions of the Board. The Chief Executive Officer and management are responsible for seeking the advice and, in appropriate situations, the approval of the Board with respect to extraordinary actions that we may undertake.

The Board's general policy, based on experience, is that the positions of Chairman of the Board and Chief Executive Officer should be held by separate persons as an aid in the Board's oversight of management. In addition, the Board has an independent director designated as the Lead Independent Director, who is responsible for coordinating the activities of the other independent directors and performing various other duties. The general authority and responsibilities of the Lead Independent Director are established in a written charter adopted by the Board.

The Board and its committees meet throughout the year on a set schedule, and also hold special meetings and act by written consent from time to time as appropriate. Board agendas include regularly scheduled sessions for the independent directors to meet without management present, and the Board's Lead Independent Director leads those sessions. The Board has delegated various responsibilities and authority to different Board committees as described in this section of the proxy statement. Committees regularly report on their activities and actions to the full Board. Board members have access to all of our employees outside of Board meetings, and the Board has a program that encourages each director to visit different Intel sites and events worldwide on a regular basis and meet with local management at those sites and events.

*Board Committees and Charters.* The Board currently has, and appoints the members of, standing Audit, Compensation, Corporate Governance and Nominating, Executive and Finance Committees. In addition, the Finance Committee has the authority to appoint the members of the Retirement Plans Investment Policy Committee, and there are Board members serving on that committee. Each member of the Audit, Compensation, Corporate Governance and Nominating, and Finance Committees is an independent director in accordance with NASDAQ standards. Each of the Board committees has a written charter approved by the Board. Copies of each charter, including the charter describing the position of Lead Independent Director, are posted on our Investor Relations web site at *www.intc.com* under the "Corporate Governance & Social Responsibility" section. The members of the committees are identified in the following table.

| Director | Audit | Compensation | Corporate Governance and Nominating | Executive | Finance | Retirement Plans Investment Policy[†] |
|---|---|---|---|---|---|---|
| Craig R. Barrett | | | | ✓ | | |
| Charlene Barshefsky | | | | | ✓ | ✓ |
| E. John P. Browne | ✓ | ✓ | | | | |
| Andrew S. Grove | | | | | | |
| D. James Guzy | ✓ | | Co-Chair | | | |
| Reed E. Hundt | | Chair | | ✓ | | |
| Paul S. Otellini | | | | ✓ | | ✓ |
| David S. Pottruck | | ✓ | | | | Chair |
| Jane E. Shaw | Chair | | | ✓ | | |
| John L. Thornton | | | | | Chair | |
| David B. Yoffie | | | Co-Chair | Chair | ✓ | |

† Members are appointed by the Finance Committee.

*Audit Committee.* The Audit Committee assists the Board in its general oversight of our financial reporting, internal controls and audit functions, and is directly responsible for the appointment, retention, compensation and oversight of the work of our independent registered public accounting firm. In 2004, the Audit Committee held eight meetings. The responsibilities and activities of the Audit Committee are described in greater detail in "Report of the Audit Committee" and "Exhibit C: Charter of the Audit Committee."

*Compensation Committee.* The Compensation Committee reviews and determines salaries, performance-based incentives and other matters relating to executive compensation, and administers our stock option plans, including reviewing and granting stock options to our executive officers. The Compensation Committee also reviews and determines various other company compensation policies and matters. The Compensation Committee held two meetings in 2004 and also regularly acts by written consent. For more information, see "Report of the Compensation Committee on Executive Compensation."

*Corporate Governance and Nominating Committee.* In May 2004, we combined the Corporate Governance Committee and the Nominating Committee to form the Corporate Governance and Nominating Committee. The Corporate Governance and Nominating Committee reviews and reports to the Board on a periodic basis with regard to matters of corporate governance and corporate social responsibility, such as environmental, workplace or stakeholder issues. The Corporate Governance and Nominating Committee also reviews and assesses the effectiveness of the Board's Guidelines

7

on Significant Corporate Governance Issues; makes recommendations to the Board regarding proposed revisions to the Guidelines; and makes recommendations to the Board regarding the size and composition of the Board. In addition, the Corporate Governance and Nominating Committee makes recommendations to the Board regarding the agendas for our annual meetings, reviews stockholder proposals and makes recommendations to the Board for action on such proposals, and reviews and makes recommendations concerning compensation for the independent directors.

The Corporate Governance and Nominating Committee is responsible for reviewing with the Board, from time to time, the appropriate skills and characteristics required of Board members in the context of the current makeup of the Board. This assessment includes issues of diversity in numerous factors such as age; understanding of and experience in manufacturing, technology, finance and marketing; and international experience and culture. These factors, and others as considered useful by the Committee, are reviewed in the context of an assessment of the perceived needs of the Board at a particular point in time. As a result, the priorities and emphasis of the Committee and of the Board may change from time to time to take into account changes in business and other trends, and the portfolio of skills and experience of current and prospective Board members. The Corporate Governance and Nominating Committee establishes procedures for the nomination process, recommends candidates for election to the Board and also nominates officers for election by the Board.

As described in "Director Changes in 2005" on page 4, the Corporate Governance and Nominating Committee is currently considering candidates for the Board to succeed to the Board seat currently held by Dr. Grove. The Board expects to identify and appoint a new director at some time in 2005 following the annual meeting. We will make a public announcement if and when a new director is appointed.

Consideration of new Board nominee candidates typically involves a series of internal discussions, review of information concerning candidates and interviews with selected candidates. Board members or employees typically suggest candidates for nomination to the Board. In 2004, we did not employ a search firm or pay fees to other third parties in connection with seeking or evaluating Board nominee candidates. The Corporate Governance and Nominating Committee will consider candidates proposed by stockholders, and has from time to time received unsolicited candidate proposals from stockholders. The Committee evaluates candidates proposed by stockholders using the same criteria as for other candidates. A stockholder seeking to recommend a prospective nominee for the Corporate Governance and Nominating Committee's consideration should submit the candidate's name and qualifications to our Corporate Secretary via e-mail at *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119.

The Corporate Governance and Nominating Committee held three meetings in 2004, the former Nominating Committee held one meeting in 2004 and the former Corporate Governance Committee held two meetings in 2004.

*Executive Committee.* The Executive Committee may exercise the authority of the Board between Board meetings, except to the extent that the Board has delegated authority to another committee or to other persons, and except as limited by applicable law. The Executive Committee held one meeting in 2004.

*Finance Committee.* The Finance Committee reviews and recommends matters related to our capital structure, including the issuance of debt and equity securities; our cash and dividend policy and dividend declarations; banking arrangements, including investment of corporate cash; and management of the corporate debt structure. In addition, the Finance Committee reviews and approves finance and other cash management transactions whose authorization is not otherwise approved by the Board or delegated to our management. During 2004, the Finance Committee held three meetings.

*Retirement Plans Investment Policy Committee.* The Finance Committee appoints the members of the Retirement Plans Investment Policy Committee, which is responsible for adopting and amending investment policies for our U.S. employee retirement plans. The members of this committee also include Board members and company officers.

*Attendance at Board, Committee and Annual Stockholders' Meetings.* The Board held six meetings in 2004. We expect each director to attend each meeting of the Board and the committees on which he or she serves, and also expect them to attend the annual meeting. In 2004, each director attended at least 75% of the meetings of the Board and the committees on which he or she served, and all directors except one attended the 2004 Annual Stockholders' Meeting. That meeting included reports from the independent-director chairs of the Audit and Compensation Committees.

The Board does not have a formal policy that seeks to limit the number of board seats held by an independent director, but the Board's guideline of 100% attendance at meetings reflects the Board's expectation that each director will meet his or her commitments to the position. The time commitments of directors vary substantially with regard to their individual involvement with their primary positions; their involvement with commercial, charitable and other organizations; and additional commitments. A director's involvement with other boards is just one factor to be considered in deciding if a director can devote the time and attention necessary to be an informed and effective director.

We have a policy, and an approval process, that generally limits each of our employees to serving on no more than one organization's board as a personal, non-Intel activity. The approval process considers both the time commitment involved and the potential for business conflicts between Intel and the other organization. This policy is applicable to our three management directors and our other officers.

*Communications from Stockholders to the Board.* The Board recommends that stockholders initiate any communications.with the Board in writing and send them in care of our Corporate Secretary. Stockholders can send communications by e-mail to *corporate.secretary@intel.com*, by fax to (408) 653-8050 or by mail to Cary Klafter, Corporate Secretary, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd., Santa Clara, California 95052-8119. This centralized process will assist the Board in reviewing and responding to stockholder communications in an appropriate manner. The name of any specific intended Board recipient should be noted in the communication. The Board has instructed our Corporate Secretary to forward such correspondence only to the intended recipients; however, the Board has also instructed our Corporate Secretary, prior to forwarding any correspondence, to review such correspondence and, in his discretion, not to forward certain items if he deems them to be of a commercial or frivolous nature or otherwise inappropriate for the Board's consideration. In such cases, our Corporate Secretary may forward some of that correspondence elsewhere in the company for review and possible response.

## CORPORATE GOVERNANCE GUIDELINES

The Board has adopted a set of Guidelines on Significant Corporate Governance Issues, and the Corporate Governance and Nominating Committee is responsible for overseeing the Guidelines and reporting and making recommendations to the Board concerning corporate governance matters. We have posted the Guidelines on our Investor Relations web site at *www.intc.com* under the "Corporate Governance & Social Responsibility" section.

Among other matters, the Guidelines include the following items concerning the Board:

- The Board believes that there should be a substantial majority of independent directors on the Board. The Board's general policy, based on experience, is that the positions of Chairman of the Board and Chief Executive Officer should be held by separate persons as an aid in the Board's oversight of management. The Board has an independent director designated as the Lead Independent Director, who is responsible for coordinating the activities of the other independent directors and performs various other duties.

- Independent directors meet on a regular basis apart from other Board members and management representatives, and the Lead Independent Director is responsible for setting the agenda and running the meetings.

- All directors stand for reelection every year.

- The Board has adopted a retirement policy for officers and directors. Under the policy, independent directors may not stand for reelection after age 72, and management directors, other than former Chief Executive Officers, may not stand for reelection after age 65. Following Dr. Barrett's tenure, the Chief Executive Officer may continue as CEO no later than the annual meeting at which the person is age 60; however, a former CEO may continue to be employed by the company in another capacity beyond that time, including until age 72 as a director or Chairman of the Board. Other corporate officers may continue as such no later than age 65.

- Board compensation should be a mix of cash and equity-based compensation. Management directors will not be paid for Board membership in addition to their regular employee compensation. Independent directors may not receive consulting, advisory or other compensatory fees from Intel in addition to their Board compensation. To the extent practicable, independent directors who are affiliated with our service providers will undertake to ensure that their compensation from such providers does not include amounts connected to payments by Intel.

- Board members must act at all times in accordance with the requirements of our Corporate Business Principles, which are applicable to each director in connection with his or her activities relating to Intel. This obligation includes adherence to our policies with respect to conflicts of interest, confidentiality, protection of our assets, ethical conduct in business dealings, and respect for and compliance with applicable law. We will report to the Board any waiver of the requirements of the Corporate Business Principles with respect to any individual director or executive officer, and such waiver is subject to the Board's approval.

- The Board appoints members of Board committees.

- The Audit, Compensation, and Corporate Governance and Nominating Committees consist entirely of independent directors.

- We expect the annual cycle of agenda items for Board meetings to change on a periodic basis to reflect Board requests and changing business and legal issues. The Board will have regularly scheduled presentations from Finance, Sales and Marketing, and our major business units and operations. The Board's annual agenda will include, among other items, our long-term strategic plan, capital projects, budget matters, evaluation of our Chief Executive Officer and management succession.

- The Board has access to, and may contact and meet with, any of our employees. The Board has a program for members to visit our sites and meet with local management and other employees on a worldwide basis.

- The Chief Executive Officer reports at least annually to the Board on succession planning and management development.

- At least annually, the Board evaluates the performance of the Chief Executive Officer and other senior management personnel.

- The Board has a process whereby the Board and its members are subject to periodic self-evaluation and self-assessment.

- The Board works with management to schedule new-director orientation programs and continuing education programs for directors. The orientation programs are designed to familiarize new directors with our businesses, strategies and challenges, and to assist new directors in developing and maintaining the skills necessary or appropriate for the performance of their responsibilities. Continuing education programs for Board members may include a mix of in-house and third-party presentations and programs.

The "Corporate Governance & Social Responsibility" section of our Investor Relations web site at *www.intc.com* also includes our Corporate Business Principles and Principles for Responsible Business, which the Board adopts. Our Corporate Business Principles is our code-of-ethics document for all employees and also applies to our independent directors with regard to their Intel-related activities. In addition to the Corporate Business Principles, we have adopted Principles for Responsible Business, which are intended to succinctly express our commitment to ethical and legal business practices on a worldwide basis. We discuss most of those topics in more detail in our Corporate Business Principles, and we cover other topics in other company policies and practices.

Directors and officers are encouraged to be Intel stockholders through their participation in our stock option and employee stock participation plans. The Board has established stock ownership guidelines for our independent directors and corporate officers to help ensure that they each maintain an equity stake in Intel, and by doing so, appropriately link their interests with those of our other stockholders. These stock ownership guidelines provide that within a five-year period following appointment or election, the covered individuals should attain and hold an investment position (not including unexercised stock options) of no less than a specified number of shares of our stock (for officers, approximating three to five times the sum of their annual baseline total cash compensation, depending on the individual's scope of responsibilities, and there is a similar guideline for independent directors). With limited exceptions, directors and officers may not invest in (purchase or otherwise receive, or write) derivatives of our securities, e.g., puts and calls on our securities, or enter into any "short sales" or "short positions" with respect to our securities. A short position is one in which the holder will profit if the market price of the securities either remains the same or decreases. We consider it inappropriate and contrary to the interests of Intel and our stockholders for directors and officers to take such investment positions.

**Policy on Poison Pill Plans**

In 2001, a stockholder submitted a request to us regarding the approval process for adopting stockholders' rights plans (also known as "poison pills"). We do not have a poison pill and are not presently considering the adoption of such a device. Following consideration of the stockholder's request, the Board adopted a statement of policy that it shall seek and

obtain stockholder approval before adopting any poison pill, provided, however, that the Board may revise or repeal this policy without prior public notice, and the Board may thereafter determine to act on its own to adopt a poison pill if, under the circumstances, the Board in its exercise of its fiduciary responsibilities, including the majority of the independent members of the Board, deems it to be in the best interests of our stockholders to adopt a poison pill without the delay in adoption that would come from the time reasonably anticipated to seek stockholder approval. The Board has directed the Corporate Governance and Nominating Committee to review this policy statement, including the proviso, on an annual basis and to report to the Board on any recommendations that it may have concerning the policy. The Committee last reported to the Board in February 2005 that the policy should continue in effect without change. The terms of the policy, as in effect, are included in our published Corporate Governance Guidelines and proxy statements.

## DIRECTORS' COMPENSATION

It is the Board's general policy that compensation for independent directors should be a mix of cash and equity-based compensation. We do not pay employee directors for Board service in addition to their regular employee compensation. Independent directors may not receive consulting, advisory or other compensatory fees from us in addition to their Board compensation. To the extent practicable, independent directors who are affiliated with our service providers ensure that their compensation from such providers does not include amounts connected to our payments.

In 2004, we paid each independent director an annual cash retainer of $60,000. The Lead Independent Director and the Chairman of the Audit Committee each receive an additional cash retainer of $20,000 per year; other committee chairs each receive an additional cash retainer of $10,000 per year. We reimburse our directors for their travel and related expenses in connection with attending Board meetings and Board-related activities and provide each director with a computer for his or her personal use. Directors' charitable contributions that meet the guidelines of our employee charitable matching gift program are eligible for matching funds from us in an amount up to $10,000 per year. Because we expect attendance at all meetings, and a substantial amount of the Board's work is done in committee meetings and outside of formal meetings, we do not pay meeting fees.

We also grant stock options to independent directors. In accordance with our 2004 Equity Incentive Plan, option grants to independent directors may not exceed 30,000 shares per director per year, and the option exercise price must be at least equal to the market value on the date of grant. During 2004, we granted each independent director an option to purchase a total of 15,000 shares at an exercise price of $27.53 per share. We also granted Ambassador Barshefsky a prorated stock option grant reflecting her period of service on the Board from her appointment in January 2004 to her election by stockholders in May 2004, to purchase a total of 5,000 shares at an exercise price of $32.06 per share.

We have a deferred compensation plan for our independent directors. Under this plan, our independent directors may elect to defer up to 100% of their annual cash fees and receive an investment return on the deferred funds as if the funds were invested in our common stock. Plan participants must irrevocably elect to receive the deferred funds either in a lump sum or in equal annual installments over 5 years or 10 years, and either to begin receiving distributions at retirement or at the earlier of retirement and a date specified at the time of the election, which cannot be less than 24 months from the election date. This deferred compensation is our unsecured obligation. Dr. Shaw and Mr. Hundt participated in the deferred compensation plan with respect to fees for 2004, and they and other directors have participated in prior years.

In 1998, the Board terminated its retirement program for independent directors. Independent directors serving at the time of termination were vested with the number of years served, and will receive an annual benefit equal to the annual retainer fee in effect at the time of payment, to be paid beginning at commencement of retirement and continuing for the lesser of the number of years served as an independent director or the life of the director.

*Review of Directors' Compensation.* In 2004, the Board decided that the Corporate Governance and Nominating Committee, instead of the Compensation Committee, should have the primary responsibility to review and consider any revisions to directors' compensation. Each of these committees consists solely of independent directors. The Corporate Governance and Nominating Committee is currently reviewing and considering revisions to directors' compensation, and expects to complete this work by June 2005 and make any recommendations to the full Board for action in July 2005. Because of this review process, the Board does not expect to grant stock options to the independent directors in May as has previously been the Board's practice. Instead, the Board is postponing consideration of any equity-related grant or award to await the results of the review. The Committee did request that this year's submission of the 2004 Equity Incentive Plan to stockholders include a proposed amendment authorizing the potential issuance to independent directors of the full range of equity incentive instruments available under the plan, in addition to stock options. This proposed

11

amendment is more fully described in "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan." The Board expects that there will be a grant of equity instruments to the independent directors following completion of the review and any related Board action, and subject in part to results of the stockholders' vote on Proposal 3. We will publicly announce any revisions to directors' compensation.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

To our knowledge, the following table sets forth information regarding ownership of our common stock on February 25, 2005 by (i) each of our directors, our director emeritus and named executive officers, (ii) one holder of 5.2% of our common stock, and (iii) all of our directors, our director emeritus and executive officers as a group. Except as otherwise indicated and subject to applicable community property laws, each owner has sole voting and investment powers with respect to the securities listed.

| Stockholder | Number of Shares of Common Stock Beneficially Owned at February 25, 2005 | | Percent of Class |
|---|---|---|---|
| Barclays Global Investors, NA, et al | 320,052,009 | (1) | 5.2% |
| Gordon E. Moore, Director Emeritus and Chairman Emeritus of the Board | 173,992,357 | | 2.8% |
| Andrew S. Grove, Director and Chairman of the Board | 10,844,564 | (2) | ** |
| D. James Guzy, Director | 10,472,352 | (3) | ** |
| Craig R. Barrett, Director and Chief Executive Officer | 6,316,670 | (4) | ** |
| Paul S. Otellini, Director, President and Chief Operating Officer | 2,494,744 | (5) | ** |
| Arvind Sodhani, Senior Vice President and President, Intel Capital | 1,940,509 | (6) | ** |
| Andy D. Bryant, Executive Vice President and Chief Financial and Enterprise Services Officer | 1,302,179 | (7) | ** |
| Sean M. Maloney, Executive Vice President and General Manager, Mobility Group | 1,207,589 | (8) | ** |
| F. Thomas Dunlap, Jr., Former Senior Vice President and General Counsel | 696,806 | (9) | ** |
| Jane E. Shaw, Director | 303,695 | (10) | ** |
| David B. Yoffie, Director | 291,400 | (11) | ** |
| David S. Pottruck, Director | 119,350 | (12) | ** |
| E. John P. Browne, Director | 116,600 | (13) | ** |
| Reed E. Hundt, Director | 72,000 | (14) | ** |
| John L. Thornton, Director | 12,500 | (15) | ** |
| Charlene Barshefsky, Director | 6,700 | (16) | ** |
| All directors, director emeritus and executive officers as a group (24 individuals) | 218,344,636 | (17) | 3.5% |

** Less than 1%.

(1) Based on information set forth in a Schedule 13G filed with the Securities and Exchange Commission on February 14, 2005 by Barclays Global Investors, NA and certain related entities, reporting sole power to vote or direct the vote over 283,214,158 shares and sole power to dispose or direct the disposition of 320,052,009 shares.

(2) Includes outstanding options to purchase 2,927,696 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(3) Includes outstanding options to purchase 235,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 10,040,350 shares held by the Arbor Company, of which Mr. Guzy is a general partner.

(4) Includes outstanding options to purchase 3,159,196 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(5) Includes outstanding options to purchase 1,802,586 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,295 shares held by Mr. Otellini's spouse, and Mr. Otellini disclaims beneficial ownership of these shares.

(6) Includes outstanding options to purchase 1,165,420 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 4,000 shares held by Mr. Sodhani's mother.

(7) Includes outstanding options to purchase 1,152,130 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,600 shares held by Mr. Bryant's son and 1,000 shares held by Mr. Bryant's daughter, and Mr. Bryant disclaims beneficial ownership of these shares.

(8)  Includes outstanding options to purchase 1,129,946 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(9)  Includes outstanding options to purchase 456,312 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(10)  Includes outstanding options to purchase 155,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 148,695 shares held by a family trust for which Dr. Shaw shares voting and disposition authority.

(11)  Includes outstanding options to purchase 155,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(12)  Includes outstanding options to purchase 95,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Includes 800 shares held by Mr. Pottruck's daughter and 2,000 shares held by Mr. Pottruck's son. Includes an aggregate of 13,400 shares held in two separate annuity trusts for the benefit of Mr. Pottruck's brother for which Mr. Pottruck shares voting and disposition authority.

(13)  Includes outstanding options to purchase 115,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date. Also includes 1,596 shares held by Lord Browne for which he shares voting and disposition authority.

(14)  Includes outstanding options to purchase 65,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(15)  Includes outstanding options to purchase 12,500 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(16)  Includes outstanding options to purchase 5,000 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

(17)  Includes outstanding options to purchase 17,933,150 shares, which were exercisable as of February 25, 2005, or which become exercisable within 60 days from such date.

## STOCK PRICE PERFORMANCE GRAPH

This section includes a line graph comparing the cumulative total stockholder return on our common stock with the cumulative total return of the Dow Jones Technology Index and the Standard & Poor's 500 Index for the five fiscal years ended December 25, 2004. The graph and table assume that $100 was invested on December 23, 1999 (the last day of trading for the fiscal year ended December 25, 1999) in each of our common stock, the Dow Jones Technology Index and the S&P 500 Index, and that all dividends were reinvested. Dow Jones and Company, Inc. and Standard & Poor's Compustat Services, Inc. furnished this data. Cumulative total stockholder returns for our common stock, the Dow Jones Technology Index and the S&P 500 Index are based on our fiscal year.

### COMPARISON OF FIVE-YEAR CUMULATIVE RETURN FOR INTEL, THE DOW JONES TECHNOLOGY INDEX AND THE S&P 500 INDEX



|  | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|
| Intel Corporation .......................................... | $100 | $72 | $78 | $40 | $76 | $58 |
| Dow Jones Technology Index ........................... | $100 | $64 | $47 | $29 | $42 | $43 |
| S&P 500 Index ............................................. | $100 | $92 | $82 | $63 | $80 | $90 |

## REPORT OF THE COMPENSATION COMMITTEE ON EXECUTIVE COMPENSATION

The Compensation Committee (the "Committee") administers Intel's compensation program for its executive officers. Intel's executive officers are those persons whose job responsibilities and policy-making authority are the broadest in the company. Currently, 14 of Intel's officers are designated as executive officers. In this regard, the Committee's role is to oversee Intel's compensation plans and policies, annually review and determine all executive officers' compensation, and administer Intel's equity incentive plans (including reviewing and approving grants to Intel's executive officers). The Committee's charter reflects these various responsibilities, and the Committee and the Board periodically review and revise the charter. The Board determines the Committee's membership, which is composed entirely of independent directors. The Committee meets at scheduled times during the year, and it also considers and takes action by written consent. The Committee Chairman reports on Committee actions and recommendations at Board meetings. Intel's Legal department, its Corporate Secretary, and the Compensation and Benefits Group in Intel's Human Resources (HR) department support the Committee in its work and in some cases act pursuant to delegated authority to fulfill various functions in administering Intel's compensation programs. In addition, the Committee has the authority to engage the services of outside advisers, experts and others to assist the Committee. For two of the past three years, the Committee has directly engaged an outside compensation consulting firm to assist the Committee in its review of the compensation for the executive officers. The Committee did not engage an outside firm in 2004 in connection with its work on 2005 executive compensation, but the Committee is undertaking a study during 2005 of Intel's executive compensation philosophy and design, and expects to engage outside service providers to assist in this work.

## General Compensation Philosophy

Intel's general compensation philosophy is that total cash compensation should vary with Intel's performance in achieving financial and non-financial objectives, and that any long-term incentive compensation should be closely aligned with the stockholders' interests. This philosophy applies to all Intel employees, with a more significant level of variability and compensation at risk as an employee's level of responsibility increases. Intel's employees, including its executive officers, are employed at will and do not have employment agreements, severance payment arrangements or payment arrangements that would be triggered by a "change in control" of Intel.

The Committee's review of Intel's executive compensation programs and practices includes an analysis, for each of Intel's executives, of all elements of compensation, consisting of base and variable cash compensation; stock option grants; retirement programs; and health and welfare benefits. The Committee compared these compensation components separately and in the aggregate to compensation of companies that Intel uses as its "peer groups" for these purposes (the peer groups are also referred to in this report as the "market"). Intel's peer groups consist of a cross-industry subset of Fortune 50 companies as well as a technology industry subset of companies generally considered to be comparable to Intel, most of which are included in the Dow Jones Technology Index. As a result of this review, the Committee made determinations that it believes were appropriate and reasonable for the mix of fixed and variable compensation, and linked to both individual and corporate performance for Intel's executive officers. The Committee also reaffirmed Intel's key strategic compensation design priorities: pay-for-performance, employee retention, cost management, egalitarian treatment of employees, alignment with stockholders' interests and continued focus on corporate governance. This compensation review confirmed that, in the Committee's view, Intel's executive compensation program elements individually and in the aggregate strongly support and reflect the compensation philosophy and strategic design priorities. Specifically, the review confirmed the following:

- Intel's base salaries are less than the average of Intel's peer groups. Intel's performance-based cash incentives are a higher percentage of its total cash compensation than the average for its peer groups.

- Intel's philosophy is that total cash compensation (base salaries plus performance-based cash incentives) should approximate the average of its peer groups, with the potential for higher than average total cash compensation when Intel performs well. In setting executive compensation, the Committee considered other factors, including individual and business group performance. In 2004, Intel paid some of its executives above the market average cash compensation, based on their individual and business group performance in addition to Intel's overall performance. Intel paid other executives lower than the market average total cash compensation based on their relative newness to their positions or their individual and business group performance that was lower than expected.

- As an incentive for future performance, Intel intends for its annual stock option grants to be less than the average peer group levels, and Intel intends for its annual stock option grants to provide the appropriate performance-based focus on long-term stockholder value creation.

- As another means of long-term incentive and retention, Intel grants additional stock options at approximately seven-year intervals, with vesting typically beginning five years from the grant date.

Intel's executive compensation practices reflect a higher proportion of total compensation delivered through pay-for-performance cash incentive and long-term equity compensation, equating to more compensation risk for its executives than for the executives of its peer groups. This higher risk is due to the combination of lower-than-market base salaries and the potential for higher-than-market annual pay-for-performance incentive payments and Intel's use of infrequent, long-vesting stock option grants. The higher-than-market compensation variability that Intel employs is closely linked to Intel's annual financial results through lower-than-market total cash compensation in times of poor financial performance. Conversely, in times of excellent performance, Intel's compensation variability yields higher total cash compensation, rewarding its employees for excellent performance. Intel's philosophy is to pay higher-than-market average compensation over periods of sustained excellent performance. Despite continued improved company performance in 2004, Intel's aggregate executive cash compensation remained below the average of its peer groups because Intel's compensation philosophy requires that Intel outperform the relevant market over an extended period to deliver above-market compensation.

Intel has several performance-based compensation programs in which the majority of its employees are eligible to participate. Most Intel employees who are not compensated on a commission basis participate in a broad-based variable cash incentive program.

Total compensation for the majority of Intel employees, including executive officers, consists of the following components:

- Annual cash compensation consists of base salary, an annual pay-for-performance cash incentive dependent on Intel's earnings per share ("EPS") and level of satisfaction of performance goals for the performance period, and a semiannual cash award payment based on Intel's profitability.

- Intel employees realize long-term incentive compensation through the granting of market value, time-vesting stock options. All of Intel's general full-time and part-time employees, including executive officers, are eligible to receive stock options. Stock options require Intel's stock price to appreciate in order for Intel employees to realize any benefit, thus directly aligning the interests of employees and stockholders.

- Intel employees can also acquire Intel stock through a tax-qualified employee stock purchase plan, which is generally available to all employees. This plan allows participants to buy Intel stock at a discount to the market price with up to 10% of their salary and incentives (subject to IRS limits), with the objective of allowing employees to profit when the value of Intel stock increases over time. Under applicable tax law, no plan participant may purchase more than $25,000 in market value (based on the market value of Intel stock on the last trading day prior to the beginning of the enrollment period for each subscription period) of Intel stock in any calendar year.

- Intel offers retirement benefits to U.S. employees through tax-qualified plans, including an employee-funded 401(k) Savings Plan, a discretionary company-funded Profit Sharing Plan, and a company-funded Pension Plan, and through a non-qualified supplemental deferred compensation plan for certain highly compensated employees. For employees outside the U.S., Intel offers similar retirement benefits that are consistent with local market practices.

- Intel provides health and welfare benefits for substantially all of its employees. Intel shares the cost of health and welfare benefits with its employees, the cost of which is dependent on the level of benefits coverage an employee elects. Intel's health and welfare plans are the same for its executive officers and for its other employees.

*Determining Executive Compensation*

A substantial amount of the Committee's annual work relates to the determination of compensation for Intel's executive officers, including the Chief Executive Officer (CEO). In 2004, the Committee conducted a review of industry standards and "best practices" for evaluating and setting executive compensation compared to Intel's processes. Each year, the Committee determines the annual base salary and an individual pay-for-performance incentive baseline amount which is described below (together, base salary and incentive baseline are referred to as "BSIB") for each of Intel's executive officers. In determining these amounts, the Committee reviews the peer group executive compensation information that is derived from compensation surveys. The Committee also reviews Intel's executive officers' cash compensation levels for internal consistency relative to Intel's 100 most highly paid employees. Intel does not automatically intend for its 14 executive officers to be the 14 most highly paid employees. Intel's top 100 most highly paid employees include worldwide senior leaders in many functions, such as sales, engineering, marketing, technology, legal, finance and research. The Committee does not have specific guidelines to determine where Intel's executive officers fall within the top 100, but rather uses the data to monitor that executive officer compensation is not increasing at rates significantly beyond that of Intel's other highly valued employees.

The Committee most recently determined executive compensation in February 2005, when it determined incentive payments for 2004 and set compensation amounts for 2005. In determining 2005 compensation, the Committee reviewed the total remuneration that each of Intel's executive officers could potentially receive in each of the next 10 years, under scenarios of continuing employment with the company or upon retirement from the company. Total remuneration included all aspects of the executive officer's future cash-convertible benefits, total cash compensation (base salary plus incentive) from continuing employment, the future value of stock options under varying stock price growth assumptions and including as applicable the impact of accelerated vesting upon retirement, the value of any deferred compensation and profit sharing retirement benefits, and the value of health care benefits.

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code") places a limit of $1,000,000 on the amount of compensation that Intel may deduct in any one year with respect to its CEO and each of the next four most highly compensated executive officers. Certain performance-based compensation approved by stockholders is not subject to the deduction limit. Intel's Executive Officer Incentive Plan (EOIP), provided that Intel's stockholders approve the amendment and extension as requested at the annual meeting, and Intel's stockholder-approved 2004 Equity Incentive Plan are qualified so that awards under such plans constitute performance-based compensation not subject to Section 162(m) of the Tax Code. To maintain flexibility in compensating Intel's executive officers in a manner designed to

16

promote varying corporate goals, the Committee has not adopted a policy that all compensation must be deductible. If Intel's stockholders do not approve the amendment and extension of the EOIP, any incentive payments to the top five most highly compensated executives will not be tax-deductible in 2005, or until such time as an incentive plan is approved by stockholders.

*Base Salary*

The Committee reviews the history of and proposals for the compensation of each of Intel's executive officers, including cash and equity-based components. In accordance with Intel's compensation philosophy that total cash compensation should vary with company performance, the Committee establishes Intel's executive officers' base salaries at levels that it believes are below the average base salaries of Intel's peer groups' executives. The Committee also determines Intel's executive officers' base salaries as a percentage of BSIB, taking into account each officer's level and amount of responsibility. As a result, a large part of each executive officer's potential total cash compensation is variable and dependent upon Intel's performance.

In general, executive officers with the highest level and amount of responsibility have the lowest percentage of their BSIB fixed as base salary and the highest percentage of their BSIB dependent on variable performance-based standards. For example, in 2004, the base salary for Dr. Barrett, Intel's Chief Executive Officer, was 50% of his total BSIB. The Committee determined Intel's other executives' base salaries in the same manner, but for 2004, their base salary as a percentage of BSIB ranged from 50% to 68%, depending on their job responsibilities. Once base salary is fixed, it does not depend on Intel's performance.

## Performance-Based Compensation

*Executive Officer Incentive Plan (EOIP)*

The EOIP is an annual cash-based pay-for-performance incentive program, and its purpose is to motivate and reward eligible employees for their contributions to Intel's performance by making a large portion of their cash compensation variable and dependent upon Intel's annual financial performance. EOIP participants have a higher proportion of their total cash compensation delivered through this pay-for-performance incentive, which equates to more compensation risk for Intel's executives than for those of Intel's peer groups due to the relative mix of lower-than-market base salary and higher-than-market annual EOIP pay-for-performance incentive amounts.

The EOIP incentive formula has three variables: (1) the executive officer's annual incentive baseline amount, (2) Intel's EPS and (3) a factor pre-established each year by the Committee (the "Performance Factor"), all of which are further explained below. The Committee sets the incentive baseline amount annually for each EOIP participant and sets the Performance Factor for all participants in the EOIP. At the end of each year, Intel multiplies the individual's incentive baseline amount by Intel's EPS for the year and the Performance Factor to calculate the actual EOIP amount for that year. The EOIP has a cap limiting each individual's incentive payment to a maximum annual limit of $5,000,000. After Intel calculates the individual incentive amounts, the Committee reviews and authorizes each participant's actual incentive payments and has the discretion to reduce (but not increase) a participant's incentive payment. The EOIP does not specify criteria that the Committee must use in exercising its discretion to reduce EOIP payments, and it also does not require the Committee to make any reductions. The Committee has often reduced the incentive amounts below what the EOIP formula would allow, and it did so for the 2004 incentive payments.

17

Intel expects that the actual EOIP payout will be greater than the incentive baseline amount, because of the multiplier effect of the formula. However, the key feature of the formula is that the multiplier and the resulting payout are intended to be closely linked to Intel's financial and operational performance for the year. From year to year, the payout is much more affected by the pay-for-performance effect of the multiplier than by any adjustment in the baseline amount. Over the past five years, the corporate average multiplier approved by the Committee for EOIP purposes has ranged from 1.66 (for 2002) to 4.59 (for 2000). For the 2004 incentive payments, the corporate average multiplier was 2.88. This substantial variability in payout can be seen in the following graph.



[1] EPS is net income divided by Intel's weighted average common shares outstanding, assuming dilution.
[2] Represents the total cash compensation average for the top six most highly compensated executive officers.

For purposes of this EOIP formula, EPS is the greater of (x) Intel's operating income or (y) Intel's net income divided by Intel's weighted average common shares outstanding, assuming dilution. The Committee may adjust Intel's operating income or its net income based on objective criteria selected by the Committee in its sole discretion and in compliance with IRS regulations. These adjustments may include, but are not limited to asset write-downs; litigation; claim judgments, settlements or tax settlements; the effects of tax law changes, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; gains or losses on investments; acquisition-related costs; and any extraordinary non-recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in Intel's annual report to stockholders for the applicable year. Operating income does not include gains or losses on equity securities or interest and other income Intel earned, and does not include a deduction for interest expense and income taxes; as a result, EPS based on operating income generally exceeds EPS based on net income.

The Committee determines the Performance Factor annually for all participants in the EOIP. When determining the annual Performance Factor, the Committee considers Intel's past financial performance, Intel's internal estimates of current year financial performance, and the competitiveness of Intel's executive officers' base salary and incentive baseline amounts compared to Intel's peer groups.

In January 2004, the Committee established individual incentive baseline amounts ranging from $100,000 to $610,000 for each of Intel's executive officers (representing a range of 32% to 50% of BSIB) and set the Performance Factor as 2.98 for the 2004 performance period, a 15% reduction from 2003, which required improved financial performance to provide incentive payouts consistent with 2003. The 2004 financial results yielded an EPS based on operating income of $1.56**, which exceeded net income per share of $1.16 and led to an EPS value, as defined, of $1.56 to be used in the formula for determining the maximum incentive amount.

However, for the 2004 performance period, the Committee exercised its discretion in February 2005 to reduce incentive payments below what would have been allowed under the EOIP. Taking into account Intel's strong egalitarian philosophy, the Committee determined that it was appropriate to limit the incentive payments to the amounts that would

---

** Operating income per share is not defined under generally accepted accounting principles and is not a deemed alternative to measure performance under GAAP. As explained above, the EOIP is based on either operating income or net income, both of which can be adjusted by the Committee at its discretion. We have presented EPS based on operating income per share solely to indicate the inputs to the EOIP formula for 2004. EPS based on operating income adds to GAAP net income per share, the per share impact of income tax expense of $2,901 million, loss on equity securities, net of $2 million and subtracts interest and other, net of $289 million.

have resulted from calculating the incentive payments under Intel's broad-based employee annual cash incentive plan. This determination resulted in a 38% average reduction from the EOIP formula calculation. Intel's broad-based plan uses a Performance Factor in its calculation, as generally described above, although Performance Factors for the broad-based plan and the EOIP may differ. Intel's broad-based plan also takes into account whether certain business groups have met their objectives over the performance period. Intel sets the goals annually and they vary from year to year. In determining incentives payable to the executive officers with responsibility for Intel's overall performance, such as the Chief Executive Officer and the President, the Committee takes into account the corporate average score on achievement of business objectives. For executive officers with specific responsibility for a particular business group, achievement scores are based on either the individual business group's score or a combination of the group's score and the corporate average score. Incentives paid to Intel's executive officers for 2004 under the EOIP were on average 20% higher than incentive payments for 2003, which is in general accordance with the intent of the EOIP to reflect the relative level of Intel's financial performance from year to year, consistent with the significant earnings growth achieved in 2004.

*Semiannual Cash Award*

Intel's semiannual cash award offers cash incentive payments to Intel employees, including executive officers, based on Intel's corporate profitability. Twice a year, Intel awards eligible employees 0.55 day of pay (calculated based on eligible earnings for the six-month period, including one-half of incentive baseline amounts as applicable) for every two percentage points of corporate pretax margin (pretax profit as a percentage of revenue), or a total payment based on 4% of net income, whichever is greater. Intel makes cash award payments in the first and third quarters of each year based on corporate performance for the preceding two quarters. The plan also has a provision for rewarding employees with an additional day of pay for each six-month period for helping Intel achieve customer satisfaction goals under its Customer Excellence Program; however, Intel did not achieve these goals in 2004. Cash award payments earned in 2004 totaled 16.9 days of pay per employee, down from 18.4 days in 2003.

*Year-End Bonus*

In 2004, the Committee approved a special Year-End Bonus for all employees that varied by geography, in recognition of employees' commitment and dedication that resulted in improved operational and financial results. Intel awarded each of its executive officers a $1,000 bonus under this special program, the same amount that Intel awarded to its other employees in the relevant geographic location.

*Retirement Plans*

Intel offers retirement benefits to its U.S. employees through tax-qualified plans including an employee-funded 401(k) Savings Plan, a discretionary company-funded Profit Sharing Plan, and a company-funded Pension Plan. Intel refers to these tax-qualified plans collectively as the Sheltered Employee Retirement Plan ("SERP"). Intel also has a non-tax-qualified supplemental deferred compensation plan for certain highly compensated employees ("SERPLUS"). For employees outside the U.S., Intel offers similar retirement benefits consistent with local market practices.

The retirement benefits under these tax-qualified plans for Intel's executive officers are the same as those available for other eligible employees in the U.S. The plans differ, as described below, but each plan (other than the Pension Plan) results in individual participant balances that reflect a combination of: (1) a differing annual amount contributed by the company or the employee, or the employee deferring a portion of his or her cash compensation; (2) the annual contributions and/or deferred amounts being invested either at the direction of the company or the employee (the same investment choices are available to all participants); and (3), as in (2), the continuing reinvestment of the investment returns until the accounts are paid out. This means that similarly situated employees, including Intel's executive officers, may have materially different account balances because of a combination of factors: the number of years that the person has participated in the plan; the amount of money contributed, or compensation deferred, at the election of the participant from year to year; and the investments chosen by the participant with regard to those plans providing for participant investment direction. Except with respect to the Pension Plan, these plans do not involve any guaranteed minimum returns or above-market returns; the investment returns are dependent upon actual investment results. When determining annual compensation for executive officers, the Compensation Committee reviewed the individuals' retirement plan balances and payout projections over a 10-year period:

The 401(k) Savings Plan in SERP provides a long-term savings vehicle that allows for pretax contributions by an employee and tax-deferred earnings. Employees may generally contribute up to 50% of eligible annual pay to the 401(k) Savings Plan, not to exceed the annual IRS limit ($13,000 for 2004). Employees at least 50 years of age by the end of 2004 were eligible to make 401(k) catch-up contributions to a maximum of $3,000. Employees direct their own investments in the 401(k) Savings Plan.

19

The Profit Sharing Plan is a defined contribution plan designed to accumulate retirement funds for Intel's employees, including executive officers, and to allow Intel to make contributions or allocations to those funds. The Profit Sharing Plan features a discretionary cash contribution determined annually by the Committee and the Chief Executive Officer. Intel's contributions made under the plan vest beginning after three years of service in 20% annual increments until the employee is 100% vested after seven years. Additional company contributions made after the seven-year period are immediately vested. For 2004, Intel's discretionary contributions (including allocation of forfeitures) to the Profit Sharing Plan for all eligible U.S. employees, including executive officers, equaled 8% of eligible salary (which includes actual incentive payments as applicable). Intel invests all of its contributions in the Profit Sharing Plan in a diversified equity portfolio.

The Pension Plan in SERP is a so-called "floor offset" pension plan, which provides pension benefits in the event that an employee's Profit Sharing Plan account balance does not offer a minimum level of retirement income as determined by a pension formula based on final average pay, Social Security covered compensation, and length of service upon separation not to exceed 35 years. If the Profit Sharing Plan account balance does not provide a minimum level of retirement income, the Pension Plan makes up the difference. The Profit Sharing Plan balance for each of Intel's executive officers is above this minimum, and so none of those individuals would receive any payments from the Pension Plan if they retired today.

SERPLUS participants can elect to defer their salary in excess of the qualified plan limit and their year-end cash incentive payment without regard to such limits. SERPLUS salary deferrals commence upon the participant's deferrals and contributions reaching the annual IRS limit in the 401(k) Savings Plan ($13,000 for 2004). Participants direct the investment of their deferrals in SERPLUS among the same investment options as are available in the 401(k) Savings Plan; thus, there is no guaranteed return. Upon enrollment, participants make a one-time irrevocable distribution election, from among several distribution options, to be effective following separation from employment. SERPLUS also has a profit sharing component that credits contributions on behalf of eligible employees that could not be credited to their individual accounts under the Profit Sharing Plan because of Tax Code limitations, particularly that found in Section 401(a)(17) governing maximum eligible compensation. SERPLUS amounts representing the profit sharing component are subject to the same vesting and investment provisions as under the Profit Sharing Plan. For 2004, where Tax Code limits applied, Intel allocated the excess, up to 8% of eligible salary, to SERPLUS for eligible employees, including executive officers. All deferral and credit balances in SERPLUS are unfunded obligations of Intel; increases and decreases based on "investment" of the balances are also unfunded amounts reflected as hypothetical returns equal to the actual returns of investments designated by a participant or the company.

## Stock Options

To reward and retain employees, Intel uses stock options as its primary long-term incentive vehicle. With Intel's strong belief in the alignment of all employees with stockholders, the Committee decided for 2004 and 2005 to continue its use of stock options for executive officers and the broad-based employee population. Intel conducted an evaluation of performance stock, including both the positive and negative consequences that could result by providing compensation through performance stock versus stock options tied to stock price improvement. Intel intends to further evaluate the use of performance stock as well as the use of other equity vehicles through the 2005 compensation study considering industry comparables, Intel's culture and best practices for driving long-term pay-for-performance.

Through May 2004, Intel had two stock option plans under which it granted stock options. Intel's stockholder-approved 1984 Stock Option Plan, as amended, expired in May 2004 and Intel generally used it for making annual grants to officers and directors as a part of its executive performance review process, and Intel also used it for infrequently granted long-term executive performance incentive and retention grants. Intel's 1997 Stock Option Plan, under which it granted the majority of its stock options, was used for stock options granted to employees other than officers and directors, and was not a stockholder-approved plan. In May 2004, Intel's stockholders approved the Intel 2004 Equity Incentive Plan (the "2004 Plan"), replacing both the 1984 and 1997 Stock Option Plans. Intel cancelled all remaining shares available in the expired 1984 Stock Option Plan and the 1997 Stock Option Plan. The 2004 Plan has a duration of two years, and each year, beginning in 2005, Intel will ask its stockholders to amend the Plan to extend the term by an additional year, which provides stockholders with more frequent opportunities to review Intel's use of equity compensation and the opportunity to approve Intel's equity incentive plan. The Board has reviewed and approved the 2004 Plan amendments for which Intel is seeking stockholder approval at the annual meeting (see "Proposal 3: Approval of Amendment and Extension of the 2004 Equity Incentive Plan"). Under the 2004 Plan, Intel's directors, executives and broad employee base are eligible to receive stock options. The 2004 Plan also permits Intel to award restricted shares or units, stock appreciation rights and performance-based awards should the Committee determine that it is appropriate to do so.

Intel's stock option programs are broad-based, and in 2004, Intel granted stock options to more than 90% of its employees. The Compensation Committee has established a policy that in any one year Intel may not grant more than 5% of the shares subject to all options granted in that year to the Chief Executive Officer and the next four most highly compensated executive officers (five in 2004). In 2004, approximately 99% of the options that Intel granted went to employees other than its top six most highly compensated executive officers; for the period 2000 to 2004, only 1.2% of all options that Intel granted went to its top five most highly compensated executive officers (top six for 2004). (See the "Option Grants in Last Fiscal Year" table under the heading "Executive Compensation.")

Annual stock option grants for executives are a key element of Intel's market-competitive total compensation. In 2004, the Committee approved annual stock option grants for Intel's executive officers. The Committee based individual grant amounts on factors such as the relative job scope, expected future contributions to the growth and development of the company, and competitiveness of grants relative to Intel's peer groups.

In general, initial grants that employees receive when they begin employment at Intel and grants subsequent to hire vest over a four-year period. Intel grants stock options at a price equal to the market value of Intel stock on the date of grant. For all employees including executives (new hires and existing employees), Intel uses pre-established quarterly dates for the formal granting of stock options during the year, with limited exceptions; these dates typically occur shortly following publication of Intel's quarterly earnings releases.

**Stockholding Guidelines**

Because the Committee believes in linking the interests of management and stockholders, the Board has set stockholding guidelines for Intel's executive officers. The holding guidelines specify a number of shares that Intel's executive officers must accumulate and hold within five years of the later of the effective date of the program or the date of appointment as an officer. The specific share requirements are based on a multiple of annual baseline total cash compensation ranging from three to five times, with the higher multiples applicable to executive officers having the highest levels of responsibility.

**Personal Benefits**

Intel seeks to maintain an egalitarian culture in its facilities and operations. Intel's officers are not entitled to operate under different standards than other employees. Intel does not provide its officers with reserved parking spaces or separate dining or other facilities, nor does Intel have programs for providing personal-benefit perquisites to officers, such as permanent lodging or defraying the cost of personal entertainment or family travel. Intel's office-building layouts are cubicle-based for all employees, including officers. Company-provided air travel for Intel's officers is for business purposes only: Intel's company-owned aircraft each hold approximately 40 passengers and are used in regularly scheduled shuttle routes between Intel's major U.S. facility locations, and Intel's use of non-commercial aircraft on a time-share or rental basis is limited to appropriate business-only travel. Intel's health care, insurance and other welfare and employee-benefit programs are the same for all eligible employees, including Intel's officers. Intel's loan programs, although modest in nature, are not available to Intel's executive officers. Intel has no outstanding loans of any kind to any of its executive officers, and since 2002, federal law has prohibited Intel from making any new loans to its executive officers. Intel expects its officers to be role models under its Corporate Business Principles, which are applicable to all employees, and Intel's officers are not entitled to operate under lesser standards.

**Company Performance and CEO Compensation**

The company's compensation program is designed to promote the achievement of corporate and business objectives. This pay-for-performance program is most clearly exemplified in the compensation of Intel's Chief Executive Officer, Dr. Barrett. The Committee determines Dr. Barrett's BSIB in the same manner as described for all executive officers. In setting compensation levels for the Chief Executive Officer, the Committee considers comparative compensation information from Intel's peer groups for the prior year. However, consistent with the Committee's general practice and discretionary authority, Dr. Barrett's 2004 salary and individual pay-for-performance incentive baseline amount were not tied directly to the comparative compensation data but set at levels believed to be below the average of Intel's peer groups. In January 2004, the Committee set Dr. Barrett's base salary at 58% of the market average and set his BSIB at 45% of the market average, with the expectation that actual cash compensation would be closer to or ahead of the market average depending on company performance as reflected in the operation of the EOIP formula.

Under the EOIP, Dr. Barrett's actual pay-for-performance incentive for 2004 (paid in 2005) was $1,756,800. This incentive, like the incentives paid to each of Intel's other executive officers under the EOIP, was less than the maximum amount payable under the EOIP formula. Although Dr. Barrett's BSIB was 45% of the average total baseline

compensation disclosed by Intel's peer groups, due to the higher variability in Intel's total compensation program, his actual cash compensation (base salary and incentive) for 2004 was 90% of the average total actual cash compensation disclosed by Intel's peer groups.

In April 2004, the Committee awarded Dr. Barrett 350,000 stock options, which become exercisable in 2005 through 2008 in 25% annual increments. These stock options expire 10 years from the grant date. In 2004, Intel also contributed $16,400 to Dr. Barrett's account under the tax-qualified retirement plan and allocated $154,300 to Dr. Barrett's account under the non-qualified retirement plan. In general, Dr. Barrett's retirement plan accounts are available to Dr. Barrett only upon retirement or termination from Intel as an employee, or upon disability or death.

In November 2004, the Board of Directors elected Paul S. Otellini as President and Chief Executive Officer and Dr. Barrett as Chairman of the Board, effective as of the 2005 annual meeting. In February 2005, the Committee approved the salary and other compensation arrangements of Mr. Otellini and Dr. Barrett, as described below, for 2005.

The Committee set Mr. Otellini's base salary for 2005 at $550,000 per year, effective as of January 1, 2005. Effective June 1, 2005 following his promotion to Chief Executive Officer, his base salary will increase to $650,000 per year. In addition to base salary, Mr. Otellini's individual incentive baseline amount for 2005 under the EOIP is currently set at $600,000. Effective June 1, 2005, his incentive baseline amount will increase to $750,000. The Committee granted Mr. Otellini a long-term executive performance stock option grant of 400,000 shares in February 2005. This grant vests in 25% annual increments beginning four years from the date of grant. Mr. Otellini has also been recommended to receive a stock option grant covering 500,000 shares in April in connection with Intel's annual stock option grant program. Annual stock option grants vest in 25% annual increments beginning one year from the date of grant.

The Committee set Dr. Barrett's base salary for 2005 at $610,000, and set his individual incentive baseline amount for 2005 under the EOIP at $700,000. As with Mr. Otellini, his actual payout under the EOIP will be determined in early 2006 based on Intel's performance for 2005. Dr. Barrett has also been recommended to receive a stock option grant covering 250,000 shares in April in connection with Intel's annual stock option grant program. As noted above, annual stock option grants vest in 25% annual increments beginning one year from the date of grant, and actual payouts under the EOIP, which will be based on Intel's fiscal 2005 results, will not be determined until early 2006.

The Committee is pleased to submit this report to Intel's stockholders and believes that Intel's pay-for-performance executive compensation sets the standard for best-in-class executive compensation practices.

**Compensation Committee:**

Reed E. Hundt, Chairman
E. John P. Browne
David S. Pottruck

# EMPLOYMENT CONTRACTS AND CHANGE IN CONTROL ARRANGEMENTS

All of our employees, including our executive officers, are employed at will and do not have employment agreements.

From time to time, we have implemented voluntary separation programs to encourage headcount reduction in particular parts of the company, and these programs have offered separation payments to departing employees. However, executive officers have not historically been eligible for any of these programs, nor do we retain executive officers following retirement on a part-time or consultancy basis. In 2002, we received a request from a stockholder to adopt a policy that, absent stockholder approval by vote, we would not pay severance to a departing executive officer in excess of 2.99 times that officer's most recent annual salary and cash incentives. We have no practice of making such payments, nor do we have any plans to do so in the future, but the stockholder still requested that we adopt the policy so as to cover any such payments that we might make in the future. Following discussions with the stockholder, the Board adopted a policy that we will seek stockholder approval for future severance agreements with senior executives that provide benefits in an amount exceeding three times the executive's base compensation. For this purpose, "future severance agreements" means any such agreements that we may enter into after adoption of this policy by the Board in February 2003, and includes employment agreements containing severance provisions, retirement agreements and agreements renewing, modifying or extending such agreements, but does not include retirement plans, deferred compensation plans, early retirement

programs, or similar plans or programs available to more than 50 employees on reasonably similar terms. "Senior executive" means any of our top five most highly compensated executives in the calendar year preceding termination of employment, and any executive listed in the compensation table in our annual proxy statement in any of the five years preceding termination of employment. "Benefits" include lump-sum cash payments (including payments in lieu of medical and other benefits) and the estimated present value of periodic retirement payments, fringe benefits and consulting fees (including reimbursable expenses) to be paid to the executive. "Benefits" does not include settlement of a legal obligation, such as a cash payment in exchange for the surrender of vested stock options, or payments to settle pending or threatened litigation. "Base compensation" shall be determined consistent with federal regulations under Tax Code Section 280G, and generally means the executive's average W-2 compensation over the five full calendar years preceding termination of employment. The Board may in its discretion revise or terminate this policy in the future, but will at that time publicly disclose any such action on its part.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

*Our Policies.* It is our policy that all employees must avoid any activity that is or has the appearance of being hostile, adverse or competitive with Intel, or that interferes with the proper performance of their duties, responsibilities or loyalty to Intel. These policies are included in our Corporate Business Principles, which cover our directors, executive officers and other employees. Each director and executive officer is instructed to always inform the Board when confronted with any situation that may be perceived as a conflict of interest, even if the person does not believe that the situation would violate our guidelines. If in a particular circumstance the Board concludes that there is or may be a perceived conflict of interest, the Board will instruct our legal department to work with our relevant business units to determine if there is a conflict of interest. Any waivers to these conflict rules with regard to a director or executive officer require the prior approval of the Board or the Audit Committee.

*NASDAQ Rules.* The NASDAQ rules defining "independent" director status also govern conflict of interest situations. Each of our directors other than Messrs. Barrett, Grove and Otellini qualifies as "independent" in accordance with the NASDAQ rules. The NASDAQ rules include a series of objective tests that would not allow a director to be considered independent if the director had certain employment, business or family relationships with the company. The NASDAQ independence definition includes a requirement that the Board also review the relations of each independent director to the company on a subjective basis. In accordance with that review, the Board has made a subjective determination as to each independent director that no relationships exist that, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director. In making these determinations, the directors reviewed and discussed information provided by the directors and Intel with regard to each director's business and personal activities as they may relate to Intel and Intel's management.

*SEC Rules.* In addition to the Intel and NASDAQ policies and rules described above, the SEC has specific disclosure requirements covering certain types of transactions involving Intel and a director, executive officer or other specified party. There was one such transaction in 2004 that requires disclosure: We retained the law firm of Wilmer Cutler Pickering Hale and Dorr LLP to perform legal services in 2004. Ambassador Barshefsky, one of our directors, is Senior International Partner of this firm. We began using Wilmer Cutler Pickering Hale and Dorr LLP before Ambassador Barshefsky was elected to the Board. In accordance with our Corporate Governance Guidelines, Ambassador Barshefsky's compensation from Wilmer Cutler Pickering Hale and Dorr LLP does not include amounts connected to payments we made to the law firm. Due to Ambassador Barshefsky's affiliation with Wilmer Cutler, the Board has established a special process which requires that use of that firm is subject to the prior approval of the Chief Executive Officer, the Board's Audit Committee and the Board. To date, we have not used the Wilmer Cutler firm in 2005.

Further, with regard to SEC rules, we have not engaged in any transaction, or series of similar transactions, since the beginning of 2004, or any currently proposed transaction, or series of similar transactions, to which Intel or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $60,000 and in which any of our directors, executive officers, nominees for election as a director, beneficial owners of more than 5% of our common stock or members of their immediate family had, or will have, a direct or indirect material interest.

In addition, none of the following persons has been indebted to Intel or its subsidiaries at any time since the beginning of 2004: any of our directors or executive officers; any nominee for election as a director; any member of the immediate family of any of our directors, executive officers or nominees for director; any corporation or organization of which any of our directors, executive officers or nominees is an executive officer or partner or is, directly or indirectly, the beneficial owner of 10% or more of any class of equity securities (except trade debt entered into in the ordinary course of business); and any trust or other estate in which any of the directors, executive officers or nominees for director has a substantial beneficial interest or for which such person serves as a trustee or in a similar capacity.

*Business Relationships.* We are a large business organization with worldwide operations, and we engage in thousands of purchase, sale and other transactions annually. We have various types of business arrangements with corporations and other organizations in which one of our directors, executive officers or nominees for director may also be a director, trustee or investor, or have some other direct or indirect relationship. We would usually enter into these arrangements in the ordinary course of our business, and they typically will involve Intel receiving or providing some good or service on a non-exclusive basis and at arms-length negotiated rates or in accordance with regulated price schedules. We do not believe that in any material circumstance either Intel or the other corporation or organization is a sole-source supplier to the other with regard to the relevant good or service. We also do not believe that in any case the director, executive officer or nominee for director receives any compensation from the other corporation or organization that is directly linked to the revenue or profits of the Intel-related business. Any revenue or profits from Intel-related business may, of course, be indirectly reflected in the overall revenue or profits of the other corporation or organization, which in turn may affect the individual's overall compensation or the value of his or her investments in the corporation or organization.

Under our Intel Capital program, we make equity investments in companies around the world to further our strategic objectives and support our key business initiatives. Our Intel Capital program generally focuses on investing in companies and initiatives to stimulate growth in the digital economy, create new business opportunities for us and expand global markets for our products. The investments may support, among other things, our product initiatives, emerging trends in the technology industry or worldwide Internet deployment. This strategic investment program helps advance our overall mission to be the preeminent supplier of building blocks to the worldwide digital economy. Many of our investments are in private companies, including development-stage companies with little or no revenue from current product offerings. We invest in companies that develop software, hardware or services supporting our technologies. Any one or more of these companies may be a supplier, vendor, customer, joint-venture partner or investment of a corporation or other organization with which one of our directors, executive officers or nominees for director, or one of their family members, is affiliated.

We have a corporate charitable donations program and have established the Intel Foundation for similar activity. Our charitable activities focus primarily on pre-collegiate mathematics, science and computer-related programs on a worldwide basis. We have a program whereby we will match certain charitable donations of individual employees up to $10,000 per employee per year. Directors and executive officers are eligible to participate in this matching program on the same terms as our other employees. It is possible that through this matching program and/or other parts of our corporate donation programs or the Intel Foundation, we may make charitable contributions to organizations at which one of our directors, executive officers or nominees for director, or one of their family members, is a director, trustee, consultant or employee.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

All members of the Compensation Committee during 2004 were independent directors, and none of them were our employees or former employees. During 2004, none of our executive officers served on the compensation committee (or equivalent), or the board of directors, of another entity whose executive officer(s) served on our Compensation Committee or Board.

## EXECUTIVE COMPENSATION

The following tables set forth the annual compensation for our Chief Executive Officer and our five other most highly compensated executive officers in 2004.

### SUMMARY COMPENSATION TABLE

| Name and Principal Position | Year | Annual Compensation | | | Long-Term Compensation Awards | All Other Compensation ($)(3) |
| | | Salary ($) | Bonus ($)(1) | Other Annual Compensation ($) | Securities Underlying Options (#)(2) | |
|---|---|---|---|---|---|---|
| Craig R. Barrett . . . . . . . . . . . . . . . . . . . . . . . . | 2004 | 610,000 | 1,844,000 | — | 350,000 | 170,700 |
| Chief Executive Officer | 2003 | 610,000 | 1,512,100 | — | 1,350,000 | 134,800 |
| | 2002 | 610,000 | 1,070,400 | — | 584,000 | 134,900 |
| Paul S. Otellini . . . . . . . . . . . . . . . . . . . . . . . . | 2004 | 450,000 | 1,359,700 | — | 300,000 | 106,400 |
| President and Chief Operating Officer | 2003 | 350,000 | 867,600 | — | 900,000 | 77,200 |
| | 2002 | 350,000 | 612,600 | — | 664,000 | 73,000 |
| Andy D. Bryant . . . . . . . . . . . . . . . . . . . . . . | 2004 | 305,000 | 913,500 | — | 200,000 | 84,600 |
| Executive Vice President | 2003 | 290,000 | 746,700 | — | 200,000 | 66,000 |
| Chief Financial and | 2002 | 280,000 | 532,300 | — | 1,332,852 | 59,900 |
| Enterprise Services Officer | | | | | | |
| F. Thomas Dunlap, Jr. (4). . . . . . . . . . . . . . . | 2004 | 270,000 | 671,200 | — | 100,000 | 69,300 |
| Former Senior Vice President | 2003 | 270,000 | 590,100 | — | 100,000 | 51,800 |
| and General Counsel | 2002 | 270,000 | 375,500 | — | 569,568 | 50,300 |
| Sean M. Maloney . . . . . . . . . . . . . . . . . . . . . . | 2004 | 250,000 | 716,000 | — | 200,000 | 63,600 |
| Executive Vice President | 2003 | 225,000 | 538,500 | — | 200,000 | 44,100 |
| General Manager, Mobility Group | 2002 | 225,000 | 325,100 | — | 1,333,707 | 46,500 |
| Arvind Sodhani . . . . . . . . . . . . . . . . . . . . . . | 2004 | 215,000 | 681,500 | — | 60,000 | 65,600 |
| Senior Vice President and | 2003 | 210,000 | 603,800 | — | 75,000 | 47,800 |
| President, Intel Capital | 2002 | 210,000 | 386,600 | — | 413,568 | 46,000 |

(1) This amount includes the annual performance incentive payments earned under the EOIP and as semiannual cash awards for 2002, 2003 and 2004. The incentive payment paid under the EOIP and the semiannual cash awards program for the second half of the relevant year are typically paid in the first quarter of the year following the year in which they were earned. See "Report of the Compensation Committee on Executive Compensation" for a description of the EOIP, the semiannual cash awards and the other major aspects of our executive compensation program. We awarded Mr. Sodhani an additional $50,000 bonus for 2004 in recognition of certain services performed during the year, and we awarded each of the executive officers a special $1,000 year-end bonus, as further described in "Year-End Bonus" in that report.

(2) Indicates the number of shares of common stock underlying options.

(3) All amounts listed in this column are composed of tax-qualified discretionary company contributions to the Profit Sharing Plan of $16,400 in 2004 ($16,000 in each of 2003 and 2002) for each of the named executives, plus discretionary company contributions made under Intel's non-tax-qualified SERPLUS. These amounts are to be paid out to the named executives only upon retirement, termination, disability or death.

(4) A portion of these grants terminated upon Mr. Dunlap's retirement from the company in January 2005.

25

*OPTION GRANTS IN LAST FISCAL YEAR*

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term ($)(4) | |
| Name | Number of Securities Underlying Options Granted (#)(1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/Share)(3) | Expiration Date | 5% | 10% |
|---|---|---|---|---|---|---|
| C. Barrett | 350,000 | 0.31 | 27.00 | 4/15/14 | 5,942,000 | 15,058,100 |
| P. Otellini | 300,000 | 0.26 | 27.00 | 4/15/14 | 5,093,100 | 12,906,900 |
| A. Bryant | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| T. Dunlap (5) | 100,000 | 0.09 | 27.00 | 4/15/14 | 1,697,700 | 4,302,300 |
| S. Maloney | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| A. Sodhani | 60,000 | 0.05 | 27.00 | 4/15/14 | 1,018,600 | 2,581,400 |

(1) Options granted to executives on April 15, 2004 are exercisable in 25% annual increments beginning on April 15, 2005.

(2) Based on a total of 115 million shares subject to options granted to employees under our option plans in 2004.

(3) Under all stock option plans, the option purchase price is equal to the market price at the date of the grant. We granted options to executives on April 15, 2004.

(4) In accordance with SEC rules, these columns show gains that could accrue for the respective options, assuming that the market price of our common stock appreciates from the date of grant over a period of 10 years at an annualized rate of 5% and 10%, respectively. For example, the options that we granted to Dr. Barrett would produce a pre-tax gain of $15,058,100 only if Intel's stock price appreciates by 10% per year for the next 10 years and rises from $27.00 to $70.02 per share before Dr. Barrett exercises his options. Such an increase in share price of 159% would result in a significant increase in Intel's aggregate market capitalization. If the stock price does not increase above the exercise price at the time of exercise, realized value to the named executives from these options will be zero.

(5) A portion of this grant terminated upon Mr. Dunlap's retirement from the company in January 2005.

*AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR*
*AND FISCAL YEAR-END OPTION VALUES*

| | | | Number of Securities Underlying Unexercised Options at December 25, 2004 (#)(1) | | Value of Unexercised In-the-Money Options at December 25, 2004 ($)(2) | |
| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Exercisable | Unexercisable | Exercisable | Unexercisable |
|---|---|---|---|---|---|---|
| C. Barrett | 384,000 | 10,667,300 | 2,666,200 | 3,142,500 | 21,771,000 | 10,636,800 |
| P. Otellini | 192,000 | 5,356,700 | 1,608,600 | 2,345,000 | 11,478,500 | 6,799,500 |
| A. Bryant | 400,000 | 5,390,100 | 852,100 | 1,714,400 | 7,181,800 | 1,942,800 |
| T. Dunlap | — | — | 866,900 | 941,800 | 7,573,200 | 1,046,100 |
| S. Maloney | — | — | 840,600 | 1,701,800 | 4,903,200 | 1,944,200 |
| A. Sodhani | 628,000 | 10,274,700 | 1,059,700 | 680,000 | 9,400,500 | 765,400 |

(1) These amounts represent the total number of shares subject to stock options held by the named executives at December 25, 2004. These options were granted on various dates during the years 1995 through 2004. Unexercisable options are those that are not yet vested.

(2) These amounts represent the difference between the exercise price of the stock options and the price of our common stock on December 24, 2004 (the last day of trading for the fiscal year ended December 25, 2004) for all in-the-money options held by the named executive. The in-the-money stock option exercise prices range from $5.71 to $20.23. These stock options were granted at the market price of the stock on the grant date.

**PENSION PLAN TABLE**

| Eligible Compensation | Years of Service | | | | |
|---|---|---|---|---|---|
| | 15 | 20 | 25 | 30 | 35 |
| $205,000 and above .......................................... | 38,537 | 51,383 | 64,229 | 77,075 | 89,920 |

The Pension Plan provides for minimum pension benefits determined by a participant's years of service credited under the plan and final average compensation (taking into account the participant's social security wage base), reduced by the participant's balance in the Profit Sharing Plan. If the pension benefit exceeds the participant's balance in the Profit Sharing Plan, the participant will receive a combination of pension and profit sharing amounts equal to the pension benefit. However, the participant will receive only the benefit from the Profit Sharing Plan if that benefit is greater than the value of the pension benefit. Compensation includes regular earnings and most cash incentives. However, maximum eligible compensation for 2004 is $205,000, in accordance with Section 401(a)(17) of the Tax Code. This amount is subject to cost-of-living adjustments in accordance with Section 415(d) of the Tax Code.

The table above illustrates the estimated annual benefits payable in the form of a straight-life annuity upon retirement at age 65 under the Pension Plan to persons in the specified compensation and years of service classifications for social security benefits. The Employee Retirement Income Security Act of 1974 limits the amount of benefits that may be paid under pension plans qualified under the Tax Code. The amounts shown are subject to reduction to the extent that they exceed such limits.

The majority of our employees, including executive officers, are not expected to receive a pension benefit upon separation. Historically, we have contributed 8% to 12.5% of participants' eligible compensation to the Profit Sharing Plan on an annual basis, which has caused the value of our employees' Profit Sharing Plan accounts to typically exceed their Pension Plan benefits, resulting in no payments being made from the Pension Plan.

For each of our employees named in the Summary Compensation Table, the years of credited service as of year-end 2004 under the Pension Plan are: Dr. Barrett (30), Mr. Otellini (30), Mr. Bryant (23), Mr. Dunlap (30), Mr. Maloney (22) and Mr. Sodhani (23). Credited service equals the actual number of years the named executives have been fully employed at Intel; our executive officers do not receive extra or bonus credits for this purpose.

## REPORT OF THE AUDIT COMMITTEE

The ultimate responsibility for good corporate governance rests with the Board, whose primary roles are oversight, counseling and direction to Intel's management in the best long-term interests of the company and its stockholders. The Audit Committee has been established for the purpose of overseeing Intel's accounting and financial reporting processes and audits of Intel's annual financial statements and internal control over financial reporting.

The Audit Committee is made up solely of independent directors, as defined in the applicable NASDAQ and SEC rules, and it operates under a written charter adopted by the Board, a copy of which is included in this proxy statement as Exhibit C. Intel intends for the composition of the Audit Committee, and the attributes of its members and its responsibilities, as reflected in its charter, to be in accordance with applicable requirements for corporate audit committees. The Audit Committee reviews and assesses the adequacy of its charter on an annual basis, and the Board last revised the charter in February 2005.

As described more fully in its charter, the purpose of the Audit Committee is to assist the Board in its general oversight of Intel's financial reporting, internal controls and audit functions. Management is responsible for the preparation, presentation and integrity of Intel's financial statements; accounting and financial reporting principles; internal controls; and procedures designed to reasonably assure compliance with accounting standards, applicable laws and regulations. Intel has a full-time Internal Audit department that reports to the Audit Committee and to management. This department is responsible for objectively reviewing and evaluating the adequacy, effectiveness and quality of Intel's system of internal controls relating, for example, to the reliability and integrity of Intel's financial information and the safeguarding of Intel's assets. Ernst & Young LLP, Intel's independent registered public accounting firm, is responsible for performing an independent audit of Intel's consolidated financial statements in accordance with generally accepted auditing standards and expressing opinions on management's assessment of the effectiveness of Intel's internal control over financial reporting and the effectiveness of Intel's internal control over financial reporting. In accordance with law, the Audit Committee has ultimate authority and responsibility to select, compensate, evaluate and, when appropriate, replace Intel's independent audit firm. The Audit Committee has the authority to engage its own outside advisers, including experts in particular areas of accounting, as it determines appropriate, apart from counsel or advisers hired by management.

The Audit Committee members are not professional accountants or auditors, and their functions are not intended to duplicate or to certify the activities of management and the independent audit firm, nor can the Audit Committee certify that the independent audit firm is indeed "independent" under applicable rules. The Audit Committee serves a board-level oversight role, in which it provides advice, counsel and direction to management and the auditors on the basis of the information it receives, discussions with management and the auditors, and the experience of the Audit Committee's members in business, financial and accounting matters.

The Audit Committee has an agenda for the year that includes reviewing Intel's financial statements, internal control over financial reporting and audit matters. The Audit Committee meets each quarter with Ernst & Young, the Chief Audit Executive and management to review Intel's interim financial results before the publication of Intel's quarterly earnings press releases. Management's and the independent audit firm's presentations to and discussions with the Audit Committee cover various topics and events that may have significant financial impact and/or are the subject of discussions between management and the independent audit firm. In addition, the Audit Committee generally oversees Intel's internal compliance programs. In accordance with law, the Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints received by Intel regarding accounting, internal accounting controls or auditing matters, including the confidential, anonymous submission by Intel's employees, received through established procedures, of any concerns regarding questionable accounting or auditing matters.

Among other matters, the Audit Committee monitors the activities and performance of Intel's internal and independent auditors, including the audit scope, external audit fees, auditor independence matters and the extent to which the independent audit firm may be retained to perform non-audit services. Intel's independent audit firm provides the Audit Committee with the written disclosures and the letter required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and the Audit Committee discusses with the independent audit firm and management that firm's independence.

The Audit Committee has reviewed and discussed with management its assessment and report on the effectiveness of Intel's internal control over financial reporting as of December 25, 2004, which it made using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework. The Audit Committee has also reviewed and discussed with Ernst & Young its attestation report on management's assessment of internal control over financial reporting and its review and report on Intel's internal control over financial reporting. Intel published these reports in its Annual Report on Form 10-K for the year ended December 25, 2004.

In accordance with Audit Committee policy and the requirements of law, the Audit Committee pre-approves all services to be provided by Ernst & Young. Pre-approval includes audit services, audit-related services, tax services and other services. In some cases, the full Audit Committee provides pre-approval for up to a year, related to a particular defined task or scope of work and subject to a specific budget. In other cases, the Chairman of the Audit Committee has the delegated authority from the Audit Committee to pre-approve additional services, and the Chairman then communicates such pre-approvals to the full Audit Committee. To avoid certain potential conflicts of interest, the law prohibits a publicly traded company from obtaining certain non-audit services from its independent audit firm. Intel obtains these services from other service providers as needed. The Audit Committee has been reducing the scope and amount of permissible non-audit services obtained from Ernst & Young and obtaining other providers for those services. This activity continued in 2004 and will continue in 2005. See "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm" for more information regarding fees paid to Ernst & Young for services in fiscal years 2004 and 2003.