IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANK D. SEINFELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 05-298 (JJF) |
| | ) | |
| CRAIG R. BARRETT, CHARLENE | ) | |
| BARSHEFSKY, E. JOHN P. BROWNE, | ) | Jury Trial Demanded |
| D. JAMES GUZY, REED E. HUNDT, | ) | |
| PAUL S. OTELLINI, DAVID S. POTTRUCK, | ) | |
| JANE E. SHAW, JOHN L. THORNTON, | ) | |
| DAVID B. YOFFIE, ANDREW S. GROVE, and | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPENDIUM OF UNREPORTED DECISIONS IN SUPPORT OF THE
OPENING BRIEF IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS VERIFIED COMPLAINT**

OF COUNSEL:

Michael D. Torpey
James N. Kramer
Susan D. Resley
Erin L. Bansal
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard St.
San Francisco, CA  94105
(415) 773-5700

Stephen C. Norman (#2686)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box. 951
Wilmington, DE  19899-0957
(302) 984-6000

Attorneys for defendants Craig R. Barrett,
Charlene Barshefsky, E. John P. Browne, D.
James Guzy, Reed E. Hundt, Paul S. Otellini,
David S. Pottruck, Jane E. Shaw, John L.
Thornton, David B. Yoffie, Andrew S. Grove,
and nominal defendant Intel Corporation

Dated:  June 27, 2005
688004

# TABLE OF CASES

Tab

*Citron v. Fairchild Camera & Instrument Corp.*,
    C.A. No. 6085, 1988 WL 53322 (Del. Ch. May 19, 1988), *aff'd*,
    569 A.2d 53 (Del. 1989) ........................................................................................1

*Fink v. Komansky*,
    No. 03CV0388, 2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004)................................2

*Leung v. Schuler*,
    No. 17089, 2000 WL 264328 (Del. Ch. Feb. 29, 2000) .........................................3

*Levine v. Smith*,
    C.A. No. 8833, 1989 WL 150784 (Del. Ch. 1989), *aff'd*,
    591 A.2d 194 (Del. 1991) ......................................................................................4

*Lewis v. Austen*,
    C.A. No. 12937, 1999 WL 378125 (Del. Ch. June 2, 1999) ...................................5

*Lewis v. Fites*,
    C.A. No. 12566, 1993 WL 47842 (Del. Ch. Feb. 19, 1993).....................................6

*Seinfeld v. Becherer*,
    No. CA 03-5225 (D.N.J. Jan. 27, 2005) ................................................................7

*Seinfeld v. Allen*,
    No. 02 Civ. 5018, 2005 WL 1231644 (S.D.N.Y. May 25, 2005)............................8

*Shaev v. Alvord*,
    No. 034750, 2005 WL 1009721 (Mass. Super. Mar. 23, 2005) ..............................9

*Shaev v. Claflin*,
    No. 794039, 2004 WL 1381037 (Cal. App. June 21, 2004)...................................10

*Shaev v. Hampel*,
    No. 99 Civ. 10578, 2002 WL 31413805 (S.D.N.Y. Oct. 25, 2002) ......................11

*In re Tri-Star Pictures, Inc. Litig.*,
    C.A. No. 9477, 1990 WL 82734 (Del. Ch. June 14, 1990) ...................................12

# TAB 1

1988 WL 53322, Citron v. Fairchild Camera and Instrument Corp., (Del.Ch. 1988)          Page 1

*53322    14 Del. J. Corp. L. 273

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Edith CITRON, Plaintiff,
v.
FAIRCHILD CAMERA and INSTRUMENT CORPORATION, Wilfred J. Corrigan, William C. Franklin, William A. Stenson, Walter Burke, Alvin C. Rice, C. Lester Hogan, Albert Bowers, Walter J.P. Curley, Schlumberger (California) Inc., Schlumberger Technology Corporation and Schlumberger Limited, Defendants.

Civ. A. No. 6085.
May 19, 1988.

Joseph A. Rosenthal, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Anthony L. Tersigni, and Richard N. Gray, of Meyers, Tersigni, Lurie, Feldman & Gray, and Marian Probst Rosner, of Wolf Popper Ross Wolf & Jones, New York City, for plaintiff.

Michael D. Goldman, Donald J. Wolfe, Jr., and Richard L. Horwitz, of Potter Anderson & Corroon, Wilmington, for defendant Fairchild Camera and Instrument Corporation.

H. Murray Sawyer, Jr., and John J. Schreppler, of Sawyer & Akin, P.A., Wilmington, and Kathleen M. Comfrey, Joseph P. Cyr, W. Foster Wollen, and Jack G. Stern, of Shearman & Sterling, New York City, for defendants William C. Franklin, William A. Stenson, Alvin C. Rice, Albert Bowers and Walter J.P. Curley.

Steven J. Rothschild, Andrew J. Turezyn, and Andre Bouchard, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendants Wilfred J. Corrigan and C. Lester Hogan.

Richard R. Cooch, of Cooch & Taylor, Wilmington, and Albert J. Beveridge, III, and Brenda Mallory, of Beveridge & Diamond, P.C., Washington, D.C., for defendant Walter Burke.

MEMORANDUM OPINION

ALLEN, Chancellor.

**1    This too lengthy opinion reflects decision on the merits of a stockholder class action that was tried for ten days last spring. The case was brought on behalf of all stockholders of Fairchild Camera and Instrument Corporation ("Fairchild" or "the Company") who sold their shares to Schlumberger (California), Incorporated ("Schlumberger") pursuant to a May 29, 1979 tender offer or had them converted into cash in the subsequent merger of Schlumberger into Fairchild on September 29, 1979. Defendants in the suit are Fairchild Camera and its directors as of May 4, 1979, excepting one. (FN1)

Plaintiff alleges that the directors violated their fiduciary duties of good faith and due care in recommending Schlumberger's offer to Fairchild's shareholders and, in particular, that they violated a duty to conduct an auction of the Company and to maximize the price to be received by shareholders. Plaintiff also alleges that all defendants breached a duty of candor by omitting certain information from Schlumberger's May 29, 1979 offer to purchase, arguing that Fairchild, as successor to Schlumberger, is liable for Schlumberger's alleged knowing participation in the directors' breach of fiduciary duty. Plaintiff alleges that Wilfred J. Corrigan, the then chairman of Fairchild, in particular, breached his fiduciary duties in order to promote his own self-interest. Finally, plaintiff alleges that the Notice of Merger was defective because it did not disclose the results of a post-tender offer asset valuation and that the merger was unfair. Accordingly, plaintiff seeks an award of damages of $14 per share (plus interest) to the plaintiff class and an accounting from Corrigan for personal gains on the transaction.

I.

Based upon a preponderance of the admissible testimony, I find the relevant facts to be as follows.

*The Fairchild Board of Directors*

Throughout the relevant period, Fairchild's board of directors was comprised predominately of experienced businessmen who were not officers or employees of the Company. Only two directors were employees of Fairchild during this period. Wilfred J. Corrigan joined the management of Fairchild in 1968, became President, Chief Executive Officer ("CEO") and a director in 1974, and became Chairman of the Board in 1977. Dr. C. Lester Hogan, a former president and CEO, became a director in 1968. In May of 1979, he was Vice-Chairman of the Board

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

and was a full-time employee of the Company. As of June 1, 1979, he was in a limited employment (semi-retired) status.

Although the remaining directors were "outsiders," most of them had long been deeply involved with the Company. Walter Burke represented a major shareholder, Sherman Fairchild Foundation of which he was the President. He joined the Fairchild Board in 1960 and had served as chairman during the period 1971-75. During the period relevant to this case, the Foundation held approximately 11 1/2% of Fairchild's outstanding stock. (FN2)

Roswell Gilpatric, a highly experienced and respected corporate attorney began advising Fairchild as outside counsel in 1942. In 1966, he became a Fairchild director. He served as Chairman of the Board from 1975 to 1977. In 1979, he was a member of the executive and compensation committees. Mr. Gilpatric had served on a number of boards of large corporations, including one (CBS, Inc.) that had recently been the target of a hostile takeover effort. Gilpatric was not named as a defendant in this action.

**2    Both William C. Franklin, a Fairchild director since 1936, and William A. Stenson, a director since 1967, had extensive experience in commercial and investment banking.

In 1976, Dr. Albert Bowers, President, CEO and Chairman of a large California-based pharmaceutical company, joined the board at the suggestion of Mr. Corrigan. Also in 1976, Mr. Walter J.P. Curley, former Ambassador to Ireland, became a director. He was originally suggested by Gilpatric. Mr. Alvin C. Rice, who had been a senior officer at the Bank of America, joined the Fairchild board in 1977. He was identified as a potential board member by Corrigan.

Finally, Mr. Louis Polk, former president of MGM, became a director in 1968. Since he did not stand for re-election at the annual shareholders' meeting on May 4, 1979, he retired from the Board on that date. Consequently, he did not participate in board meetings after May 3, 1979. (FN3)

The Board met monthly. An informal session, lasting several hours, frequently occurred the evening before the meeting. In the formal Board sessions, which normally lasted from two to four hours, it was the Board's regular practice to hear a report, from the chief financial officer, of the results of current operations and projections for the remainder of the

year and, occasionally, beyond. (FN4) The Board also periodically visited Fairchild's domestic and foreign plants. The Fairchild Board was not dominated or controlled by any individual director, although certain of the directors were more active than others.

*Fairchild's Performance*

Although Fairchild had been one of the pioneers of the semiconductor (FN5) industry, by the mid-70s, a number of factors had adversely affected the Company's performance. It had lost a number of key employees who left to form their own competing--and successful--companies. The departure of employees in the highly technical semi-conductor industry, created a continuing source of concern to management and the Board. Moreover, Fairchild had apparently not made adequate capital and research and development expenditures. Shortly after the semi-conductor industry suffered two major recessions (one in 1970 and one in 1974-75), foreign competition, particularly from the Japanese, increased. Finally, in the late 1970s, Fairchild was still suffering losses from an ill-fated diversification into the consumer products area (*e.g.*, digital watches). As a result, Fairchild's performance during the 1970s was erratic. Its ranking in the industry slipped. (FN6)

As the industry became increasingly competitive and as unnegotiated merger activity in general began to increase, the Board began to educate itself on preparations for and responses to unsolicited efforts to acquire Fairchild. In 1977, Nelson Stone, Fairchild's General Counsel, reviewed for the Board its responsibilities and such defensive measures as staggered boards and supermajority voting requirements. In April of the following year, management retained Kidder, Peabody & Co. ("Kidder Peabody") to analyze Fairchild's financial position and to advise it with respect to potential proposals for its acquisition.

**3    At that time, there were no specific indications that an unsolicited offer for Fairchild would be made. The Board did not adopt any preventative or defensive measures as a result of the Kidder Peabody presentation.

*Interest in Acquiring Fairchild*

Specific indications that Fairchild was a candidate for acquisition did, however, emerge some months later. In the first few months of 1979, trading activity

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

in the company's stock increased, as did its price (from approximately $29 per share in the period between January and March 1 to in excess of $45 per share in early April). At the same time, members of the Board became aware of rumors in the financial community and the financial press that Fairchild might become an acquisition target. On February 21, 1979, Felix Rohatyn of Lazard Freres & Co. ("Lazard") contacted Roswell Gilpatric to indicate that one of Rohatyn's clients, not identified at that time, was interested in negotiating a proposal to acquire Fairchild if and when the company was for sale. Gilpatric did not pursue the conversation.

Fairchild retained the firm of Wachtell, Lipton, Rosen & Katz ("Wachtell, Lipton") to render legal advice in connection with unsolicited acquisition proposals or tender offers. Kidder Peabody refused to renew its contract to advise Fairchild, stating that it was representing someone interested in acquiring Fairchild. On March 9, the executive committee of the Board approved management's proposal to retain Salomon Brothers to render financial advice. (FN7) Salomon Brothers had previously acted as Fairchild's investment adviser for other matters, and had, in that capacity, analyzed the Company's capital structure, projected operating results and long-term financial needs. (DX20). The Board also retained First Boston in a "back up" capacity. That firm also generated a detailed written financial analysis. (DX23).

*Gould's April 25 Proposal*

On April 25, 1979, Gould, Inc. ("Gould"), a manufacturer of electronic products, proposed to acquire 45% of Fairchild's outstanding stock (approximately 2,450,000 shares) for $54 cash and the remainder in exchange for Gould common stock. Mr. William T. Ylvisaker, Chairman of Gould, communicated the offer by telephone to Corrigan. Corrigan responded that, although the company was not interested in being acquired, if Gould submitted a written proposal, Corrigan would present it to Fairchild's Board. Gould delivered a written proposal to Corrigan that afternoon. It contained the following language:

We would expect Fairchild to operate as a separate subsidiary of Gould. We would anticipate appropriate representation on the Fairchild Board of Directors, and we would invite Fairchild representation on the Gould, Inc. Board of Directors. We have no plans to change the nature of Fairchild's operations, the locations of its headquarters and

principal facilities, or its present management. We expect to continue to operate Fairchild so as to retain the goodwill of its employers and customers and to maintain or improve employee benefit and compensation programs.

**4  (PX11). Neither the verbal nor the written offer specified the rate at which the Gould common would be exchanged for the Fairchild common.

On the evening of April 25, Corrigan and Nelson Stone contacted the members of the Board to inform them of the substance of the proposal and to notify them that the proposal would be considered at the next Board meeting, then scheduled for May 3.

During this time period, Ylvisaker contacted Burke twice to request a meeting. The first time, April 20, Ylvisaker did not disclose his purpose. Burke declined. In contrast, in the second conversation on April 25, Ylvisaker briefly outlined for Burke the first Gould proposal. The two then met on the morning of April 26. At that meeting, Ylvisaker stated that the move was a friendly one and asked Burke to tell Corrigan that Ylvisaker wished to discuss the proposal with him (Corrigan).

On April 27, 1987, representatives of management met with lawyers from Wachtell Lipton and investment bankers from Salomon Brothers. Management reviewed the recent communications with Gould. Legal counsel reviewed with management the responsibilities of the directors and noted that a Gould-Fairchild combination presented significant antitrust problems. Salomon Brothers indicated that, based on the information available to it at the time, Gould's $54 per share offer appeared inadequate. Salomon Brothers also advised that the firm had to be in a position to deliver information immediately to other potential acquirors should a tender offer surface. Although not authorized to contact alternative buyers at that time, Salomon Brothers started assembling information for a "white knight book" and developing a list of potential acquirors as part of its responsibility. At or before the April 27 meeting, Salomon Brothers and Wachtell Lipton advised Fairchild that, in the event it received an unsolicited proposal, it should designate one person to act as a "clearinghouse" for proposals and inquiries related to proposals. Finally, at the April 27 meeting, management, particularly Corrigan, expressed unequivocally its opposition to the $54 Gould proposal.

Immediately following Fairchild's receipt of the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

$54 Gould proposal, the Investment Committee of the Fairchild Foundation ("Foundation") retained the investment firm of Dillon, Read & Co., Inc. ("Dillon Read") independently to advise the Foundation regarding the Gould proposal and any related developments. It was the opinion of Mr. Nicholas Brady of Dillon Read that the first Gould proposal at $54 per share was inadequate and that the exchange of Fairchild stock for Gould stock in the second phase of the transaction was a bad deal for the Foundation.

Also immediately following Gould's April 25 offer, a Fairchild "Company Private" evaluation of Gould reported that:

**5   Gould's policy regarding acquisitions is to break up the existing organization and to fit the acquired company's operations into Gould's existing divisions. Few members of the acquired company's top management have remained with Gould under this system.

(PX14 at A001631).

Shortly after the first Gould proposal was publicly announced, Felix Rohatyn again called Gilpatric, identified Schlumberger as the Lazard Freres client interested in Fairchild, and arranged a meeting between representatives of the two companies. On May 1, 1979, those representatives met and decided to explore an acquisition of Fairchild by Schlumberger.

*The May 3, 1979 Fairchild Board Meeting*

On May 3, 1979, at its regular monthly meeting and with all ten directors in attendance, the Fairchild Board considered the $54 Gould proposal. Nelson Stone reviewed the terms of the proposal. The Vice-President, Treasury and Corporate Development, summarized Fairchild's financial position and future prospects. Representatives of Salomon Brothers opined that the proposal was inadequate from a financial standpoint. Higgins (of Salomon Brothers), reviewing the comparative acquisition financial data generated by his firm and supplied to the board (DX 34), stated that the proposed price did not represent a substantial premium over the industry average. In evaluating the Gould proposal, Salomon Brothers assumed that the Gould common stock to be exchanged for Fairchild stock in the second-step merger would have a market value of $54 and could immediately be converted into cash. Salomon Brothers had also used, in preparing its materials, Fairchild's original earnings estimates for 1979 of

$6.30 per share. (FN8) In Salomon Brothers' opinion, Fairchild's business was "healthy" and a price higher than $54 could be obtained.

Wachtell, Lipton reported that the possible acquisition of Fairchild by Gould raised substantial antitrust issues and that there was a substantial legal question as to whether Gould's conduct prior to its first proposal to Fairchild violated the securities laws. It was also noted that the integrity of Gould's management would be in issue if Gould proceeded unilaterally with a tender offer and raised questions regarding the adequacy of Gould's public disclosure of two consent decrees relating to Gould's acquisition of I-T-E Corporation and a real estate transaction between Gould and certain of its officers.

At the May 3 meeting, Mr. Corrigan presented management's opinion that the $54 per share price was inadequate and that it was not time to sell the company because Fairchild would be more prosperous in the future. Mr. Corrigan also expressed his own strong reservations about a combination with Gould. In particular, he expressed concern that Fairchild personnel would not fit into what he characterized, according to one witness, as a "highly centralized monolithic organization." Corrigan clearly was not pleased by Gould's proposal.

As a result of the advice of its investment banker and legal counsel, and as a result of the adverse impact of the uncertainties created by the takeover proposal on personnel in particular, and on customers and suppliers as well, the Board, after deliberating further in executive session, voted unanimously to reject the offer and authorized management to commence litigation if necessary.

**6   The annual meeting of the shareholders of Fairchild took place on May 4, 1979. The shareholders reelected all the incumbent directors except for Louis F. Polk, Jr., who had had a social relationship with Ylvisaker and was not renominated.

*A Second Gould Proposal*

On May 7, 1979, Gould notified Fairchild of its intention to make a tender offer for up to 46% of Fairchild common stock at $57 cash per share. Gould's Schedule 14D-1, filed with the Securities and Exchange Commission, indicated that Gould intended, at that time, if it acquired a substantial number of shares, to propose a tax-free merger in which Fairchild's shareholders would receive "shares of Gould Common Stock or other equity securities of

Gould in exchange for their Shares." (PX 29 at 40).

The second Gould offer was considered in a telephone meeting on May 7, 1979 in which all nine directors participated. Jay Higgins reported that, in Salomon Brothers' opinion, the revised proposal was inadequate from a financial point of view. The firm evaluated the proposals as if it were a $57 per share cash offer for all of Fairchild's common stock, assuming (as it had in evaluating the first proposal) that any securities offered in the second step would be worth $57 per share of Fairchild common stock and that the Gould securities could immediately be converted into cash. Salomon Brothers believed that the $57 per share price could be improved upon, given sufficient time to negotiate with a third party. The lawyers expressed their opinion that the proposed acquisition of Fairchild by Gould raised significant antitrust and securities regulation issues. Corrigan stated that it continued to be management's position that Fairchild's future was bright and that it was not time to sell or merge the company. The directors then unanimously adopted a resolution rejecting Gould's second proposal.

*Litigation*

Shortly after Gould's second proposal was rejected, both companies initiated legal action. On May 8, 1979, Gould filed suit against Fairchild in the United States District Court for the Northern District of Illinois, alleging violations of the federal securities laws. Fairchild filed suit against Gould on May 9, 1979 in the Southern District of New York seeking to enjoin Gould from acquiring Fairchild securities. Fairchild alleged that Gould's conduct in connection with its tender offer violated disclosure provisions of federal securities laws and that the proposed combination with Gould would violate federal antitrust laws. (FN9)

*The Search for an Alternative Transaction*

Fairchild formally authorized a search for alternative transactions shortly after the May 4th annual meeting. According to Corrigan, Fairchild, concerned that Gould would use the annual meeting as a forum to gain information on Fairchild's discussions with other bidders, deliberately delayed the formalized search until after the annual meeting. By that time, Salomon Brothers had compiled financial and operations information on Fairchild in a "white knight book" (PX 27) and had prepared a list of potential bidders. All but two pages of the white knight book consisted of information that was

publicly available; those two pages contained projections subsequently disclosed in Schlumberger's May 29th Offer to Purchase (*See* PX 27, pp. 1450-51). According to Higgins, during the May 7th telephone board meeting, Salomon Brothers strongly urged the board to allow them to begin the search. Before that time, representatives of Salomon Brothers encouraged those who requested information on Fairchild to review publicly available information.

**7    Salomon Brothers contacted approximately 75 potential third-party bidders (including such companies as Minnesota Mining & Manufacturing Co., Standard Oil Co., Martin-Marietta Corp., Bendix Corp. and United Technologies Corp.); provided 20 to 25 of them with the white knight book; and engaged in substantive discussions with 10 or 12. Only a few ultimately met with Fairchild to review its business and operations. The white knight book was never given to Gould. Apparently, Gould never requested it.

Nicholas Brady of Dillon Read, who was acting for the Fairchild Foundation, also solicited prospective third-party bidders (Burke Testimony, Vol. II at 153), as did Wilfred Corrigan and Roswell Gilpatric. Corrigan contacted by telephone Robert Bosch GmbH, a German corporation which had in the past expressed interest in a partial investment in Fairchild (or another semiconductor company). Bosch, however, was not interested in acquiring Fairchild at the time. Corrigan also contacted, in late April or early May, General Electric Company ("GEC"), a British corporation engaged in a joint venture with Fairchild in England. Representatives of the two companies met in New York in early May. Subsequently, on May 13th or 14th, Corrigan met in London with the Board of Directors of GEC. The GEC board, although quite interested, considered the price range too high and the pace of competitive bidding in this country too rapid. GEC suggested, as an alternative, that it buy 25% of Fairchild's outstanding stock in order to impede a takeover. This proposal was rejected.

*Developing Schlumberger's Interest*

Ultimately, none of the many companies contacted ever made a competing bid, with the exception of Schlumberger, a potential third-party bidder whose interest Roswell Gilpatric pursued initially. Schlumberger, an oil service company, had a strong balance sheet and enormous cash resources. (Stenson Testimony, Vol. IV at 158-59). (FN10) Pursuant to the decision, on May 1, 1979, to explore

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

the feasibility of an acquisition of Fairchild by Schlumberger, representatives of the two companies (Messrs. Gilpatric and Corrigan from Fairchild; Mr. Rohatyn of Lazard Freres and M. Jean Riboud from Schlumberger) established a schedule of discussions. On May 10 and 11 representatives of Schlumberger and Fairchild attended meetings at Salomon Brothers' offices in New York. In the first of those meetings, Corrigan and Unruh made a general presentation of Fairchild to Mr. Thomas Roberts, Vice-President--Finance. Investment bankers for both companies also apparently attended. Unruh made a slide presentation of Fairchild financial data. (PX 31). Included in the slides were projected earnings per share for the years 1979, 1980 and 1981, as well as projections for those years for corporate sales and net income, return on sales and return on equity; semiconductor products revenues and operating profit; and electronic equipment revenues and operating profit. (FN11) At the second meeting, several technical people from Fairchild made a presentation on the company's technology and products. Present on behalf of Schlumberger were Roberts and a member of Schlumberger's Board.

On May 13 and 14, Schlumberger and Fairchild representatives met at Fairchild headquarters in Mountain View, California, to provide additional information to Schlumberger.

**8    Although Roberts was at that time concerned about what he perceived to be Fairchild's weakness in the MOS area (a newly emerging technological development in the semiconductor industry), strained management relationships, and inadequate investment in research and development, Rohatyn of Lazard Freres told Gilpatric on May 12 that Schlumberger would probably make an offer for Fairchild. According to Gilpatric's May 14 (Monday) memorandum, summarizing the conversation (PX 32), Rohatyn reported that a proposal by Schlumberger would involve 1) a firm agreement to buy all of the Fairchild Foundation's Fairchild Camera stock, 2) a tender offer to the shareholders, and 3) a follow-up cash merger. Gilpatric suggested that a letter of intent should address Schlumberger's intentions to 1) operate Fairchild as a separate entity, a subsidiary of Schlumberger, following the acquisition; 2) retain some or all of Fairchild's present directors on the board of the reincorporated company along with Schlumberger representatives constituting a majority; 3) retain Corrigan as president and CEO and retain present management; 4) maintain Fairchild's existing salary, compensation and benefit programs (or comparable substitutes) and

5) meet Fairchild's additional capital and research and development expenditures. Rohatyn agreed.

On May 16, meetings between Schlumberger and Fairchild representatives reconvened in Houston. Visits to various Schlumberger operations in Houston were scheduled, apparently to acquaint Fairchild with Schlumberger's operations. Present for Fairchild were Corrigan, A. James Hazel (Vice-President--Finance), and Robert Bernhard (from Salomon Brothers); Roberts, Roland Genen (director and Executive Vice President-Operations) and Jean Riboud (Chairman of the Board and President) attended for Schlumberger.

That evening, Corrigan and Riboud met privately for a short period of time. Although the two participants' accounts of that conversation are at odds in some respects, it is clear that a point of the discussion was Corrigan's future position with the company. Although Corrigan testified at trial that he did not expect to continue as CEO of Fairchild in the event of an acquisition by Schlumberger, he claims to have agreed, in order to allay Riboud's fears that he would be left without management experienced in the semiconductor industry, to stay on for a transition period. After that time period, according to Corrigan's testimony at trial, he told Riboud that the only circumstances under which he could visualize remaining were if he had a position as a director of Schlumberger. Riboud responded, according to Corrigan's testimony, that although it was not the appropriate time to discuss it, if things went well during the transition and if both sides wanted Corrigan to remain, a directorship "was in the cards." (Corrigan Testimony, Vol. VI at 112-114).

At his deposition in February of 1986, Corrigan was more emphatic. He testified that he believed that Riboud made a commitment to place Corrigan on the Schlumberger board; that Riboud later failed to honor that commitment; and that that failure in part prompted Corrigan's resignation. (Corrigan Dep. at 23-24).

**9    Riboud, who has subsequently died, had testified earlier on this subject in unrelated litigation in California. That testimony was admitted into evidence in this trial due to the unavailability of the witness, the fact that it was given under oath and subject to cross-examination by one with parallel interests to plaintiff and because it thus offered indicia of reliability. In that testimony, Riboud stated that Corrigan requested the private meeting on May 16 and asked Riboud what would happen to him.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

According to Riboud, he responded that Corrigan's future employment would not be discussed until an agreement was reached between the two companies.

I conclude, from the testimony of both participants, that Corrigan was concerned about his future employment, that he discussed his future with Riboud and that Riboud did not agree to provide Corrigan with a directorship, but, rather, to simply leave open the possibility that, if *both* Corrigan and Riboud so desired after the transition period, Corrigan could expect to serve Schlumberger in the capacity of director. At the time of the meeting, both participants had reason to be optimistic that the transaction would work out well and that in due course Corrigan would be nominated for the Schlumberger board.

No agreement between the two companies was reached by May 19. A board meeting was scheduled for May 19 and Schlumberger and Gould were each instructed to make their best offer to the Fairchild board. At a meeting on either May 16 or 17, Higgins of Salomon was told "banker to banker" by Rohatyn that Schlumberger's offer would probably be for $62 per share. Higgins response was that $62 would probably be inadequate in light of other likely economic alternatives. By May 18, Corrigan and other Fairchild Directors were aware of the $62 suggested price. Moreover, Roberts of Schlumberger was aware of rumors in the marketplace that Gould would increase its offer, that possibly other bidders were involved and that "shopping" was going on. (Roberts Dep. at 42).

*Gould's Efforts on May 18 and 19 To Win Approval*

The "economic alternative" to which Higgins referred was an improved offer from Gould. Higgins had frequently been in contact with Peter Slusser of Paine Webber, Gould's investment banker. Slusser stressed the seriousness of Gould's interest and Gould's desire to meet with Fairchild representatives. Higgins responded that, in his firm's opinion, Gould's early offers were very inadequate and that, while the lines of communication would remain open, Fairchild was not yet interested in negotiating.

Once it appeared that discussions (with Schlumberger) might produce a competing bid and the Fairchild Board meeting was scheduled for May 19, Higgins again called Gould's advisor, Slusser. Slusser again requested a meeting. Higgins refused. Higgins told Slusser that other bidders were seriously interested and that Gould should make its best offer,

stating with specificity its terms and conditions, including a description of the securities involved (if it were not an all-cash offer), before the Board meeting scheduled for Saturday, May 19. Higgins offered his assistance and asked if Gould needed anything; Slusser responded that he needed only phone numbers and that he would send a revised proposal. (Higgins Testimony, Vol. V. at 67-68).

On May 18, when Fairchild had not received Gould's revised bid, Higgins again phoned Slusser. Slusser assured Higgins that an improved offer would be forthcoming that night or the following morning. Slusser indicated that the offer would be for $70 per share in cash and preferred securities. When asked by Higgins what terms would make it worth $70 per share, Slusser said that the terms would be worked out. Higgins urged Slusser to outline precisely the terms of the offer, the type of security and any conditions. Slusser promised a comprehensive offer for the board's review and again told Higgins, in response to Higgins' query, that Gould needed nothing. (Higgins Testimony, Vol. V at 73).

**10 On the afternoon of May 18, at the urging of Gilpatric and Burke, Corrigan spoke by telephone with Ylvisaker of Gould. Corrigan told Ylvisaker that Fairchild had another bidder; that Fairchild was looking for an all-cash offer, and that, because the board meeting was scheduled for the next morning, Gould should put its best and final offer in writing. (Corrigan Testimony, Vol. VI at 121-23). Ylvisaker did not request any additional information. He assured Corrigan that someone from Gould would be in touch in a few hours.

Throughout the time that Gould was bidding for Fairchild (April 25-May 18), Corrigan and Higgins refused to negotiate directly with Gould. According to Corrigan, it was part of Fairchild's negotiating strategy to attract other bidders--it was feared that open negotiations would chill the interest of other potential bidders. (Corrigan Testimony, Vol. VI at 82, 118, 124; Corrigan Dep. at 330). *See also* Higgins Testimony, Vol. V at 149). Indeed, Corrigan testified at his deposition, in response to questions concerning his refusal to meet with Ylvisaker, that "... he was an anxious buyer and I felt that the more distance he was kept, the more anxious he would get and the higher his price would come.... [H]e was the known quantity which did not require negotiations.... This was my business judgment, that we would weaken other negotiating positions by entering into discussions with him before we had precipitated another offer at least from another suitor." (Corrigan

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1988 WL 53322, Citron v. Fairchild Camera and Instrument Corp., (Del.Ch. 1988)                    Page 8

Dep. at 336-37).

On May 18, Gould's Board of Directors authorized a proposal at $70 per share for up to 2,250,000 shares (approximately 42%) of Fairchild "subject to assurance from counsel and auditors for the Company that restrictions in the Company's loan agreements were satisfied." (DX 49). The Gould Board did not take any action approving the terms of a new issuance of preferred stock or a second-step merger. (DX 49).

Either later on the 18th or early on the 19th, Higgins received the third written Gould proposal which contained the following language:

Gould (through a subsidiary) would make a tender offer for up to 2,750,000 shares of Fairchild common stock at $70 per share in cash.... Gould would then propose a merger between Fairchild and Gould or a subsidiary of Gould in which each remaining share of Fairchild would be exchanged for one share of a new issue of Gould preferred stock, the terms of which would be negotiated by our respective investment banking representatives. We would also endeavor to work out with you an equitable means of handling your company's employee stock rights.

In addition to the sources of funds discussed in our previous offer, financial arrangements necessary prior to the commencement of the cash tender offer are expected to be made by the refinancing of Gould's real estate subsidiary, and Gould has been advised by a major institutional lender that such financing can be consummated on May 29, 1979.

**11  (DX 51). The proposal was subject to withdrawal of pending litigation and the Fairchild board's approval by Monday, May 21.

After Higgins received the letter, he spoke to Slusser about information requested earlier by Higgins that was missing from the letter. When Higgins asked why the terms of an issue of preferred were missing, Slusser replied it was an oversight; Gould could not, however, be firm about the terms because it assumed that they would be negotiated later. (Higgins Testimony, Vol. V at 117). In response to another question, Slusser assured Higgins that it was Gould's intention to negotiate a security worth $70 per share. This assurance was not included in the letter, although Slusser recognized that it was something Fairchild might consider important. (Higgins Testimony, Vol. V at 118).

*Negotiations With Schlumberger on May 18*

By the close of the business day on Friday, May 18, Fairchild was aware that it would receive a revised offer from Gould as outlined above and anticipated an offer from Schlumberger for $62 per share.    Representatives of Salomon Brothers, Wachtell Lipton and Fairchild (principally Corrigan and Gilpatric) had been in session all day. Thus, when Rohatyn invited Corrigan and Gilpatric to meet with Roberts and Riboud late in the evening on May 18, Corrigan and Gilpatric understood that it was to be their responsibility to elicit from Schlumberger the best offer that Schlumberger would make. (Gilpatric Testimony, Vol. II at 41-45;  Corrigan Testimony, Vol. VI at 124-28). Riboud and Roberts, after being informed that Fairchild expected a revised bid from Gould, had immediately requested the evening session and flown to New York to make their own point: that Schlumberger would not participate in any way in a bidding context. It would make one offer only and if it were not accepted, it would withdraw.

At the late-night meeting, Corrigan indicated that a second bidder was in the picture and that Fairchild expected a bid in the low to mid-seventies. Roberts and Riboud expressed outrage that Fairchild was entertaining competing bids.    They had earlier expressed a clear intention not to be drawn into a bidding contest and thought now that Fairchild was trying to compel that. Corrigan responded that, although he was interested in a Schlumberger bid for Fairchild, the Fairchild Board would have to take the higher offer. (Corrigan Testimony, Vol. VI at 127; Roberts Dep. at 44). Gilpatric, believing that Schlumberger would not make a high bid immediately, suggested a price of $68 per share. At the conclusion of the acrimonious meeting, no figures were mentioned by Schlumberger. Rohatyn agreed to phone Gilpatric the next morning to let him know what, if any, offer Schlumberger intended to make.

After Corrigan and Gilpatric left, Riboud, Roberts and Rohatyn decided that Schlumberger should make an offer. Although Roberts recommended $62 per share, Riboud settled on $66 per share. Earlier that day (May 18), the Schlumberger Board discussed the possible acquisition of Fairchild. After outlining the structure of a possible tender offer, Riboud suggested a price in the low to mid-sixties, a price in line with the $65 price recommended to him by Lazard Freres. (Jacquith Dep. at 10). In order to give Riboud the flexibility to determine a final price after further consideration of the transaction, the Schlumberger Board authorized a price in the range of $60 to $70

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

per share. (PX 34 at 5-6). None of the Fairchild directors were aware of this authorization. (FN12)

*The Fairchild Board Meeting of May 19*

**\*\*12** At 8:00 a.m. on May 19, Rohatyn phoned Gilpatric to communicate Schlumberger's proposal to offer $66 per share (all cash) for all of Fairchild's five million plus shares. The offer was conditioned on 1) rejection of the Gould proposal; 2) *acceptance of Schlumberger's offer by noon that day;* 3) unanimous approval by Fairchild's board; and 4) execution of an agreement and a joint public announcement before the close of business that day. Rohatyn told Gilpatric to communicate clearly to the Fairchild Board that Schlumberger would not entertain any negotiations or discussions.

Gilpatric, having been acquainted with Rohatyn for a number of years and having observed Riboud's "continental no-nonsense, no bargaining, take it or leave it" style (Gilpatric II at 46-47) "believed ... that Schlumberger meant what it said and it was a take it or leave it, $66 that day or Schlumberger was gone." (Gilpatric Testimony, Vol. II at 69). This belief was shared by other Fairchild directors (Burke Testimony, Vol. II at 172-73; Bowers Testimony, Vol. IV at 27-28; Corrigan Testimony, Vol. VI 137-38). Salomon Brothers, as well, believed that the offer, if not accepted, would be withdrawn. (Higgins Testimony, Vol. V at 91-92; Bernhard Dep. at 57). The reasonableness of this belief is fully supported by the record.

The Fairchild Board meeting began at 9:00 a.m. on May 19. Eight directors attended the meeting which lasted nearly three hours. Curley was out of the country. None of the directors were furnished with materials to review for the meeting, as the two offers were received only shortly before the meeting opened. Gilpatric outlined the terms of the Gould proposal delivered to Higgins. Gilpatric then outlined the Schlumberger proposal, a copy of which was delivered during the meeting.

Higgins of Salomon Brothers reviewed the two proposals. As to Schlumberger's proposal, Higgins reported that Salomon Brothers was of the opinion that $66 cash per share was an adequate price for the common stock of Fairchild. Higgins read the Gould proposal dated May 18, 1979 to the Board ("the Final Gould proposal"). According to Higgins, he told the board that, although the letter omitted certain terms despite Higgins' repeated requests, Gould's investment banker (Slusser of Paine Webber) had

assured him that the omission of terms was an oversight and that Gould intended to create securities, to be received by Fairchild shareholders in the second step merger, worth $70 per share (Higgins Testimony, Vol. V at 118-122). Therefore, Higgins assumed, for the purpose of evaluating the Final Gould Proposal, that Gould intended to create a security it valued at $70. Higgins told the Board that the Gould offer could not be valued because the preferred stock had not been assigned terms. Thus, the offer was subject to some negotiation risk (*i.e.,* that Gould's investment bankers might believe that certain terms would yield a greater value than Fairchild's investment bankers believed those terms would yield). Even if the terms were already assigned, timing and market risks were present, introducing the risk that the assigned terms would not actually yield the intended worth. Finally, whatever the terms, because the second step of the Gould transaction could not be consummated for as long as four months, a discount of the offer for the time value of money was appropriate. Higgins provided the directors with financial data concerning premiums paid in selected acquisitions and relative price information for Fairchild and comparative semiconductor companies (PX 38, 39). This data was extracted from a Salomon Brothers study dated May 19, 1979. (DX 36).

The uncertainty of the Final Gould Proposal was contrasted with the Schlumberger $66 all-cash offer. Higgins stated that in Salomon Brothers' opinion, $66 was an "adequate price." (PX 37 at 4). (FN13)

**\*\*13** Wachtell Lipton advised the Board that discovery in pending litigation buttressed the firm's conclusion that acquisition of Fairchild by Gould raised serious antitrust issues, while a preliminary study indicated that substantially fewer antitrust issues were raised by a Fairchild-Schlumberger combination. Nussbaum stated that the Board had sufficient information to act on the two proposals. He then described the legal duties of the directors-- essentially to exercise their business judgment in the best interests of Fairchild's stockholders in choosing between the two offers.

Corrigan presented management's persistent concern that the delay inherent in consummating the Gould transaction would have an adverse impact on retention of key employees, particularly technical employees, whose exodus would, in turn, jeopardize negotiations for the second-step merger by making Fairchild a less valuable asset. (*See* Bowers Testimony, Vol. IV at 19-20).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Thus, the Fairchild Board was concerned about a number of aspects of the Final Gould proposal. (FN14) Of greatest concern was the indefinite nature of the proposal. Director Stenson believed the omission of proposed terms of the preferred stock to be a deliberate tactical maneuver:

[O]ne thing Gould was not was fiscally naive. They were very savvy as far as the market was concerned, and certainly [Paine Webber] was, too.

And for Gould and [Paine Webber] to come to the Fairchild Board with a preferred stock without any terms attached to it was beyond my belief. It couldn't have been done as an oversight. It was obvious.

\* \* \*
\* \* \*

... And I feel certain that the reason it was proposed was to get rid of Schlumberger, to entice us to turn Schlumberger down, at which point we would have been left with one and only one suitor and a hasty retreat would have been beaten from [the] "70" offer.

(Stenson Testimony, Vol. IV at 160-163). Bowers concurred: "[Y]visaker] had [a] full opportunity at that point in time to say exactly what he was prepared to offer. He did not say what he was prepared to offer. He was hedging his bet." (Bowers Testimony, Vol. IV at 56).

The Fairchild directors were concerned about the financing contingency (*i.e.,* that part of Gould's financing of the cash portion of the offer which was to be provided by refinancing of a Gould subsidiary) in the Gould Final Proposal, even though the written proposal contained an assurance from a bank that refinancing would be completed by the date the tender offer was to commence. (*See, e.g.,* Stenson Testimony, Vol. IV at 159). During March 1979, Gould was unable to complete a private placement of a $125 million preferred stock offering. (DX 14; Burke Testimony, Vol. II at 180). (FN15) At least some of the directors were concerned, more broadly, with Gould's financial wherewithal, not simply to complete the transaction, but to sustain the capital-intensive semiconductor business after consummation of the transaction. (Burke Testimony, Vol. III at 56-57; Bowers Testimony, Vol. IV at 16-24; Stenson Testimony, Vol. IV at 163). At the May 19th meeting, Higgins noted that, assuming the preferred stock proposed to be issued had a 9% dividend rate, the dividend requirement would exceed Fairchild's earnings for the previous fiscal year. (PX 37 at 6).

The Board then went into executive session, at the conclusion of which it voted unanimously to recommend the Schlumberger proposal to the stockholders. The board considered the following factors, "among other factors," important:

**\*\*14** 1) The opinion of Salomon Brothers that the Schlumberger proposal was adequate and Salomon Brothers' inability to express an opinion either as to the value of the latest Gould proposal or as to whether such proposal was more or less adequate than the Schlumberger proposal due to the uncertainties as to the value and the terms of the proposed Gould preferred stock issue included in such proposal.

2) The opinion of the Wachtell, Lipton firm that he Schlumberger proposal ... did not appear to present antitrust issue of the seriousness involved in the Gould proposal; and

3) Fairchild management's judgment that the delay--possibly as much as four months--that would be encountered in consummating the Gould proposal could have a material adverse effect on Fairchild's operations in the meantime particularly in the hiring and retention of key personnel.

(PX 37 at 7-8). Later on May 19, Fairchild and Schlumberger executed a merger agreement and issued a joint press release according to which Fairchild would operate as a subsidiary of Schlumberger under its present management and that Schlumberger would continue present or comparable benefit programs. (PX 41).

*Completion of the Transaction*

Gould withdrew its proposal the following Monday (May 21) and issued a press release to that effect. Gould never commenced a competing tender offer. The Fairchild Board took no defensive action which would have precluded or impeded initiation of a competing bid by Gould.

Schlumberger's tender offer began on May 29 and expired on June 18. The Offer to Purchase (DX 45) disclosed Schlumberger's intention to operate Fairchild as a separate subsidiary, to continue existing management and to continue existing or comparable employee benefit programs; Schlumberger's intention to furnish stock options and/or cash in lieu of stock options and related rights held by officers and employees of Fairchild; and previously non-public

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

information. Approximately 93% of Fairchild's stock was tendered in the tender offer. The merger took place on September 28, 1979. The remaining Fairchild shares were cashed out.

Corrigan resigned as president and CEO of Fairchild in November, 1979, at Schlumberger's request. He remained, however, in a consulting status, until February, 1980, at an annual salary of $125,000. The consultation agreement contained a non-competition clause by which Corrigan was bound as long as he remained an employee.

Corrigan, as well as the other employees, was paid for all vested stock option and related rights. The options provided that any acquiror would be bound by their terms.

Against this factual setting, the plaintiffs challenge the actions of Fairchild's board of directors and Schlumberger on a number of grounds.

II.

In essence, plaintiff asserts that the board improperly favored Schlumberger during the time that a contest was, in effect, going on for control of Fairchild. It did this, it is posited, as an accommodation to Mr. Corrigan and perhaps to keep its members in office. This favoritism was displayed most clearly in the board's accepting an offer that, it is charged, was worth less to shareholders than was a clearly available alternative. The reasons offered by the board for embracing the Schlumberger proposal are, it is said, when viewed honestly, simple pretexts not deserving of credit or judicial deference. Moreover, it is claimed that the board was grossly negligent, as it is said to have not placed itself in a position to know the true or "intrinsic" value of the Company at the time it agreed to recommend its sale. All of this resulted in substantial injury. Not only did the board turn its back on the Gould proposal that was worth more, but even that deal represented, in plaintiff's view, quite a bargain. Thus, it is said that had the board negotiated a transaction that would have realized the fair value of the Company, a substantially higher price--in the low eighties--could have been achieved.

**15 The defendants answer that the evidence simply will not support this interpretation of events. They acted in good faith throughout, they assert, and with due care. Thus, even if it were true that a later review of the alternatives faced on May 19, 1979 would show the Gould offer to have been a better

one--which the defendants, of course, deny--that fact could lead to no liability. In taking this position, the director defendants thus assert that they are subject to the formidable protections of the business judgment rule and that, in these circumstances, the policy of that rule precludes liability. *See Aronson v. Lewis,* Del.Supr. 473 A.2d 805 (1984).

For the reasons that follow, I conclude that defendants are correct. A judgment dismissing the complaint with prejudice will therefore be entered.

*The Board's Good Faith*

I turn first to the question of the board's good faith. While the absence of significant financial adverse interest creates a presumption of good faith, or a prima facie showing of it, *Grobow v. Perot,* Del.Supr., No. 133, 1987 (March 15, 1988) slip op. at 13-14; *Polk v. Good,* Del.Supr., 507 A.2d 531 (1986), the question of *bona fides* may not be finally determined on that basis alone. Rather, that question calls for an *ad hoc* determination of the board's motives in this particular instance. As in other contexts, however, this inquiry into a subjective state of mind necessarily will require inferences to be drawn from overt conduct--the quality of the decision made being one notable possible source of such an inference. *See, e.g., West Point-Pepperell, Inc. v. J.P. Stevens & Co., Inc.,* Del.Ch., Allen, C., No. 9763, C.A. No. 9634 (April 8, 1988) slip op. at p. 28.

I conclude that the evidence in this case establishes that the Fairchild board was properly motivated in all that it did in response to the Gould interest in acquiring control of the Company. It acted in good faith. In so concluding, I reject as unsupported by substantial credible evidence the claim that the predominately "outside" board, which was unusually conversant with the details of the Company's business, was dominated by Mr. Corrigan with respect to those events. Corrigan did act as the principal actor in the affair for the Company, but there is no basis to conclude either that he used that special role inappropriately to manipulate the events that lead to the alternatives that the board faced on May 19, 1979, or that at that critical meeting, he interfered with exercise of independent, informed judgment by the other members of the board. Thus, even assuming, *arguendo,* that Mr. Corrigan had an animus towards Gould that motivated him towards rejecting any offer by Gould without regard to its terms, such an animus would not, on these facts, infect the motive of other board members. *Weinberger v. United Financial Corp.,* Del.Ch., No.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

5915, Hartnett, V.C. (Oct. 13, 1983).

The board appears, structurally so to speak, to have been independent,*i.e.,* it had no personal financial interest in whether Schlumberger or Gould prevailed; both bidders expressed an intention to operate the Company as an independent division; both agreed to continue present management. (FN16) Nor does a sensitive evaluation of the evidence suggest any substantial basis to conclude that the apparently disinterested nature of the board's action masked an underlying predominating motivation to favor one of the two bidders for an inappropriate reason.

**\*\*16** There may be instances in which an apparently disinterested board makes a judgment that is essentially inexplicable except on the basis of an otherwise unproven inappropriate motive--such as personal favoritism or antipathy. Such a case might arise, for example, where an apparently disinterested board rejects a higher bid in favor of a lower one, on the same terms. *See Thomas v. Kempner,* Del.Ch., C.A. No. 4138, Marvel, V.C. (March 22, 1973).

A decision made by competent directors that is not explicable on any rational ground, inevitably does raise a question of the *bona fides* of the decision makers. This principle is implicitly invoked when plaintiff asserts that there was no basis upon which a well-motivated and competent board could have chosen the Schlumberger proposal over the Gould proposition on May 19, 1979. The Gould proposal, she asserts, was for materially more money. Well-motivated, competent directors will never seek to exercise discretion to accept less when more is offered. (FN17) The evidence, however, will not support the view that competent directors acting in good faith could not proceed on the view that the Schlumberger offer was more valuable to the shareholders than the Gould proposal. It is not necessary to specify in great detail the reason why this appears so. As it seems fairly apparent, I will simply touch on the main points. The Schlumberger offer was all cash, and from a source that required no financing. It could be closed quickly. The Gould offer was in significant part paper and there had been no specifics given as to the terms of the paper. Moreover, the Gould offer, if accepted, would require some time to get cash into the shareholders' hands. Finally, there was some basis to suspect that Gould may have intentionally left itself some maneuvering room on the issue of the precise terms of its second step consideration. The board proceeded in a rational way to assess the potential present value of the Gould

proposition and to compare it to the Schlumberger offer.

In these circumstances, the board's decision to act and its decision to accept the Schlumberger proposal may not be viewed as so beyond the bounds of reasonable judgment (FN18) as to support an inference that the board was acting in bad faith in accepting that offer. If any "proof" is necessary that the board's decision to accept the Schlumberger offer, in these circumstances, was a rationally justifiable one, it is supplied by the fact that Gould did not even bother to offer its deal directly to the Fairchild stockholders in a tender offer. There were no "poison pills," asset "lockups," stock options or other defensive measures that would have impeded the success of such an offer if the stockholders would have preferred it over the all cash alternative. As the evidence indicates, however, it was not thought likely that the holders of Fairchild stock would themselves reject a $66 all cash offer now in favor of a $70 (maybe) deal that was not all cash, in the future. The board could in good faith conclude similarly. (FN19)

Accordingly, I conclude on the evidence that the Fairchild board, once it became clear that a control transaction would be forced upon the Company, acted in good faith to try to arrange and support the transaction that seemed to offer the best option for the Fairchild shareholders.

*The Board's Due Care*

**\*\*17** The requirement that a director act in good faith in pursuit of the best interest of the corporation and its shareholders is at the core of the fiduciary duty of a director. To act in good faith, however, will not alone satisfy that duty. A director must, as well, act advisedly, with due care. *See Aronson v. Lewis,* Del.Supr., 473 A.2d at 812; *Polk v. Good,* Del.Supr., 507 A.2d 531 (1986); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985); *Ivanhoe v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987). The evidence establishes that this board clearly acted in a deliberate, thoughtful way in proceeding to locate available alternatives to the Gould proposal, to negotiate a transaction and to recommend it to shareholders. The board was well-advised. It was active. It conducted a competent search for available alternatives.

On the critical day in question, May 19, the board elected to embrace the all cash $66 proposal and to reject the Gould proposal that was claimed to be worth $70. In getting to the point of that meeting, I

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

am persuaded that it acted competently (*i.e.,* in this setting, without gross negligence). It was held above that the decision to reject a purportedly higher offer on terms in favor of an all cash offer with an arguably lower value does not, on these facts, constitute a breach of the duty of loyalty. The question of value was clearly debatable. There was obviously room for the exercise of judgment on that question. But was that decision, even if it represented one rational choice that was made in good faith, nevertheless improper because it was the result of a negligent process? The detailed statement of facts recited above is, to my mind, completely inconsistent with a finding of gross negligence. The decision made was made pursuant to a highly deliberate process. Only one aspect of the matter deserves further comment.

The time for consideration of the final alternatives was short--Schlumberger said its offer would be withdrawn if not accepted on the day it was offered--and that fact deserves comment. An auction of a kind was chilled, even if not foreclosed, by the board's action of May 19. It is not altogether plain from the record that Gould might not have gone higher. (Its failure to commence a tender offer, however, may provide a basis to so conclude.) More time might have been helpful--not to permit the board to value Fairchild, for it knew its company--but it may have been helpful to determine whether a $70 Gould alternative could be made real.

Here, however, an arm's-length adversary imposed a time limit under the threat of losing its proposal. The board believed that risk to be real. I find that its belief in that regard was no sham or pretext for preferring a favored bidder. That belief forced the board to grapple with an important decision in a short period. Ordinarily, a board may not act with due care if it has not placed itself in a position to make an advised judgment. *See, e.g., Moran v. Household International, Inc.,* Del.Supr., 490 A.2d 1059, 1075 (1985); *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872 (1985). When the decision is to recommend a merger, surely a prudent judgment requires an assessment of available alternatives. Obviously, such an assessment will always take some time. But, in the world of business (as elsewhere), persons are often (or always) required to act on less than perfect or complete information. Thus, just how much information prudence requires before a decision is made is itself a question that calls for informed judgment of the kind courts are not well-equipped to make. *See Solash v. Telex,* Del.Ch., C.A. No. 9518, Allen, C. (Jan. 19, 1988) (slip op. at 21-22). In my opinion, where a disinterested board in

good faith considers the significance of the decision called for, the available information of which it and its advisors are aware and the time constraints imposed upon it, and in those circumstances, the board makes a decision that it *is* in the best interests of the corporation to act, that decision itself is entitled to the benefits of the business judgment rule.

These circumstances all appear from the evidence in this case. The board had a deadline imposed upon it; it clearly knew enough as of May 19 concerning the value of the Company to make a rational choice with respect to the matter before it. I could not conclude that it acted negligently in any respect.

*The Effects of the Business Judgment Rule in this Case*

**\*\*18** This case does not involve a self-dealing transaction. Indeed, parenthetically I will add that the relationship between Schlumberger and Fairchild was, or so the evidence indicates, wholly arm's-length; there is no basis for a claim that Schlumberger "conspired" or "participated" with the directors. (FN20) As disinterested directorial action is here challenged, the case necessarily implicates the business judgment rule. The business judgment rule is both a presumption (*i.e.,* a burden-allocating mechanism for use in litigation) and a substantive rule of law. As a presumption, the rule provides that the acts of independent directors will be*presumed* to be taken in good faith and with appropriate care. Thus, one who seeks to visit liability upon a director for injury suffered by the corporation as a result of an act of an independent board must prove that the action was grossly negligent or was not taken in an honest attempt to foster the corporation's welfare. As a substantive rule of law, the business judgment rule provides that there is no liability for an injury or loss to the corporation arising from corporate action when the directors, in authorizing such action, proceeded in good faith and with appropriate care. Thus, where independent director action is challenged and the presumption is not overcome, the substantive aspect of the rule mandates the outcome of litigation.

That is the situation in this case. As the actions attacked are not self-interested, the rule applies fully. Plaintiff has not overcome the presumption (or stated differently, has not shown a basis for liability). Therefore, the substantive element of the rule mandates judgment against plaintiff on this aspect of her claim.

III.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1988 WL 53322, Citron v. Fairchild Camera and Instrument Corp., (Del.Ch. 1988)    **Page 14**

Plaintiff also claims that defendants are guilty of disclosure violations with respect to the Offer to Purchase and the Notice of Merger.

*Schlumberger's Offer to Purchase*

Plaintiff contends that the Fairchild directors are responsible for alleged breaches of the duty of candor with respect to the Schlumberger Offer to Purchase. While plaintiff does not contend that the directors drafted the Schlumberger Offer to Purchase, she claims that they were legally responsible for its contents because it contained their recommendation to the shareholders to accept the offer. Moreover, she adds, Fairchild's inside and outsidecounsel received drafts of the Offer to Purchase. Finally, she adds, Hogan agreed during his deposition that he was responsible, as a director joining in the recommendation, to review the document.

Plaintiff Citron also alleges that Schlumberger (of whom defendant Fairchild is now a successor) is responsible for disclosure violations. Plaintiff has shown no evidence indicating that Schlumberger was a fiduciary of the Fairchild shareholders at the time of its Offer to Purchase. Not being a fiduciary, it owed no duty of candor under state law. Citron contends, however, that Schlumberger is liable because it aided and abetted the Fairchild directors in their breach of fiduciary duty. I reject on the evidence the claim that Schlumberger knowingly participated in an attempt by the Fairchild board to violate rights of shareholders.

The contention that the Fairchild directors are liable for breaching the duty of candor is also materially deficient. Since Schlumberger was an unrelated third party, the Fairchild directors did not share responsibility for its statements. Moreover, no authority has been cited in support of the interesting contention that directors have an independent duty to inform their shareholders of the truth if a third party has made a misstatement.

**\*\*19** Even assuming, however, that such a duty exists, allegations of non-disclosure relate either to claims that have not been established or to items that are not material. An item is material if a reasonable shareholder would regard it as significant in making his decision, considering the "total mix" of information made available to him. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985); *In Re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680 (1986).

Plaintiff presents a lengthy list of purported disclosure violations:

--that Fairchild's management had favored Schlumberger in the bidding for Fairchild and had not accorded Gould an equal opportunity to bid for the company;

--that Corrigan had received a secret commitment to be made a director of Schlumberger in furtherance of a friendly acquisition of Fairchild by Schlumberger;

--that Gould's proposal of May 18, 1979 was intended to have a value of $70 per share and that Fairchild's investment bankers, management and board had been so advised;

--that Schlumberger had itself authorized payment of up to $70 in cash for Fairchild's stock;

--that Salomon had informed the Fairchild board that it could not opine whether the Gould offer was worth more or less than Schlumberger's offer;

--that the Fairchild board did not know what the intrinsic value of Fairchild was;

--that no fairness opinion had been sought or given with respect to Schlumberger's offer; and

--that Fairchild's management believed that Fairchild's stock was worth $80 a share.

--that Fairchild's management had favored Schlumberger in the bidding for Fairchild and had not accorded Gould an equal opportunity to bid for the company;

--that Corrigan had received a secret commitment to be made a director of Schlumberger in furtherance of a friendly acquisition of Fairchild by Schlumberger;

(Plaintiff's Opening Brief at 47-48).

I shall specifically treat several of these "violations" in turn. First, the evidence fails to show that Schlumberger was favored in the bidding or that Gould was not given an equal opportunity. Schlumberger was not favored; many potential purchasers were courted in order to get the highest bid for Fairchild. Gould was not left out; it was encouraged to make its best offer to the board before the May 19, 1979 board meeting, and it never sought

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

information that was made available to Schlumberger.

Second, the evidence fails to establish the existence of any secret commitment to Corrigan. Instead, the deposition testimony of Riboud and the trial testimony of Corrigan refutes this accusation.

Third, it was not established that Gould's proposal credibly showed that it intended that the offer would be worth $70 per share. The proposal sent by Gould on the morning of May 19 did not describe the terms of the Gould preferred, nor did it state that the intended value was $70 per share. In no writing did Gould ever express any intention that its offer was intended to be worth $70 per share. Notably, plaintiff attacks the board because the offer "quoted Gould's May 14, 1979 letter *verbatim* " but did not indicate that Higgins had said that the offer was intended to be worth $70 per share. Since Gould had ample opportunity to state in writing an intention that the offer be worth at least $70 per share, it might reasonably be questioned how reliable any such oral statements were. Disclosure of information of this character may fairly be said to create a greater risk of inaccurate disclosure.

**20** Fourth, the fact that the Schlumberger board had authorized a price of up to $70 per share was not a fact that required disclosure. No doubt, any party to a transaction would like to know what the other side's "best offer" would be. There is, of course, no obligation for an adversary to reveal that information. Moreover, there is no evidence that the Fairchild board itself knew any such fact.

Fifth, plaintiff asserts that the offer did not show that the board failed to obtain a fairness opinion. Yet, Salomon Brothers had opined to the board that the Schlumberger offer was "adequate". While plaintiff struggles to establish a distinction between an opinion that an offer is "fair" and an opinion that an offer is "adequate," the evidence in this case does not support such a distinction.

*The Notice of Merger*

Seven percent of Fairchild's outstanding shares were not tendered. Those shares were converted into $66 in cash in a merger effectuated in the fall of 1979. The Notice of Merger was sent, along with an Information Statement, to Fairchild Shareholders on October 5, 1979. Accordingly, Citron's nondisclosure charges regarding the Notice of Merger are essentially directed against Schlumberger, which as of that time did owe fiduciary duties, including a duty of

candor, to the remaining minority shareholders.

Plaintiff charges that the Notice of Merger was fatally flawed in that it failed to disclose the results of an appraisal of Fairchild's assets as of July 1, 1979 performed by Valuation Research.  (PX 60). According to plaintiff, this appraisal shows that the Company had a value of $450 million. (FN21) In fact, page 3 of that report states the report's conclusion that the various categories of assets there listed had a total "market value" of $235,604,000 or slightly more than one half of the figure that plaintiff urged should have been disclosed. (FN22) That summary page also notes that: "We have made no investigation of and assume no responsibility for the title to or any liabilities against the property appraised."    As support for its conclusion, the appraisal report contained a section (*see* PX 60, pp. 30-38) termed "Economic Support" which contained "a financial analysis ... made to establish economic support for the appraised fair market value of the designated property." (p. 30). It is in that section that the $450 million figure that plaintiff invokes appears.    (p. 37). The financial analysis appears to be done largely, and perhaps wholly, on publicly available information. The purpose of the report was not to arrive at a fair value of the minority share (*see* p. 35), or even of shares generally. It appears to have been an effort to allocate acquisition cost among categories of assets for depreciation or other cost accounting purposes. The value placed upon the entire equity of the Company on page 37 ($450 million) was simply an opinion given to show that the appraised value of assets ($235 million), when combined with working capital ($180 million) (or $414 million in total), did not exceed this view of total enterprise financial worth. (*i.e.,* $450 million estimated value + debt of $46.2 million (p. 37) = $496.2 million). (PX 60, pp. 37-38). (Recall that at $66 per share, Schlumberger had paid about $442 million for all of the Company's 6.7 million fully diluted shares (DX 63, 68)).

I will pass over defendants' point that disclosure of "soft information" of this kind was not required in 1979 and indeed was discouraged. *Compare South Coast Service Corp. v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265 (9th Cir.1982) *with Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978 (3d Cir.1984).    They argue that they ought not be pilloried for failure to comply with a late innovation in disclosure law. It is a fair point, and while I am not sure that the adoption by this court of the *Flynn* approach (FN23) does necessarily reflect a change in the law (*compare Lynch v. Vickers Energy Corp.,*

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Del.Supr., 383 A.2d 278, 280 (1977)), (FN24) defendants' argument is surely one worthy of attention. I need not now address that question because I conclude that, in the circumstances, disclosure of the opinion was not required by the standard of the *Rosenblatt* case, 493 A.2d at 944-45.

**\*\*21.** In *Anderson Clayton,* the court held that an asset valuation was not material in light of a number of considerations, including:

[T]he facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

519 A.2d at 692 (citation omitted).

Here, the $450 million figure was produced by a firm with expertise in asset appraisals. The record does not show it to have been particularly expert with respect to the overall financial valuation of an enterprise. Moreover, there is record basis to conclude that that firm did not do a complete, or even competent, job for that larger task. (*See, e.g.,* Michel Testimony, Vol. VII, at pp. 60-61). This is no criticism of the appraiser, but a recognition of the limited purpose for which the appraisal was prepared. Given, most importantly, the fact of its particular, limited purpose, but also considering its questionable methodology and the fact that it apparently was not based upon important or dramatic information not available to the market (*compare Lynch v. Vickers, supra* ), I cannot conclude that the disclosure of this opinion, in these circumstances, was required by the exacting standard governing disclosure by fiduciaries.

For the foregoing reasons, judgment will be entered in favor of all defendants and against plaintiff. Defendants may submit an appropriate form of order on notice.

(FN1.) Also named as defendants were Schlumberger Technology Corporation ("Technology"), of which Schlumberger Cal. is a subsidiary, and Schlumberger Limited, parent of Technology. Neither entity has appeared and plaintiff has apparently conceded that neither was served.

(FN2.) Fairchild stock, when valued at $30 per share, constituted approximately 12 1/2 of the assets of

the Foundation; valued at $66 per share, Fairchild stock constituted more than 20% of the Foundation's assets.

(FN3.) The circumstances surrounding Mr. Polk's resignation are addressed *infra* at 14.

(FN4.) Gilpatric testified at trial that "of all the boards I have been on, I ... never was better informed than I was ... as a director of Fairchild." (Gilpatric Testimony, Vol. II at 11).

(FN5.) A semiconductor is a device that operates on physical principles peculiar to a class of elements (which includes silicon), considered neither metals (conductors) nor insulators. Semiconductors act as conductors at high temperatures and insulators at low temperatures. They are used in integrated circuits which are, in turn, used in various types of electronic equipment.

(FN6.) For example, Fairchild's earnings per share (on a primary basis) were as follows: 1973--$5.04; 1974--$5.17; 1975--$1.94; 1976--$2.27; 1977--$2.06; 1978--$4.48. (DX9 at A001255). The 1975 earnings were revised after an accounting change.

(FN7.) Under its retainer agreement, Salomon Brothers would receive a flat fee not to exceed $500,000 and a 5% contingent fee based on the difference between any initial offer and the price ultimately paid. (PX8).

(FN8.) That estimate was subsequently revised upwards to $7.00 per share, reinforcing Salomon Brothers' opinion that the proposal was inadequate.

(FN9.) In addition, on May 11, Fairchild asked the New York Attorney General to investigate and to schedule a hearing concerning Gould's actions in connection with its tender offer for Fairchild, in order to secure enforcement of the New York Security Takeover Disclosure Act. In particular, Fairchild alleged that Gould manipulated the market in Fairchild shares prior to announcing the tender offer and failed to disclose all material facts relating to 1) the consent order pertaining to a real estate transaction among the company and some of its directors and officers; 2) the consent order pertaining to alleged misrepresentations in Gould's purchase of I-T-E stock; and 3) Gould's plans and proposals for Fairchild following a

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

second-step merger (DX 45).

(FN10.) Stenson, an institutional investor, testified that "Schlumberger was the premier oil service company" and that it was "probably the premier industrial company in America at that time [1979] and [was] so regarded by institutional investors." (Stenson Testimony, Vol. IV at 158). He also testified that it had "cash resources ... in the billions" and "one of the strongest balance sheets in America." (*Id.* at 159).

**21_    (FN11.) PX 31 contains two sets of projections for each of these items. It is not apparent from the document when either set was generated. The table of contents, however, indicates that the more optimistic of the two was included in the slide show.

(FN12.) Indeed, Corrigan testified that Roberts' anger, expressed at the May 18th meeting, at having the price bid up "meant to me that they [Roberts and Riboud] would probably have to go back to the board for further authorization before they could move up from the $62." (Corrigan Testimony, Vol. VI at 201-01).

(FN13.) Higgins regarded "adequacy" and "fairness" as being synonymous: if in an investment banker's opinion, under better than fire sale conditions, a higher economic alternative could be developed, an offer was, by definition, "inadequate." (Higgins Testimony, Vol. V at 48-49; Higgins Dep. at 239).

(FN14.) Some of the reservations about the Final Gould Proposal expressed by the directors at trial are not treated extensively or, in some cases, explicitly, in the minutes of the May 19 Board meeting. (*See* PX 37). Plaintiff has noted that each defendant, in answer to Plaintiff's Interrogatory No. 18, stated under oath "the considerations the Fairchild board took into account in reaching its decision to accept the Schlumberger proposal and to recommend it to Fairchild's stockholders are stated in the minutes of the May 19, 1979 meeting ..." Because it is obviously impractical to transcribe verbatim all that was said in a three-hour meeting because the minutes themselves preface the factors considered important with "the following factors, *among others* ..." (PX 37 at 7) (emphasis added); and, most importantly, because the testimony of the various directors at trial and in their depositions is both credible and consistent on these points, I

reject plaintiff's implication that defendants are engaging in *post hoc* fabrication.

(FN15.) To obtain acquisition funds, Gould then executed a revolving credit and term loan agreement for that amount with twelve banks. (PX 29). Under the loan agreement, Gould was required to maintain certain financial ratios and was required to adhere to certain restrictive covenants which, among other things, limited the ability of Gould and its consolidated subsidiaries to issue certain securities and prevented Gould or any subsidiary from dissolving, liquidating or merging with or into any other corporation under certain circumstances.

(FN16.) Why the outsiders on the board, including the representative of the Foundation, were interested in assuring employee retention (*see* p. 21, *supra* ) can, from a very narrow perspective, be thought to raise a question about their motives. Without an undertaking such as Gilpatric sought, however, there may have been a real threat that the Company would lose talented managers and employees during the unsettling period while a change of ownership was negotiated. A failure then to negotiate a deal that would close would present shareholders with a risk of owning an injured corporation. Thus, the action of the independent board in seeking to protect incumbent management clearly could serve stockholder interests as well.

(FN17.) Plaintiff invokes the *Revlon* case in making this argument. I find it unnecessary to specifically treat that well-known case's holding here except to say that plaintiff is certainly incorrect to assert that that case recognized a duty on the part of directors when a corporation is "for sale," to get the highest available price. Rather, the duty can only be to try in good faith, in such a setting, to get the best available transaction for the shareholders. Directors are not insurers.

(FN18.) Or "egregious," or "irrational," or other verbal formulations attempting to convey the same idea.

(FN19.) Plaintiff's expert testified that "in practice the market will take an any and all bid for cash as opposed to a partial bid for cash ..." (Matthews Testimony, Vol. I at 132).

(FN20.) In this connection, it should be noted that I reject the assertion that Corrigan and Riboud had

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

an agreement that Corrigan would go on Schlumberger's board. Even had I concluded otherwise, I would find no conspiracy or actionable participation in a breach of duty. The independent majority of the board was not dominated by Corrigan.

(FN21.) Plaintiff somehow calculates this as approximately $80 per share. It appears to me to be about $67.80 per share ($450 / 6,700,000 fully diluted shares). *See* DX 63, 68.

**\*\*21_** (FN22.) The conclusion is restated at page 41 and the version of PX 60 in evidence contains two such pages, the second of which states a different

conclusion: $255,764.000.

(FN23.) *See In re Anderson Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 690 (1986); *Weinberger v. Rio Grande Industries, Inc.,* Del.Ch., 519 A.2d 116, 123-24 (1986).

(FN24.) That is, I regard the multi-factorial test of *Flynn* as simply one convenient checklist of the factors that will determine, in any particular instance, whether "soft information"--with all of the uncertainties and hazards that it necessarily invokes--may nevertheless rise to the level of materiality as defined in *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
(Cite as: 2004 WL 2813166 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jay FINK, derivatively on behalf of Merrill Lynch &
Co., Inc., Plaintiff,
v.
David H. KOMANSKY et al, Defendants.
No. 03CV0388 (GBD).

Dec. 8, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

*1 On January 17, 2003, plaintiff filed a Verified Shareholder Derivative Complaint ("the Complaint") against nominal defendant Merrill Lynch ("the Company"), its entire board of directors ("Director Defendants" or "the Board") and four individual former employees of Merrill Lynch ("Non-Director Defendants") for breach of fiduciary duty, gross mismanagement, corporate waste and violations of Section 14(a) of the Securities and Exchange Act ("Securities Act") from April 1998 through December 2001 ("the Relevant Period"). On May 2, 2003, defendants moved to dismiss the Complaint. In lieu of responding to defendants' motion to dismiss, on August 7, 2003, plaintiffs filed a Verified Amended Shareholder Derivative Complaint ("Amended Complaint"). Defendants now jointly move pursuant to Fed.R.Civ.P. 23.1 to dismiss the Amended Complaint because plaintiff has not pled with particularity sufficient reasons for his failure to make a pre-suit demand on the Board that would permit plaintiff to bring suit on behalf of the corporation. Defendants also move to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Defendants' motion to dismiss the Amended Complaint pursuant to Rule 23.1 is hereby GRANTED.

*BACKGROUND*

Plaintiff Jay Fink, a citizen of Nevada, is a current shareholder of Merrill Lynch common stock and was a shareholder throughout the period of alleged wrongdoing. Merrill Lynch is incorporated in the state of Delaware with its headquarters and principal place of business located in New York. Merrill Lynch is a publicly traded holding company providing investment, financing, advisory, insurance, banking and other products and services worldwide. At the time of the filing of the Amended Complaint, Merrill Lynch's board of directors was comprised of eleven members. Am. Compl. ¶ 209.

Director Defendant David H. Komansky served as Merrill Lynch's director from 1995 until his retirement on April 28, 2003. For a period of six years, Mr. Komansky also served as Chairman of the Board and Chief Executive Officer of Merrill Lynch. Director Defendant Stanley E. O'Neal was appointed Chairman of the Board in 2003 and also serves as President and Chief Operating Officer of the Company. Defendants Aulana L. Peters, John J. Phelan, Jr., Robert P. Luciano, W.H. Clark, Jill K. Conway, George B. Harvey, Heinz-Joachim Neuburger, David K. Newbigging, and Joseph W. Prueher are the remaining Merrill Lynch directors named in this action. The Non-Director Defendants, Schuyler M. Tilney, Robert S. Furst, Daniel H. Bayly, and Thomas W. Davis, are all former executives of Merrill Lynch. *Id.* at ¶ ¶ 19 -33.

The Amended Complaint alleges that because of their positions on the board of directors or as senior executives of the Company, the defendants had knowledge of "adverse non-public information about Merrill Lynch and its relationship with Enron [Corporation]," obtained by accessing "corporate documents, conversations and connections with other corporate officers and employees [,]" by attending Board or management meetings, and serving on the Board's standing committees. *Id.* In sum, the Amended Complaint alleges that in anticipation of currying favor with the Enron Corporation ("Enron"), defendants assisted in camouflaging the true financial state of affairs at Enron and caused Merrill Lynch to enter into "sham business transactions" with Enron. *Id.* at ¶ ¶ 1, 3, 77-78, 94-96, 103-04, 114. Consequently, the defendants "participated in the issuance of false and/or misleading statements regarding Enron, including the preparation of false and/or misleading SEC filings." *Id.* at ¶ ¶ 19-33, 209(n).

*2 The Amended Complaint further alleges that defendants acquiesced to, and engaged in, unlawful transactions with Enron thereby potentially exposing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
(Cite as: 2004 WL 2813166 (S.D.N.Y.))

Page 2

Merrill Lynch to liability estimated in the billions of dollars. *Id.* at ¶ ¶ 5, 7, 204, 205. Specifically, the Amended Complaint asserts that Merrill Lynch knowingly provided Enron with commercial and investment banking services to structure or finance Enron's illicit partnerships such as the off-balance sheet partnership, LJM2, used by Enron to inflate its profits and to conceal its debt and bad assets. *Id.* at ¶ ¶ 77, 95-114, 117(a)-(i), 181(a).

Moreover, it is alleged that, in their quest to win investment-banking fees from Enron, defendants pressured the Company's research analysts to issue falsified favorable reports boosting Enron's investment ratings. *Id.* at ¶ ¶ 80, 82-93. Resultantly, defendants failed in their oversight obligations by not maintaining adequate systems to monitor Merrill Lynch's dealings with Enron. *Id.* at ¶ ¶ 37-59, 209(f)-(i). Plaintiff cites as examples, Director Defendants' membership on the Board's standing committees, which are entrusted with overseeing the Company's internal communications, reviewing the financial condition and commitments of Merrill Lynch, and ensuring that Merrill Lynch's officers and directors were not improperly compensated for engaging in acts harmful to the Company. *Id.* Additionally, the Amended Complaint contends that Director Defendant Komansky in his capacity as CEO and Chairman of the Board, permitted Merrill Lynch to engage in illegal transactions with Enron. *Id.* at ¶ ¶ 94-155. The Amended Complaint also alleges two Director Defendants, O'Neal and Peters, sold a total of 631,880 shares of Merrill Lynch stock valued at $41,140,801 to Enron while they were in possession of adverse non-public information regarding the Company's interactions with Enron. *Id.* at ¶ ¶ 20, 21, 209(a). Finally, the Amended Complaint asserts that Director Defendants receive compensation for their Board membership. *Id.* ¶ ¶ 209(d)- (e)

## DEMAND REQUIREMENT

This cause of action belongs to the corporation and not the individual shareholder. Therefore, it is mandated that plaintiff make a demand on the corporation's board of directors to bring suit on behalf of the corporation. Fed.R.Civ.P. 23.1; *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991). The decision to bring a lawsuit is a business one and a corporation's board of directors has the primary responsibility of conducting the business affairs of the corporation. *See RCM Secs. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir.1991); *Elfenbein v. Gulf & Western Indus., Inc.,* 590 F.2d 445, 450 (2d Cir.1978). Thus, plaintiff's derivative suit questions

the Board's independence and ability to exercise its fiduciary obligations. *See Kaplan v. Peat Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988); *see also In Re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115 (S.D.N.Y.2000)* (quoting *Kamen,* 500 U.S. at 96) ("[A] derivative action [places] in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers." '). Requiring the plaintiff to make a pre-suit demand on the Board "afford[s] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation...." *In re Oxford,* 192 F.R.D. at 115.

### A. Demand Is Excused Where Futile.

*\*3 Because plaintiff has not made a pre-suit demand on the board of directors, he may only move forward with his derivative action if demand is excused by "extraordinary conditions" or by pleading demand futility. *Kamen,* 500 U.S. at 96 (quoting *Ross v. Bernhard,* 396 U.S. 531, 534; 90 S.Ct. 733, 736, 24 L.Ed.2d 729 (1970)); *accord Kaplan,* 540 A.2d at 730. Under Rule 23.1, when a shareholder plaintiff asserts demand was not made on the board because it would have been futile, the plaintiff must plead "with particularity ... the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed.R.Civ.P. 23 .1; *see also Lewis,* 701 F.2d at 250 n. 3 (noting that to overcome Rule 23.1's particularity requirement, pleadings must allege a particular nexus between the challenged action and the board's conduct). Rule 23.1 is an exception to the traditional and less stringent requirement of notice pleadings. *See Allison v. Gen. Motors Corp.,* 604 F.Supp. 1106, 1112 (D.Del.1985), *aff'd.* 782 F.2d 1026 (3d Cir.1985); *cf. Levener v. Saud,* 903 F.Supp. 452, 456 (S.D.N.Y.1994) ("[The] pleading burden under Rule 23.1 is ... more onerous than [what is] required to withstand a Rule 12(b)(6) motion to dismiss.") (citation omitted). Further, the futility of making a demand is determined on the basis of existing facts alleged at the time the suit is filed. *See Lewis,* 701 F.2d at 250. Although Rule 23.1 creates a procedural and federal standard as to the specificity of pleading the futility of demand, "the adequacy of those efforts is to be determined by state [substantive] law." *RCM Secs. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1330 (2d Cir.1991); *see also Kamen v. Kemper Fin. Serv.,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.E.d.2d 152 (1991).

Accordingly, the parties are in agreement that Delaware law governs the instant action. Under Delaware law, the Amended Complaint must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
(Cite as: 2004 WL 2813166 (S.D.N.Y.))

Page 3

sufficiently set forth "particularized factual allegations" establishing that a majority of the Merrill Lynch board of directors cannot properly exercise its sensible business judgment to proceed with the claim. *See, e.g., Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984) *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). Thus, the issue before this Court is whether the Amended Complaint pleads with particularity facts to create a reasonable doubt that the Merrill Lynch board of directors is so interested in the transactions the Company entered into with Enron that the majority lacks independence to impartially make a decision regarding demand futile. *See Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993) (establishing the standard for reviewing demand futility in nonfeasance derivative suits). As a threshold matter, the Amended Complaint must plead particularized facts demonstrating that a majority of the Board has either a personal material financial interest in the outcome that is different from that of the shareholders, *see Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm,* 746 A.2d at 253, or that the Director Defendants "are beholden to [an] interested director or so under the influence of [an interested director] that their discretion would be sterilized." *Rales,* 634 A.2d at 936; *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 117 (S.D.N.Y.2000).

*B. The Amended Complaint Does Not Plead With Particularity Facts Excusing Demand.*

*4 Plaintiff's entire lawsuit is based upon the allegation that someone on Merrill Lynch's board of directors or on the senior executive staff must have known or should have known of the unlawfulness of the transactions the Company entered into with Enron. Am. Compl. ¶ ¶ 37 -59, 84-86, 129-135, 142-143, 147, 156-163, 209(f)-(i). Thus, defendants failed in their oversight obligations as corporate fiduciaries. *Id.* From there, plaintiff argues that there is reasonable doubt whether the Merrill Lynch board of directors is disinterested and independent, because Merrill Lynch provided underwriting and other investment banking services to Enron, thereby aiding and abetting Enron in its unlawful conduct. *Id.* However, conclusionary allegations of fact or law not substantiated with specific facts are insufficient to support demand futility. *See Levener v. Saud,* 903 F.Supp. 452, 456 (S.D.N.Y.1994); *Richardson v. Graves,* C.A. No. 6617, 1983 WL 21109, at *2 (Del. Ch. Mar. 7, 1983). Where plaintiff has "not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing" but instead base his claim "on a presumption that employee wrongdoing

would not occur if directors performed their duty properly[,]" demand is not excused. *In re Baxter Int'l, Inc.,* 654 A.2d 1268, 1270-71 (Del. Ch.1995).

While the eighty-page, 229-paragraph Amended Complaint recounts fully the illegal transactions engaged in by the Enron Corporation, it nonetheless fails to allege with particularity *precisely* defendants' role in those illegal acts. The Amended Complaint does not lay out any specific facts demonstrating that the defendants were aware of the unlawful nature of Enron's conduct that would signal to the Board that Merrill Lynch should not do business with Enron. *Cf. In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115 (S.D.N.Y.2000) (finding plaintiff pleaded specific facts to show defendants had knowledge of false records and intentionally caused the company harm).

In his supplemental letter to the Court dated October 27, 2004 ("Pl.Suppl.Let."), plaintiff highlights the Third Interim Report of Neal Batson, a court appointed examiner in the Enron bankruptcy case to support his argument that specific allegations of Merrill Lynch's involvement in the Enron illegal schemes are sufficiently pled. *See* Pl. Suppl. Let. at 4; Am. Compl. ¶ ¶ 156-163. The Amended Complaint alleges that because the examiner's report implicates Merrill Lynch, the Company, "then it is only reasonable to conclude that Defendants breached their own fiduciary duties to the Company by allowing Merrill Lynch to aide and abet Enron's officers to breach their fiduciary duties." Am. Compl. ¶ 163. However, the allegation that Merrill Lynch's individual board members knowingly approved of the Company aiding and abetting Enron's illegal transactions "is not supported by specific facts showing ... that the board members approved of those transactions." *Simon v. Becherer,* 775 N.Y.S.2d 313, 318 (1st Dep't 2004) (applying Delaware law).

*5 There is also no allegation in the Amended Complaint demonstrating defendants had a sustained failure to exercise their oversight function. To the contrary, the Amended Complaint highlights the frequent meetings of the Board and its standing committees. *Id.* at ¶ ¶ 37, 41, 47, 51, 57. While the Amended Complaint speculates that these frequent meetings indicate that the Board had knowledge of Merrill Lynch and Enron's unlawful business dealings, the Amended Complaint is devoid of specific facts to indicate that the subject matter of these meetings were the transactions at issue. The Amended Complaint implicitly alleges that the frequency of these meetings were somehow unusual because these meetings took place during the

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

Page 4

Relevant Period. [FN1] However, there is no indication that the Board met fewer times in years outside of the Relevant Period to support this allegation. Such meetings are examples of the Board exercising its proper fiduciary obligations rather than indicative of misfeasance or malfeasance on their part. "[B]ald charges of mere failure to take corrective action are ... inadequate to demonstrate futility." *Lewis v. Graves*, 701 F.2d 245, 249 (2d Cir.1983).

> FN1. In the Amended Complaint plaintiff asserts that the wrongdoings herein alleged took place April 1998 through December 2001. Am. Compl. ¶ 1. In his Opposition Memorandum, plaintiff alleges that Merrill Lynch's "wanton" and "surreptitious" relationship with Enron "spanned approximately five years," a much longer time frame than the indicated Relevant Period. Pl.'s Opp'n Memo at 3.

The Amended Complaint further alleges that a research analyst was fired for refusing to issue favorable investment ratings about Enron. Am. Compl. ¶ ¶ 80, 82-93. Although the Amended Complaint alleges that Non-Director Defendant Schuyler Tilney sent a memorandum to the then Merrill Lynch president, Herb Allison, complaining about this research analyst, no specific allegation involves knowledge on the part of the directors. *Id.* at ¶ 84-87. The Amended Complaint implies this memorandum was the basis for the research analyst's termination because four months after the memorandum, the analyst was fired and further, the analyst stated under oath that he believes "100 percent" that Merrill Lynch fired him because of the unfavorable ratings he issued on Enron. *Id.* at ¶ 87.

The research analyst quoted in the Amended Complaint states, "I can go back over ten years really and tell you that various investment bankers had, in no uncertain terms, told me that they would seek to get me fired if I did not put a strong buy recommendation out on Enron, *this even pre-dates Merrill Lynch.*" *Id.* (emphasis added). It is unclear from this quote whether the research analyst was told this by Merrill Lynch investment bankers or this was the general attitude of investment bankers in the industry. It is not alleged whether the research analyst was told this prior to his employment at Merrill Lynch, prior to Merrill Lynch's investment banking relationship with Enron, or even prior to his alleged firing for failure to issue favorable ratings.

Plaintiff further contends that in determining the adequacy of allegations pleaded in the Amended Complaint, the Court should look to the totality of defendants' misconduct. *See* Pl.'s Opp'n. Mem. at 8 n. 10; *see also In re Cendant Corp.*, 189 F.R.D. 117, 128 (D.N.J.1999); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 118 (S.D.N.Y.2002). According to plaintiff, the Amended Complaint pleads particularized facts demonstrating that a majority of the Board lacks disinterestedness and independence: that members of the Board engaged in insider trading; that the Company's CEO and COO, O'Neal lacked independence from the Director Defendants; that certain Director Defendants have professional and personal entanglements preventing them from being independent members of the board; and that all eleven members of the Director Defendants have impending exposure to personal liability such that making a pre-suit demand on the board would lead Director Defendants to sue themselves. However, taken together, these allegations amount to mere conclusions that do not rise to the level of particularity necessary to plead demand futility.

**\*6** The standard of pleading "with particularity" means with specificity. That is, the Amended Complaint must sufficiently detail defendants' involvement. *See, e.g., Lewis v. Graves*, 701 F.2d 245, 250 (2d Cir.1983) ( "[P]articularized allegations of bias or self-interest on the part of defendant directors are necessary to establish a degree of 'involvement' sufficient to excuse demand."). The Amended Complaint alleges that Director Defendants O'Neal and Peters are interested because of insider trading. Am. Compl. ¶ ¶ 20-21, 209(a). Specifically, it alleges that these Director Defendants sold 631,880 shares of Merrill Lynch stock valued at $41,140,801 to Enron during the Relevant Period. *Id.* In his Opposition Memorandum, plaintiff asserts that O'Neal and Peters received personal financial benefits from this transaction rendering them interested. Pl.'s Opp'n. Mem. at 10. Plaintiff asserts that their membership on the Board and their positions at executive levels of Merrill Lynch provided O'Neal and Peters with adverse, non-public information. But, plaintiff does not state what exactly was that information. "[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Rattner v. Bidzos*, No. 19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003) (citation omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

Therefore, the Court does not find that plaintiff has pleaded facts with adequate particularity creating reasonable doubt that Director Defendants O'Neal and Peters are interested. Even if this Court were to find that O'Neal and Peters are interested for selling their stock to Enron, the Amended Complaint falls short of establishing that a majority of Merrill Lynch's board of directors is sufficiently beholden to, or under the influence of, O'Neal and Peters to excuse demand. *See Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993); *see also Elfenbein v. Gulf & Western Indus., Inc.,* 590 F.2d 445, 451 (2d Cir.1978) (finding plaintiff's allegations of insider sales by the controlling stock owner who had two nominees on the elevenmember board of directors did not suggest remaining directors would breach their fiduciary duty rendering demand excused).

Plaintiff further alleges that Director Defendants Phelan, Peters, Komansky and Luciano have professional and personal entanglements with each other preventing "the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein." Am. Compl. ¶ 209(k)(i) and (ii). Plaintiff argues that because Phelan and Peters attended a seminar in the USSR together in 1990, and because Komansky and Luciano served together as directors on the board of another company, demand is futile because these Director Defendants would not be willing to sue each other. *Id.*

*7 In support of his proposition of demand futility based on director prejudicial entanglements, plaintiff cites the Delaware Chancery Court decision, *In re New Valley Corporation Derivative,* 2001 Del. Ch. LEXIS 13, at * *25-26 (Del. Ch. Jan. 11, 2001). However, that case is inapposite here. The *New Valley* court found the plaintiff to have alleged particularized facts excusing demand because *"all* the members of the current Board [had] current or past business, personal, and employment relationships with each other." *Id.* at *25 (emphasis added). The Chancery Court provided some examples of the conflicts on the New Valley board which excused demand. The court noted that the Chairman and CEO of New Valley, who was also the controlling shareholder of the corporation, paid other directors $30,000 for agreeing to be a director nominee in the Chairman's proxy bid for another company. *Id.* Moreover, one of the members of the board of directors of New Valley was a former employee of the law firm rendering substantial legal services to the corporation. *Id.*

In the instant action, the Amended Complaint pleads *no* particularized facts to support a finding that the Merrill Lynch directors are interested because of personal and professional entanglements. In fact, plaintiff, in his Opposition Memorandum, concedes that "further discovery and factual development will further reveal the nature of these disabling relationships." Pl.'s Opp'n. Mem. at 12 n. 18. Consequently, plaintiff has not met the pleading burden required pursuant to Rule 23.1 or Delaware law on the issue of Director Defendants' professional entanglements.

Plaintiff also contends that all eleven Director Defendants have personal liability for "caus[ing] the Board to falsely understate the Company's liabilities in its proxies ... which they signed and filed with the SEC." *Id.* at ¶ 209(n). Thus, Plaintiff argues that the Director Defendants' exposure to potential personal liability makes demand futile. *Id.* at ¶ 209(j). These allegations are simply suppositions not substantiated by any facts. It is settled law that demand is not excused because plaintiff pleads that directors would have to sue themselves thereby "placing the litigation in hostile hands." *See Aronson v. Lewis,* 473 A.2d 805, 818 (Del.1984); *Brehm v. Eisner,* 746 A.2d 244, 257 n. 34 (Del.2000); *see also Pogostin v. Rice,* 480 A.2d 619, 625 (Del.1984) *overruled on other grounds by Brehm,* 746 A.2d at 253 (stating "reluctance by the directors to sue themselves" does not excuse demand).

According to the Amended Complaint, Director Defendants receive compensation for their membership on the Merrill Lynch board and therefore would not jeopardize their position by initiating a suit against the Board. Am. Compl. ¶ ¶ 209(d)-(e). A charge of director self-interest is not supported by such threadbare allegations. Without specific facts suggesting a lack of independence by the Board, receipt by directors of benefits and compensation as a result of Board membership is insufficient to excuse demand. *In re E.F. Hutton Banking Practices Lit.,* 634 F.Supp. 265, 271 (S.D.N.Y.1986); *accord Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988) *overruled on other grounds by Brehm,* 746 A.2d at 253. To rule otherwise would only circumvent the purpose of the demand requirement and render Rule 23.1 useless.

*8 Finally, the Amended Complaint fails to plead particularized facts that support the allegation that the four Non-Director Defendants were involved in the solicitation of proxies in violation of Section 14(a) of the Securities Act, or that the Non-Director

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2813166 (S.D.N.Y.)
(Cite as: 2004 WL 2813166 (S.D.N.Y.))

Page 6

Defendants aided and abetted the Company's
directors in breaching their fiduciary duties. Plaintiff
has not sufficiently alleged that the Non-Director
Defendants knowingly participated in the transactions
between Merrill Lynch and Enron. Thus, plaintiff's
derivative action is dismissed against the Non-
Director Defendants because demand is also not
excused with regards to the claims alleged against the
Non-Director Defendants.

### CONCLUSION

The defendants' motion to dismiss the Amended
Complaint pursuant to Federal Rule of Civil
Procedure 23.1 is hereby GRANTED. Because the
Amended Complaint is dismissed for failure to
establish particularized facts that create a reasonable
doubt as to the disinterest or independence of a
majority of the Merrill Lynch board of directors at
the time the Amended Complaint was filed so as to
excuse demand, it is not necessary for the Court to
address defendants' other arguments in favor of
dismissal.

2004 WL 2813166 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.