# TAB 3

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)

*264328    UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Nelson LEUNG, individually and on behalf of all others similarly situated, and derivatively on behalf of Ventana Medical Systems, Inc ., a Delaware corporation, Plaintiff,

v.

Jack W. SCHULER, John Patience, R. James Danehy, Edward Giles, Thomas M. Grogan, M.D., James M. Stickland, James Weersing, Ventana Medical Systems, Inc., a Delaware corporation, Marquette Venture Partners, L.P., a Delaware limited partnership and MVP II Affiliates Fund, L.P., a Delaware limited partnership, Defendants,

No. 17089.
Feb. 29, 2000.

Craig B. Smith, David A. Jenkins and Michele C. Gott, of Smith, Katzenstein & Furlow LLP, Wilmington, Delaware; for Plaintiff.

Jesse A. Finkelstein and Raymond J. DiCamillo, of Richards, Layton & Finger, Wilmington, Delaware; and Steven M. Schatz, Elizabeth M. Saunders and Michele E. Rose, of Wilson Sonsini Goodrich & Rosati, Palo Alto, California; for Defendants Jack W. Schuler, John Patience, R. James Danehy, Edward Giles, Thomas M. Grogan, James M. Stickland, James Weersing and Ventana Medical Systems, Inc.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**1    Pending are the defendants' motions to dismiss this stockholder derivative and class action under Court of Chancery Rules 12(b)(6) and 23.1. Under challenge is the issuance by Ventana Medical Systems, Inc. ("Ventana"), in January 1996, of 646,734 shares of its common stock to certain inside directors. It is claimed (in the derivative Counts) that those Ventana shares were issued at a price far below its fair market value, and that consequently, the issuance was invalid *per se,* constituted a waste of assets, violated the duties of care and loyalty owed by the Ventana directors who authorized the transaction. It is also claimed (in the class Counts) that the Ventana directors' failure to disclose the challenged

stock issuance to the plaintiff class in connection with a merger in which the class ultimately became Ventana stockholders (FN1) constituted a breach of those directors' contractual and fiduciary duties to make full disclosure of all material facts.

All defendants have moved to dismiss this action. I conclude, for the reasons set forth below, that the defendants' motions must be granted.

I. FACTUAL BACKGROUND

The facts narrated here are derived from the well-pleaded allegations of the complaint, including documents incorporated therein by reference. (FN2)

A. *The Parties*

The plaintiff, Nelson Leung ("Leung") is, and at all relevant times has been, a holder of Ventana common stock. Leung was originally a holder of Investor Notes of BioTek Investor Solutions, Inc. that were exchanged for Ventana Exchange Notes when BioTek was acquired by Ventana in February, 1996.

The named defendants are (i) Ventana, which is a Delaware corporation headquartered in Tucson, Arizona, that develops, manufactures and markets various tests used in treating cancer; (ii) the "Director Defendants" who were the directors of Ventana at all times relevant to this action, (FN3) and the "Marquette Venture Partner Defendants," which are three affiliated Delaware limited partnerships. (FN4)

B. *The Merger*

In February, 1996, BioTek Solution, Inc. ("BioTek") a California corporation that developed, manufactured, and distributed systems used to diagnose diseases, entered into an agreement to merge with Ventana, which became the surviving corporation (the "Merger"). At the time it was acquired in the Merger, BioTek had been experiencing significant financial difficulty and was on the verge of bankruptcy. In early February 1996, BioTek and Ventana mailed to BioTek's stockholders (who were also BioTek noteholders) and also to Ventana Preferred Stockholders (whose approval was also required), an Information Statement soliciting their approval of the Merger. The Information Statement disclosed that there was a "substantial likelihood" that the BioTek stockholders would receive no consideration in the Merger, and that the only value the BioTek noteholders would likely realize would be the Ventana convertible

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)                                    Page 2

subordinated notes (the "Ventana Exchange Notes") they would be receiving in exchange for their BioTek Investor notes.

**2    The Ventana Exchange Notes that were issued to the BioTek noteholders in the Merger entitled the holders, at any time before the 30th day following the closing of the Merger, to convert any or all of their Ventana Exchange Notes into Ventana common stock at a conversion price of $13.53 per share. (FN5) If the Noteholder did not elect to convert during that 30 day period, then one-half of the principal amount of that holder's Ventana Exchange Notes would automatically be converted into Ventana common stock at the 13.53 per share conversion price.

On February 23, 1996, the BioTek noteholders (who, to reiterate, were also BioTek stockholders) approved the Merger, which became effective three days later. The plaintiff alleges that when he and the other members of the Noteholder class gave their approval, they were unaware of the facts that are next described.

In January, 1996, one month before the Merger was consummated, Ventana's board authorized the issuance to director defendants Schuler and Patience, and also to Crabtree Partners (FN6) (the "Insiders"), 554,343 shares of Ventana's common stock at a price of $1.62 per share (the "Insider Sale"). At a second meeting held on February 23, 1996, the Board increased the number of shares to be issued to the Insiders, to 646,734 shares. When issued, those shares would constitute 26.5% of Ventana's equity. According to the Preliminary Prospectus issued in connection with Ventana's July, 1996 initial public offering, the stock was issued to Messrs. Patience and Schuler in connection with (i) their efforts in completing the BioTek acquisition and assisting management with the integration of the companies, (ii) Schuler's agreement to serve as Chairman of Ventana's board, and (iii) Schuler's and Patience's devotion of significant work to Ventana's board. (FN7) The complaint alleges that the board made no valuation of the services for which these shares were being issued. The board did determine, however, that the "fair market value" of the to-be-issued Ventana common stock was the $1.62 per share issuance price to the Insiders.

During the February 23, 1996 meeting, the board also approved a memorandum that outlined the principal elements of the stock sale to the Insiders (the "Memorandum"). Those elements included two

Conditions that are relevant to these motions. Condition 3 stated that:

"[t]he valuation used by Ventana as a basis for valuing its Common Stock, at a price of $.60 per share, shall not be determined subsequently by the Securities and Exchange Commission ("SEC"), in the event of an initial public offering by the Company of its Common Stock, as "Cheap Stock" and therefore subject to excess compensation accounting and disclosure requirements."

And Condition 6 provided that:

"[i]n the event any stockholder holding 10% or more of the Company's stock (on an as converted basis) initiates litigation with respect to the [Insider Sale], Jack W. Schuler and Crabtree Partners shall indemnify and hold harmless Ventana and its directors and executive officers from costs of defending such litigation and from any damages or settlement paid as a result of such litigation."

**3    The relevance of these Conditions will later appear.

As earlier noted, the Ventana Exchange Notes received in the Merger provided a 30-day post-merger conversion window during which those holders could convert none, some, or all of their Notes into Ventana common stock for $13.53 per share. The plaintiff claims that at the time that the Ventana Notes were converted, he and the other Noteholders were unaware that the Insider Sale at $1.62 per share had been authorized several weeks earlier. The plaintiff claims that had he and the other class members known that, he would have elected not to convert any of his Ventana Exchange Notes into Ventana shares, because the Insider Sale would have diluted Ventana's shares by over 25%. Unaware of the Insider Sale, the plaintiff (and other Noteholders) made no election and as a result, one-half of the face amount of the plaintiff's Ventana Exchange Notes ($31,041.36) was automatically converted into 2,295 shares of Ventana common stock on March 26, 1996.

In April and May 1996, the Insider Sale that had been authorized four months earlier was consummated, by Ventana issuing 646,734 shares of stock to the Insiders for $1.62 per share. The plaintiff alleges that he and the other Noteholders did not learn of the Insider Sale until it was disclosed for the first time in the Ventana Preliminary Prospectus, dated July 3, 1996, that was issued in connection with the initial public offering of Ventana stock. That

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Prospectus also disclosed that in connection with the Insider Sale, the Director Defendants had determined that the fair market value of Ventana's common stock as of January 1996 was $1.62 per share.

This action followed. (FN8)

## II. THE CLASS CLAIMS

I first address the legal sufficiency of the class claims, which the defendants have moved to dismiss under Rule 12(b)(6). Under that Rule, a claim will be dismissed where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proved to support the claim. (FN9) All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions unsupported by specific factual allegations will not be. (FN10) On a Rule 12(b)(6) motion the Court will also consider all documents that are incorporated into the complaint by reference. (FN11)

The thrust of the class claims is that the Ventana board breached their contractual and fiduciary duties by failing to disclose to the then-BioTek noteholders that one month earlier, the Ventana board had authorized the sale to the Insiders of 646,734 shares at $1.62 per share. That undisclosed fact, it is claimed, was highly material because had it been disclosed, the plaintiff and the other Noteholders would have voted against the Merger, or elected to not convert their Ventana notes into (highly diluted) shares of Ventana. The plaintiff claims that Ventana's directors had both a contractual duty under the Note Exchange Agreement, as well as a fiduciary duty under Delaware law, to disclose the authorization of the Insider Sale to BioTek Noteholders when seeking their approval of the Merger in February, 1996.

**\*\*4** The defendants argue that the disclosure claims are legally insufficient because: (1) the Note Exchange Agreement did not impose any contractual disclosure obligation, running in favor of the BioTek Noteholders, upon Ventana's directors, and (2) the directors had no fiduciary duty of disclosure to the (former) BioTek noteholders because (a) the directors were not fiduciaries of those noteholders at the time the disclosure was (arguably) required, and (b) the claim that the directors "voluntarily assumed" a fiduciary duty is without any basis in law.

These contentions frame two issues. The first is whether the Note Exchange Agreement imposed a contractual duty of disclosure upon the Ventana Director defendants. The second is whether the Director Defendants--who admittedly were not fiduciaries of the BioTek noteholders--nonetheless voluntarily assumed a fiduciary duty of disclosure to them.

### A. The Breach of Contract Claim (Count IV)

The first issue--whether the Note Exchange Agreement imposed a contractual duty of disclosure upon Ventana's Directors--arises because it is undisputed the Note Exchange Agreement, standing alone, imposed no disclosure duty upon the Ventana board. The only contract document that did arguably impose a disclosure duty is the Reorganization Agreement, which (together with the Information Statement) was one of the documents furnished in connection with obtaining the BioTek noteholders' approval of the Merger.

The Reorganization Agreement contains two provisions that, plaintiff claims, required Ventana's directors to disclose the authorization of the Insider Sale. Section 4.5 recites the number of authorized and outstanding shares of Ventana's common and preferred stock, and goes on to state that Ventana expected in the future to increase that number of shares by 1,860,500 shares of Series D Preferred Stock. The plaintiff alleges that the undisclosed authorization of the sale of almost 647,000 shares to the Insiders made that representation untrue, and as a consequence, triggered the second relevant provision of the Reorganization Agreement, Section 4 .7. That latter Section provides:

> No representation or warranty made by Ventana in this Article IV or in any other Article or Section of this Agreement, *or in any* certificate, schedule or *other document furnished or required to be furnished by Ventana* pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they are made. (emphasis added)

The claim that plaintiff advances here is that the nondisclosure of the board's authorization of the Insider Sale rendered Section 4.5 false, which (in turn) operated as a breach of Section 4.7, which (in turn) proscribed any untrue statement of a material fact in connection with any representation, warranty, or any certificate, schedule or "other document" furnished by Ventana.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)

**\*\*5** The difficulty with this claim is that the plaintiff was not a party to the Reorganization Agreement, and he therefore lacks standing to enforce it. Recognizing that, the plaintiff urges that the Reorganization Agreement, (including Section 4.7) was incorporated by reference into the Note Exchange Agreement to which the plaintiff was a party. The defendants dispute this. They contend that the Reorganization Agreement was not incorporated by reference into the Note Exchange Agreement. These disputed contentions make the "incorporation by reference" issue pivotal to the plaintiff's contractual disclosure claim.

The precise issue, which both sides agree is governed by California law, is whether the parties intended the Note Exchange Agreement to be the exclusive expression of their agreement. (FN12) I conclude that the parties so intended, and that the Reorganization Agreement was incorporated into the Note Exchange Agreement, but only for the very limited purpose of defining certain terms.

The Note Exchange Agreement contains a "merger" or "integration" clause. Section 6.4 provides that: "[t]his Agreement embodies the entire understanding and agreement between the Noteholder and the Company and supersedes all prior agreements and understandings relating to the subject matter hereof." Under California law, an integration or merger clause is regarded as conclusive evidence that "the parties intended the written instrument to serve as the exclusive embodiment of their agreement." (FN13)

The plaintiff argues that because the Note Exchange Agreement refers to the Reorganization Agreement in several places, the Court must conclude that the parties intended to incorporate the entire Reorganization Agreement into the Note Exchange Agreement. But the conclusion does not follow from the premise. Under California law, where a contract refers to another writing for a particular specified purpose, that other writing becomes part of the contract for the specified purpose only. (FN14) That is because if the contracting parties intended to incorporate the entire Reorganization Agreement into the Note Exchange Agreement, they could have explicitly so provided. Other merger clauses have been specifically worded to incorporate other documents by reference. (FN15) Because there is no clear expression of an intent to incorporate the entire Reorganization Agreement into the Note Exchange Agreement, I conclude that the California courts would limit any incorporation by reference of the Reorganization Agreement to the definitions that were specifically incorporated by reference in the Note Exchange Agreement. Because the premise of Count IV--that the entire Reorganization Agreement was incorporated by reference--is legally incorrect, that Count must be dismissed.

B. The Beach of Fiduciary Duty of Disclosure Claim (Count V)

Count V alleges that the Director Defendants voluntarily assumed a fiduciary duty of disclosure, which they breached by failing to disclose their authorization of the Insider Sale. The plaintiff concedes that no fiduciary duty was owed to him as a debt holder at the time he was asked to approve the Merger in February, 1996, because he was not then a stockholder of Ventana and did not become one until March 26, 1996. What the plaintiff contends is that the Director Defendants, even though they were not fiduciaries, voluntarily *assumed* a fiduciary of duty of disclosure to those noteholders when they solicited the BioTek noteholders' approval of the Merger. That claimed assumption of a fiduciary duty is said to arise from two circumstances: (1) the Directors' possession of superior knowledge about Ventana's financial condition (about which the BioTek Noteholders knew little, because Ventana was then privately owned); and (2) the Ventana Directors' representation in Section 4.7 of the Reorganization Agreement that no untrue representations would be made.

**\*\*6** In my opinion this claim is also legally unsupported. No Delaware case cited to me has imposed a fiduciary duty of disclosure upon a corporate director who did not occupy a fiduciary relationship to the persons claiming entitlement to the disclosure. Nor do the facts alleged in the complaint persuade me that this is a proper occasion to adopt plaintiff's unprecedented legal theory.

It is well established in Delaware that to successfully state a claim for breach of the fiduciary duty of disclosure, the plaintiff must have been owed a fiduciary duty at the time of the alleged breach. (FN16) In *Sanders v. Devine,* (FN17) the plaintiff alleged that the directors had breached their fiduciary duty of disclosure by failing to disclose certain information in the prospectus pursuant to which preferred stock had been issued and sold to the public. Rejecting that claim, Vice Chancellor Lamb held:

In order to prevail on a breach of fiduciary duty

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

claim, plaintiff Sanders must first establish that at the time the Prospectus was issued he was a person to whom a fiduciary duty was owed. In the present case, plaintiff was not a stockholder at the time the prospectus was issued, therefore, *as a matter of law,* there can be no liability under any fiduciary duty theories for the disclosures made in connection with the offering. (FN18)

In this case the alleged disclosure violation occurred in February, 1996. Because the plaintiff did not become a stockholder of Ventana until March 26, 1996, no fiduciary relationship or duty existed or arose at the time of the alleged violation.

The plaintiff argues that *In re Cencom Cable Income Partners, L . P. Litig,* (FN19) is authority to the contrary. I cannot agree. In *Cencom,* the general partner of a limited partnership retained a law firm to represent the interests of the limited partners, and disclosed the law firm's obligations to the limited partners. The Court held that in those circumstances, the general partner had "voluntarily assumed a duty to ensure that [the law firm] would fulfill these obligations and that the Limited Partners could rely on the General Partner's representation that [the law firm] would do so." (FN20)*Cencom* is distinguishable from this case and, moreover, does not support the proposition being advanced here. At issue in *Cencom* was whether the scope of the general partner's fiduciary duty to the limited partners-- *persons to whom fiduciary duties were clearly owed--* extended beyond the duties expressly stated in the partnership agreement. Here, the plaintiff represents a class of investors to whom *no* fiduciary duties were owed at the time of the alleged disclosure violation.

Because the Director Defendants owed no fiduciary duty to the plaintiff class at the time their approval of the Merger was obtained, the "assumption of the fiduciary duty" claim in Count V must fail, and that Count of the complaint must be dismissed. (FN21)

## III. THE DERIVATIVE CLAIMS

### A. *Introduction*

**\*\*7**  The remaining Counts of the complaint are derivative. The defendants seek the dismissal of those Counts under Rules 12(b)(6) and 23.1. Court of Chancery Rule 23.1 imposes special pleading requirements for derivative actions. (FN22) Those requirements are more stringent than the notice pleading requirements governed by Court of Chancery Rule 8(a). (FN23) In cases where no

demand is made, complaints in derivative actions must be pled with factual particularity. Although the plaintiff stockholder is not required to plead evidence, Rule 23.1 does require the plaintiff to plead particularized facts to excuse the failure to make a demand. (FN24)

The defendants argue that all three derivative Counts must be dismissed. *First,* the defendants argue that because the Insider Sale transaction concluded in January 1996 when the Ventana directors authorized the issuance of stock to the Insiders, and because the plaintiff did not become a shareholder until March 1996, the plaintiff lacks standing under Rule 23.1 and 8 *Del. C.* § 327 to assert a derivative claim challenging that stock issuance. *Second,* the defendants argue that the derivative counts must be dismissed because the plaintiff failed to make the pre-suit demand required by Rule 23.1 or to allege facts establishing that a demand would have been futile. *Third,* the defendants argue that even if the plaintiff has standing and a demand was excused, Counts II and III must be dismissed because they are based solely on a due care theory of liability, for which any monetary damage recovery is precluded by the exculpatory provision of Ventana's Articles of Incorporation.

In response, the plaintiff contends that he has standing to maintain the derivative Counts because the transaction complained of (the Insider Sale), was not completed until it was consummated in April and May of 1996, by which point the plaintiff was a Ventana shareholder. The plaintiff further argues that demand was excused, because (a) Count I alleges that the stock issuance was invalid *per se* and is not protected by the business judgment rule, (b) Count II alleges that the stock issuance constituted waste, and (c) Count III alleges that the directors acted in bad faith. Finally, the plaintiff contends that under 8 *Del. C.* § 102(b)(7), the Ventana exculpatory charter provision does not and cannot apply to claims of illegality, waste and bad faith.

These contentions raise three issues. The first involves standing, *viz,* when was the transaction complained of "complete"--when the Insider Sale was authorized in January, 1996, or when the stock was issued in April and May of 1996? The second issue is whether a demand on the Ventana's board was excused on the basis that the Insider Sale was not a valid exercise of business judgment? The third issue is whether Counts I, II and III are barred by the exculpatory clause in Ventana's Articles of Incorporation.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)                                     Page 6

B. The Standing Defense

A threshold issue is whether the plaintiff was a shareholder at the time of the transaction complained of. If he was, then he has standing to bring the derivative claims. If he was not, then he lacks standing, and the derivative claims must be dismissed.

**8 Under 8 *Del. C.* § 327 and Rule 23.1, the critical time for determining standing is when the transaction complained of is completed. (FN25) The plaintiff argues that the transaction was not completed (and, hence, the claim did not arise) until the Ventana shares were issued to the Insiders in April and May, 1996, at which time the plaintiff was a Ventana stockholder. The plaintiff is correct. *Maclary v. Pleasant Hills,* (FN26) which is essentially on point, supports his position. In *Maclary* this Court held that the alleged wrongdoing--the issuance of 100 shares of stock members of to the board of directors--did not occur when the board authorized the issuance, but, rather, when the stock certificates were actually issued. The Court held that "[w]here certificates are presumably to be issued therefor at once, and that is the very action under attack, the transaction is not complete for purposes of applying 8 *Del. C.* § 327 until the certificates are issued." (FN27)

That same logic applies here. Although the Ventana directors may have authorized the issuance of stock to the Insiders in February, 1996, no claim could or did arise (because the transaction was not complete) until the shares were actually issued in April and May 1996. By that point the plaintiff was a stockholder. The plaintiff therefore has standing to assert the derivative claims.

The defendants argue that a recent decision, *7547 Partners v. Beck,* (FN28) has overruled *Maclary.* I disagree. In *Beck,* the plaintiff challenged a board of directors' decision to sell stock to board members at a price lower than what was being offered to the public generally in the company's initial public offering ("IOP"). (FN29) The Delaware Supreme Court held that the plaintiff lacked standing to raise derivative claims because the challenged conduct (setting the IPO price) predated the IPO in which the plaintiff purchased his shares, (FN30) for which reason the plaintiff was not a stockholder at the time of the conduct complained of.

The claim advanced in *Beck* is different from the claims asserted here and in *Maclary.* In *Beck,* the alleged wrong was the board's decision to fix a below-market price for the stock being offered in the IPO. Once that price was fixed, the transaction was completed, and there was nothing further for the board to do. But, here (as in *Maclary* ), the alleged wrong is the *issuance* of the stock to the Insiders in April and May 1996, rather than its authorization by the board two months before. Indeed, in this case, no claim for *damage* relief arose or could have arisen until the stock was actually issued. (FN31) Because the plaintiff was a stockholder at the time that took place, he has standing to assert Counts I through III.

C. The Demand Defense

The next issue is whether the plaintiff was excused from making a demand on the Ventana board. Under *Aronson v. Lewis* (FN32) demand is considered futile, and will be deemed excused, if the particularized facts alleged in the complaint create a reasonable doubt that: (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Because the plaintiff does not challenge the independence and loyalty of the Defendant Directors, the analysis must focus on *Aronson'* s second prong. That is, plaintiff's demand excusal argument is that the particularized factual allegations of the complaint create a reasonable doubt that the sale of Ventana stock to the Insiders at the $1.62 per share price was the product of a valid business judgment. The plaintiff contends that the complaint alleges cognizable claims, and excuses demand, for three reasons: (i) the Insider Sale was invalid *per se,* (ii) the Insider Sale was a waste of assets, and (iii) the Insider Sale was not approved in good faith. The defendants respond that none of these allegations states a cognizable claim for relief and must therefore be dismissed under Rule 12(b)(6), and under Rule 23.1 as well.

**9 These arguments are next addressed.

1. The Illegal Stock Issuance Claim (Count I)

The defendants first argue that Count I must be dismissed under Rules 12(b)(6) and 23.1 because the complaint does not state a cognizable claim that the stock issuance to the Insiders was legally invalid. The plaintiff argues the contrary. He maintains that the Director Defendants' decision to issue stock representing 26.5% of Ventana's equity in exchange for services that they did not value was invalid *per se,* and therefore cannot be defended as a proper exercise of the directors' business judgment. For that reason, plaintiff argues, the Insider Sale was not subject to

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

the demand requirement.

The Delaware General Corporation Law grants a board of directors considerable discretion in determining the consideration for the issuance of stock. 8*Del. C.* § § 152 pertinently provides:

"The consideration, ..., for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine. In the absence of actual fraud in the transaction, the judgment of the directors as to the value of such consideration shall be conclusive." (FN33)

8 *Del. C.* § 153(a) provides, in part:

"(a) Shares of stock with par value may be issued for such consideration, having a value not less than the par value thereof, as determined from time to time by the board of directors, or by the stockholders if the certificates of incorporation so provides." (FN34)

Thus, absent fraud, Sections 152 and 153 give a board considerable latitude in evaluating the kind and amount of consideration to be received for newly-issued stock.

The complaint here--which does not claim fraud--does allege the specific consideration being received for the to-be-issued stock, specifically, that the Insiders were being compensated with Ventana stock for the services they rendered, and would render, to Ventana, including their efforts in connection with "structuring and negotiating the Merger."

The plaintiff argues under Delaware case law, a stock-for-services transaction is *per se* invalid if the services are not formally valued, because the statute imposes a duty upon the board to value the services. But the above-quoted statutory provisions do not so provide, nor do they explicitly require that the board conduct a "formal valuation." Nor do the cited cases support the *per se* invalidity proposition that plaintiff advances. Of course, a board must determine the value of services being received by the corporation in exchange for issuing the corporation's stock of equivalent value. But, the cited decisions do not hold that a board's failure to conduct a "formal" valuation of those services automatically vitiates the stock issuance as a matter of statutory law. (FN35) Rather, the board's duty to value services received in exchange for newly-issued stock is more properly understood as one aspect of its broader fiduciary duty

of care. Moreover (and as discussed more fully *infra* in connection with the waste claim) the complaint alleges facts from which it may be inferred that the Ventana directors *did* determine the value of the services being rendered. Accordingly, to the extent Count I alleges that the stock issuance was invalid *per se,* that claim is unsupported in law. Moreover, because the complaint shows that the Insiders' services were valued (albeit not "formally)," the claim is unsupported by the pleaded facts. Accordingly, Count I must be dismissed because it fails to state a claim under Rule 12(b)(6) and does not excuse a demand on the board as required by Rule 23.1.

2. The Waste Claim (Count II)

**\*\*10** The defendants next argue that Count II must be dismissed under Rules 12(b)(6) and 23.1, for failure to state a cognizable claim that the Board's issuance of the shares to the Insiders constituted corporate waste. If a cognizable claim of waste is alleged, that would deprive the challenged conduct of the protection of the business judgment rule and, consequently, would excuse demand.

The standard under Delaware law for pleading waste is stringent. (FN36) The plaintiff contends that the pleaded facts satisfy that stringent test. Here, it is alleged, the board issued shares representing approximately 26.5% of Ventana's post-issuance equity to the Insiders, but did not determine the value of the services to be provided in exchange. That failure (it is claimed) is sufficient of itself to create a reasonable doubt that the Board committed waste, and it is amply sufficient when coupled with the allegation that the stock was issued to the Insiders at a fraction of market value. The claim that $1.62 was far less than market value rests on the alleged fact that the board valued the stock at $1.62 per share for purposes of the Insider Sale, but only 3 weeks later, the board mailed to BioTek Noteholders, solicitation materials that valued the Ventana Exchange Notes at $13.53 per share for purposes of converting the Notes into Ventana common shares. Plaintiff argues that issuing approximately 26.5% of Ventana's equity for only 12% of the price that the Noteholders would pay for the same stock when converting their Ventana Notes, constitutes cognizable waste sufficient to survive dismissal under Rule 12(b)(6) and to excuse demand under Rule 23.1.

Despite its surface appeal, the argument lacks merit. The standard for pleading waste has been described thusly:

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

... [a] waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex-post,* to judge appropriate degrees of business risk. (FN37)

Thus, even if the complaint alleges facts that if true would show that in hindsight the consideration was inadequate, that alone will not satisfy the waste standard. The particularized pleaded facts must show that the consideration received for the stock was so minimal that issuing the Ventana stock was the functional equivalent of making a gift to the Insiders. Although the issued stock constituted one fourth of Ventana's outstanding common shares, the complaint does not allege that the Defendant Directors irrationally gave away those shares for essentially no consideration. To the contrary, the pleaded facts show that the board knew the precise value of the stock to be issued as compensation, and the nature of the services being rendered in exchange therefor. (FN38) Inherent in the act of setting the number of to-be-issued shares (646,734) and the price per share ($1.62) was the board's determination that the value of the services being performed was commensurate with the aggregate value of the shares being sold. Given those pleaded facts, I am unable to conclude that a claim of waste has been stated that would survive dismissal under Rule 12(b)(6), or that would excuse a demand under Rule 23.1. For these reasons, Count II will be dismissed.

### 3. The "Bad Faith" Claim (Count III)

**11** Lastly, the defendants argue that the motions to dismiss should be denied because the complaint does not allege a cognizable claim that the Director Defendants' approval of the Insider Sale was made in good faith. The basis for this claim is that the Director Defendants (i) failed to value Patience and Schuler's services before authorizing the issuance of the shares; (ii) determined a fair market value of Ventana common stock that was significantly less than the conversion price offered to the former BioTek stockholders only weeks later, and (3) included conditions in the Memorandum that "implicitly acknowledged" a "lack of confidence" that the Board had priced the Insider Sale at fair market value. (FN39)

Under the business judgment rule a board's good faith in making a decision is presumed. That presumption is heightened where, as here, the majority of the directors making the decision are independent or outside directors. (FN40) To overcome that presumption and to survive a motion to dismiss under Rule 12(b)(6) or Rule 23.1, the complaint must plead specific facts from which it can be inferred that "the decision [by the board] is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds ." (FN41) The complaint here falls short of meeting that standard.

*First,* as previously discussed, the claim that the Defendant Directors failed to value the services of Patience and Schuler before approving the issuance of the stock is unsupported. While it may be true that no formal valuation was conducted, the pleaded facts show that the board knew the value of the compensation (in the form of stock) it was awarding to the Insiders and the nature of the services the Insiders would perform in exchange. Moreover, the complaint alleges that a fair market evaluation of the Ventana common stock did take place, the valuation being $1.62 per share.

*Second,* the fact that the $13.53 per share conversion price offered to the BioTek noteholders was greater than the $1.62 per share fair market value of the shares sold to the Insiders, does not, without more, defeat the presumption that the Ventana board acted in good faith. Nowhere is it alleged that any BioTek noteholder was told that the $13.53 conversion rate being offered in the Merger was the fair market value of the Ventana stock, nor is it fair to infer that equivalence. The inference that is fair and reasonable, is that the conversion price offered to the BioTek noteholders was equal to the amount and value of the equity Ventana was willing to pay for BioTek. To put it differently, the Ventana board, in exercising its business judgment, did not believe that the $1.62 per share fair market value of Ventana stock was a conversion rate that Ventana should pay to the BioTek noteholders in order to purchase

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)                                                    Page 9

BioTek. Had the BioTek noteholders been given a conversion price in the Merger equal to $1.62 per share, that would result in Ventana transferring almost half of its equity to BioTek's noteholders in exchange for a financially troubled company. (FN42)

**\*\*12.** Finally, the fact that the Memorandum provided for contingency safeguards in the event the SEC disagreed with the fair market valuation of Ventana's common stock, does not evidence that the board acted in bad faith. What that contingency does indicate is that determining the fair market value of the common stock of a non-publicly held company is a matter of judgment about reasonable persons can disagree. In this case the "SEC disapproval" condition was designed to protect the corporation: if the SEC disagreed with the board's fair market value determination, the Insider Sale would not go forward at the price contemplated. That the board recognized and provided for that risk may evidence its conservatism, but that is hardly emblematic of bad faith.

I conclude, for these reasons that the complaint fails to state a cognizable claim, under either Rule 12(b)(6) or Rule 23.1, that in approving the Sale to the Insiders the Ventana board acted in bad faith and breached its duty of loyalty. Count V must therefore be dismissed.

C. The Effect of the Exculpatory Clause

Lastly, the defendants argue that the derivative claims sound in gross negligence. Even if that is so, the claims would fail as against the Director Defendants, because any duty of care claims for monetary damages are precluded by Article XI of Ventana's Amended and Restated Certificate of Incorporation, which is modeled after 8 *Del. C.* § 102(b)(7). (FN43)

Because Counts I through III will be dismissed on Rule 12(b)(6) and Rule 23.1 grounds, there is no need to decide whether Ventana's Certificate provision exculpates its directors from liability for money damages with respect to those Counts.

IV. CONCLUSION

For the above reasons, the motions to dismiss the class claims under Rule 12(b)(6), and to dismiss the derivative claims under Rule 12(b)(6) and Rule 23.1, will be granted. Counsel shall submit an appropriate form of order implementing the rulings made in this Opinion.

(FN1.) The class consists of the holders of Ventana Exchange Notes ("Noteholders"), who acquired those notes on a merger of BioTek Solution, Inc. "BioTek") into Ventana in February, 1996. In the merger, the shareholders of BioTek--who were also the holders of BioTek Investor Notes--exchanged their BioTek notes for Ventana Exchange Notes that were convertible into Ventana common stock. The plaintiff, who was originally a BioTek noteholder, became a Ventana Noteholder in the Merger, and thereafter a portion of his Ventana notes were converted into Ventana common stock.

(FN2.) The documents that are incorporated into the complaint by reference include the Information Statement that was disseminated in connection with the Merger, the Reorganization Agreement, the Memorandum which outlines the principal elements of the Insider Sale, and the Preliminary Prospectus that was disseminated in July, 1996 in connection with the Ventana initial public offering. Those documents are described more fully, *infra.*

(FN3.) The Director Defendants are Jack W. Schuler ("Schuler"), John Patience ("Patience"), R. James Danehy ("Danehy"), Edward Giles ("Giles"), Thomas M. Grogan, M.D. ("Grogan"), James M. Strickland ("Strickland") and James Weersing ("Weersing").

(FN4.) The Marquette Venture Partner Defendants are Marquette Venture Partners, L.P., Marquette Venture Partners II, L.P. and MVP II Affiliates Fund, L.P.

(FN5.) $13.53 per share was equal to $5.00 before a 1-for-2.7 reverse stock of Ventana's shares that occurred effective July 26, 1996. All figures relating to the conversion price of the Ventana Exchange Notes and the stock issuance amounts are calculated after giving effect to the reverse stock split.

(FN6.) Crabtree Partners was a venture capital fund affiliated with the Marquette Venture Partner Defendants which, in turn, was a principal stockholder of Ventana with whom Mr. Patience was formerly affiliated.

(FN7.) The complaint alleges (at ¶ 15) that the stock was being issued in the exchange for the defendants' services, but does not particularize the services. That information appears in the Preliminary Prospectus (Raju Aff., Ex. A at 58),

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)

which is incorporated by reference into the complaint. (*See* Complaint at ¶ 26). The plaintiff, in his brief, does not dispute the substance of the disclosures made by Ventana with respect to the services for which the Insiders were being compensated.

(FN8.) The filing of this action was preceded by the filing, by the plaintiff's relatives, of a lawsuit in the United States District Court for the District of Delaware ("the Federal Action"). The Federal Action asserts claims attacking the Insider Sales under the Securities Exchange Act of 1934, and also under California statutory and common law.

(FN9.) *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

\*\*12_ (FN10.) *See id.; see also In re Wheelabrator Technologies Inc. Shareholders Litig.,* Del. Ch., C.A. No. 11495, Jacobs, V.C., Mem. Op. at 4 (Sept. 1, 1992) (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n.6 (1988)); *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1264 (1979).

(FN11.) *See, e.g., Vanderbilt Income and Growth Assocs., L.L .C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996).

(FN12.) *City of Manhattan Beach v. The Superior Court of Los Angeles County,* Cal.Supr., 914 P.2d 160, 164 (1996) ("the primary object of all interpretation is to ascertain and carry out the intention of the parties").

(FN13.) *Airs Int'l, Inc. v. Perfect Scents Distribution, Ltd.,* 902 F.Supp. 1141, 1146 (N.D.Cal.1995).

(FN14.) *Valley Constr. Co. v. City of Calistoga,* Cal.App., 165 P.2d 521, 522 (1946).

(FN15.) *See e.g., Bionghi v. Metropolitan Water Dist. of S. California,* 70 Cal.App. 4th 1358, 1362-63 (1999).

(FN16.) *Sanders v. Devine,* Del. Ch., C.A. No. 14679, Lamb, V.C., Mem. Op. at 13 (Sept. 24, 1997) (emphasis added) (alleged omission in preferred stock prospectus cannot give rise to breach of fiduciary duty because plaintiff was not a stockholder at the time the prospectus was issued); *accord Arnold v. Society for Savings Bancorp, Inc.,* Del. Ch., C.A. No. 12883, Chandler, V.C.,

Mem. Op. at 15-16 (June 15, 1995) (acquiring corporation owed no duty of disclosure to stockholders of acquired corporation, even though it participated in drafting of proxy materials); *accord Thorpe v. CERBCO, Inc.,* Del. Ch., C.A. No. 11713, Allen, C., Mem. Op. at 4-5 (Jan. 26, 1993) (plaintiffs could not challenge disclosure in proxy statement issued before they became stockholders);*accord Zirn v. VLI Corp.,* Del. Ch., C.A. No. 9488, Hartnett, V.C., Mem. Op. at 12-13 (July 17, 1989) (tender offeror owed no fiduciary duty of disclosure to target corporation's stockholders); *accord Glaser v. Norris,* Del. Ch., C.A. No. 9538, Chandler, V.C. Slip Op. at 19-20 (July 13, 1989) (alleged omissions contained in prospectus cannot give rise to breach of fiduciary duty because prospective purchaser of stock not owed fiduciary duties).

(FN17.) Del. Ch., C.A. No. 14679, Lamb, V.C., Mem. Op. (Sept. 24, 1997).

(FN18.) *Sanders* at 13 (emphasis added).

(FN19.) Del. Ch., C.A. No. 14634, Steele, V.C., Mem. Op. (Oct. 15, 1997).

(FN20.) *Id.* at 16.

(FN21.) This does not mean that the plaintiff class has no available remedy. Although the Court finds that the complaint does not allege actionable disclosure claims under state law, the plaintiff's family has made the same conduct the subject of federal disclosure claims that are currently being pursued in the separate companion Federal action in the United States District Court for Delaware. The existence (or nonexistence) of disclosure liability under the Federal Securities laws is not dependent upon the existence of a fiduciary relationship.

(FN22.) Rule 23.1 pertinently provides: "The complaint shall ... allege with particularity the efforts, if any, ... to obtain the action the plaintiff desires form the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

(FN23.) *Brehm v. Disney,* Del.Supr., __ A.2d __, No. 469, 1998, Veasey, C.J. (Feb. 9, 2000).

(FN24.) *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)

**\*12_** (FN25.) 8 *Del. C.* § 327 relevantly provides:

> "[i]t shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

(FN26.) Del. Ch., 109 A.2d 830, 833-34 (1954).

(FN27.) 109 A.2d at 834.

(FN28.) Del.Supr., 682 A.2d 160 (1996).

(FN29.) *See id.* at 162-63.

(FN30.) *See id.* at 163.

(FN31.) A claim for *injunctive* relief may have arisen at the time the Insider Sale was authorized, but the claim asserted here is for *post-issuance* damages.

(FN32.) *Aronson v. Lewis,* 473 A.2d at 814.

(FN33.) 8 *Del. C.* § 152.

(FN34.) 8 *Del. C.* § 153(a).

(FN35.) *Bowen v. Imperial Theatres, Inc.,* Del. Ch., 115 A. 918, 920 (1922) (stock issuance held invalid when stock was issued to two members of the board where the authorization to issue the shares was not by the board of directors acting collectively, but, rather, was an individual decision by two of its members. The issue of valuation of services, was left undecided); *John W. Cooney Co. v. Arlington Hotel Co.,* Del. Ch., 101 A. 879, 887-88 (1917), *modified,* Del.Supr., 106 A. 39 (1918) (Noting that because no money was paid for stock and there was "scanty opportunity" to perform work on behalf of the company, and no "statement as to the character or value" of the service rendered to the company, there must have been "an intention to avoid the statute and Constitution" requiring payment of adequate compensation for issuance of company stock.); *Field v. Carlisle Corp.,* Del. Ch., 68 A.2d 817, 819-20 (1949) (holding that a Delaware corporation may not delegate its duty to comply with a provision of the articles of incorporation requiring "that the corporation's stock may be issued 'for such consideration as may be fixed from time to time by the Board of Directors.")

(FN36.) *In re The Walt Disney Co. Derivative Litig.,*

Del. Ch., 731 A.2d 342, 362 (1998) (to constitute waste "an exchange ... [must be] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *aff'd Brehm v. Disney,* Del.Supr., __ A.2d __, No. 469, 1998, Veasey, C.J. at 34 (Feb. 9, 2000) (quoting *Glazer v. Zapata Corp.,* Del. Ch., 658 A.2d 176, 183 (1993)).

(FN37.) *Vogelstein,* 699 A.2d at 336 (emphasis added) (citations omitted); *accord, Grimes,* 673 A.2d at 12, 14. Consistent with this view, the Delaware Supreme Court, has recently found that a complaint challenging an agreement that called for a $140 million severance payment to a senior executive did not allege waste, and noting that waste claims are "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Brehm v. Disney,* Del.Supr., __ A.2d __, No. 469, 1998, Veasey, C.J. (Feb. 9, 2000) Slip Op. at __.

(FN38.) The Memorandum describes the services that the Insiders would be performing. Those services are also summarized in the July, 1996 Preliminary Prospectus furnished in connection with the Ventana IPO.

(FN39.) Complaint at ¶ 39.

(FN40.) *Moran v. Household Int'l. Inc.,* Del. Ch., 490 A.2d 1059, 1074-75 (1985); *aff'd,* Del.Supr., 500 A.2d 1346 (1985); *Solash v. Telex Corp.,* Del. Ch., C.A. Nos. 9518 & 9528, Allen, C ., Mem. Op. at 8 (Jan. 19, 1988).

**\*12_** (FN41.) *In re Rexene Corp. Shareholder Litig.,* Del. Ch., C.A. Nos. 10897 & 11300, Mem. Op. at 8, Berger, V.C. (May 8, 1991); *aff'd sub nom. Eichorn v. Rexene Corp.* Del.Supr., 604 A.2d 416 (1991) (TABLE); *see alsoSolash* at 22-23 (to infer bad faith the board's decision must be "so grossly off the mark as to amount to 'reckless indifference' or 'gross abuse of discretion' ").

(FN42.) The financial difficulties of BioTek were disclosed in the Information Statement formulated to the BioTek noteholders and Ventana preferred stockholders. The Information Statement, which is incorporated into the complaint by reference, states that "... It has been the goal of BioTek directors, in this process, to seek to satisfy, to the extent possible, the claims of creditors of BioTek ... [T]he benefit of the Merger to BioTek is the ability of BioTek to achieve an orderly resolution of creditor

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 264328, Leung v. Schuler, (Del.Ch. 2000)

claims ..." Information Statement at 10. That document may be considered on a motion to dismiss for purposes of determining what facts were disclosed to BioTek noteholders, and accordingly, what facts the Ventana directors knew at the time of the Merger.

(FN43.) Article XI of the Amended and Restated Certificate of Incorporation pertinently states that: "[A] director of the [C]orporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# TAB 4

Westlaw.

Not Reported in A.2d                                                                Page 1
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
**(Cite as: Not Reported in A.2d)**

▷

Not Reported in A.2d, 1989 WL 150784, 16 Del. J.
Corp. L. 333

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Morton LEVINE, Plaintiff,
v.
Roger B. SMITH, F. James McDonald, Howard H.
Kehrl, F. Alan Smity, Robert J. Atwood, Lloyd E.
Reuss, Robert C. Stempel, Thomas A. Murphy Anne
L. Armstrong, Catherine B. Cleary, James H. Evans,
Walter A. Fallon, Charles T. Fisher, III, Marvin L.
Goldberger, John J. Horan Edmund T. Pratt, Jr.,
James D. Robinson, III, Leon H. Sullivan, Dennis
Weatherstone, Thomas H. Wyman, H. Ross Perot,
Morton H. Meyerson, J. Thomas Walter, Jr., and
William K. Gayden, Defendants,
andGeneral Motors Corporation, Nominal Defendant.
**Civil Action No. 8833.**

Submitted April 10, 1989.
Decided: Nov. 27, 1989.
Revised: May 21, 1990.

**337 John M. Bader, of Law Offices of John M.
Bader, Wilmington, Delaware; Curtis V. Trinko, and
Kevin J. Yourman, of Law Offices of Curtis V.
Trinko, New York City, of Counsel, James F.
Koehler, and John F. Hill, Esquires, of Gallagher,
Sharp, Fulton & Norman, Cleveland, Ohio, of
Counsel, for plaintiff.
William O. LaMotte, III and Thomas Reed Hunt, Jr.,
of Morris, Nichols, Arsht & Tunnell, Wilmington,
Stephen C. Neal, Robert J. Kopecky, and Helen E.
Witt, of Kirkland & Ellis, Chicago, Illinois, Michael
J. Basford, and Louis H. Lindeman, Jr., of General
Motors Corporation, Detroit, Michigan, of Counsel,
for defendant General Motors Corporation.
E. Norman Veasey, and Thomas A. Beck, of
Richards, Layton & Finger, Wilmington, Dennis J.
Block, Irwin H. Warren, Stephen A. Radin, and
Timothy E. Hoeffner, of Weil, Gotshal & Manges,
New York City, for General Motors Corporation
Director Defendants, Anne L. Armstrong, Catherine
B. Cleary, James H. Evans, Walter A. Fallon, Charles
T. Fisher, III, Marvin L. Goldberger, John J. Horan,
Howard H. Kehrl, Thomas A. Murphy, Edmund T.
Pratt, Jr., James D. Robinson, III, John G. Smale,

Leon H. Sullivan, Dennis Weatherstone and Thomas
H. Wyman.
Grover C. Brown, and Barbara MacDonald, of
Morris, James, Hitchens & Williams, Wilmington,
Roy L. Reardon, and Joseph F. Tringali, of Simpson,
Thatcher & Bartlett, New York City, for General
Motors Corporation Director defendants, Donald J.
Atwood, F. James McDonald, Lloyd E. Ruess, F.
Alan Smith, Roger B. Smith, and Robert C. Stempel.
Bruce M. Stargatt, and David C. McBride, of Young,
Conaway, Stargatt & Taylor, Wilmington, Thomas
D. Barr, Evan R. Chesler, and Christopher M. Mason,
of Cravath, Swaine & Moore, New York City, of
Counsel, Thomas W. Luce, III, and M. David Bryant,
Jr., of Hughes & Luce, Dallas, Texas, of Counsel, for
defendant H. Ross Perot.

**338 JACOBS, Vice Chancellor.
*1 The plaintiff, a shareholder of General Motors
Corporation ("GM"), brings this derivative action
against GM and its Board of Directors (collectively,
"GM defendants"), and H. Ross Perot ("Perot"), to
challenge GM's repurchase, on December 1, 1986, of
GM Class E stock and contingent notes owned by
Perot and others. The plaintiff formally demanded,
on December 11, 1986, that the GM Board rescind
the repurchase. On January 5, 1987, the GM Board
unanimously rejected that demand. On February 13,
1987, the plaintiff filed this derivative action,
alleging that GM's directors, in approving the
repurchase, breached their fiduciary duties of care
and loyalty to the corporation and its shareholders.

On April 20, 1987, the GM defendants moved to
dismiss the complaint, and also moved for a
protective order staying discovery pending the
outcome of their dismissal motion. On December
22, 1987, the Court granted the GM defendants'
motion for a protective order and stayed all
discovery. *Levine v. Smith,* Del.Ch., C.A. No. 8833,
Jacobs, V.C. (December 22, 1987).

On January 26, 1988, after briefing had already gone
forward, the plaintiff filed an amended complaint. In
response, the GM defendants moved to dismiss the
amended complaint under Chancery Court Rule 23.1,
arguing that that complaint fails to allege
particularized facts sufficient to create a reasonable
doubt that the GM board wrongfully rejected the
plaintiff's pre-suit demand. Defendant Perot also
filed a separate motion to dismiss the amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

complaint pursuant to Chancery Court Rules 9(b) , 12(b)(6) , and 23.1. Both motions were argued on February 1, 1988. Both motions were argued on February 1, 1988. This is the decision of the Court on those motions.

## I. *The Facts*

The pertinent facts are as alleged in the amended complaint. Because the facts are largely as described in the earlier opinions of this Court and the Delaware Supreme Court in *Grobow v. Perot,* Del.Ch., 526 A.2d 914 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988) , they are given brief treatment here, except where necessary to highlight the differences between the present amended complaint and the complaint adjudicated in *Grobow.*

During the fall of 1984, GM and Electronic Data Systems ("EDS") consummated an Agreement and Plan of Merger in which **339 EDS became a wholly owned subsidiary of GM. (Am.Compl. ¶ ¶ 12-13). In that transaction, defendant Perot (who was EDS's Chairman) and defendants Morton H. Meyerson, Thomas Walter, Jr., and William K. Gayden (who were directors and officers of EDS) exchanged their EDS stock for newly-created GM Class E stock, plus certain contingent notes maturing in 1991. Perot remained EDS's Chairman and joined GM's Board of Directors (Am.Compl. ¶ ¶ 18-19), and the Class E Stock that he received in the merger made Perot GM's single largest shareholder.

Despite the merger, EDS retained substantial autonomy, which preserved EDS's profitability and competitive force. That autonomy also minimized GM's potential conflict that existed by virtue of its dual status as EDS's parent corporation and as its largest customer. (Am.Compl. ¶ ¶ 20-29).

*2 The GM-EDS merger was initially successful in many respects. EDS provided GM with a broad range of data processing and telecommunication systems. For its part, GM provided EDS with approximately 75 percent of its total revenues, and GM's suppliers accounted for a large portion of EDS's other customers. (Am.Compl. ¶ 30). However, a conflict soon developed between the two companies which ended their amicable relationship. The companies' managements disputed over the pricing of EDS's services to GM, over certain long term contracts between EDS and GM, and over executive compensation, auditing, and management style. (Am.Compl. ¶ 31). Perot became increasingly and openly critical of GM's operations,

business, and management (Am.Compl. ¶ ¶ 32-34). In May of 1986, Perot wrote to Roger B. Smith, GM's Board Chairman, proposing several options for settling the differences between GM and himself. Among these was the suggestion that GM buy him out. (Am.Compl. ¶ 35). Perot persisted in his criticisms of GM, and over the ensuing months, those criticisms became more pointed and received wide media attention. (Am.Compl. ¶ ¶ 37-41).

After Perot began to voice his criticisms publicly, GM negotiated to sell EDS to American Telephone and Telegraph. After those negotiations broke down in November of 1986, Perot took serious steps to resell his interest to GM (Am.Compl. ¶ ¶ 42-43). By November 30, 1986, Perot and GM had reached agreement with GM on a buyout, FN1 and the following day (December 1, 1986), GM's entire **340 Board, a majority of whom were independent (Am.Compl. ¶ ¶ 5-6), approved the buyout transaction. (Am.Compl. ¶ 47).

Under the terms of the repurchase agreement, GM would repurchase approximately 12 million shares of its Class E stock, plus all of the contingent notes, held by Perot and three of his associates, for $61.90 per share. That represented a total cost of $742.8 million to GM. (Am.Compl. ¶ ¶ 47-48). The December 1, 1986 repurchase agreement also provided that: (i) for three years, Perot would not start a business that would compete with EDS; (ii) for 18 months Perot would not recruit EDS executives; (iii) for five years Perot would not acquire any GM stock or engage in a proxy contest against GM (Am.Compl. ¶ 51); (iv) Perot would (and did) resign from the GM Board and as EDS's Chairman, and Perot's three associates would (and did) resign from their executive positions with EDS (Am.Compl. ¶ ¶ 51-52); and (v) Perot would not criticize GM publicly, and would pay GM up to $7.5 million if he were found to have violated that covenant. (Am.Compl. ¶ 51).

The complaint alleges that the buyout agreement, and Perot's concomitant resignation from his positions at EDS and GM, occurred shortly before an anticipated major confrontation between Perot and the other GM directors over end-of-the-year senior management bonuses. (Am.Compl. ¶ 58). Shortly after the repurchase was consummated, Perot offered to hold in escrow, until December 15, 1986, the moneys he had received in exchange for his GM securities. That offer was made to give GM's directors time to "review the matter and the events that led to [the] decision." GM's directors, however, decided not to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

rescind the buyout agreement. (Am.Compl. ¶ ¶ 47, 57).

*3 On December 11, 1986, plaintiff submitted a written demand to the GM Board that it rescind the repurchase agreement. FN2 By letter **341 dated December 15, 1986, GM responded that the plaintiff's demand would be considered at the next regularly scheduled Board meeting on January 5, 1987. On December 16, 1986, plaintiff requested permission to make a formal presentation to the Board. By letter dated January 9, 1987, GM replied that its Board had considered the plaintiff's demand on January 5, 1987, and had unanimously rejected it, on the basis that neither litigation nor rescission of the repurchase would serve the corporation's best interests. In his amended complaint, the plaintiff alleges that the Board's determination to reject his demand was wrongful.

## II. *The Contentions*

The defendants first argue that both the decision in *Grobow v. Perot,* Del.Ch., 526 A.2d 914 (1987), *aff'd,* Del.Supr., 539 A.2d 180 (1988), and the doctrine of res judicata, operate to preclude the plaintiff from contending that the Board wrongfully refused his demand. Alternatively, the defendants argue that in all events this action must be dismissed under Rule 23.1, because the amended complaint does not allege sufficiently particularized facts creating a reasonable doubt as to whether the Board's rejection of the demand **342 was wrongful. Specifically, the defendants argue that no reasonable doubt is created as to whether the GM Board was disinterested, or whether its rejection of the demand was adequately informed.

Defendant Perot advances three arguments in support of his separate motion to dismiss under Rule 12(b)(6). First, Perot contends that because he was no longer a director when GM's Board rejected plaintiff's demand, he owed no fiduciary duty, and therefore could not have breached any duty, owed by the Board to GM's stockholders. Second, he argues that the complaint fails to state a claim for breach of a duty owed in any other capacity. Third, Perot argues that the complaint fails to state a valid claim for aiding and abetting, because it alleges no valid underlying breach of fiduciary duty by GM's directors.

The plaintiff responds that the *Grobow* decisions do not operate either as res judicata or as collateral estoppel. He further contends that the amended complaint is sufficient under Rule 23.1, because (among other reasons) it need not allege particularized facts-but only "legally sufficient reasons"-to make the requisite showing that the GM Board wrongfully rejected his demand. Plaintiff insists that that showing is made because the complaint alleges that (a) the Board's decisions to enter into the December 1, 1986 buyout transaction, and to reject plaintiff's demand to rescind that transaction, were uninformed; (b) the Board failed to conduct an adequate investigation before rejecting plaintiff's demand; and (c) the directors acted in their own self interest to preserve their positions and remuneration.

As for the claims against Perot, the plaintiff responds that their adequacy must be evaluated under the Rule 12(b)(6) "notice pleading" standard, which (plaintiff contends) is easily satisfied here. Finally, plaintiff argues that, should his amended complaint be dismissed, he should be granted leave to amend under Chancery Court Rule 15(a).

*4 Having considered the parties' contentions, I conclude that the amended complaint must be dismissed for failure to satisfy the requirements of Rule 23.1. That makes it unnecessary to address the defendants' res judicata argument or Perot's separate motion to dismiss under Rule 12(b)(6).

## III. *The Motion to Dismiss Under Rule 23.1*

### A. *The Applicable Standard.*

Chancery Court Rule 23.1 mandates that in a derivative action:

**343 The complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort ...

The purpose of that Rule is to require shareholders to seek redress of their grievances through the corporation's board of directors, or, alternatively, to justify their entitlement to act on the corporation's behalf independently of the board. The Rule is consistent with, and is designed to effectuate, the fundamental principle that the board of directors normally controls the corporation's actions and policies. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 811-12 (1984). Whether or not a corporation should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

bring a lawsuit is a question normally addressed to the directors' business judgment, for which reason shareholders normally lack the legal managerial power to bring a suit to enforce a corporate claim. *Id.*

The derivative action device is an exception to that rule and may be invoked only in those cases where the board is legally disabled from acting on the corporation's behalf due to circumstances that would deprive its decision of the business judgment rule's protections. The *Rule 23.1* demand requirement, and the implimenting form of judicial scrutiny required by *Aronson v. Lewis* and *Grobow v. Perot, supra*, are procedures to which this Court must adhere in determining whether the board is so disabled.

Under Delaware law, the question of whether a derivative action may go forward normally arises in one of two distinct procedural settings. FN3 The first is where the plaintiff shareholder files a derivative action without first having made a demand upon the board of directors to rectify the matters complained of, and claims that a **344 demand would have been futile. In this so-called "demand futility" procedural posture, the derivative action will be allowed to go forward where the Court is satisfied that the particularized facts in the complaint create a reasonable doubt either that the directors were disinterested and independent, or that the transaction under challenge was the product of a valid business judgment. *Aronson, 473 A.2d at 814; Grobow, 539 A.2d at 188-89.*

The second procedural setting (of which this case is an example) is the so-called "demand refused" case, wherein the plaintiff makes a demand upon the board of directors, which the board rejects, after which the plaintiff files a derivative action. In those circumstances the plaintiff will be permitted to proceed with his derivative suit if the Court is satisfied that the board's rejection of the demand was wrongful. That determination, as in the "demand futility" situation, is based upon the allegations of the complaint itself. *Levine v. Smith,* Del.Ch., C.A. No. 8833, Jacobs, V.C. (December 22, 1987).

*5 In this case the plaintiff has raised a threshold question, namely, what standard the Court should apply in assessing whether the complaint satisfactorily establishes, for *Rule 23.1* purposes, that the demand was wrongfully rejected. The plaintiff advances several arguments toward his proposition that the *Aronson-Grobow* standard should not apply in "demand refused" cases.

First, the plaintiff suggests that the Court should adopt the "notice pleading" standard employed on motions to dismiss pursuant to *Rule 12(b)(6)*, *i.e.*, whether the plaintiff would be entitled to relief under any reasonably conceivable set of facts based upon the allegations made. *Harman v. Masoneilan Int'l, Inc.,* Del.Supr., 442 A.2d 487, 502 (1982). This argument, however, flows from a misconception of this Court's earlier December 22, 1987 ruling in this case, and of the nature of a dismissal motion under Rule 23.1. In its December 22, 1987 Opinion, the Court observed that a determination of whether a demand was wrongfully rejected is, procedurally speaking, more akin to a Rule 12(b)(6) motion to dismiss than to a Rule 56 motion for summary judgment. *Levine,* slip op. at 11-12. In making that observation, the Court did not intend to suggest, nor did it hold, that the standard to be employed in a "demand refused" case is identical to that applied on a Rule 12(b)(6) dismissal motion.

Nor does the plaintiff advance any reasoned basis for his argument that the standard in a "demand refused" case should be different from that employed in a "demand futility" situation. In **345 both cases the judicial inquiry is the same, *viz,* to determine whether the Board is legally disabled from making a decision that would be protected under the business judgment rule. The inquiry being the same, logic suggests that the standard should be also. Moreover, the plaintiff's argument ignores the critical difference between a motion to dismiss brought under Rule 23.1 and a motion to dismiss under Rule 12(b)(6). Unlike its Rule 12(b)(6) counterpart, a motion to dismiss under Rule 23.1 is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf. As earlier stated, that latter determination hinges upon whether there is a reasonable doubt that the challenged board action is protected by the business judgment rule. Such reasonable doubt must be based upon particularized facts alleged with the complaint. To supplant that requirement with the more lenient Rule 12(b)(6) "notice pleading" standard would contravene the policy underlying Rule 23.1 and the clear mandate of *Aronson.*

Alternatively, the plaintiff argues, in reliance upon certain language in *Allison v. General Motors Corp., 604 F.Supp., 1106, 1121 (D.Del.1985),* that the complaint need allege only legally sufficient

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

"reasons" (as distinguished from particularized "facts") to create a reasonable doubt concerning the directors' decision to reject a demand. Plaintiff relies upon *Allison* for his argument that a pleading standard less stringent than that called for by *Aronson* and *Grobow* should be applied in "demand refused" cases. But that argument rests upon a misreading of *Allison.* The *Aronson, Grobow,* and *Allison* decisions all applied, in specific factual settings, the Rule 23.1 mandate that the plaintiff "allege with particularity ... the reasons for his failure to obtain the action." Nothing in the *Allison* opinion, when fairly read, indicates that the District Court, by alluding to "legally sufficient reasons," intended any substantive departure from the particularized pleading requirement of Rule 23.1 and *Aronson.*

*6 Finally, the plaintiff argues that to satisfy Rule 23.1 , the complaint need satisfy only the pleading requirements of Chancery Court Rule 9, which provides that only certain specified matters need be alleged with particularity. FN4 Rule 9, however, governs complaints **346 generally, while Rule 23.1 specifically governs complaints in derivative actions. Because this is a derivative action, it must satisfy the pleading requirements independently imposed by Rule 23.1.

The Court concludes that the applicable standard for determining whether or not a demand has been wrongfully refused is that of "demand futility" under *Aronson* and *Grobow.* But it must be noted that while the standard is the same, the focus of the Court's inquiry varies according to the context. In a "demand futility" case, the inquiry focuses upon whether the business judgment rule protects the directors' initial decision to approve the challenged transaction. In a "demand refused" case such as this, the focus is upon whether the business judgment rule protects the board's later decision to reject a shareholder demand. FN5

B. *The Propriety of the Directors' Refusal of the Demand*

The appropriate review standard having been determined, the inquiry becomes whether the complaint alleges particularized facts that create a reasonable doubt as to whether (i) the GM Board was disinterested and independent when it rejected the demand, or (ii) its decision to reject the demand was the product of an informed business judgment. Because, as discussed below, that question must be answered in the negative, the plaintiff has not met his burden of justifying his entitlement to proceed

derivatively on the corporation's behalf.

**347 1). *The Director's Disinterestedness and Independence*

The plaintiff first argues that the amended complaint adequately alleges that the GM directors were motivated by self interest both when they approved the Perot buyout and when they rejected plaintiff's demand that the buyout be rescinded. It is claimed that the directors' sole purpose in approving the buyout was to silence Perot and to remove him as a threat to their domination and control of GM. For that claim to satisfy Rule 23.1, it must be supported by particularized pleaded facts creating a reasonable doubt that the GM directors were tainted by financial self interest or were motivated by entrenchment considerations. *Grobow v. Perot,* 539 A.2d at 188. No such facts are found in the amended complaint.

The complaint does not allege that the GM directors were financially interested in the buyout transaction, or that they were not independent. FN6 *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 626-627 (1986) ; *Aronson,* 473 A.2d at 815. Accordingly, any reasonable doubt concerning the directors' disinterest and independence can flow only from the claim that the directors were seeing to entrench their control of GM. The particularized factual allegations, however, do not support that claim. While Perot was very critical of the Board and was GM's single largest shareholder, he and his fellow Class E shareholders were in no position to threaten the GM Board's incumbency. Moreover, the complaint does not charge Perot and his associates with having commenced, threatened, or contemplated a tender offer, proxy contest, or other action to gain control of GM or to remove the incumbent Board. Therefore, no reasonable doubt that the GM Board rejected the demand to defend itself from a threat to their incumbency, arises.

*7 Similarly, the allegations that the Board acted solely in its own interest and to silence Perot do not create a reasonable doubt that the Board was disinterested. Those allegations are conclusory, and there are no particularized factual claims that the Board members stood to benefit personally from the buyout transaction. FN7

**348 2). *Whether the Board's Decision to Reject The Demand Was Informed*

Plaintiff next contends that the business judgment rule does not protect the GM's Board's decision to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                              Page 6
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

reject plaintiff's demand, because that decision was not adequately informed. Plaintiff says that the amended complaint creates a reasonable doubt in that regard, because it alleges that (1) the Board denied plaintiff's counsel an opportunity to make an oral presentation at the Board meeting, to explain why the buyout transaction was harmful to the corporation, and (2) the Board "did nothing" (including conducting no investigation) in response to his demand. FN8 The Court finds those contentions also to be insufficient.

To begin with, as a matter of logic it cannot be true that a board's decision to reject a shareholder demand becomes uninformed because the shareholder's counsel was refused permission to present his case orally to the directors. That conclusion does not flow from the premise. The Board may not have needed further information at that time, because they possessed the information essential to an informed decision. Nor does the argument have a **349 sufficient foundation in law. A board of directors is not legally obligated to permit a demanding shareholder to make an oral presentation at a meeting. Corporate directors normally have only limited available time to deliberate, and a determination of what matters will (and will not) be considered must necessarily fall within the board's discretion. *See* Manning, *The Business Judgment Rule and the Director's Duty of Attention,* 39 Bus.Law 1477, 1485 (1984). A ruling that, as a practical matter, would require GM's Board to hear the plaintiff's oral presentation, would place directors in the untenable position of having to entertain presentations by any shareholder who threatens to file a derivative action. It would also be an unwarranted intrusion upon the board's authority to govern the corporation's affairs conferred by 8 Del.C. § 141.

Lastly, the plaintiff urges that the complaint independently establishes that the GM board was uninformed when it approved the buyout transaction. In his brief, plaintiff argues that his bare allegation that the GM Board was uninformed, must implicitly be taken to mean that the Board (i) conducted no investigation, (ii) interviewed none of the participants in the negotiations leading to the buyout, (iii) reviewed no relevant documentation, (iv) failed to assess the economic impact of the buyout transaction upon GM's recapitalization plans, (v) failed to consider Perot's admissions concerning the illegality of the transaction, and (vi) failed to consider Perot's offer to return the repurchase consideration.

*8 That is a lot of water for one conclusory allegation

to carry uphill. A motion to dismiss under Rule 23.1 must be overcome with particularized facts. It will not do for a plaintiff to allege, in conclusory fashion, that the board "did nothing" and then argue that that conclusion establishes an array of subsidiary factual inferences that themselves are not supported by particularized facts alleged in the complaint. To accept that approach would virtually eviscerate the pleading requirements of *Aronson* and *Grobow.* The plaintiff's claim that the board was uninformed when it approved the buyout must therefore fail, because it is unsupported by particularized facts in the amended complaint. FN9

**350 In addition, GM's letter reply to the plaintiff's demand (which plaintiff incorporates in his complaint by reference) is inconsistent with, and thus diminishes the force of, plaintiff's allegation that the Board 'did nothing.' That letter states that the Board *reviewed* the demand and determined that it was in the corporation's best interests to reject it. FN10 Finally, the alleged statements attributed to observers that the buyout was not the best decision for GM, suggest that others might have exercised their own business judgment differently, but do not create a reasonable doubt as to whether the GM Board, in making its decision, was sufficiently informed.

In summary, the amended complaint does not allege, in a legally sufficient manner, that the Board's rejection of the plaintiff's demand was wrongful. Therefore, this derivative action must be dismissed as to all defendants. *Zapata,* 430 A.2d at 784; *Aronson,* 473 A.2d at 813.

### IV. The Application for Leave to Amend

Finally, the plaintiff requests leave to file a second amended complaint pursuant to Chancery Court Rule 15(a), which provides that "leave [to amend] shall be freely given when justice so requires." I conclude that in this case, justice does not so require.

This action is derivative. Legally it is brought on behalf of GM, the nominal defendant. At present ten other such derivative suits, **351 all arising out of the same buyout transaction, are pending. In this particular case, the plaintiff has already been permitted to file an amended complaint, after the defendants had previously submitted an opening brief in support of their motion to dismiss the initial complaint. The defendants have thus twice been put to the task of having to brief the sufficiency of the derivative allegations of the complaint in this action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 7
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
**(Cite as: Not Reported in A.2d)**

alone.

It will not serve justice to continue multiplying the number of derivative complaints filed as a result of a single transaction. If there is a valid derivative claim to be raised on GM's behalf, it is reasonable to assume that at least one of the several pending complaints will serve as the appropriate vehicle. There is no cognizable prejudice to the corporation in denying this particular plaintiff permission to add yet another complaint to the many already on file. For that reason, and given the procedural history of this action, to permit the filing of yet another amended complaint exceeds, my view, the requirements of reasonableness and justice.

*9 Accordingly, the motion to dismiss the amended complaint under Rule 23.1 is granted, and the motion for leave to file a second amended complaint under Rule 15(a) is denied. IT IS SO ORDERED.

> FN1. The original complaint alleged that a Special Review Committee of three GM directors, chaired by GM Audit Committee Chairman defendant James H. Evans, had approved the buy-back proposal.

> FN2. The full text of the plaintiff's December 11, 1987 demand letter is as follows:
> We are writing to you on behalf of our client, Morton Levine, a common shareholder of General Motors Corp. ...
> On behalf of our client, we hereby demand that GM take prompt action to rescind the buy-back of GM series "E" stock from H. Ross Perot, Morton H. Meyerson, J. Thomas Walter, Jr., and William K. Gaylord.

The monetary value given to Mr. Perot by the Company is grossly in excess of the present market value of his series "E" stock and notes. Our client regards these payments to Mr. Perot as a waste of corporate assets and a deprivation of corporate opportunity. Moreover, the failure of the Company to offer a similar acquisition package to other GM shareholders was discriminatory, unjust and constitutes a breach of the Board's fiduciary duties to all of the Company's shareholders.

Additionally, the prohibition on Mr. Perot's future ability to criticize GM and its management is nothing more than an attempt by the present Board of Directors to squelch constructive criticism of its

business practices and philosophy. Not only is this a disservice to the Company and its shareholders, but it also reeks of improper personal motivations on the part of Mr. Smith and his cohorts, and is contrary to the principles of free speech and expression so precious to our society's and GM's future progress and growth.

Accordingly, Mr. Levine request that the Board of Directors of GM rescind the contract with Mr. Perot and his associates immediately. Mr. Perot has foreseen the aforesaid injustices and has granted the Company time, until December 15, to reconsider the buy-back agreement, and, in fact, publicly appears to welcome such a rescission. Mr. Levine, on behalf of all of the Company's shareholders, as well as the Company itself, demands that the Board rescind the aforesaid contract. By rescinding the contract, there will be no damage or prejudice suffered by the Company, hundreds of millions of dollars in excessive "payoff" money will be returned to the Company's treasury, and the Company will not lose the comments, suggestions and insights of America's most successful entrepreneur.

We will be happy to meet with you to discuss these matters in greater detail. Moreover, we are certain that you will give significant consideration to the views expressed herein. However, please be advised that if you decide not to rescind the buy-back contract, we will have no alternative other than to seek the resolution of these issues in the appropriate forum. Therefore, unless you rescind the contract on or before December 15, we will be forced to take further action.

> FN3. For this purpose I place to one side the "demand excused" situation involved in *Zapata Corp. v. Maldonado*, Del.Supr., 430 A.2d 779 (1981), where a derivative action goes forward, and the corporation then forms an independent committee of its board of directors, which then conducts an investigation and determines that it would be in the corporation's best interests to terminate the derivative action. In those circumstances *Zapata* prescribes a two-step inquiry to determine whether the action should proceed. However, that inquiry is not, strictly speaking, conducted pursuant to Rule 23.1. *See Kaplan v. Wyatt*, Del.Ch., 484 A.2d 501, 506-07 (1984) aff'd 499 A.2d 1184 (1985) ; *Lewis v. Fuqua*, Del.Ch., 502 A.2d 962, 966 (1985); *appeal refused*, Del.Supr., 504 A.2d 571 (1986). Indeed,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
(Cite as: Not Reported in A.2d)

the "demand excused" scenario presupposes that a majority of the directors are disabled from making a protectible business judgment concerning whether or not to bring the litigation. *See, Levine v. Smith,* Del.Ch., C.A. No. 8833, Jacobs, V.C. (December 22, 1987).

FN4. Rule 9 requires particularized pleading to allege fraud, mistake, or special damage, as well as to deny the performance or occurrence of conditions precedent, or the legal existence of a party to sue or be sued in a representative capacity.

FN5. For the above reasons, the Court also rejects the defendants' invitation to impose, in demand refused cases, a requirement stricter than the *Aronson-Grobow* "reasonable doubt" standard. Defendants argue that the Court should require that the pleaded facts be sufficient to rebut the presumption of the business judgment rule. That argument stems from an erroneous reading of *Spiegel v. Buntrock,* Del.Ch., C.A. No. 8936, Allen, C. (November 17, 1988), where the Court applied the *Aronson-Grobow* standard, not a more stringent standard. Defendants' argument also overlooks the significance of the Supreme Court's holding in *Grobow,* that this Court had erred in interpreting "reasonable doubt" to require that the factual allegations be sufficient to support a "judicial finding." That Court held that such a requirement would impose a more rigorous pleading standard than was warranted by *Aronson, 539 A.2d at 186.* By parity of reasoning, to adopt the defendants' position would come close to requiring the plaintiff to prove his entire case at the pleading stage, which goes far beyond the limited burden envisioned on a Rule 23.1 motion. *See Siegman v. Tri-Star Pictures, Inc.,* Del.Ch., C.A. No. 9477, Jacobs, V.C., slip op. at 32-33 (May 5, 1989).

FN6. To the contrary, the complaint concedes that a majority of the GM directors who approved the buyout transaction, and who rejected plaintiff's demand, were outside directors (Am.Compl. ¶ ¶ 5-6), which is inconsistent with the allegation that the directors were interested or not independent.

FN7. In a similar vein, the complaint alleges that industry analysts and others had concluded that the GM Board "paid off Perot to get him off the board and off their backs." Those attributed conclusions do not establish that the Board members were improperly motivated in the sense that they stood to benefit personally from the buyout.

FN8. The core of these contentions is set forth in Paragraphs 100 and 101 of the amended complaint, which state:
100. In compounding their failure to make properly informed business decisions, GM's Board of Directors, upon receiving plaintiff's demand for action on December 11, 1987, did nothing. The GM Board of Directors disregarded the duties and did not undertake an investigation, which would have uncovered the above detailed discrepancies and falsehoods underlying their original decision regarding the Perot buy-out. The GM Board merely met at their regularly scheduled January meeting and denied plaintiff's request for action.
101. As previously asserted, the Board of Directors has colluded in the self-motivated buy-out of Mr. Perot. The board's refusal to permit plaintiff's counsel to make a presentation at the board meeting further indicated that the board would not actually consider rescinding the buy-out. Once again the board's intolerance to criticism has injured the Company. The board's actions show that the board was predisposed to refuse plaintiff's demand for action, without giving plaintiff the slightest actual consideration. Indeed, on December 2, 1986, *The Wall Street Journal* quoted James H. Evans, Chairman of GM's Audit Committee, as stating: "The directors have 'no intention of rescinding the agreement.' " Therefore, in addition to all of the previously detailed breaches of their duties, GM's Board of Directors did not consider plaintiff's demand with the due care and reasonable investigation required by their corporate office.

FN9. To the extent that the amended complaint alleges other facts, those facts are not sufficiently particularized to create a reasonable doubt as to whether the GM Board was informed when it approved the

Not Reported in A.2d
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333
**(Cite as: Not Reported in A.2d)**

buyout transaction or decided to reject the plaintiff's demand.    At most those facts establish that the Board was not aware of all of the details of the Perot-Smith dispute-a dispute that plaintiff concedes was public knowledge.    Specifically, the complaint alleges that when the Board approved the buyout, at least some of the Board members were not aware of the agreements made by Perot and GM to preserve EDS's autonomy. The complaint suggests that if the Board members had known of these agreements, they would not have authorized the buyout, because they would have conceded the correctness of Perot's positions on the autonomy issue.    But that allegation is inconsistent with, and is contradicted by, other allegations that there were strong disagreements in late 1986 as to how EDS should be managed, which caused the Board to conclude that it was in GM's best interest to buy out Perot and his associates.    *See* Am.Compl. ¶¶ 67-90.    Taken as a whole, these allegations do not create a reasonable doubt that the Board's decisions to approve the buyout and to reject the demand, were sufficiently informed.

FN10.  GM's January 9, 1987 reply letter states as follows:
Please be advised that on January 5, 1987, following review of the matters set forth in your December 11, 1986 letter, the Board of Directors of General Motors Corporation unanimously determined that an attempt to rescind, or litigation, or other action concerning the transaction involving the purchase of General Motors Class E stock and related contingent notes from H. Ross Perot, Morton Meyerson, William Gayden and Thomas Walter is not in the best interests of the Corporation.    Accordingly, the board refused your demands.

Del.Ch.,1989.
Levine v. Smith
Not Reported in A.2d, 1989 WL 150784, 16 Del. J. Corp. L. 333

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

1999 WL 378125, Lewis v. Austen, (Del.Ch. 1999)

**\*378125**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.   CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Harry LEWIS, Plaintiff,
v.
K. Frank AUSTEN, M.D., et al., Defendants.
No. C.A. 12937.
June 2, 1999.

Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; and A. Arnold Gershon, P.C., New York, New York; for Plaintiff.

Kevin G. Abrams, Thomas A. Beck, and Srinivas M. Raju, of Richards, Layton & Finger, Wilmington, Delaware; and Alexander R. Sussman, of Fried, Frank, Harris, Shriver & Jacobson, New York, New York; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*\*1** Pending is a motion to dismiss the amended complaint ("complaint") in a stockholder derivative action brought on behalf of Humana, Inc. ("Humana") against its present, and certain of its former, directors. The complaint charges that those directors wrongfully enriched themselves by making certain adjustments to Humana's stock option plans when Humana "spun-off" its hospital subsidiary, Galen Health Care, Inc. ("Galen"), in connection with a tax-free reorganization and distribution in March 1993 (the "Distribution"). Those adjustments were made to reflect the fact that after the Distribution, Humana stockholders would own shares in two separate companies--Humana and Galen. The plaintiff's claim is that Humana's directors adjusted the stock option plans to give themselves a larger number of options than what they would have otherwise been entitled to receive.

The defendants have moved to dismiss the amended complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6), and for failure to satisfy the demand requirements of Rule 23.1. For the reasons that follow, I conclude that the motion is meritorious and should be granted.

## I. BACKGROUND (FN1)

### A. The Parties

The plaintiff is a Humana stockholder who brings this action derivatively on behalf of Humana, which is a Delaware corporation engaged in the health care industry. Humana's shares are publicly traded on the New York Stock Exchange.

Six of the individual defendants--K. Frank Austen, M.D., Michael E. Gellert, John R. Hall, W. Ann Reynolds, Ph.D., David A. Jones, and Wayne T. Smith (sometimes referred to as the "post-Distribution Humana Board")--have been Humana directors since March 1, 1993, the date of the Distribution.   The four remaining individual defendants--J. David Grissom, John W. Landrum, William T. Young, and Carl F. Pollard (referred to as the "Galen Directors")--were Humana directors before the Distribution, and after the Distribution became directors of Galen. For ease of reference, the ten-member board of directors that approved both the Distribution and the adjustments to Humana's stock option plans are referred to throughout this Opinion as the "pre-Distribution Humana Board."

### B. The Distribution

Before the Distribution, Humana was engaged in two lines of business: managing acute-care hospitals, and providing and administering health plans. Because the joint operation of those two businesses generated conflicts that were perceived to adversely affect Humana's overall profitability, the Humana Board decided that the company and its stockholders would be better off if the two businesses were owned and operated as separate entities.

In December 1992, the Humana Board decided to separate the company's two businesses by "spinning-off" the hospital business to Galen (at that time a wholly-owned subsidiary) in a tax-free reorganization.   The transaction would proceed as follows: Humana would transfer to Galen the assets of its acute-care hospital business, and in exchange would receive stock of Galen. Humana would then distribute its Galen stock to each of its (Humana's) stockholders on the basis of one Galen share for each share of Humana.   That transaction, as above-described, is the Distribution and would result in Humana's stockholders owning stock in both Humana and Galen, which would be two separate publicly owned companies, each having its own separate board of directors.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

C. The Humana Option Plans

**\*\*2** The foregoing narrative is background. The critical facts--and the focus of the plaintiff's claims-- concern what occurred after the Distribution particularly with respect to Humana and Galen's outstanding stock options.

At the time of the Distribution, Humana had three separate stock option plans: (i) the Humana 1981 Non-Qualified Stock Option Plan, (ii) the Humana 1989 Employees Stock Option Plan, and (iii) The Humana 1989 Stock Option Plan for Non-Employee Directors. (Collectively, these plans are referred to as the "Humana Option Plans," or the "Plans."). (FN2) Under the Plans, the options generally would expire ten years from the date of their grant, but their exercise date could be accelerated in the discretion of the Compensation Committee of the Humana Board. (FN3) These option Plans all contained the identical capital adjustment provision, the critical term of which was that in the event of a "stock dividend" or "reorganization," the optioned shares "*shall* be adjusted in a manner consistent with such capital adjustment," and the purchase price of the optioned shares "*shall* be adjusted so that there will be no material change in the aggregate purchase price payable upon exercise" of the options. (FN4)

D. The December 7, 1992 Humana and Galen Board Meetings

On December 7, 1992, the Humana and Galen boards held meetings at which three important actions were taken. First, the Humana Board amended Humana's Stock Option Plans to reflect the impact of the Distribution (the "Humana Option Plan Amendments" or "Amendments"). The effect of the Amendments was that: (a) each Humana option holder would receive one Galen option for each Humana option he or she held; (b) the exercise prices of Humana options would be reduced based upon a formula derived from the post-Distribution market prices of Humana and Galen stock; (FN5) (c) all Humana options held by Humana personnel who would be leaving Humana to work for Galen would become immediately exercisable, and the expiration date of those options would be extended to the *earlier* of the original expiration date or March 1, 1995; and (d) all Galen options issued to Humana personnel who were not departing Humana to work for Galen would expire on March 1, 1995. The Amendments and the Distribution were both made subject to shareholder approval.

Second, the Galen Board adopted, and Humana as Galen's sole stockholder approved, the "Galen Adjustment Plan," whose purpose was to implement the Humana Option Plan Amendments that governed the contemplated distribution of Galen options to Humana option holders. Defendants Austen, Hall, Reynolds, Jones, Pollard, and Smith--all of whom held Humana stock options--ultimately received Galen stock options as a result of the combined Humana Option Plan Amendments and the Galen Adjustment Plan.

Third, the Galen Board approved a plan (the "Galen Directors Plan") that would automatically grant (a) 5,000 restricted Galen shares to each non-Galen employee who joined the Galen Board after the Distribution, and (b) 1,500 restricted Galen shares to each Galen director for each three years of continuous service on the Galen Board. Under the Galen Directors Plan, the Galen Board issued to defendants Grissom, Landrum, and Young (subject to the Distribution receiving shareholder approval) 5,000 shares of restricted Galen stock for $.01 per share, plus the right to receive every third year an additional 1,500 shares of Galen restricted stock at the same price, for as long as they served continuously on the Galen Board. At the time the Director Defendants took these actions, Messrs. Grissom, Landrum, and Young owned no Humana stock options.

E. The February 18, 1993 Stockholder Meeting

**\*\*3** The Distribution, the Amendments, the Galen Adjustment Plan, and the Galen Directors Plan were all approved at Humana's annual stockholder meeting held on February 18, 1993. The Distribution became effective on March 1, 1993. On that date the closing price of Galen stock (on a "when-issued" basis) was $12 1/4 per share, and the (pre-Distribution) closing price of Humana stock was $19 7/8, equivalent to an implied post-Distribution price of $7 5/8 for each Humana share.

F. The Galen-Columbia Merger

The Proxy Statement disclosed that shortly after the Distribution, Galen and Columbia Health Care ("Columbia") began engaging in merger negotiations. On June 10, 1993, those companies publicly announced that Galen would be acquired by Columbia in a stock-for-stock merger. On September 1, 1993, the Galen-Columbia merger was consummated. The complaint alleges that even before the Distribution became effective, the pre-Distribution Humana Board "knew or should have

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1999 WL 378125, Lewis v. Austen, (Del.Ch. 1999)                                                    Page 3

known" that Humana had been engaging in preliminary "discussions" with Columbia about a possible Galen-Columbia combination, and that the Board should have disclosed those discussions to Humana's shareholders in connection with seeking their approval of the Distribution.

G. This Lawsuit

On April 15, 1993, the plaintiff filed his original complaint, alleging that the issuance of Galen options to post-Distribution Humana personnel, and the issuance of adjusted Humana options to Galen personnel, (FN6) constituted a waste of corporate assets. The defendants moved to dismiss the original complaint. On September 13, 1995, this Court granted the plaintiff leave to file an amended complaint, which the plaintiff served and filed on October 3, 1995. The amended complaint alleges only Humana derivative claims. The plaintiff made no pre-suit demand on the Humana Board to redress these claims.

In response, the defendants moved to dismiss the amended complaint. This is the Court's decision on that motion.

II. THE CONTENTIONS

The plaintiff concedes that the amended complaint should now be regarded as asserting only three claims. (FN7) The first claim is that the post-Distribution Humana Board breached their duty of loyalty (i) by engaging in a self-dealing transaction that involved using undisclosed "inside information" (that Galen might be merged with or sold to Columbia) at the time the Board approved the Humana option adjustments, and (ii) by illicitly profiting from that information by having received Galen options for no consideration. The second claim is that the Adjustments to the Humana options that would be distributed to post-Distribution Galen employees, represented a waste of corporate assets. The third claim is that the Galen Directors Plan was itself unfair and a waste of corporate assets.

For the reasons next discussed, the Court concludes that all three claims are legally insufficient and must be dismissed under Rule 12(b)(6). It further concludes that the plaintiff has failed to satisfy the "demand futility" pleading requirement of Rule 23.1 that governs the derivative claims being asserted here.

III. ANALYSIS

**4  To prevail on a motion to dismiss under Court of Chancery Rule 12(b)(6), a plaintiff must allege facts that, taken as true, establish each and every element of a claim upon which relief could be granted. (FN8) Conclusory allegations that lack specific supportive factual averments will not be accepted as true. (FN9) These standards govern the Court's evaluation of the claims at issue here.

A. The Self-Dealing Claim

The plaintiff first claims self-dealing by the post-Distribution Humana directors, all of whom were members of the Humana Board that approved the Distribution. The logic underlying this claim runs as follows: the Galen-Columbia merger was announced six months, and closed nine months, after the Distribution became effective. Given the timing, the post-Distribution Humana directors must have known of--and therefore must have used and benefited from-- the undisclosed information that Columbia was interested in acquiring Galen's hospital assets. Therefore, those directors improperly used their position as fiduciaries by approving the Amendments and obtaining Galen options for themselves. Thus, the claim is that the Amendments enabled the post-Distribution Humana Board to unjustly enrich themselves in the Galen-Columbia merger, by permitting them to exercise options that would otherwise have expired or remained unvested.

Because a majority of the Humana board were outside directors at the time of the Distribution, the director defendants are cloaked with a presumption that in approving the Distribution and Amendments, they acted in good faith and acted with appropriate loyalty and due care. (FN10) The plaintiff may of course rebut this presumption, but only with specific, nonconclusory factual allegations. (FN11) Because the pleaded facts fail to rebut that presumption, the self-dealing claim must fail.

The self-dealing claim against the post-Distribution Humana directors is legally insufficient for three reasons. First, it rests upon "fraud by hindsight" allegations of the kind which, as a legal matter, cannot support a claim for self-dealing. Second, it does not adequately allege that the defendants received an improper benefit because the so-called option "enhancements"--which neither extended the options' expiration date nor accelerated any vesting rights--created no new "benefits." Third, the complaint asserts no facts that support a claim of misuse of inside information or of disloyalty and self-dealing by the post-Distribution Humana Directors.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

These reasons are now elaborated.

1. The "Fraud by Hindsight" Problem

The essence of the self-dealing claim is that in December 1992 Humana had discussions with Columbia about a possible combination, which discussions were not, but should have been, disclosed to the Humana shareholders. Therefore, by approving the Distribution the Humana directors wrongfully misused and personally benefited from that undisclosed information.

This claim as pleaded is conclusory: it lacks specific supporting factual allegations that would establish that merger discussions actually took place before the Distribution, and that the Humana directors misused their knowledge of those discussions. That is not surprising, because what the complaint actually does allege is that "[s]hortly *after* the [Distribution], Galen and Columbia began discussing the possible acquisition of Galen by Columbia." (FN12) While the complaint alleges that the directors had "the benefit of undisclosed, inside information *concerning Columbia's interest in Galen,*" it does not allege that they had information concerning a possible merger of those entities at that time. (FN13)

**5 This claim amounts to "fraud by hindsight"-- a theory this Court specifically rejected in *Noerr v. Greenwood.* (FN14) In *Noerr,* the plaintiff challenged proxy disclosures relating to the market value of a corporation's stock, claiming that those values had been understated at the time of the disclosure. The sole factual basis for the claim was that the stock price had substantially increased eight months later. That "fraud by hindsight" claim was found to be legally insufficient, because it did not rest upon a contemporaneous fact from which "guilty knowledge" could be inferred.

The claim in this case is that the post-Distribution Humana Board members had engaged in *pre-Distribution* merger discussions with Columbia. Here, as in *Noerr,* that claim is supported by a single alleged "hindsight" fact--that the Galen-Columbia merger was announced six months, and closed nine months, after the Distribution. What the complaint does not allege, however, is any "*contemporaneous* pleaded fact from which one may infer" that pre-Distribution discussions actually took place or that the defendants had wrongfully benefited from their knowledge of those alleged discussions. (FN15) That omission is fatal to the claim.

2. The Post-Distribution Humana Directors' Alleged Benefit

The self-dealing claim is also deficient because the complaint does not adequately plead a benefit that the post-Distribution Humana directors wrongfully obtained by reason of their alleged self-dealing.

a. Expiration Date Extensions

The post-Distribution Humana Directors are said to have benefited by granting themselves Galen options that would be exercisable up to March 1, 1995. That, it is claimed, was wrongful because the pre-Distribution Humana options those directors surrendered in exchange would have expired before that time. But the record does not support the claim that the expiration date(s) of the Galen options were (wrongfully) extended beyond the date that would otherwise apply; on the contrary, the expiration dates of the Galen options were shortened. The Proxy Statement (incorporated by reference into the complaint) disclosed that the expiration date of an option to acquire stock in Galen would be the then-current expiration date, or March 1, 1995, whatever was earlier. The effect was to shorten to March 1, 1995 the expiration date of any Galen option issued in respect of a corresponding Humana option that would expire after March 1, 1995. (FN16)

b. Accelerated Vesting

Nor has the plaintiff adequately alleged that the Humana directors voted to confer upon themselves the authority to accelerate the vesting and exercise date of the Galen options, which they then proceeded to invoke in order to enable themselves to take advantage of their knowledge of a future acquisition of Galen by Columbia. The Humana Option Plans disclose that the post-Distribution Humana directors did not need to amend or adjust those Plans to be able to accelerate either the vesting or the exercise of the options. Those Plans already gave the Humana Board's Compensation Committee full discretion "to determine when Options may be exercised, including the ability to accelerate [the] exercise dates of Options previously granted." (FN17) The Compensation Committee also had pre-existing authority to modify the options "to preserve for the [Employee or Optionee] the benefits of any appreciation of the underlying Stock during the term of the Option which benefits might otherwise be lost as a result of" an acquisition or merger. (FN18) The Galen Adjustment Plan contained similar provisions. (FN19) The purpose of accelerated exercise

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

provisions is to assure that no one will lose the benefit of options as the result of a merger. That preexisting authority undermines the claim that Humana's directors accelerated the vesting and/or the exercise date of the options to take advantage of the Galen-Columbia merger.

c. Wrongfully Obtained Profits

**6** Finally, the plaintiff attempts to infer self-dealing from the profits the post-Distribution Humana Directors allegedly made as a result of the grant of Galen options. The inference would be erroneous, however, because the pleaded facts do not show that the post-Distribution Humana Directors were better off as a result of those options being granted. The complaint alleges that *Galen shares* appreciated $19.04 over two years, from $12.25 per share on March 1, 1993, to an adjusted $31.29 per Galen share on March 1, 1995. (FN20) The plaintiff claims that because five of the six post-Distribution Humana Directors held 425,703 optioned Galen shares, this "suggest[s] benefits to the five board members in excess of $9 million." (FN21)

But this overlooks the fact that if the Humana option holders had not received Galen options in the Distribution, they could have received additional Humana options in lieu thereof. As the complaint discloses, during that same two-year period, the *post-Distribution Humana shares* appreciated $16.50 per share. (FN22) If the post-Distribution Humana Directors had received (in lieu of a Galen option) the economic equivalent in the form of an additional option for 1.64 new Humana shares for each of their optioned Humana shares, then the increased value of the additional optioned Humana shares would have been $27.06 per share--1.64 times $16.50. (FN23) Thus, the directors who received about $9 million of capital appreciation on their 425,703 optioned Galen shares, would have realized even greater benefits of $11,519,523 under that alternative scenario.

3. The Alleged Use of "Inside Information"

Finally, the self-dealing claim is deficient because the plaintiff has not adequately pled that the post-Distribution Humana Directors misused inside information. The claim (to reiterate) is that the Humana directors misused their knowledge of undisclosed "pre-Distribution discussions" with Columbia to obtain Galen options for themselves. But, the complaint alleges that the Galen-Columbia discussions occurred after the Distribution, not before. Nor does the complaint disclose that the

challenged expiration and vesting features of the option Adjustments conferred upon the post-Distribution Humana directors a benefit that was not shared equally by all other shareholders who continued to hold Humana options. (FN24)

B. The Waste Claims

The plaintiff's second and third principal claims are that the Humana Option Plan Amendments that related to the Galen employees and the Galen Directors Plan amounted to corporate waste. These claims are analyzed separately.

1. The Adjustment of Humana Options Held by Post-Distribution Galen Employees

The analysis of these claims must begin with 8 *Del, C,* § 157, which authorizes a Delaware corporation to create and issue options to purchase its shares, and provides that "[i]n the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such ... options and the sufficiency thereof shall be conclusive." (FN25) Accordingly, a claim of waste will not succeed unless the plaintiff is able to allege facts demonstrating that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." (FN26) Expressed in somewhat different terms, the pleaded facts must show "an absolute lack of consideration, rather than inadequate consideration." (FN27) That "extreme test [is] very rarely satisfied by a shareholder plaintiff, because if under the circumstances any reasonable person might conclude that the deal made sense, then the judicial inquiry ends." (FN28)

**7** The issue is whether the complaint satisfies that "extreme test." The plaintiff contends that it does, because after the Distribution became effective the former Humana employees who stayed on with Galen had effectively been "terminated" as employees of Humana. As a consequence, the Humana Board had a duty to treat those departing employees as terminated, with the result that those employees' unvested options would have expired at the time of the Distribution. Accordingly, plaintiff concludes, by accelerating the vesting of those options, the Humana Board committed waste by causing Humana to give the departing employees a benefit that the corporation was not legally obligated to give.

The flaw in this reasoning is that the complaint

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

does not adequately claim that the Humana Stock Option Plans "must be read" to require that those Humana employees who became employees of Galen after the Distribution be regarded as "terminated." No cited provision, definition, or language in the Plans mandates such a reading, and the Humana Option Plans explicitly permitted the Compensation Committee, in its discretion, to accelerate the vesting of the Options. Consequently, the pleaded facts do not support the contention that the Humana employees who would continue on with Galen were "terminated" as a consequence of the Distribution.

Nor does the complaint allege that no consideration flowed to Humana as a result of the Humana Option Plan Amendments. Those Amendments were necessary because Galen was to be spun-off in the Distribution. The objective of the Amendments was both to retain the services of Humana (but soon-to-be Galen) employees before the Distribution became effective, and to retain their services thereafter when they would be working in their same jobs, but as Galen employees. By inducing the continued services of these employees, the Amendments resulted in consideration flowing to Humana. (FN29) Consideration also flowed for another reason. In the absence of the Amendments, the (new) Galen employees might have asserted a legal claim that they had not been terminated as Humana employees, and therefore were entitled to take advantage of the Humana Option Plan's capital adjustment provision. To the extent the Amendments eliminated that potential claim, they resulted in consideration to Humana in this form as well.

2. The Galen Directors Plan

The plaintiff's third and final claim is that the Galen Directors Plan constituted a waste of assets. It will be recalled that in connection with the Distribution, defendants Grissom, Landrum, and Young resigned from the pre-Distribution Humana Board and joined the post-Distribution Galen Board as non-employee outside directors. The Galen Directors Plan granted each of these former Humana directors 5,000 restricted Galen shares, plus an additional 1500 shares for each three year period of continuous service on the Galen Board.

The plaintiff claims that those features of the Galen Directors Plan were unfair and wasteful to Humana, but nowhere did he support that claim legally or factually in his brief or at oral argument. Because the Galen Directors Plan was approved by a majority of disinterested directors, it was entitled to

the protective presumption of the business judgment rule. Any suggestion that that Plan amounts to waste is unsupported by the pleaded facts, which show that Humana received consideration for the grant of restricted Galen shares, namely, the inducement to Messrs. Grissom, Landrum, and Young to remain in Humana's service during the period from December 1992 to the effective date of the Distribution, and thereafter to perform services for Galen as post-Distribution Galen non-employee directors. (FN30)

\* \* \*
\* \* \*

**8.** In addition to being legally deficient under Rule 12(b)(6), the complaint also fails to comply with the pleading requirements of Chancery Court Rule 23.1, because it does not allege particularized facts showing that a demand on the post-Distribution Humana Board would have been futile. Under Delaware law, the requirement of a pre-suit demand will be excused only if the plaintiff alleges particularized facts creating a reason to doubt that (i) the directors who approved the transaction were disinterested or independent, or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. (FN31) The amended complaint satisfies neither of these criteria.

The post-Distribution Humana directors constituted a majority of the Humana board at the time the original complaint was filed. No particularized pleaded facts suggest that those directors had any improper financial interest in, or engaged in self-dealing by approving, the Amendments or the Galen Adjustment Plan. With respect to the claims challenging the validity of the option Adjustments for Galen directors and employees and the Galen Directors Plan, the complaint shows that the post-Distribution Humana directors were disinterested and independent, and nothing in that pleading suggests otherwise. (FN32)

The plaintiff has not satisfied *Aronson*'s second prong either. As earlier discussed, the complaint states no cognizable claim of waste because it pleads no facts demonstrating a total absence of consideration flowing to Humana for adopting the Humana Option Plan Amendments and the Galen Directors Plan. The complaint also alleges no particularized facts that show the various Amendments and Adjustments were not otherwise the product of a valid business judgment. (FN33) Accordingly, the motion to dismiss under Rule 23.1 is also well-founded.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

## IV. CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the amended complaint is granted. IT IS SO ORDERED.

(FN1.) The factual background, drawn from the complaint, must be accepted as true for purposes of this motion. *Weinberger v. UOP, Inc.,* Del. Ch. 409 A.2d 1262 (1979). The parties agree that the Court may consider, in addition, the specific terms of the Humana Stock Option Plans, the Humana Option Plan Amendments, the Galen Adjustment Plan, and the Galen Directors Plan, all of which are found in the Proxy Statement and in two affidavits of Kevin G. Abrams, Esquire ("Abrams Aff." and "Abrams Supp. Aff."). *Lewis v. Austin,* Del. Ch., C.A. No. 12937, Jacobs, V.C. (Jan. 26, 1997) (Transcript of January 26, 1999 Oral Argument, at 55). Because those documents form an integral part of the complaint and their contents are not disputed, they may be considered on this motion. *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996); *In re Santa Fe Pacific Corp, Shareholder Litig.,* Del.Supr., 669 A.2d 59, 68-69 (1995) ("*Santa Fe*"); *Joyce v. Cuccia,* Del. Ch., C.A. No. 14953, mem. op. at 1, n. 1, 9, n. 9, and 20, Jacobs, V.C. (May 14, 1997); *Ash/Ramunno Assocs., Inc. v. Branner,* Del. Ch., C.A. No. 12389, mem. op. at 4-5, Hartnett, V.C. (May 21, 1993).

(FN2.) Under the Humana Option Plans, as of January 1, 1993, two months before the Distribution, options had been granted to purchase 3,343,820 Humana shares. Since 1989, options to purchase 2,921,696 shares (or approximately 87.3% of the outstanding options) had been granted under the 1989 Directors Plan, and the 1989 Employees Plan.

(FN3.) Abrams Aff. Ex. 2 at A-2-3, para. 8-9; *Id.,* Ex. 3 at B-2-3, para. 9-10; *Id.,* Ex. 4 at 2, para. 6-7.

(FN4.) Abrams Aff. Ex. 2 at A-3, para. 13; *Id.,* Ex. 3 at B-3, para. 14; *Id.,* Ex. 4 at 2, para. 10 (emphasis added).

(FN5.) The defendants offer the following example to help clarify the Distribution formula's effect: If (hypothetically) Humana stock was trading at $20 per share pre-Distribution and $8 per share post-Distribution, and if Galen stock was trading at $12 post-Distribution, each owner of one Humana

share worth $20 would hold (post-Distribution) one (post-Distribution) Humana share worth $8 and one Galen share worth $12. A pre-Distribution Humana option holder who held an option to purchase one Humana share at a pre-Distribution exercise price of $20 would receive two separate options--an option to purchase post-Distribution one Humana share at $8 per share, and an option to purchase one Galen share at $12 per share.

(FN6.) The original complaint did not allege any derivative claim on behalf of Humana with respect to the Humana Option Plan Amendments and the Galen Adjustment Plan. Rather, the original complaint alleged solely a*Galen* derivative claim for waste, *viz.,* that Galen had received no consideration for issuing those options. Belatedly conceding that Columbia had succeeded to the Galen derivative claim as a result of its merger with Galen in 1993, the plaintiff amended his original complaint to assert a derivative claim on behalf of *Humana,* charging the continuing Humana Directors with self-dealing and waste by approving option adjustments that resulted in their receiving Galen options.

**\*\*8**    (FN7.) In his answering brief and at oral argument, the plaintiff unilaterally narrowed his claims to three. The Court will address those claims, and considers as abandoned any remaining claims that were not argued in the answering brief or at oral argument, including his *ultravires* and certain waste claims against the post-Distribution Humana Board.

(FN8.) *Santa Fe,* 669 A.2d at 65-66; *In re Tri-Star Pictures, Inc .,* Del.Supr., 634 A.2d 319, 326 (1993).

(FN9.) *Santa Fe,* 669 A.2d at 65-66; *accord Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988) ("[e]ven under the less stringent standard of a Chancery Rule 12(b)(6) motion to dismiss ... neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true.").

(FN10.) *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984); *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 361 (1993).

(FN11.) *See Aronson,* 473 A.2d at 812 (burden is on

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1999 WL 378125, Lewis v. Austen, (Del.Ch. 1999)                                                    Page 8

plaintiff "to establish facts rebutting the presumption" of the business judgment rule); *Santa Fe,* 669 A.2d at 65-66 ("[c]onclusory allegations will not be accepted as true without specific supporting factual allegations.").

(FN12.) Amended Complaint, ¶ 15 (emphasis added).

(FN13.) Amended Complaint, ¶ 14 (emphasis added).

(FN14.) *See Noerr v. Greenwood,* Del. Ch., C.A. No. 14320, Jacobs, V.C. (July 16, 1997).

(FN15.) *Noerr, supra* note 14, at 13.

(FN16.) Approximately 89% of the outstanding options were granted in 1989 and were 10 year options, meaning that their expiration dates were effectively shortened. The Proxy Statement pertinently states:

[F]ollowing the Distribution to the extent any [Galen option] has not earlier been exercised, each [Galen option] will automatically terminate on the date which is the earlier of (a) the date on which the Optionee's corresponding [Humana option] terminates (*i.e.,* upon the expiration of the original term of the [Humana Option] due to termination of the Optionee's employment; or (b) the second anniversary of the Distribution Date [ *i.e.,* March 1, 1995].

(FN17.) Abrams Aff. Ex. 2 at A-2, ¶ 9; *Id.,* Ex. 3 at B-2, ¶ 10; *Id.,* Ex. 4 at 2, ¶ 7.

(FN18.) Abrams Aff. Ex. 2 at 3-A-4, ¶ 14; *Id.,* Ex. 3 at B-3-B-4, ¶ 15; *Id.,* Ex. 4 at 3, ¶ 11.

(FN19.) Abrams Aff. Ex. 1 at F-6, ¶ 15.

(FN20.) Amended Complaint, ¶ 16; Abrams Supp. Aff. ¶ 2.

(FN21.) Plaintiff's Answering Brief, at 11.

(FN22.) Amended Complaint, ¶ 16; Abrams Supp. Aff. ¶ 2.

(FN23.) As explained in Abrams Supp. Aff. ¶ 3, one (pre-Distribution) option to purchase one Humana share would become one (post-Distribution) option to purchase 2.64 Humana shares.

(FN24.) The defendants also raise, as an alternative argument, that the Humana stockholders' approval of the Humana Option Plan Amendments constituted a ratification whose effect was to extinguish the plaintiff's duty of loyalty claim. A fully informed shareholder ratification of a transaction will normally cause the transaction to be reviewed under the business judgment review standard. *See* 8 *Del. C.* § 144(a)(2); *In re Wheelabrator Technologies, Inc. Shareholders Litig.,* Del. Ch., 663 A.2d 1194, 1203 (1995) ( *"Wheelabrator II"* ) (finding that 8 *Del. C.* § 144(a)(2) prevents "interested" transactions from being voidable if they are approved in good faith by a majority of disinterested stockholders."). Ratification does not, however, extinguish a duty of loyalty claim. *Id.* Where a duly ratified transaction is challenged as a breach of fiduciary duty, to avoid dismissal a plaintiff must (i) "capture in its pleadings the formidable yet elusive elements of an action for corporate waste in order to pierce" the business judgment rule presumption; or (ii) provide sufficient, specific allegations that the stockholder approval was defective due to disclosure deficiencies in the proxy statement. *See In re the Walt Disney Company Derivative Litig.,* Del. Ch ., C.A. No. 15452, mem. op. at 49-51, Chandler, C. (Oct. 7, 1998); *see also Solomon v. Armstrong,* Del. Ch., C.A. No. 13515, mem. op. at 55, Chandler, C. (Mar. 25, 1999) ("[S]o long as the shareholder vote to approve or disapprove the transaction was made on a fully-informed, non-coerced basis, that vote operates *ex proprio vigore* as an independent foundation for the application of the business judgment rule.").

The plaintiff has not made that showing. He has failed to state a claim that the Proxy Statement disclosures were deficient. He has also seemingly abandoned his claim that the Humana Option Adjustments for continuing Humana employees and directors amounted to waste, and (as discussed *infra* ) his other waste claims are legally insufficient as well. Because the business judgment rule presumptively protects the Humana directors' decision to make the Adjustments, and the plaintiff has not alleged facts that rebut that presumption, the duty of loyalty claim fails on ratification grounds as well.

**\*\*8_**  (FN25.) *See also Zupnick v. Goizueta,* Del. Ch., 698 A.2d 384, 387 (1997).

(FN26.) *Grobow v. Perot,* Del.Supr., 539 A.2d 180,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1999 WL 378125, Lewis v. Austen, (Del.Ch. 1999)                                    Page 9

189 (1988) (quoting *Saxe v. Brady,* Del. Ch., 184 A.2d 602, 610 (1962)).

(FN27.) *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984) (quoting *Michelson v. Duncan,* Del.Supr., 407 A.2d 211, 224 (1979)).

(FN28.) *Zupnick,* 698 A.2d at 387 (quoting *Steiner v. Meyerson,* Del. Ch., C.A. No. 13139, mem. op. at 2, Allen, C. (July 18, 1995).

(FN29.) *See e.g., Zupnick,* 698 A.2d at 388-89 ("consideration for stock options is often the reasonable prospect of obtaining the employee's valued future services").

(FN30.) That latter benefit would flow to Humana stockholders, albeit in their capacity as Galen stockholders.

(FN31.) *Aronson,* 473 A.2d at 814.

(FN32.) The cases relied on by the plaintiff to satisfy *Aronson'* s first prong are inapposite, because there (unlike here) the directors were alleged to have received a personal financial benefit. *See Bergstein v. Texas Int'l Co.,* Del. Ch., 453 A.2d 467, 471 (1982) (new stock appreciation rights); *Siegman v. Tri-Star Pictures, Inc.,* Del. Ch., C.A. No. 9477, Jacobs, V.C. (May 30, 1989) (substantial Coca-Cola dividends). No such

personal benefit is alleged to have resulted from the economically neutral adjustment of the options in the instant case. *See Cinerama Inc. v. Technicolor, Inc.,* Del. Ch., 663 A.2d 1134, 1151-52 (1994), *aff'd,* Del.Supr., 663 A.2d 1156 (1995) (plaintiff must show directors were "especially susceptible" to an opportunity for personal enrichment or that they would behave "differently in this instance than one would expect a reasonable person in the same or similar circumstances to act").

(FN33.) *See Kahn v. Tremont Corp.,* Del. Ch., C.A. No. 12339, mem. op. at 16, Allen, C. (Apr. 22, 1994) (*Aronson'* s second prong is "directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review" and the test "is thus necessarily high, similar to the legal test for waste."); *Levine v. Smith,* Del.Supr., 591 A.2d 194, 207 (1991) ("Plaintiffs' pleading burden under Rule 23.1 is also more onerous than that required to withstand a Rule 12(b)(6) motion to dismiss."); *In re Chrysler Corp, Shareholder Litig.,* Del. Ch., C.A. No. 11873, mem. op. at 7-8, Jacobs, V.C. (July 27, 1992) ("[D]emand is not excused from the complaint if it appears that the challenged transaction could, at least as easily, serve a valid corporate purpose as an improper purpose.").

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.