# TAB 6

*47842     UNPUBLISHED OPINION.  CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Harry LEWIS, Plaintiff,
v.
Donald V. FITES, George A. Schaefer, James W. Wogsland,
Charles E. Rager, Frank N. Grimsley, R.R. Thornton, Lilyan
H. Affinito, John W. Fondahl, Louis V. Gerstner, Jr., Robert
E. Gilmore, James P. Gorter, Walter H. Helmerich, III, Jerry
R. Junkins, Charles F. Knight, Lee L. Morgan, and Rawleigh
Warner, Jr., Defendants,
and
Caterpillar, Inc., Nominal Defendant.
Civ. A. No. 12566.
Submitted:  Nov. 10, 1992.
Decided:  Feb. 19, 1993.

Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, of counsel: Stanley M. Grossman, Marc I. Gross, and Judith R. Schneider, of Pomerantz Levy Haudek Block & Grossman, New York City, and Norman Berman, of Berman DeValerio & Pease, Boston, MA, for Plaintiff.

Lawrence A. Hamermesh, of Morris, Nichols, Arsht & Tunnell, Wilmington, of counsel: Douglas A. Poe, Franklin P. Auwarter, and Mitchell D. Raup, of Mayer, Brown & Platt, Chicago, Ill, for defendants.

MEMORANDUM OPINION

BERGER, Vice Chancellor.

**1  In this derivative action, a stockholder of defendant, Caterpillar Inc.  ("Caterpillar"), alleges that the company's officers and directors breached their fiduciary duties in connection with the dissemination of periodic financial reports.  In addition to Caterpillar, the complaint names as defendants thirteen directors, including three present or former officers, and three other Caterpillar officers who are not directors of the company.  This is the decision on defendants' motion to dismiss for failure to make demand pursuant to Chancery Court Rule 23.1.

The facts, summarized below, are drawn from the complaint and a consent order, referred to in the complaint, entered by the Securities and Exchange Commission ("SEC") on March 31, 1992 (the "Consent Order").   Caterpillar, a Delaware corporation with operations throughout the world, manufactures heavy industrial machinery.  The claims in this case relate to Caterpillar's Brazilian subsidiary, Caterpillar Brazil, S.A. ("CBSA").  In 1989, CBSA accounted for approximately 23% of Caterpillar's net profits, although CBSA's revenues represented only 5% of Caterpillar's total revenues.    CBSA's exceptional 1989 results were based largely on non-operating factors such as Brazil's high inflation and a favorable currency exchange rate.   In December, 1989, Brazil elected a new President who was expected to institute economic reforms to curb inflation.

Caterpillar's management recognized that changes implemented by the new administration in Brazil could have a significant impact on CBSA's 1990 performance.  Caterpillar reports its financial results on a consolidated basis and historically management had not viewed each subsidiary's profits as reliable indicators of its contribution to the parent company.  In January of 1990, however, Caterpillar's accounting department began to analyze CBSA's performance separately.  Management's analysis was reported to Caterpillar's board at the February 1990 board meeting.  Caterpillar's directors were told that the situation in Brazil was "volatile" and that operations in Brazil would have a significant negative impact on Caterpillar's overall results for 1990.

Approximately two weeks after the February board meeting, Caterpillar filed its 1989 Form 10-K.  As in prior years, the 1989 financial results were reported on a consolidated basis.  As a result, CBSA's disproportionate impact on Caterpillar's overall profits was not disclosed.    The Management Discussion and Analysis ("MD & A") section of the Form 10-K did not provide very much information about Brazil.  It stated:

Sales rose 14% in 1989 [in Latin America], the sixth consecutive year of improvement.  The biggest gain was in Brazil, where very high inflation rates increased demand for hard goods, including earth moving equipment.  (Given the extraordinarily high rate of inflation in Brazil, many contractors preferred to own hard assets, such as equipment, rather than depreciating cruzados.)    Toward yearend, however, sales growth in Brazil moderated as interest rates rose.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

**\*\*2** OUTLOOK

... Sales in Brazil, however, could be hurt by post-election policies which will likely aim at curbing inflation.

Consent Order, p. 6.

On March 15, 1990, Fernando Collor de Mello, Brazil's newly elected President, took office. President Collor immediately instituted sweeping economic changes, including an 80% reduction in the amount of currency in circulation and a plan to devalue the Brazilian currency. The Consent Order describes these reforms as creating an "economic crisis [where] even large companies were unable to meet their payrolls or pay normal trade payables." Consent Order, p. 4. However, the impact of these changes on CBSA did not become manifest until after the close of its first quarter on March 31, 1990.

At Caterpillar's April 1990 board meeting, management advised the directors that profits in Brazil would be substantially lower in 1990 than they had been in 1989. Management discussed the likely negative effects of President Collor's new programs, but the 1990 forecast was not revised because management considered the situation in Brazil too volatile and difficult to predict. On May 9, 1990, Caterpillar filed its Form 10-Q for the first quarter of 1990. The MD & A section of that report did not disclose anything about CBSA's anticipated performance. It stated only that demand in Brazil had increased but that Caterpillar continued to be concerned about Brazil's uncertain economic situation.

Caterpillar continued to monitor the impact of Brazil's new policies on CBSA throughout April and May of 1990. By June, Caterpillar had concluded that CBSA would suffer significant losses in 1990 as a result of the Brazilian economic reforms. Accordingly, on June 25, 1990, Caterpillar issued a press release announcing that results for 1990 would be substantially lower than previously projected. Later that day, Caterpillar also disclosed CBSA's importance to the company's 1989 earnings and advised stock analysts that Caterpillar's disappointing results for the second quarter of 1990 were caused largely by circumstances in Brazil. The next day, Caterpillar stock opened at 51 3/4, down 9 5/8 points from the previous day's opening price.

Following these disclosures, the SEC began an investigation and two class action law suits were filed. The class action suits charged Caterpillar and its management with violations of federal securities laws based upon alleged false statements and omissions in the company's 1989 Form 10-K and first quarter 1990 Form 10-Q. On March 31, 1992, the SEC investigation was concluded by the issuance of the Consent Order in which the SEC found that Caterpillar violated Section 13(a) and Rules 13a-1 and 13a-13 of the Exchange Act. As part of the Consent Order, Caterpillar voluntarily implemented procedures to ensure future compliance with MD & A requirements. The federal court actions are still pending.

Plaintiff claims that the alleged misstatements and omissions in Caterpillar's SEC filings have exposed the company to significant potential liability and that the company is already being injured by the cost of defending the pending class actions. Plaintiff alleges that the individual defendants breached their fiduciary duties by failing to fully disclose material information concerning CBSA and by failing to maintain adequate controls to assure proper disclosure of the same information. Plaintiff made no demand on Caterpillar's board before instituting this action. Rather, plaintiff alleges that demand would have been futile and, therefore, demand is excused pursuant to Chancery Court Rule 23.1. Defendants moved to dismiss on several grounds. However, in light of my conclusion that plaintiff has not adequately pled demand futility, I will not reach the alternative grounds for dismissal urged by all defendants or the jurisdictional argument raised by those individual defendants who are not also directors of Caterpillar.

**\*\*3** The test for determining whether a derivative plaintiff has adequately alleged demand futility is well settled:

(1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith,* Del.Supr., 591 A.2d 194, 205 (1991). The complaint alleges that Caterpillar's directors have been aware of the alleged wrongs for more than two years but have taken no action because they participated in and approved the alleged wrongs and would have to sue themselves. Allegations of this sort offered as an excuse for failure to make demand have been rejected repeatedly. *Aronson v.*

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

*Lewis,* Del.Supr., 473 A.2d 805, 815, 818 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 625 (1984); *Haber v. Bell,* Del.Ch., 465 A.2d 353, 359, 360 (1983). Plaintiff offers two additional factors to buttress his claim that defendant directors are interested for purposes of the demand requirement. In the complaint, he notes that defendants agreed to the entry of the Consent Order. Since the Consent Order establishes a violation of federal securities law, plaintiff argues that defendant directors are much more likely to be held liable in this case than in a case where there has been no finding of wrongdoing. This heightened threat of personal liability, according to plaintiff, creates a reasonable doubt that Caterpillar's directors are disinterested. Plaintiff also suggested, at oral argument, that several of Caterpillar's directors were interested in withholding information about CBSA because they were then standing for re-election and the undisclosed information would reflect poorly on them.

Neither of these additional facts excuse demand. The Consent Order does not contain any admission of wrongdoing and it does not include any findings concerning Caterpillar's directors. Thus, the Consent Order does not create a substantial likelihood of director liability. *See Aronson v. Lewis,* 473 A.2d at 815. The fact that three directors were being considered for re-election at the time of the alleged wrongdoing, likewise, fails to excuse demand. First, a majority of the Caterpillar directors were not slated for election at that time and, therefore, were not interested in avoiding disclosures in order to continue on the board. Second, the complaint contains no allegations suggesting that the positions of those directors who were seeking re-election were actually threatened. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

Alternatively, plaintiff argues that demand should be excused because there is a reasonable doubt that the directors' conduct was the product of a valid exercise of business judgment. He argues that Caterpillar's directors engaged in a knowing violation of federal securities laws. Before the two financial statements at issue were filed, the Caterpillar board knew that CBSA's profits in 1990 would be substantially lower than in 1989. Plaintiff describes this as being "obviously" material information that should have been fully disclosed. Plaintiff's Memorandum of Law, p. 15. Plaintiff acknowledges that Caterpillar's general counsel opined on the adequacy of the disclosures before the board approved filing the 1989 Form 10-K. However, plaintiff contends that reliance on outside opinions and reports is not sufficient to insulate the directors as a matter of law. *See Avacus Partners, L.P. v. Brian,* Del. Ch., Civil Action No. 11,001, Allen, C. (October 24, 1990), Mem.Op. at 16. Here, plaintiff suggests that the board's reliance was misplaced in light of the information known to the directors. Accordingly, plaintiff argues that there is a reasonable doubt that the directors' conduct will be protected by the business judgment rule.

**\*\*4.** The problem with this argument is that it is premised on an assumption that I am not prepared to make. Plaintiff seems to be arguing that because the directors knew of the economic problems affecting CBSA, they also must have known that Caterpillar's MD & A disclosures were inadequate and misleading. The facts set forth in the Consent Order suggest the opposite:

> The MD & A sections of the 1989 10-K and 10-Q for the first quarter of 1990 were drafted by employees in Caterpillar's accounting department. Prior to the issuance of those reports, the language of the MD & A was reviewed by the Controller, Financial Vice President, Treasurer, and the company's legal, economic, and public affairs departments. After that, the language of the MD & A was reviewed by the top officers of the Company.

> The board of directors reviewed the final draft of the 1989 Form 10-K, including the MD & A, at the February 1990 board meeting. At that time, the board, including top management who were members of the board, received a written opinion of the company's independent auditor that the financial statements complied with the rules and regulations of the Commission, and also an opinion of the company's General Counsel that the Form 10-K complied with all the rules and regulations of the Commission.

Consent Order, p. 5 (footnotes omitted). While it is true, as plaintiff suggests, that the directors' reliance on these reports does not totally insulate them from potential liability, that reliance certainly is a factor to be considered in deciding whether there is a reasonable doubt as to the applicability of the business judgment rule. Here, there is nothing in the complaint to suggest that the directors' reliance was unreasonable. Accordingly, I conclude that the complaint fails to satisfy the second prong of the demand futility test and that the complaint, therefore, must be dismissed for failure to make demand.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1993 WL 47842, Lewis v. Fites, (Del.Ch. 1993)

IT IS SO ORDERED.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# TAB 7

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FRANK DAVID SEINFELD, | ) | Civil Action No. 03-5225 |
|  | ) |  |
| Plaintiff, | ) | **OPINION** |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| HANS W. BECHERER, GORDON M. BETHUNE, JAIME CHICO PARDO, ANN M. FUDGE, JAMES J. HOWARD, BRUCE KARATZ, RUSSELL E. PALMER, IVAN G. SEIDENBERG, MARSHALL N. CARTER, DAVID M. COTE, ROBERT P. LUCIANO, JOHN R. STAFFORD, MICHAEL W. WRIGHT, and HONEYWELL INTERNATIONAL, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**KATHARINE S. HAYDEN, U.S.D.J.**

This matter comes before the Court by way of the defendants' motion to dismiss

plaintiff's claims.  Plaintiff is a shareholder of defendant Honeywell International, Inc.

("Honeywell" or the "Company"), a publicly traded corporation organized under the laws of

Delaware. (Am. Compl. at ¶¶ 3, 5.)  Defendants Hans W. Becherer, Gordon M. Bethune, Jaime

Chico Pardo, Ann M. Fudge, James J. Howard, Bruce Karatz, Russell E. Palmer, Ivan G.

Seidenberg, Marshall N. Carter, David M. Cote, Robert P. Luciano, John R. Stafford, and

Michael W. Wright are members of Honeywell's board of directors (the "Board"). (Id. at ¶ 6.)

This lawsuit seeks relief on the theory that the defendants failed to include sufficient information

in Honeywell's March 17, 2003 proxy statement (the "Proxy Statement") that solicited

shareholder approval of the Honeywell 2003 Stock Incentive Plan (the "2003 Plan"). Plaintiff

alleges the Proxy Statement violates Section 14(a) of the Securities and Exchange Act of 1934

and various securities regulations, because it fails to state adequately the number of shares

available under the 2003 Plan and the cost of the plan.

The 2003 Plan authorizes Honeywell's Management Development and Compensation

Committee (the "Committee"), in its discretion, to issue stock options, stock appreciation rights

("SARs"), performance awards, restricted units, restricted stock, and other stock-based awards to

eligible Honeywell employees. (Certification of Anthony M. Gruppuso ("Gruppuso Cert."), Exh.

B at 28-29.) Under the heading "SHARES AVAILABLE FOR ISSUANCE," the Proxy

Statement specifies that "[t]he maximum number of Shares that may be issued to Participants

under the Plan is 33,888,057 ......" (Id., Exh. B at 32.) Per the Proxy Statement, additional

shares may become available under the following circumstances:

> In addition, any Shares relating to Awards under the Plan, the
> 1997 Honeywell Stock and Incentive Plan, the 1993 Employees
> Plan, the 1993 Honeywell Stock and Incentive Plan, the 1988
> Honeywell Stock and Incentive Plan, the 1985 Stock Plan for
> Employees of AlliedSignal Inc. and Its Subsidiaries, and the
> Honeywell Employee Stock and Incentive Plan (collectively, the
> 'Prior Plans') that expire or are forfeited, cancelled or settled in
> cash in lieu of Shares on or after January 1, 2003, will again be
> available pursuant to new Awards under the Plan.
>
> Shares issuable under the 2003 Stock Incentive Plan may consist of
> authorized but unissued Shares or Shares held in Honeywell's
> treasury. In determining the number of Shares that remain
> available under the Plan (including Shares originally authorized
> under the 1993 Employees Plan), only Awards payable in Shares
> will be counted. If an Award under the Plan or any Prior Plan is
> terminated on or after January 1, 2003, by expiration, forfeiture,
> cancellation or for any other reason without issuance of Shares, or
> is settled in cash in lieu of Shares, the Shares underlying such
> Award will be available for future Awards under the 2003 Stock
> Incentive Plan. Also, if Shares are tendered or withheld on or after
> January 1, 2003, in payment of all or part of the Exercise Price of a

2

Stock Option, or in satisfaction of tax withholding obligations, these Shares will be available for future Awards under the 2003 Stock Incentive Plan. In addition, Shares may be reacquired under the Plan with cash tendered in payment of the Exercise Price of a Stock Option or with moneys attributable to the tax deduction enjoyed by Honeywell upon the exercise or disqualifying disposition of Stock Options. The Committee may also grant Shares under the Plan in connection with the assumption, conversion or substitution of Awards as a result of the acquisition of another company by Honeywell or a combination of Honeywell with another company.

(Id., Exh. B at 32-33.) The foregoing information also appears in the Plan itself, which is attached to the Proxy Statement. (Id., Exh. B. at 32-33; A-16.)

The Proxy Statement states further that "[t]he actual amount of the 2003-04 Performance Award is not presently determinable because these amounts are dependent on the level of attainment of the applicable Performance Measures as of the end of the 2003-04 Performance Cycle and the ability of the Committee, in its discretion, to reduce the amount of the Awards." (Id.) Moreover, the Proxy Statement states the annual amount of awards to be granted under the 2003 Plan "is not expected by the Committee to be materially different than the aggregate annual amount of Awards granted under the 1993 Employees Plan." (Id.) As of the issuance of the Proxy Statement, no awards had been made under the 2003 Plan. (Id., Exh. B. at 35.)

Plaintiff filed this action on November 3, 2003. On February 20, 2004, he filed the Amended Complaint, which alleges that the Proxy Statement violated Section 14(a), Rule 14a-9, and federal regulations pertaining to the contents of proxy statements because it misrepresented or omitted the total number of shares underlying stock-based awards under the Plan (Am. Compl. at ¶¶ 3, 19, 20-21), and failed to disclose the cost of stock options and other stock-based awards

under the Plan "by means of the Black-Scholes option pricing model or a binomial model."[1] (Id. at ¶¶ 18, 23-24.) Based on these alleged violations, plaintiff seeks judgment voiding the 2003 Plan and enjoining payments under it; requiring defendants to account for Company losses resulting from the alleged violations; directing defendants to establish a "fair and reasonable" stock incentive plan; enjoining defendants from issuing proxy statements that omit fair and adequate disclosure concerning stock-based benefits; and awarding attorneys fees and costs. (Id. at pg. 8-9.)

Defendants move to dismiss the Amended Complaint on three grounds: (1) plaintiff failed to make a demand upon the Company's Board pursuant to Federal Rule of Civil Procedure 23.1 or, alternatively, to allege with particularity why demand is excused; (2) the Amended Complaint fails to meet the heightened pleading standards of the Private Securities Litigation Reform Act; and (3) the Amended Complaint describes no material omissions that are actionable under Section 14(a).

## DISCUSSION

### I.    Legal Standards

A pleading may be dismissed under Rule 12(b)( 6) for "failure to state a claim where it appears beyond doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. "Chugh v. Western Inventory Servs., Inc., 333 F. Supp. 2d 285,289 (D.N.J. 2004) (citations and quotations omitted). In deciding a motion to dismiss for

---

[1]    Economists Fisher Black and Myron Scholes developed the Black-Scholes stock option valuation model in 1971 and were awarded the Nobel Prize for its development in 1997. The Black-Scholes model takes several variables into consideration when valuing a stock option, including (1) the price of the underlying stock on the date of valuation; (2) the exercise price at which the option holder can purchase the stock; (3) the amount of time over which the option will be valid and outstanding; (4) the volatility of the underlying stock; and (5) the risk-free rate of interest at the time the option is being valued. See Mathias v. Jacobs, 238 F. Supp. 2d 556, 574 n.12 (S.D.N.Y. 2002).

failure to state a claim, courts are required to accept all well-pleaded allegations in the complaint as true and to draw all reasonable inferences in favor of the non-moving party. In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 311 F.3d 198,215 (3d Cir. 2002); Chugh, 333 F. Supp. 2d at 289. Legal conclusions made in the guise of factual allegations are not given the presumption of truthfulness. See Papasan v. Allain, 478 U.S. 265, 286 (1986).

In deciding a motion to dismiss, courts may consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); 5B C. Wright & A. Miller, Federal Practice and Procedure § 1357, at 375-76 (3d ed. 2004). Courts may also consider documents that are "integral to or explicitly relied upon in the complaint", Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quotations omitted), or undisputedly authentic documents that form the basis of the plaintiffs claims, PBGC v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Accordingly, the Court may rely upon the proxy statement at issue here without converting this motion into one under Rule 56.

Notably, a party asserting a claim under the federal securities laws must generally meet the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard. Under the PSLRA,

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

> the complaint shall specify each statement alleged to have been
> misleading, the reason or reasons why the statement is misleading,
> and, if an allegation regarding the statement or omission is made
> on information and belief, the complaint shall state with
> particularity all facts on which that belief is formed.

15 U.S.C.A. § 78u-4(b)(1); see also In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1329 (3d Cir.

2002) (applying the heightened pleading standard of 15 US.C. § 78u-4(b)(1) to plaintiff's

Section 14(a) and Rule 10b-5 fraud claims).

    As to this, plaintiff argues the PSLRA does not apply to the Amended Complaint because

it does not allege fraud.  Very recently, the Third Circuit held that "[w]hile claims brought

pursuant to section 14(a) of the 1934 Act do not require that scienter be pleaded, any claims

brought under the 1934 Act must meet the PSLRA particularity requirements. . . *if a plaintiff*

*elects to ground such claims in fraud.*" California Pub. Employees' Ret. Sys. v. Chubb Corp., No.

CNV.A.03-3755, 2004 WL 3015578, at *11 (3rd Cir. Dec. 30, 2004) (emphasis added) (citing In

re NAHC, 306 F.3d at 1329).  In her dissent, Judge Sloviter concluded the plaintiffs should have

been granted leave to amend their Section 14(a) claims because, "if divorced from any

allegations of fraud, [they] would not be subject to heightened pleading requirements of the

PSLRA." 2004 WL 3015578, at *33.  Judge Sloviter further noted that if plaintiffs were granted

leave to amend, their Section 14(a) claim would be governed by the "short and plain statement"

standard of pleading embodied in Federal Rule of Civil Procedure 8(a)(2). Id. at *34.

Accordingly, it appears the Third Circuit would not subject Section 14(a) claims that do not arise

from an alleged fraud to the heightened pleading standards of the PSLRA.

    Carefully, the Amended Complaint avers that this case "is not a securities fraud class

action," and "does not present the possibility of abuse that Congress sought to remedy with the

Private Securities Litigation Reform Act of 1995 . . . ." (Am. Compl. at ¶ 4.)  Plaintiff further

alleges defendants "knew or should have known" the Proxy Statement "was materially false and misleading and failed to comply with the SEC regulations." (Id. at ¶¶ 20, 24.) But while plaintiff styles his claim as negligence, he alleges "an ordinarily loyal board of directors does not (or should not) adopt a multi-billion dollar project without knowing the cost," implying the board breached not only its duty of reasonable care but its duty of loyalty. (Id. at ¶ 21.)

The Court need not decide whether or not these claims "sound in fraud" and are subject to the heightened pleading standard of the PSLRA, however, because as set forth below, the Court concludes that plaintiffs claims fail even under Rule 8(a)(2).

## II.    Plaintiff's Section 14(a) Claims

Section 14(a) of the Securities Exchange Act of 1934 governs the solicitation of proxy statements and provides that

> [i]t shall be unlawful for any person, . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, . . . to solicit any proxy. . . in respect to any security. . . registered pursuant to section 78*l* of this title.

15 U.S.C.A. § 78n(a). Rule 14a-9, promulgated under Section 14(a), in turn provides that no proxy statement shall contain

> any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9. Section 14(a) seeks to prevent management or others from obtaining shareholder authorization for corporate actions by means of deceptive or inadequate disclosures in proxy solicitations. J.I. Case v. Borak, 377 U.S. 426, 430-31 (1964); Shaev v. Saper, 320 F.3d 373,379 (3d Cir. 2003); Gould v. Am.-Hawaiian S.S. Co., 535 F.2d 761, 777-78 (3d Cir. 1976). A proxy statement should inform the person reading it, not "challenge the reader's critical wits, or make stockholders unwitting agents of self-inflicted damage." See Virginia Bankshares, Inc.v. Sandberg, 501 U.S. 1083, 1097, 1103-04 (1991). Thus an omission of information from a proxy statement will violate Section 14(a) "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002). Section 14(a) provides shareholders with an implied cause of action to seek relief when a false or misleading proxy statement interferes with "fair corporate suffrage." J.I. Case, 377 U.S. at 430-31.

To state a claim under Section 14(a), a plaintiff must allege that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" Shaev, 320 F.3d at 379 (quoting General Electric Co. by Levit v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992)). An omitted fact is "material" if there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Id. (citing TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384 (1970)). Put another way, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed

8

by the reasonable investor as having significantly altered the 'total mix' of the information made available." TSC Industries, 426 U.S. at 449.

Plaintiff alleges the Proxy Statement issued in connection with the 2003 Plan violates Section 14(a) because it omits material information required under 17 C.F.R. § 240.14a-l0l et seq. ("Schedule 14A"). Schedule 14A is a section of the SEC regulations governing proxy disclosure that is considered "persuasive authority as to the required scope of disclosure in proxy materials [because] the regulation provides us with the SEC's expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to shareholders in a proxy contest." Cathart, 980 F.2d at 937 (quotations omitted). Plaintiff claims that the Proxy Statement violates various provisions of Schedule 14A because it omits the total number of shares underlying the stock-based awards and the cost of the 2003 Plan.

### A.    Number of Shares Available Under the 2003 Plan

According to plaintiff, the Proxy Statement is materially deficient under Section 14(a) because "the reasonable investor, reading the Proxy Statement, understood that only approximately 33 million shares were available to underlie awards under the plan." (Am. Compl. at ¶ 19.) Plaintiff further alleges 17 C.F.R. § 240. 14a-101, Item 10(b)(2)(i)(A) calls for disclosure of the number of shares available under a plan, regardless of whether or not "such benefits or amounts are determinable", and that defendants' omission of the number of shares violated 17 C.F.R. § 240.14a-101, Item 20. (Id. at ¶ 17.)

### i.    Adequacy of Disclosure

Defendants argue in this motion that the Proxy Statement adequately specifies the number of shares available for issuance under the 2003 Plan and the circumstances under which that number may increase. (Defs' Br. at 21-22.) In support, defendants cite Shaev v. Hampel,

No. CIV.A.99-10578, 2002 WL 31413805 (S.D.N.Y. Oct. 25, 2002) aff'd, 2003 WL 22139567 (2d Cir. 2003)[2], in which the district court dismissed claims that an analogous proxy statement improperly omitted the number of shares available under a stock option plan. In Shaev, plaintiff alleged the statement that 14 million shares were available under the plan was misleading because other sections of the plan recited circumstances under which the total number could be increased. 2002 WL 31413805, at *7. In rejecting that argument, the district court held that "[n]o reasonable shareholder reading the entirety of the Proxy Statement would have believed that the Plan was authorizing only 14 million shares" because "the Proxy Statement clearly discloses that additional shares could become available under three circumstances. . . ." Id. at *8 (citation omitted). The district court in Shaev further held that plaintiffs amended complaint lacked any substantiation that its proposed "reasonable estimates" of the number of shares "would have been anything more than speculation" and such speculation is discouraged under federal law. Id. (citations omitted).

Here, just as in Shaev, the Proxy Statement specifies the number of shares available under the 2003 Plan (33,888,057), and indicates that the number of shares may increase if, for example, shares relating to awards under "Prior Plans" were forfeited, cancelled, or settled in cash on or after January 1, 2003; or if certain shares were reacquired; or shares were made available as a result of the acquisition of or combination with another company. (See Gruppuso Cert., Exh. B at 32.) In considering the adequacy of the disclosure, this Court takes note of Werner v. Werner, 267 F.3d 288, 297 (3d Cir. 2001), where the Third Circuit explained that "[u]nder the 'buried facts' doctrine, a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the

---

[2]    Plaintiffs counsel here also represented the plaintiff in Shaev v. Hampel.

fact in question is hidden in a voluminous document or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the 'correlation and overall import of the various facts interspersed throughout' the document." See Kohn v. American Metal Climax, Inc., 322 F. Supp. 1331, 1362 (E.D. Pa. 1970) (holding 200 page proxy statement explaining proposed merger buried crucial facts, which, by reason of their importance, "should have in some way been highlighted to insure that the shareholders were aware of them," and concluding that defendants' failure to adequately present those facts constituted a violation of Section 14(a)).

This Proxy Statement is 44 pages long with 7 pages devoted to the 2003 Plan. (Gruppuso Cert., Exh. B at 28-34.) Prominently displayed on page 32 is the section title "SHARES AVAILABLE FOR ISSUANCE." The first sentence of that section states the number of available shares is 33,888,057. (Id., Exh. B at 32.) The following sentences set forth the circumstances under which the number of available shares may be increased. (Id., Exh. B at 32-33.) This information is disclosed in the appropriate section of the Proxy Statement, and the possibility of an increased number of shares is not addressed in a piecemeal fashion. As such, the Court finds that the disclosure is not buried nor challenging to a reader and determines that the Proxy Statement, contrary to plaintiff s theory, adequately discloses the number of shares available under the 2003 Plan and the circumstances under which that number could increase.

Moreover, the Amended Complaint does not allege that more specific estimates could have been calculated or that estimates about increased shares would be anything more than speculation and predictions about future events. Cf. Stricklin v. Ferland, No. CIV.A.98-3279, 1998 WL 966023, at *7 (E.D. Pa. Nov. 10, 1998) (holding plaintiff who alleged a proxy statement could have included additional information without alleging anything to explain why the statement, as is, was materially misleading, fails to state a claim under Rule 14a-9). To

11

arrive at a more specific prediction of the number of shares available under the 2003 Plan would have required knowledge of several variables, including the preferences of shareholders who received awards under prior plans to forfeit, cancel, or exercise their stock-based benefits. Courts have discussed the practical difficulties inherent in getting this information. See, e.g., Freedman v. Barrow, 427 F. Supp. 1129, 1144 (S.D.N.Y. 1976) (holding that the omission of discussion of SAR holders' likely preferences of whether or not they would exercise options was not misleading and that making such a prediction would have been "an overgeneralization since the decision whether to exercise the option or the appurtenant SAR necessarily depends on individual factors such as the employee's own financial situation, his ability and willingness to borrow, and his tax consequences."). Requiring such information in a proxy statement would result in a deluge of information regarding shareholders' personal preferences, an undue burden upon the soliciting corporation, and confusion among shareholders considering the proxy statement. Cf. Mendell v. Greenberg, 927 F.2d 667,677 (2d Cir. 1991) (declining to require that major shareholders include speculative predictions of their personal finances in a proxy statement because such information would likely confuse rather than enlighten shareholders and might inundate them with trivial information). The Court agrees with the conclusions drawn in the foregoing cases, and further is persuaded that the level of specificity this plaintiff argues for would result in an "avalanche of trivial information a result that is hardly conducive to informed decision making." TSC Industries, 426 U.S. at 448-49.

### ii.    Item 10(b)(2)(i)(A) and Item 20

_____As to plaintiffs remaining grounds for inadequacy of disclosure, Item 10(b)(2)(i)(A) requires "[w]ith respect to any specific grant of or any plan containing options, warrants or rights submitted for security holder action," that a proxy statement state "[t]he title and amount of

securities underlying such options, warrants or rights. . . ." Alternatively, plaintiff alleges the

proxy statement violated 17 C.F.R. § 240.14a-l01, Item 20, which provides "[i]f action is to be

taken on any matter not specifically referred to in this Schedule 14A, describe briefly the

substance of each such matter in substantially the same degree of detail as is required by Items 5

to 19, inclusive, of this Schedule. . . ." Plaintiff argues Item 20 requires disclosure of information

similar to that under Item 1 O(b )(2)(i)(A) as to other stock-based awards, (Am. Compl. at ¶ 14),

but has provided no legal authority for his interpretation of Item 10(b)(2)(i)(A) or Item 20.

The 2003 Proxy Statement satisfies Item 10(b )(2)(i)(A). At the time of its issuance, no

awards had been made and so there had been no "specific grant" of stock-based awards under the

2003 Plan. (See Grappuso Cert., Exh. B. at 35.) To the extent Item l0(b)(2)(i)(A) may require

disclosure of the number of shares with regard to "any plan containing options, warrants or rights

submitted for security holder action," the Proxy Statement's disclosure of the number of available

shares and the circumstances under which the number of shares could increase meets that

requirement. See Seinfeld v. Gray, Slip Op. 03-7931 at 4 (S.D.N.Y. May 17, 2004) (holding a

proxy statement that stated the number of shares available for issuance under a proposed plan

and the circumstances under which the number of shares could increase satisfied Item

l0(b)(2)(i)(A)).[3]

Item 20 appears to be a catchall provision that addresses any item "*not specifically*

*referred to in this Schedule 14A*." In light of the Court's holding that the Proxy Statement

satisfied Item 10(b)(2)(i)(A), which specifically refers to the "amount of securities underlying

---

[3]    Plaintiff's counsel in this case also represented the plaintiff, Latrice Seinfeld, in Seinfeld v. Gray.

such options, warrants or rights" within a proposed compensation plan, plaintiff's claim that defendants violated Item 20 is moot.

For these reasons, the Court finds no omission in the Proxy Statement regarding its disclosures about the number of shares available under the 2003 Plan that violates Section 14(a), Item 10(b)(2)(i)(A), or Item 20.

### B.    Cost of the 2003 Plan

Plaintiff's discrete allegation of material omission with regard to the cost of the 2003 Plan is that defendants failed to state the Black-Scholes value of stock-options that will be awarded, which he argues is required by their duty to disclose material information, and by 17 C.F.R. 240.14a-101, Item 10(a)(2). (Am. Compl. at ¶¶ 22,23.)

#### i.    Materiality of Black-Scholes Value

Black-Scholes values of stock options that will be issued under a proposed compensation plan is considered "soft information" - valuation opinion or projections - that is more easily subject to manipulation or error than historical data. Lewis v. Vogelstein, 699 A.2d 327, 331 (Del. Ch. 1997). Plaintiff's claim raises the issue of whether the Black-Scholes information is material and must be disclosed under Section 14(a). While the Third Circuit has not addressed this specific issue, other courts have uniformly held that the Black-Scholes value of stock options is not a material component of a proxy statement seeking approval of a compensation plan.

For example, in Lewis v. Vogelstein, 699 A.2d 327 (Del. Ch. 1997), plaintiff alleged that defendants' proxy statement failed to include the present value of stock options granted to

14

outside directors under a proposed compensation plan.[4]  The proposed plan qualified each

outside director to receive a one-time grant of options on 15,000 shares and an additional grant

of options based on the directors' seniority. Id.. at 330.  Plaintiff argued since Black-Scholes

values are reliable enough for the Financial Accounting Standards Board ("FASB") to require

them in financial statements, the directors were obligated to include the same information in

shareholder proxy statements. Id. at 332.  In rejecting plaintiff's argument, the court noted

"salient differences" between financial statements and proxy statements, including,

> [f]or instance, [that] financial statements are compiled at the end of
> the fiscal year, *when the value of the options granted can be*
> *assessed with greater certainty*, than is possible at the time the
> option plan is authorized or ratified since the market price at time
> of issue is known at that later point.

Id. (emphasis in original).  The opinion further noted that Black-Scholes does not take into

account the effect of non-transferability of stock-options, the cost-reducing effect of early

exercise, and the effect of market volatility of the underlying stock on restricted versus

unrestricted options.  Id. at 332.  Given these considerations, the court concluded, "such soft

information estimates may be highly problematic and not helpful at all, as for example would

likely be the case here, if the options terminate two months after the holder leaves [the

Company's] board, instead of continuing for ten years, as defendants assert."  Id. at 333 (internal

quotations omitted).  Accordingly, the court held Black-Scholes is soft information that is not

required in a proxy statement because of its unreliability.

The Delaware Chancery court in In re 3Com Corporation Shareholders Litigation, No.

CIV.A.1672l, 1999 WL 1009210 (Del. Ch. Oct. 25, 1999), considered whether a proxy statement

---

[4]    Plaintiffs counsel here represented the plaintiffs in Lewis, 3Com, Resnik, Shaev v. Hampel, Cohen, Seinfeld v. Bartz, and Seinfeld v. Gray, discussed *infra*.

soliciting shareholder approval to expand the pool of shares available under an existing plan violated disclosure regulations because it omitted the Black-Scholes value of options from the underlying stock. The plaintiff shareholder sued 10 members of the 3Com board, all but one of whom were outside directors. Id. at * 1, n.1. At the time of the proxy statement, no options from the proposed increase had been granted or received. Id. at * 1. Plaintiff alleged, inter alia, that the board breached its fiduciary "duty of candor" by failing to include in the proxy statement the present values of the options under the Black-Scholes option pricing model. Id.

As in Lewis, the court rejected plaintiff's argument and held "the Black-Scholes Option Pricing Model is neither sufficiently reliable nor necessary to apprise shareholders of the value of the options in question." Id. at *6. The decision noted that while "[t]he plaintiff has established the usefulness of Black-Scholes in other contexts," he failed to plead "any facts to indicate that this model would be of such material importance to shareholders that it would alter the total mix of information needed to properly inform shareholders." Id. The 3Com court declined to require the inclusion of Black-Scholes in the proxy statement.

More recently, in Resnik v. Swartz, 303 F.3d 147 (2d Cir. 2002), the Second Circuit considered plaintiff shareholder's claims that defendants improperly failed to disclose in their proxy statement the Black-Scholes value of options. The proxy statement in Resnik solicited shareholder approval of a compensation plan and included both the directors' compensation and the terms of the plan, which provided that each non-employee director would have the option to purchase 50,000 shares of company stock and could exercise those options at the higher of two prices: the closing price on February 14, 2000 or the company's closing price on the day the plan was approved. 303 F.3d at 149. The plaintiff sued, arguing defendants' failure to include the Black-Scholes value of the options was a material omission under Section 14(a) and Rule 14(a)-

16

9. Id. at 150. Plaintiff argued that Item 8 of Schedule 14A, 17 C.F.R. 240.14a-101, which

requires the disclosure of information set forth in Regulation S-K, 17 C.F.R. § 229.402, made

such detail mandatory. Id. at 151. Regulation S-K requires in part that a proxy statement

disclose "standard [compensation] arrangements, stating amounts, pursuant to which directors. ..

are compensated for any services provided. . . ." and any "other arrangements pursuant to which

directors are compensated during the last fiscal year. . ., stating the amount paid. . . ." Id.

(quoting 17 C.F.R. § 229.402(g)(1)-(2)).

    The district court in Resnik dismissed the complaint, reasoning that to impose such a

requirement

> would thrust corporate boards into a Catch-22. If a board includes
> in its proxy material a present value of options--which can only be
> described as a best guess based on market variables, even with
> numerous disclaimers regarding 'soft information' and forward
> looking statements--the corporation will surely run a substantial
> risk of suit if the information turns out to be inaccurate at a later
> date. However, if the corporate board does not disclose such
> information it will be subject to a fraud suit such as this one.

No. CIV.A.00-5355, 2001 WL 15671, at *1 (S.D.N.Y. Jan. 8,2001). In affirming, the Second

Circuit observed the plain language of Regulation S-K, viewed alone and in the context of the

entire text of Item 402, does not require disclosure of the grant-date value of stock options

proposed to be provided to the directors. 303 F.3d at 152. The court also rejected plaintiff's

argument that FASB 123 supports inclusion of Black-Scholes values in proxy statements, noting

the FASB "does not purport to address the requirements for reporting proposed compensation in

a proxy statement." Id. at 153. Accordingly, the Second Circuit held defendants' failure to

include Black-Scholes did not violate proxy statement disclosure regulations. Id. at 154; see also

Shaev v. Hampel, No. CIV.A.99-l0578, 2002 WL 31413805, at *5 (S.D.N.Y. Oct. 25, 2002)

(same), aff'd No. CIV.A.02-9453, 2003 WL 22139567, at *1 (2d Cir. Sept. 17,2003); Cohen v. Calloway, 246 A.D.2d 473 (N.Y. App. Div.) (holding speculative option value estimates "would not have been viewed by the reasonable investor as a significant part of the total mix of information in the proxy statement. . . and indeed the significance of such method is so imprecise that its inclusion probably would have done more harm than good. . . .") (citations omitted), appeal denied, 700 N.E.2d 319 (N.Y. 1998).

The district court reached a similar conclusion, and was affirmed, in Seinfeld v. Bartz, No. CIV.A.01-2259, 2002 WL 243597, at *1 (N.D. Cal. Feb. 8,2002). There, the plaintiff shareholder sued Cisco Corporation and its directors under Section 14(a) for failure to include the Black-Scholes value of stock options in a proxy statement that sought shareholder approval to increase the number of options available under an existing compensation plan. The district court, citing Resnik, 3Com, Cohen, and Lewis, held that "[b]ased on the persuasive case law presented by Defendants, and the lack of convincing rebuttal by Plaintiff. . . as a matter of law, Black-Scholes valuations are not material for purposes of Rule 14a-9 analysis." Id. at *4.

In affirming, the Ninth Circuit rejected plaintiff's argument that FASB 123 requires Black-Scholes values in financial statements. Seinfeld v. Bartz, 322 F.3d 693,697 (9th Cir.), cert. denied, 540 u.S. 939 (2003). Calling upon the Lewis case, the court noted the "salient differences" between financial statement disclosures and proxy statement disclosures and held that SEC regulations do not require the use of the Black-Scholes valuation. Id. In Seinfeld v. Gray, No. 03-7931, Slip Op. at 6 (S.D.N.Y. May 17, 2004), the district court held similarly, reasoning that "disclosing the estimated cost of the Plan using the Black-Scholes or binomial option pricing model would be purely speculative as the six input variables necessary to perform the calculation were not yet known."

18

These cases are factually similar to this case, and the Court finds their legal analysis persuasive. Plaintiff's counsel, who represented the plaintiffs in each of the above cases, offers no authority that holds a proxy statement must include the Black-Scholes value of options. Policy arguments would perhaps be better made to the Securities and Exchange Commission rather than to the courts by means of an odyssey of lawsuits. See Lewis, 699 A.2d at 333.

Although the Third Circuit has not addressed whether Black-Scholes values of stock-options must be included in a proxy statement seeking approval of a compensation plan, in Flynn v. Bass Brothers Enterprises, Inc., 744 F.2d 978 (3d Cir. 1984), it addressed the disclosure of "soft information," holding it should be disclosed if it is deemed useful, after weighing its potential for benefit against its potential for harm to shareholders. Id. at 988. In determining whether particular soft information is useful, courts must consider several factors:

> the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

Id. Consideration of these factors "permits an assessment of the reliability and relevance to the investor of the omitted information, as well as the probability that a given contingent event will occur." Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628,643 n.23 (3d Cir. 1989).

Applying the Flynn factors in this case yields a result consistent with those reached by courts outside the Third Circuit.

Under Flynn, which directs that the Court consider the facts on which soft information is based, Black-Scholes values based on speculation would yield unreliable information. The 2003

19

Plan makes no specific grant of options, instead stating that "[a]s of the date of this Proxy Statement, no Awards have been paid under the Plan." (Gruppuso Cert., Exh. B at 35.) This means that the defendants lack the number of shares by which to multiply the theoretical value of an individual option. In <u>Lewis</u>, <u>Resnik</u>, and <u>Seinfeld v. Bartz</u>, the courts uniformly rejected Black-Scholes values as required, and the plans in those cases actually had harder information on which to base Black-Scholes calculations. Such calculations in this case would be even more speculative, and in turn less reliable.

Furthermore, even if the number of options the Committee would issue were determinable at the time Honeywell issued the Proxy Statement, other variables that would affect Black-Scholes value were not. For example, the 2003 Plan provides that stock options can be granted, at the discretion of the Committee, "in the form of Non qualified Stock Options or Incentive Stock Options or a combination of the two, at the discretion of the Committee. . . ." (Gruppusso Cert., Exh. B at 29.) Nonqualified Stock Options are transferable and Incentive Stock Options are not. (<u>Id.</u>) (stating "Incentive Stock Options may not be transferred. . . other than by will or the laws of descent and distribution. . . .") The court in the <u>Lewis</u> case found this becomes problematic because "[p]ublicly-traded options increase in value as the price volatility of the underlying stock increases. The value of [restricted options], on the other hand, arguably decreases with increased volatility, because the holders are more likely to exercise the options early since they cannot be traded." 699 A.2d at 332. If the amount of restricted versus unrestricted options cannot be determined, the reliability of a Black-Scholes calculation is compromised. Moreover, to the extent the Committee issues unrestricted options, for which exercise dates cannot be determined, Black-Scholes values would be unreliable because it may not take into account the "cost-reducing effect of early exercise." Id. Accordingly, there is a

significant risk that the limited information available to defendants at the time they issued the Proxy Statement would have yielded unreliable Black-Scholes values.

Second, while perhaps appropriate in some circumstances, Black-Scholes is an unsuitable method of predicting the cost of the 2003 Plan because it requires historical facts. As Flynn held, an important factor in deciding whether soft information is material is the purpose for which it was originally intended. Flynn, 744 F.2d at 988. Plaintiff alleges that Honeywell should have included Black-Scholes or other binomial model of stock-option valuation because it does so in its financial statements pursuant to FASB 148 and 123. (Am. Compl. at ¶¶ 18,21-23.) While the F ASB requires a company to include in its financial statements the cost of a stock-option compensation plan based on historic events, Item 10(a)(2)(i) calls for a forward-looking analysis. See 17 C.F.R. 240.14a-l0l, Item 10(a)(2)(i) (requiring inclusion in a proxy statement of "the benefits or amounts that *will be received by or allocated* to each of the following. . . .") (emphasis added). Given their reliance on historic events, Black-Scholes values are more reliable in a retrospective analysis when variables necessary to their calculation can be ascertained. Lewis, 699 A.2d at 332; cf. Resnik, 303 F.3d at 153 (holding FASB 123, which provides that the preferred method of valuing stock-option compensation in financial statements is to recognize the options' grant-date value as part of compensation expense, is inapplicable because it does not purport to address "proposed compensation in a proxy statement."). Plaintiff argues the cases that defendants cite are distinguishable because none deal with FASB 148 or a company that expenses stock options pursuant to FASB 123, such as Honeywell. (Am. Compl. at ¶ 23.) But plaintiff does not dispute that the calculations embodied in FASB 148 deal with historic data such as grant-date value of stock-options. Because FASB 148, like FASB 123, requires knowledge of historic data, the reasoning of the Lewis and Resnik courts applies. Under

21

this factor, therefore, the strength of plaintiff's argument that the Proxy Statement should contain information originally intended for a financial statement is greatly diminished.

Also, Black-Scholes predictions of the cost of the 2003 Plan would be subjective and particularly susceptible to manipulation. Flynn holds that courts must consider the degree of subjectivity or reflected in preparing such information. 744 F.2d at 988. If Black-Scholes calculations are made before necessary variables such as the underlying stock price and the exercise price can be determined, then those variables must be predicted. Predicting Black-Scholes variables leaves room for manipulation and advocacy through overly conservative cost predictions. At the very least, this subjectivity factor underscores that Black-Scholes values in this context would be nothing more than "a best guess based on market variables" and, therefore, unhelpful to shareholders. Resnik, 2001 WL 15671, at *1. As such, the usefulness of Black-Scholes to shareholders is considerably undermined.

### ii.    Item l0(a)(2)(i)

Plaintiff cites no legal authority for his argument that 10(a)(2)(i) applies to the 2003 Plan. Item 10( a )(2)(i) requires disclosure of compensation amounts "*if such benefits or amounts are determinable. . ..*" 17 C.F.R. 240.14a-101, Item 10(a)(2)(i) (emphasis provided). Nothing in Item 10(a)(2)(i) specifically states that a proxy statement such as defendants' must include Black-Scholes or any other valuation method for options. Cf. Resnik, 303 F.3d at 151-52. Rather, the plain language of the regulation demonstrates the Commission's intent to require disclosure of compensation amounts only if such amounts can be determined. Here, the 2003 Plan does not contain "set benefits or amounts" and the Committee had not made any awards "subject to shareholder approval" at the time it issued the Proxy Statement. Indeed, no awards had been made under the 2003 Plan when Honeywell issued the Proxy Statement. (Gruppuso Cert., Exh.

B. at 35.)  Moreover, the Securities and Exchange Commission has interpreted this language as

requiring disclosure of amounts that will be received by or allocated to the named categories of

beneficiaries only if

> the plan being acted upon is: (i) a plan with set benefits or amounts
> (e.g., director option plans); or (ii) one under which some grants or
> awards have been made by the board or compensation committee
> subject to shareholder approval (e.g., action is to add shares
> available under an existing option plan, because there are not
> enough shares remaining under the plan to honor exercises of all
> outstanding options).

http://www.sec.gov/interps/telephone/1997manual.txt.  Cf. Seinfeld v. Gray, Slip Gp. At

4 (citing the Telephone Interpretations and concluding Item 10(b)(2)(ii) does not apply to new

plans "because there have been no grants under that new plan to report.").  Given the

Commission's apparent intent, this Court is reluctant to read new requirements into the securities

regulations in the absence of legal authority.

   The dilemma that the district court discussed in Resnik v. Swartz, 2001 WL 15671, at *1,

further supports the Court's conclusion.  The district court in Resnik rejected the argument that

Item 8 of Schedule 14A, 17 C.F.R. 240.14a, which incorporates Regulation S-K by reference,

required Black-Scholes predictions in a proxy statement.  Id.  Such a requirement, the court

reasoned, would "thrust corporate boards into a Catch-22" in which disclosure carries with it the

risk of fraud claims when predictions turn out to be inaccurate, and omission the risk of claims

such as this plaintiff has made.  See id.  Like Regulation S-K, Item 10(a)(2)(i) requires that a

proxy statement include amounts of compensation paid under a plan.  17 C.F .R. 240.14a-l01,

Item 10(a)(2)(i).  Item 10(a)(2)(i), however, goes further and seeks disclosure of benefits that

"*will be* received by or allocated to" certain employees, something more speculative than the

disclosure of existing arrangements "pursuant to which directors of the registrant *are*

*compensated*," as required by Regulation S-K. As Resnik demonstrates, this Court would be thrusting a virtual Catch 22 upon the Honeywell Board by requiring it to include Black-Scholes option value forecasts in the 2003 Plan.

For all of these reasons, the Court concludes that Item 10(a)(2)(i) does not require a proxy statement relating to a new plan under which benefits have not yet been allocated to state the specific amount of benefits to be granted using the Black-Scholes or other similar valuation method.

## SUMMARY

In summary, plaintiff alleges defendants omitted material information from the Proxy Statement by failing to state the number of shares available under the 2003 Plan, which plaintiff claims is required under Section 14(a), 17 C.F.R. § 240.14a-l0l, Item 10(b)(2)(i)(A) and Item 20. Plaintiff further alleges defendants omitted material information from the Proxy Statement by failing to state the cost of the 2003 Plan, as determined by the Black-Scholes value of available stock options, pursuant to Section 14(a) and 17 C.F.R. § 240.14a-l0l, Item 10(a)(2)(i). The Court has considered all of the arguments and, after carefully weighing the authority presented by both sides, concludes that the Proxy Statement disclosed adequate information relating to the number of shares available under the 2003 Plan and its cost. The Court further concludes that, under the Flynn case in this Circuit and consistent with the analyses in cases directly addressing the issue, the Black-Scholes value of options is not material information requiring disclosure, and its absence here does not render the Proxy Statement misleading or in violation of Item 10(a)(2)(i). Thus, the Court is satisfied that plaintiffs complaint fails to allege material omissions or misrepresentations and, as such, must be dismissed.

24

Based on this substantive finding, the Court need not address defendants' procedural argument that the claims warrant dismissal because of plaintiffs failure to serve demand upon the Board before filing suit pursuant to Rule 23.1.

## CONCLUSION

For the reasons stated above, this Court grants defendants' motion to dismiss. Plaintiffs claims having been addressed and decided in favor of defendants, and it appearing that plaintiff cannot amend the Amended Complaint to remedy its deficiencies, see In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004), and plaintiff having not requested leave to amend, the plaintiff's Amended Complaint is hereby **dismissed with prejudice** and this case is **closed**. An appropriate order will be filed.

January 27,2005                                     /s/Katharine S. Hayden
                                                    KATHARINE S. HAYDEN, US.D.J.

25

# TAB 8

Westlaw.

Slip Copy
2005 WL 1231644 (S.D.N.Y.)
(Cite as: 2005 WL 1231644 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Frank D. SEINFELD, Plaintiff,
v.
James C. ALLEN; Judith Areen; Carl J. Aycock;
Ronald R. Beaumont; Max E.
Bobbit; Bernard J. Ebbers; Francesco Galesi; Stiles
A. Kellett; Gordon S.
Macklin; Bert C. Roberts, Jr.; John W. Sidgmore;
Scott D. Sullivan; Lawrence C.
Tucker; Bank of America, N.A.; and Worldcom, Inc.,
Defendants.
No. 02 Civ.5018(DLC).

May 25, 2005.
A. Arnold Gershon, Chris Mularadelis, A. Arnold
Gershon P.C., New York, New York, for plaintiff.

Gregory A. Markel, Jason M. Halper, Stacey A.
Lara, Cadwalader, Wickersham & Taft, New York,
New York, for defendant Bank of America, N.A.

Pamela Rogers Chepiga, Andrew Rhys Davies,
Allen & Overy LLP, New York, for the Director
Defendants.

George E. Ridge, Cooper, Ridge & Lantinberg, P.A.,
Jacksonville, Florida, for defendant Bert C. Roberts.

Lyndon M. Tretter, David F. Wertheimer, Hogan &
Hartson LLP, New York, New York, for defendant
Bernard J. Ebbers.

*OPINION AND ORDER*

COTE, J.

*\*1* This Opinion considers motions to dismiss this
derivative action related to the events underlying the
financial collapse of WorldCom, Inc. ("WorldCom").
This action was filed on June 27, 2002 by Frank D.
Seinfeld (the "Shareholder"), owner of an unspecified
number of WorldCom shares. The original Verified
Complaint pled claims under Section 14(a) of the

Securities Exchange Act of 1934, 15 U.S.C. §
78n(a), and Georgia common law. The Verified
Amended Complaint ("Complaint"), filed August 17,
2004, retains only state law claims of breach of
fiduciary duty and commission of waste against
various directors and officers of WorldCom and a
claim of aiding and abetting a breach of fiduciary
duty against Bank of America, N.A. ("BOA"). [FN1]
On November 12, 2004, defendants James A. Allen,
Judith Areen, Carl J. Aycock, Max E. Bobbitt, Stiles
A. Kellett, Jr., Gordon S. Macklin, the Estate of John
Sidgmore, and Lawrence C. Tucker (collectively, the
"Director Defendants"), all former directors of
WorldCom, filed a joint motion to dismiss. Former
WorldCom board member and chief executive officer
Bernard J. Ebbers ("Ebbers") joined the Director
Defendants' motion. Former WorldCom chairman
Bert C. Roberts, Jr. ("Roberts") and BOA filed
separate motions to dismiss. [FN2]

> FN1. The Complaint also lists WorldCom as
> a defendant. No claim against it is specified,
> however, so this Opinion will treat
> WorldCom as a nominal defendant only.

> FN2. WorldCom filed no motion to dismiss.
> This action has been stayed against
> defendant Scott Sullivan, former chief
> financial officer of WorldCom, pending the
> resolution of criminal proceedings against
> him. Ronald R. Beaumont and Francesco
> Galesi are no longer defendants.

For the reasons stated below, all motions to dismiss
are granted on the basis that derivative actions
against former directors, officers, and lenders arising
from events predating or contemporaneous with
WorldCom's bankruptcy proceedings are barred by
WorldCom's Modified Second Amended Joint Plan
of Reorganization (the "Plan") of October 21, 2003.
In addition, the request of plaintiff in his opposition
brief to be permitted to replead in the event of
dismissal is denied.

*Background*

The Complaint alleges the following facts. Bernard
J. Ebbers was both CEO and a board member of
WorldCom at the time of the events in question. By
early 2000, Ebbers had taken out loans from BOA
totaling approximately $330 million. Ebbers' debt

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 2
2005 WL 1231644 (S.D.N.Y.)
**(Cite as: 2005 WL 1231644 (S.D.N.Y.))**

was secured by 11.6 million shares of his own WorldCom stock. On April 17, 2000, as the share price of WorldCom stock declined, BOA began making margin calls on Ebbers' loans. From September through December of 2000, WorldCom loaned Ebbers a total of $100 million to cover his personal debts, secured by three promissory notes payable on demand. In November 2000 and February 2001, the company guaranteed Ebbers' loans to BOA. Ebbers promised to pay the company if it were to make payments to BOA pursuant to the guarantees. WorldCom received no consideration for these guarantees save Ebbers' continuing service as an officer of the company and, later, avoidance of BOA's demand for payment under previous guarantees. The company's proxy statements for 2001 and 2002 represent that the guarantees were made as a result of the pressure on the price of WorldCom stock and the margin calls faced by Ebbers. To fulfill its obligations under the guarantees, WorldCom paid BOA nearly $199 million between April 12, 2001 and February 5, 2002.

*2 As noted in the Declaration of George E. Ridge submitted with Roberts' motion to dismiss, on July 21, 2002, less than a month after Shareholder filed his initial complaint in this action, the company filed for bankruptcy. On October 17, 2002, in response to an Order to Show Cause of August 20, 2002, this action was stayed pending WorldCom's bankruptcy proceedings. WorldCom's Plan was confirmed by the Honorable Albert J. Gonzalez on October 31, 2003, and WorldCom emerged from bankruptcy on April 20, 2004, the date the Plan became effective. Also on April 20, WorldCom merged with MCI, Inc., formerly its wholly owned subsidiary, and the name of the combined entity became MCI, Inc. ("MCI"). On July 9, 2004, MCI filed a lawsuit against Ebbers to recover the money it had expended to pay BOA for Ebbers' loans. The Plan and MCI's complaint against Ebbers were submitted as materials in support of Roberts' motion to dismiss.

The Shareholder alleges that the loans to Ebbers and guarantees of his debt were void *ab initio* under Georgia law. He brings a derivative action against the Director Defendants and BOA. He alleges that, by approving the guarantees, the Director Defendants violated their fiduciary duties of loyalty and good faith to WorldCom and committed waste. He also alleges that BOA aided and abetted a breach of fiduciary duty by "knowingly participat[ing] in or join [ing] in an enterprise whereby [WorldCom's] directors violated their fiduciary obligations, and it thereby reaped a benefit."

The Director Defendants, Roberts, and Ebbers now move for dismissal on three independent grounds: First, they submit that the Shareholder failed to make a demand on WorldCom's board of directors before filing suit, as required under Ga.Code Ann. § 14-2-742. [FN3] Second, they argue that WorldCom's bankruptcy filing vested any claims asserted by the Shareholder on behalf of WorldCom in the bankruptcy estate and, ultimately, in the reorganized entity, MCI, barring the prosecution of any derivative lawsuit. Third, they argue that, because WorldCom merged into MCI, the Shareholder no longer owns shares in WorldCom and therefore does not meet the continuous stock ownership requirement for maintaining a derivative action under Georgia law. BOA has filed its own motion to dismiss on the basis that Georgia law does not recognize a cause of action for aiding and abetting a breach of fiduciary duty.

> FN3. WorldCom was incorporated in the State of Georgia, and the applicable law of pre-suit demand is governed by the law of the state of incorporation. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U .S. 90, 108-09 (1991). Rule 23.1 imposes an additional pleading requirement for derivative actions. The complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Rule 23.1, Fed.R.Civ.P.

Because the Complaint must be dismissed on the ground that WorldCom's bankruptcy extinguished the Shareholder's right to bring a derivative action against all persons in respect to whom WorldCom retained causes of action that were vested exclusively in the bankruptcy estate, it is unnecessary to reach the other grounds urged by the movants.

*Discussion*

A derivative action "permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties." ' *Scalisi v. Fund Asset Management, L.P.,* 380 F.3d 133, 138 (2d Cir.2004) (citing *Kamen,* 500 at 95). "Thus, a derivative action permits an individual shareholder to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Id.* (citation omitted). That the present lawsuit is a derivative action is

undisputed; it is described as such on the face of the Complaint. It is a derivative action in substance as well as form: the requested relief is damages and an equitable accounting on behalf of WorldCom, and the Complaint alleges no injury specific to the Shareholder. See *Grace Bros., Ltd. v. Farley Indus., Inc.,* 450 S.E.2d 814, 819 (Ga.1994); cf. *Tooley v. Donaldson, Lufkin & Jenrette,* 845 A.2d 1031, 1033 (Del.2004) (en banc).

\*3 A bankruptcy filing temporarily vests the property of the bankrupt corporation, known as the debtor, in a bankruptcy estate. The bankruptcy estate is an entity that is legally separate from the debtor. *In re Jamko, Inc.,* 240 F.3d 1312, 1313 n.1 (11th Cir.2001). It comprises, with few exceptions, "all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(1). Such property "includes all kinds of property, including tangible or intangible property [and] causes of action." *Mitchell Excavators, Inc. v. Mitchell,* 734 F.2d 129, 131 (2d Cir.1984) (quoting H.R.Rep. No. 595, 95th Cong.2d Sess. 367). Section 541(a)(1) of the bankruptcy code "has been construed to prevent individual shareholders and creditors from suing to enforce a right of the corporation when that corporation is in bankruptcy." *Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1042 (2d Cir.1986). "[W]hile normally the fiduciary obligation of officers, directors, and shareholders 'is enforceable directly by the corporation or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee.' " *Mitchell,* 734 F.2d at 131 (quoting *Pepper v. Litton,* 308 U.S. 295, 306-07 (1939)). [FN4]

> FN4. Although much of the case law discusses bankruptcy trustees, it is often the case, and was with WorldCom, that the debtor administers the bankruptcy estate during Chapter 11 proceedings as a "debtor in possession." The appointment of a trustee in Chapter 11 cases is actually "exceptional." *Official Comm. of Unsecured Creditors of Cybergenics Corp v. Chinery,* 330 F.3d 548, 573 (3d Cir.2003). If no trustee is appointed, the debtor in possession exercises the powers that would otherwise be exercised by the trustee and has the same fiduciary duties toward the estate. *Id.* (citing 11 U.S.C. § 1107(a)).

Important policy reasons exist for assigning derivative causes of action to the bankruptcy estate:

"Making the pursuit of certain causes of action the sole responsibility of the trustee in bankruptcy furthers the fundamental bankruptcy policy of equitable distribution among creditors. It allows the trustee to exercise the 'strong arm' power and recover corporate assets for the benefit of all creditors of the corporation." *Cumberland,* 791 F.2d at 1042 (citing *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1275 (5th Cir.1983)). If a trustee voluntarily abandons a claim, [FN5] or is ordered by the bankruptcy court to abandon a claim, a shareholder may have standing to assert it. *Mitchell,* 734 F.2d at 131-32. In either event, "some proceeding in the bankruptcy court must take place before a shareholder can assert [a derivative] right directly." *Id.* at 132.

> FN5. A trustee's decision not to pursue a claim does not constitute abandonment. See *Gen. Dev. Corp. v. Atlantic Gulf Communities Corp.,* 179 B.R. 335, 339 (S.D. Fla 1995). The plaintiff does not raise an argument that the bankruptcy trustee (or subsequently, WorldCom) abandoned its claims against the defendants in any event.

The original complaint in this action was filed before WorldCom entered bankruptcy, and the action was thus properly stayed when WorldCom filed for bankruptcy. Throughout the bankruptcy proceeding, the debtor in possession was unquestionably the only entity that had standing to pursue a claim on behalf of the bankruptcy estate without leave of the bankruptcy court. The issue is now whether the plaintiff may resume the prosecution of his derivative action now that WorldCom has emerged from bankruptcy.

A bankruptcy proceeding yields a bankruptcy plan "for the adjustment of the debtor's debts." 11 U.S.C. § 941. The plan is generally submitted by the debtor itself, although the debtor, creditors, stockholders, or certain other persons may file a plan under certain circumstances. See *id.* § 1121 (regarding who may file a bankruptcy plan); *id.* § 1123 (describing what the plan is to contain). "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan by the bankruptcy court vests all of the property of the estate in the debtor." *Id.* § 1141(b). Subject to limited exceptions, "the provisions of a confirmed plan bind the debtor ... and any creditor, *equity security holder,* or general partner in the debtor ... whether or not such creditor, equity security holder, or general partner has accepted the plan." *Id.* § 1141(a).

\*4 The terms of the bankruptcy plan thus determine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                           Page 4
2005 WL 1231644 (S.D.N.Y.)
**(Cite as: 2005 WL 1231644 (S.D.N.Y.))**

whether the right to assert WorldCom's claims against the defendants in this action continues to reside with the emerged debtor.

The Plan's Injunction states:

> Except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold, or may hold Claims against *or Equity Interests in* any or all of the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, *are permanently enjoined,* on and after the Effective Date, from ... commencing or contributing in any manner an action or other proceeding of any kind *with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan* ....

Plan ¶ 10.04 (emphasis supplied).

"Causes of action" is defined as:

> without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to a judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, *assertable directly or derivatively,* existing or hereafter arising, in law, equity, or otherwise, *based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Chapter 11 Cases,* including through the Effective Date.

*Id.* ¶ 1.23 (emphasis supplied).

The Plan further provides:

> [N]othing contained in the Plan or Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, ... *Causes of Action against current or former directors, officers, professionals, agents, financial advisors, underwriters, lenders, or auditors relating to acts or omissions occurring prior to the Commencement Date.*

*Id.* ¶ 10.08 (emphasis supplied).

As the bankruptcy court recently concluded in regard to a derivative suit against former directors for

issuing an unlawful dividend, the Plan bars derivative claims arising from events before WorldCom's filing for bankruptcy or during the bankruptcy proceedings, at least against the former directors who were defendants in that action. *See In re WorldCom, Inc.,* No. 02- 13533(AJG), 2005 WL 949063, at *11 (Bankr.S.D.N.Y. Apr. 26, 2005) ("[A]ny such action commenced was property of the estate and upon the effective date became property of the reorganized Debtors."). As Paragraph 10.08 of the Plan makes clear, MCI, the reorganized debtor, has retained ownership of all causes of action against former directors, officers, lenders, [FN6] and certain other persons. The Plan's definition of "cause of action" clearly includes derivative actions such as this one. [FN7] If the Shareholder had wished to press his claims on WorldCom's behalf, he should have petitioned the bankruptcy court to compel the debtor in possession to either bring suit or abandon the claim. *See Mitchell, 734 F.2d at 132.* He chose not to do so. The motions to dismiss are granted.

> FN6. Because WorldCom guaranteed Ebbers' loans from BOA, BOA likely qualifies as a lender to WorldCom under the language of the Plan. "A guaranty is a collateral promise to enter for the debt or obligation of another, and, absent language in the instrument to the contrary, a guarantor's liability is usually equal to that of the principal debtor." *Am.Jur.2d Bills and Notes § 487.* The claim against BOA would be dismissed on the basis that Georgia does not recognize a claim for aiding and abetting a breach of fiduciary duty in any event. This Opinion incorporates by reference the reasoning set forth in *In re WorldCom, Inc. Sec. Litig., 336 F.Supp.2d 310, 317-18 (S.D.N.Y.2004),* which decided precisely the same issue under Georgia common law. *See also Monroe v. Bd. of Regents of the Univ. Sys. of Cal., 602 S.E.2d 219, 224 (Ga.App.2004)* ("Georgia has never recognized a claim for aiding and abetting a breach of fiduciary duty.").

> FN7. Plaintiff makes the feeble argument that " 'suits ... assertable directly or derivatively' refers to suits that the Company can assert derivatively, not to actions by stockholders suing on its behalf." He provides the example of an action for civil conspiracy, which "is a derivative, rather than independent, cause of action." (citing *Treppel v. Biovail Corp.,* No. 03 Civ.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 5
2005 WL 1231644 (S.D.N.Y.)
**(Cite as: 2005 WL 1231644 (S.D.N.Y.))**

3002(PKL), 2004 WL 2339759, at *6
(S.D.N.Y. Oct. 15, 2004). Given the context,
and in light of the fact that the counterpart to
"derivatively" in the Plan's definition of
"cause of action" is "directly," not
"independently," the assertion that the
language was crafted to encompass both
independently actionable torts and those
"connected to a separate underlying tort," *id.*
at *17, is untenable as a matter of law.

*5 In addition, plaintiff's motion for leave to amend
the Complaint is denied. The standards for amending
a complaint are set forth in Rules 15(a) and 16,
Fed.R.Civ.P. The governing law in this Circuit has
been described in detail in *In re Wireless Tel. Svcs.
Antitrust Litig.,* No. 02 Civ. 2637(DLC), 2004 WL
2244502, at *4-*5 (S.D.N.Y. Oct. 6, 2004). That
description is incorporated herein. Rule 16 governs
this motion, as the date for amending the complaint
has been set through a scheduling order. Rule 16
requires a party seeking to modify a scheduling order
to show good cause. Plaintiff has not shown good
cause why he should be allowed to amend his
complaint at this late stage, having already done so
once, on August 17, 2004-- more than two years after
the action was originally filed and well after the legal
and factual landscape should have been entirely clear.

*Conclusion*

The plaintiff's motion to amend is denied. The
motions to dismiss are granted. Because the defect in
the Complaint applies equally to moving and non-
moving defendants, the action is dismissed in its
entirety. The Clerk of Court shall close the case.

SO ORDERED:

2005 WL 1231644 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

•          1:02CV05018               (Docket)
(Jun. 28, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.