# TAB 9

Westlaw.

Not Reported in N.E.2d
19 Mass.L.Rptr. 180, 2005 WL 1009721 (Mass.Super.)
**(Cite as: 2005 WL 1009721 (Mass.Super.))**

Superior Court of Massachusetts.
David SHAEV, Profit Sharing Account f/b/o David
B. Shaev
v.
Joel B. ALVORD et al. [FN1]

> FN1. William Barnet, III; Daniel P.
> Burnham; Paul J. Choquette, Jr.; Kim B.
> Clark; John T. Collins; Gary L.
> Countryman; Charles K. Gifford; Marian L.
> Heard; Robert M. Kavner; Thomas J. May;
> Donal F. McHenry; Terrence Murray;
> Michael B. Picotte; Francene S. Rodgers;
> Thomas M. Ryan; T. Joseph Senirod; Paul
> R. Tregurtha; and FleetBoston Financial
> Corporation.

No. 034750BLS.

March 23, 2005.

MEMORANDUM AND ORDER ON MOTION TO
DISMISS

ALLAN VAN GESTEL, Justice.

*1 This matter is before the Court on the motion of
the defendants to dismiss the plaintiff's amended
verified complaint against them. The plaintiff, David
Shaev, Profit Sharing Account f/b/o David B. Shaev
("Shaev") [FN2] proceeds derivatively on behalf of
the defendant FleetBoston Financial Corporation
("FleetBoston").

> FN2. The Court is uncertain as to whether a
> "Profit Sharing Account" is an entity that
> can sue or be sued. For the sake of the
> present motion, it makes no difference.
> However, it is for that reason that in this
> memorandum the Court refers to Shaev as
> "it" because it is the Profit Sharing Account
> that is said to be the plaintiff, not its
> beneficiary Mr. Shaev.

BACKGROUND

What is at issue is the propriety of action by
FleetBoston's Board of Directors (the "Board") in
ratifying a plan for increased retirement benefits to
Terrence Murray ("Murray"), the company's then
long-serving Chief Executive Officer. In recognition
for what are asserted by the Board to be Murray's

"extraordinary achievements," the Board, in 2001,
ratified an amendment to the company's
Supplemental Executive Retirement Plan (the "SERP
Amendment"). As a result, Murray's retirement
benefits were increased from $2.7 million to $5.8
million worth of benefits per year. The SERP
Amendment was approved just one month before
Murray's retirement.

Shaev charges essentially that the Board's action in
approving the SERP Amendment was a *per se* waste
of corporate assets. It basically disagrees with the
Board's collective business judgment in voting for the
amendment.

Shaev readily concedes that it did not demand that
the Board institute this action on behalf of the
company because, it says, such a demand would be
futile. See Complaint, Paras. 14-15. It charges that
the Board's directors abdicated their directorial duties
by failing to investigate the transaction and, in any
event, had no authority to incur such an obligation
without consideration. *Id.* Moreover, Shaev alleges
that the directors could not be expected to institute
litigation against themselves. *Id.*

The Complaint makes no allegations whatsoever that
any of the directors-- except inferentially, Murray--
had a financial interest in the SERP Amendment or
otherwise lacked independence with regard to the
decision to approve the amendment.

FleetBoston was at all times material a national bank
organized and incorporated under the laws of Rhode
Island. [FN3]

> FN3. FleetBoston recently has been acquired
> by Bank of America Corporation ("BoA"). It
> is not necessary at this time to delve into the
> effect of that acquisition on this case.

While there are many things involved in Shaev's
claims, the rather simple posture described above is
what controls the Court's action in addressing the
motion to dismiss.

DISCUSSION

The defendants' motion is stated to be "pursuant to
R.I.Super.R .Civ.P. 12(b)(6) and 23.1." This Court, to
the contrary, believes that it is Mass.R.Civ.P. Rule
12(b)(6) and Rule 23.1 that controls the procedural

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
19 Mass.L.Rptr. 180, 2005 WL 1009721 (Mass.Super.)
(Cite as: 2005 WL 1009721 (Mass.Super.))

Page 2

aspects of the motion, see e.g., *Cosme v. Whitin Machine Works, Inc.,* 417 Mass. 643, 645 (1994), even though Rhode Island law may control certain aspects of the substantive law that involves internal affairs of the company. See *Harrison v. NetCentric Corporation,* 433 Mass. 465, 470 (2001). As a practical matter, however, the wording of the Rhode Island rule and the Massachusetts rule, in pertinent part, is essentially the same.

R.I. Rule 23.1 reads:
> In a derivative action brought by one or more shareholders to enforce a right of a corporation ... which may properly be asserted by it, *the complaint shall be verified ... The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires, from the directors or comparable authority, and the reasons for the plaintiff's failure to obtain the action or for not making the effort.*

\*2 (Emphasis added.)

Mass. Rule 23.1 reads in material part:
> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... to enforce a right which properly may be asserted by it, *the complaint shall be verified by oath ... The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority, and the reasons for his failure to obtain the action or for not making the effort.*

(Emphasis added.)

The defendants do not agree that any demand was excused.

Rhode Island law on the demand issue is scant. Thus, the Court will focus on *Harhen v. Brown,* 431 Mass. 838 (2000), the SJC's most recent exposition of the demand requirement under Massachusetts Rule 23.1. Justice Ireland explained the reasoning behind the demand requirement and the difference between a demand excused case and a demand refused case as follows:

> In general, before filing a derivative action on behalf of a corporation, a plaintiff "must establish that ... all available means to obtain relief through the corporation itself" are exhausted by making a demand on the corporation's board of directors to prosecute the litigation. The rationale behind the demand requirement is that, as a basic principle of corporate governance, the board of directors or a majority of shareholders should set the

corporation's business policy, including decisions whether to pursue a lawsuit. However, if a majority of directors are alleged to have participated in the wrongdoing, or are otherwise interested, a plaintiff may seek to have the demand on the board excused as futile. This is referred to as a "demand excused" case.

> If the plaintiff chooses to make demand, the board may institute suit, take action short of litigation to resolve the issues the demanding shareholder has identified, or determine that no action is appropriate at that time. Should a board of directors, the majority of whom are disinterested, refuse the demand to pursue litigation, a plaintiff may pursue the suit only by showing that the demand was wrongly refused. This is referred to as a "demand refused" case.

> *Id.* at 844.

There are no factual allegations in the complaint revealing a demand by Shaev or a refusal of that demand. Indeed, Shaev concedes this fact. Thus, in the matter and on the record currently before the Court, whether this is, as alleged, a demand excused case will depend upon whether a majority of the directors "are alleged to have participated in the wrongdoing, or are otherwise interested." Rule 23.1 places the burden on Shaev to allege with particularity the factors relating to the demand issues.

The "wrongdoing" here must be seen as the vote to approve the SERP Amendment.

A demand may be excused as futile if the directors are "otherwise interested." *Id.* at 844. None of the voting directors, however, are shown by the complaint to have had any business or financial relationship with Murray, nor have they been shown to be a party to the FleetBoston SERP or to stand to benefit personally from the SERP Amendment at issue. Thus, unless they are subject to Murray's controlling influence, [FN4] under the standards for determining interestedness set out in *Demoulas v. Demoulas Supermarkets, Inc.* 424 Mass. 501, 523-24 (1997), and *Harhen* at 842-43 and n. 5, they must be considered and treated for purposes of this motion as disinterested.

> FN4. The complaint contains no allegations of any director being under Murray's controlling interest.

\*3 Consequently, of the ALI Principles of Corporate Governance relied upon in both *Demoulas* and *Harhen,* only one of the criteria needs to be reviewed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
19 Mass.L.Rptr. 180, 2005 WL 1009721 (Mass.Super.)
(Cite as: 2005 WL 1009721 (Mass.Super.))

It is Subsection (a)(4), which reads:
> The director ... is subject to a controlling influence by a party to the transaction or conduct or a person who has a material pecuniary interest in the transaction or conduct, and that controlling influence could reasonably be expected to affect the director's ... judgment with respect to the transaction or conduct in a manner adverse to the corporation.

The Court now re-examines the complaint to determine whether Shaev has, as it must under Rule 23.1, alleged "with particularity ... the reasons for [its] failure to obtain the action or for not making the effort."

Nothing in the complaint reveals that any proceeding has been brought by any shareholder, including particularly Shaev, challenging the status of any of these directors.

Further, the ALI Principles of Corporate Governance, in Sec. 1.23(c)(2), provides that a director is not deemed "interested" with respect to a complaint naming him as a defendant if the complaint is "based only on the fact that the director approved or acquiesced in the transaction or conduct that is the subject of the action, and ... does not otherwise allege with particularity facts that, if true, raise a significant prospect that the director would be adjudged liable to the corporation or its shareholders."

As this Court said itself in deciding the motion to dismiss in *Harhen,* "a Court is ill-equipped to burst into the boardroom and make decisions as to what actions should be taken in the best interests of the company." *Harhen v. Brown,* Suffolk Superior Court, Civil Action No. 97-1522-H, Memorandum and Order on Defendants' Motion to Dismiss at p. 3. "Massachusetts has always recognized the need for courts to abstain from interfering in business judgments." (7 Mass. L. Rptr. 598). *Houle v. Low,* 407 Mass. 810, 824 (1990). "Intelligent and honest men differ upon questions of business policy. It is not always best to insist upon one's rights ..." *S. Solomont & Sons Trust v. New England Theatres Operating Corp.,* 326 Mass. 99, 112 (1950).

The particularity of pleading required has not been met by the plaintiff to show that it sought to obtain the action it desires from the FleetBoston directors, nor are the reasons for its failure to obtain the action or for not making the effort stated with sufficient clarity. Shaev needs to provide more than its assumption that "demand is excused against the

directors who are complicit in [the] waste" alleged. See Plaintiff's Memorandum in Opposition at p. 2.

For failure to comply with Mass.R.Civ.P. Rule 23.1 the complaint must be dismissed.

Next, the Court examines whether there is also a failure to state a claim and, therefore, the complaint also should be dismissed pursuant to Mass.R.Civ.P. Rule 12(b)(6).

*4 Here, the question is whether "waste" is properly alleged. The Court finds nothing in the complaint about waste other than the allegation in the beginning of Paragraph 12 stating, "This change [the approval of the SERP Amendment] was wasteful, inappropriate and beyond the authority of the board of directors." This is pretty thin stuff, even under notice-pleading standards.

The Court begins, however, with an observation by the Supreme Judicial Court, when discussing its own duties regarding a motion to dismiss:
> The standard of review for a motion to dismiss pursuant to Rule 12(b)(6) is well settled. We take as true " 'the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor ...' *Blank v. Chelmsford Ob/Gyn, P.C.,* 420 Mass. 404, 407 (1995). In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *Nader v. Citron,* 372 Mass. 96, 98 (1977), quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)." *Warner-Lambert Co. v. Execuquest Corp.,* 427 Mass. 46, 47 (1998). Although errors of law based on the facts alleged will not surmount a rule 12(b)(6) challenge, the plaintiff's burden is "relatively light." *Id.,* citing *Gibbs Ford, Inc. v. United TruckLeasing Corp.,* 399 Mass. 8, 13 (1987). Under the "generous principles" governing our review ... *Connerty v. Metropolitan Dist. Comm'n,* 398 Mass. 140, 143 (1986), we summarize the facts alleged in the ... complaint and in uncontested documents of record.
> *Marram v. Kobrick Offshore Funds, Ltd.,* 442 Mass. 43, 45 (2004).

This Court should do no less; and it has not. The emperor's clothes are thin, indeed, but not quite wholly absent. On the claim of waste the defendants cannot surmount Shaev's "relatively light burden" and show beyond doubt that it can prove no set of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
19 Mass.L.Rptr. 180, 2005 WL 1009721 (Mass.Super.)
**(Cite as: 2005 WL 1009721 (Mass.Super.))**

Page 4

facts in support of its claims which would entitle it to derivative relief on behalf of FleetBoston.

### ORDER

For the foregoing reasons, the motion of the defendants to dismiss the plaintiff's complaint against them, Paper # 5, for failure to comply with Mass.R.Civ.P. Rule 23.1 is *ALLOWED,* and for failure to state a claim pursuant to Mass.R.Civ.P. Rule 12(b)(6) is *DENIED.*

19 Mass.L.Rptr. 180, 2005 WL 1009721 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in Cal.Rptr.3d                                                                Page 1
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

☞

<u>Briefs and Other Related Documents</u>

California Rules of Court, rule 977(a), prohibits
courts and parties from citing or relying on opinions
not certified for publication or ordered published,
except as specified by rule 977(b). This opinion has
not been certified for publication or ordered
published for purposes of rule 977.

Court of Appeal, Sixth District, California.
David B. SHAEV, Plaintiff and Appellant,
v.
Bruce L. CLAFLIN, et al., Defendants and
Respondents.
**No. H026204.**
**(Santa Clara County Super. Ct. No. CV794039).**

June 21, 2004.
Review Denied Sept. 29, 2004.
Jeffrey Mark Forster, Forster & Segal, San Jose, CA,
<u>Irving Bizar</u>, Attorney at Law, New York, NY, for
Plaintiff and Appellant.

<u>Boris Feldman</u>, Wilson Sonsini Goodrich & Rosati,
Palo Alto, CA, for Defendant-Respondent.

BAMATTRE-MANOUKIAN, Acting P.J.

*1 This case arises from events following the spin-
off of Palm, Inc., formerly a subsidiary of 3Com
Corporation. After the spin-off of Palm, the board of
3Com adjusted outstanding stock options held by
employees and non-employee directors at 3Com,
because the value of the stock options had been
affected by the spin-off. Plaintiff David B. Shaev is a
3Com stockholder, but does not hold any options. He
filed suit against 3Com and its directors, containing
two causes of action: the first was a derivative action
by which plaintiff alleged that the officers and
directors of 3Com breached fiduciary duties in
making the adjustments of the 3Com stock options.
The second cause of action was a class action on
behalf of all shareholders of 3Com stock except those
who received the benefits of the option adjustment.

The trial court sustained a demurrer, without leave to
amend, as to plaintiff's second amended complaint
and plaintiff appeals from the judgment of dismissal.
We find that in making the stock option adjustments
the 3Com directors acted in accordance with stock
option plans approved by the shareholders, and that
the adjustments did not amount to corporate waste.
The directors' actions were thus protected by the
business judgment rule and plaintiff's complaint
failed to state a cause of action for breach of
fiduciary duty. Plaintiff's class action must also fail as
it is based upon the same underlying allegations of
breach of fiduciary duty. We therefore affirm the
judgment.

**BACKGROUND**
3Com is a Delaware Corporation with its principal
place of business in Santa Clara, California. Its stock
has been publicly traded since 1984. Plaintiff is a
stockholder of 3Com. The individual defendants are
current or former officers and directors of 3Com.

Prior to March of 2000, Palm, Inc. was a wholly
owned subsidiary of 3Com. On or about March 2,
2000, Palm held its initial public offering, selling
approximately 23 million shares. On July 27, 2000,
3Com completed the "spin-off" of Palm by
distributing the remaining 532 million Palm shares to
its 3Com stockholders. The stockholders received
1.4832 shares of Palm for each outstanding share of
3Com common stock they owned. After the spin-off,
3Com no longer owned Palm, and 3Com's
shareholders owned stock in two separate companies,
3Com and Palm.

3Com has stock option plans both for its employees
and for its non-employee directors. The option plans
were adopted with shareholder approval and are
administered by the 3Com board of directors. Both
plans contain provisions authorizing the board to
adjust the number and exercise price of outstanding
options under certain circumstances. The employees'
plan provides as follows in paragraph 7: "EFFECT
OF CHANGE IN STOCK SUBJECT TO PLAN.
Appropriate adjustments shall be made in the number
and class of shares of stock subject to this Plan and to
any outstanding Options and in the exercise price of
any outstanding Options in the event of a stock
dividend, stock split, reverse stock split or like

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                 Page 2
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

change in the capital structure of the Company."
[FN1]

> FN1. The non-employee directors' option
> plan similarly provides, in paragraph 3(b):
> "In the event of any stock dividend, stock
> split, reverse stock split, recapitalization,
> combination, reclassification or similar
> change in the capital structure of the
> Company, appropriate adjustments shall be
> made in the number and class of shares
> subject to the Plan, the Guidelines and the
> per option limits set forth in section 4, and to
> any outstanding options granted under the
> Plan, and in the exercise price of such
> outstanding options."

*2 After the spin-off of Palm, the stock price of
3Com stock declined sharply. The day before the 532
million Palm shares were distributed, 3Com's stock
price was $64.5625. On July 28, 2000, the day after
the distribution, 3Com's stock price closed at
$13.375. As a consequence, the stock options held by
3Com employees and directors were worth much less
than when the options were originally granted. In
order to preserve the value of the options, which in
the case of the employees were part of bargained-for
compensation, the board made an adjustment
pursuant to the adjustment provisions in the stock
option plans. The board used a ratio of 4.827,
consisting of the price of 3Com stock before the Palm
spin-off ($64.5625) and after the spin-off ($13.375).
On July 28, 2000, each 3Com option holder then
received 4.827 3Com stock options for each option
held prior to the Palm distribution, and the exercise
price for each such option was divided by 4.827.
Following this adjustment the total number of
outstanding 3Com options increased from
approximately 35 million to approximately 169
million.

Plaintiff, who is a shareholder in 3Com but not an
option holder, filed his original complaint on
November 17, 2000, alleging that the officers and
directors breached their fiduciary duties to
stockholders by making the option adjustments
following the Palm spin-off. He alleged that the
adjustments were not specifically authorized by the
option plans. Furthermore, the adjustments
disproportionately increased director and employee
ownership of 3Com stock, thereby diluting the public
shareholders' ownership and giving the option
holders majority control of 3Com. Plaintiff pleaded

these allegations as a derivative action and as a class
action. As to the derivative action, he alleged that he
had not made a pre-suit demand on 3Com's board of
directors because to do so would have been futile
since the directors personally benefited from the
option adjustments and were thus not disinterested.

On November 29, 2001, defendants' demurrer to this
complaint was sustained, with leave to amend. The
court found that insufficient facts were alleged to
show that the spin-off and option adjustments
resulted in a dilution of the shareholders' interest
amounting to "waste," such as to take the transaction
out of the protection of the business judgment rule.
The court also found inadequate the allegations that
demand on the board of directors was excused simply
because the directors stood to benefit from the
transaction.

Plaintiff's first amended complaint was filed
December 26, 2001. He added various allegations
detailing why the adjustments were "arbitrary and not
a valid exercise of business judgment." He alleged
that the board should have applied a different formula
for the adjustments, namely the formula used by the
American Stock Exchange in trading 3Com options
after the spin-off. He alleged that there had been no
independent valuation of the fairness of the option
adjustment; that the Palm spin-off itself was improper
and unauthorized; that the spin-off was not the type
of transaction that triggered the adjustment clause in
the option plans; that the adjustment resulted in the
option holders increasing their ownership of 3Com
from a 10 percent interest to a majority 51 percent
interest; and that the adjustment was accomplished
with no consideration to 3Com. As to the allegations
regarding demand futility, plaintiff included figures
representing the number of options owned by various
directors before and after the adjustments.

*3 Defendants' demurrer to the first amended
complaint was sustained with leave to amend. The
court noted that the allegations regarding waste and
demand futility were "insufficient."

Plaintiff's second amended complaint was filed on
December 17, 2002. Plaintiff added a number of
allegations of malfeasance regarding the Palm spin-
off. He alleged that because the Palm spin-off itself
was improper and ineffective, the subsequent 3Com
option adjustments were invalid. He further alleged
that even if the Palm spin-off was valid, the board did
not act in accordance with the option plans, because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))

Page 3

the plans did not specifically authorize an adjustment in the event of a spin-off. And even if some adjustment was authorized, he alleged that the adjustment made by the board was not "appropriate," within the meaning of the option plans. He alleged the proper adjustment should have been to grant the 3Com option holders options to purchase 1.4832 shares of Palm for every 3Com option, which would have maintained the proportionate ownership interests of 3Com. Instead, by granting the 3Com option holders additional 3Com options, the board increased the ownership interests of 3Com insiders-- namely the employees, officers and non-employee directors--and thereby diluted the ownership interest of the public shareholders. Allegations regarding the futility of demand on the 3Com directors remained unchanged from the first amended complaint.

On May 29, 2003, the court issued an order sustaining defendants' demurrer to the second amended complaint without leave to amend, and dismissing the action. The order stated no reasons. However, at oral argument on the demurrer, the court indicated that plaintiff had not pleaded facts sufficient to show "improper conduct or waste" so as to remove the board's action from the protection of the business judgment rule.

## ARGUMENT
### Standard of Review and Applicable Law

Following the dismissal of a complaint upon the sustaining of a demurrer without leave to amend, we conduct a de novo review in order to determine whether the complaint states a cause of action as a matter of law. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790, 90 Cal.Rptr.2d 598.) We "review the facts alleged in the complaint in light of the well-established principle that 'allegations of the complaint which are not contrary to law or to a fact of which this court may take judicial notice must be deemed to be true. [Citations.]' ' "A demurrer admits all material and issuable facts properly pleaded. [Citations.] However, it does not admit contentions, deductions or conclusions of fact or law alleged therein." [Citations.]' " (*Casella v. City of Morgan Hill* (1991) 230 Cal.App.3d 43, 48, 280 Cal.Rptr. 876.) A demurrer is properly sustained without leave to amend " 'where the facts are not in dispute, and the nature of the plaintiff's claim is clear, but, under the substantive law, no liability exists.' " (*Traverso v. Department of Transportation* (2001) 87 Cal.App.4th

1142, 1144-1145, 105 Cal.Rptr.2d 179 .)

*4 The parties agree that substantive Delaware law applies in this case since 3Com is a Delaware corporation and the case concerns the duties of 3Com's officers and directors. (*First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba* (1983) 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46; Corp.Code, § 2116; *American Center for Education, Inc. v. Cavnar* (1978) 80 Cal.App.3d 476, 485, 145 Cal.Rptr. 736.) Procedurally, Delaware law is similar to California, in that a motion to dismiss a shareholder derivative suit for failure to state a claim or to comply with pleading requirements is reviewed de novo. (*Brehm v. Eisner* (Del.2000) 746 A.2d 244, 253.) In order to withstand dismissal, plaintiff must allege facts that, if taken as true, establish every element of a claim upon which relief could be granted. (*In re Santa Fe Pacific Corp. Shareholder Litigation* (Del.1995) 669 A.2d 59, 65- 66.) Conclusory allegations, without specific supporting facts, will not be accepted as true. (*Ibid.; Grobow v. Perot* (Del.1988) 539 A.2d 180, 187, overruled on another point in *Brehm v. Eisner, supra,* 746 A.2d at p. 253.)

### The Demand Requirement for a Derivative Action

"The 'derivative' action is so called because the rights of the plaintiff shareholders derive from the primary corporate right to redress the wrongs against it." (*Desaigoudar v. Meyercord* (2003) 108 Cal.App.4th 173, 183, 133 Cal.Rptr.2d 408.) The derivative action provides a means for shareholders to assert a claim of misuse of managerial power on behalf of the corporation. However, since such an action "impinges on the managerial freedom of directors, the law imposes certain prerequisites to the exercise of this remedy." (*Pogostin v. Rice* (Del.1984) 480 A.2d 619, 624.) Thus before undertaking the prosecution of a derivative claim, a shareholder must first make a demand on the corporation's board of directors to consider pursuing the proposed action. (*Aronson v. Lewis* (Del.1984) 473 A.2d 805, 811, overruled on another point in *Brehm v. Eisner, supra,* 746 A.2d at p. 253.) This rule is designed to insure that the stockholder exhaust intracorporate remedies and also to provide an early screening mechanism to prevent abuse of the derivative action. (*Id.* at p. 812.)

Where the shareholder complains about acts of the board itself, the question arises whether the board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                    Page 4
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))

would be able to pursue the claim with impartiality, since doing so would require that the board sue itself on behalf of the corporation. In such a case a derivative plaintiff may by-pass demand on the board. However, under Delaware law plaintiff must allege with particularity why such a demand was excused or would have been futile. [FN2] (*Brehm v. Eisner, supra,* 746 A.2d at p. 254; *Aronson v. Lewis, supra,* 473 A.2d at p. 812.) In order to demonstrate demand futility, plaintiff must allege facts sufficient to raise "a reasonable doubt ... that: (1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." (*Aronson v. Lewis, supra,* 473 A.2d at p. 814; *Rales v. Blasband* (Del.1993) 634 A.2d 927, 933.) If plaintiff establishes either prong of the *Aronson* test, demand is excused and plaintiff may proceed with the lawsuit. (*RCM Securities Fund, Inc. v. Stanton* (2d Cir.1991) 928 F.2d 1318, 1330--1330.) A complaint that fails to meet either prong of the demand futility test will be dismissed. (*Haber v. Bell* (Del.Ch.1983) 465 A.2d 353, 357.)

> FN2. Delaware Chancery Rule 23.1 provides, in part: "The complaint shall ... allege with particularity the efforts, if any, ... to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

*\*5* The business judgment rule comes into play both in evaluating demand futility and in assessing whether plaintiff's complaint has stated a claim that the directors breached fiduciary duties. (*Aronson v. Lewis, supra,* 473 A.2d at p. 814.) The business judgment rule is a core presumption of corporation law that "in making a business decision the directors of a corporation act[ ] on an informed basis, in good faith and in the honest belief that the action taken [is] in the best interests of the company." (*Aronson v. Lewis, supra,* 473 A.2d at p. 812.) A plaintiff seeking to avoid the protection of the business judgment rule must allege facts showing that the directors engaged in self-dealing or wasted corporate assets. (*In re the Walt Disney Company Derivative Litigation* (Del.1998) 731 A.2d 342, 353, reversed in part in *Brehm v. Eisner, supra,* 746 A.2d 244; *Glazer v. Zapata Corp.* (Del.Ch.1993) 658 A.2d 176, 183.) "Under the business judgment rule, director liability is predicated upon concepts of gross negligence." (*Aronson v. Lewis, supra,* 473 A.2d at p. 812.) "If a

board's decision can be 'attributed to any rational business purpose,' [citation] a court will not substitute its judgment for that of a board." (*Levine v. Smith* (Del.1991) 591 A.2d 194, 207, overruled on another point in *Brehm v. Eisner, supra,* 746 A.2d at p. 253.)

Defendants argue that plaintiff did not meet the threshold requirements of the *Aronson* demand futility test, in that the second amended complaint did not contain particularized factual allegations raising a reasonable doubt about the directors' disinterest or their valid business judgment. Plaintiff contends that the second amended complaint adequately raised a reasonable doubt about the directors' disinterest for purposes of demand futility, because it alleged that all of the board members participated in the decision to make the stock option adjustments, and that "[a]ll the directors received the benefits of the adjustment and thus had a financial interest in the transaction." Even if a particular transaction appears to be self-interested, however, this will not necessarily satisfy the demand-futility test. Not every personal financial benefit realized by directors as a result of a challenged board action will raise a reasonable doubt that the board was disinterested. (*Grobow v. Perot, supra,* 539 A.2d 180, 186.) The conflicting self-interest must be "material." (*Cede & Co. v. Technicolor, Inc.* (Del.1993) 634 A.2d 345, 363; *Rales v. Blasband, supra,* 634 A.2d at p. 936.) More important to the case before us, if the directors were acting according to the provisions of a stock option plan approved by the shareholders, their actions in adjusting the stock options are protected by the business judgment rule, even if they benefited from the adjustments. (*In re 3Com Corporation Shareholders Litigation* (Del.Ch., Oct. 25, 1999, No. C.A.16721) 1999 WL 1009210.) In such a case, plaintiff must allege fraud, waste or gross negligence, sufficient to overcome the presumption that the board exercised its business judgment in administering the option plans. (See *Kerbs v. California Eastern Airways, Inc.* (Del.1952) 90 A.2d 652, 655.)

*\*6* Although the demand-futility test is often analyzed separately, the question whether the business judgment rule applies to the challenged actions determines both the sufficiency of the complaint on the merits and the threshold demand-futility issue. (See, e.g., *Criden v. Steinberg* (Del.Ch., Mar. 23, 2000, No. 17082) 2000 WL 354390 [Chancery Court found "no real need to engage in a demand analysis" where pleading indicated directors had acted according to an approved stock option

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

plan].) _[FN3]_ We will therefore proceed to analyze the issues with respect to the business judgment rule: first, whether the board acted in conformance with the provisions of the stock option plan; and second, whether the method of adjusting the options was so devoid of consideration or benefit to the corporation that it amounted to a waste of corporate assets.

> FN3. Cases published only on Westlaw are apparently cited in Delaware. (_Pitcavage v. Delaware State Personnel Com'n_ (Del.Super., Mar 25, 1993, No. C.A. 92A-07-006) 1993 WL 93458.)

### *Compliance with the Stock Option Plans*

Appellant argues that the directors are not protected by the business judgment rule because the option adjustments were not authorized by 3Com's option plans. The employees' option plan provided for an adjustment to the number and exercise price of outstanding options "in the event of a stock dividend, stock split, reverse stock split or like change in the capital structure" of 3Com. The non-employee directors' plan similarly authorized an adjustment "[i]n the event of any stock dividend, stock split, reverse stock split, recapitalization, combination, reclassification or similar change in the capital structure" of 3Com. Neither option plan expressly provided for an adjustment in the event of a spin-off of a subsidiary. Appellant argues that because the plans did not identify a spin-off as a triggering event, the board was acting outside the authority of the plans in making any adjustment based on the spin-off. 3Com argues that the distribution of Palm stock to the 3Com shareholders was a "stock dividend" within the meaning of the stock option plans so as to trigger an option adjustment, or that it was sufficiently like a stock dividend to fall within the catchall phrase, "like [or similar] change in the capital structure ."

3Com directs us to its annual report for 2000, filed with the Securities and Exchange Commission, in which it reported the spin-off and characterized the distribution of Palm stock to its stockholders as a "stock dividend." And similar distributions have been referred to in Delaware case law as stock dividends. (See, _Anadarko Petroleum Corp. v. Panhandle Eastern Corp._ (Del.1988) 545 A.2d 1171, 1172; _Shaev v. Wyly_ (Del.Ch. Jan. 6, 1998, No. 15559-NC) 1998 WL 13858; see also _MCA, Inc. v. Matsushita Elec. Indus. Co._ (Del.Supr.2001) 785 A.2d 625, 628-

629; _In re MCA, Inc._ (Del.Ch.1991) 598 A.2d 687, 690; _Shields v. Shields_ (Del.Ch.1985) 498 A.2d 161, 163; _Epstein v. Celotex Corp._ (Del.Ch.1968) 238 A.2d 843, 845.)

On the other hand appellant argues that under section 173 of Delaware's General Corporation Law, a stock dividend is defined as a distribution of a *company's own shares.* Section 173 does not exactly define "stock dividend," however. Rather, it provides that "[d]ividends may be paid in cash, in property, or in shares of the corporation's capital stock." (Del.Code Ann., tit. 8, § 173.) _[FN4]_ This is not an exclusive list and the permissive language allows for the possibility that other forms of payment or property could be termed dividends. Appellant argues further that the distribution in this case has none of the accounting characteristics of a dividend. A dividend, he contends, describes a distribution of earnings, in the form of a company's own stock, rather than a large and nonrecurring distribution of stock of another company.

> FN4. "No corporation shall pay dividends except in accordance with this chapter. Dividends may be paid in cash, in property, or in shares of the corporation's capital stock. If the dividend is to be paid in shares of the corporation's theretofore unissued capital stock the board of directors shall, by resolution, direct that there be designated as capital in respect of such shares an amount which is not less than the aggregate par value of par value being declared as a dividend and, in the case of shares without par value being declared as a dividend, such amount as shall be determined by the board of directors. No such designation as capital shall be necessary if shares are being distributed by a corporation pursuant to a split-up or division of its stock rather than as payment of a dividend declared payable in stock of the corporation." (Del.Code Ann. tit. 8, § 173.)

\*7 Both sides discuss the case of _Noddings Inv. Group, Inc. v. Capstar Communications, Inc._ (Del.Ch., Mar. 24, 1999, No. C.A.16538) 1999 WL 182568 (_Noddings_ ). In _Noddings_ the court considered whether a spin-off triggered the " 'anti-destruction' " provision of a warrant agreement granting certain rights to warrant-holders upon "reclassification, capital reorganization or other

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

Page 6

change of outstanding shares of Common Stock...." (*Noddings, supra,* at p. 3.) The Delaware Chancery Court applied New York law in interpreting the anti-destruction provision in light of the surrounding language in the particular warrant agreement. The court determined that the spin-off was not "*necessarily* a reorganization" within the context of the warrant agreement, and was not an "other change of outstanding shares of stock." The court acknowledged that plaintiffs' arguments to the contrary had some merit, but decided that in the absence of a specific "spin-off protection provision," the spin-off by itself did not trigger the anti-destruction provision. [FN5]

> FN5. In *Noddings,* the spin-off was part of a two-step transaction, involving a subsequent merger. The court went on to find that the merger did trigger the right to an adjustment.

Appellant argues that *Noddings* stands for the proposition that if an option plan does not expressly provide for an adjustment in the event of a spin-off, such a right does not exist. He contends that the drafters of the stock option plans were well aware of the prevalence of spin-off transactions in the corporate world, and they could have specifically included spin-offs as a triggering event authorizing an option adjustment. The failure to do so thus reflects that such transactions were *not* intended to trigger an option adjustment.

We do not find *Noddings* to be controlling in the circumstances here. The Chancery Court in *Noddings* applied New York law to a specific warrant agreement, and its holding is properly limited to the particular language of that agreement. Indeed the court distinguished another New York case construing different language, where the court had observed that the distribution of shares of a spin-off company "seems to be a dividend" from the parent company to its common stockholders. (*Prescott, Ball & Turben v. LTV Corp.* (S.D.N.Y.1981) 531 F.Supp. 213, 220.) Furthermore, the adjustment clause in our case, unlike the one in *Noddings,* listed several possible triggering events, and then provided that an adjustment would be authorized in the event of "like" or "similar" changes in the capital structure of 3Com. Thus even if a distribution of stock as part of a spin-off of a subsidiary does not, strictly speaking, have the characteristics of a "stock dividend," the catch-all provision in the adjustment clause allows the board, in the exercise of its business judgment, to decide

whether there was a change in the capital structure of 3Com that was "like" or "similar" to a stock dividend, stock split, recapitalization, or reclassification. Delaware case law supports the view that the spin-off of Palm operated to change 3Com's capital structure. (See *Grand Metropolitan Public Ltd. Co. v. Pillsbury Co.* (Del.Ch.1988) 558 A.2d 1049, 1061 [parent company's "capital structure would be permanently changed" by dividing the Company into two companies"]; *HB Korenvaes Investments, L.P. v. Marriott Corp.* (Del.Ch., Jun. 9, 1993, No. C.A.12922) 1993 WL 205040, *1 [the spin-off "transaction will, of course, transform the capital structure of [the company] with several important effects upon the preferred and common stockholders ."].)

**\*8** Furthermore, in acting pursuant to the option plans the 3Com board was entitled to consider that the purpose of the adjustment provision was to prevent outstanding options from becoming devalued. It is undisputed that the value of outstanding 3Com options was negatively affected by the Palm spin-off. Thus the board's action furthered the purpose of the adjustment provision and protected the contractual rights of the option holders under the plans. In the case of the employees, stock options were an integral and bargained-for part of their compensation.

Appellants argue that the option adjustments made in this case produced a result so "unexpected and unintended" that the shareholders could not be deemed to have approved such adjustments when they voted to approve the option plans. (See *Criden v. Steinberg, supra,* 2000 WL 354390.) From the shareholders' approval of the plans, however, one can draw the inference that the shareholders endorsed the view that the option plans were an appropriate performance incentive. (*Ibid.*) Appellant concedes that the purpose of the option adjustment clause was to prevent dilution of the value of 3Com options held by employees and non-employee directors. Since the board's action resulted in preserving the value of these options, this cannot have been an unexpected and unintended result.

In sum, we find that the board's decision to make an adjustment under the authority of the adjustment clause in 3Com's option plans can be attributed to a " 'rational business purpose,' " namely preventing option dilution and protecting the value of the employees' options. (*Levine v. Smith, supra,* 591

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

A.2d at p. 207 .) Since the board was acting in accordance with the option plans when it made the adjustments, its actions are protected by the business judgment rule, even if some benefit flowed to the directors. However, the protection of the business judgment rule does not extend to acts of bad faith, fraud or gross negligence amounting to corporate waste. (*Brehm v. Eisner, supra,* 746 A.2d at pp. 263-264.) We therefore turn next to consider the propriety of the particular adjustments made by the board.

### *Were the Option Adjustments Appropriate?*

Appellant contends that even if *some* adjustment of options was justified following the Palm spin-off, the adjustments made by the board were not "appropriate" within the meaning of the adjustment clause because they were disproportionately large, and because they were unfair to the 3Com shareholders who were not option holders. In his second amended complaint appellant alleged that the stock adjustments should have "replicate[d] the underlying change in the 3Com stockholder's ownership" by granting the option holders 1.4832 shares of Palm stock for every outstanding 3Com option. He contends that this method of calculating the adjustment would have been consistent with the American Stock Exchange's treatment of the 3Com stock options following the spin-off. Furthermore, it would not have resulted in the substantial dilution of the public shareholders' interest in 3Com, and increase in the ownership interest of the 3Com insiders. [FN6] Appellant argues that any adjustment which increases defendants' share of 3Com and decreases the public shareholders' ownership is not an "appropriate" adjustment.

> FN6. Plaintiff initially alleged that the option adjustments resulted in the 3Com employees and directors obtaining a controlling majority of 51percent. Appellant is apparently no longer relying on this figure. Instead he contends that as a result of the adjustments, the interest of the insiders in 3Com would increase from approximately 10 percent to approximately 32 percent, assuming all options are exercised, while the public shareholders' proportionate interest would be reduced from 90 percent to 68 percent.

*9 Appellant's allegations suggesting a different methodology for adjusting the 3Com stock options

are insufficient to state a claim that the board acted beyond the scope of its business judgment. "Courts do not measure, weigh or quantify directors' judgment." (*Brehm v. Eisner, supra,* 746 A.2d at p. 264.) In order to avoid the protection of the business judgment rule, appellant must allege facts showing that the directors acted irrationally, were grossly negligent or wasted corporate assets. (*Aronson v. Lewis, supra,* 473 A.2d 805; *Glazer v. Zapata Corp., supra,* 658 A.2d at p. 183.) Here the methodology employed by the board helped to ensure that the option holders would remain 3Com employees and would work toward their company's success. Under the circumstances, appellant's allegations that this was an inappropriate way to calculate adjustments do not show irrationality or gross negligence.

Furthermore, a shareholder stating a claim for corporate waste must allege facts demonstrating that the directors authorized a transaction that was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." (*Glazer v. Zapata Corp., supra,* 658 A.2d at p. 183.) The transaction must either serve no corporate purpose or be so completely devoid of consideration that it is "in effect a gift." (*Lewis v. Vogelstein* (Del.Ch.1997) 699 A.2d 327, 336.) This standard specifically applies where waste is alleged with respect to grants of options to directors under a stock option plan approved by the shareholders. (*Id.* at p. 338.) A pleading does not meet this test by alleging facts showing that the transaction was lopsided or could have been more beneficial to one group or another. Rather the pleaded facts must show "an absolute lack of consideration, rather than inadequate consideration ." (*Pogostin v. Rice* (Del.Supr.1984) 480 A.2d 619, 625.)

Appellant's second amended complaint alleged that the option adjustments resulted in "materially excessive costs to 3Com" and that after the adjustments the equity of the public stockholders of 3Com was substantially decreased. Allegations such as this are not sufficient to state a claim for waste or fraud against the board. The option adjustments were made pursuant to option plans that had been approved by the shareholders. The acknowledged purpose of the options plans was to create incentive for key employees and non-employee directors to remain with the company, in order to promote the financial success and progress of 3Com. Enhancing productivity by giving employees a stake in a company is a legitimate business purpose. (See

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))

*Shamrock Holdings, Inc. v. Polaroid Corp.* (Del.Ch.1989) 559 A.2d 257, 272.) The directors could have rationally decided that making the adjustment with shares of Palm, as appellant suggests, rather than options in 3Com, would not have served this legitimate business purpose.

*10 Although courts have observed that increased loyalty and productivity is an "ephemeral" form of consideration because it does not lend itself to valuation in dollar terms (see, *Pogostin v. Rice, supra,* 480 A.2d at p. 625), it is nonetheless a benefit to the company and provided consideration. Appellant's allegations to the contrary, that the adjustment "produced no benefit to and was without any consideration to 3Com," are conclusory and without factual support. Delaware law provides that the judgment of the directors as to whether the consideration for the issuance of options was sufficient is conclusive, absent "actual fraud." (Del.Code Ann., tit. 8., § 157.) This statute was enacted to protect directors' business judgment specifically with regard to consideration flowing to the corporation in exchange for the issuance of stock options. (*Pogostin v. Rice, supra,* 480 A.2d at p. 625.) In order to state a claim for waste that is legally sufficient to overcome the presumption of the business judgment rule, a plaintiff must allege facts showing that the benefit received by the corporation in the form of increased productivity and loyalty was such that " 'no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.' " (*Grobow v. Perot, supra,* 539 A.2d at p. 189, quoting *Saxe v. Brady* (Del.Ch.1962) 184 A.2d 602, 610; see also *RCM Securities Fund, Inc. v. Stanton, supra,* 928 F.2d 1318, 1334.) Appellant's allegations do not meet this test.

### Other Issues

In his second amended complaint, appellant added numerous allegations challenging the legality of the Palm spin-off. He alleged that the formation of Palm as a separate entity, which involved merging companies in California and Delaware, and then Palm's subsequent spin-off from 3Com, were accomplished without technical compliance with documentation requirements of Delaware and California corporation law. Because the Palm spin-off itself was thus illegal, 3Com's distribution of Palm stock was ineffective and could not have triggered the adjustment clause in the 3Com option plans. Plaintiff's claims regarding the legality of the

Palm spin-off were the subject of a separate derivative action for breach of fiduciary duty and waste filed by appellant in 2001. (*Shaev v. Benhamou* (Super. Ct. Santa Clara County, 2001, No. CV 795128.) That action was settled after Palm's board of directors "confirmed, ratified and approved" Palm's corporate actions. The settlement further recited that plaintiff and defendants agreed that the Palm board's confirmation of its actions "cured the defects" alleged in case No. CV 795128.

Appellant points out that the settlement in CV 795128 expressly reserved his right to continue to pursue claims against director Eric Benhamou in his role as a 3Com director in the action before us. However, the second amended complaint in the action before us seeks relief only as to the propriety of the actions of the 3Com board in making the option adjustments. When questioned by the judge during argument on the demurrer, plaintiff's counsel stated that he was "seeking cancellation and rescission of the option adjustment" and was not seeking any relief regarding the Palm spin-off and stock distribution. The judge clarified "So that any fault that you're alleging here really relates only to the dilution of the ownership of 3Com?" Counsel replied, "That is correct, your honor." We believe this record shows that appellant was not pursuing relief with respect to claims that the Palm spin-off was illegal. The allegations in the second amended complaint regarding the validity of the formation of Palm are therefore not properly before us.

*11 In a similar vein, plaintiff inserted numerous allegations in his second amended complaint claiming that the market price of Palm stock was the subject of "a fraudulent scheme of manipulation." Since the adjustment formula was based in part on the value of Palm stock, this directly affected the calculation of the option adjustments and was "grossly unfair" to 3Com and its stockholders. These allegations were taken from an ongoing multi-district federal securities litigation. (*In re Initial Public Offering Securities Litigation* (S.D.N.Y., Dec. 24, 2003, No. 21 MC 92 SAS) 2003 WL 23021976.) This litigation alleges misconduct by underwriters, securities issuers and officers of issuers, concerning the initial public offers of approximately 300 companies that went public during the years 1998 through 2000. Suit was not filed against Palm in this consolidated action until 2001, after the 3Com board had made the option adjustments that are the subject of the action before us. Because the 3Com board can

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d
2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367
**Not Officially Published**
**(Cal. Rules of Court, Rules 976, 977)**
**(Cite as: 2004 WL 1381037 (Cal.App. 6 Dist.))**

Page 9

only be responsible for considering "material facts that are reasonably available" at the time it took the action complained of, allegations later coming to light in a subsequent lawsuit do not undermine the board's exercise of its business judgment. (See, *Brehm v. Eisner, supra,* 746 A.2d at p. 259.)

### The Class Action

Appellant argues that even if the court found that he had failed to meet the demand futility threshold test, the court should not have dismissed the second cause of action, in which he pleaded a class action, because the demand futility test does not apply to class actions. He contends that Delaware law recognizes a direct action by minority stockholders for wrongful dilution of stock. (See, *In re Tri-Star Pictures, Inc., Litigation* (Del.Supr.1993) 634 A.2d 319, disapproved in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* (Del.Supr.2004) 845 A.2d 1031, 1038.) As we have discussed in regard to the first cause of action, however, the allegations that the directors breached fiduciary duties are legally insufficient because the directors' actions are protected by the business judgment rule. The second cause of action in plaintiff's second amended complaint rests upon the same factual assertions and similarly alleges that the directors engaged in wrongful conduct and "breached their fiduciary and common law duties." These allegations are also legally insufficient to support a class cause of action. Consequently, plaintiff's class action was properly dismissed.

### DISPOSITION
The judgment is affirmed.

WE CONCUR: MIHARA and McADAMS, JJ.

2004 WL 1381037 (Cal.App. 6 Dist.), 33 Employee Benefits Cas. 2367 Not Officially Published, (Cal. Rules of Court, Rules 976, 977)

**Briefs and Other Related Documents** (Back to top)

• 2004 WL 2809781 (Appellate Petition, Motion and Filing) Petition for Rehearing (Jun. 29, 2004)Original Image of this Document (PDF)

• 2004 WL 485697 (Appellate Brief) Appellant's Reply Brief (Feb. 04, 2004)Original Image of this Document (PDF)

• 2004 WL 526967 (Appellate Brief) Respondents'

Brief (Jan. 06, 2004)Original Image of this Document (PDF)

• 2003 WL 22945413 (Appellate Brief) Appellant's Opening Brief (Oct. 29, 2003)

• H026204 (Docket) (Jul. 09, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

# H

Motions, Pleadings and Filings

United States District Court,
S.D. New York.
Victoria SHAEV, Plaintiff,
v.
Sir Ronald HAMPEL, John P. Mulroney, Marina
V.N. Whitman, Alain J.P. Belda,
Hugh M. Morgan, Henry B. Schacht, Franklin A.
Thomas, Kenneth W. Dam, Judith M.
Gueron, Paul H. O'Neill, Joseph T. Gorman, George
E. Bergeron, Richard L.
Fischer, L Patrick Hassey, Richard B. Kelson, Denis
A. Demblowski,
PricewaterhouseCoopers LLP, and Alcoa Inc.,
Defendants.
No. 99 Civ. 10578(RMB).

Oct. 25, 2002.

Shareholder brought action against corporation, its officers and directors, and its outside accountant for alleged proxy solicitation misrepresentations. On defendants' motion to dismiss, the District Court, Berman, J., held that: (1) suit was not time-barred, and (2) statement was not misleading.

Motion granted.

West Headnotes

**[1] Limitation of Actions** ☞125
241k125 Most Cited Cases
Complaint alleging proxy solicitation misrepresentations, which merely substituted individual shareholders for originally named corporate plaintiff, related back to filing of original complaint, for limitations purposes. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); Fed.Rules Civ.Proc.Rules 15, 17(a), 28 U.S.C.A.

**[2] Securities Regulation** ☞49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not required to provide estimate of cost of plan. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[3] Securities Regulation** ☞49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not required to disclose federal income tax consequences for stock option recipients. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[4] Securities Regulation** ☞49.21
349Bk49.21 Most Cited Cases
Alleged errors in valuation estimates, contained in proxy solicitation for stock incentive plan, were not misleading; statement expressly warned shareholders that valuations were estimates, assumptions on which estimates were based were disclosed, and there was no showing that valuations were made without reasonable basis or in other than good faith. Securities Exchange Act
of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[5] Securities Regulation** ☞49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan adequately disclosed number of shares available under plan; statement disclosed number of shares and circumstances under which additional shares could become available. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[6] Securities Regulation** ☞49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not required to provide full text of plan; statement merely had to disclose material features of plan. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

*DECISION AND ORDER*

BERMAN, J.

I. Introduction

*1 Plaintiff Victoria Shaev ("Plaintiff") filed her original action on October 15, 1999 ("Complaint") against Alcoa, Inc. ("Alcoa"), certain Alcoa officers and directors, and Alcoa's outside accountant, PricewaterhouseCoopers LLP (collectively "Defendants"), as a derivative action "in the right of and for the benefit of" Alcoa, alleging violations of Section 14(a) of the Securities Exchange Act of 1934

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
(Cite as: 2002 WL 31413805 (S.D.N.Y.))

Page 2

("Exchange Act"), 15 U.S.C. § 78n(a) ( "Section 14(a)"). and 17 C.F.R. § 240.14a-9 ("Rule 14a-9") promulgated thereunder. Plaintiff alleged that Defendants "knew or should have known" about certain "materially false representations and omissions" made in connection with the solicitation of Alcoa stockholders by means of a proxy statement, dated March 8, 1999 ("Proxy Statement" or "PS"). Comp. ¶ ¶ 30-33. Plaintiff's derivative action was dismissed without prejudice on March 19, 2001 for Plaintiff's failure to make a demand on the Alcoa Board of Directors ("Board"). Order, dated March 19, 2001, at 7 ("The Court believes that such a demand, required under Pennsylvania law, would not, as a matter of law, be inconsistent with applicable Federal policy.").

Following dismissal, on May 31, 2001, Plaintiff filed an amended complaint   ("Amended Complaint") alleging claims on her own behalf and "on behalf of all the stockholders of Alcoa, except the individual defendants and the participants in [Alcoa's stock incentive plan]". Am. Comp. ¶   34. Plaintiff otherwise makes the same substantive allegations she made in the Complaint. On June 25, 2001, Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 9(b) and 12(b)(6) ( "Def.Mem."). On July 12, 2001, Plaintiff submitted an opposition memorandum ("Pl.Mem."); and, on July 27, 2001. Defendants submitted a reply memorandum ("Def. Reply Mem."). Oral argument was held on October 24, 2002. For the reasons set forth below, Defendants' motion is granted.

II. Background

In January 1999, the Board approved the Alcoa Stock Incentive Plan ("Plan") to replace the company's Long Term Incentive Plan ("Prior Plan"), subject to shareholder approval at the stockholders' May 7, 1999 annual meeting ("Annual Meeting"). Am. Comp. ¶  6; PS at 21. On March 8, 1999, the Proxy Statement and Alcoa's 1998 Annual Report ("Annual Report") were sent to stockholders, and a copy of the Plan was filed with the Securities and Exchange Commission ("SEC" or "Commission").

The Proxy Statement "summarized the principal features" of the Plan and provided a toll-free number for stockholders to obtain a copy. PS at 21. The Plan authorized the Board of Directors to grant Alcoa employees stock options, so-called reload options, and stock appreciation rights ("SARs"). [FN1] Id. Alcoa sought shareholder approval for the

authorization of 14 million shares of Alcoa common stock for issuance under the Plan. Id. at 21. The Proxy Statement also provided that:

> FN1. Ordinary stock options give the holders the right to purchase, for a specified time, a fixed number of shares at a fixed price. Reload options are granted upon exercise of options received under an initial grant. See PS at 15. The option holder can "reload" by receiving a new option grant "at the current market price" and with the same expiration date as the exercised option." "covering the number of shares exercised in the underlying option less the number of profit shares delivered to the optionee after withholding for taxes." PS at 15. An SAR entitles the holder to receive, upon exercise, the excess of the fair market value of the shares on the exercise date over the SAR grant price. Id. at 22.

*2 In addition to the 14 million shares, the following also would be available to grant under the Plan:
Shares subject to awards under the Plan or the Prior Plan that are forfeited, settle for cash, expire or otherwise terminate without issuance of the shares;
Shares tendered in payment of the purchase price of an option award under the Plan or the Prior Plan or tendered or withheld to pay required withholding taxes; and
Shares repurchased by Alcoa and designated by the Board as available for issuance under the Plan.
Id.

The Proxy Statement stated that the Compensation Committee of the Board could also grant "Substitute Awards" to employees of companies acquired by Alcoa (or a subsidiary) "in exchange for or assumption of outstanding stock-based awards granted by the acquired company." Id. at 23. It described Alcoa's "practice to repurchase shares in the open market in amounts at least equal to the number of shares issued under employee stock option and other stock incentive plans." Id. at 25.

The Proxy Statement contained a chart summarizing the options and reload options that were granted in 1998 under the Prior Plan for the six highest paid executive officers of Alcoa ("1998 Chart"). Id. at 18. Among other things, the 1998 Chart gave the actual exercise price for each issued option, the number of securities underlying the option, and the estimated present value of the option. Id. The Proxy Statement

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
(Cite as: 2002 WL 31413805 (S.D.N.Y.))

Page 3

stated that Alcoa had used the Black-Scholes option pricing model to estimate the present value of the option grants reflected in the 1998 Chart. *Id.* at 19. [FN2]

> FN2. Alcoa "used the following assumptions in calculating grant date present value: volatility--25%; average risk-free rate of return--5.2%; dividend yield--2.1%; expected life, annual grants--2.5 years; expected life, reload grants--1.5 years." PS at 19 n. 2.

The Plan was approved at the Annual Meeting and became effective on June 1, 1999. Am. Comp. ¶ ¶ 8- 9. Thereafter, Alcoa acquired Reynolds Metals Company ("Reynolds") and, in connection with that transaction, granted options in the year 2000 for approximately 7.6 million Alcoa shares to former Reynolds employees to substitute for Reynolds options. *Id.* at ¶ 16. Also in 2000, Alcoa granted stock options pursuant to the Plan covering nearly 15.6 million (other) Alcoa shares. *Id.*

III. Standard of Review

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." ' *Polar International Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 229 (S.D.N.Y.2000) (quoting *Harris,* 186 F.3d at 247). "[T]he court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor." *Id.*

"In deciding a Rule 12(b)(6) motion, the district court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits or documents incorporated in the complaint by reference." *Id.* at 230. In securities fraud actions, the Court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991). [FN3] Where a "plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint." *Steinberg v. PRT Group,* 88 F.Supp.2d 294, 300 (S.D.N.Y.2000).

> FN3. The Court has considered the Proxy Statement and the Annual Report, in addition to the Complaint and Amended Complaint.

IV. Analysis

*3 Defendants contend that the Amended Complaint: (i) is barred by the statute of limitations because "plaintiff knew all the facts on which she premises her claim[ ] at least by October 15, 1999, when she filed the initial, derivative complaint ... [but] did not file the Amended Complaint ... until May 31, 2001," Def. Mem. at 8; (ii) is not plead with particularity required under Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u-4(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *id.* at 6; and (iii) fails to state a claim because "the alleged [misstatements and] omissions did not render the Proxy Statement materially false or misleading." *Id.* at 13, 21. Plaintiff contends that: (i) the Amended Complaint, filed May 31, 2001, is timely because it "relates back" to the Complaint under Fed.R.Civ.P. 15(c), Pl. Mem. at 3- 4; (ii) her claim is governed by a negligence standard, *id.* at 7, and therefore, Fed.R.Civ.P. 9(b) and the PSLRA do not apply, *id.* at 9; and (iii) the Proxy Statement does contain material misrepresentations and omissions. *Id.* at 11.

A. Time-Bar and Relation Back

[1] A Section 14(a) claim "must be brought within ... one year from discovery of the conduct constituting the violation." *In re American Express Co. Shareholder Litig.,* 840 F.Supp. 260, 267 (S.D.N.Y.1993). Plaintiff knew all of the facts which constituted the alleged violation by October 15, 1999, when she filed the Complaint. Thus, to be timely, the Amended Complaint had to have been filed by October 15, 2000, but, in fact, it was filed on or about May 31, 2001--more than seven months (too) late. *See id.*

The parties agree that Plaintiff's Section 14(a) claim is time-barred unless it "relates back" to the Complaint within the meaning of Fed.R.Civ.P. 15(c), but the parties disagree as to which section of Fed.R.Civ.P. 15(c) applies to the Amended Complaint. [FN4] While Fed.R.Civ.P. 15 was meant generally to be applicable to a proposed change of plaintiffs, "Rule 17(a) is implicated as well." *Advanced Magnetics, Inc. v. Bayfront Ptns., Inc.,* 106 F.3d 11, 19 (2d Cir.1997). See also Fed.R.Civ.P. 15 Advisory Committee Notes (1966) ("Also relevant is

Not Reported in F.Supp.2d
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
(Cite as: 2002 WL 31413805 (S.D.N.Y.))

... Rule 17(a) (real party in interest).")

> FN4. The Court has also considered the Supreme Court of Iowa's opinion in *Rieff v. Evans, 630 N.W.2d 278 (Iowa 2001),* referenced by Plaintiff's counsel at oral argument.

Fed.R.Civ.P. 17(a) provides (in pertinent part) that "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ... substitution of, the real party in interest; and such ... substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." Fed. R. Civ. 17(a). In *Advanced Magnetics* the United States Court of Appeals for the Second Circuit found that Fed.R.Civ.P. 17(a) governed where a plaintiff sought to amend its complaint to substitute individual shareholders for the corporate plaintiff originally named. The Second Circuit reversed the district court's determination that the amended complaint would not relate back under Fed.R.Civ.P. 15(c), finding that "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or participants." *Advanced Magnetics,* 106 F.3d at 20.

*4 As in *Advanced Magnetics,* Plaintiff Shaev's amended claims "are sufficiently asserted in the original complaint." *Id.* Indeed, Defendants agree that the "Amended Complaint alleges the same cause of action, based on the same facts as the initial complaint." [FN5] Def. Mem. at 6 Consequently, the Complaint's "only pertinent flaw was the identity of the party pursuing those claims." *Advanced Magnetics,* 106 F.3d at 20. The Court perceives no unfairness to Defendants in allowing substitution of Plaintiff as the real party in interest. *See id. at 21* ("Nor do we see any unfairness to defendants in allowing the substitution of the selling shareholders as plaintiffs on their respective claims.") *See also Staren v. American Nat'l Bank & Trust Co.,* 529 F.2d 1257, 1263 (7th Cir.1976) ("the substituted corporate plaintiff had such an identity of interest with the individual plaintiffs that the original complaint served to notify defendant ... of the actual claim being asserted against it, with no resulting prejudice to its interests.") Therefore, the Amended Complaint may be said to relate back. [FN6] *See Advanced Magnetics,* 106 F.3d at 21.

> FN5. Defendants also concede that

Plaintiff's "substantive factual allegations regarding the Proxy Statement are exactly the same as they were in the initial complaint." Def. Mem. at 6.

> FN6. The Court is not here ruling whether or not a class action would be timely in this case. For the purposes of this motion the Court finds that Plaintiff's individual claim survives.

B. Particularity

The parties disagree as to whether the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA apply to Plaintiff's claims. Defendants contend that because "Section 14(a) and Rule 14a-9 are antifraud provisions of the federal proxy rules ... a claim under those provisions must be pleaded with particularity pursuant to [Fed.R.Civ.P.] 9(b) and [15 U.S.C.] § 78u-4(b)(1) of the PSLRA ." Def. Mem. at 10. Plaintiff argues that Fed.R.Civ.P. 9(b) and the PSLRA are inapplicable because her claim "is governed by a negligence standard." Pl. Mem. at 7-9.

Because the Court, for the reasons discussed below, dismisses Plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) there is no need to resolve the question of whether (or not) Fed.R.Civ.P. 9(b) and the PSLRA apply. *See, e.g., Mercury Air Group, Inc. v. Jet USA Airlines, Inc.,* No. 97 Civ. 3473(LMM), 1998 WL 542291 at *8 (S.D.N.Y. Aug.26, 1998) ("the Court grants defendants' 12(b)(6) motion ... [t]he Court does not reach the merits of defendants' motion to dismiss pursuant to Rule 9(b)").

C. Alleged Material Misrepresentations and Omissions

Plaintiff alleges that the Proxy Statement contains material misrepresentations and omissions with regard to: (1) the cost of the Plan; (2) the number of shares available under the Plan; and (3) the text of the Plan.

1. Cost of the Plan

[2] Plaintiff alleges that Defendants failed to disclose "a reasonable estimate" of the cost of the Plan. [FN7] Am. Comp. ¶ 18. At the same time, Plaintiff (somewhat inconsistently) contends that the Proxy Statement makes "materially false and misleading" representations that "understate the cost of the plan to Alcoa." Am. Comp. ¶ 19. Defendants argue that "there is no obligation under § 14(a) or Rule 14a-9

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
(Cite as: 2002 WL 31413805 (S.D.N.Y.))

Page 5

for Alcoa to provide an estimate of the cost of the plan." Def. Mem. at 14. Defendants also contend that the challenged disclosures in the Proxy Statement were not materially misleading and "bear no relation to the cost" of the Plan. Def. Mem. at 22.

> FN7. Plaintiff contends that an estimate of the Plan's cost, specifically an estimate prepared in accordance with the so-called Black-Scholes option pricing model, is a material fact that must be included in the Proxy Statement. Pl. Mem. at 16.

*5 "Section 14(a) makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.' 15 U.S.C. § 78n(a). Rule 14a-9, in turn, prohibits proxy solicitation 'by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.' 17 C.F.R. § 240.14a-9(a). In the context of a proxy statement, a fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." ' *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir.2002) (internal case citations omitted).

Plaintiff fails to cite any authority in support of the proposition that Section 14(a) and Rule 14a-9 require the disclosure of a Black-Scholes estimate of the Plan's cost. Indeed, at least six courts, including most recently the United States Court of Appeals for the Second Circuit, have considered (and rejected) the Plaintiff's argument. [FN8] *See, Resnik*, 303 F.3d at 155; *Seinfeld v. Bartz*, No. C01-2259, 2002 WL 243597 (N.D.Cal. Feb.8, 2002); *Resnik v. Swartz*, No. Civ. 5355(LMM), 2001 WL 15671 (S.D.N.Y. Jan.8, 2001); *In re 3Com Corp. S'holder Litig.*, No. C .A. 16721, 1999 WL 1009210 (Del.Ch. Oct.25, 1999); *Cohen v. Calloway*, 246 A.D.2d 473, 667 N.Y.S.2d 249 (1st Dep't 1998); *Lewis v. Vogelstein*, 699 A.2d 327 (Del.Ch.1997). "Courts in all ... of these cases held that Black-Scholes valuations are not material as a matter of law." *Seinfeld*, 2002 WL 243597 at *3 (emphasis added).

> FN8. Counsel for Plaintiff was also counsel for the plaintiffs in each of these actions.

In *Resnik*, the Second Circuit noted that: "Disclosure

of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor. For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." 303 F.3d at 154. Here, as in *Resnik*, "no duty of disclosure has been established." *Id.* If Plaintiff "believes that Black-Scholes value disclosure should be mandatory whenever shareholders' approval is sought for a proposed option grant, [her] remedy is to advocate a change in the regulations before the Commission." *Id.* at 155.

Plaintiff also alleges (unpersuasively) that statements regarding: (a) the federal income tax consequences of the Plan; and (b) the value of options granted under the Prior Plan, were misleading and understated the cost of the Plan.

a. Federal Income Tax Consequences

[3] Plaintiff alleges that the Proxy Statement is materially false and misleading because it fails to "disclose all the federal tax consequences" of granting an option, particularly the fact that "under the U.S. federal estate tax, gift tax, and generation-skipping transfer tax, these stock options and SARs are treated as taxable." Am. Comp. ¶ 27. Defendants respond that the Proxy Statement only purports to describe the federal income tax consequences of a grant and "does not purport to state 'all the federal tax consequences' of the ... Plan." Def. Mem. at 20.

*6 "The Court agrees with Defendants that this allegation is illogical. Stating that an act has no federal *income* tax consequences does not imply that the act has absolutely no federal tax consequences whatsoever." *Seinfeld*, 2002 WL 243597 at *5. Furthermore, "[e]xpanding the requirements of SEC Rule 14a-9 to insist upon disclosure of incidental tax benefits--benefits that do not flow directly from the corporate transaction itself but rather from the individual shareholder's personal tax situation--goes beyond the purposes of the Rule." *Mendell v. Greenberg*, 927 F.2d 667, 677 (2d Cir.1990), modified on other grounds, 938 F.2d 1528 (2d Cir.1991).

b. Value of Options Granted Under the Prior Plan

[4] Plaintiff challenges the Proxy Statement's disclosure regarding the value of options granted under the Prior Plan. [FN9] Plaintiff (further) contends that Defendants used false and misleading assumptions regarding both the dividend yield (2.1 percent) and expiration of the options (2.5 years).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 6
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

Am. Comp. ¶ ¶ 24-25. Defendants argue that the statements could not have been misleading because all of the assumptions were fully disclosed and the "Proxy Statement provides clear cautionary language warning the reader of the limitations of the estimates in the table." Def. Mem. at 22. Plaintiff responds that the warnings fail to protect against the alleged (mis)statements because the Black-Scholes estimate is not a predictive future value, the "cautionary language" is not substantive and tailored to the projection and is "plain wrong." Pl. Mem. at 23.

> FN9. Disclosure of the Black-Scholes value of options already granted is governed by Item 402 of Regulation S-K. 17 C.F.R. § 229.402.

"Under the bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." _In re Independent Energy Holdings PLC Securities Litigation,_ 154 F.Supp.2d 741, 755 (S.D.N.Y.2001). The Court analyzes allegedly misleading materials "in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." _Halperin v. eBanker USA.COM, Inc.,_ 295 F.3d 352, 354 (2d Cir.2002).

The Proxy Statement warns or cautions that Alcoa's use of the Black-Scholes option pricing model "is not an endorsement of the model's accuracy in valuing options. All stock option models require a prediction about future stock prices." PS at 19 n. 2. The relevant footnote (required by SEC rules) enumerates each of the assumptions that Alcoa used in determining the Black-Scholes value of the options. _Id._ The Proxy Statement also advises that the "real value of the options in this table depends on the actual performance of Alcoa stock and the timing of the exercises." _Id._

*7 The Proxy Statement explicitly warns stockholders that the Black-Scholes calculations are estimates, and that the values derived are dependent upon certain (enumerated) assumptions. In light of the specific warnings that applied to both the option valuations and the underlying assumptions used in the Black-Scholes calculations, the Court concludes,

as a matter of law, that "no reasonable investor would be misled" by the disclosures. _See e.g., I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,_ 936 F.2d 759, 763 (2d Cir.1991). Plaintiff's contention that the warning about the value of the options is "simply false" is similarly rejected. _See Resnik,_ 303 F.3d at 153 ("We similarly find no merit in appellant's allegation that ... the proxy statement was materially false or misleading in stating that '[t]he actual value, if any, an executive will realize [from stock options] will depend on the excess of the market price over the exercise price on the date the option is actually exercised.' ")

In addition, certain forward-looking statements contained in the Proxy Statement are protected by "safe-harbor" provisions. _See e.g.,_ 17 C.F.R. § 240.3b-6; 17 C.F.R. § 230.175. Grant date option valuations made pursuant to Item 402 of Regulation S-K (such as those made by Alcoa here) are entitled to safe harbor protections. _See_ Executive Compensation Disclosure. Sec. Act Release No. 7032, 55 S.E.C. Docket 1352 (Nov. 22, 1993) ("The Commission notes that the option value is a projection of a financial item entitled to safe harbor protections, as are the underlying assumptions.") The option valuations are not actionable "unless it is shown that such statement was made ... without a reasonable basis or was disclosed other than in good faith." 17 C.F.R. § 240.3b-6(a); _see also_ 17 C.F.R. § 230.175(a). Plaintiff has failed to allege that the purportedly misleading statements were made without a reasonable basis or in other than good faith. _See e.g., In re Healthcare Compare Corp. Sec. Litig.,_ No. 93 C 1970, 1994 WL 262730 (N.D.Ill. June 2, 1994) (Plaintiffs failed to allege facts "suggesting that Defendants' statements are not entitled to the protections of that safe harbor because they lacked a reasonable basis.")

2. Number of Shares Available Under the Plan

[5] Plaintiff alleges that it was "materially misleading for the Proxy Statement to represent to the stockholders that 14 million shares were available under the Plan," because other sections of the Proxy Statement indicated that in three circumstances the total number of options could be increased. Pl. Mem. at 13. That is, the number of options available under the Plan could be increased (i) by replacing shares available under the Prior Plan, (ii) by (Alcoa) repurchasing its shares in the market and designating them as available under the Plan, or (iii) by substituting Alcoa shares for those held by an employee of a company acquired by Alcoa. _See infra_

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101
(Cite as: 2002 WL 31413805 (S.D.N.Y.))

Page 7

at __. Plaintiff further alleges that the Proxy Statement should have disclosed a "reasonable estimate" of the number of shares that would be added because of these (three) contingencies. Am. Comp. ¶ 13. Defendants respond that these claims have no merit in light of the fact that the Proxy Statement disclosed both that 14 million shares were available under the Plan and that the number of shares could be increased in each of the three instances described by Plaintiff. Def. Mem. at 17. Defendants also argue that disclosure of the number of additional shares would have "required Alcoa to make predictions about unknowable future events, which ... is not required by the proxy rules." *Id.*

*8 No reasonable shareholder reading the entirety of the Proxy Statement would have believed that the Plan was authorizing only 14 million shares. *See, e.g., Seinfeld,* 2002 WL 243597 at *5. The Proxy Statement clearly discloses that additional shares could become available under three circumstances. *See* PS at 21 ("In addition to the 14 million shares, the following also would be available under the plan..").

Plaintiff also fails to allege facts to substantiate the charge that additional "reasonable estimates" would be anything more than speculation. *See e.g., Krauth v. Executive Telecard, Ltd.,* 890 F.Supp. 269, 288-89 (S.D.N.Y.1995) ("It is well established that 'Section 14 carries with it no formal requirement that predictions be made as to future behavior, and indeed, they are discouraged.' ") (internal citations omitted); *Kahn v. Wien,* 842 F.Supp. 667, 676 (S.D.N.Y.1994) ("proxy solicitations need only provide the full objective facts upon which investors can make their own judgments as to value, and need not, and most often should not, 'embellish [the facts] with speculative financial predictions.' ") (internal citation omitted); *Freedman v. Barrow,* 427 F.Supp. 1129, 1144 (S.D.N.Y.1976) ("It was not materially misleading for the Proxy materials to have omitted discussion of the likely preferences of employees following granting SARs.")

3. Text of the Plan

[6] Plaintiff alleges that Defendants' failure to include the text of the Plan in the Proxy Statement was a material omission. Am. Comp. ¶ 28. Plaintiff argues that if the text of the Plan had been attached, stockholders would have been aware an "unusual feature," namely that the options did not terminate if a grantee left Alcoa. [FN10] Pl. Mem. at 27. Defendants contend that "Alcoa's obligation was to

disclose material features of what *was* included in the Plan," Def. Mem. at 20 (emphasis in original), and the Proxy Statement disclosed that "[t]he [Compensation] Committee has the authority to ... set the terms and conditions of the awards and to cancel or suspend them." PS at 22.

> FN10. The basis for this allegation is limited to "plaintiff's attorney's reading ... of many proxy statements and plans for nearly 30 years." Am. Comp. ¶ 28.

SEC rules and regulations do not require that the full text of the Plan be included with the Proxy Statement. 17 C.F.R. § 240.14a-101 ("the plan to be acted upon ... need not be provided to security holders unless it is a part of the proxy statement.") "Similarly, this information is not required to make any other information presented in the proxy statement not materially false or misleading." *Resnik,* 303 F.3d at 154.

V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted [21]. The Clerk is respectfully requested to close this case.

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**Motions, Pleadings and Filings** (Back to top)

•            1:99CV10578            (Docket) (Oct. 15, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 12

1990 WL 82734, Tri-Star Pictures, Inc. Litigation, In re, (Del.Ch. 1990)                                    Page 1

*82734    16 Del. J. Corp. L. 951

UNPUBLISHED OPINION.    CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New
Castle County.

In re; TRI-STAR PICTURES, INC.,
LITIGATION.

CIV. A. No. 9477.
June 14, 1990.

William Prickett, Michael Hanrahan, and Elizabeth
M. McGeever, of Prickett, Jones, Elliott, Kristol &
Schnee, Wilmington, Joseph A. Rosenthal of Morris,
Rosenthal, Monhait & Gross, Wilmington, Arthur T.
Susman and Terry Rose Saunders of Susman,
Saunders, & Buehler, Chicago, Ill., and Roger W.
Kirby of Kaufman, Malchman, Kaufmann & Kirby,
New York City, for plaintiffs.

James F. Burnett and Donald J. Wolfe, Jr. of
Potter, Anderson & Corroon, Wilmington, for
defendant Columbia Pictures Entertainment, Inc.
formerly Tri-Star Pictures, Inc.

Lawrence C. Ashby and Stephen E. Jenkins of
Ashby, McKelvie & Geddes, Wilmington, and Allen
Keszbom, Debra M. Torres, and Abraham Rappaport
of Fried, Frank, Harris, Shriver, Jacobson, New York
City, for defendants Victor A. Kaufman, David A.
Matalon, Patrick M. Williamson, Judd A. Weinberg,
and Dan W. Lufkin.

Lawrence A. Hamermesh and Thomas C. Grimm of
Morris, Nichols, Arsht & Tunnell, Wilmington, and
Frank C. Jones and L. Joseph Loveland of King &
Spalding, Atlanta, Ga., for defendants, The Coca-
Cola Company, CPI Film Holdings, Inc., Ira C.
Herbert, and Francis T. Vincent, Jr.

Allen M. Terrell, Jr., and Michael J. Feinstein of
Richards, Layton & Finger, Wilmington, and Robert
C. Myers and Anthony J. Viola of Dewey, Ballantine,
Bushby, Palmer & Wood, New York City.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**1  Pending decision is a motion to dismiss the
amended and supplemental complaint in this action
brought by shareholders of Tri-Star Pictures, Inc.

("Tri-Star"). (FN1)  In both the original complaint
which was filed on December 15, 1987, and in the
amended complaint which was filed on April 7, 1988,
plaintiffs challenge a transaction (referred to as "the
Combination") wherein Tri-Star acquired the stock
and assets comprising the Entertainment Sector of the
Coca-Cola Company, Inc. ("Coca-Cola") in exchange
for approximately 75 million shares of Tri-Star.  As a
result of the Combination, Coca-Cola's stock
ownership of Tri-Star increased from approximately
37% to 80% of Tri-Star's outstanding shares.

In the amended and supplemental complaint, the
plaintiffs (FN2) attack the Combination as an act of
corporate waste.  They also allege disclosure and
fraud claims under Delaware law arising out of the
proxy materials disseminated in connection with the
stockholders' meeting, held on December 15, 1987, to
vote on the Combination.  The amended complaint
further challenges the validity under Delaware law of
certain amendments to Tri-Star's certificate of
incorporation approved at that meeting.

The defendants moved to dismiss the amended
complaint on the ground, *inter alia,* that the claims
alleged in that pleading were wholly derivative, and
that plaintiffs failed to comply with the requirement
of Court of Chancery Rule 23.1 that they make
demand or demonstrate its futility.  In addition,
defendant Home Box Office, Inc. ("HBO") moved to
dismiss on the ground that the amended complaint
failed to state any cognizable claim against HBO.

In an Opinion dated May 5, 1989, the Court
granted HBO's dismissal motion in its entirety, and
granted the remaining defendants' dismissal motion in
part.  The Court held that even if it were assumed,
without deciding, that the amended complaint alleged
derivative claims, the pleaded facts excused the
making of a demand.  The Court also dismissed the
claims challenging the validity of the certificate
amendments, except for the claim relating to Article
Sixth.  *Siegman v. Tri-Star Pictures, Inc.,* Del.Ch.,
C.A. No. 9477, Jacobs, V.C. (May 5, 1989, revised
May 30, 1989).

On June 22, 1989, the plaintiffs then moved for
partial summary judgment on the claim that Article
Sixth was invalid as a matter of law.  On November
6, 1989, after the completion of briefing on the partial
summary judgment motion, Tri-Star was acquired by
Sony USA, Inc. ("Sony") in a merger.  Pursuant to
that merger, Article Sixth was eliminated from Tri-
Star's certificate of incorporation. The significance of
the Sony merger and of the elimination of Article

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Sixth are discussed elsewhere in this Opinion.

On June 6, 1989, the plaintiffs filed a motion for class certification. Later they moved to compel certain discovery from the defendants. In response, on December 1, 1989, the defendants renewed their motion to dismiss the amended complaint on December 1, 1989, on the ground (*inter alia* ) that the Tri-Star/Sony merger had eliminated the plaintiffs' standing to maintain derivative claims on behalf of Tri-Star, and that the amended complaint must be dismissed because all of the plaintiffs' claims are derivative. The defendants' renewed motion to dismiss and the plaintiffs' motion for class certification were argued on May 31, 1990. The parties agreed to submit the remaining pending motions (for partial summary judgment and to compel discovery) on the briefs.

**\*\*2** At the conclusion of oral argument, the Court announced that it would reserve decision on the renewed motion to dismiss, except for Count III which challenges the validity of Article Sixth. The Court ruled that the Article Sixth claim had been mooted because the merger had eliminated that Article from Tri-Star's certificate of incorporation. (FN3) The Court also concluded that the plaintiffs' motion for partial summary judgment to determine the invalidity of Article Sixth had likewise become moot, and therefore would not be decided. The Court announced that no discovery would go forward until it had decided the renewed motion to dismiss. Finally, the Court ruled that the defendants' challenges to class certification lacked merit, but that no class could be certified until the Court determined whether the amended complaint alleges any class claim.

As a consequence of these rulings, the only motion to be decided is the defendants' renewed motion to dismiss the amended complaint. (FN4) This is the Opinion of the Court on that motion.

I.

The question presented on this motion, which was expressly left undecided by this Court's May 5, 1989 Memorandum Opinion, is whether the claims alleged in the amended complaint are wholly derivative. That issue arises because by reason of the Sony merger, the plaintiffs are no longer shareholders of Tri-Star. It is settled Delaware law that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson,* Del.Supr., 477

A.2d 1040, 1049 (1984); *see also Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 354 (1988). (FN5) That is because the right to maintain a corporate cause of action "is an asset of a merged corporation which passes to the corporation surviving the merger." *Lewis v. Anderson,* Del.Ch., 453 A.2d 474, 479 (1982); *aff'd,* 477 A.2d 1040 (1984). Thus, to the extent that the plaintiffs' claims are derivative, they must be dismissed because the plaintiffs, who no longer have an ownership interest in Tri-Star, have no standing to maintain those claims, and because Sony, which does own Tri-Star and is the only party which has standing, has chosen not to assert those claims.

II.

Although the amended complaint is prolix and describes the Combination in lengthy detail, the Combination's essential features are easily summarized. Under a written agreement between Coca-Cola and Tri-Star (the "Transfer Agreement"), Tri-Star would acquire all of the assets comprising Coca-Cola's Entertainment Sector, except for $300 million in cash, an intra-company receivable of $240 million, and certain real estate and other assets. (FN6) (Amended Compl., ¶ 30(c)) In exchange, Coca-Cola would receive the greater of (i) an additional 75,176,667 shares of Tri-Star common stock, or (ii) the number of Tri-Star shares that when added to the 12.7 million shares Coca-Cola owned, would equal 80% of Tri-Star's outstanding shares. In addition, Coca-Cola would receive 500,000 additional shares of Tri-Star common stock to be paid by Tri-Star. ( *Id.,* ¶ 30(d). Coca-Cola was also given the right to purchase $100 million of newly created Tri-Star preferred stock, which was senior to the common stock as to dividends and liquidation preferences.

**\*\*3** As part of that transaction, on January 15, 1988, Coca-Cola paid to its own shareholders a dividend consisting of 31,400,000 of the Tri-Star shares it received in the Combination. The result was to reduce Coca-Cola's Tri-Star holdings from 80% to 49% of Tri-Star's outstanding shares.

Finally, the Transfer Agreement required Tri-Star, as part of the Combination, to effect certain amendments to its certificate of incorporation. Those amendments included (a) increasing Tri-Star's authorized common stock from 100 million to 400 million shares, and its authorized preferred stock from 13 million to 100 million shares, (b) changing the par value of Tri-Star's common stock from ten cents per share to one cent per share, (c) classifying the Tri-Star Board of Directors into three classes, (c)

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

eliminating the liability of Coca-Cola, HBO, and officers and directors of those companies for certain breaches of the duty of loyalty to Tri-Star, (d) eliminating the right of Tri-Star's shareholders to act by written consent, and (e) imposing certain supermajority stockholder vote requirements for certificate and by-law amendments.

At a special Tri-Star stockholders' meeting held on December 15, 1987, the shareholders approved the Transfer Agreement, including the certificate amendments. The Combination was consummated on December 17, 1987.

On January 27, 1988, less than six weeks after the closing, Tri-Star was forced to make a public offering of $575 million in subordinated debentures and notes. That amount was approximately equal to the cash and receivables that Coca-Cola had extracted from the Entertainment Sector just before the Combination. ( *Id.,* ¶ 37). Moreover, on March 15, 1988, Coca-Cola and Tri-Star jointly announced that Tri-Star had been forced to write down, by nearly $200 million, the book value of the assets it had just acquired from the Entertainment Sector. The result was a $105 million charge against Tri-Star's earnings for the period December 17, 1987 to February 29, 1988. Plaintiffs allege that if Coca-Cola had not delayed the $200 million writedown, the book value attributed to Coca-Cola's assets in the Transfer Agreement would have been $545 million rather than $745 million. Plaintiffs also aver that neither of these transactions was forecast in the proxy statement for the Combination; that is, the proxy statement disclosed no plans to issue over a half billion dollars of debt, or the possibility of a $200 million write down, so soon after the Combination. (*Id.*)

III.

Of the seven Counts alleged in the amended complaint, Count III has been dismissed as moot and Count VI (alleging breach of contract) is not claimed to be other than derivative. That leaves Counts I, II, IV, V, and VII. Those Counts will be addressed in that sequence, except for Counts II and IV (the disclosure claims), which are treated last because of their peculiar difficulties.

A. *Count I*

In Count I, plaintiffs allege that the Combination was a self dealing transaction structured by Coca-Cola, acting in concert with HBO, to implement the transaction solely for its own benefit and contrary to

the best interests of Tri-Star's public shareholders. (Am.Compl., ¶ 41-44). The structure and terms of the transaction are said to constitute "waste, gross overreaching and a constructive fraud by Coca-Cola [and HBO] on Tri-Star and its stockholders." (Id, ¶ 46). Coca-Cola is charged with breaching its duty of loyalty and obligation of entire fairness to Tri-Star and its public shareholders in the following pertinent respects:

**4  a) fixing the terms so that Coca-Cola received "excessive consideration" for the Entertainment Sector, which (it is claimed) Coca-Cola wished to "unload" before losses from its operations would appear on Coca-Cola's financial statements (*Id.,* ¶ 45(a)(b));

b) utilizing an unfair method of setting the exchange ratio, and deliberately omitting to obtain any appraisal of the Entertainment Sector's assets (*Id.,* ¶ 45);

c) permitting Coca-Cola to drain off a huge portion of the Entertainment Sector's cash and financial assets immediately before the Combination, and requiring Tri-Star to pay any tax liability caused by Coca-Cola's dividend of its Tri-Star shares to Coca-Cola stockholders (*Id.*), and

d) allowing Coca-Cola to increase its equity position in Tri-Star without paying fair value, while substantially diluting the equity interest of Tri-Star's other stockholders. (*Id.*)

It is settled Delaware law that in order to determine whether a complaint states a derivative or an individual cause of action, one must look to the nature of the wrong alleged, not to the plaintiff's labels or characterizations. *Lewis v. Spencer,* Del.Supr., No. 494, 1989, Order (May 11, 1990); *Lipton v. News Int'l., Plc.,* Del.Supr. 514 A.2d 1075, 1078 (1986); *Moran v. Household Int'l. Inc.,* Del.Ch., 490 A.2d 1059, 1070,*aff'd,* Del.Supr., 500 A.2d 1346 (1985). A derivative claim is a wrong to an incorporated group as a whole that depletes or destroys corporate assets and, as a consequence, reduces the value of the corporation's stock. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1188, n. 10 (1988).

To have standing to sue individually rather than derivatively on behalf of the corporation, a shareholder must allege more than an injury resulting from a wrong to the corporation. *Kramer v. Western Pacific Indus. Inc.,* Del.Supr., 546 A.2d 348, 351

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

(1988). The plaintiff must be injured directly and independently of the corporation, *Lewis v. Spencer,* Order at 3; *Kramer,* 546 A.2d at 351, and "must allege either 'an injury separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote or to assert majority control, which exists independently of any right of the corporation." *Moran,* 490 A.2d at 1070, quoting 12B *Fletcher Cyc. Corp.* § 5921, at 452 (Perm.Ed.1984); *see also Lewis v. Spencer, supra; Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 222 (1953).

Applying these principles to Count I leads inescapably to the conclusion that it is derivative. The substance of that Count is that the corporation was wrongfully caused to overpay for the assets that it received in the Combination, which was a purchase of assets for stock. Count I states a classic claim of waste for which any recovery would run solely to Tri-Star. Plaintiffs conclusorily allege damage to the shareholder class, but the claimed injury consists solely of the diminution of their shares as an indirect result of the injury to the corporation. The claim is therefore derivative. *Elster,* 100 A.2d at 222.

**\*\*5** In an effort to defend their characterization of Count I as a class claim, plaintiffs advance several arguments, all of them designed to show that Count I alleges more than pure waste and that Tri-Star's public stockholders suffered injury of a direct and distinct kind. As a matter of law, none of these arguments is tenable.

First, plaintiffs argue that the Combination involved more than a purchase of assets for stock. They say that that transaction also included a recapitalization that "dramatically altered" the rights of Tri-Star's common stockholders by amending the certificate of incorporation. However, the certificate amendment aspect of the Combination is not a subject of, or essential to, any claims of wrongdoing in Count I. Rather, the amendments are the subject of Count III, which has been dismissed for the reasons stated above. See pages 2 and 3 and Note 3, *supra.*

Second, plaintiffs argue that the Combination, while structured as a purchase of assets, was in effect and substance the equivalent of a merger, which is recognized as a proper subject of an individual or class action. But the Combination was a sale of assets, not a merger. As a matter of substance, the Tri-Star shareholders retained their equity interest in the corporation. They did not exchange their Tri-Star shares for either cash or securities in connection with the Combination. The independent significance of these two distinct forms of corporate transaction is respected under our law. *Rothschild Int'l Corp. v. Liggett Group, Inc.,* Del.Supr., 474 A.2d 133, 136 (1984). The Combination as structured does not, therefore, lend itself to a claim that Tri-Star's shareholders suffered direct injury by receiving inadequate merger consideration.

Third, plaintiffs argue that the harm suffered by the class was a "direct diminution of the equity interest of the class by a Combination that correspondingly increased Coca-Cola's equity interest." (Pl.Br. 19). That, however, does not differentiate this case from any other situation involving corporate waste in a transaction between the corporation and its controlling stockholder. Allegations of self-dealing do not transform the fundamental nature of the alleged injury to shareholders, which is the wrongful diminution of the corporate treasury and the consequent diminution in the value of each Tri-Star share. An injury of that kind affects equally the value of the shares held by all Tri-Star stockholders, including Coca-Cola. *Cf. Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 248-49 (1970); *Brook v. Acme Steel Co.,* Del.Ch., C.A. No. 10276, Chandler, V.C., Mem.Op. at 4-5 (May 11, 1989); *Rosen v. Navarre,* Del.Ch., C.A. No. 7098, Hartnett, V.C., Mem.Op. at 5 (October 29, 1985). That the plaintiffs and the public shareholders did not benefit by the alleged wrongdoing does not, in these circumstances, transform them into a separate shareholder class entitled to a recovery distinct from that to which the corporation is entitled. *Taormina v. Taormina Corp.,* Del.Ch., 78 A.2d 473, 476 (1951). The only entity that can recover for an injury to Tri-Star is Tri-Star itself. *Bokat,* 262 A.2d at 250.

**\*\*6** Fourth, plaintiffs assert that where, as here, it is alleged that a corporate transaction between a corporation and its fiduciary fails to meet the standard of entire fairness, that claim may be brought individually or on behalf of a class. For that *ipse dixit* plaintiffs cite no authority, and understandably so because no such rule of law exists. What gives rise to an individual or a class claim is not the nature of the fiduciary duty owed. Rather, it is the nature of the injury flowing from a violation of the duty. An attack upon the fairness of a transaction gives rise to an individual cause of action if the harm to the shareholders involves an injury to, or loss of, the shareholders' membership rights, be they financial or contractual. A cash-out or exchange merger is a common example of such a transaction. See *e.g., Kramer,* 546 A.2d at 351-352; *Cede,* 542 A.2d at

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1188, and n. 10. No such harm is alleged in Count I of the amended complaint.

Lastly, plaintiffs contend that Count I is not derivative, because the amended complaint seeks an award of damages for the class. (Pl.Br. at 21). However, the plaintiffs are entitled to seek damages for themselves, or for a class, only if the underlying claims are not derivative. For plaintiffs to argue that Count I is not derivative because they seek damages for the class, stands logic on its head.

### B. *Count V*

Count V alleges that Coca-Cola and HBO used their control of Tri-Star and manipulated its corporate machinery to bring about a series of transactions that increased their control at the public shareholders' expense. The plaintiffs argue that because that manipulation injured both the stockholders and Tri-Star, they are entitled to sue both individually and on behalf of Tri-Star's stockholders. The defendants respond that the claim is solely derivative.

In my view, Count V is derivative for the identical reasons set forth in connection with Count I. There are no averments of specific fact showing how Coca-Cola's and HBO's alleged misuse of control specially injured the plaintiffs or affected their (or the remaining stockholders') membership or contract rights. Because the plaintiffs have pled no direct injury to themselves or the class, as distinguished from injury to the corporation, Count V is derivative and must be dismissed, *See Moran*, 490 A.2d at 1070
.

### C. *Count VII*

Count VII alleges that Coca-Cola conspired, aided, abetted, and knowingly participated in the above-described breaches of fiduciary duty by Tri-Star's directors. For Coca-Cola to be liable for aiding and abetting (*i.e.,* for conspiracy), Tri-Star's directors must have committed an underlying breach of fiduciary duty. *See Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984); *aff'd,* Del.Supr., --- A.2d ---- (May 16, 1990); *Weinberger v. Rio Grande Indus. Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Logic indicates that an aiding and abetting claim should take on the same character as the fiduciary duty claim that underlies it. Accordingly, insofar as Coca-Cola is charged with having aided and abetted Tri-Star's directors in the fiduciary duty violations alleged in Counts I, V, and VII, those conspiracy claims are derivative and will be dismissed.

However, the aiding and abetting claim that corresponds to the claims alleged in Count II will be maintainable as a class claim for the reasons next discussed.

### D. *Counts II and IV*

**\*\*7** Counts II and IV Counts are considered together, because they are grounded in alleged misdisclosures in the proxy statement furnished to the Tri-Star shareholders in connection with the December 15, 1987 stockholders meeting. Count II alleges that the proxy statement misdisclosures constitute a breach of the defendants' fiduciary duty of candor. Count IV alleges that those disclosure violations constitute common law fraud. Count IV is the more easily disposed of, since the plaintiffs have not alleged actual reliance upon the proxy disclosures. Because reliance is an indispensable element of common law fraud, *Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983), Count IV is dismissed on that basis.

That leaves Count II. For the reasons now discussed, I reject defendants' argument that Count II is wholly derivative, but I reject also the argument that Count II, as plaintiffs broadly define it in their brief, is a class claim. The aspect of Count II that is found to be properly maintainable as a class claim is far narrower in scope than the claim as plaintiffs seek to define it.

The plaintiffs argue that the disclosure claims implicate a "membership right" of the Tri-Star shares, specifically, their right to vote on the Combination, which flowed from the requirement that shareholders approve the proposed certificate amendments. See 8 *Del. C.* § 242. The plaintiffs also contend that because the fiduciary duty of candor is owed directly to stockholders, a claim for breach of that duty is necessarily maintainable individually or on behalf of a class.

The defendants respond that the plaintiffs' position is flawed, because it assumes that the derivative or individual nature of a claim flows from the nature of the duty allegedly breached, rather than from the nature of the injury allegedly sustained. What is critical, defendants urge, is the nature of the injury, which in this case was inflicted solely upon Tri-Star. Defendants emphasize that although the plaintiffs' cited disclosure cases were brought as class actions (FN7), they do not support plaintiffs' argument that a disclosure violation is inherently and invariably an individual or class claim as a matter of law.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Defendants point out that those authorities involved a merger or tender offer where the substantive transaction itself caused the shareholders to incur an injury distinct from the corporation (*i.e.*, loss of their share membership in exchange for inadequate and unfair consideration), apart from and irrespective of any disclosure.

In short, the defendants take the position that where the alleged disclosure violation has not caused direct harm to a membership right of the shareholders, a claim to redress that violation must be brought derivatively. They argue that the disclosure claims alleged here are derivative, because (i) the underlying substantive transaction that is the subject of the disclosure claim injured only Tri-Star, and (ii) even if a class claim were otherwise permissible in circumstances such as these, no class claim is maintainable here because the plaintiffs did not rely upon the disclosures complained of. In support of that latter point, the defendants cite federal decisions appearing to require reliance as a prerequisite to bringing a disclosure claim on behalf of a shareholder class.

**8 The solution to this question is far from obvious. Our case law has not yet addressed how properly to characterize a disclosure claim in a situation where the class representatives did not rely upon the complained of disclosures, and where the direct economic injury is solely to the corporation. Moreover, the disclosure claims here possess both derivative and class aspects. Having considered the arguments of both sides, I conclude that the disclosure claims here may be maintained as class claims, but only if their scope is considerably narrowed as described below.

To treat the disclosure claims as wholly derivative would be unsound. Those claims do implicate a membership (and in this case also a contractual) right of the shareholders, namely, their right to exercise an informed vote on the Combination. Moreover, to characterize the claims as derivative would create two anomalies. First, if the disclosure claim were truly corporate, logic suggests that the party wrongfully induced to approve the Combination would be the corporation acting in its capacity as a shareholder. Yet the claim here is that Tri-Star's shareholders were the parties improperly induced to approve the transaction. Second, if the disclosure claims were derivative, they would be subject to the demand requirement of Rule 23.1, which is rooted in business judgment rule considerations. *Aronson v. Lewis,* Del.Supr. 473 A.2d 805, 812 (1984). Yet, that result

would be inconsistent with Delaware case law holding that the business judgment rule does not apply to "... the question whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made...." *In Re Anderson, Clayton Shareholders' Litigation,* Del.Ch., 519 A.2d 669, 675 (1986).

On the other hand, to say that the disclosure claims are not wholly derivative does not mean that they are entirely class claims either. Critical to the analysis is the nature of the relief being sought. If, for example, the claims are defined as being ones for compensatory damages for the purely economic harm caused by the Combination, it is difficult to perceive how claims so defined could be other than derivative. That is because the underlying compensation claim for the transaction-caused financial injury belongs to the corporation, not to the shareholders who no longer possess an economic interest in the corporation. Thus, to determine whether, in these circumstances, the disclosure claim is a class claim, a distinct inquiry must be made: to what relief, if any, would the class be entitled as a consequence of the disclosure claim?

That inquiry is what reveals the infirmities in the plaintiffs' position, because with one exception, no meaningful relief could be granted to the shareholder class in consequence of the alleged disclosure violations. Injunctive relief cannot be granted, because the Combination has been an accomplished fact for over two years. Rescission is conceded to be impracticable both for that reason and because Tri-Star is now merged into Sony. Punitive damages are not recoverable in equity, and, as earlier stated, compensatory damages to redress the economic harm occasioned by the underlying substantive transaction itself are available only to the corporation. (FN8) That leaves but one alternative: compensatory damages to the class for being deprived of their right to exercise an informed vote. That deprivation is the only identifiable harm that the amended complaint reveals was visited upon the shareholder class.

**9. There is precedent for awarding monetary damages to a shareholder class for being deprived of its right to cast an informed vote on a corporate transaction. *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642, Brown, C. (Jan. 30, 1985). However, that decision indicates that where the harm consists solely of disclosure violations unaccompanied by any other cognizable financial injury, there is a significant

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

prospect that the damage recovery will be nominal. Such was the result in *Weinberger*, where the Court awarded damages of $1 per share. And where, as here, the underlying substantive claim is derivative (as contrasted with *Weinberger*, which involved a class claim arising out of a "cash out" merger) the measure and amount of the recovery, if any, is even more problematic.

Accordingly, Count II is an individual and class claim, but only insofar as it is defined as a claim for wrongful deprivation or loss of the shareholders' right to cast an informed vote. To the extent that plaintiffs seek to define the disclosure claims more broadly to seek rescissory or other damage relief, such claims cannot be maintained, because no such broader damage or equitable relief could be awarded to the shareholder class.

* * *

* * *

For the foregoing reasons, the defendants' renewed motion to dismiss will be granted as to all Counts, except as to Count II as defined above, and as to that portion of Count VII (the conspiracy claim) that corresponds to Count II. Counsel shall submit an appropriate form of order implementing these rulings.

(FN1.) Although Tri-Star's name was changed to Columbia Pictures Entertainment, Inc. in December, 1987, for simplicity it will be referred to as "Tri-Star".

(FN2.) The *Epstein* action (C.A. No. 9565) was filed in January 8, 1988, one month after the filing of the *Siegman* action. The two actions were not consolidated until August 3, 1989. Although the pre-consolidation activity was generated by plaintiff Siegman, for ease of reference, neither of the plaintiffs will be referred to separately.

(FN3.) The plaintiffs conceded that the Article Sixth claim was moot from the date of the merger. However, they argued that any premerger claims involving the validity of Article Sixth remained viable, both by definition and because Tri-Star's stockholders had not been permitted to vote on Article Sixth separately but, rather, were required to vote on the amendments as a package. The

Court rejected those arguments on the basis that (a) the complaint alleged no facts from which it could be concluded that any premerger claims involving the validity of Article Sixth have or will be asserted, and (b) the fact that the shareholders were not allowed to vote separately on Article Sixth would not require a determination of, and indeed is logically unrelated to, the validity of that Article.

(FN4.) Except for Count III, which has been dismissed.

(FN5.) There are limited exceptions to that rule, but they are not applicable here, and plaintiffs do not contend otherwise. See *Lewis v. Anderson*, 477 A.2d at 1046, n. 10.

(FN6.) The value of the assets to be transferred would be based upon the ratio of the aggregate book value of the Entertainment Sector as of the closing, to the aggregate book value of Tri-Star. That ratio was 745 to 245, and was based upon the market value of those assets. No appraisal of those companies' assets made prior to the closing. The Transfer Agreement provided that the amount of assets to be transferred could be adjusted after the closing to satisfy the 745 to 245 ratio requirement. (Amended Compl., ¶ 19(d)).

(FN7.) *e.g.*, *Smith v. Van Gorkom*, Del.Supr. 488 A.2d 858 (1985) (cash out merger); *Weinberger v. UOP, Inc*, Del.Supr., 457 A.2d 701 (1983); *Rand v. Western Airlines*, Del.Ch., C.A. No. 8632, Berger V.C., (Sept. 11, 1989) (merger) *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324 (1987) (cash out merger), *Kahn v. United States Sugar Corp.*, Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) (tender offer).

(FN8.) Plaintiffs assert that the Court has the power to award rescissory damages or, alternatively, to direct Coca-Cola to disgorge to the class the gain that Coca-Cola is alleged to have wrongfully obtained in the Combination. However, plaintiffs cite no authority to support an award to a class for economic harm that the corporation alone sustained. The entitlement to such a recovery, in these circumstances, would belong to the corporation.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I do hereby certify that, on June 27, 2005, the within document was filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY EMAIL AND HAND DELIVERY

Francis G.X. Pileggi, Esquire
Sheldon K. Rennie, Esquire
Fox Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, Delaware 19801

_____
Stephen C. Norman (#2686)
Potter Anderson & Corroon LLP
Hercules Plaza – 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: snorman@potteranderson.com