# TAB 1

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)

*1370341        UNPUBLISHED OPINION.
CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Arlene ASH, Noel Saito, Kimberly
Madajczyk and Sydney H. Dalman,
Plaintiffs,
v.
Charles W. MCCALL, Mark A.
Pulido, Richard H. Hawkins, Heidi E.
Yodowitz, Alfred E. Eckert III, Tully
M. Friedman, Alton F. Irby III, M.
Christine Jacobs, Gerald E. Mayo,
James v. Napier, David S. Pottruck,
Carl E. Reichardt, Alan Seelenfreund
and Jane E. Shaw, Defendants,
and

MCKESSON HBOC, INC., Nominal
Defendant.

No. Civ.A. 17132.
Submitted March 15, 2000.

Decided Sept. 15, 2000.

Pamela S. Tikellis, Robert J. Kriner, Jr., and
Timothy R. Dudderar, of Chimicles & Tikellis LLP,
Wilmington, Delaware, for Plaintiffs.

Joel Friedlander, of Bouchard Margules &
Friedlander, Wilmington, Delaware; Samuel R.
Miller, of Folger Levin & Kahn LLP, San Francisco,
California, for the Former HBOC Outside Directors,
of counsel.

Anthony W. Clark and Paul J. Lockwood, of
Skadden, ARPS, Slate, Meagher & Flom LLP,
Wilmington, Delaware; Jonathan J. Lerner, of
Skadden, Arps, Slate, Meagher & Flom LLP, New
York, New York, and James E. Lyons, of Skadden,
ARPS, Slate, Meagher & Flom LLP, San Francisco,
California, for McKesson Hboc, Inc., of counsel.

Alan J. Stone and Jessica Zeldin, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware;
Karen Steinberg Kennedy, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York, for
Defendant Charles W. McCall, of counsel.

Grover C. Brown, of Gordon, Fournaris &
Mammarella, P.A., Wilmington, Delaware, for
Defendants Tully M. Friedman, David S. Pottruck,
Carl E. Reichardt, Alan Seelenfreund and Jane E.

Shaw, of counsel.

Michael D. Goldman, of Potter Anderson &
Corroon LLP, Wilmington, Delaware, for Defendant
Mark A. Pulido.

*MEMORANDUM OPINION*

CHANDLER, J.

**1 Shareholder plaintiffs Arlene Ash, Noel Saito,
Kimberly Madajczyk and Sydney H. Dalman assert
derivative claims on behalf of McKesson HBOC, Inc.
("McKesson HBOC" or the "Company"), a Delaware
corporation, which was formed through the merger of
McKesson Corporation ("McKesson") and HBOC &
Co. ("HBOC") on January 12, 1999. Approximately
3 1/2 months after McKesson's acquisition of HBOC
became effective, McKesson HBOC issued the first
of what appears to be three downward revisions of
revenues, earnings, net income, and other financial
information, for financial years 1996-1998. The
complaint generally asserts claims related to these
revisions. Pending before me is defendants' motion to
dismiss.

Ordinarily, I would summarize here the complaint's
allegations. In this instance, however, plaintiffs have
filed a complaint without specifying their causes of
action, despite having twice amended it. The
complaint does not enumerate specific counts, nor
does it present claims in any other readily discernable
manner. Although the complaint is generously laden
with conclusory allegations that "the facts described
herein constitute breaches of directors' duties of good
faith, care and loyalty," plaintiffs decline to connect
the facts of the complaint with specific claims of
wrongdoing.

Plaintiffs' answering brief, however, does suggest
several claims, some of which appear to be based on
alleged violations of directors' oversight duties, while
others are predicated exclusively on alleged fiduciary
breaches in connection with McKesson's due
diligence investigation of HBOC in the course of the
merger process. I will briefly describe plaintiffs'
claims now, restating them later with the specificity
that I believe necessary to rule on the pending
motion.

Generally, plaintiffs allege that the directors of
HBOC and McKesson HBOC failed to exercise
proper oversight of the companies' financial reporting
process so as to prevent accounting improprieties;
that the McKesson directors breached their duty of

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

care in the course of investigating HBOC's books and records before the merger; and, finally, that McKesson's acquisition of HBOC constituted an act of corporate waste.

Twelve of the fourteen individual defendants named in this lawsuit comprised McKesson HBOC's full board of directors when plaintiffs filed their first complaint on April 30, 1999, two days after the Company's first publication of earnings restatements. The remaining two individual defendants were senior executive officers. Defendants have moved to dismiss the complaint in part for lack of standing and otherwise for failure to plead particularized facts warranting exception to the pre-suit demand requirement of Chancery Rule 23.1.

For reasons described more fully below, I grant defendants' motion. I will, however, dismiss plaintiffs' complaint without prejudice, thereby affording plaintiffs an opportunity to gather additional facts and to file a complaint that is legally sufficient.

## I. FACTUAL BACKGROUND

### A. The Merger

**\*\*2** HBOC, a Delaware corporation headquartered in Atlanta before the merger, provides computer software and technology solutions to the healthcare industry. McKesson, a Delaware corporation headquartered in San Francisco, is primarily engaged in the business of healthcare supply management.

Merger discussions between the two companies began in June 1998 when McKesson solicited HBOC's interest in a business combination in order to enter the fast-growing market of software sales to the medical industry. These discussions ripened into due diligence during the first half of July. Shortly thereafter, however, the parties suspended merger talks.

Three months later, in October 1998, discussions resumed when McKesson's Chairman and CEO, Mark Pulido, contacted his counterpart at HBOC, Charles McCall, in order to rekindle interest in a deal. On October 16, McKesson and HBOC announced a definitive merger agreement where McKesson would acquire HBOC in a tax-free, stock-for-stock merger then-valued at approximately $14 billion. Under the terms of the agreement, HBOC would merge with a McKesson acquisition subsidiary and HBOC shareholders would receive 0.37 shares of McKesson common stock in exchange for each share of HBOC common stock.

The parties signed the merger agreement on October 18, 1998. On or around November 27, McKesson and HBOC disseminated a joint proxy statement and on January 12, 1999, their shareholders voted to approve the merger, which became effective on that date. McKesson's name was changed to McKesson HBOC and HBOC, now a wholly owned subsidiary of McKesson HBOC, became the combined Company's health care information technology division.

After the merger, six directors from each pre-merger company comprised the combined Company's board of directors. Five of the six former HBOC directors on the combined Company's board were non-executive, outside directors: Alfred E. Eckert III, Alton F. Irby III, M. Christine Jacobs, Gerald E. Mayo, and James V. Napier. The one inside director, Charles W. McCall, was president, CEO, and chairman of HBOC before the merger and chairman of the combined McKesson HBOC, until his removal from the board on June 21, 1999.

Five of the six former McKesson directors on the combined Company's board were also non-executive, outside directors: Tully M. Friedman, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund, and Jane E. Shaw. Mark A. Pulido, president, CEO, and director of pre-merger McKesson held the same positions at McKesson HBOC after the merger. On June 21, 1999, the Company announced Pulido's resignation.

### B. McKesson HBOC's Accounting Restatements

On April 28, 1999, McKesson HBOC announced that in connection with its year-end audit, DeLoitte & Touche ("DeLoitte"), the Company's auditor, discovered improperly recorded revenue for the financial year ending March 31, 1999. According to Company press releases, DeLoitte discovered the improprieties by mailing surveys to customers that purportedly bought HBOC software products. When DeLoitte compared the results to the Company's books, it became apparent that many sales had been improperly recorded. McKesson HBOC's share price fell by over $31, nearly half of its value, on the afternoon of the announcement.

**\*\*3** In May 1999, the Company announced that more revisions would be made to earnings. Two months later, with its internal investigations

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)

concluded, the Company announced that it would have to make a further restatement covering the two previous financial years to correct for improperly recorded revenue. In all, McKesson HBOC had to disallow $327.4 million of revenue and $191.5 million of operating income.

All of the earnings overstatements, disclosed by the Company between April and July 1999, are attributable to HBOC. It appears that HBOC began overstating earnings in 1996 and continued to do so until shortly before the board of the combined McKesson HBOC first disclosed such overstatements on April 28, 1999, approximately 3 1/2 months after the McKesson/HBOC merger closed on January 12, 1999.

The bulk of the accounting irregularities, according to the complaint, stem from the decision of HBOC senior executives (and their subordinates) to book contingent sales as final sales, both before and after the merger with McKesson. These sales remained contingent, say plaintiffs, because they were made containing "side letters" providing for rights of return and, thus, not properly booked as revenue under applicable accounting standards. The complaint also alleges that senior HBOC executives (and their subordinates) backdated sales contracts so that revenues could be falsely reported as having occurred in an earlier period.

### C. Lawsuits Mount and House Cleaning Begins

Shortly after the first round of earnings restatements, over twenty law firms announced that they had been retained by McKesson HBOC shareholders to investigate and file class action lawsuits for violations of federal securities laws against the Company and certain of the individual defendants named in this lawsuit, among others. Defendants report that over seventy-five class action, derivative, and individual lawsuits have been filed in connection with these events at McKesson HBOC. Additionally, the U.S. Attorney for the Northern District of California and the SEC have launched investigations of the Company.

On June 21, 1999, McKesson HBOC announced that its board of directors would fire defendant McCall and remove him as chairman, and that defendant Pulido would tender his resignation as president, director, and CEO. The Company also announced the resignation of defendant Richard H. Hawkins, executive vice president and chief financial officer. Pulido's and Hawkins' resignations became

effective July 15, 1999.

The board of directors also fired several senior executives of the Company's information technology subsidiary (formerly HBOC) including Albert Bergonzi (president and chief operating officer), David Held (controller and chief financial officer), Jay Lapine (senior vice president, general counsel, and secretary), and Michael Smeraski (senior vice president of sales). Contemporaneous with these terminations, the board of directors appointed new executive management for McKesson HBOC; John H. Hammergren and David L. Mahoney, previously executive vice presidents of the Company, were appointed co-CEO's and elected to the board.

### D. The "Red Flags"

**4 Plaintiffs' overarching litigation theory, as articulated in their answering brief, is that "the directors of McKesson, HBOC and McKesson HBOC failed to institute and maintain appropriate financial controls and recommended the merger based upon a recklessly inadequate investigation in the face of clear warnings of accounting improprieties at HBOC." (FN1)

These "clear warnings" or "red flags" are the linchpin of plaintiffs' liability theory. Plaintiffs point to four "red flags" that HBOC senior officers and directors, and McKesson's board and management team (presumably in the course of due diligence), allegedly disregarded with some degree of culpability ranging from inattention to actual knowledge.

The first of these "red flags" occurred in January 1997 when *Bloomberg*, a financial news company, published a short article questioning HBOC's accounts receivable and near-term growth. Nothing more is alleged about this article.

The second "red flag" occurred three months later in April 1997 when the Center for Financial Research & Analysis, Inc. ("CFRA"), an organization that researches and publishes reports (primarily for institutional investors) relating to financial and accounting issues of public corporations, issued a report on HBOC observing, among other things, that its balance of receivables had surged upward in recent periods. (FN2) The report was mailed to CFRA clients on or about April 15, 1997.

On April 17 and 18, 1997, *The Atlanta Constitution* reported that on April 15, HBOC's stock price had declined nearly 8% on market speculation

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                    Page 4

that the CFRA report criticized HBOC's accounting practices. (FN3) *The Atlanta Constitution* also reported that several industry analysts, who publicly commented on the CFRA report, expressed doubt that it had identified any significant problem at HBOC, citing the Company's "strong fundamentals."

Several analysts took the extraordinary step of publishing special reports contesting the CFRA analysis point by point. An HBOC spokesperson stated that the report "doesn't warrant comment." Following these reassurances, HBOC's stock price rebounded to nearly pre-CFRA report levels.

Indefatigable (and apparently correct), on August 19, 1998, CFRA issued a second report critical of HBOC's revenue recognition procedures. CFRA published this report, the third "red flag," approximately sixteen months after the first report and two months before McKesson and HBOC signed their merger agreement. (FN4) Based upon a review of HBOC's public filings, CFRA reported, among other things, that HBOC's operations "may be deteriorating, as partially evidenced by a high and generally growing level of receivables relative to revenue." CFRA also observed that cash flows from operations trailed significantly behind net income in the first two quarters of calendar year 1998.

The final alleged "red flag" flew on or around November 13, 1998, when HBOC announced that Jay Gilbertson, chief financial officer, president, and chief operating officer, would leave the company. Plaintiffs argue that "despite this clear signal of financial impropriety neither HBOC, McKesson, nor McKesson HBOC discovered and/or reported the fundamental accounting irregularities that were overstating HBOC's (and thereafter McKesson HBOC's) sales and revenue." (FN5)

## II. CONTENTIONS OF THE PARTIES

**\*\*5** Plaintiffs have not set forth claims, based on the above-summarized facts, with particularity. As noted previously, the complaint does not enumerate specific counts; nor does it present plaintiffs' claims in any other readily discernable manner. Despite its ambiguity, the complaint, read liberally but fairly, seems to raise four claims.

Plaintiffs' first two claims can be distilled into a due care claim and a waste claim. The due care claim alleges that the directors of McKesson and the directors of HBOC breached their duty of care by failing to inform themselves of all reasonably

available material information before deciding to enter into, and recommend, the merger. Put another way, plaintiffs contend that the directors breached their duty of care by failing to detect HBOC's accounting irregularities during the course of due diligence investigations performed in connection with the merger. Although this claim more logically applies to the McKesson directors, plaintiffs seem to insist that it is equally applicable to the HBOC directors.

Plaintiffs assert their waste claim against the McKesson directors. They contend that the McKesson directors' decision to enter into and recommend the merger to McKesson's shareholders constituted an act of corporate waste. That is, plaintiffs contend that the McKesson director's decision to exchange properly valued McKesson shares for overvalued HBOC shares amounts to waste.

Plaintiffs' second set of claims addresses the less often visited issue of a board's oversight duty, a subset of the duty of care, but also potentially raising issues of directors' good faith. Plaintiffs first contend that the directors of HBOC failed to monitor adequately the company's financial reporting in order to ensure compliance with applicable federal laws and regulations for approximately a two-year period preceding the merger (the "First Oversight Claim"). Plaintiffs next maintain that the directors of McKesson HBOC failed to do the same for a three-and-one-half month period after the merger (the "Second Oversight Claim").

Defendants argue that this action must be dismissed for two reasons. First, and primarily, defendants seek dismissal under Chancery Rule 23.1 on the ground that plaintiffs have not made a pre-suit demand on the board of directors and have not alleged particularized facts establishing that demand would be futile. Second, defendants argue that none of the named derivative plaintiffs have proper standing to assert the First Oversight Claim (*i.e.,* the claim that HBOC directors breached fiduciary duties in failing to uncover and cure accounting irregularities before the merger).

## III. ANALYSIS

Though all four of plaintiffs' claims generally assert duty of care breaches, I believe it is sensible to analytically separate the due care and waste claims, brought in connection with the merger transaction, from the two oversight claims, which do not

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

challenge a specific board action or decision. I do so primarily because the demand futility analysis for oversight claims differs from demand futility analysis for due care and waste claims.

## A. Demand Futility Standard for the Due Care and Waste Claims

**\*\*6** A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile. (FN6) Here, plaintiffs contend demand would be futile and, thus, should be excused.

In considering a motion to dismiss under Chancery Rule 23.1, as in the case of a Rule 12(b)(6) motion to dismiss, the Court confines its attention to the face of the complaint and accepts all well-pled allegations of fact as true. To survive a motion to dismiss under Rule 23.1, however, a plaintiff must plead with particularity the reasons why pre-suit demand would have been futile. (FN7)

Plaintiffs' due care and waste claims arise in connection with an affirmative business decision made by a board of directors. Accordingly, I will analyze demand futility under the two-prong test set forth by the Delaware Supreme Court in *Aronson v. Lewis.* (FN8) Under *Aronson,* pre-suit demand is excused if the shareholder alleges, with particularity, facts sufficient to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment. (FN9)

### 1. Are the Director Defendants Disinterested and Independent?

If a plaintiff can raise a reasonable doubt that a majority of directors was disinterested or capable of exercising independent business judgment with respect to the transaction in question, the pre-suit demand requirement is generally excused. A director is considered interested where he receives a personal financial benefit that is not equally shared by the stockholders. (FN10) A disabling conflict of interest is also said to exist when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. (FN11)

In this case, plaintiffs allege that defendants Pulido and McCall, the "masterminds" of the merger, received certain unique benefits upon consummation of the transaction. Specifically, plaintiffs allege Pulido held 1.49 million non-vested options to acquire McKesson common stock as well as 40,000 shares of restricted McKesson common stock. Upon consummation of the merger, these stock options vested and the share restrictions lapsed. Moreover, upon consummation of the merger, defendant McCall became entitled to the maximum amount payable under a McKesson bonus plan–$47,600.

While not conceding that these facts render Pulido or McCall interested in the merger, defendants observe that the absence of any particularized allegations of fact indicating that any of the remaining ten directors were interested in the merger makes Pulido's and McCall's alleged interest legally irrelevant. Not the case, counter plaintiffs, arguing that Pulido and McCall "dominated" the other directors. Specifically, paragraphs 71 and 72 of the complaint provide:

**\*\*7** 71. "The six former HBOC Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, their former Chairman defendant McCall who exerted during his tenure on the Board, and still exerts, such influence and control over these directors."

72. "The six former McKesson Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, defendant Pulido and now also defendant McCall who exerts such significant control and influence over them as to render them unobjective."

Nowhere to be found in the pleadings or plaintiffs' opposition brief, however, are particularized facts supporting the conclusory allegations annexed above. Under the very clear guidance of the *Aronson* Court, conclusory allegations of domination and control are insufficient to excuse pre-suit demand:

"in the demand futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a 'direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient." (FN12)

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Plaintiffs have not made a single factual allegation that ten of twelve board members, all of whom were non-management, outside directors, had any material self-interest in the merger. Nor have they alleged particularized facts that would establish that Pulido or McCall-the two allegedly interested directors-dominated the ten non-management, outside directors, neutralizing their ability to make a good faith judgment with respect to the merger transaction. (FN13)

In short, plaintiffs have not alleged a single fact in support of their domination theory and, as Delaware courts have repeatedly observed, such assumptions will not be made in the context of pre-suit demand. Consequently, pre-suit demand is not excused under *Aronson's* first prong based on plaintiffs' unadorned, conclusory allegation that a majority of director defendants' were interested in the merger or not independent of allegedly interested parties. (FN14)

*2. Is There a Reasonable Doubt that Approval of the Merger was the Product of a Valid Exercise of Business Judgment?*

Under *Aronson's* second prong, the Court must determine whether the complaint raises a reasonable doubt that the "directors exercised proper business judgment in the transaction." (FN15) In this instance, the second prong of the *Aronson* test addresses the waste claim (purchase terms) and due care claim (informed decisions). I will first consider the waste claim leveled against former McKesson directors.

*a. The Waste Claim*

Although it is indeed axiomatic that a corporate act cannot be a product of sound business judgment and also constitute waste, allegations of waste must nonetheless comply with Rule 23.1 demand requirements. To excuse demand on grounds of corporate waste, plaintiffs must allege "particularized facts that the consideration received by the corporation was 'so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation has paid." ' (FN16) Put another way, plaintiffs must show that the merger in question either served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift. (FN17)

**8** Paragraph 32 of the complaint states that McKesson acquired HBOC "to enter the fast-growing business of software sales to the healthcare industry." Evidently, plaintiffs concede that the merger had a

perfectly sensible corporate purpose.

It is paragraph 28 of the complaint, however, upon which plaintiffs center their waste claim. There, they quote an analyst from Warburg Dillon Read, an investment bank, who shortly after the Company's first round of corrective disclosures, purportedly stated that '[t]he marketplace is basically valuing HBOC as zero.' (FN18) On the strength of one analyst's hyperbole, made in some undisclosed and uncited medium, plaintiffs argue that McKesson paid $14 billion for something (*i.e.,* HBOC before disclosure of accounting irregularities) that was really worth nothing (*i.e.,* HBOC after disclosure of accounting irregularities). This, argue plaintiffs, constitutes waste. I disagree.

When McKesson exchanged approximately $14 billion of its stock for all of HBOC's outstanding stock, the market valued HBOC stock at or around that price. That is, the merger did not appear wasteful when it was entered into, put to a shareholder vote, and approved. The fact that the merger turned out badly or, indeed, abominably for McKesson simply does not and cannot mean that approval of the merger was an act of corporate waste *at the time* the McKesson board entered into it. (FN19) The facts alleged by plaintiffs do not make out a waste claim and do not demonstrate that the merger was other than a good faith effort to advance corporate interests or the product of a valid business judgment, at the time the board approved the transaction.

In any event, plaintiffs' argument, in my opinion, fundamentally misapprehends the nature of a waste claim. If Company A exchanges $100 for an asset from Company B that Company A believes is worth $100, it is not "waste" if it later turns out that Company B's asset was worth only $10. Company B may have perpetrated a fraud on Company A or, perhaps, Company A's directors breached their duty of care, but Company A or its directors did not commit "waste."

Plaintiffs are examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for McKesson, so horribly that it must be a waste of corporate assets. But the relevant time to measure whether the McKesson board committed "waste" is at the time they entered into and approved the transaction. To analyze this claim under the waste standard confuses the due care standard with substantive due care-a concept that is foreign to the business judgment rule. (FN20) Due care in the decision making context is process due

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                      Page 7

care-whether the board was reasonably informed of all material information reasonably available at the time it made its decision. That is the true nature of plaintiffs' attack on McKesson's board, to which I turn next.

### b. *The Due Care Claim*

Here lies the heart of the lawsuit against former McKesson directors and, to a lesser extent, former HBOC directors. (FN21) Plaintiffs contend that the directors missed several "red flags" that should have alerted them to the accounting problems, in the course of full-scale due diligence, before they approved the merger. Plaintiffs then allege that the directors failed to identify the accounting defects, with some degree of mental culpability ranging from actual knowledge to gross recklessness, reckless disregard, just plain recklessness and, finally, gross negligence.

**\*\*9** The notion that McKesson directors had actual knowledge of HBOC's earnings overstatements and nonetheless proceeded with the merger finds no support in the amended complaint. Moreover, it is simply illogical to presume that McKesson directors would *knowingly* cause McKesson to acquire a company with significant, undisclosed earnings misstatements. Nothing in the pleadings remotely suggests a reason why McKesson would purposefully buy such a company; nor do the pleadings offer anything by way of explanation-not a single fact or theory that could possibly support such a conclusion. (FN22)

Taking all the facts in the complaint as true, and reading every conceivable inference in plaintiffs' favor, inexorably leads to the conclusion that plaintiffs' claims sound in negligence, at most. The McKesson board determined that it was in McKesson's strategic interests to enter the healthcare information technology business. It then acted on that objective by pursuing a business combination with HBOC-one of the leading companies in the field. It hired expert accounting and financial advisors to perform due diligence on HBOC-DeLoitte & Touche and Bear Stearns, respectively. After DeLoitte and Bear Stearns completed their due diligence reviews, with the participation of McKesson management, they waived "green flags" to the McKesson board, in effect saying, "This merger is financially and strategically sound." The McKesson directors approved the merger.

Defendants characterize the "red flags" that plaintiffs make so much of as "dated," "obscure," and "inconsequential" relative to the prominent "green flags" given to the directors by the accounting and financial experts who conducted due diligence reviews in advance of the merger. When plaintiffs' "red flags" are juxtaposed with the clean bill of health given by DeLoitte and Bear Stearns after due diligence reviews, the complaint permits one conclusion: that the McKesson directors' reliance on the views expressed by their advisors was in good faith. What would plaintiffs have the McKesson board do in the course of making an acquisition other than hire a national accounting firm and investment bank to examine the books and records of the target company? Nothing in the pleadings otherwise casts doubt on the good faith of the McKesson directors. (FN23)

Undaunted by the facts alleged in their own complaint, plaintiffs contend that "there is no authority for defendants' argument that the directors here are entitled to abdicate their duties to their experts." (FN24) It is, in reality, plaintiffs' argument that is without basis in fact or law. Directors of Delaware corporations quite properly *delegate* responsibility to qualified experts in a host of circumstances. (FN25) One circumstance is surely due diligence review of a target company's books and records. To delegate this assignment is not an "abdication" of duty. (FN26)

The complaint here, fairly read, alleges that the McKesson directors were advised by their experts (DeLoitte and Bear Stearns) and that they relied on their expertise in conducting due diligence ancillary to the proposed merger. So the question becomes whether such directors are to be "fully protected" on the basis that they relied in good faith on qualified experts under 8 *Del. C.* § 141(e). The McKesson board is entitled to the presumption that it exercised proper business judgment, including proper reliance on experts. Plaintiffs have not rebutted the presumption with particularized facts creating reason to believe that the McKesson board's conduct was grossly negligent. That is, plaintiffs have not alleged particularized facts (in contrast with conclusions) that, if proved, would show that (1) the directors in fact did not rely on the expert, or (2) that their reliance was not in good faith, or (3) that they did not reasonably believe that the experts' advice was within the experts' professional competence, or (4) that the directors were at fault for not selecting experts with reasonable care, or (5) that the issue (here, alleged accounting deficiencies in HBOC's financial records) was so obvious that the board's failure to detect it was grossly negligent regardless of the experts' advice, or

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                                                Page 8

(6) that the board's decision was so unconscionable as to constitute waste or fraud. (FN27) This complaint is devoid of particularized allegations along these lines and is, therefore, incapable of surviving a motion to dismiss.

**10 More importantly, this Court has stated on several occasions that mere allegations that directors made a poor decision-absent some showing of self-dealing or suspect motivation-does not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson.* (FN28) When the challenged transaction was approved by a board composed of a majority of independent, disinterested directors, "a heavy burden falls on [plaintiffs] to avoid pre-suit demand" by challenging the directors' fulfillment of their duty of care. (FN29)

In determining whether the complaint creates any doubt that the McKesson directors used due care in approving the merger, the Court considers whether the directors:

(i) inform[ed] themselves of available critical information before approving the transaction; (ii) consider[ed] expert opinion; (iii) provid[ed] all Board members with adequate and timely notice of the [transaction] before the full Board meeting and of its purpose; or (iv) inquir[ed] adequately into the reasons for or terms of [the transaction].... (FN30)

Plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors did not act in accordance with any of these guidelines. Plaintiffs' allegations that directors were less than fully informed of reasonably available material information or that they considered the merger in any other procedurally unsound manner relies entirely on the wisdom of hindsight. The complaint fails to create a reasonable doubt that the informational component of the McKesson directors' decision-making process, measured by the concept of gross negligence, included consideration of all material information reasonably available.

Defendants have also directed the Court's attention to exculpatory charter provisions, enacted under 8 *Del. C.* § 102(b)(7), in McKesson's and the combined McKesson HBOC's articles of incorporation. Although the exculpatory provisions serve as adequate independent grounds for dismissing the due care claim, (FN31) I principally rely on plaintiffs' failure to allege particularized facts creating a reasonable doubt that the merger, at the time it was entered into, was other than a valid exercise of business judgment.

*B. Demand Futility and Standing for Oversight Claims*

The oversight claims do not challenge a director's decision or judgment but, rather, assert that directors failed to properly monitor the corporation they managed. The Delaware Supreme Court modified the demand futility analysis for claims that do not challenge a business decision in *Rales v. Blasband.* (FN32) In the oversight context, where the board has not yet made a decision, demand is excused only when the complaint contains particularized facts creating a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand. (FN33) Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood." (FN34)

**11 The odd procedural posture in which this case arises has caused an awkward bifurcation of plaintiffs' oversight claims. Plaintiffs allege that the directors of McKesson HBOC, the parent, *and* HBOC, now a wholly-owned subsidiary, recklessly disregarded the best interests of the respective companies by failing to monitor and control their accounting and financial reporting practices. Accordingly, plaintiffs have brought two oversight claims: the first against HBOC's board for pre-merger oversight failures (the "First Oversight Claim") and the second against McKesson HBOC's board for post-merger oversight failures (the "Second Oversight Claim").

*1. The First Oversight Claim*

Plaintiffs' First Oversight Claim targets the HBOC board for pre-merger oversight failures. Although the defendants contest the merits of the First Oversight Claim, they principally argue that the merits need not and should not be reached because none of the named plaintiffs have standing to bring this claim, predicated on alleged pre-merger fiduciary breaches.

Section 327 of Delaware's General Corporation Law requires a shareholder plaintiff asserting derivative claims to allege that he was a stockholder of the corporation at the time of the transaction of which he complains. (FN35) In addition to this statutory requirement, it is also settled law in Delaware that a derivative plaintiff must be a

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                    Page 9

stockholder at the time he commences suit and must maintain such stockholder status throughout the course of the litigation. (FN36) This is known as the continuous ownership requirement.

None of the four plaintiffs who bring this suit are presently, or were at the time of filing the complaint, shareholders of HBOC. As explained earlier, HBOC became a wholly-owned subsidiary of McKesson in connection with the merger, McKesson was renamed McKesson HBOC, and the now wholly-owned HBOC is simply the Company's information technology subsidiary. For clarity, I will refer to the post-merger HBOC entity as "HBOC Sub."

Nonetheless, two of the four purported representative plaintiffs in this action, Madajczyk and Dalman, contend that they have maintained standing to bring derivative claims against the HBOC board for alleged pre-merger fiduciary breaches because they were shareholders of HBOC before the merger and became shareholders of McKesson HBOC in connection with the merger. Thus, Madajczyk and Dalman insist that their continuing equity interests meet all the statutory and common law continuous ownership requirements for standing.

It is settled Delaware law, however, that once a plaintiff ceases to be a shareholder, "whether by reason of a merger or for any other reason," he loses standing to continue a derivative suit. (FN37) The Delaware Supreme Court definitively set forth this bright line rule in *Lewis v. Anderson* and recently reaffirmed it in *In re First Interstate Bancorp Consolidated Shareholder Litigation*. (FN38) The plaintiffs have not effectively distinguished either case.

**12 Defendants contend that in *First Interstate* this Court held that the derivative "claims" of a First Interstate Bancorp shareholder "were extinguished" as a result of the stock-for-stock merger with Wells Fargo & Company. This characterization of the *First Interstate* holding is well off the mark. *First Interstate* did not hold that a merger "extinguished" derivative "claims." Such a conclusion is utterly incompatible with 8 *Del. C.* § 259(a). (FN39) Rather, the *First Interstate* Court held that barring the applicability of either of two exceptions set forth in *Lewis v. Anderson,* the merger "extinguished" plaintiff's "standing" to assert derivative claims. (FN40)

The two exceptions to *Lewis v. Anderson's* apparently iron-clad rule that a shareholder of a

merged entity loses standing to assert pre-merger derivative claims are (i) if the merger itself is the subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise. (FN41) In *First Interstate,* plaintiff Bradley argued under the second exception to the standing rule. The Court rejected this argument holding that "the exception would not apply to mergers with outside or pre-existing corporations with substantial assets." (FN42) Although plaintiffs here have not argued under this second exception, it would be unavailing for similar reasons given that (1) the McKesson/HBOC merger involved two free-standing companies with substantial assets, and (2) the new, combined entity comprised a mix of assets distinctly different from that of the pre-merger company. This arm's length stock-for-stock transaction between two independent companies cannot be characterized as a corporate reorganization.

Like the plaintiff Bradley in *First Interstate,* however, plaintiffs in this case ask the Court to follow the Third Circuit's decision in *Blasband v. Rales,* (FN43) which granted plaintiffs standing under virtually identical circumstances, rather than *Lewis v. Anderson,* which denied standing in circumstances also virtually identical to those here.

Plaintiffs have not explained why they believe I am free to follow *Blasband* and not *Lewis.* The *First Interstate* Court rejected the Third Circuit's reasoning in *Blasband v. Rales* in no uncertain terms. Reading *Lewis v. Anderson* expansively, the *First Interstate* Court held that former First Interstate shareholders lost standing to assert pre-merger derivative claims solely by virtue of the merger. In contrast to *Blasband v. Rales,* the fact that the purported derivative plaintiff maintained a significant, though diluted, economic interest in the combined (Wells Fargo) company after the stock-for-stock merger had no impact on the *First Interstate* Court's view of the standing issue:

"Finally, plaintiff Bradley asks the Court to follow the Third Circuit's ruling in *Blasband v. Rales,* 3 rd Cir., 971 F.2d 1034 (1992) (purporting to apply Delaware law), and a case finding post-merger standing under California law. I decline to do so, as the teaching of the Delaware Supreme Court in *Lewis v. Anderson* is both clear and controlling of my decision." (FN44)

**13 In a footnote, the *First Interstate* Court described *Blasband* as being "inconsistent with the

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                                          Page 10

clear holding of *Lewis v. Anderson.*" (FN45)

During the briefing on this motion, the Delaware Supreme Court's Order affirming *First Interstate* bolstered defendants' reliance on that case and, relatedly, defendants' reliance on their construction of *Lewis v. Anderson* and *Blasband v. Rales.* Importantly, the Supreme Court's Order concluded that the Court of Chancery correctly determined that plaintiff Bradley had pleaded derivative claims and that "[a]ccordingly, [he] lacks standing to assert those claims. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984)." (FN46)

*First Interstate* clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in *Blasband v. Rales* that the combination of a direct pre-merger equity interest (in the subsidiary) and a direct but diluted post-merger equity interest (in the surviving corporation) is sufficient to meet the common law continuous ownership requirement necessary to prosecute pre-merger derivative claims. The Third Circuit's view-that the plaintiff shareholders' continuing economic interest in the subsidiary and thereafter in the parent does not give rise to the concern expressed in 8 *Del. C.* § 327-has been characterized by commentators as "persuasive." (FN47) Nonetheless, it is not the law in Delaware. Accordingly, the complaint is dismissed to the extent that it purports to assert claims on behalf of former HBOC shareholders (plaintiffs Madajczyck and Dalman) for pre-merger acts or omissions of the HBOC directors.

Although the complaint-as pleaded regarding the First Oversight Claim-must be dismissed for lack of standing, the dismissal order will be without prejudice for three reasons. First, as presently drafted, the amended complaint does not implicate either of the two exceptions to the standing requirement in the merger context. Nor have plaintiffs argued that the merger was perpetrated merely to deprive the shareholders of standing to bring a derivative action or that the merger was in reality merely a reorganization. (FN48) Nevertheless, it is conceivable that the plaintiffs might be able to allege, consistent with Rule 11, that the merger was designed in part to thwart shareholder derivative claims arising out of the HBOC board's failure to monitor the company's internal accounting practices. Dismissing the complaint without prejudice will give plaintiffs that opportunity.

Second, plaintiffs have not asserted a double derivative claim on behalf of the parent corporation

(McKesson HBOC) to enforce a cause of action (the oversight claim against the directors and management of HBOC) in favor of a related corporation (HBOC Sub). Plaintiffs' counsel tried, during oral argument on the motion to dismiss, to recast this lawsuit as a double derivative action. Plaintiff Bradley, in *First Interstate,* made a somewhat similar argument, contending that the claims previously held by First Interstate had passed in the merger to the survivor, Wells Fargo, and he was therefore free to pursue them derivatively as a new stockholder of the survivor. The Court of Chancery rejected this argument on the ground that plaintiff Bradley had never purported to satisfy the demand requirements for a derivative suit on behalf of Wells Fargo. The Court did not address, however, whether standing would have been found to exist if such a showing had been made. (FN49) In any event, the plaintiffs have not adequately pled such a claim at this juncture, not having (apparently) made demand on the boards of the subsidiary company (HBOC Sub) and the parent company (McKesson HBOC) .   (FN50) Here, plaintiffs appear to contend that demand is futile as to both boards. But the plaintiffs have not identified the members of the HBOC Sub board, much less pled explicitly that making a demand on them would be futile. Furthermore, plaintiffs have not named HBOC Sub as a party, also a prerequisite for asserting a double derivative action. (FN51)

**14 Third, and finally, although it is not pleaded in the existing complaint, certain allegations made in the amended complaint and during oral argument on the motion suggest that the current shareholders of the combined McKesson HBOC may be able to assert a claim for breach of fiduciary duty directly against the directors of the combined company as a result of the directors' decision not to pursue a potential claim against the former directors of HBOC for the (alleged) fraud in connection with HBOC's accounting practices. If the directors of the combined company decided not to pursue this potential claim in a manner that is grossly negligent or self-interested, such decision may itself give rise to a potential claim for breach of the fiduciary duties of care or loyalty. That claim would be separate and distinct from a claim based on the failure of HBOC's directors to oversee or monitor properly the accounting practices at HBOC before the merger (*i.e.,* the First Oversight Claim). The claim that I am suggesting might be implicated here arose when the board of the combined company refused, conceivably for reasons related to self-interest or lack of information, to pursue a potential claim or asset of the combined company. In any event, this claim is conceivably

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

implicated by the existing pleadings and, regardless of whether or not it would withstand scrutiny on a motion to dismiss, I think, in the interest of justice, plaintiffs should be afforded an opportunity to amend their existing complaint (if possible) so as to assert it properly. By dismissing the complaint without prejudice, therefore, I afford plaintiffs an opportunity to marshal facts in support of one or more of the alternative theories implicated in the existing pleadings to avoid the impediment of the standing requirements.

### 2. The Second Oversight Claim

With the First Oversight Claim barred on standing grounds, defendants attack the Second Oversight Claim straightforwardly. They argue that the McKesson HBOC board's failure to detect and cure accounting irregularities for a mere 3 1/2 months (from the merger date in January 1999 until the disclosures of accounting irregularities in April 1999) could not possibly constitute oversight violations under the high liability standards set forth in *Graham v. Allis-Chalmers Mfg. Co.* (FN52) or *In re Caremark Int'l Inc. Derivative Litigation*, (FN53) the seminal Delaware cases addressing directors' oversight duties. This argument, no doubt, carries some intuitive appeal. It also, however, exposes the awkward bifurcation of the oversight claims alluded to earlier, which I will now explain in greater detail.

Analysis of the Second Oversight Claim is to a significant extent shaped by my analysis of plaintiffs due care and waste claims brought against the McKesson directors. In analyzing these claims, it is evident that plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors' decision to acquire HBOC was anything other than a valid exercise of business judgment, made for the good faith purpose of advancing a legitimate corporate interest. It is equally evident, despite the complaint's prolixity, that plaintiffs have not alleged facts creating a reasonable doubt that McKesson's directors acted on an informed basis or properly relied on the advice of the expert advisors they retained in connection with the due diligence review of HBOC.

**\*\*15** Within three months of the McKesson board's recommendation and McKesson shareholders' approval of the merger, the combined Company's auditor, DeLoitte & Touche, informed the board of HBOC Sub's accounting irregularities. The McKesson HBOC board, comprised of six former McKesson directors and six former HBOC directors,

responded to this information by initiating an internal investigation that culminated in a series of sweeping earnings restatements. In addition, the board made sweeping management changes, firing several senior managers and creating a new executive management structure.

In light of these facts, drawn directly from plaintiffs' complaint, it seems ineluctable that McKesson directors became aware of the accounting improprieties after the merger was consummated and immediately took decisive steps to disclose and cure them. These actions do not bespeak faithless or imprudent fiduciaries.

The role played by the six former HBOC directors on the combined Company's board in connection with the disclosure of the accounting irregularities remains somewhat unclear. A modicum of well-pled facts, sprinkled throughout the complaint, could lead to an inference that the HBOC directors might have had knowledge of suspect accounting practices and, therefore, *potential* accounting irregularities, in advance of the DeLoitte report. (FN54) If plaintiffs can allege such facts with particularity, which to this point they have not, relief from the demand requirement might be warranted.

As recounted more fully above, plaintiffs have alleged well-pled facts that in April 1997 the CFRA published a report questioning HBOC's revenue recognition practices. This report garnered a fair amount of media attention, was the focus of much analyst commentary, and appeared to have some impact, albeit brief, on HBOC's share price. Although HBOC did not issue an official response, *The Atlanta Constitution* quoted HBOC's director of investor relations as saying "we don't think [the report] warrants comment." (FN55)

These facts indicate that HBOC, at some organizational level, knew of and responded to public criticism of its accounting practices. Plaintiffs have not, however, alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities. Moreover, I do not, at this point, suggest that HBOC's board had constructive knowledge of a statement the company's investor relations department issued. In other words, I do not suggest that the mere existence of a statement from HBOC's investor relations department, made in response to the CFRA report, is sufficient to impute knowledge of such statement to the company's board of directors. (FN56) If plaintiffs can allege

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

particularized facts that might enable this Court to infer that HBOC directors (or perhaps members of HBOC's audit committee) did possess knowledge of facts suggesting potential accounting improprieties (such as knowledge of the CFRA reports) and took no action to respond to them until they were confronted (three months after the merger) with DeLoitte's audit report, one could argue that the HBOC directors (or the audit committee members) failed to act in good faith. (FN57) As a result, demand might in turn be excused.

**16** This result presents an awkward circumstance. If HBOC directors possessed knowledge of suspect accounting practices at HBOC *before* the merger, one would think such knowledge might give rise to colorable claims that McKesson, as an acquiror, could assert against HBOC under fraud-based theories or perhaps for breaches of provisions in the parties' merger agreement. McKesson, however, is not asserting such claims.

Although one may speculate as to the reasons behind McKesson's disinclination to take legal action against HBOC and its officers and directors, such speculation is completely idle absent nonconclusory allegations of fact. (FN58) Nonetheless, if plaintiffs can allege with some particularity facts indicating that HBOC directors had actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until confronted with the DeLoitte audit report in early 1999 (after the merger), such facts, to my mind, could possibly excuse demand as to the Second Oversight Claim. In addition, as indicated above, such facts could give rise to claims that McKesson might bring directly attacking the merger seeking rescission or rescissory damages; or, if McKesson HBOC was unwilling to assert contract-based claims, shareholders might endeavor to bring those claims derivatively on behalf of McKesson HBOC.

Notwithstanding the present inadequacy of the amended complaint, I am convinced that the course of action most consistent with fairness and equity is to dismiss the Second Oversight Claim without prejudice and to grant plaintiffs leave to replead and allege additional, particularized facts that would support a demand futility determination.

IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, I dismiss plaintiffs' due care and waste claims for failure to make demand under Court of Chancery Rule 23.1. Further, I dismiss the first and second oversight claims, but this dismissal is without prejudice. Using the tools at hand, plaintiffs may seek to develop additional particularized facts in order to allege properly an oversight claim that will meet the demand futility standard and to avoid the standing requirement of Delaware's continuing ownership rule.

An Order has been entered in accordance with this Memorandum Opinion.

*ORDER*

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that plaintiffs' due care and waste claims are dismissed pursuant to Court of Chancery Rule 23.1, and that plaintiffs' first and second oversight claims are dismissed without prejudice.

(FN1.) Plaintiffs' Brief at 1.

(FN2.) Complaint Ex. A.

(FN3.) Complaint Exs. C and D.

(FN4.) Complaint Ex. B.

(FN5.) Complaint at ¶ 40.

(FN6.) Court of Chancery Rule 23.1.

(FN7.) *See id; see also Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996).

(FN8.) Del.Supr., 473 A.2d 805, 814 (1984).

(FN9.) *Id.* at 814.

(FN10.) *See Aronson v. Lewis,* 473 A.2d at 812.

(FN11.) *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 936 (1993).

(FN12.) *Aronson v. Lewis* at 816 (quoting *Kaplan v. Centex,* Del. Ch., 284 A.2d 119, 123 (1971).

(FN13.) *See, e.g., Haber v. Bell,* Del. Ch., 465 A.2d 353, 358 (1983) (dismissing suit for failure to make demand where only two of thirteen directors were alleged to have material interest in decision).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)                                    Page 13

(FN14.) Although McCall's removal and Pulido's resignation from the McKesson HBOC board post-date the filing of the first derivative complaint, these events surely belie plaintiffs naked assertion that McCall and Pulido dominated the board of either the premerger or post-merger companies.

(FN15.) *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 189 (1988).

(FN16.) *Benerofe v. Cha,* Del. Ch., C.A. No. 14614, mem. op. at 19, Chandler, V.C. (Sept. 12, 1996) (quoting *Grobow,* 539 A.2d at 189).

(FN17.) *See In re 3Com Shareholders Litig.,* Del. Ch., C.A. No. 16721, mem. op. at 11, Steele, V.C. (Oct. 25, 1999) (citing *Lewis v. Vogelstein,* Del. Ch., 699 A.2d 327, 336 (1997)).

**16 (FN18.) Complaint ¶ 28.

(FN19.) *See, e. g., Gagliardi v. TriFoods Int'l., Inc.,* Del. Ch., 683 A.2d 1049, 1051 (1996) (stating that an "elementary precept of corporation law [holds that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith."); *see also Harbor Fin. Partners v. Huizenga,* Del. Ch., C.A. No. 14933, mem. op. at 34, Strine, V.C. (Nov. 11, 1999).

(FN20.) *See Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000).

(FN21.) I characterize this claim as primarily directed against the McKesson directors because the merger represented something of a windfall to the HBOC shareholders to the extent that the losses borne by HBOC shareholders in connection with the accounting irregularities were serendipitously halved (or thereabout) by virtue of the merger. In other words, because HBOC shareholders received properly valued McKesson stock for their own improperly or, rather, overvalued HBOC stock, and held only a 60% interest in the combined company, as opposed to all of it when the irregularities were disclosed and the stock price plummeted, HBOC shareholders bore only 60% of whatever losses accrued from the accounting irregularities, as opposed to 100%. Former McKesson shareholders, undoubtedly to their chagrin, bore the remaining 40% of the losses. Put more simply, by reducing their ownership interest in the company

containing the earnings overstatements from 100% to 60% through the merger, HBOC shareholders reduced their exposure to the overstatements by the same amount.

(FN22.) Plaintiffs' allegation that HBOC directors proceeded with actual knowledge of accounting irregularities is a more complicated issue. It is more properly addressed in my discussion of plaintiffs' oversight claims, *infra,* at 41-44.

(FN23.) If these facts demonstrate anything, it is merely that DeLoitte, Bear Stearns, and McKesson management performed shoddy due diligence. Plaintiffs have not brought claims against any of these parties.

(FN24.) Plaintiffs' Brief at 17.

(FN25.) 8 *Del. C.* § 141(e).

(FN26.) For an excellent description of the due diligence process in the context of a merger, *see generally,* A. Lajoux & C. Elson, *The Art of M & A Due Diligence* (2000). To conduct due diligence, acquirors typically draw from in-house sources of expertise and from retained outside consultants and advisers. *Id.* at 15.

(FN27.) *Brehm v. Eisner,* Del.Supr., 746 A.2d 244, 262 (2000).

(FN28.) *See, e. g., Gagliardi,* 683 A.2d at 1052 (stating that to "allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.").

(FN29.) *Grobow,* 539 A.2d at 190.

(FN30.) *Id.* at 191.

(FN31.) To be precise, the plaintiffs' complaint fails to allege adequately either pre-merger or post-merger bad faith or disloyalty by the McKesson or McKesson HBOC boards. Read fairly, this aspect of plaintiffs' complaint, which sounds in negligence and seeks money damages as a remedy, must be dismissed because of the § 102(b)(7) provision. *See In re Frederick's of Hollywood, Inc. Shareholders Litig.,* Del. Ch., Consol. C.A. No. 15944, mem. op. at 14-16, Jacobs, V.C. (Jan. 31,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)

2000); *In re Lukens Inc. Shareholders Litig.*, Del. Ch., Consol. C.A. No. 16102, mem. op. at 26-27, Lamb, V.C. (Dec. 1, 1999).

(FN32.) Del.Supr., 634 A.2d 927 (1993).

(FN33.) *Id.* at 934 n. 9 (stating that "where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.").

**16    (FN34.) *See In re Baxter Int'l., Inc. Shareholders Litig.*, Del. Ch ., 654 A.2d 1268, 1269 (1995) (quoting *Rales v. Blasband*, 634 A.2d at 936 (internal quotations omitted)).

(FN35.) 8 *Del. C.* § 327 provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

(FN36.) *See, e.g., Lewis v. Anderson,* Del.Supr., 477 A.2d 1040 (1984).

(FN37.) *Id.* at 1049; *see also Kramer v. Western Pac. Indus., Inc .,* Del.Supr., 546 A.2d 348, 354 (1988).

(FN38.) Del. Ch., 729 A.2d 851 (1998), *aff'd sub nom., Bradley v. First Interstate Bancorp,* Del.Supr., No. 445, Walsh, J. (March 21, 2000) (ORDER).

(FN39.) Section 259(a) provides that all rights, privileges, powers and franchises pass to the surviving corporation in the event of a merger. Derivative claims of the merged corporation constitute choses in action that pass to the surviving corporation by operation of § 259(a). *See Lewis v. Anderson,* 477 A.2d at 1044.

(FN40.) *In re First Interstate,* 729 A.2d at 867.

(FN41.) *Lewis v. Anderson,* 477 A.2d at 1046 n. 10 (citing *Bokat v.. Getty Oil Co.,* Del.Supr., 262 A.2d

246, 249 (1970); *Schreiber v. Carney,* Del. Ch., 447 A.2d 17 (1982)).

(FN42.) *In re First Interstate,* 729 A.2d at 867 (internal quotations omitted) (citing *Schreiber v. Carney* at 22; also citing *Bonime v. Biaggini,* Del. Ch., C.A. No. 6925 & 6980, Walsh, V.C. (holding second exception not applicable where merger resulted in a "corporate mix ... distinctly different from that [of pre-merger company]")).

(FN43.) 971 F.2d 1034 (3 rd Cir.1992).

(FN44.) *In re First Interstate,* 729 A.2d at 868 (footnotes omitted).

(FN45.) *Id.* at 868 n. 18.

(FN46.) *Bradley v. First Interstate Bancorp,* Del.Supr., No. 455, Walsh, J. (March 21, 2000) (ORDER) (emphasis added).

(FN47.) *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(2)(ii) at 549 (1999). Quite frankly, I also find the Third Circuit's view on this issue persuasive. To be sure, it is not consistent with the Delaware Supreme Court's holding in *Lewis v. Anderson* and, for that reason, I am not free to follow it. Nonetheless, I do not think that a principled economic argument exists for denying standing to a former HBOC shareholder who continues to hold an equity interest, albeit diluted, in the HBOC subsidiary through the controlling interest of the combined entity, McKesson HBOC. Like the Third Circuit in *Blasband,* I do not understand how the concerns that animate § 327 are implicated in stock-for-stock mergers of this kind. Indeed, the Court of Chancery has suggested that former stockholders of the subsidiary who held stock in the parent post-merger should nonetheless have standing to assert derivative claims in exactly this type of situation. *See In re Caremark Derivative Litig.,* Del. Ch., 698 A.2d 959, 972 n. 30 (1996). But if this area of Delaware law is to be made consistent with basic economic principles, as well as fundamental principles of equity and fairness, it will have to come from the Delaware Supreme Court.

**16    (FN48.) *See Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A .2d 348, 354 (1988) (describing the two exceptions to the rule that a plaintiff must be a shareholder at the time of filing of the suit and must remain a shareholder

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

2000 WL 1370341, Ash v. McCall, (Del.Ch. 2000)

throughout the litigation).

(FN49.) *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(3)(iii) at 96 (2000 Supp.).

(FN50.) 13 Fletcher Cyclopedia of Corporations, § 5977.

(FN51.) *Carlton Invs. v. TLC Beatrice Int'l. Holdings, Inc.,* Del. Ch., C.A. No. 13950, mem. op. at 17, Allen, C. (Apr. 16, 1996) ("[I]t is of course well settled that in a standard double derivative action both the parent and subsidiary corporation are indispensable parties.").

(FN52.) Del.Supr., 188 A.2d 125 (1963).

(FN53.) Del. Ch., 698 A.2d 959 (1996).

(FN54.) I emphasize the word "potential" because despite having (inconsistently) pled that every named defendant had "actual" knowledge of accounting irregularities and legal violations, plaintiffs have not asserted a single fact that might reasonably support such an allegation.

(FN55.) Complaint at ¶ 21, Ex. D.

(FN56.) I leave it to plaintiffs to adduce such facts through various pre-discovery fact-gathering methods they have at their disposal. As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the "tools at hand," most prominently § 220 books and records actions, to obtain information necessary to sue derivatively. *See, e.g., Rales v. Blasband,* 634 A.2d at 934-935 n. 10; *Brehm v. Eisner,* 746 A.2d at 249.

(FN57.) Plaintiffs allege that HBOC had an audit committee in place. In light of the known facts, one would be hard pressed to say that it performed particularly well. Nevertheless, the existence of an audit committee, together with HBOC's retention of Arthur Anderson as its outside auditor to conduct annual audits of the company's financial reporting, is some evidence that a monitoring and compliance system was in place at HBOC premerger. If a properly framed complaint were filed, the interesting question would be whether one could find directors liable on an oversight claim when those directors have retained a reputable

independent, outside auditing firm and when the same directors have appointed an audit committee that is charged with overseeing the internal and external auditors? Would these facts support a finding that the directors had "utterly fail[ed] to attempt to assure a reasonable reporting system exists" or exhibited a "sustained and systematic failure to exercise reasonable oversight [?]" *Caremark* at 971. Or do such facts indicate the malfunction or breakdown of the compliance system, rather than the absence of, or systematic failure to exercise, reasonable oversight? Without an adequately framed complaint, however, these issues are not properly before the Court. But they illustrate the problem of assessing claims, based on accounting irregularities, under the *Caremark* standard.

(FN58.) Plaintiffs have alleged, in a single conclusory paragraph, that demand was futile because the McKesson HBOC board was faced with an "inherent conflict" that made it unable to respond to the disaster or to bring suit against HBOC for fraud or breach of contract. Second Amended Compl., ¶ 77. According to the amended complaint, the McKesson HBOC board is evenly split-consisting of six former McKesson directors and six former HBOC directors. As a result, when the accounting improprieties came to light, "one half of the Board's blame was the other half of the Board's cover." Pl. Ans. Brief at 9 (Jan. 14, 2000). The notion of a paralyzed board is belied somewhat by the aggressive steps to disclose the problem and to remove certain senior managers. On the other hand, the current board's failure or refusal to pursue potential claims against HBOC's former directors and managers, or against those firms that performed the due diligence, supports the notion of an incapacitated board. But I need not address this issue now, given that plaintiffs will be afforded an opportunity to plead more particular facts about what the HBOC directors knew concerning the accounting improprieties, and when they knew it, in the context of either a direct attack on the current board's failure to pursue the claim or in a double derivative action, as mentioned earlier. Such facts, together with additional facts regarding the board's composition, would assist a court in determining whether the board is structurally unable to make an independent and disinterested judgment regarding the potential claim against HBOC.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

TAB 2



Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
BOND OPPORTUNITY FUND and Steven
Gidumal, suing on their own behalf
individually, and on behalf of shareholders of
Unilab Corporation, Plaintiffs,
v.
UNILAB CORPORATION, David C. Weavil,
Haywood Cochrane, Jr., Kirby L. Cramer,
William J. Gedale, Richard A. Michaelson, Gabriel
B. Thomas, and BT Alex.Brown,
Defendants.
No. 99 Civ. 11074(JSM).

May 9, 2003.

Former shareholders brought action against former directors, investment banker, and others, alleging that proxy materials containing false and misleading statements were issued in furtherance of a scheme to induce them to sell their shares at an unfairly low price pursuant to a buyout arising from a merger. Upon defendants' motions to dismiss, the District Court, Martin, J., held that: (1) claims failed to meet the pleading standards set out by the Private Securities Litigation Reform Act (PSLRA); (2) no claim could be maintained for control person liability; and (3) claims against investment banker were time-barred.

Dismissed.

West Headnotes

**[1] Securities Regulation ☜49.28**
349Bk49.28 Most Cited Cases
Claims of shareholders, who alleged that proxy materials containing false and misleading

statements were issued in furtherance of a scheme to induce them to sell their shares at an unfairly low price pursuant to a buyout arising from a merger, failed to meet the demanding pleading standards set out by the Private Securities Litigation Reform Act (PSLRA); although the disclosure with respect to the merger may not have been perfect, the "total mix" of information provided was complete and accurate enough to allow a shareholder to make an informed decision, none of the misstatements or omissions alleged by shareholders could pass the materiality test, and they also did not show that the directors were negligent in their failure to disclose material information in the proxy materials. Securities Exchange Act of 1934, § 21D(b), as amended, 15 U.S.C.A. § 78u-4(b); Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

**[2] Corporations ☜320(4)**
101k320(4) Most Cited Cases
Since the waste of corporate assets affects all shareholders equally, it is a derivative claim, which is extinguished upon completion of a merger.

**[3] Securities Regulation ☜49.21**
349Bk49.21 Most Cited Cases
Breach of fiduciary duty to protect corporate assets for the benefit of all of the shareholders does not give rise to a securities law claim for false and misleading statements in proxy materials. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

**[4] Securities Regulation ☜49.25(1)**
349Bk49.25(1) Most Cited Cases
Since complaint failed to state an underlying violation of statute prohibiting false and misleading statements in proxy materials, no claim could be maintained for control person liability. Securities Exchange Act of 1934, §§ 14(a), 20(a), 15 U.S.C.A. §§ 78n(a), 78t(a); 17 C.F.R. § 240.14a-9(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 2

[5] Limitation of Actions ☞99(1)
241k99(1) Most Cited Cases

[5] Limitation of Actions ☞100(1)
241k100(1) Most Cited Cases
Statute of limitations applicable to claims for false and misleading statements in proxy materials is one year from discovery or three years from the occurrence that gives rise to the complaint, whichever is less. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

[6] Limitation of Actions ☞100(12)
241k100(12) Most Cited Cases
Given that at least the basics of investment banker's role as a key player on both sides of the merger was disclosed in the proxy statement, and elaborated in the supplemental proxy, limitations period for claims for false and misleading statements in proxy materials began to run prior to investment banker's deposition, which took place one year after supplemental proxy and filing of original complaint. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

OPINION AND ORDER

MARTIN, J.

*1 This purported class action, filed by former shareholders of Unilab Corporation, arises out of a buyout of virtually all of the public shareholders of Unilab in a merger of Unilab into UC Acquisition Sub, Inc., a subsidiary of Kelso & Co., which was created for that purpose. Plaintiffs allege that the proxy statement dated October 26, 1999, and a supplemental proxy statement dated November 15, 1999, [FN1] contained false and misleading statements in violation of §§ 14(a) and 20(a) of the Securities Exchange Act, 15 U .S.C. §§ 78n(a), 78t(a). In addition, Plaintiffs assert state law claims of breach of fiduciary duty, common law fraud and deceit, and negligent misrepresentation.

> FN1. The Plaintiffs filed their original Complaint in this action, seeking to enjoin the merger, on November 4, 1999. The

supplemental proxy was prepared with the participation of Plaintiffs' counsel, and published pursuant to a preliminary settlement, subject to confirmatory discovery. The shareholder vote, in which the merger was approved, took place on November 23, 1999.

Plaintiffs claim that the allegedly misleading proxy materials were issued in furtherance of a scheme to induce shareholders to sell their Unilab shares at an unfairly low price. They contend that this scheme was intended to benefit the director defendants, BT Alex .Brown (the investment banker), Kelso, and three institutional shareholders, two of which remained shareholders after the merger. Plaintiffs claim that the extent to which Unilab stock was undervalued in the merger is demonstrated by the fact that 18 months after the buyout at $5.85 per share, Kelso took the successor company public at $16 per share, and it closed its first day of trading at $23 per share. This increase took place despite the fact that Unilab's results over that period of time were not as good as had been expected, and the stock market declined generally.

All Defendants have moved to dismiss the Third Amended Complaint pursuant to Fed.R.Civ.P. Rules 12(b)(6) and 9(b), and § 21D(b) of the Securities Exchange Act, 15 U.S.C. § 78u-4(b), for failure to state a cause of action. In addition, BT Alex.Brown has moved to dismiss the securities law claims asserted against it as barred by the statute of limitations.

*The Proxy Materials*
Plaintiffs charge that the original proxy statement contained a number of misstatements and omissions, and that the supplemental proxy that was sent to shareholders after the Plaintiffs filed the original Complaint in this action, and before the vote approving the merger, did not remedy a number of deficiencies in the disclosure with respect to the merger. Plaintiffs allege that the following statements constituted material misstatements and omissions.

1. The statement in both the proxy and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

**(Cite as: 2003 WL 21058251 (S.D.N.Y.))**

supplemental proxy that two institutional investors, Pequot Scott Fund, LP and EOS Partners, LP, were retaining a portion of their shares in the merger and that this was a benefit to other shareholders, who would be able to receive cash for all of their shares, and would allow ther merger to be accunted for as a recapitalization, was untrue because Pequot and EOS Partners actually were permitted to retain their shares primarily because they had expressed disappointment in the proposed $5.85 buy out price.

2. The proxy and supplemental proxy did not disclose that prior to the announcement of the merger, the Unilab Board had elected not to exercise a prepayment option on a $14 million note held by Oaktree, which was convertible into Unilab stock, allegedly giving Oaktree a windfall and gaining Oaktree's support for the buyout as a result.

*2 3. The proxy stated that the $5.85 buy out price was supported by earnings estimates of research analysts, when, in fact, there was only one research analyst who covered Unilab, and it was not disclosed that Unilab had urged that analyst to reduce her earnings estimates.

4. The proxy did not disclose that the financial projections that were included in the proxy were not the ones used by BT Alex.Brown in rendering its fairness opinion to the Board, and that using the same projections would have yielded an implied range of values that were $1.95 higher than the range of values presented to the Board.

5. The proxy stated that the company had engaged in an extensive auction process, which ensured that the buyout price was fair. Plaintiffs allege that this statement was false and misleading because it failed to state that in addition to its role as financial advisor to Unilab, BT Alex.Brown had agreed to provide financing to six of the nine parties that initially indicated interest in purchasing Unilab, to two of the final three bidders, and to Kelso, with whom Unilab negotiated exclusively in May 1999. Kelso, the ultimate purchaser, also agreed to permit BT Alex.Brown to purchase a 1% interest in the new company Consequently, according to Plaintiffs, BT Alex.Brown was on both sides of the

negotiations. In addition, while the proxy stated that the Board had created a special committee to oversee the negotiations, the negotiations were actually left to BT Alex.Brown, which allegedly had motivation to keep the price as low as possible and to ensure that Kelso was the winning bidder.

6. The proxy statement included a fairness opinion prepared by BT Alex.Brown, and stated that in reaching its opinion, BT Alex.Brown relied upon data prepared by management *and* publicly available research analysts' estimates, when the estimated financial data upon which BT Alex.Brown relied actually was prepared by Unilab alone and did not include projections of benefits from Unilab's recent Meris and Bio-Cypher acquisitions.

7. The Unilab net income figure for the last twelve months that was included in the proxy allegedly was understated because it did not include the benefit of Unilab's net operating loss carry forwards.

8. BT Alex.Brown allegedly did not use appropriate discount rates in the proxy, making the "discounted cash flow analysis" materially false and misleading. Moreover, the inclusion of "Projections" and the description of a discounted cash flow analysis made it appear that BT Alex.Brown had discounted the projections in arriving at its range of fairness, when, it is alleged, it had not.

The supplemental proxy disclosed BT Alex.Brown's compensation from Unilab and Kelso, BT Alex.Brown's intent to make an equity investment in UC Acquisition Sub, and the failure to include net operating loss carryforwards in BT Alex.Brown's discounted cash flow analysis, but it did not correct the alleged misrepresentations and omissions regarding the auction process, the fairness opinion, the failure to use appropriate discount rates, the failure to include the benefits of the Meris and Bio-Cypher acquisitions in the cash flow figures, the true reason why EOS and Pequot would retain their shares after the merger, the fact that only one analyst followed Unilab and that Unilab employees had urged her to reduce her price

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

projections for the company, and the benefit realized by Oakland due to Unilab's failure to prepay its note.

### Section 14(a) Claims

*3 A motion to dismiss is directed to the sufficiency of the Complaint, and, for purposes of the motion, all of the material allegations of the Complaint are assumed to be true, and are viewed in the light most favorable to the plaintiff. *Jenkins v. McKeithen,* 395 U.S. 411, 423, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The motion may be granted only if it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief. *Minzer v. Keegan,* 218 F.3d 144, 148 (2d Cir.2000), *cert. denied,* 531 U.S. 1192, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") dictates the pleading standards for Plaintiffs' claim under § 14(a) of the Securities Exchange Act and Rule 14a-9. The PSLRA requires that the complaint specify each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity upon which that belief is formed. 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." *In re: Champion,* 145 F.Supp.2d 871, 877 (E.D.Mich.2001) (citing *Helwig v. Vencor,* 251 F.3d 540, 553 (6th Cir.2001), *cert. denied,* 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002)). However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir .), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

Rule 14a-9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.
17 C.F.R. § 240.14a-9(a).

Thus, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 384-85, 90 S.Ct. 616, 621-22, 24 L.Ed.2d 593 (1970).

### Materiality

A plaintiff who charges that a statement or omission is materially false must show:

a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.
*4 *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

In the context of a merger, an omitted or misstated fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

On a motion to dismiss pursuant to Rule 12(b), the Court may dismiss for lack of materiality only if the facts that are alleged to have been omitted or misleading are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re:*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

*MCI World Com, Inc. Securities Litigation,* 93 F.Supp.2d 276, 282 (E.D.N.Y.2000). On the other hand, proxy materials need not be perfect. They need only convey a sufficiently accurate picture so as not to mislead. *Id.; Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1200 (2d Cir.1978) ("[N]it-picking should not become the name of the game.").

*State of Mind*

Although the Supreme Court has reserved decision on whether *scienter* is necessary for liability under § 14(a), *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1091 n. 5, 111 S.Ct. 2749, 2757 n. 5, 115 L.Ed.2d 929, the lower courts generally have held that the plaintiffs need only prove only negligence when seeking to impose liability under that section and Rule 14a-9. In *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298-1301 (2d Cir.1973), the Second Circuit held that with respect to a corporate defendant, plaintiffs who "represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement ... are not required to establish any evil motive or even reckless disregard of the facts." *Id.,* 478 F.2d at 1300. [FN2] Numerous other courts have held that the negligence standard also applies to § 14(a) claims against individual defendants. *See, e.g., Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 778 (3rd Cir.1976); *In re: Trump Hotels Shareholder Derivative Litigation,* Nos. 96 Civ. 7820, 96 Civ. 8527, 2000 WL 1371317, *12 (S.D.N.Y. Sept.21, 2000); *In re: Reliance Securities Litigation,* 135 F.Supp.2d 480, 511 (D.Del.2001) ("In enforcing that standard, courts should apply the standard of due diligence rather than the standard of actual knowledge or gross negligence."); *In re: McKesson HBOC, Inc. Securities Litigation,* 126 F.Supp.2d 1248, 1263 (N.D.Cal.2000); *Lichtenberg v. Besicorp Group, Inc.,* 43 F.Supp.2d 376, 384-85 (S.D.N.Y.1999), *app. dism.,* 204 F.3d 397 (2d Cir.2000); *Katz v. Pels,* 774 F.Supp. 121, 126 (S.D.N.Y.1991) ("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and

directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure.").

> FN2. In that case, the Second Circuit did "not pass on the principles that govern liability of directors and other individuals having some responsibility for the statement, as distinguished from a controlling corporation which has been the beneficiary of the action that was induced." *Gerstle v. Gamble-Skogmo,* 478 F.2d at 1298.

Therefore, under the standards imposed by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants. For this purpose, the corporation is assumed to know all that any of its agents know. *Gerstle v. Gamble-Skogmo,* 478 F.2d at 1299. However, with respect to the individual directors, the PSLRA has eliminated the "group pleading" doctrine. Therefore, Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held. *In re: Reliance,* 135 F.Supp.2d at 507; *In re: Digital Island Securities Litigation,* 223 F.Supp.2d 546, 555 (D.Del.2002) (That insiders "must have known" true facts does not satisfy the relevant pleading requirements.); *In re: NAHC, Inc. Securities Litigation,* No. 00-4020, 2001 U.S. Dist. LEXIS 16754, *64 (E.D.Pa. Oct. 17, 2001) (Under the PSLRA pleading requirements, general statements that a defendant must have been aware that statements were false by virtue of his position within the company are inadequate.). Moreover, where plaintiffs contend that the defendants had access to facts contrary to those stated in the proxy materials, they must specifically identify the reports or statements containing this information. *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

*Statements of Opinion*

*5 Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

misleading, must allege "with particularity" "provable facts" to demonstrate that the statement of opinion is both objectively and subjectively false. *Virginia Bankshares v. Sandberg,* 501 U.S. 1083, 1093-98, 111 S.Ct. 2749, 2758-60, 115 L.Ed.2d 929 (1991). Thus, the plaintiff must show both that the directors did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect. *Id.* at 2760 ("[T]o recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize § 14(a) litigation confined solely to what one skeptical court spoke of as the 'impurities' of a director's 'unclean heart.' "); *In re: Reliance Securities Litigation,* 135 F.Supp.2d 480, 514-15 (D.Del.2001) ("Disbelief or undisclosed motivation alone does not satisfy the element of fact that must be established under § 14(a)") (quoting *Freedman v. Value Health, Inc.,* 958 F.Supp. 745, 752 (D.Conn.1997)); *In re: McKesson HBOC, Inc. Securities Litigation,* 126 F.Supp.2d 1248, 1260, 1265 (N.D.Cal.2000) ("While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held."; "Plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false.").

*The Motions to Dismiss*

[1] Plaintiffs' claims fail to meet the demanding pleading standards set out by the PSLRA and in the cases. An examination of the proxy and supplemental proxy reveals that although the disclosure with respect to the merger may not have been perfect, the "total mix" of information provided was complete and accurate enough to allow a shareholder to make an informed decision. Moreover, absent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs have not set out sufficient facts to support the conclusion that the proxy and supplemental proxy contained statements that were false and misleading.

For example, Plaintiffs allege that it was not disclosed that the real reason why the Pequot Scott

Fund and EOS Partners were allowed to retain 25% and 43% of their shares, respectively, in the merger, was to buy their votes in favor of the merger after they expressed dissatisfaction with the price. However, in the proxy statement, it is stated that:

> although they would continue to have the opportunity to participate in any potential improvements of Unilab's business following the merger, the institutional stockholders of Unilab and members of Unilab's management in either case designated by UC Acquisition Sub and who agree to retain shares in the merger would, by that agreement, enable all other common stockholders to receive cash for all of their shares and ensure that the merger be accounted for as a recapitalization.

*6 The supplemental proxy elaborated further, identifying EOS Partners and Pequot Scott as the two institutional investors that would retain shares after the merger, stated the number of shares that each would retain, and stated that Mr. Weavil would retain a small percentage of his shares. Thus, the proxy does acknowledge that retaining Unilab shares would allow the institutional investors to participate in future improvements in the business. In fact, the proxy makes no other statement regarding the funds' reasons or motivation for retaining a portion of their shares. It simply does not say, or imply, that the funds agreed to retain shares in the company *in order to* benefit the other shareholders. Furthermore, Plaintiffs have done no more than speculate as to the "real motive" that they allege, and they do not explain why the Funds would agree to sell the majority of their shares at an inadequate price in return for the "opportunity" to keep fewer than half of their shares as compensation, given that the significant number of shares that they owned would have given them a fair chance of defeating the merger, had they sought to oppose it. [FN3] Nor have Plaintiffs shown that the statement that the institutional shareholders' willingness to retain some of their shares would allow the company to purchase all of the public shareholders' tendered shares and account for the transaction as a recapitalization was, in fact, false.

> FN3. There was testimony during discovery that Pequot was "disappointed"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by the merger price, but no evidence has been cited to support the claim that EOS Partners held the same view.

Plaintiffs also allege that the statement that the $5.85 buyout price was supported by the earnings estimates of independent research analysts (plural) was false and misleading because there was, in fact, only one analyst who covered Unilab stock, and Unilab employees had urged that analyst to reduce her estimates. Assuming it is true that there was only one analyst, [FN4] this distinction is *de minimus*--and not a fact that would so alter the total mix of available information that it might change the vote of a reasonable shareholder. Plaintiffs also have not pled facts to support the conclusion that simply because Unilab employees suggested to the analyst that she reduce her earnings estimates, either that her original estimates were not overly optimistic or that her judgment was so overborne that her estimates could no longer be considered independent.

> FN4. Defendants argue that it was true that there were at least two analysts covering Unilab because the Stephens report on Unilab was signed by two individuals.

Plaintiffs allege that the net income figures for the last twelve months that were included in the proxy statement were understated because they did not include Unilab's net operating loss carry forwards. However, the supplemental proxy did state that net operating loss carry forwards were not factored into the discounted cash flow analysis performed by BT Alex.Brown in connection with its fairness opinion. Even if this statement addresses a slightly different issue, it would put a reasonable investor at least on inquiry notice as to the inclusion of such figures in Unilab's cash flow analyses and income figures.

Plaintiffs assert that the directors' recommendation that the shareholders vote to approve the merger was misleading because the financial projections that were included in the proxy were not the same as those used by BT Alex.Brown in rendering its fairness opinion to the Board, and using the same projections would have yielded an implied range of values $1.95 higher than the range of values presented to the Board. However, the fairness opinion does not set out or otherwise state what financial projections BT Alex.Brown relied on in preparing its opinion. [FN5] In addition, the proxy contained a "Cautionary Statement Regarding Forward-Looking Statements" that was more than a full page long. As the Court stated in *Rodman v. Grant Foundation,* 608 F.2d 64, 72 (2d Cir.1979), a company has no duty to include "speculative financial predictions" in a proxy.

> FN5. The Fairness Opinion stated that BT Alex.Brown had "(i) reviewed the reported prices and trading activity for Unilab Common Stock, (ii) compared certain financial and stock market information for Unilab with similar information for certain other companies whose securities are publicly traded, (iii) reviewed the financial terms of certain recent business combinations which it deemed comparable in whole or in part, (iv) reviewed the terms of a draft of the Merger Agreement dated May 24, 1999, and (v) performed such other studies and analyses and considered such other factors as it deemed appropriate."

*7 Therefore, if anything, Plaintiffs' allegations regarding BT Alex . Brown's financial analyses would tend to support a claim that the Board was misled by BT Alex.Brown, not that the Board misled the public shareholders. Furthermore, if it is true that the proxy statement contained projections that yielded a higher range of values than those presented to the Board, the shareholders were, in fact, given the information from which they could have concluded for themselves that the merger price was not adequate. That is all that § 14(a) requires.

The plaintiffs allege that BT Alex.Brown did not use appropriate discount rates, making the discounted cash flow analysis contained in the "Projections" section of the proxy materially false and misleading. It is clearly stated, however, in that section, that the projections were prepared for the company's internal purposes, and are included in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 8

proxy only because they were furnished to UC Acquisition Sub and Kelso in connection with the negotiation of the Merger Agreement. [FN6] It stated further that

> FN6. There is no allegation that this statement is untrue.

It is not possible to predict whether the assumptions made in preparing the projected financial information will be valid, and actual results may prove to be materially higher or lower than those contained in the projections. The inclusion of this information should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events, and this information should not be relied on as such. None of the Company, UC Acquisition Sub or any of their respective representatives assumes any responsibility for the validity, reasonableness, or completeness of the projected financial information, and the Company has made no representation to UC Acquisition Sub regarding such information.

Thus, absent a showing that BT Alex.Brown knowingly used inappropriate rates in order to mislead the shareholders, or incompetently did so, and that the Board was negligent in its failure to discover this lack of care, this allegation cannot support a claim under § 14(a).

Plaintiffs allege that the fairness opinion prepared by BT Alex.Brown and attached to the proxy statement falsely stated that BT Alex.Brown had relied on estimated financial data from management and publicly available research analysts' estimates, when, in fact, the data was prepared by Unilab alone, and did not include benefits from the recent acquisitions of Meris and Bio-Cypher. However, the fairness opinion states that:

in arriving at its opinion, BT Alex.Brown has reviewed certain publicly available financial and other information concerning Unilab and certain internal analyses and other information furnished to or discussed with it by Unilab and its advisors. BT Alex.Brown has also held discussions with members of the senior management of Unilab and

Kelso regarding the business and prospects of Unilab.
Proxy at B-1.

Nowhere in this statement, nor in the rest of the paragraph detailing analyses and reviews conducted by BT Alex.Brown, is there mention of research analysts' estimates. The statements to which Plaintiffs object are located on page 22 of the proxy in the sections titled, "Analysis of Selected Public Companies" and "Analysis of Selected Precedent Transactions." Plaintiffs do not state on what information they base the allegation that BT Alex.Brown did not look at analysts' reports, but assuming that to be true, it is a *de minimus* misstatement, which would not have affected a reasonable shareholder's vote with repect to the merger, especially in light of the statement that

*8 The above summary is not a complete description of the opinion of BT Alex.Brown to the Board of Directors or the financial analyses performed and factors considered by BT Alex.Brown in connection with its opinion. The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, a fairness opinion is not readily susceptible to summary description. BT Alex.Brown did not form a conclusion as to whether any single factor or analysis, considered in isolation, supported or did not support an opinion as to fairness from a financial point of view. Rather, BT Alex.Brown believed that the totality of the factors considered and analyses performed by it in connection with its opinion operated collectively to support its determination as to the fairness of the Common Stock Merger Consideration from a financial point of view. Accordingly, BT Alex.Brown believes that its analyses and the summary above must be considered as a whole and that selecting portions of its analyses and factors or focusing on information presented in tabular format, without considering all analyses and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 9

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

**(Cite as: 2003 WL 21058251 (S.D.N.Y.))**

underlying    BT    Alex.Brown's    analyses    and
opinion.
Proxy at 24. [FN7]

> FN7. If Plaintiffs' complaint is that there
> was only one analyst who covered Unilab,
> that misstatement (if it actually is a
> misstatement, given that the Stephens
> report is signed by two analysts), it cannot
> be found, as stated previously, that such a
> discrepancy would affect the vote of a
> reasonable shareholder with respect to the
> merger. To allow this action to continue on
> the basis of discrepancies of this type
> would violate the direction that "nitpicking
> should not become the name of the game."
> *Kennecott Copper Corp. v. Curtiss Wright
> Corp.,* 584 F.2d 1195, 1200 (2d Cir.1978).

Furthermore, Plaintiffs present no reason to doubt
that BT Alex.Brown "reviewed certain publicly
available    financial    and    other    information
concerning Unilab," including Unilab's public SEC
filings, which are themselves incorporated by
reference into the proxy statement. In addition, the
proxy stated that the "Company's management
believed that the Meris acquisition offered a strong
opportunity for the Company." (Proxy at 15). The
proxy also referenced both the Meris and the
Bio-Cypher transactions in the Note on page 11,
which stated that the variation in year-to-year
financial results    were    primarily    due    to    the
acquisition of Bio-Cypher Laboratories on May 6,
1999, and of Meris on November 5, 1998.

[2] Some of Plaintiffs' other claims of failure to
disclose cannot support a cause of action pursuant
to § 14(a) because they are actually claims of
breach of fiduciary duty or corporate waste. [FN8]
For example, Plaintiffs claim that the Board failed
to disclose that it had declined to exercise a
prepayment option on a $14 million note held by
Oaktree, which was convertible into Unilab stock,
in order to give Oaktree additional consideration for
its shares and gain Oaktree's support for the buyout.
While apparently pled in order to demonstrate that
Oaktree realized that the merger price was
unsatisfactory and that the Defendants had to use

such a device to secure Oaktree's vote in favor of
the merger, there is nothing in the Complaint to
support Plaintiffs' conclusion that the failure to
prepay the note was a way of giving Oaktree
additional consideration for its shares and thereby
buying Oaktree's vote. Absent that speculative and
conclusory extrapolation, all that is alleged is that
the Unilab Board's treatment of the Oaktree note
violated the duty to protect corporate assets for the
benefit of all of the shareholders.

> FN8. Since the waste of corporate assets
> affects all shareholders equally, it is a
> derivative claim, which is extinguished
> upon completion of a merger. *Behrens v.
> Aerial Communications, Inc.,* Civil Action
> No. 17436, 2001 Del. Ch. LEXIS 80, *19
> (Del. Ch. May 18, 2001), *revised,* 2001
> Del. Ch. LEXIS 80 (Del. Ch. May 22,
> 2001).

*9 [3] The breach of such a fiduciary duty does not
give rise to a securities law claim, however. Section
14(a) and Rule 14a-9 relate only to disclosure
obligations. They do not give rise to a cause of
action for breach of fiduciary duty, and do not give
Plaintiffs a right to an advantageous price, or even a
fair price for their shares. *Minzer v. Keegan,* 218
F.3d 144, 151 (2d Cir.2000), *cert. denied,* 531 U.S.
1192, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001)
(There is no § 14(a) violation for merely failing to
inform shareholders that a proposed action is not
subjectively the most beneficial to an entity's
shareholders.); *Mendell v. Greenberg,* 938 F.2d
1528, 1529 (2d Cir.1991) ( "Securities laws do not
guarantee sound business practices and do not
protect investors against reverses."); *see In re:
PHLCORP Securities Tender Offer Litigation,* 700
F.Supp. 1265, 1269 (S.D.N.Y.1988) (stating, in the
context of a § 14(e) case, that as long as the relevant
underlying facts are disclosed, the securities laws do
not require insiders to characterize conflict of
interest transactions with pejorative nouns or
adjectives) (citing *Goldberg v. Meridor,* 567 F.2d
209, 218 n. 8 (2d Cir.1977), *cert. denied,* 434 U.S.
1069 (1978)).

Furthermore, claims based on Defendants' failure

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 10

to disclose past acts that may have negatively impacted the value of Plaintiffs' shares do not state a cause of action pursuant to § 14(a) because knowledge of those facts, which would tend to support a conclusion that the corporation was worth *less* than the value attributed to it by the market, would not have influenced a reasonable shareholder to decline to sell his or her shares and reject the merger. *Minzer v. Keegan,* 218 F.3d at 149; *In re: McKesson HBOC, Inc. Securities Litigation,* 126 F.Supp.2d 1248, 1260 (N.D.Cal.2000).

Plaintiffs' claims relating to the statements regarding the auction process through which Unilab found a buyer for the company are somewhat similar in that they have more weight as complaints about the way the Board conducted the process, than about the disclosure related to that process. Plaintiffs allege that the statement that the auction process ensured that the buyout price was fair was false and misleading because it did not reveal either the full extent of BT Alex.Brown's role throughout that process or BT Alex.Brown's alleged motivation to keep the price low and to ensure that Kelso was the ultimate purchaser, and did not reveal that the special committee appointed to supervise the final negotiations with Kelso allegedly abdicated its responsibilities and left those negotiations entirely in BT Alex.Brown's hands.

However, an examination of the proxy statement and supplemental proxy reveals that the disclosure on these subjects was at least adequate to place a reasonable shareholder on inquiry notice as to the relevant facts. The original proxy stated that BT Alex.Brown had acted as a financial advisor to Unilab in connection with the merger and would receive a fee for its services, "a significant portion of which is contingent upon the consummation of the merger," that BT Alex.Brown would be participating in the financing of the merger, and that it had provided financial services to both Unilab and Kelso in the past. The supplemental proxy added more specific information about BT Alex.Brown's role in the financing of the merger, and stated that an affiliate of BT Alex.Brown would act as "lead arranger, book manager, administrative agent and a lender under Unilab's new credit

facility," and as a deal manager for Unilab's repurchase of its outstanding notes, and it set forth the fees that BT Alex.Brown would receive for those services. It also stated that BT Alex.Brown and Kelso anticipated that an affiliate of BT Alex.Brown would make an approximately $2 to $3 million investment in UC Acquisition Sub. Plaintiffs have presented no facts beyond those set forth in the proxy and supplemental proxy with respect to BT Alex.Brown's role to support their contention that BT Alex.Brown was motivated to keep the price to be paid for the shares as low as possible, [FN9] and to ensure that Kelso was the ultimate purchaser.

> FN9. The proxy states that upon completion of the merger, BT Alex.Brown would receive an aggregate financial advisory fee equal to 1% of the aggregate consideration paid, a fact that would make it in BT Alex.Brown's interest to negotiate a higher share price. On the other hand, BT Alex.Brown's role as an equity investor in the new company, which is disclosed in the supplemental proxy, creates an interest in a lower price. Regardless of what BT Alex.Brown's motivations may have been in this regard, its multiple roles were disclosed to the Unilab shareholders.

*10 According to Plaintiffs, the strongest evidence that the disclosure in the proxy materials was misleading is the fact that eighteen months later, UC Acquisition Sub shares sold for as much as $17.15 (or 300%) more than the price paid in the merger, even though the stock market fell generally over that period of time. Defendants respond that this argument constitutes an impermissible attempt to plead fraud by hindsight. "Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). *See also In re: NAHC, Inc. Securities Litigation,* No. 00-4020, 2001 U.S. Dist. LEXIS 16754, *34 (E.D.Pa. Oct. 17, 2001), *aff'd,* 306 F.3d 1314 (3rd Cir.2002) ("To

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 11

be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). The mere fact that the shares increased in value over the eighteen months subsequent to the merger does not, in itself, constitute any evidence of a securities law violation.

Furthermore, Defendants indicated in the proxy statement that they believed that Unilab stock was worth more than its current market price. The proxy stated, "Notwithstanding the significantly improved financial performance, the Company's stock price was essentially flat. As a result, the Company believes its historical stock market price has not fully reflected the Company's true value." (Proxy at 15). In fact, it is stated that this was a major reason for seeking a purchaser for the company. In addition, the section titled "Historical and Recent Market Prices Compared to Consideration to be Received by Holders of Common Stock" showed that over the 2 1/2 to 3 months prior to the issuance of the proxy statement, the price of Unilab shares had risen markedly (Proxy at 18), and the "Premiums Analysis" in the proxy showed that the premium implied in the merger had decreased from 122.9% in March 1999, to 53.4% in April, to 18.5% on the day prior to the public announcement of the merger. (Proxy at 23).

For the reasons stated, none of the misstatements or omissions alleged by Plaintiffs can pass the materiality test of § 14(a). Moreover, even if one or more of the alleged misstatements or omissions were actually false and misleading, and could, in fact, have altered the "total mix" of available information in a way that might have caused a reasonable shareholder to withhold his or her vote for the merger, Plaintiffs have not shown that the directors were negligent in their failure to disclose that information in the proxy materials. Given that knowledge cannot be attributed to directors simply by virtue of their positions, it is difficult to imagine that the directors knew or should have known of the alleged flaws in the financial analyses, which allegedly were so hidden that Plaintiffs' counsel, who engaged in exacting scrutiny and began confirmatory discovery prior to the approval of the

merger, and who are experts in this field, were satisfied with the supplemental proxy. In fact, Plaintiffs allege that due to BT Alex.Brown's overreaching, the directors were affirmatively misled by BT Alex.Brown. In addition, they claim that despite diligent inquiry, they themselves were not able to discover the true facts until November 1, 2000. Thus, Plaintiffs present no support either for the proposition that the directors did not believe that the price paid for the shares in the merger was fair from a financial point of view, and that it was in the best interests of the shareholders generally, or that they were negligent in not discovering that their belief was incorrect.

*11 In this regard, it is extremely significant that all of the defendant directors sold all or most of their Unilab shares for the same $5.85 buyout price that was paid to the public shareholders. The one exception was defendant Weavil, who retained less than 6% of his shares (85,000 out of total holdings of 1,487,428 shares). As the Second Circuit stated in *Shields v. Cititrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994), we must "assume the [director] defendant[s are] acting in [their] informed economic self-interest." *See also Kalnit v. Eichler,* 264 F.3d 131, 141 (2d Cir.2001) ("Where plaintiff's view of the facts defies economic reason, ... it does not yield a reasonable inference of fraudulent intent."; achieving a superior merger would have benefitted all shareholders, including defendants). Thus, achieving a higher price for the shares would have benefitted the directors, and particularly defendant Weavil, whose holdings were substantial.

Plaintiffs attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price, and therefore they had no motivation to ensure that the shareholders receive the highest price possible. This, however, does not negate these directors' self-interest in achieving a higher price for their shares. Since it is very common for directors and officers of a company to be given the opportunity to purchase shares at below market prices, acceptance of Plaintiffs' theory in this regard, without a further factual showing, would raise suspicion about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

**(Cite as: 2003 WL 21058251 (S.D.N.Y.))**

Page 12

directors' and officers' "conflicts" in any case where directors and officers have been given such opportunities. Furthermore, the proxy contains full disclosure as to the exercise prices of the directors' options. (Proxy at 47).

*Section 20(a) Control Person Liability*

[4] In order to maintain a cause of action for control person liability under § 20(a), 15 U.S.C. § 78t(a), plaintiffs must establish: (1) an underlying violation by a control person or entity; (2) that the defendants are controlling persons; and (3) that the defendants were in some meaningful sense culpable participants in the fraud. *In re: Digital Island Secs. Litigation,* 223 F.Supp.2d 546, 560 (D.Del.2002). Since the Complaint fails to state an underlying violation of § 14(a), plaintiffs' claims pursuant to § 20(a) must be dismissed as well. *Feasby v. Industri-Matematik Int'l Corp.,* No. 99 Civ. 8761, 2000 WL 977673, *7 (S.D.N.Y. July 17, 2000); *Ellison v. American Image Motor Co.,* 36 F.Supp.2d 628, 641 (S.D.N.Y.1999). This being the case, there is no need to determine whether the defendant directors were controlling persons within the meaning of the securities laws and whether they were culpable participants in an underlying securities violation.

*State law claims*

Plaintiffs have alleged state law claims of breach of fiduciary duty against the directors, and of fraud and deceit against the directors and Unilab. Since jurisdiction over these claims is asserted solely on the basis of the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and the court has found that the securities law claims over which it has original jurisdiction should be dismissed, there is no reason or basis upon which to retain supplemental jurisdiction over the state law claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Leyh v. Property Clerk of City of New York Police Dep't,* 774 F.Supp. 742, 747 (E.D.N.Y.1991). Therefore, Plaintiffs' state law claims shall be dismissed as well.

*Claims Against BT Alex.Brown*

*12 Plaintiffs added BT Alex.Brown as a defendant in this action in an Amended Complaint filed in September 2001. They asserted claims against BT Alex.Brown under § 14(a), for aiding and abetting the directors' breach of their fiduciary duties, fraud and deceit, and negligent misrepresentation. BT Alex.Brown contends that the § 14(a) claim should be dismissed because it did not participate in the solicitation of proxies and there was no substantial connection between the use of BT Alex.Brown's name and the solicitation effort, *see Lazzaro v. Manber,* 701 F.Supp. 353, 367 (E.D.N.Y.1988), and because the claims are time-barred.

[5] The statute of limitations applicable to the § 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less. *Ceres Partners v. GEL Associates,* 918 F.2d 349, 362-63 (2d Cir.1990). Although the original Complaint was filed in this action in November 1999, Plaintiffs did not name BT Alex.Brown as a defendant until nearly two years later. BT Alex.Brown contends that Plaintiffs were on inquiry notice as to its role in the merger as of November 1999, causing the one year limitations period to begin to run. Plaintiffs argue that they did not learn the true facts of BT Alex.Brown's involvement until they took BT Alex.Brown's deposition in November 2000, and that therefore the limitations period should not expire until November 2001.

In *LC Capital Partners v. Frontier Ins. Group,* 318 F.3d 148 (2d Cir.2003), the Second Circuit stated:
    The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action *or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge.*"
318 F.3d at 154 (citing *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.), *cert. denied,* 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992)) (emphasis in original).

In *LC Capital Partners,* the Court elaborated:
    As we have explained, "when the circumstances

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 13

would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." "Such circumstances are often analogized to 'storm warnings."'
The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor "in the exercise of reasonable diligence, should have discovered" concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.
*Id.* (citations omitted).

In this case, Plaintiffs claim that because they began to make inquiry immediately upon issuance of the proxy in late October/early November 1999, knowledge of BT Alex.Brown's role should not be imputed until they actually learned all the facts in November 2000. This argument is unconvincing, however. *LC Capital Partners* holds that the running of the statute of limitations against a plaintiff who has attempted to make an inquiry and learn the facts will be delayed as compared to the application of the statute in a situation to a plaintiff who simply sat back and made no such attempt. However, this does not mean that a plaintiff can move that inquiry along slowly, limited only by the otherwise applicable three year maximum limitations period. Thus, the Second Circuit clearly referred to the point at which, "in the exercise of reasonable diligence, [the plaintiff] should have discovered" the facts of the alleged fraud as the point at which the statute of limitations begins to run against a plaintiff who makes an inquiry. A minimal or lackadaisical investigation will not serve to extend the statute of limitations until the plaintiff actually learns facts that could have been discovered much earlier had a diligent investigation taken place.

*13 [6] In this case, given that at least the basics of BT Alex.Brown's role as a key player on both sides

of the merger was disclosed in the October 26, 1999 proxy statement, and elaborated in the supplemental proxy dated November 15, 1999, it is incomprehensible how Plaintiffs can claim that they were not sufficiently aware of BT Alex.Brown's involvement in this transaction to name it as a defendant in this action prior to its deposition in November 2000. Nor is it understandable how Plaintiffs can claim that they engaged in a diligent inquiry yet did not obtain the testimony of a BT Alex.Brown representative until a full year after the merger took place. Accordingly, the statute of limitations has run on Plaintiffs' § 14(a) claims against BT Alex.Brown, and those claims will be dismissed.

*State Law Claims Against BT Alex.Brown*

Since jurisdiction over the state law claims against BT Alex.Brown is founded on the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and the securities law claims against BT Alex.Brown are being dismissed, the state law claims against BT Alex.Brown shall be dismissed as well. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

For the foregoing reasons, the securities claims asserted against Unilab and the director defendants in the Third Amended Complaint are dismissed pursuant to Fed.R.Civ.P. Rules 12(b)(6) and 9(b), and § 21D(b) fo the Securities Exchange Act for failure to state a cause of action. The securities claims against BT Alex.Brown are dismissed as time-barred. Upon dismissal of all of the federal claims asserted in the Third Amended Complaint, the state law claims are dismissed as well.

SO ORDERED.

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Page 14

• 2002 WL 32496021 (Trial Motion, Memorandum and Affidavit) Notice of Motion (May. 24, 2002)

• 2002 WL 32496027 (Trial Motion, Memorandum and Affidavit) Notice of Renewed Motion of Unilab Corporation to Dismiss the Third Amended Complaint (May. 24, 2002)

• 2002 WL 32496028 (Trial Motion, Memorandum and Affidavit) Notice of Motion (May. 24, 2002)

• 2002 WL 32595546 (Trial Motion, Memorandum and Affidavit) Notice of Motion (May. 24, 2002)

• 2002 WL 32595547 (Trial Motion, Memorandum and Affidavit) Notice of Motion (May. 24, 2002)

• 2002 WL 32595548 (Trial Motion, Memorandum and Affidavit) Notice of Renewed Motion of Unilab Corporation to Dismiss the Third Amended Complaint (May. 24, 2002)

• 2002 WL 32495915 (Trial Pleading) Third Amended Complaint (May. 16, 2002)

• 2002 WL 32595545 (Trial Pleading) Third Amended Complaint (May. 16, 2002)

• 2002 WL 32496019 (Trial Motion, Memorandum and Affidavit) Notice of Motion for Admission Pro Hac Vice of James D. Mathias (Jan. 03, 2002)

• 2002 WL 32595544 (Trial Motion, Memorandum and Affidavit) Notice of Motion for Admission Pro Hac Vice of James D. Mathias (Jan. 03, 2002)

• 2001 WL 34545558 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Unilab's Motion to Dismiss the Second Amended Complaint (Nov. 27, 2001)

• 2001 WL 34545559 (Trial Motion, Memorandum and Affidavit) Notice of Motion of Unilab Corporation to Dismiss the Second Amended Complaint (Nov. 27, 2001)

• 2001 WL 34545619 (Trial Motion, Memorandum and Affidavit) Bt Alex. Brown Incorporated's

Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Second Amended Complaint (Nov. 27, 2001)

• 2001 WL 34611491 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Unilab's Motion to Dismiss the Second Amended Complaint (Nov. 27, 2001)

• 2001 WL 34611494 (Trial Motion, Memorandum and Affidavit) Notice of Motion of Unilab Corporation to Dismiss the Second Amended Complaint (Nov. 27, 2001)

• 2001 WL 34611495 (Trial Motion, Memorandum and Affidavit) Bt Alex. Brown Incorporated's Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Second Amended Complaint (Nov. 27, 2001)

• 1:99cv11074 (Docket)

(Nov. 04, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.