# TAB 3

*382979  UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

R. Arnold BOYER
v.
WILMINGTON, MATERIALS, INC.,
et al.

No. CIV. A. 12549.
June 27, 1997.

Wayne N. Elliott, Esquire Pricket, Jones, Elliott, Kristol & Schnee P.O. Box 1328 Wilmington, DE 19899

Joanne Shalk, Esquire Smith, Katzenstein & Furlow P.O. Box 410 Wilmington, DE 19899

Daniel B. Rath, Esquire Duane, Morris & Heckscher P.O. Box 195 Wilmington, DE 19899

Jeffrey S. Goddess, Esquire Rosenthal, Monhait, Gross & Goddess P.O. Box 1070 Wilmington, DE 19899

ALLEN

Dear Counsel:

**1 Pending are cross-motions for summary judgment. This suit arises from the sale of substantially all of the assets of Wilmington Materials, Inc. ("WMI') to Delaware Aggregates, Inc. ("DAI"), a corporation in which several of the directors of WMI have an interest. The suit is brought individually and derivatively on behalf of WMI by Arnold Boyer ("Boyer" or "Plaintiff"), a director and shareholder of WMI, against other directors (the "Individual Defendants") of WMI and against the company itself, and DAI (collectively, "Defendants"). The complaint asserts claims of breach of fiduciary duties and violations of a shareholders' agreement against the individual defendants, breach of the shareholders' agreement against WMI, and a claim of tortious interference with contract against DAI, all of which relate to the sale of WMI's assets to DAI. Defendants have filed cross-motions for summary judgment on all claims made by plaintiff, except the breach of fiduciary duty claims. One of the individual defendants, Joseph Corrado ("Mr. J. Corrado"), asserts a counterclaim against plaintiff alleging that plaintiff owes him $30,250 arising out of an obligation of indemnification pursuant to the shareholders' agreement.

Argument on the cross-motions for summary judgment was held on March 12, 1997. In a ruling from the bench, certain aspects of plaintiffs motion were denied at that time. For the reasons that follow, I now deny plaintiffs motion for summary judgment and grant defendants' cross-motion for summary judgment in part. Further, I deny defendants' motion for summary judgment on his counterclaim.

*A. Background.*

A brief summary of the relevant undisputed facts follows.

1. *Capitalization and Structure of WMI.*

WMI was incorporated in February 1987 for the purpose of owning and operating a hot mix asphalt plant. A May 1987 shareholders' agreement among all of the investors (the "Shareholders' Agreement") provided that 1,000 shares of WMI stock be issued to the shareholders as follows: plaintiff received 250 shares, and the remaining six shareholders each received 125 shares. In practice the six shareholders were aligned in three groups, each holding 250 shares. The three groups are: Frank and Joseph Corrado (the "Corrado Defendants"), Verino Pettinaro and Leonard Iacono, and Kenneth A. Kershaw and Stephen A. Cole. Shares of WMI common stock were issued to the shareholders for $200 per share.

The shareholders' agreement also contained provisions relating to the capitalization and governance of WMI. First, each shareholder group was obligated to lend WMI $25,000 interest free to serve as working capital for the corporation. The agreement also required shareholders to make additional, interest-bearing loans to WMI at the request of the board. Second, under conditions described in the agreement dividends and commissions (or rebates) on sales of hot mix products would be paid to the shareholder affiliates. Third, the agreement obligated each shareholder and the shareholders' affiliate companies to purchase all of their hot mix needs from WMI. Fourth, although not contained in the shareholders' agreement, the bylaws of WMI provided that each shareholder will serve as a board member so long as he held stock in the corporation.

2. *"License" Agreement.*

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

**2 In order to begin operations, WMI needed to locate its hot mix plant and needed capital to acquire and operate it. Thus, on May 25, 1987, WMI entered into an agreement with Delaware Residual Products, Inc. ("Residual"), the owner of a suitable tract of land. Under that agreement WMI gained the right to use a portion of land owned by Residual in the Minquadale area of New Castle County, Delaware for a fifteen year term. This agreement was characterized by the parties as a license (the "License Agreement"). The license agreement obligated WMI to pay $36,000 per year with an increase to $48,000 in years six through ten and to $55,000 in years eleven through fifteen. At the time the license agreement was signed, the Corrado defendants were the controlling stockholders of Residual and Mr. J. Corrado served as its president.

WMI obtained working capital loans from Mellon Bank ("Mellon") on the guarantee of defendants or their affiliates. The bank required that WMI assign its rights under the lease as security for the loans. Thus, WMI could not alter its residual rights in the lease without Mellon's prior consent.

3. *Sanifill Deal and the Holdback Provision.*

In June 1991, Residual merged with Sanifill of Delaware, Inc. ("Sanifill") to form a new entity, Delaware Recyclable Products, Inc. ("DRPI"). The Corrado defendants retained no equity interest in the resulting entity, DRPI. Sanifill preferred that DRPI use all of the Minquadale property for landfill operations and thus desired to terminate the license agreement. A provision in the merger agreement obligated Residual to use its best efforts to cause WMI to abandon its license agreement. Therefore, Sanifill withheld $1.5 million of the purchase price of the land (the "Holdback") until DRPI was able to secure an amendment to the license agreement with WMI. The amendment proposed that WMI would have to move the hot mix plant from its current location on DRPI's property within eighteen months of being given notice to do so by DRPI. Mellon Bank consented to this amendment prior to the closing of the merger between Sanifill and DRPI. WMI had no notice of the merger between Residual and Sanifill nor was it asked to agree to amend the license agreement prior to the merger.

In fact, the Corrado defendants did not disclose the merger to WMI until August 12, 1991. At that time, the Corrado defendants sent a letter to the WMI stockholders requesting that they agree to the amendment and announcing that they had identified a new location in Edgemoor to which the hot mix plant could be relocated.

Plaintiff did not favor moving the hot mix plant to Edgemoor and wrote a letter to WMI's president, Mr. Iacono, identifying the reasons why he objected to the move and suggesting that, if the move were to take place, each shareholder group should receive $200,000 as consideration for amending the license agreement. Opposition to the proposed move also came from another shareholder, Mr. Cole.

4. *Sale of Assets to Delaware Aggregates, Inc.*

**3 Because the directors of WMI could not agree that the plant should be moved to Edgemoor, in the fall of 1991 management began to investigate the possibility of selling all of WMI's assets, including of course the lease on the DRPI property, to DAI. The Corrado defendants and Mr. Kershaw were officers and directors of DAI at this time.

In preparation for a possible sale of assets to DAI, the Corrado defendants obtained estimates of the value of WMI's two principle assets, the hot mix plant and a Caterpillar front loader from two companies which deal in used asphalt formulating equipment, CMI Corp. And GenTec Equipment Co. These estimates valued the hot mix plant at between $670,000 and $750,000, and the loader at $125,000 to $130,000. No estimate was obtained for the 'recycled asphalt product' ('RAP') owned by WMI which allegedly also has some value, nor was the value of the license agreement determined. In addition to the estimates for the plant and the front loader, the Corrado defendants obtained an estimate of the value of WMI's assets from Duane, Morris & Heckscher ("DM & H"), a law firm which acted as WMI's counsel. DM & H utilized a capitalization of earnings formula to arrive at an estimate. The values arrived at by DM & H were similar to those given in the appraisals obtained by the Corrados.

DM & H, as counsel to WMI, advised WMI that any transaction between it and DAI, if challenged, would be evaluated under the entire fairness standard because the Corrados and Mr. Kershaw were directors of both corporations. Thus, DM & H prepared a plan of action which would allow WMI to complete the sale of assets to DAI in such a way that, in DM & H's opinion, the transaction would survive entire fairness review. On January 6, 1992 the directors of WMI, other than Mr. Boyer and Mr. Cole, met to discuss the plan for selling WMI's assets to DA. DM & H attended that meeting. Mr. Boyer

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

and Mr. Cole were not informed about nor invited to attend this meeting.

After the meeting, a special meeting of the WMI board of directors was called to take place on January 14, 1992. No announcement of the purpose of this meeting was made to Mr. Boyer or Mr. Cole. At the special meeting, Mr. Iacono delivered a letter to Mr. Boyer and Mr. Cole stating that DAI had offered to purchase substantially all of WMI's assets. Next, the individual defendants followed a planned procedural meeting agenda in which they outlined the terms of the DAI proposal and indicated their support for it. Ultimately, the board voted to approve the sale, with Mr. Boyer and Mr. Cole dissenting. According to the terms of the sale, the hot mix plant and the loader were sold to DAI for $825,000. The RAP material was also acquired by DAI, in exchange for transporting it from the DRPI site.

At the January 14th meeting, after voting to approve the sale of assets, the WMI board passed a resolution purporting to affect the obligation on the loans made to WMI by the shareholders. The resolution provided that the loans would not be repaid in cash, but would be treated as if they were converted into an equivalent dollar amount of WMI common stock. These shares would not, however, have any voting rights.

*B. Claims on Which the Court Has Denied Summary Judgment.*

1. *Fair Price.*

**4 The parties have agreed that the sale of assets to DAI, because it was an interested transaction, is properly reviewed under the entire fairness standard. See *Weinberger v. U.O.P.*, Del.Supr., 457 A.2d 701 (1983). The entire fairness test requires the interested party to establish that "the transaction was the product of fair dealing and fair price." *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345, 361 (1993). Plaintiff contended that, as a matter of law, defendants cannot establish that the price paid by DAI for WMI's assets was fair.

Plaintiff argued that the appraisals obtained by the Corrado defendants cannot be relied upon as accurate because the Corrados themselves selected the companies which provided the appraisals. Furthermore, argued plaintiff, it was DAI, not WMI, which suggested $825,000 as a fair price for the assets. WMI did not attempt to negotiate this price with DAI nor did it seek alternative offers. Plaintiff also attacked DM & H's calculation of the assets' value as being far too low. Specifically, plaintiff challenged the assumptions and the variables employed in DM & H's formula. To support his position, plaintiff submitted an alternative capitalization of earnings formula based on a model created by Horty and Horty, an accounting firm used by WMI in the past. Horty and Horty originally used this formula to calculate the value of WMI in 1988. Plaintiff asserted that the value of WMI is more fairly determined by using the Horty and Horty formula with the company's current numbers than by the capitalization formula employed by DM & H. The Horty and Horty formula, claimed plaintiff, has been used with the agreement of all WMI directors in the past to value its assets and, is, therefore, a more appropriate formula to use than one crafted by lawyers.

I concluded at the end of the summary judgment argument that determining what valuation formula should be used to calculate the fair value of the assets sold to DAI cannot be done without further testimony. For instance, it is not clear what assumptions the Horty and Horty formula make about the stability of the environment in which the assets are evaluated. In other words, if the Horty and Horty model relies on the assumption that past earnings are an accurate predictor of future earnings, that assumption must be established, and its applicability to the environment present at the time of the deal attacked must be assessed. In a business such as WMI's, where the owners of the business are virtually its exclusive customers, and major changes in the location and composition of the company have taken place, it is not at all clear that prior year's earnings will provide a reasonable predictor of future earnings.

2. *Disclosure of the Holdback.*

Plaintiff claimed that the Corrado defendants did not disclose to the other shareholders and directors of WMI, before the vote on the asset sale, the existence of the $1.5 million holdback. As discussed previously, Sanifill "held back" $1.5 million from Residual when the two entities merged. The holdback was to be paid to Residual as soon as WMI agreed to either: (1) move its hot mix plant to a different location or (2) surrender its rights to license the land on Residual's property upon which the hot mix plant was located at the request of Sanifill. The sale of WMI's assets to DAI fulfilled the first alternative and the Corrados, as owners of Residual, received the $1.5 million holdback.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

**\*\*5** According to plaintiff, the Corrado defendants' failure to disclose the holdback raises three separate claims: (1) WMI did not obtain a fair price in the DAI transaction because it was unable to negotiate with either Corrado-controlled entities, Residual or DAI, to receive some compensation for agreeing to vacate the Minquadale site; (2) a breach of the duty of loyalty by the Corrado defendants; and (3) a breach of the duty of care by the WMI board which was uninformed of the holdback at the time it voted to approve the merger.

At the conclusion of the hearing on the plaintiff's motion for summary judgment, I denied the motion with respect to the first claim. Although it is uncontested that the Corrado defendants kept secret the existence of the holdback until after the sale of assets to DAI, the effect of this failure to disclose on WMI's ability to extract additional consideration for giving up its rights in the license agreement is unclear. It is not inconsistent with the record that had the WMI board known that the Corrado defendants stood to gain $1.5 million as a result of the sale, it could have used its rights in the lease as a lever to extract a better price from Corrado-controlled DAI for WMI's assets, or to force the Corrado defendants to share the value of the holdback with WMI. The WMI board was unable to negotiate in this manner with the Corrado defendants because it did not know that the holdback existed. I concluded, however, that at this stage, I am unable to hold that defendants could not establish that the terms of the transaction were, nevertheless, entirely fair.

I address the duty of care and duty of loyalty claims, on which I did not rule from the bench, in the following section.

*C. Plaintiff's Remaining Claims.*

1. *Applicable Standard.*

Summary judgment will only be granted where there exists no genuine issue of material fact in dispute and the moving party is entitled to judgment as a matter of law. Ch. Ct. R. 56(c); *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 58-59 (1991), *cert. denied*, 112 S.Ct. 1946 (1992). The burden of proof to establish the absence of any material factual dispute rests with the moving party and any doubt will be resolved against that party. *Brown v. Ocean Drilling & Exploration Co.*, Del.Supr., 403 A.2d 1114, 1115 (1979). In addition, the Court will view the evidence in the light most favorable to the non-moving party. *Seagraves v. Urstadt Property, Co.*, Del. Ch., C.A. No. 10307, Jacobs, V.C., slip op. at 3 (April 1, 1996).

2. *Breach of Fiduciary Duties.*

In my judgment the entire fairness of this transaction requires additional evidence before a responsible judicial judgment may be reached.

A. Duty of Care Theories.

Plaintiff asserts that the WMI directors breached their duty of care in several respects. First, he claims they were uninformed about the $1.5 million holdback which the Corrado defendants received as a result of the sale of assets to DA, and that this condition rendered the directors liable for lack of care, and that reasonably active directors would have been informed. Second, and more generally, plaintiff asserts that defendants were not adequately informed about the merits of the proposed asset sale to DAI and, therefore, breached their duty of care in approving the transaction. Plaintiff alleges that the fact that the January 14th meeting lasted only one hour provides circumstantial evidence relevant to a conclusion that the board was not adequately informed. With respect to the first assertion, although defendants do not contest plaintiff's claim that the Corrados failed to disclose the existence of the holdback to the other WMI directors before the DAI transaction was voted upon, this fact does not establish that the directors failed to fulfill their fiduciary obligation to take reasonable steps to be informed about the merits of the transaction. Directors do not breach their duty of attention where, through no fault of their own, relevant information is withheld from them by others. In this case, plaintiff does not allege that the directors should have known that the Corrado defendants would receive a $1.5 million payment upon completion of the sale to DA. Therefore, summary judgment on a duty of care claim against the WMI directors who approved the sale cannot follow from their ignorance of the holdback. As to the second assertion, I am unable to grant plaintiffs motion for summary judgment on a breach of due care claim. There is no requirement under Delaware law that a board meeting last a minimum amount of time to be sufficient for the directors to fully consider a proposal such as a sale of assets. *See, e.g., Citron v. Steego Corp.*, Del. Ch., C.A. No. 10171, Allen, C. (Dec. 23, 1992). Here, five of the seven directors of the WMI board were familiar with the proposal before the January 14th meeting. I cannot conclude without further evidence that at the time the proposal was voted upon, the board as a

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

whole was not appropriately informed of the material terms of the transaction or the circumstances or that it failed fully to consider the merits of the transaction before approving it.

B. Duty of Loyalty: Fair Dealing.

**\*\*6** Because the sale of WMI's assets was an interested director transaction, the individual defendants must establish that it was entirely fair to the disinterested parties and to the corporation. *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701, 710 (1983). Entire fairness has two components: fair price and fair dealing. Fair dealing relates to "when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* at 711. Fair price, on the other hand, focuses on the financial conditions of the sale and seeks to determine whether the price paid for the assets reflected their true value. *Id.* I have concluded that whether the price paid for WMI's assets constituted a "fair price" could not be determined without further testimony. Therefore, I now turn to the fair dealing claims.

Plaintiff cites the following aspects of the transaction and asserts that they establish a breach of the individual defendants' duty to deal fairly as a matter of law. First, the price of the assets to be sold to DAI was never negotiated by an independent committee of directors. Instead the price was determined by appraisals of the equipment's value obtained by the Corrado defendants, who were also the buyers, and corroborated by a capitalization of earnings valuation performed by DM & H, a law firm not ordinarily in the business of providing valuations.

Second, the transaction was approved by a straight majority vote of the board, not a majority of the minority shareholders. Plaintiff contends that since all the board members who approved the transaction were directors or shareholders of DAI at the time the transaction was approved, or shortly thereafter, the asset sale was inherently unfair.

Third, plaintiff and Mr. Cole, the two directors who expressed interest in keeping WMI at the Minquadale site, were not told about the sale of assets proposal until the January 14, 1992 meeting at which it was voted upon. The other directors had met with DM & H to discuss the proposal on January 6th.

Fourth, plaintiff asserts that the individual defendants purposefully timed the proposal to purchase WMI's assets in order to take advantage of certain existing conditions which operated to DAI's benefit at the expense of WMI. For instance, according to plaintiff, the appraisals and the capitalization of earnings valuation both rendered artificially low values for WMI's assets because (1) the equipment market was flooded at the time the appraisals were done and (2) WMI's earnings were particularly low that year. In addition, plaintiff claims that at the time the valuations were calculated the Corrado defendants had reason to suspect that they would be awarded a lucrative contract to participate in a highway reconstruction project in Cherry Hill, N.J. According to plaintiff, the value that this project ultimately brought to DAI through sales of hot mix should have been included in the valuation of WMI's assets.

**\*\*7** Fifth, the acknowledged failure of the Corrado defendants to disclose the existence of the holdback is said to constitute a breach of candor and a manipulation of corporate process.

For the following reasons I conclude that plaintiff has not alleged facts which permit the Court to conclude on a motion for summary judgment that defendants failed to meet their fiduciary obligation of fair dealing. First, addressing plaintiffs two initial claims, there is no requirement under Delaware law that even in an interested transaction an independent committee of directors must negotiate the price of a sale of assets nor is it required that the sale be approved by a majority of the minority shareholders. *Jedwab v. MGM Grand Hotels, Inc.*, Del. Ch., 509 A.2d 584, 599 (1986); *Bershad v. Curtiss-Wright Corp.*, Del.Supr., 535 A.2d 840, 846 (1987). That is not to say that the lack of these procedural safeguards are without significance. To the contrary, they are important factors for the Court to consider in its overall assessment of whether the transaction was fair. *See Sealy Mattress Co. v. Sealy, Inc.*, Del. Ch., 532 A.2d 1324 (1987). But, this assessment can only be made after additional evidence is presented, not at the summary judgment stage.

Second, plaintiff's complaint that he was not invited to participate in the January 6th meeting to discuss DAI's proposal cannot be the basis for relief on a motion for summary judgment. The president of the company, Mr. Iacono, is certainly entitled to meet with company counsel without giving notice and an opportunity to participate to all the other directors. That the individual defendants excluded Mr. Boyer and Mr. Cole from the meeting may, upon further testimony concerning individual defendants' motives,

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

provide some evidence of unfair dealing, but it does not, without more, constitute a breach of fair dealing.

Third, plaintiff's final claim that the transaction was deliberately timed to take advantage of market conditions which resulted in a low valuation of WMI's assets, cannot be adjudicated at this stage. Plaintiff has provided no evidence to support his contention that the defendants timed the transaction with these market conditions in mind. Furthermore, plaintiff has not established that the equipment market was in fact flooded at the time the equipment appraisals were sought. Regarding DM & H's valuation formula, as discussed previously, I cannot determine without further testimony whether it was a reasonable manner in which to calculate the value of WMI's assets. The claim that the value of the Cherry Hill paving contract should have been included in the valuation of WMI's assets is also not capable of being decided at the summary judgment stage. Plaintiff has provided no evidence that the individual defendants, or the Corrado defendants for that matter, knew that the paving contract would be awarded to the Corrados before the sale to DAI. The contract was in fact awarded *after* the sale was completed and, therefore, plaintiff has not provided the Court with any justification for including the value of the contract to DAI in the determination of a fair price of WMI's assets.

**\*\*8** The failure to disclose the holdback may raise a viable *duty of loyalty* claim against the Corrado defendants. In a self-dealing transaction, interested directors have a duty to disclose all material facts concerning the transaction to the other board members. The standard of materiality is set forth in many cases including *Zirn v. VLI, Inc.*, Del.Supr., 681 A.2d 1050 (1996). If this information was material, by withholding it, the Corrado defendants breached their duty of loyalty to WMI. Materiality, however, cannot be determined as a matter of law in this instance. It is a determination which can only be made following a trial on the merits.

3. *Breach of the Shareholders' Agreement.*

Plaintiff alleges that the individual defendants have breached several provisions of the WMI shareholders' agreement to which they are a party by (1) failing to purchase all of their hot mix requirements from WMI and (2) failing to pay plaintiff dividends and commissions to which he is entitled on hot mix sold by WMI.

In response to plaintiffs motion for summary judgment on this claim, defendants have also moved for summary judgment.

A. Requirements Provision.

Paragraph 7(a) of the shareholders' agreement states in relevant part:

Except where emergency conditions or distance between job site and plant shall make such purchases impractical, the Stockholders shall purchase all paving materials needed by them ... from [WMI].... In the event of a default from the obligation to purchase materials from [WMI], [WMI] may make a claim to the defaulting Stockholder for lost profits

Plaintiff alleges that the individual defendants have violated this provision of the shareholders' agreement at all times after WMI's assets were sold to DAI because the individual defendants now buy all their paving materials from DAI. The fact that the assets were sold to DA, says plaintiff, does not relieve the individual defendants' of their obligation to WMI under the shareholders' agreement. Paragraph 11 of the shareholders' agreement states that it cannot be altered without the written consent of all the shareholders. Plaintiff has not signed an amendment permitting the individual defendants to buy their hot mix elsewhere. In addition, plaintiff alleges that simply by approving the sale to DAI, the individual defendants have violated paragraph 11 of the shareholders' agreement which obligates them to vote "in a manner consistent with the Agreement", because the sale forces them to violate the requirements provision of paragraph 7.

Plaintiff's arguments are unpersuasive. The agreement among the shareholders to purchase their paving material needs from WMI and to vote consistently with the shareholders' agreement (i.e., vote not to sell WMI's assets so that the shareholders can comply with the requirements provision) is subject to the legitimate exercise of corporate power by the WMI board. In other words, where, as here, the legitimate exercise of corporate power by the board (selling WMI's assets to DAI) made it impossible for the shareholders to comply with the requirements provision, the shareholders will not be held liable for buying paving materials elsewhere. If the shareholders wanted to bind themselves to the explicit terms of the shareholders' agreement in all events, they had to express that intention in the agreement. For instance, here they could have stated specifically in the agreement that the company would

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

not be liquidated. Absent such an expressed limitation, the shareholders' agreement is to be subject to the power of the board to exercise its authority to govern the corporation.

**\*\*9** Plaintiff's position, it seems, is that the WMI board had an obligation to keep the corporation operating. Nowhere is such an obligation stated. An implicit obligation such as this, if it exists at all, cannot take precedence over legitimate exercises of corporate power by the board. Once the board approved the asset sale, the shareholders were no longer obligated to comply with those provisions of the shareholders' agreement obviated by the sale. Here, the sale of assets to DAI made it impossible for shareholders to comply with the requirements provision in paragraph 7 because WMI did not have any paving materials to sell. Therefore, it is not a violation of paragraph 7 of the shareholders' agreement for the defendants to purchase paving materials from DAI. Furthermore, by voting as shareholders to approve the asset sale, the individual defendants did not violate paragraph 11 of the shareholders' agreement because this action was not inconsistent with the other provisions of the agreement.

Summary judgment is, therefore, awarded to the defendants on this claim.

B. Commissions and Dividends.

Plaintiff alleges that WMI has failed to pay dividends and commissions on the sale of paving materials owed to him under paragraphs 5 and 6 of the shareholders' agreement. According to WMI's 1991 financial statements, WMI did pay $159,977 in dividends and $36,628 in sales commissions to the shareholders. Paragraphs 5(b) and 6(b) of the shareholders' agreement entitle each shareholder to dividends when they are declared by the board and to a portion of the commissions as calculated by a formula contained in the agreement.

Plaintiff asserts that he is entitled to 25% of the total amount of dividends and commissions paid in 1991. Based on his 25 % ownership of WMI stock during that year, plaintiff does appear to be entitled to one-fourth of the dividends paid in 1991. Plaintiffs share of the commissions, however, is determined by a formula in paragraph 5(b) which takes into account the amount of paving materials purchased by the shareholder and his affiliates. Plaintiff has not established that based on this formula he has earned one-fourth of the total commissions paid in 1991.

Defendants contest plaintiff's eligibility to receive any dividend or commission payments at this time. Defendants allege that plaintiff owes WMI at least $57,000. According to a written consent signed by all of the WMI directors, including plaintiff, "[a]ny Stockholder of the Corporation whose accounts exceeds 90 days past due ... *shall have his ... commissions [and] dividends ... frozen until normal payment terms are met.*" (emphasis added). Plaintiff does not deny that he owes WMI money, instead arguing that at most, the money he owes to WMI should be counted as a set-off against what WMI owes him. Nothing in the shareholders' agreement or the board consent permits such a set-off. Therefore, plaintiff must make payment arrangements with WMI before he can collect any dividends or commissions.

**\*\*10** Plaintiff's motion for summary judgment on this claim is, therefore, denied. In addition, since I have concluded that defendants did not breach the shareholders' agreement by not paying dividends and commissions to plaintiff, defendants' motion for summary judgment on the breach of contract claim is granted.

There are, however, clearly issues of material fact in dispute regarding how much money WMI owes to plaintiff in the form of dividends and commissions, and upon what conditions that money must be repaid. These issues can only be resolved after evidence is presented to the Court at trial.

4. *Tortious Interference with Contract.*

Plaintiff alleges that defendant DAI tortiously interfered with a contract between plaintiff, the individual defendants and WMI, by inducing the individual defendants to breach the shareholders' agreement. The elements of a tortious interference with contract claim are: (1) there must be a contract; (2) about which the defendant had knowledge; (3) defendant must commit an intentional act that is a significant factor in causing a breach of that contract; (4) defendant must act without justification; and (5) the breach must cause injury.

Plaintiff's tortious interference claim fails for two reasons. First, the Court has not found that the shareholders' agreement was breached, so there is no breach of contract upon which to ground the tortious interference claim. Second, no evidence has been presented establishing that DAI committed an intentional act that caused the defendants to breach the shareholders' agreement. Offering to purchase

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1997 WL 382979, Boyer v. Wilmington, (Del.Ch. 1997)                                                               Page 8

WMI's hot mix equipment and front loader is not such an act. Therefore, defendants' motion for summary judgment on this claim is granted.

### 5. *Conversion of Plaintiff's Loans.*

Plaintiff asserts that he has loaned WMI $133,669, none of which has been repaid. The defendants, on the other hand, maintain that WMI satisfied its obligations regarding the loans.

Paragraph 4(c) of the shareholders' agreement required each shareholder group to loan WMI $25,000 interest free as working capital. Paragraph 4(c) further obligated shareholders to loan the corporation money at the call of the board of directors. In fact, the board never did call loans pursuant to paragraph 4(c). Instead it arranged for WMI's shareholders to loan the corporation a portion of the dividends and commissions they were to receive. According to plaintiff, these loans were to be repaid with interest of 8.1% or 8.2% per annum. Plaintiff alleges that he loaned WMI $108,669 in the form of commissions and dividends.

On the same date as the sale of assets to DAI, January 14, 1992, the WMI board adopted a resolution which purported to treat "all loans from the stockholders or directors of the Company to the Company ... as if they constituted an equivalent dollar amount of the common stock of the Company, provided that such loans shall not be deemed to have any of the voting or other rights associated with shares of the capital stock of the Company...." By "converting" the shareholder loans to common stock of WMI, a company with no assets and no on-going operations, WMI, for all practical purposes, gave the shareholders nothing of value as repayment for their loans.

**\*\*11** Defendants contend that this method of repayment is acceptable under the shareholders' agreement. Paragraph 4(b) states that the $25,000 working capital loan "shall be repaid as revenues become available and *under terms to be determined by the Board of Directors.*" (emphasis added). Defendants cite this clause as support for their position that the board, at its discretion, could decide what type of consideration would suffice to repay the shareholders. Thus, they conclude, the board resolution providing that the loans will be repaid by treating them like common stock of WMI is a legitimate method to discharge WMI's obligations under the loans.

For the following reasons, I deny both plaintiff's and defendant's motions for summary judgment on this claim. First, regarding repayment of the $25,000 capital loan, paragraph 4(b) of the shareholders' agreement, the relevant part of which is quoted in the preceding paragraph, does not clearly articulate the terms under which the loan must be repaid. In particular, the phrase stating the loan shall be repaid "under terms to be determined by the board" is ambiguous. Without further evidence regarding the meaning of this phrase, I cannot conclude whether this phrase operates to allow the board to repay the loans with something other than cash.

Second, as to the additional loans made by plaintiff, both parties rely on the wording of paragraph 4(b) to govern the terms of repayment of those loans. That paragraph, however, applies only to the repayment of the $25,000 working capital loan. It states that "[s]aid loan" (referring to the working capital loan), not all loans, will be repaid according to terms designated by the board. Therefore, this clause does not provide the terms under which the additional loans are to be repaid. In order to determine the manner in which these loans were to be repaid, I must first consider the terms of the loans as originally agreed to by the parties. Because the original terms of the loans have not been presented to the Court, I cannot make a ruling on this claim at this time.

### D. *Mr. J. Corrado's Counterclaim.*

Defendant Mr. J. Corrado has filed a counterclaim against plaintiff seeking indemnification under the shareholders' agreement of funds paid to Mellon. As discussed earlier, Mellon loaned WMI money in 1988. As required by paragraph 10(a) of the shareholders' agreement, the loans were personally guaranteed by the shareholders through their affiliate companies. Prior to the asset sale, Mellon apparently made an oral demand for repayment of the loans. The proceeds from the asset sale did not suffice to cover the extent of WMI's obligations to Mellon. According to Mr. J. Corrado, Mellon made demand upon Corrado-American, his corporate affiliate which originally guaranteed the loan, to pay a portion of the outstanding balance. Mr. J. Corrado alleges that to satisfy Mellon's demand, Corrado-American paid $121,000 to Mellon. The shareholders' agreement, paragraph 10(b), requires the other shareholders to indemnify any shareholder who is called upon by a creditor of WMI to repay a loan made to WMI. Therefore, contends Mr. J. Corrado, plaintiff must pay him $30,250 which is 25% (plaintiff's proportionate share of ownership of WMI common

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

stock) of the amount allegedly paid by Corrado-American to Mellon.

**12. In order to grant Mr. J. Corrado's motion for summary judgment on his counterclaim, there must be undisputed evidence in the record establishing that Mellon made demand upon Corrado-American and that Corrado-American in fact paid Mellon $121,000. Defendant has provided no evidence which establishes that either of these events occurred. Therefore, summary judgment on the counterclaim is denied.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# TAB 4

*1160   Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Morris GLASSMAN, Plaintiff,
v.
WOMETCO CABLE TV, INC., Defendant.
CIV. A. No. 7307.
Submitted: Oct. 28, 1988.
Decided: Jan. 6, 1989.

On Defendant's Motion for Summary Judgment: Denied.

On Plaintiff's Motion for Partial Summary Judgment: Denied.

R. Bruce McNew, and Pamela S. Tikellis, Greenfield & Chimicles, Wilmington, for plaintiff.

Steven J. Rothschild, Edward P. Welch, and Thomas P. White, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendant.

MEMORANDUM OPINION

HARTNETT, Vice Chancellor.

**1 Defendant seeks summary judgment and plaintiff seeks partial summary judgment. Both motions must be denied.

I

In this purported class action, the plaintiff, a former common stockholder of defendant Wometco Cable TV, Inc. ("Wometco Cable"), challenges the cash-out merger of Wometco Cable in which he and the other public stockholders were cashed out without any vote by the stockholders. In my June 19, 1985 Opinion in which I granted, in part, plaintiff's motion to amend the complaint and thereby in effect denied defendant's motion to dismiss, I found that the proposed amended complaint stated a claim for relief in that it alleged that the Information Statement distributed to Wometco Cable's shareholders failed to disclose certain material information in the possession of Wometco Cable's Board of Directors (the "Board") as to recent sales of comparable cable television systems. In particular, plaintiff alleged that there should have been disclosed the details of certain comparable sales because they did not compare favorably with the price being offered to the Wometco Cable public shareholders and this information was necessary to allow the shareholders to make an informed judgment whether to accept the price offered or to seek appraisal. *Glassman v. Wometco Cable TV, Inc.*, Del.Ch., C.A. No. 7307, Hartnett, V.C. (June 19, 1985).

The original complaint was filed in 1984 following a press release announcing the proposed acquisition of Wometco Cable by Kohlberg Kravis Roberts & Co. ("Kohlberg Kravis"). The proposed acquisition was part of a related transaction in which Kohlberg Kravis intended to acquire Wometco Enterprises, Inc. ("Wometco Enterprises"), Wometco Cable's parent which owned 85% of Wometco Cable's outstanding common stock.

Kohlberg Kravis announced that it planned to merge Wometco Cable into a new corporation and would pay $29.50 per share for the publicly held shares which were to be cashed out as a result of the merger. In considering the proposal, the Board of Wometco Cable heard presentations given by its retained experts Drexel Burham Lambert Incorporated ("Drexel Burnham") and Merrill Lynch Capital Markets ("Merrill Lynch") as to the fairness of the merger price. Merrill Lynch analyzed four unrelated acquisitions of cable television systems, while Drexel Burnham analyzed twenty other acquisitions. The investment bankers concluded that, based upon these comparables and a myriad of other factors, the proposed merger price was fair to Wometco Cable's stockholders. Shortly thereafter, the Board approved the terms of the proposed merger.

Because Wometco Enterprises owned 85% of the stock of Wometco Cable, no shareholder vote was necessary to approve the merger. However, an Information Statement was sent by Wometco Cable to its public shareholders advising them that they would have the option under Delaware law to either receive the $29.50 cashout price or to seek appraisal. It is undisputed that the merger was subject to Rule 13e-3 of the Federal Securities and Exchange Commission ("S.E.C.") which provides disclosure requirements in going-private transactions and a Schedule 13E-3 was therefore filed.

**2 Plaintiff, in his amended his complaint, asserted that the Information Statement contained certain material misrepresentations and omissions which would have an impact on the decision of

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Wometco Cable's public shareholders to either accept the $29.50 per share or to seek an appraisal.

In my prior opinion granting plaintiff leave to amend the original complaint and denying defendant's motion to dismiss, all the claims of plaintiff were disallowed except the claim that the Information Statement failed to disclose the details of comparable sales of cable television systems which were considered by the Board in connection with the proposed merger and the claim that these comparable sales did not compare favorably with the price being offered to Wometco Cable's stockholders.

Wometco Cable has now filed a motion for summary judgment. Plaintiff has cross-moved for partial summary judgment as to alleged non-disclosures relating: (1) to an earlier purported "appraisal" of Wometco Cable by Drexel Burnham; and (2) to supposed defects in the fairness opinions of Drexel Burnham and Merrill Lynch.

II

Summary judgment will be granted only where the pleadings and the uncontroverted allegations demonstrate that there is an absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Nash v. Connell*, Del.Ch., 99 A.2d 242 (1953). Summary judgment is employed to avoid a useless trial where there is no issue of material fact. *H. & S. Manufacturing Co. v. Benjamin F. Rich Co.*, Del.Ch., 164 A.2d 447 (1960). Facts adduced under oath by the movant which remain uncontroverted by the other side must be assumed to be true. *Tanzer v. International General Indus.*, Del.Ch., 402 A.2d 382 (1979).

The materiality of non-disclosed facts is a mixed question of law and fact and as such is not usually an appropriate issue for resolution by summary judgment. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976); *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761 (3d Cir.1976). However, if the facts are so obvious that reasonable minds cannot differ on the question of materiality, and the underlying facts and inferences to be drawn are free from controversy, the question becomes one of law which may appropriately be decided by summary judgment. *TSC Industries, Inc. supra; GAF Corp. v. Heyman*, 724 F.2d 727 (2th Cir.1983); *Gould, supra.*

III

In my prior decision I denied most of the claims of plaintiff because of the failure to state a claim upon which relief could be granted. The only remaining issue in this action, therefore, is whether the Information Statement sent to Wometco Cable's public shareholders was materially misleading in that it failed to disclose the details of comparable sales of other cable television systems considered by the Board which sales did not compare favorably with the price being offered to Wometco Cable's public shareholders.

Plaintiff's cross-motion for partial summary judgment is therefore improper because he is trying to seek summary judgment in his favor on claims which have already been dismissed. Plaintiff's cross-motion for partial summary judgment must therefore be denied.

IV

**3 The disclosure standards applicable to information statements distributed to shareholders in a going-private or freeze-out transaction are even greater than those which apply to proxy statements where there is to be a shareholder vote. *Howing Co. v. Nationwide Corp.*, 625 F.Supp. 146, *rev'd*, 826 F.2d 1470 (6th Cir.1987), *cert. denied, Nationwide Corp. v. Howing Co.*, --- U.S. ----, 108 S.Ct. 2830 (1988); *Radol v. Thomas*, 772 F.2d 244 (6th Cir.1985), *cert. denied*, 477 U.S. 903 (1986); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, Del.Ch., 532 A.2d 1324 (1987); *Wacht v. Continental Hosts, Ltd.*, Del.Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986), at 7. In *Radol*, the Court recognized the special problems of going-private transactions and the need for full disclosure:

The more extensive legal disclosure requirements which apply to freeze-out merger proxy statements are therefore justified by the fact that the law has given the majority the power to foreclose the ownership rights of the minority and has thereby eliminated the market as a correcting mechanism, leaving the minority shareholders with only the option of dissent and appraisal, an option which cannot rationally be exercised unless the majority is compelled to make full disclosure regarding appraisals, earnings projections and other information that sheds light on the value of the firm. *Radol*, 772 F.2d at 255.

The Wometco Cable Board therefore had a duty to disclose all material facts pertaining to the merger in an atmosphere of complete candor. *Rosenblatt v.*

*Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985).

Delaware's disclosure standards are essentially identical to the federal requirements and therefore, in determining whether the Delaware duty of complete candor has been met, the federal test of materiality is applied. *Rosenblatt*, supra. Under both Delaware and federal law, corporate fiduciaries are under a duty to disclose all information in their possession that a reasonable shareholder would consider material in deciding whether to sell his stock or to retain his stock and seek appraisal. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 499 (1976); *Rosenblatt*, supra; *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977). An omitted fact is material if there is "a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder ...". *TSC Industries*, supra, at 449.

Rule 13e-3 of the S.E.C. reflects the special concern expressed by the federal authorities with regards to disclosure in going-private transactions. This Rule serves as the primary and most direct vehicle under the federal securities laws for effecting this extensive disclosure. Although the S.E.C. does not require that the Schedule 13E-3 filing be reproduced in its entirety, the communication to the shareholders, must disclose verbatim those items which disclose the essence of the transaction. *Howing*, 826 F.2d at 1477.

V

**\*\*4** The question of whether there was an adequate disclosure here is not contingent on the adequacy or completeness of the fairness opinions provided to the Board by Merrill Lynch and Drexel Burnham. Rather, it is predicated on whether the Board, once having disclosed that it had considered the comparable sales, should have disclosed the data underlying them.

In my June 19, 1985 Opinion, I stated that the disclosures in the Information Statement might be inadequate "if the premiums paid in other [comparable] acquisitions were actually significantly higher than the premium being paid to the Wometco Cable shareholders." *Glassman v. Wometco Cable TV, Inc.*, supra, at 13. The defendant reads more into these words than was intended. In my opinion I also wrote "As stated in *Lynch*, supra, the question of disclosure is not one of adequacy but of completeness. All information material to a transaction must be disclosed with complete candor. *Rosenblatt v. Getty Oil Company*, supra." The issue, therefore, is not what constitutes significantly higher prices, but whether the undisclosed data on the comparables was material. *Rosenblatt*, supra.

It is clear that the Board relied on the oral opinions of Drexel Burnham and Merrill Lynch in approving the $29.50 merger consideration as being fair to Wometco Cable's shareholders from a financial view. At its December 12, 1983 meeting, the Board heard presentations by Drexel Burnham and Merrill Lynch during which there was a review of certain unrelated cable company transactions. It was explained to the Board by James A. Martens of Merrill Lynch that the two measures of value most relevant for the purposes of considering cable mergers were the cash flow multiple and the subscriber multiple. Mr. Martens summed up his presentation to the Board with a statement that Merrill Lynch believed that a value of around $1,000 per subscriber and nine times projected cash flow would be used by most acquirers in analyzing Wometco Cable as a takeover target. Drexel Burnham and Merrill Lynch later submitted opinion letters which were appended to the Information Statement distributed to Wometco Cable's public shareholders. Citing a laundry list of factors, including a review of comparable sales, it was opined in the letters that the $29.50 per share merger consideration was fair to the minority shareholders from a financial point of view.

The Information Statement, however, also indicated that the Board had expanded its use of the comparable sales data beyond their merely being used by its investment advisors in arriving at their opinions. Under the heading "Recommendation of the Wometco Board of Directors; Reasons for the Cable Merger," it is stated:

The Wometco Cable Board also considered the Cable Merger favorably in light of the alternatives available to Wometco Cable, including continuing as a public company; the business, assets, and future prospects of Wometco Cable (including management's projections of future sales and earnings); and *the prices and premiums paid in recent acquisitions of other cable televisions companies* ... Information Statement, p. 14, para. 4.

**\*\*5** It is clear from the plain meaning of this paragraph that the Board purported to have engaged in an analysis of the comparable cable television transactions in coming to its opinion that the merger

consideration was fair to the minority shareholders.

The defendant cites a number of federal cases in support of its contention that data from comparable or unrelated transactions need not be disclosed in securities disclosure documents. In none of these cases, however, did a Board of Directors state in the proxy materials that they had considered comparable or unrelated transactions in arriving at their decision that the proposed merger was fair to the minority shareholders. For example, in *Howing Co. v. Nationwide Corp.*, 625 F.Supp. 146, *rev'd*, 826 F.2d 1470 (6th Cir.1987),*cert. denied, Nationwide Corp. v. Howing Co.*, --- U.S. ----; 108 S.Ct. 2830 (1988), the Court held that Nationwide did not have to disclose data regarding sales of comparable life insurance companies which was used by its investment advisor in arriving at an opinion that the freeze-out merger transaction was financially fair to the minority. The District Court's rationale was alluded to by Judge Guy in his dissent to the Sixth Circuit's decision:

Plaintiffs also argue that the fairness discussion should have disclosed data about other companies involved in "comparative transaction." ... Since there is no evidence indicating that Nationwide relied upon such data in reaching its conclusion regarding the fairness of this transaction, disclosure was not required. *Howing*, 826 F.2d at 1483 (Guy, J., dissent).

In any case, the reversal and remand of the District Court's decision leaves open the possibility that the Court may find on remand that the comparables considered by the investment advisors in *Howing* must in fact be disclosed. Without directly addressing the disclosure of comparables issue, the Court found that the stringent disclosure requirements of Rule 13e-3 had not been met. *Howing*, 826 F.2d at 1478-79.

The myriad of detailed information that must be furnished to shareholders necessarily differs from merger to merger. *Hahn v. Breed*, 587 F.Supp. 1369 (S.D.N.Y.1984). In the present case, however, the Information Statement specifically stated that the Board considered other sales in its fairness determination and it must be assumed under these circumstances that the sales were those presented to the Board by its investment advisors. The transaction summaries submitted to the Board by Drexel Burnham and Merrill Lynch indicate that certain of the comparable transactions considered by the Board were based on cash flow and subscriber multiples in excess of those offered to Wometco Cable's public shareholders.

On the present record, I find, at least, that reasonable minds could differ as to the materiality of the omitted information and, therefore, defendant's motion for summary judgment must be denied. *TSC Industries, supra.*

VI

**\*6. I also find defendant's contention that the details of the comparable transactions constitute "soft information" and, therefore, need not be disclosed to be meritless. In my June 19, 1985 Opinion, I referred to "comparable sales" in a generic sense, meaning, collectively, the unrelated sales of other cable television systems considered by the Board and its investment advisors. I did not intend to distinguish between the unrelated sales on the subjective basis of actually being comparable or not comparable.

If the premiums based upon the cash flow and subscriber multiples paid in some of the unrelated cable television sales were higher than the premium paid in the Wometco Cable sale--which they appear to be--, it would seem reasonable to expect that a shareholder might consider this information material and be interested in knowing not only what those higher premiums were, but why the Board felt these higher premiums were not appropriate in this case. Even if this information is arguably "soft"--which I do not think it is--, in the context of cash-out mergers, Delaware's courts have held that arguably "soft" information, which indicates with some degree of reliability that a corporation was worth more than the tender price, must be publically disclosed to the shareholders. See *Weinberger v. Rio Grande Industries, Inc.*, Del.Ch., 519 A.2d 116, 128 (1986).

VII

Defendant's motion for summary judgment and plaintiff's motion for partial summary judgment are, therefore, denied.

IT IS SO ORDERED.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.