# TAB 7

1990 WL 131351, Wheelabrator Technologies Inc. Shareholders Litigation, In re, (Del.Ch. 1990)        **Page 1**

**\*131351**    16 Del. J. Corp. L. 1653

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

### In re WHEELABRATOR TECHNOLOGIES INC. SHAREHOLDERS LITIGATION.
C.A. No. 11495.
Submitted: Aug. 30, 1990.
Decided: Sept. 6, 1990.

Joseph A. Rosenthal and Norman M. Monhait of Morris, Rosenthal, Monhait & Gross, Wilmington, Pamela S. Tikellis and Carolyn D. Mack of Greenfield & Chimicles, Wilmington, Steven G. Schulman and Lee S. Shalov, of Milberg, Weiss, Bershad, Specthrie & Lerach; Abbey & Ellis; Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C.; Goodkind, Labaton & Rudoff; Wechsler, Skirnick, Harwood, Halebian & Feffer; and Law Offices of Curtis V. Trinko, all of New York City; and Berger & Montague, P.C., Philadelphia, for Plaintiffs.

David C. McBride, Josy W. Ingersoll and Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor, Wilmington, and Theodore N. Mirvis, Paul K. Rowe and Benjamin E. Rosenberg, of Wachtell, Lipton, Rosen & Katz, New York City, for defendants Wheelabrator Technologies, Inc. and the Individual defendants.

Henry E. Gallagher, Jr., Collins J. Seitz, Jr., John C. Kairis and Arthur G. Connolly, III of Connolly, Bove, Lodge & Hutz, Wilmington, and Ernest Summers, III of Waste Management, Inc., Oak Brook, Ill., for defendant Waste Management, Inc.

#### MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**\*\*1**    Under challenge on this motion for a preliminary injunction is a proposed merger between Wheelabrator Technologies Inc. ("WTI") and Waste Management, Inc. ("Waste"). The result of that merger, if approved by WTI's shareholders, is that Waste, which currently owns 22% of WTI's stock, would own 55% of WTI's outstanding shares. WTI's shareholders will vote on the proposed merger at a meeting to be held on September 7, 1990. The plaintiffs, who are stockholders of WTI, seek a preliminary injunction that would prohibit the shareholder vote on the proposal or, alternatively, halt the consummation of the merger itself. After expedited briefing, the motion was argued on August 30, 1990. This is the decision of the Court on the plaintiffs' motion for a preliminary injunction.

### I. PERTINENT FACTS

WTI is a Delaware corporation engaged in developing facilities for, and providing services to, the trash-to-energy, energy, environmental, and general industrial markets. Waste is a Delaware corporation engaged in providing hazardous waste management and environmental services, including integrated solid-waste management services consisting of collections, transfer, resource recovery and disposal.

WTI's common shares have been listed and traded on the New York Stock Exchange since WTI became a public company in 1987. As of July 17, 1990, Waste owned 22% of WTI's shares, the Henley Group, Inc. ("Henley") owned 7.3%, WTI's management owned 3.7%, and WTI's public stockholders owned 67%. WTI has an eleven member board of directors. Of these, three are members of management but are not employees of, or associated with, Waste; four are representatives of Waste; and four are independent directors. (FN1) Accordingly, Waste does not control WTI's board of directors.

During 1988, Waste and WTI negotiated a transaction in which Waste received 22% of WTI's outstanding shares in exchange for certain assets. The business rationale for that transaction was that Waste possessed landfill sites and large amounts of refuse, and WTI had the know-how to build and operate facilities that would burn such refuse to produce energy. That 1988 transaction marked the beginning of a strategic alliance between these two companies--an alliance based upon an expectation that each company could make use of the other's complementary assets and abilities in the future.

By 1989 it had become apparent, for a variety of reasons, that the full potential of the strategic alliance (including the synergies anticipated by both sides in 1988) was not being realized. That awareness eventually led both companies to conclude that their relationship would have to be altered, and ultimately led to the merger transaction at issue in this case.

WTI's perspective on these post-1988 events is

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

best understood against the background of efforts to sell WTI between 1987 and 1990. Before 1987, WTI was originally owned by Henley, which retained Goldman Sachs to arrange a sale of WTI. Goldman Sachs contacted approximately 45 potential buyers, but none expressed interest at a price that WTI or Henley considered adequate. Henley later spun off WTI, and WTI became a public company. Thereafter, WTI held discussions with companies known to be interested in the waste-to-energy business, including Westinghouse, Brown-Ferris Industries, and ABB Asea Brown Boveri, Ltd. The discussions also failed to produce a firm offer for the purchase of WTI, and the range of potential prices discussed never exceeded WTI's public market value at the time. The record indicates that there is only a limited number of potential acquirers for a company such as WTI, which has a highly specialized line of business and a high price-to-earnings ("P/E") ratio. Thus, by the time WTI and Waste began their discussions in late 1989, WTI's management and directors had reason to believe that the market for the sale of WTI had been explored, and that there were no buyers at a satisfactory price.

**\*\*2** As stated, by the winter of 1989, WTI and Waste were both convinced of the need to alter their relationship. WTI desired closer ties between the two companies so that its own employees would view both as part of the same corporate family. WTI also desired a structure that would eliminate the competitive and antitrust impediments to cooperation. For its part, Waste wished to be free of conflicts with WTI that might arise out of Waste's interest in the trash-to-energy business, particularly in Europe. For that reason, Waste decided either to obtain a majority interest--or to reduce its holdings--in WTI. WTI, on the other hand, was concerned that its (and its shareholders') interests would be adversely affected if Waste reduced its holdings in, and its involvement with, WTI. For these reasons, both companies engaged in conceptual discussions during December 1989 and the first two months of 1990, in which they explored an increased investment by Waste in WTI. Intensive negotiations began, however, only after Waste made a specific acquisition proposal on March 22, 1990.

Waste initially proposed a stock-for-stock, no-premium ("market to market") exchange offer by Waste for 33% of WTI's outstanding shares. WTI's negotiators (Messrs. Paul Montrone and Paul Meister, and representatives of Lazard Fréres & Co. ["Lazard"], one of WTI's financial advisors) rejected that proposal, and negotiated for improvements.

Those improved terms included: (a) a premium over WTI's then-market price, (b) a stockholder vote and equal treatment for stockholders through a merger structure rather than an exchange offer, (c) additional benefits to WTI through ancillary agreements providing incentives for future cooperation between the two companies, and (d) the absence of any impediments to the emergence of a financially superior offer. Arm's length negotiations over the exchange ratio began on Friday, March 23, and extended into the middle or latter part of the following week until agreement was reached.

The transaction that was finally negotiated, and later approved by the WTI board, was a stock-for-stock merger in which a subsidiary of Waste would be merged into WTI. The surviving corporation would be WTI. Each WTI share will be converted into .574 shares of WTI and .469 shares of Waste. That exchange ratio was the mathematical result of an agreement that (i) the merger consideration would be the same as if Waste had made an offer to exchange Waste shares for 33% of the outstanding WTI stock, and (ii) the value of the Waste shares to be issued would be 10% greater than the 10-day market value of the WTI shares being acquired; or $37.40 per share. (FN2)

The other significant terms of the proposal negotiated by WTI's representatives, and presented to and approved by the WTI board, were as follows:

(i) the merger agreement would require the approval of a majority of the outstanding shares of WTI stock not owned by Waste;

(ii) Although WTI was precluded from initiating a sale proposal to a third party, there is no "break-up" fee, expense reimbursement provision, asset option, "lock-up", or other impediment to the emergence of a better offer; and WTI is allowed to entertain unsolicited offers from, and provide pertinent information to, third parties, so long as such information is also provided to Waste.

**\*\*3** (iii) In addition, WTI and Waste negotiated five "Ancillary Agreements" that defined the companies' future relationship in several critical areas. (FN3) The record indicates that it was WTI that sought those Ancillary Agreements, which have considerable potential value to WTI.

In connection with the above-described transaction, WTI retained two investment banking firms as financial advisers: Lazard and Salomon

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Brothers ("Salomon"). On March 30, 1990, the WTI board met to consider the merger proposal. Two days before, the directors were provided with a summary of the terms of the transaction (including the Ancillary Agreements), a draft of a proposed merger agreement, and annual reports and other public filings containing financial information about WTI, Waste, and their respective businesses. In addition, Mr. Montrone, WTI's Chairman, discussed the negotiations and the proposed transaction with the directors before the meeting. The four Waste designees to the WTI board were asked not to--and did not--attend the meeting or otherwise participate in the board's decisionmaking process, until after the directors who were not affiliated with Waste had first voted to approve the transaction.

At the March 30, 1990 meeting, a joint Lazard-Salomon book containing pertinent financial information and analyses was distributed to the board. Thereafter, the directors heard presentations by Messrs. Montrone and Meister describing the background and business rationale for the transaction. Lazard and Salomon then made presentations describing their financial analyses of the proposal and the basis for their conclusion that the transaction was fair to shareholders from a financial point of view. (FN4) Ultimately, the non-Waste affiliated directors (and thereafter the entire board, including the Waste director-designees) voted to recommend that the shareholders approve the transaction. The board based its decision upon (*inter alia* ): (i) the previous unsuccessful efforts to sell WTI at prices above market, (ii) the absence of any impediments to a superior offer by a third party, (iii) the absence of any evidence that a better transaction or superior alternative was available or likely to materialize, (iv) the board's familiarity with Waste as a result of the Waste-WTI relationship; (v) the unique synergistic benefits to WTI promised by the proposed WTI-Waste alliance; and (vi) the fact that WTI shareholders would not only continue as shareholders in WTI, but also would become shareholders in Waste, a far more stable company with greater financial resources, whose stock had substantially outperformed WTI's stock over the past 15 months.

The merger agreement was publicly announced on April 2, 1990. On April 6, 1990, WTI filed with the Securities and Exchange Commission a Form 8-K that included a copy of the merger agreement as an exhibit. Those public filings revealed that the proposed transaction has no "lock-up", termination fee, expense reimbursement, asset option, or other provision that would operate as a financial or

structural impediment to a third party offer. However, WTI has yet to receive from any source any expression of interest regarding an alternative transaction.

**\*\*4**  On July 30, 1990, WTI disseminated to its shareholders, an extensive Proxy Statement in connection with the special shareholders' meeting noticed for September 7, 1990, to vote on the proposed merger. The disclosures in that Proxy Statement (which has been publicly filed with the S.E.C.) are discussed elsewhere in this Opinion. It should be noted, however, that that document explicitly states that "the Merger Agreement does not ... prohibit a third party from making an acquisition proposal, nor does it prevent the Board of Directors of WTI from responding to an acquisition proposal, if one is made." (Proxy Statement at 9). It further states that the terms of the Merger Agreement "did not include any material impediments to receiving from a third party another bid which might be financially superior to the terms of the Merger." (*Id* at 32)

## II  *THE PARTIES' CONTENTIONS*

The plaintiffs seek a preliminary injunction prohibiting the shareholders from voting at the forthcoming WTI stockholders' meeting, on the basis that the Proxy Statement contains materially false and misleading disclosures. Alternatively, plaintiffs seek to enjoin the consummation of the transaction itself, on the basis that the merger is the product of breaches of fiduciary duty by WTI's directors. Those breaches are said to consist of the directors' failure to seek the best available transaction, as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986) ( "*Revlon* "), by canvassing the market or otherwise exploring potential alternative transactions.

Plaintiffs contend that the directors breached their *Revlon*-imposed duties to the shareholders, because (a) WTI's negotiations with Waste were at best half-hearted, and, at worst, a sham; (b) the "no shop" clause in the merger agreement inhibited a full exploration of alternatives through an effective canvas of the market; and (c) the directors did not effectively communicate to the marketplace that WTI would entertain competing offers from third parties. In addition, plaintiffs argue that even if the merger is not subject to the enhanced responsibilities imposed by *Revlon* and by later Delaware Supreme Court decisions, the directors were grossly negligent in their hasty and superficial evaluation and approval of the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1990 WL 131351, Wheelabrator Technologies Inc. Shareholders Litigation, In re, (Del.Ch. 1990)    **Page 4**

proposed merger. Specifically, it is claimed that the board conducted little or no investigation into the merits of the proposed transaction, particularly the fairness of the merger price. Plaintiffs claim that as a consequence of these fiduciary breaches, WTI shareholders will be irreparably harmed unless the proposed merger is enjoined, because (a) the merger is not the best available transaction, and (b) the merger consideration is not fair to WTI's shareholders.

All of those contentions the defendants dispute, both legally and factually. They contend that *Revlon* does not apply to a merger negotiated at arm's length between two independent corporations, and that a transaction of that kind must be evaluated under the business judgment rule standard. As thus measured, defendants argue, the merger must be upheld, because there is no showing that the directors acted other than in good faith and in the corporation's best interests in approving this arm's length merger, and also because the directors acted with appropriate due care. In any event, defendants urge, even if the merger were deemed subject to the requirements of *Revlon*, it still must be upheld, because (i) the market had been thoroughly canvassed prior to the negotiations, (ii) an adequate market test has been underway since April of this year, and (iii) no other bid or proposal has ever materialized. Finally, the defendants maintain that, in all events, the issue should be determined by the shareholders, who will vote on the merger proposal on September 7, after receiving full disclosure of all material facts.

**\*\*5**    To obtain a preliminary injunction, the plaintiffs must show a reasonable probability of success on the merits, irreparable harm if an injunction is not granted, and harm that outweighs the damage that would befall the defendants if an injunction is issued. *See. e.g., Revlon,* 506 A.2d at 179; *Draper Communications, Inc. v. Delaware Valley Broadcasters L.P.,* Del.Ch., 505 A.2d 1283, 1296 (1985); *Gimbel v. Signal Companies,* Del.Ch., 316 A.2d 599, 602, *aff'd.* Del.Supr., 316 A.2d 619 (1974).

By application of these and other relevant principles, I conclude that the motion should be denied. For the reasons discussed in Section III, *infra,* based upon the present record, the Proxy Statement affords WTI shareholders full and fair disclosure of all material information pertinent to the merger. Moreover, as discussed in Section IV, *infra,* because the merger will be approved (or disapproved) by a fully informed shareholder vote, any infirmity in

the process by which the transaction's terms were developed would be cured. Finally, even if ( *arguendo* ) the plaintiffs' claims were to survive a fully informed shareholder vote, injunctive relief would still be inappropriate, because the harm likely to result from the grant of such relief would outweigh the harm likely to result from its denial.

### III. *THE DISCLOSURE CLAIMS*

The July 30, 1990 Proxy Statement is notable for the extensiveness of its disclosures about the terms of the merger, how those terms were arrived at, and how they were evaluated by WTI's financial advisors. Nonetheless, plaintiffs contend that the Proxy Statement is materially misleading in numerous respects, and therefore violates the defendants' fiduciary duty to disclose all material information to WTI's shareholders. *See Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985). These disclosure claims are now addressed.

1.

Pages 30 through 42 of the Proxy Statement are devoted to the fairness opinions of Lazard and Salomon, and the many and varied bases for both advisors' "fairness" analysis and conclusions. The several lines of valuation inquiry pursued by Salomon and Lazard are disclosed in painstaking detail on pages 38-42 of the Proxy Statement.

One of the several analytical methods used to evaluate the fairness of the merger proposal was to compare the terms of the merger with the P/E multiples and other relevant values paid in acquisitions of comparable companies in the waste management business. In that connection, Lazard and Salomon focused specifically upon the acquisition of Laidlaw Transportations, Inc. by Canadian Pacific, Ltd., and the acquisition of Combustion Engineering, Inc. by ABB Asea Brown Boveri, Ltd. Plaintiffs contend that the Proxy Statement omitted material facts in the disclosures relating to the Laidlaw and Combustion Engineering acquisitions.

Plaintiffs first contend that the Proxy Statement fails to disclose that Laidlaw was in the school bus business as well as the waste management business, and that the Laidlaw acquisition was subject to Canadian law and was privately negotiated. But plaintiffs have failed to show, even as a preliminary matter, a substantial likelihood that such disclosures would have significantly altered the total mix of information made available to WTI shareholders.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

*Rosenblatt*, 493 A.2d at 944. That is, plaintiffs have not shown why the fact that the Laidlaw transaction was privately negotiated or that it was subject to Canadian law, would be material to shareholders considering whether or not to approve the merger. And while plaintiffs suggest that Laidlaw was not comparable to WTI because it was in the school bus business, it is undisputed that Laidlaw also was the third largest landfill company in the United States.

**\*\*6** Accordingly, I find nothing misleading in the omission of these facts from the Proxy Statement. The purpose of the Laidlaw (and Combustion Engineering) disclosures was simply to recount historically the financial advisors' opinion, and their presentations to the board, on these subjects. The advisors' opinion was (*inter alia* ) that the Laidlaw transaction was "more relevant" to the proposed merger than was the Combustion Engineering acquisition. The advisors did *not* opine that the Laidlaw and WTI transactions were identical or comparable to the instant merger in every respect, as plaintiffs' argument implicitly assumes. (FN5)

2.

In their presentations to the WTI board, Lazard and Salomon compared certain P/E multiples for WTI with comparable multiples for Ogden Corp. and Ogden Projects. Although these financial advisors stated no conclusions with respect to that analysis, the analysis did show that the P/E ratios pertinent to WTI shares in the proposed merger were greater than the similar ratios for Ogden Corp., and less than those for Ogden Projects. The Proxy Statement disclosed the foregoing facts, and the accuracy of these disclosures is not challenged. (Proxy St. at 39)

Plaintiffs contend, however, that the Proxy Statement should also have disclosed that the Ogden Projects ratios were more relevant than the Ogden Corp. ratios, because (according to plaintiffs) Ogden Projects is more closely analogous to WTI than is Ogden Corp.

That argument misconceives the purpose and context of the Ogden-related disclosures, which was to recount, as a factual matter, the information communicated by Lazard and Salomon to the WTI board. The purpose of the Ogden disclosures was not to advocate the relative comparability of Ogden Corp. or Ogden Projects to WTI; indeed, the Proxy Statement explicitly represents that the advisors stated no conclusions in that regard. For the omissions criticized by plaintiffs to become material,

plaintiffs must resort to erecting a straw man (attributing to the advisors a conclusion they never reached or communicated) and then knocking it down (by arguing that that conclusion was misleadingly presented).

3.

The plaintiffs next contend that (a) the Proxy Statement represents that Lazard and Salomon conducted a more thorough "due diligence" review of Waste than was in fact the case, (b) the Proxy Statement fails to disclose the due diligence performed by these firms was insufficient, and (c) the Proxy Statement lacks sufficient information about Waste to enable WTI shareholders to value the Waste shares to be received in the merger.

These claims lack support in the record. First, the fairness opinions of both Lazard (Proxy St. at 35) and of Salomon (*Id* at 36-37) enumerated the steps taken by each firm in the course of its investigation. Plaintiffs can point to no evidence that Lazard and Salomon failed to take any of the steps described in their fairness opinions.

**\*\*7** Second, plaintiffs' claim that the advisors' due diligence review was insufficient rests upon their argument that Lazard and Salomon did not review Waste's four-year plan or adequately assess the $1 billion of goodwill on Waste's books. However, the four-year plan, once developed, is not used for any forecasting or other planning purpose. That plan has significance only as a process that Waste utilizes to encourage its managers to focus upon how they should plan strategically for the long term. Moreover, Lazard's Steven Golub testified at his deposition that Lazard took Waste's goodwill into account in arriving at its fairness opinion.

Third, the record does not support the plaintiffs' claim that the Proxy disclosures concerning Waste are insufficient. The Proxy Statement contains detailed disclosures of Waste's business and management (Proxy St. at 79-80, 83-94), and of its historical financial data and pro forma financial statements. ( *Id* at 19-21, 62-63). Plaintiffs argue that Waste's one-year budget forecast should have been included, but that information was not required by Federal law to be included in the Proxy Statement, and the plaintiffs have not shown why Delaware law should be held to require its disclosure in these circumstances.

4.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1990 WL 131351, Wheelabrator Technologies Inc. Shareholders Litigation, In re, (Del Ch. 1990)    **Page 6**

The Proxy Statement discloses that the 10% premium to be received by WTI shareholders was the product of "negotiations" between WTI and Waste between March 23 and March 30, 1990. Plaintiffs contend that that disclosure is misleading because in fact, Waste voluntarily offered that premium to WTI on March 23. According to plaintiffs, that shows that there were no "negotiations," and that Waste virtually dictated the terms of the deal to WTI.

That argument fails as a matter of evidence. The record shows that Waste first proposed a no-premium, "market-to-market", exchange offer for an additional 33% of WTI's shares. WTI rejected that proposal, and over the next week, it negotiated for different, improved terms. These negotiations ultimately resulted in the merger agreement. The plaintiffs' suggestion that Waste dictated the terms of the transaction, and that the negotiations were a sham, is not supported by evidence. No showing has been made that the Proxy Statement disclosures on this subject are other than accurate.

5. Finally, the plaintiffs assert the Proxy Statement fails to disclose the "true nature and terms" of the Ancillary Agreements. The contention is that the Proxy Statement fails to disclose that (i) Lazard and Salomon made no valuation analyses of the potential benefits of those agreements, and that (ii) the Ancillary Agreements will provide substantial benefits to Waste. This argument is also without merit.

The Ancillary Agreements are described in detail in nine pages of the Proxy Statement (*See* Proxy St. at 51-59). The Agreements cover a variety of matters between WTI and Waste. (*See* page 6, *supra*, footnote 3 of this Opinion). The uncontroverted evidence is that both WTI and its financial advisors believe that these agreements involve potential benefits to WTI, but no attempt has been made to quantify those benefits. The Proxy Statement plainly so states:

**\*\*8** [Lazard] and [Salomon] noted that the agreements ancillary to the proposed merger ... between [Waste] and WTI ... were a meaningful added benefit to the stockholders of WTI. However, [Lazard] and [Salomon] made no attempt to quantify the benefits which might be achieved pursuant to these agreements.

(Proxy St. at 39). Under these circumstances, no further disclosure was required. *See In Re Genentech, Inc. Shareholders Litigation,* Del.Ch.,

Cons. C.A. No. 11377, Chandler, V.C. (June 6, 1990), Mem.Op. at 21.

Lastly, the argument that the Proxy Statement should have disclosed that the Ancillary Agreements are more beneficial to Waste than to WTI, is unsupported by the record, and is, moreover, a litigation-driven characterization of the facts that the defendants are not required to adopt and then disclose. *See In Re Trans World Airlines, Inc. Shareholders Litigation,* Del.Ch., Cons.C.A. No. 9844, Allen, C. (October 21, 1988), Mem.Op. at 30; *Williams v. Geier,* Del.Ch., C.A. No. 8456, Berger, V.C. (May 20, 1987), Mem.Op. at 12.

Based upon the present record, I conclude that the Proxy Statement, far from being deficient, more closely resembles a model of detailed, candid disclosure. No basis has been established for enjoining the shareholder vote at the forthcoming stockholders meeting.

What remains to be determined is the plaintiffs' challenge to the substance of the proposed transaction, *i.e.,* their claims that the directors were grossly negligent and violated their fiduciary duties described in *Revlon.* Those claims are now addressed.

## IV. *THE REVLON AND GROSS NEGLIGENCE CLAIMS*

The plaintiffs seek to enjoin the consummation of the merger (assuming its approval by shareholders) on two grounds: (1) gross negligence of WTI's directors in approving the merger without adequately informing themselves of the value of the corporation and of the fairness of the merger consideration, and (2) the failure of WTI's directors to discharge their *Revlon*-mandated duty to seek and obtain the best possible transaction. Both claims are hotly disputed. For the reasons discussed below, the substance of those claims (FN6) need not be addressed at this stage.

As previously found (*See* Section III, *supra* ), if WTI's shareholders approve the merger, that approval will be based upon a fully informed vote. In *Smith v. Van Gorkom,* Del.Supr., 488 A 2d 858 (1985) (a case involving gross negligence by corporate directors who failed to reach an informed business judgment in approving a merger), the Supreme Court held:

" ... [a] merger can be sustained, notwithstanding the infirmity of the board's action, if its approval by

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

majority vote of the stockholders is found to have been based on an informed electorate."

*Id* at 889. That result flows from the more general principle that except in cases where the transaction is claimed to involve waste of assets, fraud, or *ultra vires*, valid shareholder ratification operates as a complete defense to a claim that the transaction was the product of gross negligence. *See Michelson v Duncan*, Del.Supr., 407 A.2d 211, 218-219 (1979); *Weiss v Rockwell Int'l*, Del.Ch., C.A. No. 8811, Jacobs, V.C. (July 19, 1989), *aff'd per curiam*, Del.Supr., No. 322; 1989 (March 14, 1990). Because WTI's shareholders will decide whether to approve or disapprove the merger, plaintiffs have failed to establish a probability of success on the merits of their gross negligence claim.

**\*\*9** Shareholder ratification would also operate, in my view, as a complete defense to the so-called *Revlon* claim. On that subject two distinguished commentators in this field have observed:

If shareholders can vote, a merger agreement reached in the old-fashioned way--through good faith negotiations conducted at arm's length--can only expand their options. Reading *Revlon* to require something more would only jeopardize proposals that are already on the table without offering shareholders an offsetting gain. The same point may be made more sharply by observing that a merger proposal in today's market invites an auction so clearly that nothing further is required to satisfy *Revlon's* requirements

R. Gilson & R. Kraakman, *What Triggers Revlon?*, 25 Wake Forest L.Rev. 37, 56 (1990). In short, the intervention of a fully informed shareholder vote is equally dispositive of the plaintiffs' *Revlon* claim.

However, even if the *Revlon* claim (assuming it is otherwise meritorious) were not extinguished by an approving shareholder vote, injunctive relief is still not justified. A preliminary injunction would deprive WTI's shareholders of the benefits of the merger transaction without offering them any realistic prospect of a superior alternative, or, for that matter, any alternative. The Court need not and does not decide the disputed question of whether the defendants adequately canvassed the market for superior alternatives. Even so, it is not disputed that since July 30, 1990 (the date of the Proxy Statement), the market has been aware that there are no material impediments to WTI's receiving and entertaining a competing proposal by a third party. The Proxy Statement, which is a public document, explicitly so states, yet no interested third party has ever come forward. The Court can only conclude, at least on this record, that there are no better alternatives and that an injunction would not cause any improved transaction to materialize. The substantial risk that an injunction will do more harm than good brings to mind the Chancellor's admonition in *Solash v. Telex Corp.*, Del.Ch., C.A. No. 9518, 9525 and 9528, Allen, C. (January 19, 1988), Mem.Op. at 33:

[T]he balance of harm in this situation in which there is no alternative transaction and issuance of the injunction inescapably involves a risk that the shareholders will lose the opportunity to cash in their investment at a substantial premium requires not only a special conviction about the strength of the legal claim asserted, but also a strong sense that the risks in granting the preliminary relief of an untoward financial result from the stockholders' point of view is small. Repeatedly the plaintiffs' class action bar exhorts the court to bravely risk the consequences in circumstances such as these, asserting that more money to the shareholders, not less, will probably result. At least on facts such as these, a due respect for the interests of the class on whose behalf these exhortations are made, requires, in my judgment, that this invitation be declined.

**\*\*10.** That observation is equally appropriate here. The plaintiffs' motion for a preliminary injunction is denied. IT IS SO ORDERED.

(FN1.) WTI's independent directors are Messrs. Edward Montgomery, retired chairman of Mellon Bank; Thomas P. Stafford, retired general of the U.S. Air Force; Gerald J. Lewis, retired Judge of the California Court of Appeals and counsel to Latham & Watkins; and Michael D. Dingman, Chairman of Henley.

(FN2.) If the 10% premium on 33% of the stock is spread over 100% of the stock (other than the 22% held by Waste), the premium is approximately 4%. That 4% premium, however, is not comparable to a 4% premium in a cash purchase of 100% of a stockholder's equity at a 4% premium. That is because, in this case, the stockholder is selling only 42%, not 100%, of his WTI stock.

(FN3.) The "Ancillary Agreements" include: (i) an agreement by Waste to use all reasonable efforts to assist WTI in obtaining and maintaining a credit rating of "A" or better for WTI's debt

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

securities (in connection with which Waste may be required to purchase up to $200 million of WTI subordinated debt or preferred stock); (ii) an option permitting WTI to purchase 15% of the stock of Waste Management International, Inc. (a subsidiary of Waste which will own, with certain limited exceptions, all of Waste's interest in Waste Management operation outside of North America) at a 15% discount from the fair market value of such stock at the time the option is exercised; (iii) an option permitting WTI to purchase Waste's medical-waste disposal business at a 15% discount from the fair market value of such business; (iv) provisions for the joint development by WTI and Waste of recycling services and technology, including the grant to WTI of royalty-free licenses to certain recycling and gas recovery technology owned by Waste; and (v) an agreement which (a) provides that Waste will make various services (including cash management, working capital and risk management services) available to WTI, (b) provides for the allocation of business opportunities among Waste and its majority owned subsidiaries, including WTI, and (c) includes an option enabling Waste to maintain its majority ownership of WTI.

(FN4.) The presentations of the financial advisors is fully disclosed at pages 37-42 of the July 30, 1990 Proxy Statement disseminated to WTI shareholders in connection with its shareholders meeting being held to consider the merger proposal.

(FN5.) Plaintiffs also argue that the Proxy Statement misleadingly conceals the higher premium paid in the Combustion Engineering transaction. However, they have not established that such information would have been material, given the advisors' conclusion that the Laidlaw acquisition was more similar to the proposed merger than the Combustion Engineering transaction. Although it does not form a basis for my ruling, I note that that information, in addition to being not material, will be made available to shareholders who request it. As announced in the Proxy Statement, the information concerning the Combustion Engineering transaction (including the premium) is contained in the Lazard/Salomon presentation book, which is available to every shareholder free of charge.

(FN6.) *i e*, the issues of whether the directors exercised due care, whether *Revlon* applies, and, if so, whether *Revlon's* requirements were satisfactorily observed in this case.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

TAB 8

1996 WL 159626, Seagraves v. Urstact Property Co., Inc., (Del Ch. 1996)                    **Page 1**

*159626          UNPUBLISHED OPINION.
CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

**Van H. SEAGRAVES and Eleanor R. Seagraves,
as joint tenants,
Jonathan Lobatto, and Richard J. Fruth,
Plaintiffs,
v.
URSTADT PROPERTY COMPANY, INC.,
Pearce Urstadt Mayer and
Greer, Inc., Charles J. Urstadt, J. Jeffrey
Urstadt, Defendants.**
Civil A. No. 10307.
Submitted Dec. 6, 1995.
Decided April 1, 1996.

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington; Henry E. Gallagher, of Connolly, Bove, Lodge & Hutz, Wilmington; Pamela S. Tikellis, of Chimicles Jacobsen & Tikellis, Wilmington; and Gary Cantor, of Berger & Montague, P.C., Philadelphia, Pennsylvania, for Plaintiffs.

Lewis H. Lazarus, of Morris, James, Hitchens & Williams, Wilmington; and Paul D. Friedland and Christine M. Hoey, of Coudert Brothers, New York City, for Defendants.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

**\*\*1** Pending is the defendants' motion for summary judgment. This stockholders class action arises out of a 1988 cash-out merger between Pearce, Urstadt, Mayer & Greer, Inc. ("PUMG"), a Delaware corporation engaged in real estate investing; and its 90.6% stockholder parent, Urstadt Property Company, Inc. ("UPCO"). The merger, which was effected pursuant to 8 *Del. C.* § 253, generated two separate litigations -- a class action suit and an appraisal action, both of which have been consolidated in this proceeding.

The plaintiffs in this class action are stockholders of PUMG; and the defendants are PUMG, UPCO, and the PUMG's board of directors at the time of the merger. (FN1) The plaintiffs claim that the PUMG directors breached their fiduciary duties by engaging in unfair dealing and by violating their duty of disclosure in connection with the merger. In 1989, the Court granted in part and denied in part the

defendants' motion to dismiss the class action claims, *Seagraves v. Urstadt Property Co.,* Del. Ch., C.A. No. 10307, Jacobs, V.C. (Nov. 13, Revised, Dec. 4, 1989). Thereafter, the parties engaged in discovery.

The defendants have moved for summary judgment dismissing the class action claims, on three separate grounds: (1) the undisputed facts establish that there was no unfair dealing; (2) the complained-of non-disclosures were, in fact, either disclosed to stockholders or were not material, and (3) appraisal is the appropriate remedy because the plaintiffs' unfair dealing claims amount essentially to a dispute over price.

The plaintiffs respond that summary judgment must be denied because the evidentiary record presents a "reasonable hypothesis" that would support a damage recovery.

The Court concludes that summary judgment should be granted in part and denied in part for the reasons stated below.

I. FACTS (FN2)

Before 1985 PUMG was a publicly traded corporation controlled by defendant Charles Urstadt and his co-investors. PUMG had one major asset -- a wholly-owned mortgage brokerage company subsidiary named Pearce Urstadt Mayer & Greer Realty Corp. ("Realty Corp."). Between 1982 and 1985, PUMG stock was listed on the American Stock Exchange, but was thinly traded. In late 1984, when PUMG had between 300 and 400 PUMG stockholders, PUMG initiated a stock repurchase program to acquire 200,000 of its outstanding publicly traded shares. That repurchase program was initiated because management believed that PUMG's shares were undervalued by the market. During this period the Charles Urstadt family was also purchasing PUMG shares independently of PUMG.

In August 1985, PUMG ceased paying dividends to its stockholders. It publicly offered two explanations for that decision: (i) the company wanted to conserve its cash, and (ii) it was prudent not to pay dividends during a time that the brokerage business was experiencing a downturn.

During 1985, PUMG purchased sufficient quantities of its stock to cause it to become delisted from the American Stock Exchange and deregistered under the Securities Exchange Act of 1934. The delisting occurred in September 1985. As a condition

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

of delisting, pursuant to an agreement with the American Stock Exchange, PUMG was required to provide its remaining public stockholders a market in which to sell their shares. Thereafter, PUMG began making open market purchases of its own shares.

**\*\*2** During 1986, PUMG sustained substantial net operating losses and declared no dividends. In January 1987, PUMG sold Realty Corp at a substantial gain. Although that sale generated more than $5 million in cash, PUMG declined to issue a dividend from the proceeds, nor did it pay dividends in either 1987, 1988, or at any time up to the merger.

In 1987, PUMG decided to expand its real estate related investments by, among other things, acquiring shares of HRE Properties ("HRE"), a publicly-traded real estate investment trust. The plan for PUMG to purchase HRE stock was initiated by Charles Urstadt, who had been an HRE stockholder, a member of HRE's Board of Trustees, and Chairman of HRE's Board since 1986.

After the Realty Corp. sale, PUMG no longer had an operating subsidiary. At that point, its assets consisted primarily of its stockholdings in HRE, certain real estate holdings, an interest in a construction publication, and cash.

By the end of 1987, Charles Urstadt and his family had accumulated a large control block (but less than 90%) of PUMG's outstanding stock. Thereafter, the Urstadts decided to pursue a "short-form" merger and "cash out" the remaining 10% minority stock interest. In January 1988, Charles Urstadt formed UPCO as a vehicle to carry out that merger.

The timing of the merger depended largely upon the Urstadts' ability to reach the 90% stock ownership threshold and PUMG's having sufficient cash on hand. While PUMG was preparing for the short-form merger, it simultaneously was negotiating to acquire additional shares of HRE.

By the merger date, PUMG had either acquired, or contracted to acquire, 753,700 shares (12.6%) of HRE's outstanding stock. At the time of the merger, PUMG's stock investment in HRE represented approximately 85% of PUMG's total assets. PUMG acquired its stake in HRE Properties through a series of private placement purchases. In the last of these, on August 10, 1988, PUMG committed to acquire 179,600 shares of HRE Properties at $25 per share -- $1.50 above the prevailing market price.

By early August 1988, the defendants had acquired sufficient PUMG shares to enable them to carry out the short-form merger. At a meeting held on August 10, 1988, the PUMG board approved the cash-out merger at a price of $12.50 per share -- representing a premium of $.50 per share over PUMG's then-current market price.

According to the minutes of the August 10, 1988 board meeting, in arriving at the $12.50 merger price the board considered several factors. These included asset value, earnings, dividend history, forecasts for the merger entity and the historic and current market value of PUMG stock. During the meeting, the board verified the current market price, and made the $12.50 merger consideration contingent on the market price remaining above $12 per share on the effective date of the merger, which was to be August 16, 1988.

That market value was a key consideration in determining the merger price is undisputed. The parties do differ, however, on the relative importance of the other factors the board considered, namely, the fact that PUMG stock had been delisted, that the company had not paid a dividend for three years, and that no PUMG stock had been traded for the six week period preceding the merger.

**\*\*3** After the merger became effective on August 16, 1988, PUMG disseminated to its stockholders an Information Statement and Notice of Merger that described the background of the merger and outlined the merger terms. The Information Statement contained PUMG financial statements and consolidated balance sheets for years 1986 through 1988, and earnings projections for years 1988 to 1990. The Information Statement also disclosed that PUMG had agreed to purchase an additional 179,600 HRE shares. However, it did not disclose the price that was to be paid for those HRE shares, that the board had applied a "block discount" in valuing its HRE stockholdings for the purposes of the merger, or that available cash on hand was also a factor the board considered in arriving at the merger price. Moreover, in a footnote to PUMG's consolidated financial statements, the defendants disclosed that "an officer of the Company [[[PUMG] is also an officer of HRE, giving the Company the ability to exercise significant influence." However, the Information Statement did not disclose that that officer was Charles Urstadt or that his position was Chairman of HRE's Board of Directors.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1996 WL 159626, Seagraves v. Urstact Property Co., Inc., (Del.Ch. 1996)                    **Page 3**

Six months after the merger, Kimco Development Corp., a HRE minority stockholder, offered to purchase all of HRE's outstanding stock for $27 per share -- a price significantly higher than the value PUMG had assigned to its HRE stockholdings in the merger. (FN3) It is undisputed that no material developments affecting the value of the HRE stock had occurred between the merger date and the Kimco offer. Charles Urstadt hired an investment banker to analyze the Kimco offer on HRE's behalf. The investment banker concluded that the $27 offering price was inadequate.

In the merger, the minority stockholders of PUMG were to receive $12.50 per share. Eight stockholders, including the plaintiffs, instead elected to seek appraisal. The plaintiffs also brought this class action alleging breach of fiduciary duty claims.

## II. APPLICABLE REVIEW STANDARD

Summary judgment may be granted if, on the undisputed facts, the moving party establishes he or she is entitled to judgment as a matter of law. *Bershad v. Curtiss Wright Corp.*, Del. Supr., 535 A.2d 840, 844 (1987). On a motion for summary judgment, the Court will view the evidence in the light most favorable to the non-moving party. *Judah v. Delaware Trust Co.*, Del. Supr., 378 A.2d 624, 632 (1977). A summary judgment motion "must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom." *Bershad v. Curtiss Wright Corp.*, 535 A.2d at 844 (quoting *Vanaman v. Milford Memorial Hospital, Inc.*, Del. Supr., 272 A.2d 718, 720 (1970) ).

The judicial review standard for interested cash-out merger transactions by a controlling stockholder is entire fairness. *Kahn v. Lynch Communication Systems, Inc.*, Del. Supr., 638 A.2d 1110, 1117 (1994). The entire fairness form of review entails a unitary, non-bifurcated assessment of whether there was both fair dealing and fair price. In making that assessment, the Court must consider all relevant components, first singly and then together as a whole. *Cinerama, Inc. v. Technicolor*, Del. Supr., 663 A.2d 1156, 1162-63 (1995) (citing *Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701, 711 (1983)); *See Kahn v. Tremont Corporation*, Del. Ch., C.A. No. 12339, Allen, C., Mem. Op. at 20-21 (Mar. 21, 1996, Revised, Mar. 27, 1996).

**\*\*4** Thus, to prevail on their motion for summary

judgment, the defendants must demonstrate that the record evidence, viewed in the light most favorable to the plaintiffs, including all reasonable inferences, compels a conclusion that the transaction was entirely fair. *See Weinberger v. UOP, Inc.* 457 A.2d at 714; *Rabkin v. Philip A. Hunt Chemical Co.*, Del. Supr., 498 A.2d 1099, 1104-05 (1985).

## III. WHETHER APPRAISAL IS THE EXCLUSIVE REMEDY

The defendants' primary contention is that appraisal is the exclusive remedy, thereby requiring dismissal of this class action. I address that argument first.

As a general matter, appraisal will be the exclusive remedy for minority stockholders cashed out in a short-form merger effectuated pursuant to 8 *Del. C.* § 253, if the dispute involves essentially issues of value. *Nebel v. Southwest Bancorp., Inc.*, Del. Ch., C.A. No. 13618, Jacobs, V.C. (Jul. 5, 1995), Mem. Op. at 4; *Stauffer v. Standard Brands, Inc.*, Del. Supr., 187 A.2d 78 (1962). That is because the purpose of § 253 is to provide a parent corporation a means to eliminate unilaterally the minority stockholders' interest in the enterprise. *Stauffer*, 187 A.2d at 80.

Delaware law recognizes, however, that appraisal may not provide an adequate remedy to minority stockholders where "fraud, misrepresentation, [or] self-dealing ... are involved." *Nebel v. Southwest Bancorp*, Mem. Op. at 4 (citing *Weinberger v. UOP, Inc.*, 457 A.2d at 714); *see also Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d at 1106. The appraisal remedy also may not afford an adequate remedy for disclosure-based claims, such as in cases where material misdisclosures or nondisclosures might warrant injunctive relief. *Nebel v. Southwest Bancorp*, Mem. Op. at 5; *see also Sealy Mattress Co. v. Sealy Inc.*, Del. Ch., 532 A.2d 1324, 1341-42 (1987).

The question is whether that exception is applicable in this case. In the present (summary judgment) context, the answer depends upon whether there is evidence of unfair dealing sufficient to justify a conclusion that appraisal would not afford adequate relief. *Compare Stauffer v. Standard Brands, Inc.* (finding appraisal remedy appropriate) *with Weinberger v. UOP, Inc.* (finding that exception to exclusive appraisal remedy warranted). I conclude, for the reasons next discussed, that the evidence supports a reasonable inference that the defendants

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

may have engaged in unfair dealing of a kind that cannot be adequately remedied in an appraisal. See Part IV.B., *infra*

## IV. ANALYSIS

### A. *Entire Fairness Assessment*

Because the merger was a self-dealing transaction, the burden of proving entire fairness rests on the defendants. *Kahn v. Lynch Communication Systems, Inc., supra* To satisfy that burden on the pending motion, the defendants must establish, based on undisputed material facts, that the merger was entirely fair as a matter of law and that any evidence of unfairness goes solely to price, for which the exclusive remedy is appraisal. The Court concludes that the evidence pertinent to both fair dealing and fair price raises disputed issues of material fact that can be resolved only after a trial.

#### 1. *Fair Dealing Analysis*

**\*\*5** Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger v. UOP, Inc.,* 457 A.2d at 711. Plaintiffs' unfair dealing claims rest upon the premise that the PUMG directors' decision to approve the $12.50 per share merger price was self-interested and improperly motivated. Specifically, the plaintiffs contend the board relied heavily (and improperly) upon PUMG's then-market price, despite the directors' knowledge that PUMG's market price did not fairly reflect the company's fair value. The plaintiffs also contend that the defendants misdisclosed material facts to shareholders in the information statement. I now address that fair dealing claim.

##### a. *Process.*

It is undisputed that the defendants did not institute any procedural safeguards designed to replicate arm's length bargaining or to assure that the interests of minority stockholders would be adequately protected. Specifically, the board declined to obtain a fairness opinion from an investment banking firm or an appraisal of the corporation's real estate holdings. Nor did it establish an independent committee to negotiate the transaction at arms length with the majority stockholder. (FN4) A board is not legally required to utilize an independent negotiating committee or obtaining an investment banker fairness opinion. *See Smith v. Van Gorkom.* Del. Supr., 488 A.2d 858, 876 (1985); *Rabkin v. Philip A. Hunt Chemical Corp., supra; Seagraves v. Urstadt,* Mem. Op. at 8. However, where a board does employ one or more of those procedural safeguards, that will be viewed as persuasive evidence that the minority stockholders were treated fairly.

In this case, the PUMG's board's failure to implement any of these procedural safeguards is a factor evidences the absence of fair dealing. (FN5)

##### b. *Disclosure*

The plaintiffs also claim the defendants breached their fiduciary duty to disclose material facts in the Information Statement sent to PUMG stockholders. Although the plaintiffs originally ten disclosure claims, they have elected to pursue only four. (FN6) Plaintiffs' failure to oppose the defendants' motion as to the remaining six disclosure claims merits their dismissal. *See Weiss v. Rockwell International Corp.,* Del. Ch., C.A. No. 8811, Jacobs, V.C., (July, 1989), *aff'd.* Del. Supr., 574 A.2d 264 (1990).

Delaware law imposes a fiduciary obligation to disclose all material information that would affect a minority stockholder's decision whether to accept the merger consideration or to seek an appraisal or other available litigation remedy. *Shell Petroleum, Inc. v. Smith,* Del. Supr., 606 A.2d 112, 114 (1992); *Weinberger v. UOP,* 457 A.2d at 711-12. Delaware has adopted the federal standard for determining materiality. *Rosenblatt v. Getty Oil Co.,* Del. Supr., 493 A.2d 929, 944 (1985); *TSC Industries, Inc. v. Northway. Inc.,* 426 U.S. 438, 449 (1976). Material information is that which would assume actual significance in the deliberations of a reasonable stockholder. *Zirn v. VLI Corp.,* Del. Supr., 621 A.2d 773, 779 (1993).

**\*\*6** The plaintiffs claim that the record evidences that the defendants failed to disclose material facts relating to (i) the value of the HRE stock, (ii) to PUMG's chosen method of valuing its HRE stock, (iii) to Charles Urstadt's position at HRE, and (iv) to the fact that cash on hand was a significant factor in arriving at the merger price. Those disclosure claims are now addressed.

##### (i) *Disclosures Relating to the Value of PUMG's HRE Shares*

Three of the plaintiffs' four disclosure claims

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

relate to PUMG's valuation of its HRE stock. Because the HRE stock accounted for roughly 85% of PUMG's assets at the time of the merger, clearly the value of that stock was material. *Shell Petroleum. Inc. v. Smith,* 606 A.2d at 114-15.

The plaintiffs' first claim -- that the defendants failed to disclose that they had applied a block discount in valuing PUMG's holdings of the HRE stock -- is factually disputed. If in fact a block discount was applied, that was material, because that discount directly impacts to PUMG's valuation of its principal asset. The parties dispute whether PUMG's directors did in fact apply a block discount. Charles Urstadt's deposition testimony supports a reasonable inference that a discount was applied. Charles Urstadt Dep. at 163-167. That is sufficient to preclude summary judgment on this issue.

Second, the plaintiffs claim that PUMG failed to disclose that on August 10, 1988 it purchased additional HRE shares at a premium above the current market price. Payment of that premium is on its face inconsistent with PUMG's decision to discount the HRE stock to a value below market price. A reasonable stockholder would find the premium significant in deciding whether to accept PUMG's merger consideration, because disclosure of the premium would give a stockholder reason to question the fairness of the lower valuation of the company's HRE stockholdings made by the PUMG board that same day.

Third, the plaintiffs claim that the defendants wrongfully omitted to disclose Charles Urstadt's status as Chairman of HRE. In that regard all the Information Statement disclosed was that "an officer of the Company [PUMG] is also an officer of HRE, giving the Company the ability to exercise significant influence." However, Mr. Urstadt's status as HRE Chairman, combined with the disclosure of the premium paid in the August 10 stock purchase, would have signaled to minority stockholders that PUMG believed that its HRE stockholdings were worth more than the value that the PUMG board had attributed to those stockholdings in fixing the merger price. (FN7)

### (ii) *Disclosure Relating to Cash on Hand*

The plaintiffs next claim that the defendants wrongfully omitted to disclose that available cash was a significant factor in establishing the merger price. Whether or not that is a "fact" is disputed; the evidence goes both ways. The Court cannot resolve that evidentiary dispute on a motion for summary judgment. *Data General Corp v. Digital Computer Controls, Inc.,* Del. Supr., 297 A.2d 437, 439 (1972). All it can determine is whether the evidence adduced by the opposing party is sufficient to create a material fact issue. I find that it is. If, in fact, cash on hand was an important factor in fixing the merger price, that would have been material, because it would indicate that the merger price was based on considerations unrelated to the company's intrinsic worth. *See Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A.No. 7954, Chandler, V.C., Mem. Op. at 7 (Sept. 16, 1994) (holding that information regarding how merger price was determined would be material to a stockholder deciding whether to accept merger terms).

**\*\*7** Having concluded that the fair dealing claims involve disputed issues of material fact, the Court now addresses the subject of fair price.

### 2. *Fair Price Analysis*

The plaintiff contends that PUMG's heavy reliance on market price is evidence that the merger was unfair. I agree. To be reliable, market price must be established in an active market. *See Kahn v. Tremont Corporation,* Mem. Op. at 20-21. In this case, PUMG stock was not traded at all for the six weeks preceding the merger. Moreover, PUMG's stock had been delisted, the company had not paid a dividend for three years, and it was controlled by a family having majority voting power. Indeed, in 1984 the Board had approved the stock repurchase program because in its view the market had undervalued the PUMG stock. In 1988 the market for PUMG stock was less reliable than it was in 1984. In such circumstances it is reasonable to infer that stock's only likely buyers would be the Urstadts (because of their desire to attain 90% stockholder status to effectuate the merger) or PUMG (which was obligated to provide a market under the delisting agreement). For this reason and because the Urstadts controlled PUMG, they had the ability significantly to influence the market price for the PUMG shares.

The plaintiffs also contend that the PUMG board's reliance on PUMG's book value (in this case, historical cost less depreciation) as a basis for fixing the merger price is additional evidence that the price was unfair. Book value is not a meaningful measure of a corporation's intrinsic or fair value. *See David J. Greene & Co. v. Schenley Industries, Inc.,* Del. Ch., 281 A.2d 30, 34 (1971). Moreover, the evidence permits the inference that the defendants chose to

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1996 WL 159626, Seagraves v. Urstact Property Co., Inc., (Del.Ch. 1996)                              **Page 6**

apply a block discount to PUMG's HRE stockholdings, even though (a) PUMG owned a significant stake in HRE, (b) Charles Urstadt was Chairman of the HRE board, and (c) defendants agreed for PUMG to pay a premium for additional shares of HRE stock the same day they approved the merger. It is facially inconsistent for PUMG to discount its HRE holdings for purposes of determining the merger consideration, while simultaneously paying a premium to acquire additional HRE shares on the open market. Some explanation for that inconsistency is called for, and a trial is needed for that explanation to be presented and explored.

Finally, the plaintiffs argue that the price was unfair, as evidenced by the defendants' reliance upon PUMG's historic nonpayment of dividends in fixing the merger consideration, even though at the time of the merger PUMG had significant cash on hand from its sale of Realty Corp. Therefore, plaintiffs argue, PUMG clearly had the ability to pay a dividend if its board chose to do so. I agree that a fact finder could infer that the board's reliance on the company's no-dividend policy, which the PUMG board had the unfettered ability to reverse, evidences that the merger price was not fairly determined.

### B. *The Nonexclusiveness of the Appraisal Remedy*

**\*\*8.** Because the entire fairness analysis involves several issues of material fact, the merits of this case cannot be resolved on a motion for summary judgment. For that reason the Court must reject the defendants' argument that appraisal is the exclusive remedy must be rejected. In this case, the evidence of process and disclosure infirmities, coupled with the directors' decision not to afford the minority any procedural safeguards, permit a reasonable inference that the defendants acted intentionally; that is, that they deliberately undervalued PUMG, and withheld disclosure of material facts, to benefit the control group at the minority's expense. Unfair dealing of this kind, if proven, would implicate the exception to the exclusivity-of-appraisal doctrine. *See Rabkin v. Philip A. Hunt Chemical Corp., supra.* Because those issues cannot be resolved without a trial in this class action, it follows that the plaintiffs cannot be remitted to their appraisal remedy.

### V. *Conclusion*

Except for (i) the claim of unfair timing and (ii) the disclosure claims that the plaintiffs have abandoned, the defendants' motion for summary judgment is denied. Counsel shall submit a form of order implementing the foregoing rulings.

(FN1.) The named director defendants are Charles J. Urstadt, J. Jeffrey Urstadt, George H. C. Lawrence, and Robert G. Wilson. The Urstadts formed UPCO in January 1988 as a vehicle for the short-form merger and contributed their 90.6% stock interest in PUMG in UPCO prior to proceeding with the short form merger.

(FN2.) Except where noted, the facts are undisputed. All inferences from the facts are drawn in the light most favorable to the plaintiffs. *Judah v. Delaware Trust Co.,* Del. Supr., 378 A.2d 624, 632 (1977).

(FN3.) At the time of the merger, the market price of HRE stock was $23.50 per share. The application by the defendants of a "block discount" to the market price necessarily resulted in a valuation of HRE (for merger purposes) at below $23.50.

(FN4.) The board's decision not to institute those procedural safeguards stands in contrast to Charles Urstadt's decision to engage an investment banker six months later, when HRE was evaluating the $27 per share Kimco offer that the investment banker found inadequate. Since there had been no material improvements in HRE during the six months between the merger and the Kimco offer, it can reasonably be inferred that an investment banker engaged to represent the minority stockholder's interests in the merger would not have applied a block discount to value the HRE shares below the then-prevailing $23.50 market price. Rather, it is inferable that an investment banker would have valued those shares at a premium, which is precisely what occurred the same day the merger was approved, when PUMG acquired HRE shares in a private placement on August 10, 1988; and also six months later in connection with the Kimco offer.

(FN5.) Plaintiffs assert, as a separate basis for their unfair dealing claims, that the merger was inequitably timed to preclude minority shareholders from benefiting from the anticipated improvements in the market price of HRE stock. There was a short term rise in the price of HRE stock after the merger, but the price then dropped below $20. PUMG did not sell its HRE stock, and there is no evidence that defendants timed the merger in order to profit from "anticipated improvements in HRE's perceived value." Because of this failure of proof, summary

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

judgment will be granted dismissing the claims related to "unfair timing."

(FN6.) Although the plaintiffs have raised the duty of disclosure claim as an independent claim, the adequacy of disclosure also is a component of fair dealing. For that reason the Court treats the disclosure claims as part of the entire fairness analysis.

The original disclosure claims were for: (1) failure to disclose the current value of the company's assets, including HRE stock, real estate holdings, and the company's interest in New York Construction News; (2) misdisclosure of Charles Urstadt's status as Chairman of HRE; (3) failure to clearly state PUMG's $22 per share book value; (4) failure to disclose that PUMG paid a premium for acquiring HRE shares; (5) failure to disclose the value of PUMG if the HRE stock had been valued at $25 per share; (6) failure to disclose that PUMG paid no dividends in order to facilitate the merger; (7) misdisclosure of PUMG's tax liabilities; and (8) misrepresentation of PUMG's involvement in the real estate brokerage business; (9) failure to disclose that PUMG had applied a block discount in valuing its HRE stockholders; and (10) failure to disclose that cash on hand was a significant factor in fixing merger price. Of these claims, the plaintiffs are pursuing only those numbered (2), (4), (9), and (10).

(FN7.) The duty of disclosure runs from the fiduciary directly to beneficiary stockholders. *See Sealy Mattress Co. v. Sealy, Inc.* 532 A.2d at 1340. Therefore, that these plaintiffs may have had actual knowledge of Urstadt's status at HRE does not foreclose inquiry into whether defendants breached their fiduciary duties of disclosure to the minority stockholders as a class.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

TAB 9



Not Reported in F. Supp.2d

Page 1

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
Victoria SHAEV, Plaintiff,
v.
Sir Ronald HAMPEL, John P. Mulroney, Marina
V.N. Whitman, Alain J.P. Belda,
Hugh M. Morgan, Henry B. Schacht, Franklin A.
Thomas, Kenneth W. Dam, Judith M.
Gueron, Paul H. O'Neill, Joseph T. Gorman,
George E. Bergeron, Richard L.
Fischer, L. Patrick Hassey, Richard B. Kelson,
Denis A. Demblowski,
PricewaterhouseCoopers LLP, and Alcoa Inc.,
Defendants.
**No. 99 Civ. 10578(RMB).**

Oct. 25, 2002.

Shareholder brought action against corporation, its
officers and directors, and its outside accountant for
alleged proxy solicitation misrepresentations. On
defendants' motion to dismiss, the District Court,
Berman, J., held that: (1) suit was not time-barred,
and (2) statement was not misleading.

Motion granted.

West Headnotes

**[1] Limitation of Actions** ⬤⟹125
241k125 Most Cited Cases
Complaint     alleging     proxy     solicitation
misrepresentations,   which    merely   substituted
individual   shareholders   for   originally   named
corporate plaintiff, related back to filing of original
complaint,   for   limitations   purposes.   Securities
Exchange Act of 1934, § 14(a), 15 U.S.C.A. §
78n(a); Fed.Rules Civ.Proc.Rules 15, 17(a), 28

U.S.C.A.

**[2] Securities Regulation** ⬤⟹49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not
required to provide estimate of cost of plan.
Securities Exchange Act of 1934, § 14(a), 15
U.S.C.A. § 78n(a).

**[3] Securities Regulation** ⬤⟹49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not
required   to   disclose   federal   income   tax
consequences for stock option recipients. Securities
Exchange Act of 1934, § 14(a), 15 U.S.C.A. §
78n(a).

**[4] Securities Regulation** ⬤⟹49.21
349Bk49.21 Most Cited Cases
Alleged errors in valuation estimates, contained in
proxy solicitation for stock incentive plan, were not
misleading;     statement     expressly     warned
shareholders    that    valuations    were    estimates,
assumptions on which estimates were based were
disclosed, and there was no showing that valuations
were made without reasonable basis or in other than
good faith. Securities Exchange Act
of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[5] Securities Regulation** ⬤⟹49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy    solicitation    for    stock    incentive    plan
adequately   disclosed   number   of   shares   available
under plan; statement disclosed number of shares
and circumstances under which additional shares
could become available. Securities Exchange Act
of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[6] Securities Regulation** ⬤⟹49.22(3)
349Bk49.22(3) Most Cited Cases
Proxy solicitation for stock incentive plan was not
required to provide full text of plan; statement
merely had to disclose material features of plan.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F. Supp.2d

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

*DECISION AND ORDER*

BERMAN, J.

I. Introduction

*1 Plaintiff Victoria Shaev ("Plaintiff") filed her original action on October 15, 1999 ("Complaint") against Alcoa, Inc. ("Alcoa"), certain Alcoa officers and directors, and Alcoa's outside accountant, PricewaterhouseCoopers LLP (collectively "Defendants"), as a derivative action "in the right of and for the benefit of" Alcoa, alleging violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) ( "Section 14(a)"), and 17 C.F.R. § 240.14a-9 ("Rule 14a-9") promulgated thereunder. Plaintiff alleged that Defendants "knew or should have known" about certain "materially false representations and omissions" made in connection with the solicitation of Alcoa stockholders by means of a proxy statement, dated March 8, 1999 ("Proxy Statement" or "PS"). Comp. ¶¶ 30-33. Plaintiff's derivative action was dismissed without prejudice on March 19, 2001 for Plaintiff's failure to make a demand on the Alcoa Board of Directors ("Board"). Order, dated March 19, 2001, at 7 ("The Court believes that such a demand, required under Pennsylvania law, would not, as a matter of law, be inconsistent with applicable Federal policy.").

Following dismissal, on May 31, 2001, Plaintiff filed an amended complaint ("Amended Complaint") alleging claims on her own behalf and "on behalf of all the stockholders of Alcoa, except the individual defendants and the participants in [Alcoa's stock incentive plan]". Am. Comp. ¶ 34. Plaintiff otherwise makes the same substantive allegations she made in the Complaint. On June 25, 2001, Defendants moved to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ.P.") 9(b) and 12(b)(6) ( "Def.Mem."). On July 12, 2001, Plaintiff submitted an opposition memorandum ("Pl.Mem."); and, on July 27, 2001, Defendants submitted a reply

memorandum ("Def. Reply Mem."). Oral argument was held on October 24, 2002. For the reasons set forth below, Defendants' motion is granted.

II. Background

In January 1999, the Board approved the Alcoa Stock Incentive Plan ("Plan") to replace the company's Long Term Incentive Plan ("Prior Plan"), subject to shareholder approval at the stockholders' May 7, 1999 annual meeting ("Annual Meeting"). Am. Comp. ¶ 6; PS at 21. On March 8, 1999, the Proxy Statement and Alcoa's 1998 Annual Report ("Annual Report") were sent to stockholders, and a copy of the Plan was filed with the Securities and Exchange Commission ("SEC" or "Commission").

The Proxy Statement "summarized the principal features" of the Plan and provided a toll-free number for stockholders to obtain a copy. PS at 21. The Plan authorized the Board of Directors to grant Alcoa employees stock options, so-called reload options, and stock appreciation rights ("SARs"). [FN1] *Id.* Alcoa sought shareholder approval for the authorization of 14 million shares of Alcoa common stock for issuance under the Plan. *Id.* at 21. The Proxy Statement also provided that:

> FN1. Ordinary stock options give the holders the right to purchase, for a specified time, a fixed number of shares at a fixed price. Reload options are granted upon exercise of options received under an initial grant. *See* PS at 15. The option holder can "reload" by receiving a new option grant "at the current market price" and with the same expiration date as the exercised option." "covering the number of shares exercised in the underlying option less the number of profit shares delivered to the optionee after withholding for taxes." PS at 15. An SAR entitles the holder to receive, upon exercise, the excess of the fair market value of the shares on the exercise date over the SAR grant price. *Id.* at 22.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

*2 In addition to the 14 million shares, the following also would be available to grant under the Plan:
Shares subject to awards under the Plan or the Prior Plan that are forfeited, settle for cash, expire or otherwise terminate without issuance of shares;
Shares tendered in payment of the purchase price of an option award under the Plan or the Prior Plan or tendered or withheld to pay required withholding taxes; and
Shares repurchased by Alcoa and designated by the Board as available for issuance under the Plan.

*Id.*

The Proxy Statement stated that the Compensation Committee of the Board could also grant "Substitute Awards" to employees of companies acquired by Alcoa (or a subsidiary) "in exchange for or assumption of outstanding stock-based awards granted by the acquired company." *Id* at 23. It described Alcoa's "practice to repurchase shares in the open market in amounts at least equal to the number of shares issued under employee stock option and other stock incentive plans." *Id.* at 25.

The Proxy Statement contained a chart summarizing the options and reload options that were granted in 1998 under the Prior Plan for the six highest paid executive officers of Alcoa ("1998 Chart"). *Id.* at 18. Among other things, the 1998 Chart gave the actual exercise price for each issued option, the number of securities underlying the option, and the estimated present value of the option. *Id.* The Proxy Statement stated that Alcoa had used the Black-Scholes option pricing model to estimate the present value of the option grants reflected in the 1998 Chart. *Id.* at 19 [FN2]

> FN2. Alcoa "used the following assumptions in calculating grant date present value: volatility--25%; average risk-free rate of return--5.2%; dividend yield--2.1%; expected life, annual grants--2.5 years; expected life, reload grants--1.5 years." PS at 19 n. 2.

The Plan was approved at the Annual Meeting and became effective on June 1, 1999. Am. Comp. ¶¶ 8-9. Thereafter, Alcoa acquired Reynolds Metals Company ("Reynolds") and, in connection with that transaction, granted options in the year 2000 for approximately 7.6 million Alcoa shares to former Reynolds employees to substitute for Reynolds options. *Id.* at ¶ 16. Also in 2000, Alcoa granted stock options pursuant to the Plan covering nearly 15.6 million (other) Alcoa shares. *Id.*

III. Standard of Review

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief' " *Polar International Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 229 (S.D.N.Y.2000) (quoting *Harris,* 186 F.3d at 247). "[T]he court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor." *Id.*

"In deciding a Rule 12(b)(6) motion, the district court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits or documents incorporated in the complaint by reference." *Id.* at 230. In securities fraud actions, the Court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) [FN3] Where a "plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint." *Steinberg v. PRT Group,* 88 F.Supp.2d 294, 300 (S.D.N.Y.2000).

> FN3. The Court has considered the Proxy Statement and the Annual Report, in addition to the Complaint and Amended Complaint.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

Page 4

IV. Analysis

*3 Defendants contend that the Amended Complaint: (i) is barred by the statute of limitations because "plaintiff knew all the facts on which she premises her claim[ ] at least by October 15, 1999, when she filed the initial, derivative complaint ... [but] did not file the Amended Complaint ... until May 31, 2001," Def. Mem. at 8; (ii) is not plead with particularity required under Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u-4(b)(1) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *id* at 6; and (iii) fails to state a claim because "the alleged [misstatements and] omissions did not render the Proxy Statement materially false or misleading." *Id* at 13, 21. Plaintiff contends that: (i) the Amended Complaint, filed May 31, 2001, is timely because it "relates back" to the Complaint under Fed.Civ.P. 15(c), Pl. Mem. at 3- 4; (ii) her claim is governed by a negligence standard, *id* at 7, and therefore, Fed.R.Civ.P. 9(b) and the PSLRA do not apply, *id* at 9; and (iii) the Proxy Statement does contain material misrepresentations and omissions. *Id* at 11.

A. Time-Bar and Relation Back

[1] A Section 14(a) claim "must be brought within ... one year from discovery of the conduct constituting the violation." *In re American Express Co. Shareholder Litig.*, 840 F.Supp. 260, 267 (S.D.N.Y.1993). Plaintiff knew all of the facts which constituted the alleged violation by October 15, 1999, when she filed the Complaint Thus, to be timely, the Amended Complaint had to have been filed by October 15, 2000, but, in fact, it was filed on or about May 31, 2001--more than seven months (too) late. *See id*

The parties agree that Plaintiff's Section 14(a) claim is time-barred unless it "relates back" to the Complaint within the meaning of Fed.R.Civ.P. 15(c) , but the parties disagree as to which section of Fed.R.Civ.P. 15(c) applies to the Amended Complaint. [FN4] While Fed.R.Civ.P. 15 was meant generally to be applicable to a proposed change of plaintiffs, "Rule 17(a) is implicated as well." *Advanced Magnetics, Inc. v. Bayfront Ptns.*,

*Inc.*, 106 F.3d 11, 19 (2d Cir.1997). *See also* Fed.R.Civ.P. 15 Advisory Committee Notes (1966) ("Also relevant is ... Rule 17(a) (real party in interest).")

> FN4. The Court has also considered the Supreme Court of Iowa's opinion in *Rieff v. Evans,* 630 N.W.2d 278 (Iowa 2001), referenced by Plaintiff's counsel at oral argument.

Fed.R.Civ.P. 17(a) provides (in pertinent part) that "No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ... substitution of, the real party in interest; and such ... substitution shall have the same effect as if the action had been commenced in the name of the real party in interest." Fed. R. Civ. 17(a). In *Advanced Magnetics* the United States Court of Appeals for the Second Circuit found that Fed.R.Civ.P. 17(a) governed where a plaintiff sought to amend its complaint to substitute individual shareholders for the corporate plaintiff originally named. The Second Circuit reversed the district court's determination that the amended complaint would not relate back under Fed.R.Civ.P. 15(c), finding that "Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or participants." *Advanced Magnetics,* 106 F.3d at 20.

*4 As in *Advanced Magnetics,* Plaintiff Shaev's amended claims "are sufficiently asserted in the original complaint." *Id* Indeed, Defendants agree that the "Amended Complaint alleges the same cause of action, based on the same facts as the initial complaint." [FN5] Def. Mem at 6 Consequently, the Complaint's "only pertinent flaw was the identity of the party pursuing those claims." *Advanced Magnetics,* 106 F.3d at 20. The Court perceives no unfairness to Defendants in allowing substitution of Plaintiff as the real party in interest. *See id* at 21 ("Nor do we see any unfairness to defendants in allowing the substitution of the selling shareholders as plaintiffs on their respective

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

(Cite as: 2002 WL 31413805 (S.D.N.Y.))

claims.") See also Staren v. American Nat'l Bank & Trust Co., 529 F.2d 1257, 1263 (7th Cir.1976) ("the substituted corporate plaintiff had such an identity of interest with the individual plaintiffs that the original complaint served to notify defendant ... of the actual claim being asserted against it, with no resulting prejudice to its interests.") Therefore, the Amended Complaint may be said to relate back. [FN6] See Advanced Magnetics, 106 F.3d at 21.

> FN5. Defendants also concede that Plaintiff's "substantive factual allegations regarding the Proxy Statement are exactly the same as they were in the initial complaint." Def. Mem. at 6.

> FN6. The Court is not here ruling whether or not a class action would be timely in this case. For the purposes of this motion the Court finds that Plaintiff's individual claim survives.

B. Particularity

The parties disagree as to whether the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA apply to Plaintiff's claims. Defendants contend that because "Section 14(a) and Rule 14a-9 are antifraud provisions of the federal proxy rules ... a claim under those provisions must be pleaded with particularity pursuant to [Fed.R.Civ.P.] 9(b) and [15 U.S.C.] § 78u-4(b)(1) of the PSLRA." Def. Mem. at 10. Plaintiff argues that Fed.R.Civ.P. 9(b) and the PSLRA are inapplicable because her claim "is governed by a negligence standard." Pl. Mem. at 7-9.

Because the Court, for the reasons discussed below, dismisses Plaintiff's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) there is no need to resolve the question of whether (or not) Fed.R.Civ.P. 9(b) and the PSLRA apply. See, e.g., Mercury Air Group, Inc. v. Jet USA Airlines, Inc., No. 97 Civ. 3473(LMM), 1998 WL 542291 at *8 (S.D.N.Y. Aug.26, 1998) ("the Court grants defendants' 12(b)(6) motion ... [t]he Court does not reach the merits of defendants' motion to dismiss pursuant to Rule 9(b)").

C. Alleged Material Misrepresentations and Omissions

Plaintiff alleges that the Proxy Statement contains material misrepresentations and omissions with regard to: (1) the cost of the Plan; (2) the number of shares available under the Plan; and (3) the text of the Plan.

1. Cost of the Plan

[2] Plaintiff alleges that Defendants failed to disclose "a reasonable estimate" of the cost of the Plan. [FN7] Am. Comp. ¶ 18. At the same time, Plaintiff (somewhat inconsistently) contends that the Proxy Statement makes "materially false and misleading" representations that "understate the cost of the plan to Alcoa." Am. Comp. ¶ 19. Defendants argue that "there is no obligation under § 14(a) or Rule 14a-9 for Alcoa to provide an estimate of the cost of the plan." Def. Mem at 14. Defendants also contend that the challenged disclosures in the Proxy Statement were not materially misleading and "bear no relation to the cost" of the Plan. Def. Mem. at 22.

> FN7. Plaintiff contends that an estimate of the Plan's cost, specifically an estimate prepared in accordance with the so-called Black-Scholes option pricing model, is a material fact that must be included in the Proxy Statement. Pl. Mem. at 16.

*5 "Section 14(a) makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.' 15 U.S.C. § 78n(a). Rule 14a-9, in turn, prohibits proxy solicitation 'by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.' 17 C.F.R. § 240.14a-9(a). In the context of a proxy statement, a fact is material 'if there is a substantial likelihood that a reasonable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                                    Page 6

2002 WL 31413805 (S D N Y ), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

shareholder would consider it important in deciding how to vote " ' *Resnik v Swartz,* 303 F 3d 147, 151 (2d Cir 2002) (internal case citations omitted)

Plaintiff fails to cite any authority in support of the proposition that Section 14(a) and Rule 14a-9 require the disclosure of a Black-Scholes estimate of the Plan's cost. Indeed, at least six courts, including most recently the United States Court of Appeals for the Second Circuit, have considered (and rejected) the Plaintiff's argument. [FN8] *See, Resnik,* 303 F 3d at 155; *Seinfeld v Bartz,* No C01-2259, 2002 WL 243597 (N D Cal Feb 8, 2002) ; *Resnik v Swartz,* No Civ 5355(LMM), 2001 WL 15671 (S D N Y Jan 8, 2001); *In re 3Com Corp S'holder Litig ,* No. C A. 16721, 1999 WL 1009210 (Del Ch Oct 25, 1999); *Cohen v Calloway,* 246 A D 2d 473, 667 N Y S 2d 249 (1st Dep't 1998); *Lewis v Vogelstein,* 699 A 2d 327 (Del Ch 1997). "Courts in all ... of these cases held that Black-Scholes valuations are not material as a matter of law " *Seinfeld.* 2002 WL 243597 at *3 (emphasis added).

> FN8 Counsel for Plaintiff was also counsel for the plaintiffs in each of these actions.

In *Resnik,* the Second Circuit noted that: "Disclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor. For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." 303 F 3d at 154. Here, as in *Resnik,* "no duty of disclosure has been established " *Id* If Plaintiff "believes that Black-Scholes value disclosure should be mandatory whenever shareholders' approval is sought for a proposed option grant, [her] remedy is to advocate a change in the regulations before the Commission." *Id* at 155.

Plaintiff also alleges (unpersuasively) that statements regarding: (a) the federal income tax consequences of the Plan; and (b) the value of options granted under the Prior Plan, were misleading and understated the cost of the Plan

a. Federal Income Tax Consequences

[3] Plaintiff alleges that the Proxy Statement is materially false and misleading because it fails to "disclose all the federal tax consequences" of granting an option, particularly the fact that "under the U.S. federal estate tax, gift tax, and generation-skipping transfer tax, these stock options and SARs are treated as taxable." Am. Comp. ¶ 27. Defendants respond that the Proxy Statement only purports to describe the federal income tax consequences of a grant and "does not purport to state 'all the federal tax consequences' of the Plan." Def Mem at 20.

*6 "The Court agrees with Defendants that this allegation is illogical. Stating that an act has no federal *income* tax consequences does not imply that the act has absolutely no federal tax consequences whatsoever." *Seinfeld,* 2002 WL 243597 at *5 Furthermore, "[e]xpanding the requirements of SEC Rule 14a-9 to insist upon disclosure of incidental tax benefits--benefits that do not flow directly from the corporate transaction itself but rather from the individual shareholder's personal tax situation--goes beyond the purposes of the Rule." *Mendell v. Greenberg,* 927 F 2d 667, 677 (2d Cir 1990), modified on other grounds, 938 F 2d 1528 (2d Cir 1991).

b. Value of Options Granted Under the Prior Plan

[4] Plaintiff challenges the Proxy Statement's disclosure regarding the value of options granted under the Prior Plan. [FN9] Plaintiff (further) contends that Defendants used false and misleading assumptions regarding both the dividend yield (2.1 percent) and expiration of the options (2.5 years). Am. Comp. ¶¶ 24-25. Defendants argue that the statements could not have been misleading because all of the assumptions were fully disclosed and the "Proxy Statement provides clear cautionary language warning the reader of the limitations of the estimates in the table." Def. Mem. at 22. Plaintiff responds that the warnings fail to protect against the alleged (mis)statements because the Black-Scholes estimate is not a predictive future value, the "cautionary language" is not substantive and

© 2005 Thomson/West. No Claim to Orig U S. Govt Works

Not Reported in F.Supp.2d

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

(Cite as: 2002 WL 31413805 (S.D.N.Y.))

Page 7

tailored to the projection and is "plain wrong." Pl. Mem. at 23.

> FN9. Disclosure of the Black-Scholes value of options already granted is governed by Item 402 of Regulation S-K. 17 C.F.R. § 229.402.

"Under the bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable." In re Independent Energy Holdings PLC Securities Litigation, 154 F.Supp.2d 741, 755 (S.D.N.Y.2001). The Court analyzes allegedly misleading materials "in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Halperin v. eBanker USA COM, Inc., 295 F.3d 352, 354 (2d Cir.2002).

The Proxy Statement warns or cautions that Alcoa's use of the Black-Scholes option pricing model "is not an endorsement of the model's accuracy in valuing options. All stock option models require a prediction about future stock prices." PS at 19 n. 2. The relevant footnote (required by SEC rules) enumerates each of the assumptions that Alcoa used in determining the Black-Scholes value of the options. Id. The Proxy Statement also advises that the "real value of the options in this table depends on the actual performance of Alcoa stock and the timing of the exercises." Id.

*7 The Proxy Statement explicitly warns stockholders that the Black-Scholes calculations are estimates, and that the values derived are dependent upon certain (enumerated) assumptions. In light of the specific warnings that applied to both the option valuations and the underlying assumptions used in the Black-Scholes calculations, the Court concludes, as a matter of law, that "no reasonable

investor would be misled" by the disclosures. See e.g., I Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir.1991). Plaintiff's contention that the warning about the value of the options is "simply false" is similarly rejected. See Resnik, 303 F.3d at 153 ("We similarly find no merit in appellant's allegation that ... the proxy statement was materially false or misleading in stating that '[t]he actual value, if any, an executive will realize [from stock options] will depend on the excess of the market price over the exercise price on the date the option is actually exercised.' ")

In addition, certain forward-looking statements contained in the Proxy Statement are protected by "safe-harbor" provisions. See e.g., 17 C.F.R. § 240.3b-6; 17 C.F.R. § 230.175. Grant date option valuations made pursuant to Item 402 of Regulation S-K (such as those made by Alcoa here) are entitled to safe harbor protections. See Executive Compensation Disclosure. See. Act Release No. 7032, 55 S.E.C. Docket 1352 (Nov. 22, 1993) ("The Commission notes that the option value is a projection of a financial item entitled to safe harbor protections, as are the underlying assumptions.") The option valuations are not actionable "unless it is shown that such statement was made ... without a reasonable basis or was disclosed other than in good faith." 17 C.F.R. § 240.3b-6(a); see also 17 C.F.R. § 230.175(a). Plaintiff has failed to allege that the purportedly misleading statements were made without a reasonable basis or in other than good faith. See e.g., In re Healthcare Compare Corp Sec Litig., No. 93 C 1970, 1994 WL 262730 (N.D.Ill. June 2, 1994) (Plaintiffs failed to allege facts "suggesting that Defendants' statements are not entitled to the protections of that safe harbor because they lacked a reasonable basis.")

2. Number of Shares Available Under the Plan

[5] Plaintiff alleges that it was "materially misleading for the Proxy Statement to represent to the stockholders that 14 million shares were available under the Plan," because other sections of the Proxy Statement indicated that in three circumstances the total number of options could be increased. Pl. Mem. at 13. That is, the number of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 8

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

options available under the Plan could be increased (i) by replacing shares available under the Prior Plan, (ii) by (Alcoa) repurchasing its shares in the market and designating them as available under the Plan, or (iii) by substituting Alcoa shares for those held by an employee of a company acquired by Alcoa. *See infra* at __. Plaintiff further alleges that the Proxy Statement should have disclosed a "reasonable estimate" of the number of shares that would be added because of these (three) contingencies. Am. Comp. ¶ 13. Defendants respond that these claims have no merit in light of the fact that the Proxy Statement disclosed both that 14 million shares were available under the Plan and that the number of shares could be increased in each of the three instances described by Plaintiff. Def. Mem. at 17. Defendants also argue that disclosure of the number of additional shares would have "required Alcoa to make predictions about unknowable future events, which ... is not required by the proxy rules." *Id.*

*8 No reasonable shareholder reading the entirety of the Proxy Statement would have believed that the Plan was authorizing only 14 million shares. *See, e.g., Seinfeld,* 2002 WL 243597 at *5. The Proxy Statement clearly discloses that additional shares could become available under three circumstances. *See* PS at 21 ("In addition to the 14 million shares, the following also would be available under the plan ..").

Plaintiff also fails to allege facts to substantiate the charge that additional "reasonable estimates" would be anything more than speculation. *See e.g., Krauth v. Executive Telecard, Ltd.,* 890 F.Supp. 269, 288-89 (S.D.N.Y. 1995) ("It is well established that 'Section 14 carries with it no formal requirement that predictions be made as to future behavior, and indeed, they are discouraged." ') (internal citations omitted); *Kahn v. Wien,* 842 F.Supp. 667, 676 (S.D.N.Y. 1994) ("proxy solicitations need only provide the full objective facts upon which investors can make their own judgments as to value, and need not, and most often should not, 'embellish [the facts] with speculative financial predictions." ') (internal citation omitted); *Freedman v. Barrow,* 427 F.Supp. 1129, 1144 (S.D.N.Y. 1976) ("It was

not materially misleading for the Proxy materials to have omitted discussion of the likely preferences of employees following granting SARs.")

3. Text of the Plan

[6] Plaintiff alleges that Defendants' failure to include the text of the Plan in the Proxy Statement was a material omission. Am. Comp. ¶ 28. Plaintiff argues that if the text of the Plan had been attached, stockholders would have been aware an "unusual feature," namely that the options did not terminate if a grantee left Alcoa. [FN10] Pl. Mem. at 27. Defendants contend that "Alcoa's obligation was to disclose material features of what *was* included in the Plan," Def. Mem. at 20 (emphasis in original), and the Proxy Statement disclosed that "[t]he [Compensation] Committee has the authority to ... set the terms and conditions of the awards and to cancel or suspend them." PS at 22.

> FN10. The basis for this allegation is limited to "plaintiff's attorney's reading ... of many proxy statements and plans for nearly 30 years." Am. Comp. ¶ 28.

SEC rules and regulations do not require that the full text of the Plan be included with the Proxy Statement. 17 C.F.R. § 240.14a-101 ("the plan to be acted upon ... need not be provided to security holders unless it is a part of the proxy statement.") "Similarly, this information is not required to make any other information presented in the proxy statement not materially false or misleading." *Resnik,* 303 F.3d at 154.

V. Conclusion

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted [21]. The Clerk is respectfully requested to close this case.

2002 WL 31413805 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,101

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                    Page 9

2002 WL 31413805 (S D.N Y ), Fed. Sec. L. Rep. P 92,101

**(Cite as: 2002 WL 31413805 (S.D.N.Y.))**

- 1:99cv10578  (Docket)

                        (Oct. 15, 1999)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Page 2 of 16



2002 WL 32817147
Page 1

2002 WL 32817147 (3rd Cir.)


United States Court of Appeals,
Third Circuit.
David B. SHAEV, Appellant,
v.
Lawrence SAPER; Alan B. Abramson; David Altschiller; Joseph Grayzel, M.D.;
George Heller; Arno Nash; and Datascope Corp., Appellees.
No. 02-2206.
August 21, 2002.
Appeal From the United States District Court for the District of New Jersey

Brief for Appellant and Appendix Volume I of II (Pages A-1 - A-14)
Irving Bizar, A. Arnold Gershon, Ballon, Stoll, Bader & Nadler, 1450 Broadway,
14th Floor, New York, New York 10018, (212) 575-7900, Attorneys for Appellant.

### TABLE OF CONTENTS

Table of Cases and Authorities ... (ii)-(v)

PRELIMINARY STATEMENT ... 1

JURISDICTIONAL STATEMENT ... 1

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 3

STATEMENT OF FACTS ... 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ... 7

STATEMENT OF STANDARD OF REVIEW ... 8

SUMMARY OF ARGUMENT ... 8

ARGUMENT

POINT I: THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER §14(a) OF THE EXCHANGE ACT
AND S.E.C. RULE 14a-9 ... 9

A. The Proxy Statement Contains Misrepresentations and Omissions. ... 10

B. The Misrepresentations And Omissions Were Material ... 15

POINT II: THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER STATE LAW. ... 20

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                    Page 2

2002 WL 32817147 (3rd Cir.)

POINT III: DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED ... 22

CONCLUSION ... 27

### TABLE OF CASES AND AUTHORITIES

*Aronson v. Lewis,* 473 A.2d 805 (Del. 1984) ... 24, 26

*Benerofe v. Cha,* 1998 WL 83081 (Del.Ch. February 20, 1998) ... 21

*Beneville v. York,* 769 A.2d 80 (Del.Ch. 2000) ... 22

*Bilunka v. Sanders,* 1994 WL 447156 (N.D.Cal. March 2, 1994) ... 22

*Commonwealth of Pennsylvania v. Pepsico, Inc.,* 836 F.2d 173 (3rd Cir. 1988) ... 18, 19

*Fendelman v. Fenco Handbag Mfg. Co.,* 482 S.W.2d 461 (Mo. 1972) ... 21

*Galef v. Alexander,* 615 F.2d 51 (2nd Cir. 1980) ... 15, 26

*Gallin v. National City Bank,* 273 N.Y.S. 87 (Sup.Ct. N.Y. Co. 1934) ... 20

*Ganino v. Citizens Utilities Co.,* 228 F.3d 154 (2nd Cir. 2000) ... 15

*Gould v. American-Hawaiian S.S. Co,* 535 F.2d 761 (3rd Cir. 1976) ... 9

*J.I. Case Co. v. Borak,* 377 U.S. 425 (1964) ... 9

*Johnsrud v. Carter,* 620 F.2d 29 (3rd Cir. 1980) ... 12

*Kahn v. Tremont Corp.,* 1994 WL 162613 (Del.Ch. April 22, 1994) ... 24

*Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90 (1991) ... 26

*Kaufman v. Beal,* 1983 Del.Ch. LEXIS 391 (Del.Ch. February 25, 1983) ... 22

*Kershner v. Mazurkiewicz,* 670 F.2d 440 (3rd Cir. 1982) ... 15

*Kohls v. Duthie,* 2000 WL 1041219 (Del.Ch. July 26, 2000) ... 24

*Kohn v. American Metal Climax, Inc.,* 458 F.2d 255 (3rd Cir.), *cert. denied,* 409 U.S. 874 (1972) ... 15

*Koppel v. 4987 Corp.,* 167 F.3d 125 (2nd Cir. 1999) ... 14, 15

*Kramer v. Time Warner, Inc.,* 937 F.2d 767 (2nd Cir. 1991) ... 15

*Lacos Land Co. v. Arden Group, Inc.,* 517 A.2d 271 (Del.Ch. 1986) ... 22

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                    Page 3

2002 WL 32817147 (3rd Cir.)

*Maldonado v. Flynn,* 597 F.2d 789 (2nd Cir. 1979) ... 15, 18

*Morse v. Lower Merion School Dist.,* 132 F.3d 902 (3rd Cir. 1977) ... 18, 19

*Olson Brothers, Inc. v. Engelhart,* 245 A.2d 166 (Del. 1968) ... 20

*Oran v. Stafford,* 226 F.3d 275 (3rd Cir. 2000) ... 8

*In re Ply Gem Industries, Inc. Sh.Lit.,* 2001 WL 755133 (Del.Ch. June 26, 2002) ...
23

*RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318 (2nd Cir. 1991) ... 26

*Rales v. Blasband,* 634 A.2d 927 (Del. 1993) ... 23

*Sanders v. Wang,* 1999 WL 1044880 (Del.Ch. Nov. 8, 1999) ... 16, 25

*Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3rd Cir. 1992) ... 15, 19

*Sierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002) ... 19

*Smith v. Dunlap,* 111 So.2d 1 (Ala. 1959) ... 20

*Steinhardt Group, Inc. v. Citicorp,* 126 F.3d 144 (3rd Cir. 1997) ... 8

*Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083 (1991) ... 9, 10, 16, 19

*In re Warfarin Sodium Antitrust Lit.,* 214 F.3d 395 (3rd Cir. 2000) ... 8, 14

*Wilderman v. Wilderman,* 315 A.2d 610 (Del.Ch. 1974) ... 20

*Williams v. Geier,* 671 A.2d 1368 (Del. 1996) ... 22

*Zell v. Intercapital Income Securities, Inc.,* 675 F.2d 1041 (9th Cir. 1982) ... 18

                                   STATUTES

FRAP Rule 4(a)(1)(A) ... 1

 17 C.F.R. §240.14a-101 (Item 10(a)(1) and (2)(i) ... 16, 17

 28 U.S.C. §1291 ... 1

 28 U.S.C. §1367(a) ... 1

 42 U.S.C. §1983 ... 19

 Fed.R.Civ.P. 12(b)(6) ... 4, 8, 14

  23.1 ... 4, 25

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                         Page 4

2002 WL 32817147 (3rd Cir.)


Securities Exchange Act of 1934

 §14(a) ... 1, 9, 19, 26

 F15 U.S.C. §78aa ... 1

 §27 ... 1

 14a-9, 17 C.F.R. §240.14a-9 ... 1, 9, 18

Treasury Regulations, 26 C.F.R.

 §1.162-27 ... 10, 11, 12, 13, 16, 17, 22

Internal Revenue Code, 26 U.S.C. §162(m) ... 10, 17

 *PRELIMINARY STATEMENT*

 This is an appeal from an order of the United States District Court for the
District of New Jersey, dismissing the action (Pisano, D.J.)(A. 1-2). The decision
is unreported, and it is designated "Not for Publication".

*JURISDICTIONAL STATEMENT*
 Jurisdiction below was based upon §27 of the Securities Exchange Act of 1934, 15
U.S.C. §78aa, in that the defendants distributed in interstate commerce a proxy
statement containing material misstatements and omissions of fact, and on 28
U.S.C. §1367(a), in that the individual defendants breached their fiduciary
duties. The claims arise under §14(a) of the Securities Exchange Act of 1934 (the
"1934 Act"), 15 U.S.C. §78n(a), and Rule 14a-9, 17 C.F.R. §240.14a-9, and the laws
of the several states.

 This court's jurisdiction is based upon 28 U.S.C. §1291. The lower court entered
a final order dismissing the federal claims with prejudice, the state claims
without prejudice, and closing the case. The final order was entered April 2,
2002. The notice of appeal was timely filed on April 26, 2002. Rule 4(a)(1)(A) of
the Federal Rules of Appellate Procedure.

 *ISSUES PRESENTED FOR REVIEW*

 1. Is a proxy statement materially false and misleading which solicits
stockholder approval of a bonus plan that includes a $3 million bonus, and
represents it to be tax deductible by the company, when in fact the plan provided
a maximum bonus of only $2 million, and it (a) omits to disclose that the increase
of the $2 million limit was done 6 1/2 weeks before the end of the fiscal year,
(b) threatens to pay the CEO a bonus anyway, even if the stockholders disapprove
it, and (c) omits to disclose that the bonus formula pays him all but $200,000 at
the rate of 83 percent of the company's earnings, up to the $2 million limit?

 Answer Below: No (A. 8-12).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147 (3rd Cir.)

  2. Does the complaint state a claim for relief for excess compensation of the CEO when he has done much better financially over the years than the company and its stockholders and much better financially than other CEOs at other companies of similar size and in similar businesses with better financial results?

  Answer Below: Not reached (A. 2)

  3. In a stockholder's derivative action is demand on the board of directors excused as futile when (a) half the members of an even numbered board are interested or not independent, (b) the other half act in an extremely improper way, and (c) they all are accused of violating federal law in the solicitation of stockholders' proxies.

  Answer Below: Not reached (A. 4)

  *STATEMENT OF THE CASE*

  In this action a stockholder of Datascope Corp. challenges the conduct of its entire board of directors in distributing a proxy statement by which they sought and obtained the stockholders' approval of an incentive plan and the payment of a bonus under it for the fiscal year ended June 30, 2000 to the Chief Executive Officer ("CEO"), who is also the board chairman and largest stockholder. As the record at bar now reveals, that proxy statement (the "Proxy Statement") materially overstated the size of the fiscal year 2000 bonus payable under that plan (the "Plan") by more than $1,000,000 (A.53). It also falsely represented that the company would get an income tax deduction for the bonus, if the stockholders approved it (A.55). But it threatened the stockholders that if they disapproved the Plan, then the CEO might get paid a bonus anyway that would not be deductible (A.53).

  The stockholder also challenges the excessive compensation paid to the CEO during fiscal years 1996 through 2000. The grounds for this challenge are that, over the years, the CEO's financial results have far exceeded those of Datascope Corp. and its stockholders (A.29-30). Moreover, the CEO of Datascope Corp. has done much better financially than other CEOs of other companies of similar size in similar businesses (A.30-31).

  Datascope Corp. ("Datascope" or the "Company") is a Delaware corporation with its principal office in New Jersey (A.24). Its CEO is defendant Lawrence Saper (A.25).

  The defendants made a motion to dismiss the amended complaint ("Com." or the "Complaint"), pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure (sometimes "FRCP") (A.4). The lower court granted the FRCP 12(b)(6) motion only as to the federal claims and dismissed the state claims on jurisdictional grounds. It did not reach the FRCP 23.1 motion (A.2).

                   *STATEMENT OF FACTS*
  An annual meeting of Datascope's stockholders was held on December 12, 2000. For that meeting the individual defendants, acting as the Company's board of directors, distributed a Proxy Statement that solicited the stockholders' proxies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147 (3rd Cir.)


to be voted in favor of the re-election to the board of defendants Saper and Nash
and in favor of the approval of the Plan. (Com. ¶8; A.25).

 The Proxy Statement represents that the Plan was initially adopted in December
1999 and then amended and restated on May 16, 2000. (Corn. ¶20; A.28). It also
represents that "Under the Management Incentive Plan, Mr. Saper's total bonus
compensation was $3,285,714 for fiscal year 2000" (A.53) and that it will be fully
deductible by Datascope for federal income tax purposes if the stockholders
approve the Plan. (Com. ¶19; A.27). The Proxy Statement contains the text of the
Amended and Restated May 16, 2000 Plan (A.59-63). However, the text of the Plan in
its initial December 7, 1999 form, (A. 117-21) was omitted from the Proxy
Statement, but the defendants have placed it in the record, making it public for
the first time, and it is, we agree with defendants, highly material at bar, for
it discloses, as the Proxy Statement did not, that the maximum Saper bonus was
$2,225,000 instead of $3,285,714, as proposed to the stockholders and paid to the
CEO (A. 119).

 Also in the record is the certification of the stockholders' vote approving that
Plan (A.122) under which the bonus of $3,285,714 was paid.

 The December 7, 1999 Plan expressly provides "the precise terms and provisions of
the performance goals" to calculate defendant Saper's bonus, but the May 16, 2000
Plan does not. (Com. ¶22; A.28). In the December 7, 1999 Plan, defendant Saper's
bonus was to be based on the Company's earnings per share, determined in
accordance with generally accepted accounting principles and measured before
extraordinary and/or special items. (A. 118).

 For example, it states that if the earnings per share equal $1.50, his bonus is
to be $200,000. If the earnings per share equal $1.58, his bonus is to be
$1,200,000, or an additional million dollars to the $1.50 earnings per share
bonus. It also provides that if the Company's earnings per share is more than
$1.50, but less than $1.58, his bonus will be proportionately adjusted, *i.e.*, an
additional $125,000 for each additional cent per share. Since Datascope has only
approximately 15 million shares outstanding, each cent per share is $150,000.
(Com. ¶7; A.24). This Plan gives the CEO $125,000 out of each additional $150,000.
Defendant Saper's maximum bonus under the December 7, 1999 Plan was $2,225,000,
not the $3,285,714 as reported in the Proxy Statement. All of these data were
omitted from the Proxy Statement.

 In the fiscal years 1996 through 2000, defendant Saper was paid excessive
amounts. (Com. ¶¶12-14; A.25-26). His compensation has increased at a higher rate
than has the Company's earnings, assets, and stockholders' equity. (Com. ¶25;
A.29). It has increased at a higher rate than has an investment in the Company's
stock. (Com. ¶26; A.30). And it is substantially higher than the compensation of
other chief executive officers at companies of comparable size in similar
businesses. (Com. ¶¶27-29; A.30-31).

 Defendant Saper is a member of Datascope's board of directors, and he is
financially interested in the approval of the Plan and in the excessive
compensation paid to him in the fiscal years 1996-2000. Two other members of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

board, defendants Altschiller and Grayzel, are paid consultants of the Company. They lack independence, for defendant Saper has engaged their services and determined their compensation. Moreover, he can change their compensation and even terminate their consulting arrangements. (Com. ¶15-17; A.26-27). The other three directors, while having the appearance of independence and disinterest, have acted with such indifference to their duty to protect the interests of Datascope and its stockholders, that further inquiry is appropriate. We refer, of course, to their decision to solicit stockholder approval of the Plan and the payment thereunder to defendant Saper of $3,285,714 when his maximum bonus was $2,225,000. This, we submit, is extreme conduct, sufficient to justify judicial review. It raises substantial questions as to their approval or even toleration of defendant Saper's past compensation.

## STATEMENT OF RELATED *CASES AND PROCEEDINGS*
This case has never been before this court, and we are unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this court, or any other court or agency, state or federal, except for a stockholder's derivative action, entitled *Shaev v. Saper,* pending in New York Supreme Court, New York County, Index No. 605302/00, filed December 6, 2000. As the result of discussions between counsel for the parties in the New York State case, we became aware of federal questions and thereupon commenced the action below on August 7, 2001. (A.15, 18). The parties have orally agreed to litigate the federal action before proceeding in the state action.

## *STATEMENT OF STANDARD OF REVIEW*
This court's review of a decision on a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6) is plenary, taking all factual allegations as true and drawing all reasonable inferences in plaintiffs favor. *In re Warfarin Sodium Antitrust Liti.,* 214 F.3d 395, 397 (3rd Cir. 2000). However, this court can consider the original December 7, 1999 Plan (A. 117-21), for it is indisputably authentic, and the Complaint is based on it, and it is attached to defendants' motion papers. *Steinhardt Group, Inc. v. Citicorp,* 126 F.3d 144, 145 (3rd Cir. 1997). The court can consider the Proxy Statement, but it is "relevant not to prove the truth of... [its] contents but only to determine what the document stated." *Oran v. Stafford,* 226 F.3d 275, 289 (3rd Cir. 2000). The same rule applies to the Form 10K. The second and third issues were presented below, but not decided. We brief them in an abundance of caution.

*SUMMARY OF ARGUMENT*

It was materially false and misleading to represent that the bonus would be tax deductible, for the performance goals were established too late, and the threat to pay the bonus, even if the stockholders disapproved, rendered even an approved bonus non deductible.

The Proxy Statement's omission of the performance goals in the original December 7, 1999 Plan was material. The CEO's compensation over the past several years is excessive when measured by the usual legal standards and against the Company's financial performance and the compensation of similar CEO's. Demand on the board is excused, for half are interested or not independent, and the other half have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                    Page 8

2002 WL 32817147 (3rd Cir.)


committed egregious wrongs. They all are accused of violating the proxy provisions
of the 1934 Act.

ARGUMENT
POINT I
THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER §14(a) OF THE *EXCHANGE ACT AND
S.E.C. RULE 14a-9*
   In *J.I. Case Co. v. Borak,* 377 U.S. 425, 431-32 (1964), the Supreme Court first
upheld the implied cause of action by a stockholder to seek relief when a false or
misleading proxy statement interfered with "fair corporate suffrage ... an
important right." This Court agrees. *Gould v. American-Hawaiian S.S. Co,* 535 F.2d
761 (3rd Cir. 1976). In addressing the requisite quality of disclosure in a proxy
statement, the Supreme Court, in *Virginia Bankshares. Inc. v. Sandberg,* 501 U.S.
1083 (1991) held that the principal purpose of a proxy statement "should be to
inform, not to challenge the reader's critical wits." 501 U.S. at 1097. The Proxy
Statement at bar is so misleading and deficient that the stockholders are made
"unwitting agents of self-inflicted damage." 501 U.S. at 1103 (Com., ¶18; A.27).


A. The Proxy Statement Contains *Misrepresentations and Omissions.*


   Under the Internal Revenue Code, 26 U.S.C. §162(m), and the Treasury Regulations,
26 C.F.R. §1.162-27, the compensation to defendant Saper, in excess of $1 million
per year, is deductible by the Company only if it is performance based and
approved by the Company's stockholders. At bar, the individual defendants sought
stockholder approval of the Plan, and the bonus would be payable if the Plan were
to be approved. (A.41, 53).


   The complaint alleges that the Proxy Statement falsely represents that the Saper
bonus would qualify for an income tax deduction for the Company, if the
stockholders approved it (Com., ¶19; A.27). The deduction was unavailable, we
allege, for the Plan was adopted too late for the necessary performance goals to
be established. 26 C.F.R. §1.162-27(e)(2)(performance goal must be established not
later than the 90th day of the performance period or before 25% of the performance
period has elapsed). In addition, the fact that the Saper bonus could be paid even
if the stockholders voted against it, would preclude the deduction. 26 C.F.R §
1.162-27(e)(4)(i) ("The requirements of this paragraph (e)(4) [entitled
*Shareholder approval requirement*] are not satisfied if the compensation would be
paid regardless of whether the material terms are approved by shareholders.")
(Com. ¶20; A.28).


   The lower court held (A.10-11) that the Plan was adopted well within the
necessary time limit, *i.e.,* less than 25% of the way through the performance
period, on December 7, 1999, the 68th day of a 274-day period, from October 1,
1999 to June 30, 2001. Even assuming that a performance period can be less than a
year, the $3,285,714 bonus under the Plan (A.53) was not in conformity with the
performance goal that was established on December 7, 1999. Under the December 7,
1999 standards, the maximum Saper bonus was $2,225,000 (A. 119). Moreover, if
there is discretion to increase the calculated bonus, the deduction is lost. 26
C.F.R. §1.162-27(e)(2)(iii)(A) ("The terms of an objective formula or standard
must preclude discretion to increase the amount of compensation payable that would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                    Page 9

2002 WL 32817147 (3rd Cir.)

otherwise be due upon attainment of the goal."). After the initial Plan was
adopted, it was amended and restated on May 16, 2000, 6 1/2 weeks before the end
of the period and much too late to set performance goals for this nine-month
performance period. Accordingly, the Proxy Statement made a false representation
when it stated that the Company would get a $3,285,714 income tax deduction for
the Saper bonus, if the stockholders approved it. The lower court committed error
in holding that a $3 million bonus had been timely pre-established.

 The lower court committed additional error in holding that, under the facts at
bar, the directors could establish a nine months performance period. Although the
lower court correctly observed that Treas.Reg. 26 C.F.R. §1.162- 27(e)(2)(i)
allows a performance goal to be established not later than 90 days or 25% of the
way into a period, it erred in holding, as a matter of law, that a nine month
performance period was proper at bar. We submit that the one year performance
period is always required except for companies newly organized in the middle of
the year and except for cases where the company changes its fiscal year in good
faith. Significantly, we submit, nothing in the statute and regulations expressly
allows a short period, and none of the examples given in the regulations addresses
a short period. Given the requirement that the "outcome" of a performance goal
must be "substantially uncertain at the time the compensation committee actually
establishes the goal," 26 C.F.R. 27(e)(2)(i) (the second sentence), a
court should be suspicious of a short period by a seasoned company. At a minimum,
the defendants should be required to establish good faith in using a short period,
for the rule in this Circuit is that "summary disposition on the merits is
disfavored and the burden is on the moving party." *Johnsrud v. Carter*, 620 F.2d
29, 33 (3rd Cir. 1980). In the case at bar, the lower court cited no authority
except for a rule of statutory construction that all parts of a regulation must be
considered. We submit that the lower court misapplied that rule too narrowly, for
the entire statute and regulations -- with all the examples -- reject such a
result.

 And no suggestion is raised that the deduction is available in the face of the
threat to pay the Saper bonus, even if the stockholders disapprove it. 26 C.F.R. §
1.162-27(e)(4)(i) (Com. ¶20) (A.28). That threat cancels the stockholder approval,
for the second sentence of that Regulation expressly provides that the stockholder
approval requirements "are not satisfied if the compensation would be paid
regardless of whether the material terms are approved by shareholders." Nowhere is
there any showing that the allegation concerning the threat to pay it anyway fails
to state a claim, and the lower court was in error to dismiss it.

 The complaint also alleges that the amount of the Saper bonus was $3,285,714
(Com. ¶12, 19; A.25, 27), and "as to ... the Saper bonus, the Proxy Statement
omitted the precise terms and provisions of the performance goals. As a result,
the Company's stockholders were unable to determine for themselves whether the
performance goals had been met and whether the bonuses were merited." (Com. ¶22;
A.28). We submit that this is a straightforward allegation, and that its
correctness is unchallenged in the lower court. A review of the Proxy Statement
reveals these omissions.

 Actually, the present record, including the text of the initial December 7, 1999

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                    Page 10

2002 WL 32817147 (3rd Cir.)


Plan (A.117-21), which is omitted from the Proxy Statement, underscores how
correct this allegation is. It shows that the Saper bonus as calculated under the
applicable performance goals was not to exceed $2,225,000 (A.119). Yet the
stockholders were asked to approve a much greater amount, the Proxy Statement
having represented that the greater amount was correct. (Com. ¶19; A.27). No
explanation appears anywhere in the record as to how and why the Saper bonus was
increased, but if the Proxy Statement had disclosed the performance goals, the
stockholders would have known that defendant Saper had not earned a three
million-dollar bonus. Nor does the Proxy Statement contain any discussion of the
old 1997 plan and what estimates there were as to how the new Plan would compare
with the old. (Com. ¶22; A.28).

  This court held, In re Warfarin Sodium Antitrust Lit., supra. 214 F.3d at 398,
that FRCP "Rule 12(b)(6) instructs that the District Court draw inferences in
favor of plaintiffs, not the proponent of the motion." And, when a complaint
challenges a proxy statement under the Exchange Act, the court should construe
that proxy statement in the light most favorable to the plaintiff, who need not
support the allegations with proof or evidence. Koppel v. 4987 Corp., 167 F.3d
125, 133 (2nd Cir. 1999).

  B. The Misrepresentations And Omissions Were Material.

  This court has held that a federal securities law complaint should not be
dismissed on materiality grounds unless "the alleged misrepresentations and
omissions are so obviously unimportant to an investor that reasonable minds cannot
differ on the question of materiality." Shapiro v. UJB Financial Corp., 964 F.2d
272, 280-81, n.11 (3rd Cir. 1992). Other cases agree. Ganino v. Citizens Utilities
Co., 228 F.3d 154, 162 (2nd Cir. 2000); Koppel v. 4987 Corp., 167 F.3d 125, 133
(2nd Cir. 1999). This court has also held that the amount of benefit that flows to
an insider from a transaction proposed to the stockholders must be fairly
disclosed. Kohn v. American Metal Climax, Inc., 458 F.2d 255, 265 (3rd Cir.),
cert. denied, 409 U.S. 874 (1972) partially overruled on other grounds, Kershner
v. Mazurkiewicz, 670 F.2d 440, 448 (3rd Cir. 1982). Other cases, addressing
questions of compensation and other benefits to insiders all agree that the amount
of the benefit is material. Kramer v. Time Warner. Inc., 937 F.2d 767, 777 (2nd
Cir. 1991); Galef v. Alexander, 615 F.2d 51, 65 (2nd Cir. 1980); Maldonado v.
Flynn, 597 F.2d 789, 796-98 (2nd Cir. 1979).

  Under these cases the amount and deductibility of the Saper bonus were material,
for the stockholders were solicited to approve the Plan to pay the Saper bonus,
and the Proxy Statement represented that it would be deductible. It was to be paid
pursuant to the precise formula expressed by the original December 7, 1999 Plan.
The board had no discretion to increase it, retroactively. Sanders v. Wang, 1999
WL 1044880 (Del.Ch. Nov. 8, 1999). Moreover, the board's decision to increase the
bonus causes the Company to lose its income tax deduction, 26 C.F.R. §
1.162-27(e)(2)(iii)(A), something that the board was supposed to preserve.

  The complaint at ¶22 (A.28), alleges that among the material omissions were
reasonable estimates of bonuses payable and the number of persons eligible under
the Plan. The lower court held that the omissions were immaterial as a matter of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147 (3rd Cir.)


law because the Proxy Statement did disclose the maximum bonus (A. 11). But the
lower court erred, for that was a maximum for each person (A.56, 61). We submit
that the disclosure is useless without reporting the number of eligible
participants, and the regulations so provide. 17 C.F.R. §240.14a-101 (Item
10(a)(1)) (Identify each eligible class of persons and the approximate number in
each class.) The Proxy Statement, however, reveals only half of what a stockholder
should know to be informed under *Virginia Bankshares, Inc. v. Sandberg, supra*. The
lower court erred in holding this omission to be immaterial.

 The complaint also alleges that it was material to omit "the precise terms and
provisions of the performance goals." Com. ¶22 (A.28). Those terms and provisions
conclusively establish that the Saper bonus, at its maximum, was more than $1
million less than the stockholders were solicited to approve. Since this is
compensation, it is material *per se,* we submit.

 The lower court committed error in holding that the performance goal omissions
were immaterial. It held that 17 C.F.R. §240.14a-101 provides that "registrants do
not need to disclose specific targets upon which bonuses are contingent." (A.12).
That regulation does not so provide, but it does, at Item 10(a)(1), require that
when stockholders are solicited to approve a compensation plan the proxy statement
must "[d]escribe briefly the material features of the plan," and Item 10(a)(2)(i)
requires disclosure of the amount of the benefit, if determinable.

 The lower court also relied, erroneously, on Treas.Reg. 26 C.F.R. §1.162-27(e)(4)
as authority that "specific business criteria upon which bonuses are contingent
need not be disclosed." We submit that such a regulation cannot stand, for it is
in direct conflict with the statute that requires the opposite. The Internal
Revenue Code, 26 U.S.C. §162(m)(4)(C)(ii), requires that the deduction is
available only if "the material terms ... including the performance goals, are
disclosed to shareholders and approved by a majority of the vote."

 Moreover, the Treasury Regulation leads to an unconscionable result here. The
example in 26 U.S.C. §162(m)(4)(iii)(A) states, "For example, if a bonus plan
provides that a bonus will be paid if earnings per share increase by 10 percent,
the 10-percent figure is a target that need not be disclosed to shareholders." At
bar, the December 7, 1999 Plan pays a bonus of $125,000 for each $150,000 added to
earnings. We submit that this is so shocking a result that no regulation should be
read to allow it. Nor should this Treasury Regulation preempt the 1934 Act, for it
is the SEC, not the IRS, that administers the 1934 Act. Two Circuits, the Second
and the Ninth, have held that meeting the minimum SEC regulatory disclosure
standards "does not necessarily guarantee that a proxy statement satisfies Rule
14a-9." *Maldonado v. Flynn*, 597 F.2d 789, 796 n.9 and accompanying text (2nd Cir.
1979); *Zell v. Intercapital Income Securities, Inc.,* 675 F.2d 1041, 1044 (9th Cir.
1982). Similarly, barebones standards of the Treasury Regulations should not
compromise protection of investors.

 Finally, the lower court committed error in holding that the allegations of
materiality were "conclusory recitations of law," in reliance upon *Commonwealth of
Pennsylvania v. Pepsico, Inc.,* 836 F.2d 173 (3rd Cir. 1988) and *Morse v. Lower
Merion School Dist.,* 132 F.3d 902 (3rd Cir. 1977). Neither case is applicable at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147 (3rd Cir.)


bar. In *Commonwealth,* the complaint failed because it did not allege facts to
support a civil conspiracy, for which this court has consistently required a
particularized statement of facts. 836 F.2d at 181-82.

The *Morse* case was an action under 42 U.S.C. §1983 under the state-created danger
theory where a "mentally unstable" person entered a "school building" through an
"unlocked back entrance" and murdered a teacher with a ".38 revolver." (132 F.3d
at 908). This court held that "defendants, as a matter of law, could not have
foreseen" the danger and that the "tragic harm which ultimately befell Diane Morse
was too attenuated from defendant's actions to support liability." *Idem.* We submit
that *Morse* was less a case of pleading "legal conclusions" *Id.* than an obvious
impossibility, akin to the "obviously unimportant" test for lack of materiality
expressed by this court in *Shapiro v. UJB Financial Corp.,* 964 F.2d at 280-81 n.
11. In *Morse,* the factual allegations of the complaint refuted the allegations of
foreseeability and fairly direct harm. 132 F.3d at 908. At bar, the omitted
performance goals reveal that the proposed Saper bonus was 50 percent greater than
what was legitimately even possible, and that it was calculated at an egregiously
excessive rate.

Neither *Commonwealth* nor *Morse* addresses pleading of materiality. Under §14(a) of
the 1934 Act, proof of materiality imposes such a light burden *(Virginia
Bankshares, Inc. v. Sandberg,* supra, 501 U.S. at 1097-98), that the pleading
requirement should be equally simple. *Sierkiewicz v. Sorema, N.A.,* 534 U.S. 506,
122 S.Ct. 992, 997 (2002).

POINT II
THE COMPLAINT STATES A CLAIM *FOR RELIEF UNDER STATE LAW.*
The lower court did not decide the state law issues. We nevertheless brief this
point in an abundance of caution.

The Chief Executive Officer of a Delaware corporation is a fiduciary, and
therefore his compensation must be reasonable. *Wilderman v. Wilderman,* 315 A.2d
610, 615 (Del.Ch. 1974); *see Olson Brothers, Inc. v. Engelhart,* 245 A.2d 166, 168
(Del. 1968). Other courts agree with this principle, e.g., *Smith v. Dunlap,* 111
So.2d 1, 4 (Ala. 1959)("equity will intervene on behalf of a minority stockholder
... [to correct] ... receipt of excessive compensation by the officers of a
corporation").

The reasonableness of compensation is a question of fact, and courts have used a
variety of factors to decide it. In *Wilderman, supra,* the court considered *inter
alia,* "what other executives similarly situated received. ... whether the salary
bears a reasonable relation to the success of the corporation ... [and] whether
increases are geared to increases in the value of services rendered." In *Smith v.
Dunlap, supra,* the court cited *Gallin v. National City Bank,* 273 N.Y.S. 87, 114
(Sup.Ct. N.Y. Co. 1934) and considered, *inter alia,* the "success achieved, amounts
under jurisdiction, corporate earnings, profits and prosperity, increase in volume
or quality of business."

In *Fendelman v. Fenco Handbag Mfg. Co.,* 482 S.W.2d 461, 464-65 (Mo. 1972) the
court considered these same factors and added "a comparison of salaries paid with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                          Page 13

2002 WL 32817147 (3rd Cir.)


the gross income and the net income ... [and] the prevailing rates of compensation
for comparable positions in comparable concerns."

 Applying the foregoing factors to the allegations of the complaint, defendant
Saper's compensation from 1996 to 2000 increased nearly four times faster than
Datascope's earnings and ten times faster than its assets and stockholders'
equity. (Com. ¶25; A.29). Moreover, in that same period, the relevant stock market
indices performed 50% better than did Datascope's stock (Com. ¶26; A.30) and when
defendant Saper's compensation is compared to that of other executives similarly
situated, he has received several times more than they have. (Com. ¶27-29;
A.30-31) See Benerofe v. Cha, 1998 WL 83081 at *4 (Del.Ch. February 20, 1998)
where the court sustained a claim of waste upon allegations that a corporation
sold its products to a controlling stockholder at prices less than those
prevailing in the open market. We further suggest that a bonus plan that pays
$125,000 for each additional $150,000 of Company profit, i.e., 83%, is
confiscatory on its face.

 Finally, defendants improperly coerced the stockholders to vote in favor of the
Plan and the Saper bonus. They threatened that if the stockholders failed to
approve the deductible bonus, the defendants might give Saper a bonus that was not
deductible. (Com. ¶19-20; A.27-28). It is improper to coerce stockholders to vote
"for some reason other than the merits." Williams v. Geier, 671 A.2d 1368, 1382-83
(Del. 1996). The threat at bar is that the board is prepared to pay this bonus
even if it is not deductible and therefore against the Company's best interest.
Lacos Land Co. v. Arden Group, Inc., 517 A.d 271, 276, 278-79 (Del.Ch. 1986). At
bar, this threat is not a truthful representation of some consequence that
necessarily follows, for the board is not bound to reject the wishes of the
stockholders. Moreover, the fact that the directors might ignore the stockholders'
expressed desire not to pay the bonus makes the bonus not deductible in any event.
26 C.F.R. §1.162-27(e)(4)(i).

                               POINT III
                   DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED.
 The lower court did not decide the demand issue. We nevertheless brief this point
in an abundance of caution.

 Under Delaware law demand is excused where half the members of an even numbered
board are alleged to be interested or to lack independence. Bilunka v. Sanders,
1994 WL 447156 (N.D.Cal. March 2, 1994); Beneville v. York, 769 A.2d 80 (Del.Ch.
2000); Kaufman v. Beal, 1983 Del.Ch. LEXIS 391 at *25-*26 (Del.Ch. February 25,
1983) (Where only ten members of twenty-member board are disinterested an "even
split is sufficient to excuse demand because, at best, the plaintiffs would face a
Board of Directors deadlocked on the response to the demand [citation omitted]").

 We submit that three board members, i.e., Saper, Altschiller, and Grayzel, are
not disinterested and independent and that the other three, i.e., Abramson, Nash,
and Heller, though having the surface appearance of independence, have conducted
themselves in such an extremely improper way that further judicial inquiry is
needed. In Rales v. Blasband, 634 A.2d 927, 936-37 (Del. 1993) the court held that
an interested director is one who receives a financial benefit from the corporate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                          Page 14

2002 WL 32817147 (3rd Cir.)


transaction (We submit that defendant Saper is an interested director.) and that a director lacks independence where he or she receives compensation from an employer that is controlled by the interested director. We submit that the consulting compensation, controlled by defendant Saper, paid to defendants Altschiller ($134,500 per year plus bonus and stock options, (Com. ¶16; A.26-27) and Grayzel ($161,700 per year plus bonuses and stock options (Com. ¶17; A.27), destroys their independence. *In re Ply Gem Industries, Inc. Sh.Lit.,* 2001 WL 755133 at *9 (Del. Ch. June 26, 2002) (annual consulting fee of $25,000 might not conflict a director, but $48,000 will).

 Accordingly, we submit that the protections of the business judgment rule are unavailable to defendants Saper, Altschiller, and Grayzel, regardless of the position of defendants Abramson, Nash and Heller.

 Although the complaint does not address the possible interest or lack of independence of defendants Abramson, Nash, and Heller, we suggest that the state of the record strongly does. In *Aronson v. Lewis,* 473 A.2d 805, 816 (Del. 1984), the court held that a director's independence must be judged by "the care, attention and sense of individual responsibility to the performance of one's duties." In *Kahn v. Tremont Corp.,* 1994 WL 162613 at *6 (Del.Ch. April 22, 1994) the court addressed facts where "despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review." The facts were that seemingly independent, disinterested directors had approved a corporate purchase of an illiquid block of shares at a high price to accommodate a controlling stockholder.

 In *Kohls v. Duthie,* 2000 WL 1041219 at *8 (Del.Ch. July 26, 2000) the court held that the facts, where nominally disinterested, independent directors failed to respond to "a particularly striking 'opportunity' for the corporation to benefit its stockholders, would seem to present a sufficiently substantial question of fiduciary misconduct to survive a motion to dismiss."

 In *Sanders v. Wang,* 1999 WL 1044880 at *5 (Del. Ch. November 8, 1999), the court held that a reasonable doubt was cast upon the board of directors' valid exercise of business judgment where the "board violated an express KESOP [*i.e.,* key employee stock ownership plan] provision limiting the number of shares they were authorized to award." We submit that *Sanders* is on all fours with the conduct of the board at bar. Here, not only did they pay out $3,285,714, when the maximum amount was only $2,225,000, but they went further and solicited stockholder approval for it and at the same time omitted to disclose the correct numbers. This conduct is so extreme and unbusiness-like that it calls into question all the compensation for defendant Saper from fiscal year 1966 through 2000. (Com. ¶¶22, 25; A.25-26, 29).

 Three board members at bar are neither disinterested nor independent, and the other three, though having the surface appearance of independence, have conducted themselves in such an extreme and improper way that further inquiry and judicial review are needed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147

2002 WL 32817147 (3rd Cir.)

The complaint also alleges, ¶5(b) and (c) (A.24), that, in addition to state law, demand is excused under federal law. Although FRCP 23.1 is a rule of pleading, and the substance of the demand rule is left to state law, yet an exception is made upon a "finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the actions." *RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318, 1330 (2nd Cir. 1991); *see also, Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 98 (1991).

If Delaware law could possibly be interpreted to require demand at bar, it would be inconsistent with federal policy. In *Galef v. Alexander, supra,* 615 F.2d at 62-64, the court held that federal policy prevents corporate directors from invoking the business judgment rule to obtain summary dismissal against themselves of well pleaded §14(a) claims. In reaching this conclusion, the court held that "[o]bviously" the vital goal of §14(a) was to obtain accurate and complete disclosures from management to stockholders and that the goal should not be "frustrated" by permitting directors who were accused of violating §14(a) to use their own business judgment to dismiss the complaint. *Galef,* 615 F.2d at 63.

Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson v. Lewis, supra,* 473 A.2d at 812. Accordingly, to require demand at bar under Delaware law would inject into the process that which federal policy forbids.

*CONCLUSION*

For the reasons stated herein, plaintiff respectfully submits that the court should reverse the lower court's order and remand for further proceedings.

Appendix not available.

David B. SHAEV, Appellant, v. Lawrence SAPER; Alan B. Abramson; David Altschiller; Joseph Grayzel, M.D.; George Heller; Arno Nash; and Datascope Corp., Appellees.

2002 WL 32817147

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.