# TAB 11

**\*803974**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**William M. SKEEN and Jacqueline L. Skeen Plaintiffs,**
**v.**
**JO-ANN STORES, INC., House of Fabrics, Inc., Alan Rosskamm, Brian P. Carney, David E. Bolen, Jane A. Aggers, John W. Hermsen, R.N. Hankin and H. Michael Hect, Defendants.**

No. Civ.A. 16836.
Sept. 27, 1999.

Ronald A. Brown, Jr., of Prickett, Jones, Elliott & Kristol, Wilmington, Delaware; for Respondents.

Allen M. Terrell, Jr., Srinivas M. Raju, and Michael D. Allen, of Richards, Layton & Finger, Wilmington, Delaware; and David J. Hooker, Keith L. Carson and Lisa R. Battaglia, of Thompson Hine & Flory LLP, Cleveland, Ohio; for Defendants.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

**\*\*1** The plaintiffs, who are former shareholders of House of Fabrics, Inc. ("HF"), brought this class action against HF and its seven former directors, claiming that those directors (i) breached their fiduciary duty of disclosure by omitting material facts from an Information Statement disseminated in connection with a proposed merger and (ii) violated 8 *Del C.* §§ 251 and 262 by not mailing to the shareholders in timely fashion the Information Statement and the Notice of meeting at which HF shareholders would vote on that merger.

The defendants moved to dismiss all claims on the grounds that the plaintiffs lack standing and that the complaint fails to state a claim upon which relief can be granted. In response, the plaintiffs filed a cross-motion for the entry of summary judgment on four of their disclosure claims. I conclude, for the following reasons, that all the claims alleged in the complaint are legally insufficient. Accordingly, the motion to dismiss will be granted and the cross-motion for summary judgment will be denied.

I. BACKGROUND

The pertinent facts are derived from the complaint. HF, a Delaware corporation headquartered in Sherman Oaks, California, is one of the largest home sewing and craft retailers in the United States. As of March 31, 1998, the record date for the April 21, 1998 shareholder meeting, HF had issued and outstanding 1,216,817 shares of common stock that were owned by thousands of public shareholders located throughout the country. At the time of the merger, HF's board of directors consisted of seven members, all of whom are named as defendants.

On February 1, 1998, two years after HF had emerged from bankruptcy, HF and FCA Acquisition Corp., a wholly-owned subsidiary of Fabri-Centers of America, Inc. ("FCA"), entered into a merger agreement (the "Merger Agreement") which provided for a two-step acquisition of HF by FCA for $4.25 per share. The $4.25 acquisition price was approximately 20% below HF's February 28, 1998 book value of $5.35 per share. The first step would consist of a tender offer to acquire a majority or all of HF's outstanding shares for $4.25 per share cash (the "tender offer"). The second step would consist of a "back-end" merger, in which each remaining share would be converted into a right to receive $4.25 in cash (the "Merger").

As a result of the tender offer, which commenced on February 6, 1998 and closed on March 6, 1998, FCA acquired 4,115,013 HF shares, representing 77.2% of HF's outstanding stock. The remaining 1,216,817 shares, representing about 22.8% of HF's outstanding shares, were not tendered. The plaintiffs, who were the beneficial owners of 3,000 HF shares held in street name, did not tender their shares or the 300 HF shares of which they were the record owners.

The day after FCA acquired 77.2% of HF in the tender offer, five of HF's seven directors resigned and were replaced by five FCA designees, all of whom were FCA senior officers. Mr. Alan Rosskam, FCA's Chairman and President, was named HF's CEO and a director. On March 10, 1996, the new HF board of directors announced that HF's headquarters would be relocated from Sherman Oaks, California to FCA's headquarters in Ohio. Two days later, FCA advanced funds to HF to repay HF's outstanding indebtedness to CIT Group/ Business Credit, Inc. (approximately $43 million against a $65 million line of credit), and as a result, FCA became HF's largest creditor.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

**\*\*2** On or about April 1, 1998 the HF board of directors caused to be mailed an Information Statement together with a Notice (the "Notice") of a special shareholders meeting to be held on April 21, 1998, to consider and vote upon the Merger Agreement. Both the Notice and the Information Statement were dated April 1, 1998. The Information Statement disclosed that it "is dated April 1, 1998 and is first being mailed to stockholders on or about April 1, 1998." The HF shareholders voted to approve the Merger, which was consummated on April 21, 1998. The named plaintiffs accepted the $4.25 per share Merger consideration.

## II. THE CONTENTIONS

In their complaint the plaintiffs assert two claims. The first is that HF directors breached their fiduciary duty of disclosure by omitting to disclose material facts to HF shareholders in the Notice and Information Statement. Specifically, plaintiffs claim that six material facts should have been, but were not, disclosed: (i) the omission of FCA's business plan concerning how HF would be treated post-acquisition; (ii) the reason why HF's board had decided to sell the company to FCA; (iii) the HF investment banker's fairness opinion; (iv) the company's earnings projections through 2003; (v) the most up-to-date available financial information; and (vi) the information concerning other offers to acquire HF.

The plaintiffs' second claim is that the mailing of the Notice and the Information Statement were untimely under 8 *Del. C.* § 251 and 262, which requires the mailing to be completed twenty days before the shareholders meeting, in this case (plaintiffs say) by April 1, 1998. The disclosure in the Information Statement that the mailing occurred "on or about" April 1, 1998, is claimed to be a tacit admission that the mailing had not been completed by April 1, 1998.

On their Rule 12(b)(6) motion, the defendants seek dismissal of both claims on four grounds. *First,* the defendants argue that the representative plaintiffs lack standing to assert their claims. *Second,* the defendants contend that the disclosure allegations fail to state claims upon which relief may be granted. *Third,* the defendants assert that even if the Information Statement omitted to disclose material facts, the exculpatory clause found in HF's Certificate of Incorporation bars the plaintiffs from recovering money damages. *Fourth,* the defendants argue that the complaint fails to state a cognizable claim for

violations of 8 *Del. C.* § 251 and 262.

On their cross-motion the plaintiffs seek summary judgment on four of their six omitted disclosure claims.

The motion to dismiss and the cross-motion for summary judgment frame four issues: (1) Do the named plaintiffs have standing to maintain this class action? (2) Were any or all of the six disclosure omissions material to HF shareholders deciding how to vote on the merger? (3) If any of those omissions was material, does the exculpatory clause in HF's Certificate of Incorporation bar a recovery of money damages? (4) Did the disclosure that the HF board began mailing the Notice and Information Statement "on or about April 1, 1998" constitute an admission that defendants failed to notify shareholders in a timely way?

**\*\*3** Only issues 1, 2, and 4 are addressed in this Opinion, because the Court's determination that the disclosure omissions are legally insufficient, obviates the need to address the plaintiffs' cross-motion for summary judgment or the defense that the exculpatory clause bars money damages.

## III. ANALYSIS

### A. *The Applicable Standards*

The two motions before the Court--the defendants' motion to dismiss and the plaintiffs' cross motion for summary judgment--involve different standards. Each motion must be independently addressed, and the Court must apply the standard applicable to each. (FN1)

The standard on a motion under Rule 12(b)(6) is that a claim will be dismissed where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proven to support the claim. (FN2) All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are unsupported by specific factual allegations will not be. (FN3) In this regard the Court will consider on a Rule 12(b)(6) motion any documents that are incorporated into the complaint by reference. (FN4)

To succeed on the motion under Rule 56 for summary judgment, the plaintiffs must show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. (FN5) All facts will be viewed in the light most

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

favorable to the non-moving party, (FN6) and summary judgment will be denied "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom." (FN7)

## B. *The Standing Defense*

The defendants first contend that the complaint must be dismissed because the representative plaintiff shareholders lack standing by reason of their having accepted the cash merger consideration. The plaintiffs respond that under clearly established Delaware law, shareholders who are misled into casting an uninformed vote retain the right to challenge a merger, even if they accept the consideration. The plaintiffs here claim that they were so misled.

The plaintiffs' position is correct. Only fully informed shareholders waive their right to challenge a merger by tendering their shares and accepting the merger consideration. (FN8) Where, as here, the plaintiff shareholders claim that their approving vote was induced by misleading disclosures, their acceptance of the merger consideration will not bar a challenge to the transaction voted on. (FN9) Specifically, because the plaintiffs claim that the directors breached their fiduciary duties by omitting to disclose material facts in the Information Statement, their acceptance of the Merger consideration will not bar their claim.

Having determined that the plaintiffs have standing to assert their claims, the Court next considers the legal sufficiency of those claims.

## C. *The Legal Sufficiency of the Claims*

1. The Claim That Defendants' Mailing "On or About April 1, 1998" Constitutes Untimely Disclosure Under §§ 251 and 262

**\*\*4** The defendants contend that the plaintiffs' "untimely mailing" claim based on 8 *Del. C.* §§ 251 and 262 must be dismissed as legally insufficient. The only factual basis for this claim (defendants argue) is an inference that the phrase in the Information Statement that the mailing occurred "on or about April 1, 1998," admits that not all of the notifications were mailed by April 1, 1998. The defendants respond that "*on or about* April 1, 1998" does not mean after April 1, 1998, and contend that this claim must be dismissed because the complaint pleads no facts that would support it.

The plaintiffs respond that it may be inferred from the phrase mailed "on or about April 1, 1998," that not all of the mailings had been completed by April 1, 1998 as was legally required. They further contend that on this motion all they need do to satisfy the requirements of notice pleading is inform the defendants that they are charged with failing to mail the Notice to all HF stockholders in a timely manner.

The defendants' position is, in my view, meritorious. The plaintiffs have not alleged that they or any other member of the class received an Information Statement postmarked after April 1, 1998. The use of the phrase "on or about April 1, 1998" may be inelegant, but that alone does not fairly permit an inference that the mailing of the Information Statements had not been completed by April 1, 1998.

2. The Disclosure Claims

The defendants next argue that the disclosure claims must be dismissed, because none of the omitted facts complained of was material. The defendants contend that the Information Statement disclosed facts that were adequate to enable HF shareholders to make a fully informed voting decision. The plaintiffs disagree. They argue that the omitted information was material, and further, that summary judgment should be granted in their favor on four of their disclosure claims.

It is well established that directors have a fiduciary duty to disclose fully and fairly all material facts within their control that would have a significant effect upon a stockholder vote. (FN10) An omitted fact is material if a reasonable shareholder would consider it important in deciding how to vote. To say it differently, it must be substantially likely that the information would have been viewed by a reasonable investor as altering the "total mix" of available information. (FN11) Determining materiality requires an assessment of what a "reasonable investor" would consider when making a decision to vote or exercise appraisal rights. (FN12)

The duty to disclose, though highly important, is not all encompassing. "Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." (FN13) Balanced against the requirement of complete disclosure is the pragmatic consideration that creating a lenient standard for materiality poses the risk that corporations will "bury the shareholders in an

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

avalanche of trivial information a result that is hardly conducive to informed decisionmaking." (FN14)

**\*\*5** The disclosure claims are assessed in light of these standards.

a) *The Omitted Disclosure of FCA Changes and FCA Plans*

The plaintiffs first contend that HF's directors failed to disclose a full explanation of (i) the changes made by FCA to HF after the tender offer closed and (ii) FCA's business plan regarding how HF would be treated after it was acquired. More specifically, the plaintiffs claim that the business reasons for replacing five of HF's directors with five FCA officers, for relocating HF headquarters from California to Ohio, and for FCA repaying the entire amount HF had borrowed from CIT Group, were not--but should have been--fully disclosed. The plaintiffs rely on *Cede & Co. v. Technicolor, Inc* (FN15) as support for their view that HF's stockholders needed that information, first to determine the going concern value of HF as of the Merger date, and then to compare that going concern value with the Merger price.

The defendants argue that the plaintiffs have failed to plead facts that support a conclusion that FCA added value to HF before the Merger was consummated. The defendants contend that FCA's plan and a summary of its effects would be of no use to shareholders seeking to calculate the going concern of HF for the purposes of a later appraisal proceeding, because the values generated would have included synergies arising from the Merger, which cannot be considered in an appraisal.

I conclude that the plaintiffs have failed to plead facts showing why the omitted information would have been material to the stockholders' decision concerning how to vote. To establish materiality, it is not enough for plaintiffs to assert conclusorily that the omitted information might perhaps have been useful to shareholders. Rather, the plaintiffs must plead facts showing that the omitted information would have altered the "total mix" of information available to shareholders and would have been considered important to a reasonable shareholder deciding how to vote. The plaintiffs have not done that in connection with this claim.

b) *The Omitted Disclosure of the Reasons for the Merger*

The plaintiffs next claim that the nine reasons

recited in the Information Statement for why the HF board was recommending the Merger, were incomplete because the board's "true"--but undisclosed--rationale for approving the Merger would have been material to shareholders deciding how to vote.

The Information Statement recited the following nine reasons why the Merger was approved:

(1) The financial condition and results of operations of the Company.

(2) The projected financial results, prospects and strategic objectives of the Company, as well as the risks involved in achieving those results, prospects and objectives, including certain liquidity constraints which the Company may face in the absence of any new financing.

(3) The fact that the $4.25 per Share to be received by the Company's stockholders in both the Offer and Merger represents a substantial premium (approximately 33%) over the closing market price of $3.19 per Share on January 30, 1998 (the last trading day prior to the Board's approval of the Offer and the Merger); and the fact that the $4.25 per Share to be received by the Company's stockholders in both the Offer and the Merger represents a substantial premium (110%) over the average market price per Share during the 60-day period prior to the Board's approval of the Offer and the Merger.

**\*\*6** (4) The Board's view, after consultation with the management and F.M. Roberts, regarding the likelihood of the existence of other viable buyers on terms as favorable as those in the Offer and the Merger.

(5) The presentation to the Company's Board of Directors by representatives of DLJ and the opinion of DLJ that the $4.25 per Share in cash to be received by the stockholders of the Company pursuant to the Merger Agreement is fair to such stockholders from a financial point of view. The full text of the written opinion of DLJ, which sets forth assumptions made, procedures followed, matters considered and limits on the review undertaken, is attached as Annex E to this Information Statement.    THE COMPANY'S STOCKHOLDERS ARE URGED TO READ THIS OPINION IN ITS ENTIRETY....

(6) The availability of appraisal rights under

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Section 262 of Delaware Law for dissenting Shares.

(7) The terms and conditions of the Merger Agreement and the course of the negotiations resulting in the execution thereof.

(8) The possible alternatives to the Offer and the Merger, including the prospects of the Company going forward as an independent entity, the range of possible benefits to the Company's stockholders of such alternatives and the timing and the likelihood of actually accomplishing any of such alternatives.

(9) The likelihood that the proposed acquisition would be consummated, including the likelihood of obtaining the regulatory approvals required pursuant to, and satisfying the other conditions to, the Offer and the Merger contained in the Merger Agreement, the experience, reputation and financial condition of the Parent and the risks to the Company if the acquisition were not consummated.

The plaintiffs do not claim that any of these disclosed reasons was false. Instead, they imply that the HF board had some other hidden reason for agreeing to the Merger, but they allege no facts to support that implicit, but conclusory, claim. Accordingly, the plaintiffs have failed to support their claim that the reasons disclosed in the Information Statement were "misleading and incomplete boilerplate."

### c) *The Omitted Disclosure Concerning DLJ's Fairness Analysis*

The plaintiffs next claim that the Information Statement should have disclosed the methodologies and analyses that Donaldson, Lufkin & Jenrette ("DLJ") used in arriving at its fairness opinion. The plaintiffs concede that the "disclosure of methodologies and analyses used by an investment banker have generally been held by the Court of Chancery not to be material." (FN16) The plaintiffs argue, however, that the fact that HF was sold for 20% less than its book value is a circumstance so unusual that it required the disclosure of DLJ's methodologies and valuation analysis in this case.

Again, I find this disclosure claim to be without factual or legal support. The plaintiffs cite no authority, nor proffer any logical reason to support their *ipse dixit*. The Information Statement included a summary of DLJ's fairness opinion. It also attached

a copy of that opinion, which disclosed DLJ's assumptions and procedures and the matters it considered. Delaware law did not require further disclosures on that subject.

### d) *The Omitted Disclosure of HF Management's Five Year Projections*

**\*\*7** Based on similar reasoning, the plaintiffs claim that the board was legally required to disclose the five year projections that HF management had provided to DLJ in connection with DLJ's fairness opinion. The plaintiffs argue that those projections would have formed the basis for a discounted cash flow valuation that a reasonable stockholder could have used to evaluate whether or not to pursue a statutory appraisal.

I conclude that the plaintiffs have not alleged facts sufficient to support an inference that the projections would have been material to stockholders deciding how to vote. All the plaintiffs allege are conclusory statements that the projections might help explain why the Company was sold for 20% below book value, and would also be useful in a discounted cash flow valuation. Those bare assertions fall short of showing that the projections would alter the information mix already available to shareholders and become important to a reasonable shareholder's voting decision.

### e) *The Omitted Disclosure Concerning Up-to-Date Financial Information*

The plaintiffs next claim that the defendants did not, but should have, disclosed the most up-to-date financial statements available. The plaintiffs concede that the Information Statement did disclose all that which was required by SEC Regulations. They contend, however, that because the financials were for the fiscal year ending January 31, 1998, and because the Information Statement was dated April 1, 1998, HF could and should have disclosed more recent financial information.

The plaintiffs cite no support for their position that with respect to this subject Delaware should impose more stringent financial disclosure requirements than those presently mandated by the SEC under federal law. It also appears that the defendants did disclose the most up-to-date financials that were available to it. (FN17) Those disclosures, in the circumstances, were sufficient. The plaintiffs have presented no persuasive authority or argument why this Court should expand Delaware disclosure requirements

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

beyond those presently mandated by Federal law.

*f) The Omitted Disclosure Regarding The Other Offers HF Received*

Lastly, the plaintiffs claim that the Information Statement failed to adequately disclose other offers HF received during the year preceding the Merger. The Information Statement disclosed that "[t]he entity that had expressed interest prior to DLJ's engagement ultimately declined to make an offer for the Company ... Other parties contacted by DLJ did not return with proposals the Company wished to pursue." In these circumstances, the defendants argue, nothing more had to be disclosed.

I concur. Where an expression of interest does not lead to a firm offer, the board has no obligation to disclose the specifics of the expression. (FN18) Moreover, shareholders are not entitled to a "play-by-play" description of merger negotiations. (FN19) Under Delaware law, efforts by public corporations to explore a possible merger do not become a subject of mandated disclosure unless and until the firms have agreed on the price and structure of the transaction. (FN20)

**\*\*8.** In this case, the entity that originally expressed an interest in acquiring HF declined to make an offer. Because no firm offer was made, the board had no duty to disclose any of the specifics of HF's negotiations with that entity. The other companies did not make any proposals that HF wished to pursue, and defendants were under no duty to disclose those proposals either.

\* \* \*

\* \* \*

Because the Court concludes that the disclosure claims are legally insufficient and must be dismissed, it is unnecessary to address the plaintiffs' motion for summary judgment respecting those claims, or the defense that the exculpatory clause in HF's charter bars a recovery of money damages with respect to these claims.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted and plaintiffs' motion for summary judgment is denied. IT IS SO ORDERED.

(FN1.) *See Continental Airlines Corp. v. American*

*Gen'l Corp.,* Del.Supr., 575 A.2d 1160, 1164 n. 5 (1990).

(FN2.) *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

(FN3.) *See supra* note 2; *see also In re Wheelabrator Technologies Inc. Shareholders Litig.,* Del. Ch., C.A. No. 11495, mem. op. at 4, Jacobs, V.C. (Sept. 1, 1992) (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988)); *see also Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1264 (1979).

(FN4.) *See Vanderbilt Income and Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996).

(FN5.) *Emerald Partners v. Berlin,* Del. Ch., C.A. No. 9700, Steele, V.C. (Sept. 22, 1995), *rev'd on other grounds,* Del.Supr., 676 A.2d 902 (1995); *see also Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

(FN6.) *Gilbert v. The El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990).

(FN7.) *Seagraves v. Urstadt Property Co., Inc.,* Del. Ch., C.A. No. 10307, mem. op. at 7, Jacobs, V.C. (April 1, 1996).

(FN8.) *Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 848 (1987).

(FN9.) *Iseman v. Liquid Air Corp.,* Del. Ch., C.A. No. 9694, Berger, V.C. (Feb. 11, 1992); *see also Seigman v. Columbia Pictures Entertainment, Inc.,* Del. Ch., C.A. No. 11152, Harnett, V. C. (Jan. 12, 1993).

(FN10.) *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 85 (1992).

(FN11.) *Ibid.*

(FN12.) *Ibid.*

(FN13.) *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448 (1976).

(FN14.) *Ibid.*

(FN15.) *Cede & Co. v. Technicolor, Inc.,* Del. Ch., C.A. No. 7129, slip op. at 35-36, 57, Allen, C.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1999 WL 803974, Skeen v. Jo-Ann Stores, Inc., (Del.Ch. 1999)  **Page 7**

(Oct. 19, 1990), *rev'd on other grounds.* Del.Supr., 684 A.2d 289 (1996).

(FN16.) *In re Dataproducts Corp. Shareholders Litig.,* Del. Ch., C.A. No. 11164, slip op. at 16-17, Jacobs, V.C. (Aug. 22, 1991).

(FN17.) As defendants point out, the Company's next quarter ended on April 30, 1998. Therefore, the January 31, 1998 financial statement was the most recent available statement for inclusion in the Information Statement that was issued on April 1, 1998, almost 1 month before.

(FN18.) *In re KDI Corp. Shareholders Litig.,* Del. Ch. Consol. C.A. No. 10278, slip op. at 18, Berger, V.C. (Nov. 1, 1988).

(FN19.) *TCG Sec. Inc. v. Southern Union Co.,* Del. Ch., C.A. No. 11282, slip op. at 17, Chandler, V.C. (Jan. 31, 1990); *Arnold v. Society For Sav. Bancorp. Inc.,* Del. Ch. C.A. No. 12883, slip op. at 17, Chandler, V.C. (Dec. 15, 1993), *aff'd in part,* Del.Supr., 650 A.2d 1270 (1994).

**\*\*8_**   (FN20.) *Bershad supra* note 8 (citing *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

# TAB 12

*42607    16 Del J Corp L 924

UNPUBLISHED OPINION.  CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New
Castle County.

**John TOMCZAK and Stuart D.
Wechsler, Plaintiffs,**
v.
**MORTON THIOKOL, INC., Charles
S. Locke, Robert C. Hyndman, Ralph
M. Barford, William T. Creson, Dennis
C. Fill, Everett A. Gilmour, Robert T.
Marsh, Neil McKay, Barry J. Shillito,
Robert S. Small, A. Dean Swift, Harry
H. Wetzel, and The Dow Chemical
Company, Defendants.**

CIV. A. No. 7861.
Submitted Nov. 30, 1989.

Decided April 5, 1990.

On Morton Thiokol, Inc. and Individual
Defendants' Motion for Summary Judgment:
Granted; on the Dow Chemical Company's Motion
for Summary Judgment: Granted.

Joseph A. Rosenthal and Kevin Gross, Morris,
Rosenthal, Monhait & Gross, Wilmington, of
counsel: Michael P. Fuchs, Wolf Popper Ross Wolf
& Jones, New York City, for plaintiffs.

Lawrence C. Ashby and Stephen E. Jenkins,
Ashby, McKelvie & Geddes, Wilmington, for
defendant Morton Thiokol, Inc.

A. Gilchrist Sparks, III, and Thomas C. Grimm,
Morris, Nichols, Arsht & Tunnell, Wilmington, for
the defendant directors of Morton Thiokol, Inc. of
counsel: Wachtell, Lipton, Rosen & Katz, New York
City.

Charles S. Crompton, Jr., and Donald J. Wolfe, Jr.,
Potter Anderson & Corroon, Wilmington, of counsel:
William J.F. Roll, III, Shearman & Sterling, New
York City, for defendant The Dow Chemical
Company.

MEMORANDUM OPINION

HARTNETT, Vice Chancellor

**\*\*1**    In this purported stockholder's derivative
action, plaintiffs challenge the sale by defendant
Morton Thiokol, Inc. ("Morton Thiokol") of its
Texize Household Products Division ("Texize") to
defendant, The Dow Chemical Company ("Dow").
The members of Morton Thiokol's Board of Directors
are also named as defendants. Plaintiffs allege that
the approval of the transaction by the Morton Thiokol
directors constituted a breach of their fiduciary duties
and a waste of corporate assets, and that the sale was
consummated to thwart an alleged Dow takeover
threat, so as to perpetuate the individual defendants in
office. The plaintiffs also claim that Dow "knowingly
aided and abetted" the alleged breach of fiduciary
duties by the Morton Thiokol Board by participating
in the transaction.

The Morton Thiokol defendants moved for
summary judgment, asserting, *inter alia,* that the
decision of Morton Thiokol's Board to sell Texize to
Dow is protected from judicial scrutiny by the
business judgment rule.  Dow also moved for
summary judgment on the grounds that it owed no
fiduciary duty to the stockholders of Morton Thiokol.
Because there are no disputed material facts and
because plaintiffs' suit is without merit, as a matter of
law, both motions for summary judgment on behalf of
the defendants must be granted.

Although the parties have different views of this
case, the material facts are not disputed and the
primary dispute involves the inferences to be drawn
from these facts.

At all times material to the present dispute, the
Morton Thiokol Board was comprised of twelve
individuals, all of whom are named defendants in this
action.  Only two of the twelve directors were
"inside" directors, that is, members of Morton
Thiokol management: Charles S. Locke, Chairman of
the Board and Chief Executive Officer, and Robert C.
Hyndman, President and Chief Operating Officer.
The other ten Morton Thiokol directors were
"outside" directors, all of whom were experienced
executives.

As a result of a 1982 merger and restructuring,
Morton Thiokol had been operating four major
business segments: Aerospace, Specialty Chemicals,
Salt, and Household Products.  The Household
Products segment was operated by the Texize
Division and marketed a number of household
cleaners and insecticides.

After Morton Thiokol's restructuring in 1982, the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

Specialty Chemicals and Aerospace business segments quickly became Morton Thiokol's chief businesses. In 1983 and 1984, Morton Thiokol experienced dramatic growth, which was attributable to its Specialty Chemicals and Aerospace segments, while the growth of the Texize Household Products segment lagged behind. Consequently, Morton Thiokol's two inside directors, Messrs. Locke and Hyndman, became concerned about the future of the Texize Division, and began considering divestiture of Texize, despite the fact that it was still profitable. They expressed concerns over the ability of Texize to achieve targeted growth rates, the existence of increasing competition, and the fact that Texize was reaching maturity in some of its major markets. The outside directors of Morton Thiokol shared management's concern with the future prospects of Texize, and were aware of the possibility that Texize might be divested.

**2** In addition, the emergence of Morton Thiokol's Aerospace and Specialty Chemicals segments as profitable businesses set Morton Thiokol in a new direction, away from consumer products similar to those sold by Texize with their heavy emphasis on advertising. Immediately following the 1982 restructuring of Morton Thiokol, Goldman Sachs & Co. (the investment banker that advised Morton Thiokol on an on-going basis) discussed with Morton Thiokol's management the lack of "strategic fit" of Texize with the company's other business segments, and the possibility of a divestiture of Texize.

Despite their concerns over the future of Texize, Morton Thiokol's Board continually rebuffed the interest that a number of companies, including Dow, expressed in purchasing the Texize Division. Messrs. Locke and Hyndman claim that Morton Thiokol was not in a hurry to "shop" Texize at that time because Texize was still profitable and because Morton Thiokol's primary emphasis was on growth and that cash received from the sale of Texize would not contribute to growth. Rather, they assert that Morton Thiokol's executive management was interested in pursuing a possible swap of Texize for a business that would strengthen Morton Thiokol's other businesses-- preferably specialty chemicals. In the alternative, they believed Morton Thiokol might find an opportunity whereby Texize could be divested and the consideration received in the sale could be immediately redeployed into Morton Thiokol's other businesses. However, no such opportunities immediately arose.

As stated previously, Dow was one of the companies that had expressed interest in acquiring Texize commencing in 1982. Morton Thiokol, however, refused to negotiate with Dow at that time, although Morton Thiokol allegedly informed Dow that it might be interested in a "swap" transaction. Dow, however, remained interested in Texize, and in early 1984, Dow began to make market purchases of Morton Thiokol's common stock, through its investment banker, Morgan Stanley & Co., Inc. ("Morgan Stanley").

On April 9, 1984, Dow filed a Schedule 13D with the Securities and Exchange Commission which set forth that it had purchased nearly one million shares, or 5.9% of Morton Thiokol's common stock. The Schedule 13D also stated:

"Although the purchases of shares of [Morton Thiokol] Common Stock ... have been made for investment, at some future time Dow might decide that it is desirable to seek to acquire [Morton] or to seek to control or otherwise influence the management and policies of [Morton Thiokol]."

After speaking with Paul Oreffice, Dow's Chairman of the Board, Mr. Locke, Morton Thiokol's Chairman of the Board and Chief Executive Officer, was not convinced that Dow was only interested in Morton Thiokol as an investment. Mr. Locke believed that Dow's investment in Morton Thiokol might be the first step of a creeping tender offer which would allow Dow to acquire Morton Thiokol without paying any premium to Morton's stockholders.

**3** On April 10, 1984, Mr. Locke and other members of Morton Thiokol's management met with the corporation's attorneys, Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), and Goldman Sachs to discuss Morton Thiokol's options. Goldman Sachs suggested and discussed possible responses to Dow, including continued close monitoring of the situation, an inquiry to Dow concerning its intentions and an examination of possible transactions that could be proposed by Dow or Morton Thiokol. Goldman Sachs also noted that Dow's stock position in Morton, together with its previously expressed interest in Texize, could be viewed as an opportunity to divest Texize. Ultimately, it was decided that Mr. Locke should meet with Mr. Oreffice of Dow.

On April 11, 1984, Mr. Locke and Mr. Oreffice met privately to discuss Dow's intentions regarding Morton Thiokol. Mr. Oreffice affirmed Dow's statement in its Schedule 13D that the purchases were

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

for investment purposes, and consequently, Mr Locke did not receive any specific commitments from Dow, except that Mr. Oreffice did orally agree that Dow would not buy any more Morton Thiokol stock without first informing Mr Locke.

During the next regularly scheduled meeting of the Morton Thiokol Board of Directors on April 26, 1984, Mr. Locke reported to the Board on Dow's investment in Morton Thiokol. The meeting focused on the possibility that Dow might be launching a creeping tender offer, with the Board discussing how to deal with Dow, including the option of putting Morton Thiokol "into play" if necessary Although Morton Thiokol was considered a takeover target, the Board did not formally adopt any defensive measures at the April 26th meeting. The Morton Thiokol Board did, however, adopt a resolution at the April 26th meeting reconfirming the Company's expressed policy of remaining independent. The Morton Thiokol Board allegedly remained open, nonetheless, to the possibility of a takeover at a fair price Since Dow had not made any offer, Morton Thiokol adopted a "wait and see" approach.

On April 27, 1984, Mr. Locke and Mr Oreffice again spoke privately to discuss Dow's holdings in Morton Thiokol. During the conversation, Mr. Locke allegedly made a general proposal that Morton Thiokol buy back Dow's interest in Morton Thiokol. Mr. Oreffice informed Mr. Locke that although Dow was never interested in "selling for a quickie profit," he would be interested in a specific buy-back proposal. Mr. Locke then informed Mr. Oreffice that he would instruct Morton Thiokol's investment bankers to make a proposal through appropriate channels.

During the ensuing months, Morton Thiokol's investment banker, Goldman Sachs, explored a range of alternative responses to Dow's accumulation of Morton's stock. Goldman Sachs' study included an analysis of the value of Texize and considered the possible sale of Texize to a third party and the effect of such a sale upon Morton Thiokol. In a May 4, 1984 internal memorandum, Goldman Sachs concluded that the anticipated range of values for a sale of Texize to a third party was $225-250 million. Goldman Sachs' valuation was based upon: (1) an analysis of the historical and projected financial information concerning Morton Thiokol, including budgets, balance sheets, projected growth rates, and after-tax income for each of its four business segments, including Texize; (2) a comparison of Texize with similar companies in terms of products,

profitability, capitalization and financial resources; (3) a review of the historic market price performance, market value and price earnings ratios of stocks of substantially similar companies; and (4) a review of acquisitions of such companies in previous years, including a comparison of the market value of those companies in the acquisitions relative to their earnings and book values.

**\*\*4** On May 7, 1984, Goldman Sachs discussed its study with Morton Thiokol's executive management, and distributed a written report. Goldman Sachs cautioned that its valuation was limited because, as a division, Texize was not a publicly listed company and it therefore did not have a market value that could be directly compared with similar companies. Morton Thiokol's management, therefore, decided not to approach Dow or its financial advisor, Morgan Stanley, with a proposal at that time. Rather, Morton Thiokol requested Goldman Sachs to continually monitor the situation and to periodically advise Morton Thiokol regarding its alternatives.

The next several months produced no further purchases of Morton Thiokol stock by Dow. Morton Thiokol's inside directors, however, continued to discuss the possible divestiture of Texize, recognizing that the sale of Texize to Dow might have the added benefit of deterring Dow from any further takeover overtures.

During that period, Morton Thiokol's management learned that the specialty chemical business of Bee Chemical was for sale, and began to explore the possibility of Morton Thiokol acquiring it.

At the Annual Meeting of Morton Thiokol's stockholders in October of 1984 the stockholders approved the Board's declaration of a three-for-one stock split to stockholders, which increased the number of authorized shares from 32 million to 200 million shares. Morton Thiokol claims, however, that such a move was not a defensive measure designed as an anti-takeover device. Rather, it claims that the split was recommended by Goldman Sachs before Dow appeared on the scene, and that the purpose of the split was to allow more people to buy Morton's stock.

On November 7th and 8th, 1984, Dow purchased additional shares of Morton Thiokol stock, bringing its total ownership of Morton Thiokol to approximately 8.23%. On November 9, 1984, Dow amended its Schedule 13D to report its additional

© 2004 West, a Thomson business. No claim to original U S. Govt. works.

purchases, and filed materials necessary under the Hart-Scott-Rodino Antitrust Improvement Act of 1976 (Pub.L. No. 94-435, 90 Stat. 1383, codified as amended in various sections of Titles 15, 18 and 28 U.S.C.). The Hart-Scott-Rodino filing would have allowed Dow, after a 30-day waiting period, to increase its holdings in Morton Thiokol to more than 10%, but less than 15%, of the outstanding shares of Morton Thiokol.

In response to this activity, on November 9, 1984, Morton Thiokol stock traded as high as 94 1/4--which was a rise in the market of almost 10 points over the price on the preceding two days.

Despite Dow's statements to the contrary, Morton Thiokol's inside directors recognized the possibility that Dow was in the second stage of a creeping tender offer. Consequently, Morton Thiokol's executive management (not its complete Board of Directors) met again with Goldman Sachs on November 9th or 10th to discuss its options, including selling Texize to Dow in exchange for cash and Dow's shares of Morton Thiokol. Goldman Sachs believed that such a sale would have the dual benefits of profitably divesting Texize and removing the threat of a possible creeping tender offer by Dow. On November 11, 1984, Morton Thiokol instructed Goldman Sachs to approach Dow, through Morgan Stanley, to see if Dow was interested in such a deal.

**5** During this critical period, Goldman Sachs conducted a comprehensive analysis, similar to that done in May of 1984, in order to update its prior analysis of Texize, including an evaluation of its operations, financial performance and future projections. The updated analysis was consistent with Goldman Sachs' earlier valuation of Texize, setting an approximate range of values of Texize at $225-250 million. Thus, when Goldman Sachs contacted Morgan Stanley on November 11th regarding Morton Thiokol's proposed transaction, Goldman Sachs suggested that the aggregate consideration should be $250 million for Texize.

While Morgan Stanley was surprised by such a proposal, it nonetheless reviewed it with Dow. Dow's Chairman and CEO, Mr. Oreffice, viewed $250 million as reasonable because Morgan Stanley had valued Texize within a range of $240-320 million. Consequently, Mr. Oreffice authorized Robert Keil, Dow's Chief Financial Officer, to negotiate the deal, if reasonable. Mr. Keil then instructed Morgan Stanley to advise Goldman Sachs that Dow was interested.

On November 12, 1984, Goldman Sachs provided Morgan Stanley with some non-public information it had regarding Texize. Morgan Stanley was disappointed with the actual performance of Texize, as reflected in this information, because it was lower than Morgan Stanley expected based on its earlier analysis of public information. Mr. Keil of Dow assumed that the merit of the offer must be based on the value of the Morton Thiokol stock held by Dow, and decided that the deal would be desirable if the stock was valued at between $83-92 per share. Consequently, a meeting was set for the next day between Morgan Stanley and Goldman Sachs to further negotiate the transaction.

At the November 13th meeting between Morgan Stanley and Goldman Sachs, Morgan agreed that the value of Texize was $250 million, the value developed previously by Goldman Sachs. The parties then considered alternative methods of valuing the Morton Thiokol stock held by Dow in order to determine the cash component of the deal. Morgan Stanley urged that the value of Morton Thiokol's stock owned by Dow should reflect the then current market price of $92 per share as of the close of business on November 9th. Goldman Sachs, on the other hand, argued that the stock should be valued at $75 per share--which was Dow's average acquisition cost per share.

Ultimately, Morgan Stanley and Goldman Sachs agreed in principle to an exchange of Texize for Dow's 1.4 million shares of Morton Thiokol's stock, plus $131 million in cash, without attributing an express value to the stock. In essence, however, Morton Thiokol paid approximately $85 per share for the Morton Thiokol stock held by Dow. Morton Thiokol and Dow also entered a standstill agreement under which Dow agreed to refrain from purchasing Morton Thiokol's common stock for ten years. When the investment bankers reported back to their respective principals, the management of both Morton Thiokol and Dow agreed to submit the proposal to their respective Boards.

**6** On November 14, 1984, the day prior to the regularly scheduled meeting of Morton Thiokol's Board, Mr. Locke held a dinner meeting for the outside directors. During the meeting, which lasted 2-3 hours, Mr. Locke explained, in general terms, the deal that had been negotiated with Dow and which the Board would formally consider the next day.

At the regularly scheduled Morton Thiokol Board

© 2004 West, a Thomson business. No claim to original U.S. Govt. works

meeting on November 15th, the proposed Letter Agreement between Morton Thiokol and Dow was submitted to the Morton Thiokol Board. Two of Morton's outside directors were absent from the meeting. The Board meeting lasted approximately two hours, with about half that time devoted to considering the proposed transaction. Each of the directors received a copy of the proposed Letter Agreement, and the discussion of the proposed deal included presentations from Mr. Locke, Goldman Sachs, and Wachtell Lipton. Mr. Locke stated his reasons for recommending the transaction and the Board discussed: (1) the long-term prospects for Texize; (2) the capability of Texize to effectively compete in the household products industry; (3) the financial impact of the transaction on Morton Thiokol's balance sheet; and (4) the threat of a creeping tender offer by Dow, which the transaction would eliminate.

A Goldman Sachs representative summarized Goldman Sachs' role in the transaction and detailed the terms of the transaction. After answering the directors' questions, the Goldman Sachs representative informed the Morton Thiokol Board of Goldman Sachs' opinion that the transaction was fair. An attorney from Wachtell Lipton also advised the Morton Thiokol Board that a decision approving the transaction would fall within the parameters of their business judgment. A number of the outside directors also allegedly did independent calculations as to the value of Texize and all concluded that $250 million was a good price for Morton Thiokol. The Morton Thiokol Board then voted unanimously to approve the sale of Texize to Dow on the terms set forth in the Letter Agreement and such consistent changes as might be approved by the managements of Morton Thiokol and Dow.

The plaintiffs, as Morton Thiokol stockholders, filed their complaint on November 26, 1984, challenging the sale of Texize to Dow. A final agreement, however, was executed by Morton Thiokol and Dow on December 21, 1984 and the transaction closed on January 4, 1985. On the same day, Morton Thiokol acquired Bee Chemical for $77 million in cash.

The plaintiffs then moved for a preliminary injunction seeking to require Dow to hold separately the acquired division, which was denied by Opinion dated February 13, 1985. *Tomczak v. Morton Thiokol, Inc.*, Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985). Shortly thereafter, the defendants filed a Motion to Dismiss for failure of the plaintiffs to have made a pre-suit demand pursuant to Chancery Court Rule 23.1. Before that motion was decided, however, plaintiffs filed a Motion for Leave to File an Amended Complaint, which was granted. *Tomczak v. Morton Thiokol, Inc.*, Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (June 4, 1985).

**\*\*7** Finally, the defendants' Motion to Dismiss was denied by Opinion dated May 7, 1986. In that Opinion, the Court was bound to accept the allegations of the Amended Complaint as being true and these allegations were found to have raised a reasonable probability that the decision of the Morton Thiokol Board to sell Texize to Dow was not protected by the business judgment rule because the allegations "paint[ed] a picture very similar to that found in *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985)." *Tomczak v. Morton Thiokol, Inc.*, Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (May 7, 1986), slip op. at 7-8.

All defendants now have moved for summary judgment.

## II

Summary judgment is employed to avoid a useless trial where there is no issue of material fact. *Bershad v. Curtis-Wright,* Del.Supr., 535 A.2d 840 (1987); *Nicolet, Inc. v. Nutt,* Del.Supr., 525 A.2d 146 (1987); *H.S. Mfg. Co. v. Benjamin F. Rich Co.*, Del.Ch., 164 A.2d 447 (1960). A motion for summary judgment, however, will be granted only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Chancery Court Rule 56(c); *Empire of America Relocation Services, Inc. v. Commercial Credit Co.*, Del.Supr., 551 A.2d 433, 435 (1988); *Wilson v. Joma, Inc.*, Del.Supr., 537 A.2d 187, 188 (1988).

The proponent of a motion for summary judgment has the burden to prove clearly the absence of any genuine issue of fact which would affect the result, and any doubt should be resolved against the moving party. *Brown v. Ocean Drilling & Exploration Co.*, Del.Supr., 403 A.2d 1114, 1115 (1979); *Nash v. Connell,* Del.Ch., 99 A.2d 242 (1953); *Weinberger v. United Financial Corp. of Cal.*, Del.Ch., C.A. No. 5915-NC, Hartnett, V.C. (Oct. 13, 1983), slip op. at 14. But see *Hammond v. Colt Ind. Operating Corp.*, Del.Supr., 565 A.2d 558 (1989); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Kellam Energy, Inc. v. Duncan,* D.Del., 668 F.Supp. 861 (1987)

## III

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

The defendants contend that they are entitled to summary judgment because the presumptions of the business judgment rule shield from further judicial scrutiny the decision of the Morton Thiokol directors to sell Morton's Texize Division to Dow. The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985). The presumption, however, attaches only to the decisions of directors who are fully independent and wholly disinterested. *Aronson*, 473 A.2d at 812. When the business judgment rule applies, it insulates directors from liability, and imposes upon the party challenging the decision the burden of rebutting the presumption. *Id.* "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 954 (1985), citing *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971).

**\*\*8** The plaintiffs contend, however, that the Morton Thiokol directors must first meet the two-step "enhanced duty" articulated in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 954 (1985), "which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Id.* In *Unocal*, the Delaware Supreme Court held that when the business judgment rule applies to the adoption of a "defensive mechanism," in response to a takeover threat, an initial burden of showing that the business judgment rule applies falls upon the directors. *Id.* See also *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1985). If the rule of *Unocal* applies, initially the "directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," and "they satisfy that burden 'by showing good faith and reasonable investigation . . .'" *Unocal*, 493 A.2d at 955, citing *Cheff v. Mathes*, Del.Supr., 199 A.2d 548, 554-55 (1964). See also *Moran*, 500 A.2d at 1356. If the initial burden is satisfied, the directors must also show that the "defensive mechanism" was "reasonable in relation to the threat posed." *Moran*, 500 A.2d at 1356, citing *Unocal*, 493 A.2d at 955. Furthermore, a showing by the directors is "materially enhanced," where, as in this case, "a majority of the board favoring the proposal consisted of outside independent directors who have acted in accordance

with the foregoing standards." *Moran*, 500 A.2d at 1356, citing *Unocal*, 493 A.2d at 955.

The Morton Thiokol directors argue, however, that the "enhanced duty" espoused in *Unocal* does not apply because, in selling Texize to Dow, they were not implementing a "defensive measure" in response to a "pending takeover bid," such as the discriminatory self-tender present in *Unocal*. They further contend that Dow's market purchases of Morton Thiokol stock did not rise to the level of a takeover bid.

The plaintiffs counter that there need not be an actual takeover bid in order for the enhanced *Unocal* standard to apply; rather, they argue that *Unocal* applies if there is an "exercise of corporate power *to forestall* a takeover bid." *Unocal*, 493 A.2d at 955 (emphasis added).

The director-defendants' argument that *Unocal* applies only when there is a "pending takeover bid" fails in light of *Moran v. Household Int'l, Inc.*, Del.Supr., 500 A.2d 1346 (1985). In *Moran*, the Delaware Supreme Court applied the *Unocal* standard to the adoption of a defensive mechanism (poison pill) which was put in place "to ward off possible future advances and not [as] a mechanism adopted in reaction to a specific threat." *Moran*, 500 A.2d at 1350. Furthermore, the Delaware Supreme Court recently stated that the *Unocal* standard applies to any corporate board decision or action that is "reasonably determined to be defensive." *Paramount Communications, Inc. v. Time Inc.*, Del.Supr., --- A.2d ----, Nos. 284, 279, 283, (Consolidated), Horsey, J. (Feb. 26, 1990, Revised Mar. 9, 1990), slip op. at 33.

**\*\*9** In the present dispute, Dow made no specific takeover proposal to Morton Thiokol, although Dow had purchased approximately 8.23% of Morton Thiokol's outstanding stock through market transactions. Although the Morton Thiokol directors concede that the sale of Texize to Dow had the effect of removing Dow as a potential takeover threat, they assert that their actions should not be viewed as an act that triggers the application of the *Unocal* standard. In essence, they argue that the sale of Texize to Dow had an independent business purpose apart from removing Dow as a takeover threat; that is, the profitable divestiture of a division whose "strategic fit" with the rest of the company had been questioned.

The sale of a single division, like Texize, is clearly different from other defensive measures, like poison

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

pills (*Moran* ) and discriminatory self-tenders ( *Unocal* ), which are clearly defensive measures with little or no other independent business purposes. From all the facts and circumstances, however, it is clear that Morton Thiokol sold Texize to Dow, at least in part, to remove Dow as a possible takeover threat. It is undisputed that Morton Thiokol's Board feared the possibility that Dow was conducting a creeping tender offer, and that Morton Thiokol instructed its investment banker, Goldman Sachs, to try to negotiate the disputed transaction with Dow's investment banker, Morgan Stanley, just a few days after Dow had increased its stock holdings in Morton Thiokol to 8.23%, and consequently, the *Unocal* standard applies.

In order to receive the protection of the business judgment rule, therefore, the Morton Thiokol directors must satisfy the two prongs of the *Unocal* standard. First, the Morton Board must show that it had "reasonable grounds for believing there was a danger to corporate policy and effectiveness" from Dow. *Unocal.* 493 A 2d at 954-55. The Morton Thiokol Board can satisfy this prong by "showing good faith and reasonable investigation." *Id* Furthermore, the showing by the directors is materially enhanced where "a majority of the board favoring the proposal consisted of outside independent directors who have acted in accordance with the foregoing standards." *Moran.* 500 A 2d at 1356.

Here, the vote by all outside directors present (with 2 absent), coupled with the advice rendered by the investment banker (Goldman Sachs) and legal counsel (Wachtell Lipton), constitute a *prima facie* showing of good faith and reasonable investigation. *Polk v. Good,* Del Supr , 507 A 2d 531, 537 (1986). See also *Moran.* 500 A 2d at 1356; *Smith.* 488 A 2d at 872-73. With 8 of the 10 Morton Thiokol directors who approved the sale of Texize to Dow being independent, the plaintiffs bear "a heavy burden of overcoming the presumptions that attaching to the board's decisions." *Polk,* 507 A 2d at 537. See also *Unocal,* 493 A 2d at 955; *Aronson,* 473 A 2d at 812. Plaintiffs here have failed to adduce any facts sufficient to overcome this *prima facie* showing by the board of their good faith and reasonable investigation.

**\*\*10** The second prong of the *Unocal* standard requires the Morton Thiokol directors to establish that their action was "reasonable in relation to the threat posed." *Unocal,* 493 at 955. Here, the threat perceived by the Morton Board was the possibility of

a creeping tender offer by Dow which would avoid or minimize the payment of any premium to the stockholders of Morton Thiokol. See generally *Telvest v Bradshaw,* 697 F 2d 576, 577 n 1 (4th Cir 1983) (stating that a "creeping tender offer" is an "acquisition device which avoids or minimizes the control premium which a would-be acquiror is usually required to pay in a conventional tender offer") Removing this threat by profitably divesting Texize was reasonable for several reasons. First, unlike many defensive actions, the sale of Texize to Dow did not have a direct negative impact on the value of Morton Thiokol. The price received by Morton for Texize was within the range of values placed on Texize by Morton's investment banker, Goldman Sachs, and essentially no premium was paid by Morton Thiokol for the stock it repurchased from Dow. Second, Morton Thiokol's management had informally considered the possible divestiture of Texize since Morton Thiokol's restructuring in 1982, although Morton's management determined that it was not in the company's best interests to actively "shop" Texize. When Dow entered the picture, however, it presented Morton with a good opportunity to divest Texize at a fair price, while at the same time removing a takeover threat. The sale of Texize also gave Morton the opportunity to use some of the cash received in the sale of Texize to purchase Bee Chemical Co , whose specialty chemical business was a better "strategic fit" with Morton's other divisions than was Texize's household products business.

The Morton Thiokol directors have, therefore, met their burden of showing compliance with the "enhanced duties" espoused in *Unocal* Consequently, Morton Thiokol's decision to sell Texize to Dow is protected from further judicial scrutiny by the presumption of propriety afforded by the business judgment rule, unless plaintiffs can show facts that remove the action of the Board from the protection of the rule. *Aronson v Lewis,* Del Supr , 473 A 2d 805 (1984); *Tanzer v International Gen Indus Inc ,* Del Ch , 404 A 2d 382 (1979).

As will be seen, plaintiffs have cited no such facts in the record.

IV

Plaintiffs first argue that the business judgment rule should not shield the Morton Thiokol Board's decision to sell Texize to Dow because "there is substantial evidence that the directors did not act in good faith in the best interests of the corporation and

© 2004 West, a Thomson business. No claim to original U.S. Govt works

its shareholders, but acted in their own self-interests."

Plaintiffs set forth five reasons in support of their broadly stated claim that the Morton Thiokol Board did not act in good faith and was not disinterested. None of them are persuasive. They are: (1) that the Morton directors were opposing a potential takeover regardless of price because of an April 1, 1984 resolution of the Morton Board to remain independent; (2) that Mr. Oreffice concluded that Morton Thiokol "did not want to be taken over no matter what" based on his discussions with Mr. Locke; (3) that Morton Thiokol ordered Goldman Sachs to come up with an offer to sell Texize to Dow for a price that would provide Dow with a "quickie profit"--a price that was based on Goldman Sachs' perception of what Dow would pay, rather than the inherent and fair value of Texize; (4) that Goldman Sachs failed to set a proper price for the Morton Thiokol stock owned by Dow, because Goldman Sachs set a price for the stock at $2 per share higher than Dow would have sold the stock, thus causing the cash component of the transaction to be lower than it otherwise would have been; and (5) that Morton Thiokol had rejected earlier expressions of interest in Texize.

**11    The plaintiffs correctly assert that the protections of the business judgment rule "can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). In order to be disinterested, "directors can neither appear on both sides of the transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* (citations omitted).

The Morton Thiokol Board that voted to sell Texize to Dow was comprised of ten members, eight of whom were outside directors (normally twelve persons sit on the Morton Thiokol Board, but two outside directors were absent from the meeting at which the sale was approved). Only two inside directors sat on the Morton Thiokol Board--Mr. Locke and Mr. Hyndman. There are no facts indicating that they dominated or controlled the other eight outside directors. As stated in the prior opinion in this case denying plaintiffs' Motion For a Preliminary Injunction:

"The Board of Directors, however, consists of 12 persons [10 were present at the meeting]--10 [8 were present at the meeting] of whom are outside directors.

The record shows no evidence that these 10 [8] directors are controlled by anyone and only two of the directors have been selected since Mr. Locke was hired by the corporation."

*Tomczak v. Morton Thiokol. Inc.,* Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985), slip op. at 11. Since that holding, plaintiffs have failed to adduce any facts suggesting that the inside directors, in any way, dominated or controlled the outside directors or that the outside directors were in any way "beholden" to the inside directors. See *Aronson,* 473 A.2d at 815; *Mayer v. Adams,* Del.Ch., 167 A.2d 729, 732, *aff'd,* Del.Supr., 174 A.2d 313 (1961).

The plaintiffs have also failed to adduce any evidence showing that a majority of the Morton Thiokol directors were on both sides of the transaction or expected to derive any personal financial benefit from it in the sense of self-dealing. *Aronson,* 473 A.2d at 812. In fact, the record conclusively indicates that the eight outside directors had no personal, financial interest in the sale of Texize. Consequently, there could be no self-dealing that would make Morton Thiokol's sale of Texize to Dow an "interested transaction" under *Aronson*

Despite the fact that eight of the ten directors who approved the transaction were outside directors, plaintiffs still claim that the Morton Thiokol Board approved the sale of Texize to Dow for entrenchment purposes. Under *Pogostin v. Rice.* Del.Supr., 480 A.2d 619, 627 (1984), however, "[i]t is the plaintiff's burden to allege with particularity that the improper motive in a given set of circumstances, i.e., perpetuation of self in office or otherwise in control, was the sole or primary purpose of the wrongdoer's conduct." Furthermore, in order to overcome the protection afforded directors by the business judgment rule, plaintiffs must point to facts indicating that "the board's action [was] motivated solely or principally for the impermissible purpose of retaining office for personal reasons and not for reasons relating to the corporations's welfare." *In re Anderson, Clayton Shareholders Litigation,* Del.Ch., 519 A.2d 680, 688 (1986), citing *Bennett v. Propp,* Del.Supr., 187 A.2d 405 (1962); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548 (1964); *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985)

**12    Plaintiffs' Amended Complaint alleges that certain business relationships between Morton Thiokol and various businesses in which seven of the ten outside directors are or were associated with, and

the $15,000 per year retainers received by each of the Board members, are evidence of an entrenchment motive. Apparently, however, plaintiffs' allegations were so weak that they declined to even mention those allegations in their Opening Brief. In any case, unsupported allegations are insufficient to establish an entrenchment motive. *Tanzer v. International Gen'l Indus., Inc.,* Del.Ch., 402 A.2d 382 (1979). The plaintiffs have failed to adduce any evidence indicating that the alleged business relationships between Morton Thiokol and its outside directors or any retainer fees influenced the directors' ability to make independent and impartial decisions regarding Morton Thiokol's sale of Texize to Dow. See, e.g., *Kaplan v. Wyatt,* Del.Supr., 499 A.2d 1184 (1985); *Aronson,* supra; *Stein v. Orloff,* Del.Ch., C.A. No. 7276-NC, Hartnett, V.C. (May 30, 1985).

Consequently, the plaintiffs' argument that the Morton Thiokol directors were not "fully independent and wholly disinterested" fails because plaintiffs failed to adduce any facts to support these claims.

V

The plaintiffs next attempt to rebut the presumption of propriety afforded by the business judgment rule by arguing that the Morton Thiokol directors, in approving the sale of Texize to Dow, failed to exercise their business judgment on an informed basis--that is, that they failed to fulfill their duty of due care. Clearly, the plaintiffs bear the burden of overcoming the presumption of the business judgment rule in these circumstances. As the Delaware Supreme Court held in *Smith v. Van Gorkom.* 488 A.2d 858 (1985):

"[T]he party attacking a board decision as uninformed must rebut the presumption that its business judgment was an informed one.

The determination of whether a business judgment is an informed one turns on whether the directors have informed themselves 'prior to making a business decision, of all material information reasonably available to them' "

*Smith v. Van Gorkom,* 488 A.2d at 872, quoting *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

The Delaware Courts have consistently held that the standard for determining whether directors are liable for breaching their duty of care to properly inform themselves is "predicated on concepts of gross

negligence." *Aronson,* 473 A.2d at 812; *Smith v. Van Gorkom,* 488 A.2d at 873; *Moran v. Household Int'l Inc.,* Del.Supr., 500 A.2d 1346, 1356 (1985). In the corporate context, gross negligence means "reckless indifference to or a deliberate disregard of the whole body of stockholders" or actions which are "without the bounds of reason." See *Allaun v. Consolidated Oil Co.,* Del.Ch., 147 A. 257, 261 (1929); *Gimbel v. Signal Companies, Inc.,* Del.Ch., 316 A.2d 599, 615, *aff'd.* Del.Supr., 316 A.2d 619 (1974); *Solash v. Telex Corp.,* Del.Ch., C.A. Nos. 9518-NC, 9528-NC, 9525-NC, Allen, C. (Jan. 19, 1988), slip op. at 22-23 (gross negligence is a "high standard" requiring proof of "reckless indifference" or "gross abuse of discretion")

**13 Earlier in this dispute, this Court refused to dismiss the plaintiffs' Amended Complaint because the "[p]laintiffs' allegations paint[ed] a picture very similar to that found in *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985), and supported "a claim of violation of fiduciary duty." *Tomczak v. Morton Thiokol, Inc.,* Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (May 7, 1986), slip op. at 7-8. At that stage of the proceedings, however, this Court was bound to accept the allegations of the plaintiffs' Amended Complaint as being true. At the present stage, however, after over three years of discovery, it is clear that the plaintiffs have failed to adduce any facts to support their allegations of gross negligence.

At the November 14, 1984 dinner meeting, Mr. Locke generally explained the terms of the proposed deal to the outside directors of Morton Thiokol. The following day, at the regularly scheduled board meeting, the proposed Letter Agreement between Morton and Dow regarding the sale of Texize was formally submitted to the Morton Thiokol Board. The November 15th meeting lasted approximately two hours, with about half of the time devoted to considering the proposed sale of Texize to Dow. Each of the Morton directors received a copy of the proposed agreement and the discussion of the proposed deal included presentations from Mr. Locke, Goldman Sachs and Wachtell Lipton.

Mr. Locke voiced his reasons for recommending the transaction and the Morton Board discussed: (1) the long-term prospects for Texize; (2) the capability of Texize to effectively compete in the household products industry; (3) the financial impact of the transaction on Morton Thiokol's balance sheet; and (4) the threat of a creeping tender offer by Dow, which the transaction would eliminate. A Goldman Sachs representative reviewed the terms of the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

transaction and after answering the directors' questions, informed the Morton Board of Goldman Sachs' opinion that the transaction was fair to Morton Thiokol. Wachtell Lipton also advised the Morton Board that, in its opinion, a decision approving the deal would properly fall within the realm of the directors' business judgment.

In addition, the Morton Thiokol Board had a solid background of information upon which to consider the sale of Texize to Dow. The November 15th board meeting was not the first time the Morton Thiokol directors had discussed the possible divestiture of Texize, although it was the first time that the Board considered a specific proposal. The Morton Board was aware of management's concerns about the profitability of Texize and its "strategic fit" with Morton's other businesses. The directors also knew for over a year before the disputed transaction that the divestiture of Texize was a possibility. In fact, the Morton Thiokol Board had been supplied with enough information on the performance and earnings of Texize so that a number of directors were able to independently assess the merits of the deal in light of their own basic evaluations of Texize.

**\*\*14** It is therefore undisputed that the plaintiffs have failed to adduce facts sufficient to support a claim that Morton Thiokol's decision to sell Texize to Dow was grossly negligent. Although Morton Thiokol's decision to sell Texize to Dow may have been made hastily, it was not made in a grossly negligent manner. And even if it could be shown that Dow would have paid somewhat more for Texize, this, standing alone, would not constitute gross negligence by the Morton Thiokol Board.

The plaintiffs, therefore, have failed to rebut the presumption of propriety afforded by the business judgment rule, and consequently, Morton Thiokol's decision to sell Texize to Dow is protected from further judicial scrutiny.

VI

Plaintiffs also allege in the Amended Complaint that the price received by Morton Thiokol for Texize was so low that it constitutes a waste of corporate assets. The assertion is without merit.

As previously noted, the decision of the Morton Thiokol directors to sell Texize to Dow must be afforded the presumption of propriety of the business judgment rule, and the plaintiffs have failed to rebut that presumption. Consequently, the Court is not

required to further scrutinize the terms of the transaction, including the fairness of the price. "Fairness becomes an issue only if the presumption of the business judgment rule is defeated." *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 (1988), citing *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812-17 (1984).

Nevertheless, the price received by Morton Thiokol for Texize was not so low as to possibly constitute a waste of assets. In order to prove a claim of waste of assets, a plaintiff must show that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid." *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 610 (1962). "If it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction." *Id.* The plaintiffs have failed to adduce any facts supporting their claim that the price received by Morton Thiokol for Texize was so low as to be "unconscionable." *Saxe*, 184 A.2d at 611.

To the contrary, the undisputed evidence shows that the transaction in question was negotiated at arm's-length by Morton Thiokol's and Dow's investment bankers--Goldman Sachs and Morgan Stanley, respectively. The $250 million price agreed on by Goldman Sachs and Morgan Stanley (and eventually Morton Thiokol and Dow) was at the top of the range of value ($225-$250 million) for Texize determined by Goldman Sachs. The price received by Morton was also within the range of values placed on Texize by Morgan Stanley ($240-$320 million), albeit at the low end of the range. Furthermore, the price paid for the shares repurchased by Morton Thiokol (approximately $85 per share) was below the market price on the last business day before the negotiations began ($92 per share) and was approximately equal to the market price on November 7th when Dow began making additional purchases of Morton Thiokol stock. Moreover, even if the stock had been valued as low as $75 per share (Dow's average acquisition cost) as plaintiffs incorrectly urge, Morton Thiokol still would have received approximately $236 million for Texize, which falls within the range of values placed on Texize by Goldman Sachs.

VII

**\*\*15** Plaintiffs' claim for waste was so weak apparently, that they failed to even address that claim in their brief. Plaintiffs instead argued that there is an

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

issue of "whether the Morton directors fulfilled their duties of obtaining the best possible price as mandated by *Revlon. Inc v MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986)."

The Delaware Supreme Court, however, recently held:

"Under Delaware law there are, generally speaking and without excluding other possibilities, two circumstances which may implicate *Revlon* duties. The first, and clearer one, is when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company. *See, e.g., Mills Acquisition Co v Macmillan, Inc.,* Del.Supr., 559 A.2d 1261 (1988). However, *Revlon* duties may also be triggered where, in response to a bidder's offer, a target abandons its long-range strategy and seeks an alternative transaction also involving the breakup of the company. Thus, in *Revlon,* when the board responded to Pantry Pride's offer by contemplating a "bust-up" sale of assets in a leveraged acquisition, we imposed upon the board a duty to maximize immediate shareholder value and an obligation to auction the company fairly. If, however, the board's reaction to a hostile tender offer is found to constitute only a defensive response and not an abandonment of the corporation's continued existence, *Revlon* duties are not triggered, though *Unocal* duties attach. *See, e.g., Ivanhoe Partners v Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334, 1345 (1987)."

*Paramount Communications, Inc v Time, Inc.,* Del.Supr., --- A.2d ----, Nos. 284, 279, 283 (Consolidated), Horsey, J. (Feb. 26, 1990; Revised Mar. 9, 1990), slip op. at 28-29.

The sale of Texize to Dow represented the sale of only one of four divisions of Morton Thiokol and did not constitute the sale of the entire company, or even most of the company, nor was Morton seeking to effect a business reorganization involving a clear break-up of the company. Furthermore, the sale of Texize was not a situation where Morton Thiokol, in response to a bidder's offer, abandoned its long-term strategy and sought a transaction involving the break-up of the company. Rather, the Texize transaction was merely the profitable sale of one division of Morton, with the sale being consistent with the company's long-term plans. Consequently, the sale of Texize could not trigger any *Revlon* duties.

Viewing the undisputed facts in a light most favorable to the plaintiffs, I find that the plaintiffs

have failed to adduce any facts sufficient to support their claim for waste of assets or their claim that *Revlon* applies in this case. Consequently, defendants are entitled to summary judgment on these issues.

## VIII

**\*\*16** Plaintiffs' final claim is that Dow is liable as an aider and abettor of the alleged violations of fiduciary duty engaged in by the Morton Thiokol directors in approving the sale of Texize to Dow. Plaintiffs' Amended Complaint in paragraph No. 47 states:

"through a preconceived plan and scheme of directly and indirectly threatening to assume control of [Morton] and coercing the directors of Morton to cause it to buy back, at a price substantially in excess of its fair market value, the Morton stock held by Dow, and to sell to Dow at an unconscionably low price the Texize Division, Dow succeeded in obtaining an agreement for the aforesaid wrongful transactions with knowledge that such transactions constituted a breach of the fiduciary duties of the defendant directors."

In essence, plaintiffs argue that Dow improperly pressured Morton into selling Texize to it in return for Dow's Morton Thiokol shares and an inadequate amount of cash. Plaintiffs also seem to assert that Dow somehow actively cooperated or participated in the decision of Morton Thiokol's Board to sell Texize for an allegedly inadequate amount.

A claim for aiding and abetting liability "requires that three elements be alleged and ultimately established: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach any by the defendants who are not fiduciaries." *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). See also *Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984); *Penn Mart Realty Co. v Becker,* Del.Ch., 298 A.2d 349, 351 (1972).

Here, it is clear that the Morton Thiokol directors stood in a fiduciary relationship to the plaintiffs. As noted previously, however, the plaintiffs have failed to establish the existence of any breach of fiduciary duty by the Morton Thiokol defendants. Even assuming, *arguendo,* that plaintiffs had established a breach of fiduciary duty by the Morton Thiokol defendants, there is no evidence that Dow "knowingly participated" in any such breach.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

1990 WL 42607, Tomczak v. Morton Thiokol, Inc., (Del.Ch. 1990)

As this Court recognized at the preliminary injunction stage, Dow owed no fiduciary duties to Morton Thiokol's stockholders at the time Morton Thiokol sold Texize to Dow. *Tomczak v. Morton Thiokol, Inc.,* Del.Ch., C.A. No. 7861-NC, Hartnett, V.C. (Feb. 13, 1985), slip op. at 8-9. Dow's 8.23% holdings in Morton Thiokol prior to the disputed transaction did not approach the threshold of control of Morton Thiokol. *Weinberger v United Financial Corp. of California,* Del.Ch., C.A. No. 5915-NC, Hartnett, V.C. (Oct. 13, 1983), slip op. at 29. Although Dow's purchases certainly had the effect of putting economic pressure on Morton Thiokol, what Dow essentially did was to simply pursue arm's-length negotiations with Morton Thiokol through their respective investment bankers in an effort to obtain Texize at the best price that it could. Dow, therefore, is entitled to summary judgment in its favor.

IX

In summary, I find, from the undisputed facts, that Morton Thiokol and the members of its Board of Directors are entitled to summary judgment as a matter of law on all of plaintiffs' claims against them. Furthermore, I find, from the undisputed facts, that Dow is also entitled to summary judgment on all of plaintiffs' claims against it.

**\*\*17.** IT IS SO ORDERED.

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.