# TAB 1

Westlaw.

Not Reported in F.Supp.2d

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jay **FINK**, derivatively on behalf of Merrill Lynch
& Co., Inc., Plaintiff,
v.
David H. **KOMANSKY** et al, Defendants.
No. 03CV0388 **(GBD)**.

Dec. 8, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

*1 On January 17, 2003, plaintiff filed a Verified Shareholder Derivative Complaint ("the Complaint") against nominal defendant Merrill Lynch ("the Company"), its entire board of directors ("Director Defendants" or "the Board") and four individual former employees of Merrill Lynch ("Non-Director Defendants") for breach of fiduciary duty, gross mismanagement, corporate waste and violations of Section 14(a) of the Securities and Exchange Act ("Securities Act") from April 1998 through December 2001 ("the Relevant Period"). On May 2, 2003, defendants moved to dismiss the Complaint. In lieu of responding to defendants' motion to dismiss, on August 7, 2003, plaintiffs filed a Verified Amended Shareholder Derivative Complaint ("Amended Complaint"). Defendants now jointly move pursuant to Fed.R.Civ.P. 23.1 to dismiss the Amended Complaint because plaintiff has not pled with particularity sufficient reasons for his failure to make a pre-suit demand on the Board that would permit plaintiff to bring suit on behalf of the corporation. Defendants also move to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Defendants'

motion to dismiss the Amended Complaint pursuant to Rule 23.1 is hereby GRANTED.

*BACKGROUND*

Plaintiff Jay Fink, a citizen of Nevada, is a current shareholder of Merrill Lynch common stock and was a shareholder throughout the period of alleged wrongdoing. Merrill Lynch is incorporated in the state of Delaware with its headquarters and principal place of business located in New York. Merrill Lynch is a publicly traded holding company providing investment, financing, advisory, insurance, banking and other products and services worldwide. At the time of the filing of the Amended Complaint, Merrill Lynch's board of directors was comprised of eleven members. Am. Compl. ¶ 209.

Director Defendant David H. Komansky served as Merrill Lynch's director from 1995 until his retirement on April 28, 2003. For a period of six years, Mr. Komansky also served as Chairman of the Board and Chief Executive Officer of Merrill Lynch. Director Defendant Stanley E. O'Neal was appointed Chairman of the Board in 2003 and also serves as President and Chief Operating Officer of the Company. Defendants Aulana L. Peters, John J. Phelan, Jr., Robert P. Luciano, W.H. Clark, Jill K. Conway, George B. Harvey, Heinz-Joachim Neuburger, David K. Newbigging, and Joseph W. Prueher are the remaining Merrill Lynch directors named in this action. The Non-Director Defendants, Schuyler M. Tilney, Robert S. Furst, Daniel H. Bayly, and Thomas W. Davis, are all former executives of Merrill Lynch. *Id.* at ¶¶ 19 -33.

The Amended Complaint alleges that because of their positions on the board of directors or as senior executives of the Company, the defendants had knowledge of "adverse non-public information about Merrill Lynch and its relationship with Enron [Corporation]," obtained by accessing "corporate documents, conversations and connections with other corporate officers and employees [,]" by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

attending Board or management meetings, and serving on the Board's standing committees. *Id.* In sum, the Amended Complaint alleges that in anticipation of currying favor with the Enron Corporation ("Enron"), defendants assisted in camouflaging the true financial state of affairs at Enron and caused Merrill Lynch to enter into "sham business transactions" with Enron. *Id.* at ¶¶ 1, 3, 77-78, 94-96, 103-04, 114. Consequently, the defendants "participated in the issuance of false and/or misleading statements regarding Enron, including the preparation of false and/or misleading SEC filings." *Id.* at ¶¶ 19-33, 209(n).

**\*2** The Amended Complaint further alleges that defendants acquiesced to, and engaged in, unlawful transactions with Enron thereby potentially exposing Merrill Lynch to liability estimated in the billions of dollars. *Id.* at ¶¶ 5, 7, 204, 205. Specifically, the Amended Complaint asserts that Merrill Lynch knowingly provided Enron with commercial and investment banking services to structure or finance Enron's illicit partnerships such as the off-balance sheet partnership, LJM2, used by Enron to inflate its profits and to conceal its debt and bad assets. *Id.* at ¶¶ 77, 95-114, 117(a)-(i), 181(a).

Moreover, it is alleged that, in their quest to win investment-banking fees from Enron, defendants pressured the Company's research analysts to issue falsified favorable reports boosting Enron's investment ratings. *Id.* at ¶¶ 80, 82-93. Resultantly, defendants failed in their oversight obligations by not maintaining adequate systems to monitor Merrill Lynch's dealings with Enron. *Id.* at ¶¶ 37-59, 209(f)-(i). Plaintiff cites as examples, Director Defendants' membership on the Board's standing committees, which are entrusted with overseeing the Company's internal communications, reviewing the financial condition and commitments of Merrill Lynch, and ensuring that Merrill Lynch's officers and directors were not improperly compensated for engaging in acts harmful to the Company. *Id.* Additionally, the Amended Complaint contends that Director Defendant Komansky in his capacity as CEO and Chairman of the Board, permitted Merrill Lynch to engage in

illegal transactions with Enron. *Id.* at ¶¶ 94-155. The Amended Complaint also alleges two Director Defendants, O'Neal and Peters, sold a total of 631,880 shares of Merrill Lynch stock valued at $41,140,801 to Enron while they were in possession of adverse non-public information regarding the Company's interactions with Enron. *Id.* at ¶¶ 20, 21, 209(a). Finally, the Amended Complaint asserts that Director Defendants receive compensation for their Board membership. *Id.* ¶¶ 209(d)- (e)

## DEMAND REQUIREMENT

This cause of action belongs to the corporation and not the individual shareholder. Therefore, it is mandated that plaintiff make a demand on the corporation's board of directors to bring suit on behalf of the corporation. Fed.R.Civ.P. 23.1; *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 95, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991). The decision to bring a lawsuit is a business one and a corporation's board of directors has the primary responsibility of conducting the business affairs of the corporation. *See RCM Secs. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir.1991); *Elfenbein v. Gulf & Western Indus., Inc.,* 590 F.2d 445, 450 (2d Cir.1978). Thus, plaintiff's derivative suit questions the Board's independence and ability to exercise its fiduciary obligations. *See Kaplan v. Peat Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988); *see also In Re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115 (S.D.N.Y.2000) (quoting *Kamen,* 500 U.S. at 96) ("[A] derivative action [places] in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers." '). Requiring the plaintiff to make a pre-suit demand on the Board "afford[s] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation...." *In re Oxford,* 192 F.R.D. at 115.

### *A. Demand Is Excused Where Futile.*

**\*3** Because plaintiff has not made a pre-suit demand on the board of directors, he may only move forward with his derivative action if demand is excused by "extraordinary conditions" or by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

pleading demand futility. *Kamen,* 500 U.S. at 96 (quoting *Ross v. Bernhard,* 396 U.S. 531, 534; 90 S.Ct. 733, 736, 24 L.Ed.2d 729 (1970)); *accord Kaplan,* 540 A.2d at 730. Under Rule 23.1, when a shareholder plaintiff asserts demand was not made on the board because it would have been futile, the plaintiff must plead "with particularity ... the reasons for the plaintiff's failure to action or for not making the effort." Fed.R.Civ.P. 23 .1; *see also Lewis,* 701 F.2d at 250 n. 3 (noting that to overcome Rule 23.1's particularity requirement, pleadings must allege a particular nexus between the challenged action and the board's conduct). Rule 23.1 is an exception to the traditional and less stringent requirement of notice pleadings. *See Allison v. Gen. Motors Corp.,* 604 F.Supp. 1106, 1112 (D.Del.1985), *aff'd,* 782 F.2d 1026 (3d Cir.1985); *cf. Levener v. Saud,* 903 F.Supp. 452, 456 (S.D.N.Y.1994) ("[The] pleading burden under Rule 23.1 is ... more onerous than [what is] required to withstand a Rule 12(b)(6) motion to dismiss.") (citation omitted). Further, the futility of making a demand is determined on the basis of existing facts alleged at the time the suit is filed. *See Lewis,* 701 F.2d at 250. Although Rule 23.1 creates a procedural and federal standard as to the specificity of pleading the futility of demand, "the adequacy of those efforts is to be determined by state [substantive] law." *RCM Secs. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1330 (2d Cir.1991); *see also Kamen v. Kemper Fin. Serv.,* 500 U.S. 90, 111 S.Ct. 1711, 114 L.E.d.2d 152 (1991).

Accordingly, the parties are in agreement that Delaware law governs the instant action. Under Delaware law, the Amended Complaint must sufficiently set forth "particularized factual allegations" establishing that a majority of the Merrill Lynch board of directors cannot properly exercise its sensible business judgment to proceed with the claim. *See, e.g., Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984) *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000). Thus, the issue before this Court is whether the Amended Complaint pleads with particularity facts to create a reasonable doubt that the Merrill Lynch board of directors is so interested in the transactions the Company entered into with

Enron that the majority lacks independence to impartially make a decision rendering demand futile. *See Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993) (establishing the standard for reviewing demand futility in nonfeasance derivative suits). As a threshold matter, the Amended Complaint must plead particularized facts demonstrating that a majority of the Board has either a personal material financial interest in the outcome that is different from that of the shareholders, *see Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm,* 746 A.2d at 253, or that the Director Defendants "are beholden to [an] interested director or so under the influence of [an interested director] that their discretion would be sterilized." *Rales,* 634 A.2d at 936; *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 117 (S.D.N.Y.2000).

*B. The Amended Complaint Does Not Plead With Particularity Facts Excusing Demand.*

*4 Plaintiff's entire lawsuit is based upon the allegation that someone on Merrill Lynch's board of directors or on the senior executive staff must have known or should have known of the unlawfulness of the transactions the Company entered into with Enron. Am. Compl. ¶¶ 37 -59, 84-86, 129-135, 142-143, 147, 156-163, 209(f)-(i). Thus, defendants failed in their oversight obligations as corporate fiduciaries. *Id.* From there, plaintiff argues that there is reasonable doubt whether the Merrill Lynch board of directors is disinterested and independent, because Merrill Lynch provided underwriting and other investment banking services to Enron, thereby aiding and abetting Enron in its unlawful conduct. *Id.* However, conclusionary allegations of fact or law not substantiated with specific facts are insufficient to support demand futility. *See Levener v. Saud,* 903 F.Supp. 452, 456 (S.D.N.Y.1994); *Richardson v. Graves,* C.A. No. 6617, 1983 WL 21109, at *2 (Del. Ch. Mar. 7, 1983). Where plaintiff has "not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing" but instead base his claim "on a presumption that employee wrongdoing would not occur if directors performed their duty properly[,]" demand is not excused. *In re Baxter Int'l, Inc.,* 654

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

A.2d 1268, 1270-71 (Del. Ch.1995).

While the eighty-page, 229-paragraph Amended Complaint recounts fully the illegal transactions engaged in by the Enron Corporation, it nonetheless fails to allege with particularity *precisely* defendants' role in those illegal acts. The Amended Complaint does not lay out any specific facts demonstrating that the defendants were aware of the unlawful nature of Enron's conduct that would signal to the Board that Merrill Lynch should not do business with Enron. *Cf. In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 115 (S.D.N.Y.2000) (finding plaintiff pleaded specific facts to show defendants had knowledge of false records and intentionally caused the company harm).

In his supplemental letter to the Court dated October 27, 2004 ("Pl.Suppl.Let."), plaintiff highlights the Third Interim Report of Neal Batson, a court appointed examiner in the Enron bankruptcy case to support his argument that specific allegations of Merrill Lynch's involvement in the Enron illegal schemes are sufficiently pled. *See* Pl. Suppl. Let. at 4; Am. Compl. ¶¶ 156-163. The Amended Complaint alleges that because the examiner's report implicates Merrill Lynch, the Company, "then it is only reasonable to conclude that Defendants breached their own fiduciary duties to the Company by allowing Merrill Lynch to aide and abet Enron's officers to breach their fiduciary duties." Am. Compl. ¶ 163. However, the allegation that Merrill Lynch's individual board members knowingly approved of the Company aiding and abetting Enron's illegal transactions "is not supported by specific facts showing ... that the board members approved of those transactions." *Simon v. Becherer,* 775 N.Y.S.2d 313, 318 (1st Dep't 2004) (applying Delaware law).

**\*5** There is also no allegation in the Amended Complaint demonstrating defendants had a sustained failure to exercise their oversight function. To the contrary, the Amended Complaint highlights the frequent meetings of the Board and its standing committees. *Id.* at ¶¶ 37, 41, 47, 51, 57. While the Amended Complaint speculates that these frequent meetings indicate that the Board had

knowledge of Merrill Lynch and Enron's unlawful business dealings, the Amended Complaint is devoid of specific facts to indicate that the subject matter of these meetings were the transactions at issue. The Amended Complaint implicitly alleges that the frequency of these meetings were somehow unusual because these meetings took place during the Relevant Period. [FN1] However, there is no indication that the Board met fewer times in years outside of the Relevant Period to support this allegation. Such meetings are examples of the Board exercising its proper fiduciary obligations rather than indicative of misfeasance or malfeasance on their part. "[B]ald charges of mere failure to take corrective action are ... inadequate to demonstrate futility." *Lewis v. Graves,* 701 F.2d 245, 249 (2d Cir.1983).

> FN1. In the Amended Complaint plaintiff asserts that the wrongdoings herein alleged took place April 1998 through December 2001. Am. Compl. ¶ 1. In his Opposition Memorandum, plaintiff alleges that Merrill Lynch's "wanton" and "surreptitious" relationship with Enron "spanned approximately five years," a much longer time frame than the indicated Relevant Period. Pl.'s Opp'n Memo at 3.

The Amended Complaint further alleges that a research analyst was fired for refusing to issue favorable investment ratings about Enron. Am. Compl. ¶ ¶ 80, 82-93. Although the Amended Complaint alleges that Non-Director Defendant Schuyler Tilney sent a memorandum to the then Merrill Lynch president, Herb Allison, complaining about this research analyst, no specific allegation involves knowledge on the part of the directors. *Id.* at ¶ 84-87. The Amended Complaint implies this memorandum was the basis for the research analyst's termination because four months after the memorandum, the analyst was fired and further, the analyst stated under oath that he believes "100 percent" that Merrill Lynch fired him because of the unfavorable ratings he issued on Enron. *Id.* at ¶ 87.

The research analyst quoted in the Amended Complaint states, "I can go back over ten years

Not Reported in F.Supp.2d

2004 WL 2813166 (S.D.N.Y.)

(Cite as: 2004 WL 2813166 (S.D.N.Y.))

Page 5

really and tell you that various investment bankers had, in no uncertain terms, told me that they would seek to get me fired if I did not put a strong buy recommendation out on Enron, *this even pre-dates Merrill Lynch.*" *Id.* (emphasis added). It is unclear from this quote whether the research analyst was told this by Merrill Lynch investment bankers or this was the general attitude of investment bankers in the industry. It is not alleged whether the research analyst was told this prior to his employment at Merrill Lynch, prior to Merrill Lynch's investment banking relationship with Enron, or even prior to his alleged firing for failure to issue favorable ratings.

Plaintiff further contends that in determining the adequacy of allegations pleaded in the Amended Complaint, the Court should look to the totality of defendants' misconduct. *See* Pl.'s Opp'n. Mem. at 8 n. 10; *see also In re Cendant Corp.,* 189 F.R.D. 117, 128 (D.N.J.1999); *In re Oxford Health Plans, Inc.,* 192 F.R.D. 111, 118 (S.D.N.Y.2002). According to plaintiff, the Amended Complaint pleads particularized facts demonstrating that a majority of the Board lacks disinterestedness and independence: that members of the Board engaged in insider trading; that the Company's CEO and COO, O'Neal lacked independence from the Director Defendants; that certain Director Defendants have professional and personal entanglements preventing them from being independent members of the board; and that all eleven members of the Director Defendants have impending exposure to personal liability such that making a pre-suit demand on the board would lead Director Defendants to sue themselves. However, taken together, these allegations amount to mere conclusions that do not rise to the level of particularity necessary to plead demand futility.

*6 The standard of pleading "with particularity" means with specificity. That is, the Amended Complaint must sufficiently detail defendants' involvement. *See, e.g., Lewis v. Graves,* 701 F.2d 245, 250 (2d Cir.1983) ( "[P]articularized allegations of bias or self-interest on the part of defendant directors are necessary to establish a degree of 'involvement' sufficient to excuse

demand."). The Amended Complaint alleges that Director Defendants O'Neal and Peters are interested because of insider trading. Am. Compl. ¶¶ 20-21, 209(a). Specifically, it alleges that these Director Defendants sold 631,880 shares of Merrill Lynch stock valued at $41,140,801 to Enron during the Relevant Period. *Id.* In his Opposition Memorandum, plaintiff asserts that O'Neal and Peters received personal financial benefits from this transaction rendering them interested. Pl.'s Opp'n. Mem. at 10. Plaintiff asserts that their membership on the Board and their positions at executive levels of Merrill Lynch provided O'Neal and Peters with adverse, non-public information. But, plaintiff does not state what exactly was that information. "[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Rattner v. Bidzos,* No. 19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 30, 2003) (citation omitted).

Therefore, the Court does not find that plaintiff has pleaded facts with adequate particularity creating reasonable doubt that Director Defendants O'Neal and Peters are interested. Even if this Court were to find that O'Neal and Peters are interested for selling their stock to Enron, the Amended Complaint falls short of establishing that a majority of Merrill Lynch's board of directors is sufficiently beholden to, or under the influence of, O'Neal and Peters to excuse demand. *See Rales v. Blasband,* 634 A.2d 927, 936 (Del.1993); *see also Elfenbein v. Gulf & Western Indus., Inc.,* 590 F.2d 445, 451 (2d Cir.1978) (finding plaintiff's allegations of insider sales by the controlling stock owner who had two nominees on the elevenmember board of directors did not suggest remaining directors would breach their fiduciary duty rendering demand excused).

Plaintiff further alleges that Director Defendants Phelan, Peters, Komansky and Luciano have professional and personal entanglements with each other preventing "the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein." Am. Compl. ¶ 209(k)(i) and (ii). Plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

argues that because Phelan and Peters attended a seminar in the USSR together in 1990, and because Komansky and Luciano served together as directors on the board of another company, demand is futile because these Director Defendants would not be willing to sue each other. *Id.*

*7 In support of his proposition of demand futility based on director prejudicial entanglements, plaintiff cites the Delaware Chancery Court decision, *In re New Valley Corporation Derivative*, 2001 Del. Ch. LEXIS 13, at * *25-26 (Del. Ch. Jan. 11, 2001). However, that case is inapposite here. The *New Valley* court found the plaintiff to have alleged particularized facts excusing demand because *"all* the members of the current Board [had] current or past business, personal, and employment relationships with each other." *Id.* at *25 (emphasis added). The Chancery Court provided some examples of the conflicts on the New Valley board which excused demand. The court noted that the Chairman and CEO of New Valley, who was also the controlling shareholder of the corporation, paid other directors $30,000 for agreeing to be a director nominee in the Chairman's proxy bid for another company. *Id.* Moreover, one of the members of the board of directors of New Valley was a former employee of the law firm rendering substantial legal services to the corporation. *Id.*

In the instant action, the Amended Complaint pleads *no* particularized facts to support a finding that the Merrill Lynch directors are interested because of personal and professional entanglements. In fact, plaintiff, in his Opposition Memorandum, concedes that "further discovery and factual development will further reveal the nature of these disabling relationships." Pl.'s Opp'n. Mem. at 12 n. 18. Consequently, plaintiff has not met the pleading burden required pursuant to Rule 23.1 or Delaware law on the issue of Director Defendants' professional entanglements.

Plaintiff also contends that all eleven Director Defendants have personal liability for "caus[ing] the Board to falsely understate the Company's liabilities in its proxies ... which they signed and filed with the

SEC." *Id.* at ¶ 209(n). Thus, Plaintiff argues that the Director Defendants' exposure to potential personal liability makes demand futile. *Id.* at ¶ 209(j). These allegations are simply suppositions not substantiated by any facts. It is settled law that demand is not excused because plaintiff pleads that directors would have to sue themselves thereby "placing the litigation in hostile hands." *See Aronson v. Lewis*, 473 A.2d 805, 818 (Del.1984); *Brehm v. Eisner*, 746 A.2d 244, 257 n. 34 (Del.2000); *see also Pogostin v. Rice*, 480 A.2d 619, 625 (Del.1984) *overruled on other grounds by Brehm*, 746 A.2d at 253 (stating "reluctance by the directors to sue themselves" does not excuse demand).

According to the Amended Complaint, Director Defendants receive compensation for their membership on the Merrill Lynch board and therefore would not jeopardize their position by initiating a suit against the Board. Am. Compl. ¶ ¶ 209(d)-(e). A charge of director self-interest is not supported by such threadbare allegations. Without specific facts suggesting a lack of independence by the Board, receipt by directors of benefits and compensation as a result of Board membership is insufficient to excuse demand. *In re E.F. Hutton Banking Practices Lit.*, 634 F.Supp. 265, 271 (S.D.N.Y.1986); *accord Grobow v. Perot*, 539 A.2d 180, 188 (Del.1988) *overruled on other grounds by Brehm*, 746 A.2d at 253. To rule otherwise would only circumvent the purpose of the demand requirement and render Rule 23.1 useless.

*8 Finally, the Amended Complaint fails to plead particularized facts that support the allegation that the four Non-Director Defendants were involved in the solicitation of proxies in violation of Section 14(a) of the Securities Act, or that the Non-Director Defendants aided and abetted the Company's directors in breaching their fiduciary duties. Plaintiff has not sufficiently alleged that the Non-Director Defendants knowingly participated in the transactions between Merrill Lynch and Enron. Thus, plaintiff's derivative action is dismissed against the Non-Director Defendants because demand is also not excused with regards to the claims alleged against the Non-Director Defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2813166 (S.D.N.Y.)

**(Cite as: 2004 WL 2813166 (S.D.N.Y.))**

CONCLUSION

The defendants' motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 23.1 is hereby GRANTED. Because the Amended Complaint is dismissed for failure to establish particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Merrill Lynch board of directors at the time the Amended Complaint was filed so as to excuse demand, it is not necessary for the Court to address defendants' other arguments in favor of dismissal.

2004 WL 2813166 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Page 1

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.


Court of Chancery of Delaware.
Nelson LEUNG, individually and on behalf of all
others similarly situated, and
derivatively on behalf of Ventana Medical Systems,
Inc ., a Delaware
corporation, Plaintiff,
v.
Jack W. SCHULER, John Patience, R. James
Danehy, Edward Giles, Thomas M.
Grogan, M.D., James M. Stickland, James Weersing,
Ventana Medical Systems,
Inc., a Delaware corporation, Marquette Venture
Partners, L.P., a Delaware
limited partnership and MVP II Affiliates Fund, L.P.,
a Delaware limited
partnership, Defendants,
**No. 17089.**

Feb. 29, 2000.

Craig B. Smith, David A. Jenkins and Michele C.
Gott, of Smith, Katzenstein & Furlow LLP,
Wilmington, Delaware; for Plaintiff.

Jesse A. Finkelstein and Raymond J. DiCamillo, of
Richards, Layton & Finger, Wilmington, Delaware;
and Steven M. Schatz, Elizabeth M. Saunders and
Michele E. Rose, of Wilson Sonsini Goodrich &
Rosati, Palo Alto, California; for Defendants Jack W.
Schuler, John Patience, R. James Danehy, Edward
Giles, Thomas M. Grogan, James M. Stickland,
James Weersing and Ventana Medical Systems, Inc.

*MEMORANDUM OPINION*

JACOBS, Vice Chancellor.

*1 Pending are the defendants' motions to dismiss
this stockholder derivative and class action under
Court of Chancery Rules 12(b)(6) and 23.1. Under
challenge is the issuance by Ventana Medical
Systems, Inc. ("Ventana"), in January 1996, of
646,734 shares of its common stock to certain inside
directors. It is claimed (in the derivative Counts) that
those Ventana shares were issued at a price far below
its fair market value, and that consequently, the
issuance was invalid *per se,* constituted a waste of

assets, violated the duties of care and loyalty owed by
the Ventana directors who authorized the transaction.
It is also claimed (in the class Counts) that the
Ventana directors' failure to disclose the challenged
stock issuance to the plaintiff class in connection
with a merger in which the class ultimately became
Ventana stockholders [FN1] constituted a breach of
those directors' contractual and fiduciary duties to
make full disclosure of all material facts.

> FN1. The class consists of the holders of
> Ventana Exchange Notes ("Noteholders"),
> who acquired those notes on a merger of
> BioTek Solution, Inc. "BioTek") into
> Ventana in February, 1996. In the merger,
> the shareholders of BioTek--who were also
> the holders of BioTek Investor Notes--
> exchanged their BioTek notes for Ventana
> Exchange Notes that were convertible into
> Ventana common stock. The plaintiff, who
> was originally a BioTek noteholder, became
> a Ventana Notecholder in the Merger, and
> thereafter a portion of his Ventana notes
> were converted into Ventana common stock.

All defendants have moved to dismiss this action. I
conclude, for the reasons set forth below, that the
defendants' motions must be granted.

**I. FACTUAL BACKGROUND**
The facts narrated here are derived from the well-
pleaded allegations of the complaint, including
documents incorporated therein by reference. [FN2]

> FN2. The documents that are incorporated
> into the complaint by reference include the
> Information Statement that was
> disseminated in connection with the Merger,
> the Reorganization Agreement, the
> Memorandum which outlines the principal
> elements of the Insider Sale, and the
> Preliminary Prospectus that was
> disseminated in July, 1996 in connection
> with the Ventana initial public offering.
> Those documents are described more fully,
> *infra.*

*A. The Parties*

The plaintiff, Nelson Leung ("Leung") is, and at all
relevant times has been, a holder of Ventana common

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
**(Cite as: 2000 WL 264328 (Del.Ch.))**

stock. Leung was originally a holder of Investor Notes of BioTek Investor Solutions, Inc. that were exchanged for Ventana Exchange Notes when BioTek was acquired by Ventana in February, 1996.

The named defendants are (i) Ventana, which is a Delaware corporation headquartered in Tucson, Arizona, that develops, manufacturers and markets various tests used in treating cancer; (ii) the "Director Defendants" who were the directors of Ventana at all times relevant to this action, [FN3] and the "Marquette Venture Partner Defendants," which are three affiliated Delaware limited partnerships. [FN4]

> FN3. The Director Defendants are Jack W. Schuler ("Schuler"), John Patience ("Patience"), R. James Danehy ("Danehy"), Edward Giles ("Giles"), Thomas M. Grogan, M.D. ("Grogan"), James M. Strickland ("Strickland") and James Weersing ("Weersing").

> FN4. The Marquette Venture Partner Defendants are Marquette Venture Partners, L.P., Marquette Venture Partners II, L.P. and MVP II Affiliates Fund, L.P.

### B. *The Merger*

In February, 1996, BioTek Solution, Inc. ("BioTek") a California corporation that developed, manufactured, and distributed systems used to diagnose diseases, entered into an agreement to merge with Ventana, which became the surviving corporation (the "Merger"). At the time it was acquired in the Merger, BioTek had been experiencing significant financial difficulty and was on the verge of bankruptcy. In early February 1996, BioTek and Ventana mailed to BioTek's stockholders (who were also BioTek noteholders), and also to Ventana Preferred Stockholders (whose approval was also required), an Information Statement soliciting their approval of the Merger. The Information Statement disclosed that there was a "substantial likelihood" that the BioTek stockholders would receive no consideration in the Merger, and that the only value the BioTek noteholders would likely realize would be the Ventana convertible subordinated notes (the "Ventana Exchange Notes") they would be receiving in exchange for their BioTek Investor notes.

*2 The Ventana Exchange Notes that were issued to the BioTek noteholders in the Merger entitled the holders, at any time before the 30th day following the

closing of the Merger, to convert any or all of their Ventana Exchange Notes into Ventana common stock at a conversion price of $13.53 per share. [FN5] If the Noteholder did not elect to convert during that 30 day period, then one-half of the principal amount of that holder's Ventana Exchange Notes would automatically be converted into Ventana common stock at the 13.53 per share conversion price.

> FN5. $13.53 per share was equal to $5.00 before a 1-for-2.7 reverse stock of Ventana's shares that occurred effective July 26, 1996. All figures relating to the conversion price of the Ventana Exchange Notes and the stock issuance amounts are calculated after giving effect to the reverse stock split.

On February 23, 1996, the BioTek noteholders (who, to reiterate, were also BioTek stockholders) approved the Merger, which became effective three days later. The plaintiff alleges that when he and the other members of the Noteholder class gave their approval, they were unaware of the facts that are next described.

In January, 1996, one month before the Merger was consummated, Ventana's board authorized the issuance to director defendants Schuler and Patience, and also to Crabtree Partners [FN6] (the "Insiders"), 554,343 shares of Ventana's common stock at a price of $1.62 per share (the "Insider Sale"). At a second meeting held on February 23, 1996, the Board increased the number of shares to be issued to the Insiders, to 646,734 shares. When issued, those shares would constitute 26.5% of Ventana's equity. According to the Preliminary Prospectus issued in connection with Ventana's July, 1996 initial public offering, the stock was issued to Messrs. Patience and Schuler in connection with (i) their efforts in completing the BioTek acquisition and assisting management with the integration of the companies, (ii) Schuler's agreement to serve as Chairman of Ventana's board, and (iii) Schuler's and Patience's devotion of significant work to Ventana's board. [FN7] The complaint alleges that the board made no valuation of the services for which these shares were being issued. The board did determine, however, that the "fair market value" of the to-be-issued Ventana common stock was the $1.62 per share issuance price to the Insiders.

> FN6. Crabtree Partners was a venture capital fund affiliated with the Marquette Venture Partner Defendants which, in turn, was a principal stockholder of Ventana with whom

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Mr. Patience was formerly affiliated.

> FN7. The complaint alleges (at ¶ 15) that the stock was being issued in the exchange for the defendants' services, but does not particularize the services. That information appears in the Preliminary Prospectus (Raju Aff., Ex. A at 58), which is incorporated by reference into the complaint. (*See* Complaint at ¶ 26). The plaintiff, in his brief, does not dispute the substance of the disclosures made by Ventana with respect to the services for which the Insiders were being compensated.

During the February 23, 1996 meeting, the board also approved a memorandum that outlined the principal elements of the stock sale to the Insiders (the "Memorandum"). Those elements included two Conditions that are relevant to these motions. Condition 3 stated that:

"[t]he valuation used by Ventana as a basis for valuing its Common Stock, at a price of $.60 per share, shall not be determined subsequently by the Securities and Exchange Commission ("SEC"), in the event of an initial public offering by the Company of its Common Stock, as "Cheap Stock" and therefore subject to excess compensation accounting and disclosure requirements."

And Condition 6 provided that:

"[i]n the event any stockholder holding 10% or more of the Company's stock (on an as converted basis) initiates litigation with respect to the [Insider Sale], Jack W. Schuler and Crabtree Partners shall indemnify and hold harmless Ventana and its directors and executive officers from costs of defending such litigation and from any damages or settlement paid as a result of such litigation."

*3 The relevance of these Conditions will later appear.

As earlier noted, the Ventana Exchange Notes received in the Merger provided a 30-day post-merger conversion window during which those holders could convert none, some, or all of their Notes into Ventana common stock for $13.53 per share. The plaintiff claims that at the time that the Ventana Notes were converted, he and the other Noteholders were unaware that the Insider Sale at $1.62 per share had been authorized several weeks earlier. The plaintiff claims that had he and the other class members known that, he would have elected not to convert any of his Ventana Exchange Notes into Ventana shares, because the Insider Sale would have

diluted Ventana's shares by over 25%. Unaware of the Insider Sale, the plaintiff (and other Noteholders) made no election and as a result, one-half of the face amount of the plaintiff's Ventana Exchange Notes ($31,041.36) was automatically converted into 2,295 shares of Ventana common stock on March 26, 1996.

In April and May 1996, the Insider Sale that had been authorized four months earlier was consummated, by Ventana issuing 646,734 shares of stock to the Insiders for $1.62 per share. The plaintiff alleges that he and the other Noteholders did not learn of the Insider Sale until it was disclosed for the first time in the Ventana Preliminary Prospectus, dated July 3, 1996, that was issued in connection with the initial public offering of Ventana stock. That Prospectus also disclosed that in connection with the Insider Sale, the Director Defendants had determined that the fair market value of Ventana's common stock as of January 1996 was $1.62 per share.

This action followed. [FN8]

> FN8. The filing of this action was preceded by the filing, by the plaintiff's relatives, of a lawsuit in the United States District Court for the District of Delaware ("the Federal Action"). The Federal Action asserts claims attacking the Insider Sales under the Securities Exchange Act of 1934, and also under California statutory and common law.

## II. THE CLASS CLAIMS

I first address the legal sufficiency of the class claims, which the defendants have moved to dismiss under Rule 12(b)(6). Under that Rule, a claim will be dismissed where it is clear from the allegations of the complaint that the plaintiffs would not be entitled to relief under any set of facts that could be proved to support the claim. [FN9] All well-pleaded facts alleged in the complaint will be accepted as true, but inferences and conclusions that are unsupported by specific factual allegations will not be. [FN10] On a Rule 12(b)(6) motion the Court will also consider all documents that are incorporated into the complaint by reference. [FN11]

> FN9. *In re Tri-Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993); *see also Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., 700 A.2d 135, 140 (1997).

> FN10. *See id.; see also In re Wheelabrator Technologies Inc. Shareholders Litig.,* Del. Ch., C.A. No. 11495, Jacobs, V.C., Mem.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Page 4

Op. at 4 (Sept. 1, 1992) (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n.6 (1988)); *Weinberger v. UOP, Inc.,* Del. Ch., 409 A.2d 1262, 1264 (1979).

FN11. *See, e.g., Vanderbilt Income and Growth Assocs., L.L .C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613 (1996).

The thrust of the class claims is that the Ventana board breached their contractual and fiduciary duties by failing to disclose to the then-BioTek noteholders that one month earlier, the Ventana board had authorized the sale to the Insiders of 646,734 shares at $1.62 per share. That undisclosed fact, it is claimed, was highly material because had it been disclosed, the plaintiff and the other Noteholders would have voted against the Merger, or elected to not convert their Ventana notes into (highly diluted) shares of Ventana. The plaintiff claims that Ventana's directors had both a contractual duty under the Note Exchange Agreement, as well as a fiduciary duty under Delaware law, to disclose the authorization of the Insider Sale to BioTek Noteholders when seeking their approval of the Merger in February, 1996.

*4 The defendants argue that the disclosure claims are legally insufficient because: (1) the Note Exchange Agreement did not impose any contractual disclosure obligation, running in favor of the BioTek Noteholders, upon Ventana's directors, and (2) the directors had no fiduciary duty of disclosure to the (former) BioTek noteholders because (a) the directors were not fiduciaries of those noteholders at the time the disclosure was (arguably) required, and (b) the claim that the directors "voluntarily assumed" a fiduciary duty is without any basis in law.

These contentions frame two issues. The first is whether the Note Exchange Agreement imposed a contractual duty of disclosure upon the Ventana Director defendants. The second is whether the Director Defendants--who admittedly were not fiduciaries of the BioTek noteholders--nonetheless voluntarily assumed a fiduciary duty of disclosure to them.

A. The Breach of Contract Claim (Count IV)

The first issue--whether the Note Exchange Agreement imposed a contractual duty of disclosure upon Ventana's Directors--arises because it is undisputed the Note Exchange Agreement, standing alone, imposed no disclosure duty upon the Ventana

board. The only contract document that did arguably impose a disclosure duty is the Reorganization Agreement, which (together with the Information Statement) was one of the documents furnished in connection with obtaining the BioTek noteholders' approval of the Merger.

The Reorganization Agreement contains two provisions that, plaintiff claims, required Ventana's directors to disclose the authorization of the Insider Sale. Section 4.5 recites the number of authorized and outstanding shares of Ventana's common and preferred stock, and goes on to state that Ventana expected in the future to increase that number of shares by 1,860,500 shares of Series D Preferred Stock. The plaintiff alleges that the undisclosed authorization of the sale of almost 647,000 shares to the Insiders made that representation untrue, and as a consequence, triggered the second relevant provision of the Reorganization Agreement, Section 4 .7. That latter Section provides:

No representation or warranty made by Ventana in this Article IV or in any other Article or Section of this Agreement, *or in any* certificate, schedule or *other document furnished or required to be furnished by Ventana* pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements or facts contained herein or therein not misleading in light of the circumstances under which they are made. (emphasis added)

The claim that plaintiff advances here is that the nondisclosure of the board's authorization of the Insider Sale rendered Section 4.5 false, which (in turn) operated as a breach of Section 4.7, which (in turn) proscribed any untrue statement of a material fact in connection with any representation, warranty, or any certificate, schedule or "other document" furnished by Ventana.

*5 The difficulty with this claim is that the plaintiff was not a party to the Reorganization Agreement, and he therefore lacks standing to enforce it. Recognizing that, the plaintiff urges that the Reorganization Agreement, (including Section 4.7) was incorporated by reference into the Note Exchange Agreement to which the plaintiff was a party. The defendants dispute this. They contend that the Reorganization Agreement was not incorporated by reference into the Note Exchange Agreement. These disputed contentions make the "incorporation by reference" issue pivotal to the plaintiff's contractual disclosure claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Page 5

The precise issue, which both sides agree is governed by California law, is whether the parties intended the Note Exchange Agreement to be the exclusive expression of their agreement. [FN12] I conclude that the parties so intended, and that the Reorganization Agreement was incorporated into the Note Exchange Agreement, but only for the very limited purpose of defining certain terms.

FN12. *City of Manhattan Beach v. The Superior Court of Los Angeles County,* Cal.Supr., 914 P.2d 160, 164 (1996) ("the primary object of all interpretation is to ascertain and carry out the intention of the parties").

The Note Exchange Agreement contains a "merger" or "integration" clause. Section 6.4 provides that: "[t]his Agreement embodies the entire understanding and agreement between the Noteholder and the Company and supersedes all prior agreements and understandings relating to the subject matter hereof." Under California law, an integration or merger clause is regarded as conclusive evidence that "the parties intended the written instrument to serve as the exclusive embodiment of their agreement." [FN13]

FN13. *Airs Int'l, Inc. v. Perfect Scents Distribution, Ltd.,* 902 F.Supp. 1141, 1146 (N.D.Cal.1995).

The plaintiff argues that because the Note Exchange Agreement refers to the Reorganization Agreement in several places, the Court must conclude that the parties intended to incorporate the entire Reorganization Agreement into the Note Exchange Agreement. But the conclusion does not follow from the premise. Under California law, where a contract refers to another writing for a particular specified purpose, that other writing becomes part of the contract for the specified purpose only. [FN14] That is because if the contracting parties intended to incorporate the entire Reorganization Agreement into the Note Exchange Agreement, they could have explicitly so provided. Other merger clauses have been specifically worded to incorporate other documents by reference. [FN15] Because there is no clear expression of an intent to incorporate the entire Reorganization Agreement into the Note Exchange Agreement, I conclude that the California courts would limit any incorporation by reference of the Reorganization Agreement to the definitions that were specifically incorporated by reference in the Note Exchange Agreement. Because the premise of

Count IV--that the entire Reorganization Agreement was incorporated by reference--is legally incorrect, that Count must be dismissed.

FN14. *Valley Constr. Co. v. City of Calistoga,* Cal.App., 165 P.2d 521, 522 (1946).

FN15. *See e.g., Bionghi v. Metropolitan Water Dist. of S. California,* 70 Cal.App. 4th 1358, 1362-63 (1999).

**B. The Beach of Fiduciary Duty of Disclosure Claim (Count V)**

Count V alleges that the Director Defendants voluntarily assumed a fiduciary duty of disclosure, which they breached by failing to disclose their authorization of the Insider Sale. The plaintiff concedes that no fiduciary duty was owed to him as a debt holder at the time he was asked to approve the Merger in February, 1996, because he was not then a stockholder of Ventana and did not become one until March 26, 1996. What the plaintiff contends is that the Director Defendants, even though they were not fiduciaries, voluntarily *assumed* a fiduciary of duty of disclosure to those noteholders when they solicited the BioTek noteholders' approval of the Merger. That claimed assumption of a fiduciary duty is said to arise from two circumstances: (1) the Directors' possession of superior knowledge about Ventana's financial condition (about which the BioTek Noteholders knew little, because Ventana was then privately owned); and (2) the Ventana Directors' representation in Section 4.7 of the Reorganization Agreement that no untrue representations would be made.

*6 In my opinion this claim is also legally unsupported. No Delaware case cited to me has imposed a fiduciary duty of disclosure upon a corporate director who did not occupy a fiduciary relationship to the persons claiming entitlement to the disclosure. Nor do the facts alleged in the complaint persuade me that this is a proper occasion to adopt plaintiff's unprecedented legal theory.

It is well established in Delaware that to successfully state a claim for breach of the fiduciary duty of disclosure, the plaintiff must have been owed a fiduciary duty at the time of the alleged breach. [FN16] In *Sanders v. Devine,* [FN17] the plaintiff alleged that the directors had breached their fiduciary duty of disclosure by failing to disclose certain information in the prospectus pursuant to which preferred stock had been issued and sold to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

public. Rejecting that claim, Vice Chancellor Lamb held:

> FN16. *Sanders v. Devine*, Del. Ch., C.A. No. 14679, Lamb, V.C., Mem. Op. at 13 (Sept. 24, 1997) (emphasis added) (alleged omission in preferred stock prospectus cannot give rise to breach of fiduciary duty because plaintiff was not a stockholder at the time the prospectus was issued); *accord Arnold v. Society for Savings Bancorp, Inc.*, Del. Ch., C.A. No. 12883, Chandler, V.C., Mem. Op. at 15-16 (June 15, 1995) (acquiring corporation owed no duty of disclosure to stockholders of acquired corporation, even though it participated in drafting of proxy materials); *accord Thorpe v. CERBCO, Inc.*, Del. Ch., C.A. No. 11713, Allen, V.C., Mem. Op. at 4-5 (Jan. 26, 1993) (plaintiffs could not challenge disclosure in proxy statement issued before they became stockholders); *accord Zirn v. VLI Corp.*, Del. Ch., C.A. No. 9488, Hartnett, V.C., Mem. Op. at 12-13 (July 17, 1989) (tender offeror owed no fiduciary duty of disclosure to target corporation's stockholders); *accord Glaser v. Norris*, Del. Ch., C.A. No. 9538, Chandler, V.C. Slip Op. at 19-20 (July 13, 1989) (alleged omissions contained in prospectus cannot give rise to breach of fiduciary duty because prospective purchaser of stock not owed fiduciary duties).

> FN17. Del. Ch., C.A. No. 14679, Lamb, V.C., Mem. Op. (Sept. 24, 1997).

In order to prevail on a breach of fiduciary duty claim, plaintiff Sanders must first establish that at the time the Prospectus was issued he was a person to whom a fiduciary duty was owed. In the present case, plaintiff was not a stockholder at the time the prospectus was issued, therefore, *as a matter of law,* there can be no liability under any fiduciary duty theories for the disclosures made in connection with the offering. [FN18]

> FN18. *Sanders* at 13 (emphasis added).

In this case the alleged disclosure violation occurred in February, 1996. Because the plaintiff did not become a stockholder of Ventana until March 26, 1996, no fiduciary relationship or duty existed or arose at the time of the alleged violation.

The plaintiff argues that *In re Cencom Cable Income Partners, L .P. Litig,* [FN19] is authority to the contrary. I cannot agree. In *Cencom,* the general partner of a limited partnership retained a law firm to represent the interests of the limited partners, and disclosed the law firm's obligations to the limited partners. The Court held that in those circumstances, the general partner had "voluntarily assumed a duty to ensure that [the law firm] would fulfill these obligations and that the Limited Partners could rely on the General Partner's representation that [the law firm] would do so." [FN20] *Cencom* is distinguishable from this case and, moreover, does not support the proposition being advanced here. At issue in *Cencom* was whether the scope of the general partner's fiduciary duty to the limited partners-- *persons to whom fiduciary duties were clearly owed--* extended beyond the duties expressly stated in the partnership agreement. Here, the plaintiff represents a class of investors to whom *no* fiduciary duties were owed at the time of the alleged disclosure violation.

> FN19. Del. Ch., C.A. No. 14634, Steele, V.C., Mem. Op. (Oct. 15, 1997).

> FN20. *Id.* at 16.

Because the Director Defendants owed no fiduciary duty to the plaintiff class at the time their approval of the Merger was obtained, the "assumption of the fiduciary duty" claim in Count V must fail, and that Count of the complaint must be dismissed. [FN21]

> FN21. This does not mean that the plaintiff class has no available remedy. Although the Court finds that the complaint does not allege actionable disclosure claims under state law, the plaintiff's family has made the same conduct the subject of federal disclosure claims that are currently being pursued in the separate companion Federal action in the United States District Court for Delaware. The existence (or nonexistence) of disclosure liability under the Federal Securities laws is not dependent upon the existence of a fiduciary relationship.

### III. THE DERIVATIVE CLAIMS
#### A. *Introduction*

**\*7** The remaining Counts of the complaint are derivative. The defendants seek the dismissal of those Counts under Rules 12(b)(6) and 23.1. Court of Chancery Rule 23.1 imposes special pleading requirements for derivative actions. [FN22] Those

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

requirements are more stringent than the notice pleading requirements governed by Court of Chancery Rule 8(a). [FN23] In cases where no demand is made, complaints in derivative actions must be pled with factual particularity. Although the plaintiff stockholder is not required to plead evidence, Rule 23.1 does require the plaintiff to plead particularized facts to excuse the failure to make a demand. [FN24]

> FN22. Rule 23.1 pertinently provides: "The complaint shall ... allege with particularity the efforts, if any, ... to obtain the action the plaintiff desires form the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

> FN23. *Brehm v. Disney,* Del.Supr., __ A.2d __, No. 469, 1998, Veasey, C.J. (Feb. 9, 2000).

> FN24. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814 (1984).

The defendants argue that all three derivative Counts must be dismissed. *First,* the defendants argue that because the Insider Sale transaction concluded in January 1996 when the Ventana directors authorized the issuance of stock to the Insiders, and because the plaintiff did not become a shareholder until March 1996, the plaintiff lacks standing under Rule 23.1 and 8 *Del. C. § 327* to assert a derivative claim challenging that stock issuance. *Second,* the defendants argue that the derivative counts must be dismissed because the plaintiff failed to make the pre-suit demand required by Rule 23.1 or to allege facts establishing that a demand would have been futile. *Third,* the defendants argue that even if the plaintiff has standing and a demand is excused, Counts II and III must be dismissed because they are based solely on a due care theory of liability, for which any monetary damage recovery is precluded by the exculpatory provision of Ventana's Articles of Incorporation.

In response, the plaintiff contends that he has standing to maintain the derivative Counts because the transaction complained of (the Insider Sale), was not completed until it was consummated in April and May of 1996, by which point the plaintiff was a Ventana shareholder. The plaintiff further argues that demand was excused, because (a) Count I alleges that the stock issuance was invalid *per se* and is not protected by the business judgment rule, (b) Count II alleges that the stock issuance constituted waste, and

(c) Count III alleges that the directors acted in bad faith. Finally, the plaintiff contends that under 8 *Del. C. § 102(b)(7),* the Ventana exculpatory charter provision does not and cannot apply to claims of illegality, waste and bad faith.

These contentions raise three issues. The first involves standing, *viz,* when was the transaction complained of "complete"--when the Insider Sale was authorized in January, 1996, or when the stock was issued in April and May of 1996? The second issue is whether a demand on the Ventana's board was excused on the basis that the Insider Sale was not a valid exercise of business judgment. The third issue is whether Counts I, II and III are barred by the exculpatory clause in Ventana's Articles of Incorporation.

B. The Standing Defense

A threshold issue is whether the plaintiff was a shareholder at the time of the transaction complained of. If he was, then he has standing to bring the derivative claims. If he was not, then he lacks standing, and the derivative claims must be dismissed.

*8 Under 8 *Del. C. § 327* and Rule 23.1, the critical time for determining standing is when the transaction complained of is completed. [FN25] The plaintiff argues that the transaction was not completed (and, hence, the claim did not arise) until the Ventana shares were issued to the Insiders in April and May, 1996, at which time the plaintiff was a Ventana stockholder. The plaintiff is correct. *Maclary v. Pleasant Hills,* [FN26] which is essentially on point, supports his position. In *Maclary* this Court held that the alleged wrongdoing--the issuance of 100 shares of stock members of to the board of directors--did not occur when the board authorized the issuance, but, rather, when the stock certificates were actually issued. The Court held that "[w]here certificates are presumably to be issued therefor at once, and that is the very action under attack, the transaction is not complete for purposes of applying 8 *Del. C. § 327* until the certificates are issued." [FN27]

> FN25. 8 *Del. C. § 327* relevantly provides: "[i]t shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
**(Cite as: 2000 WL 264328 (Del.Ch.))**

FN26. Del. Ch., 109 A.2d 830, 833-34 (1954).

FN27. 109 A.2d at 834.

That same logic applies here. Although the Ventana directors may have authorized the issuance of stock to the Insiders in February, 1996, no claim could or did arise (because the transaction was not complete) until the shares were actually issued in April and May 1996. By that point the plaintiff was a stockholder. The plaintiff therefore has standing to assert the derivative claims.

The defendants argue that a recent decision, *7547 Partners v. Beck,* [FN28] has overruled *Maclary.* I disagree. In *Beck,* the plaintiff challenged a board of directors' decision to sell stock to board members at a price lower than what was being offered to the public generally in the company's initial public offering ("IOP"). [FN29] The Delaware Supreme Court held that the plaintiff lacked standing to raise derivative claims because the challenged conduct (setting the IPO price) predated the IPO in which the plaintiff purchased his shares, [FN30] for which reason the plaintiff was not a stockholder at the time of the conduct complained of.

FN28. Del.Supr., 682 A.2d 160 (1996).

FN29. *See id.* at 162-63.

FN30. *See id.* at 163.

The claim advanced in *Beck* is different from the claims asserted here and in *Maclary.* In *Beck,* the alleged wrong was the board's decision to fix a below-market price for the stock being offered in the IPO. Once that price was fixed, the transaction was completed, and there was nothing further for the board to do. But, here (as in *Maclary* ), the alleged wrong is the *issuance* of the stock to the Insiders in April and May 1996, rather than its authorization by the board two months before. Indeed, in this case, no claim for *damage* relief arose or could have arisen until the stock was actually issued. [FN31] Because the plaintiff was a stockholder at the time that took place, he has standing to assert Counts I through III.

FN31. A claim for *injunctive* relief may have arisen at the time the Insider Sale was authorized, but the claim asserted here is for *post-issuance* damages.

C. The Demand Defense

The next issue is whether the plaintiff was excused from making a demand on the Ventana board. Under *Aronson v. Lewis* [FN32] demand is considered futile, and will be deemed excused, if the particularized facts alleged in the complaint create a reasonable doubt that: (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Because the plaintiff does not challenge the independence and loyalty of the Defendant Directors, the analysis must focus on *Aronson'* s second prong. That is, plaintiff's demand excusal argument is that the particularized factual allegations of the complaint create a reasonable doubt that the sale of Ventana stock to the Insiders at the $1.62 per share price was the product of a valid business judgment. The plaintiff contends that the complaint alleges cognizable claims, and excuses demand, for three reasons: (i) the Insider Sale was invalid *per se,* (ii) the Insider Sale was a waste of assets, and (iii) the Insider Sale was not approved in good faith. The defendants respond that none of these allegations states a cognizable claim for relief and must therefore be dismissed under Rule 12(b)(6), and under Rule 23.1 as well.

FN32, *Aronson v. Lewis,* 473 A.2d at 814.

**\*9** These arguments are next addressed.

1. The Illegal Stock Issuance Claim (Count I)

The defendants first argue that Count I must be dismissed under Rules 12(b)(6) and 23.1 because the complaint does not state a cognizable claim that the stock issuance to the Insiders was legally invalid. The plaintiff argues the contrary. He maintains that the Director Defendants' decision to issue stock representing 26.5% of Ventana's equity in exchange for services that they did not value was invalid *per se,* and therefore cannot be defended as a proper exercise of the directors' business judgment. For that reason, plaintiff argues, the Insider Sale was not subject to the demand requirement.

The Delaware General Corporation Law grants a board of directors considerable discretion in determining the consideration for the issuance of stock. 8 *Del. C.* § 152 pertinently provides:
"The consideration, ..., for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine. In the absence of actual fraud in the transaction, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
**(Cite as: 2000 WL 264328 (Del.Ch.))**

judgment of the directors as to the value of such consideration shall be conclusive." [FN33]

FN33. 8 *Del. C.* § 152.

8 *Del. C.* § 153(a) provides, in part:
"(a) Shares of stock with par value may be issued for such consideration, having a value not less than the par value thereof, as determined from time to time by the board of directors, or by the stockholders if the certificates of incorporation so provides." [FN34]

FN34. 8 *Del. C.* § 153(a).

Thus, absent fraud, Sections 152 and 153 give a board considerable latitude in evaluating the kind and amount of consideration to be received for newly-issued stock.

The complaint here--which does not claim fraud--does allege the specific consideration being received for the to-be-issued stock, specifically, that the Insiders were being compensated with Ventana stock for the services they rendered, and would render, to Ventana, including their efforts in connection with "structuring and negotiating the Merger."

The plaintiff argues under Delaware case law, a stock-for-services transaction is *per se* invalid if the services are not formally valued, because the statute imposes a duty upon the board to value the services. But the above-quoted statutory provisions do not so provide, nor do they explicitly require that the board conduct a "formal valuation." Nor do the cited cases support the *per se* invalidity proposition that plaintiff advances. Of course, a board must determine the value of services being received by the corporation in exchange for issuing the corporation's stock of equivalent value. But, the cited decisions do not hold that a board's failure to conduct a "formal" valuation of those services automatically vitiates the stock issuance as a matter of statutory law. [FN35] Rather, the board's duty to value services received in exchange for newly-issued stock is more properly understood as one aspect of its broader fiduciary duty of care. Moreover (and as discussed more fully *infra* in connection with the waste claim) the complaint alleges facts from which it may be inferred that the Ventana directors *did* determine the value of the services being rendered. Accordingly, to the extent Count I alleges that the stock issuance was invalid *per se,* that claim is unsupported in law. Moreover, because the complaint shows that the Insiders' services were valued (albeit not "formally")," the

claim is unsupported by the pleaded facts. Accordingly, Count I must be dismissed because it fails to state a claim under Rule 12(b)(6) and does not excuse a demand on the board as required by Rule 23.1.

FN35. *Bowen v. Imperial Theatres, Inc.,* Del. Ch., 115 A. 918, 920 (1922) (stock issuance held invalid when stock was issued to two members of the board where the authorization to issue the shares was not by the board of directors acting collectively, but, rather, was an individual decision by two of its members. The issue of valuation of services, was left undecided); *John W. Cooney Co. v. Arlington Hotel Co.,* Del. Ch., 101 A. 879, 887-88 (1917), *modified,* Del.Supr., 106 A. 39 (1918) (Noting that because no money was paid for stock and there was "scanty opportunity" to perform work on behalf of the company, and no "statement as to the character or value" of the service rendered to the company, there must have been "an intention to avoid the statute and Constitution" requiring payment of adequate compensation for issuance of company stock.); *Field v. Carlisle Corp.,* Del. Ch., 68 A.2d 817, 819-20 (1949) (holding that a Delaware corporation may not delegate its duty to comply with a provision of the articles of incorporation requiring "that the corporation's stock may be issued 'for such consideration as may be fixed from time to time by the Board of Directors.")

2. The Waste Claim (Count II)

**\*10** The defendants next argue that Count II must be dismissed under Rules 12(b)(6) and 23.1, for failure to state a cognizable claim that the Board's issuance of the shares to the Insiders constituted corporate waste. If a cognizable claim of waste is alleged, that would deprive the challenged conduct of the protection of the business judgment rule and, consequently, would excuse demand.

The standard under Delaware law for pleading waste is stringent. [FN36] The plaintiff contends that the pleaded facts satisfy that stringent test. Here, it is alleged, the board issued shares representing approximately 26.5% of Ventana's post-issuance equity to the Insiders, but did not determine the value of the services to be provided in exchange. That failure (it is claimed) is sufficient of itself to create a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
**(Cite as: 2000 WL 264328 (Del.Ch.))**

reasonable doubt that the Board committed waste, and it is amply sufficient when coupled with the allegation that the stock was issued to the Insiders at a fraction of market value. The claim that $1.62 was far less than market value rests on the alleged fact that the board valued the stock at $1.62 per share for purposes of the Insider Sale, but only 3 weeks later, the board mailed to BioTek Noteholders, solicitation materials that valued the Ventana Exchange Notes at $13.53 per share for purposes of converting the Notes into Ventana common shares. Plaintiff argues that issuing approximately 26.5% of Ventana's equity for only 12% of the price that the Noteholders would pay for the same stock when converting their Ventana Notes, constitutes cognizable waste sufficient to survive dismissal under Rule 12(b)(6) and to excuse demand under Rule 23.1.

> FN36. *In re The Walt Disney Co. Derivative Litig.*, Del. Ch., 731 A.2d 342, 362 (1998) (to constitute waste "an exchange ... [must be] so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *aff'd Brehm v. Disney*, Del.Supr., ___ A.2d ___, No. 469, 1998, Veasey, C.J. at 34 (Feb. 9, 2000) (quoting *Glazer v. Zapata Corp.*, Del. Ch., 658 A.2d 176, 183 (1993)).

Despite its surface appeal, the argument lacks merit. The standard for pleading waste has been described thusly:

> ... [a] waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex-post,* to judge appropriate degrees of business risk. [FN37]

> FN37. *Vogelstein,* 699 A.2d at 336

(emphasis added) (citations omitted); *accord, Grimes,* 673 A.2d at 12, 14. Consistent with this view, the Delaware Supreme Court, has recently found that a complaint challenging an agreement that called for a $140 million severance payment to a senior executive did not allege waste, and noting that waste claims are "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Brehm v. Disney,* Del.Supr., ___ A.2d ___, No. 469, 1998, Veasey, C.J. (Feb. 9, 2000) Slip Op. at ___.

Thus, even if the complaint alleges facts that if true would show that in hindsight the consideration was inadequate, that alone will not satisfy the waste standard. The particularized pleaded facts must show that the consideration received for the stock was so minimal that issuing the Ventana stock was the functional equivalent of making a gift to the Insiders. Although the issued stock constituted one fourth of Ventana's outstanding common shares, the complaint does not allege that the Defendant Directors irrationally gave away those shares for essentially no consideration. To the contrary, the pleaded facts show that the board knew the precise value of the stock to be issued as compensation, and the nature of the services being rendered in exchange therefor. [FN38] Inherent in the act of setting the number of to-be-issued shares (646,734) and the price per share ($1.62) was the board's determination that the value of the services being performed was commensurate with the aggregate value of the shares being sold. Given those pleaded facts, I am unable to conclude that a claim of waste has been stated that would survive dismissal under Rule 12(b)(6), or that would excuse a demand under Rule 23.1. For these reasons, Count II will be dismissed.

> FN38. The Memorandum describes the services that the Insiders would be performing. Those services are also summarized in the July, 1996 Preliminary Prospectus furnished in connection with the Ventana IPO.

### 3. The "Bad Faith" Claim (Count III)

**\*11** Lastly, the defendants argue that the motions to dismiss should be denied because the complaint does not allege a cognizable claim that the Director Defendants' approval of the Insider Sale was made in good faith. The basis for this claim is that the Director Defendants (i) failed to value Patience and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 11
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Schuler's services before authorizing the issuance of the shares; (ii) determined a fair market value of Ventana common stock that was significantly less than the conversion price offered to the former BioTek stockholders only weeks later, and (3) included conditions in the Memorandum that "implicitly acknowledged" a "lack of confidence" that the Board had priced the Insider Sale at fair market value. [FN39]

FN39. Complaint at ¶ 39.

Under the business judgment rule a board's good faith in making a decision is presumed. That presumption is heightened where, as here, the majority of the directors making the decision are independent or outside directors. [FN40] To overcome that presumption and to survive a motion to dismiss under Rule 12(b)(6) or Rule 23.1, the complaint must plead specific facts from which it can be inferred that "the decision [by the board] is so beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other grounds ." [FN41] The complaint here falls short of meeting that standard.

> FN40. *Moran v. Household Int'l. Inc.,* Del. Ch., 490 A.2d 1059, 1074-75 (1985); *aff'd,* Del.Supr., 500 A.2d 1346 (1985); *Solash v. Telex Corp.,* Del. Ch., C.A. Nos. 9518 & 9528, Allen, C ., Mem. Op. at 8 (Jan. 19, 1988).

> FN41. *In re Rexene Corp. Shareholder Litig.,* Del. Ch., C.A. Nos. 10897 & 11300, Mem. Op. at 8, Berger, V.C. (May 8, 1991); *aff'd sub nom. Eichorn v. Rexene Corp.* Del.Supr., 604 A.2d 416 (1991) (TABLE); *see also Solash* at 22-23 (to infer bad faith the board's decision must be "so grossly off the mark as to amount to 'reckless indifference' or 'gross abuse of discretion' ").

*First,* as previously discussed, the claim that the Defendant Directors failed to value the services of Patience and Schuler before approving the issuance of the stock is unsupported. While it may be true that no formal valuation was conducted, the pleaded facts show that the board knew the value of the compensation (in the form of stock) it was awarding to the Insiders and the nature of the services the Insiders would perform in exchange. Moreover, the complaint alleges that a fair market evaluation of the Ventana common stock did take place, the valuation being $1.62 per share.

*Second,* the fact that the $13.53 per share conversion price offered to the BioTek noteholders was greater than the $1.62 per share fair market value of the shares sold to the Insiders, does not, without more, defeat the presumption that the Ventana board acted in good faith. Nowhere is it alleged that any BioTek noteholder was told that the $13.53 conversion rate being offered in the Merger was the fair market value of the Ventana stock, nor is it fair to infer that equivalence. The inference that is fair and reasonable, is that the conversion price offered to the BioTek noteholders was equal to the amount and value of the equity Ventana was willing to pay for BioTek. To put it differently, the Ventana board, in exercising its business judgment, did not believe that the $1.62 per share fair market value of Ventana stock was a conversion rate that Ventana should pay to the BioTek noteholders in order to purchase BioTek. Had the BioTek noteholders been given a conversion price in the Merger equal to $1.62 per share, that would result in Ventana transferring almost half of its equity to BioTek's noteholders in exchange for a financially troubled company. [FN42]

> FN42. The financial difficulties of BioTek were disclosed in the Information Statement formulated to the BioTek noteholders and Ventana preferred stockholders. The Information Statement, which is incorporated into the complaint by reference, states that "... It has been the goal of BioTek directors, in this process, to seek to satisfy, to the extent possible, the claims of creditors of BioTek ... [T]he benefit of the Merger to BioTek is the ability of BioTek to achieve an orderly resolution of creditor claims ..." Information Statement at 10. That document may be considered on a motion to dismiss for purposes of determining what facts were disclosed to BioTek noteholders, and accordingly, what facts the Ventana directors knew at the time of the Merger.

*12 Finally, the fact that the Memorandum provided for contingency safeguards in the event the SEC disagreed with the fair market valuation of Ventana's common stock, does not evidence that the board acted in bad faith. What that contingency does indicate is that determining the fair market value of the common stock of a non-publicly held company is a matter of judgment about reasonable persons can disagree. In this case the "SEC disapproval" condition was designed to protect the corporation: if the SEC disagreed with the board's fair market value

Not Reported in A.2d
2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401
(Cite as: 2000 WL 264328 (Del.Ch.))

Page 12

determination, the Insider Sale would not go forward at the price contemplated. That the board recognized and provided for that risk may evidence its conservatism, but that is hardly emblematic of bad faith.

I conclude, for these reasons that the complaint fails to state a cognizable claim, under either Rule 12(b)(6) or Rule 23.1, that in approving the Sale to the Insiders the Ventana board acted in bad faith and breached its duty of loyalty. Count V must therefore be dismissed.

C. The Effect of the Exculpatory Clause

Lastly, the defendants argue that the derivative claims sound in gross negligence. Even if that is so, the claims would fail as against the Director Defendants, because any duty of care claims for monetary damages are precluded by Article XI of Ventana's Amended and Restated Certificate of Incorporation, which is modeled after 8 *Del. C.* § 102(b)(7). [FN43]

> FN43. Article XI of the Amended and Restated Certificate of Incorporation pertinently states that: "[A] director of the [C]orporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director."

Because Counts I through III will be dismissed on Rule 12(b)(6) and Rule 23.1 grounds, there is no need to decide whether Ventana's Certificate provision exculpates its directors from liability for money damages with respect to those Counts.

IV. CONCLUSION

For the above reasons, the motions to dismiss the class claims under Rule 12(b)(6), and to dismiss the derivative claims under Rule 12(b)(6) and Rule 23.1, will be granted. Counsel shall submit an appropriate form of order implementing the rulings made in this Opinion.

2000 WL 264328 (Del.Ch.), 26 Del. J. Corp. L. 401

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.