# TAB 3

Westlaw.

Not Reported in A.2d
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
**(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)**

Page 1

▷

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
In re; TRI-STAR PICTURES, INC., LITIGATION.
**CIV. A. No. 9477.**

June 14, 1990.
**\*\*955** William Prickett, Michael Hanrahan, and
Elizabeth M. McGeever, of Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, Joseph A. Rosenthal
of Morris, Rosenthal, Monhait & Gross, Wilmington,
Arthur T. Susman and Terry Rose Saunders of
Susman, Saunders, & Buehler, Chicago, Ill., and
Roger W. Kirby of Kaufman, Malchman, Kaufmann
& Kirby, New York City, for plaintiffs.

James F. Burnett and Donald J. Wolfe, Jr. of Potter,
Anderson & Corroon, Wilmington, for defendant
Columbia Pictures Entertainment, Inc. formerly Tri-
Star Pictures, Inc.

Lawrence C. Ashby and Stephen E. Jenkins of
Ashby, McKelvie & Geddes, Wilmington, and Allen
Keszbom, Debra M. Torres, and Abraham Rappaport
of Fried, Frank, Harris, Shriver, Jacobson, New York
City, for defendants Victor A. Kaufman, David A.
Matalon, Patrick A. Williamson, Judd A. Weinberg,
and Dan W. Lufkin.

Lawrence A. Hamermesh and Thomas C. Grimm of
Morris, Nichols, Arsht & Tunnell, Wilmington, and
Frank C. Jones and L. Joseph Loveland of King &
Spalding, Atlanta, Ga., for defendants, The Coca-
Cola Company, CPI Film Holdings, Inc., Ira C.
Herbert, and Francis T. Vincent, Jr.

Allen M. Terrell, Jr., and Michael J. Feinstein of
Richards, Layton & Finger, Wilmington, and Robert
C. Myers and Anthony J. Viola of Dewey, Ballantine,
Bushby, Palmer & Wood, New York City.

MEMORANDUM OPINION

**\*\*956** JACOBS, Vice Chancellor.

\*1 Pending decision is a motion to dismiss the
amended and supplemental complaint in this action
brought by shareholders of Tri-Star Pictures, Inc.

("Tri-Star"). [FN1] In both the original complaint
which was filed on December 15, 1987, and in the
amended complaint which was filed on April 7, 1988,
plaintiffs challenge a transaction (referred to as "the
Combination") wherein Tri-Star acquired the stock
and assets comprising the Entertainment Sector of the
Coca-Cola Company, Inc. ("Coca-Cola") in exchange
for approximately 75 million shares of Tri-Star. As
a result of the Combination, Coca-Cola's stock
ownership of Tri-Star increased from approximately
37% to 80% of Tri-Star's outstanding shares.

In the amended and supplemental complaint, the
plaintiffs [FN2] attack the Combination as an act of
corporate waste. They also allege disclosure and
fraud claims under Delaware law arising out of the
proxy materials disseminated in connection with the
stockholders' meeting, held on December 15, 1987, to
vote on the Combination. The amended complaint
further challenges the validity under Delaware law of
certain amendments to Tri-Star's certificate of
incorporation approved at that meeting.

The defendants moved to dismiss the amended
complaint on the ground, *inter alia*, that the claims
alleged in that pleading were wholly derivative, and
that plaintiffs failed to comply with the requirement
of Court of Chancery Rule 23.1 that they make
demand or demonstrate its futility. In addition,
defendant Home Box Office, Inc. ("HBO") moved to
dismiss on the ground that the amended complaint
failed to state any cognizable claim against HBO.

In an Opinion dated May 5, 1989, the Court granted
HBO's dismissal motion in its entirety, and granted
the remaining defendants' dismissal motion in part.
The Court held that even if it were assumed, without
deciding, that the amended complaint alleged
derivative claims, the pleaded facts excused the
making of a demand. **\*\*957** The Court also
dismissed the claims challenging the validity of the
certificate amendments, except for the claim relating
to Article Sixth. *Siegman v. Tri-Star Pictures, Inc.*,
Del.Ch., C.A. No. 9477, Jacobs, V.C. (May 5, 1989,
revised May 30, 1989).

On June 22, 1989, the plaintiffs then moved for
partial summary judgment on the claim that Article
Sixth was invalid as a matter of law. On November
6, 1989, after the completion of briefing on the partial
summary judgment motion, Tri-Star was acquired by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)

Sony USA, Inc. ("Sony") in a merger. Pursuant to that merger, Article Sixth was eliminated from Tri-Star's certificate of incorporation. The significance of the Sony merger and of the elimination of Article Sixth are discussed elsewhere in this Opinion.

On June 6, 1989, the plaintiffs filed a motion for class certification. Later they moved to compel certain discovery from the defendants. In response, on December 1, 1989, the defendants renewed their motion to dismiss the amended complaint on December 1, 1989, on the ground (*inter alia* ) that the Tri-Star/Sony merger had eliminated the plaintiffs' standing to maintain derivative claims on behalf of Tri-Star, and that the amended complaint must be dismissed because all of the plaintiffs' claims are derivative. The defendants' renewed motion to dismiss and the plaintiffs' motion for class certification were argued on May 31, 1990. The parties agreed to submit the remaining pending motions (for partial summary judgment and to compel discovery) on the briefs.

*2 At the conclusion of oral argument, the Court announced that it would reserve decision on the renewed motion to dismiss, except for Count III which challenges the validity of Article Sixth. The Court ruled that the Article Sixth claim had been mooted because the merger had eliminated that Article from Tri-Star's certificate of incorporation. [FN3] The Court also concluded that the plaintiffs' motion for partial summary judgment to determine the invalidity of Article Sixth had likewise become moot, and therefore would not be decided. **958 The Court announced that no discovery would go forward until it had decided the renewed motion to dismiss. Finally, the Court ruled that the defendants' challenges to class certification lacked merit, but that no class could be certified until the Court determined whether the amended complaint alleges any class claim.

As a consequence of these rulings, the only motion to be decided is the defendants' renewed motion to dismiss the amended complaint. [FN4] This is the Opinion of the Court on that motion.

### I.
The question presented on this motion, which was expressly left undecided by this Court's May 5, 1989 Memorandum Opinion, is whether the claims alleged in the amended complaint are wholly derivative. That issue arises because by reason of the Sony merger, the plaintiffs are no longer shareholders of Tri-Star. It is settled Delaware law that "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit." *Lewis v. Anderson,* Del.Supr., 477 A.2d 1040, 1049 (1984); *see also Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 354 (1988). [FN5] That is because the right to maintain a corporate cause of action "is an asset of a merged corporation which passes to the corporation surviving the merger." *Lewis v. Anderson,* Del.Ch., 453 A.2d 474, 479 (1982); *aff'd,* 477 A.2d 1040 (1984). Thus, to the extent that the plaintiffs' claims are derivative, they must be dismissed because the plaintiffs, who no longer have an ownership interest in Tri-Star, have no standing to maintain those claims, and because Sony, which does own Tri-Star and is the only party which has standing, has chosen not to assert those claims.

### II.
Although the amended complaint is prolix and describes the Combination in lengthy detail, the Combination's essential features are easily summarized. Under a written agreement between Coca-Cola and Tri-Star (the "Transfer Agreement"), Tri-Star would acquire **959 all of the assets comprising Coca-Cola's Entertainment Sector, except for $300 million in cash, an intra-company receivable of $240 million, and certain real estate and other assets. [FN6] (Amended Compl., ¶ 30(c)) In exchange, Coca-Cola would receive the greater of (i) an additional 75,176,667 shares of Tri-Star common stock, or (ii) the number of Tri-Star shares that when added to the 12.7 million shares Coca-Cola owned, would equal 80% of Tri-Star's outstanding shares. In addition, Coca-Cola would receive 500,000 additional shares of Tri-Star common stock to be paid by Tri-Star. (*Id.,* ¶ 30(d). Coca-Cola was also given the right to purchase $100 million of newly created Tri-Star preferred stock, which was senior to the common stock as to dividends and liquidation preferences.

*3 As part of that transaction, on January 15, 1988, Coca-Cola paid to its own shareholders a dividend consisting of 31,400,000 of the Tri-Star shares it received in the Combination. The result was to reduce Coca-Cola's Tri-Star holdings from 80% to 49% of Tri-Star's outstanding shares.

Finally, the Transfer Agreement required Tri-Star, as part of the Combination, to effect certain amendments to its certificate of incorporation. Those amendments included (a) increasing Tri-Star's authorized common stock from 100 million to 400 million shares, and its authorized preferred stock

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
**(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)**

from 13 million to 100 million shares, (b) changing the par value of Tri-Star's common stock from ten cents per share to one cent per share, (c) classifying the Tri-Star Board of Directors into three classes, (c) eliminating the liability of Coca-Cola, HBO, and officers and directors of those companies for certain breaches of the duty of loyalty to Tri-Star, (d) eliminating the right of Tri-Star's shareholders to act by written consent, and (e) imposing certain supermajority stockholder vote requirements for certificate and by-law amendments.

At a special Tri-Star stockholders' meeting held on December 15, 1987, the shareholders approved the Transfer Agreement, including the certificate amendments. The Combination was consummated on December 17, 1987.

**960 On January 27, 1988, less than six weeks after the closing, Tri-Star was forced to make a public offering of $575 million in subordinated debentures and notes. That amount was approximately equal to the cash and receivables that Coca-Cola had extracted from the Entertainment Sector just before the Combination. (*Id.,* ¶ 37). Moreover, on March 15, 1988, Coca-Cola and Tri-Star jointly announced that Tri-Star had been forced to write down, by nearly $200 million, the book value of the assets it had just acquired from the Entertainment Sector. The result was a $105 million charge against Tri-Star's earnings for the period December 17, 1987 to February 29, 1988. Plaintiffs allege that if Coca-Cola had not delayed the $200 million writedown, the book value attributed to Coca-Cola's assets in the Transfer Agreement would have been $545 million rather than $745 million. Plaintiffs also aver that neither of these transactions was forecast in the proxy statement for the Combination; that is, the proxy statement disclosed no plans to issue over a half billion dollars of debt, or the possibility of a $200 million write down, so soon after the Combination. (*Id.*)

### III.

Of the seven Counts alleged in the amended complaint, Count III has been dismissed as moot and Count VI (alleging breach of contract) is not claimed to be other than derivative. That leaves Counts I, II, IV, V, and VII. Those Counts will be addressed in that sequence, except for Counts II and IV (the disclosure claims), which are treated last because of their peculiar difficulties.

### A. *Count I*

In Count I, plaintiffs allege that the Combination was a self dealing transaction structured by Coca-

Cola, acting in concert with HBO, to implement the transaction solely for its own benefit and contrary to the best interests of Tri-Star's public shareholders. (Am.Compl., ¶ 41-44). The structure and terms of the transaction are said to constitute "waste, gross overreaching and a constructive fraud by Coca-Cola [and HBO] on Tri-Star and its stockholders." (Id, ¶ 46). Coca-Cola is charged with breaching its duty of loyalty and obligation of entire fairness to Tri-Star and its public shareholders in the following pertinent respects:

*4 a) fixing the terms so that Coca-Cola received "excessive consideration" for the Entertainment Sector, which **961 (it is claimed) Coca-Cola wished to "unload" before losses from its operations would appear on Coca-Cola's financial statements (*Id.,* ¶ 45(a)(b));

b) utilizing an unfair method of setting the exchange ratio, and deliberately omitting to obtain any appraisal of the Entertainment Sector's assets (*Id.,* ¶ 45);

c) permitting Coca-Cola to drain off a huge portion of the Entertainment Sector's cash and financial assets immediately before the Combination, and requiring Tri-Star to pay any tax liability caused by Coca-Cola's dividend of its Tri-Star shares to Coca-Cola stockholders (*Id.*), and

d) allowing Coca-Cola to increase its equity position in Tri-Star without paying fair value, while substantially diluting the equity interest of Tri-Star's other stockholders. (*Id.*)

It is settled Delaware law that in order to determine whether a complaint states a derivative or an individual cause of action, one must look to the nature of the wrong alleged, not to the plaintiff's labels or characterizations. *Lewis v. Spencer,* Del.Supr., No. 494, 1989, Order (May 11, 1990); *Lipton v. News Int'l., Plc.,* Del.Supr. 514 A.2d 1075, 1078 (1986); *Moran v. Household Int'l. Inc.,* Del.Ch., 490 A.2d 1059, 1070, aff'd, Del.Supr., 500 A.2d 1346 (1985). A derivative claim is a wrong to an incorporated group as a whole that depletes or destroys corporate assets and, as a consequence, reduces the value of the corporation's stock. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182, 1188, n. 10 (1988).

To have standing to sue individually rather than derivatively on behalf of the corporation, a shareholder must allege more than an injury resulting

Not Reported in A.2d                                                                    Page 4
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
**(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)**

from a wrong to the corporation. *Kramer v. Western Pacific Indus. Inc.,* Del.Supr., 546 A.2d 348, 351 (1988). The plaintiff must be injured directly and independently of the corporation, *Lewis v. Spencer,* Order at 3; *Kramer,* 546 A.2d at 351, and "must allege either 'an injury separate and distinct from that suffered by other shareholders,' ... or a wrong involving a contractual right of a shareholder, such as the right to vote or to assert majority control, which exists independently of any right of the corporation." *Moran,* 490 A.2d at 1070, quoting 12B *Fletcher Cyc. Corp.* § 5921, at 452 (Perm.Ed.1984); *see also Lewis v. Spencer, supra; Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 222 (1953).

Applying these principles to Count I leads inescapably to the conclusion that it is derivative. The substance of that Count is **962 that the corporation was wrongfully caused to overpay for the assets that it received in the Combination, which was a purchase of assets for stock. Count I states a classic claim of waste for which any recovery would run solely to Tri-Star. Plaintiffs conclusorily allege damage to the shareholder class, but the claimed injury consists solely of the diminution of their shares as an indirect result of the injury to the corporation. The claim is therefore derivative. *Elster,* 100 A.2d at 222.

**\*5** In an effort to defend their characterization of Count I as a class claim, plaintiffs advance several arguments, all of them designed to show that Count I alleges more than pure waste and that Tri-Star's public stockholders suffered injury of a direct and distinct kind. As a matter of law, none of these arguments is tenable.

First, plaintiffs argue that the Combination involved more than a purchase of assets for stock. They say that that transaction also included a recapitalization that "dramatically altered" the rights of Tri-Star's common stockholders by amending the certificate of incorporation. However, the certificate amendment aspect of the Combination is not a subject of, or essential to, any claims of wrongdoing in Count I. Rather, the amendments are the subject of Count III, which has been dismissed for the reasons stated above. See pages 2 and 3 and Note 3, *supra.*

Second, plaintiffs argue that the Combination, while structured as a purchase of assets, was in effect and substance the equivalent of a merger, which is recognized as a proper subject of an individual or class action. But the Combination was a sale of assets, not a merger. As a matter of substance, the

Tri-Star shareholders retained their equity interest in the corporation. They did not exchange their Tri-Star shares for either cash or securities in connection with the Combination. The independent significance of these two distinct forms of corporate transaction is respected under our law. *Rothschild Int'l Corp. v. Liggett Group, Inc.,* Del.Supr., 474 A.2d 133, 136 (1984). The Combination as structured does not, therefore, lend itself to a claim that Tri-Star's shareholders suffered direct injury by receiving inadequate merger consideration.

Third, plaintiffs argue that the harm suffered by the class was a "direct diminution of the equity interest of the class by a Combination that correspondingly increased Coca-Cola's equity interest." (Pl.Br. 19). That, however, does not differentiate this case from any other situation involving corporate waste in a transaction between the corporation and its controlling stockholder. Allegations of self-dealing do not transform the fundamental nature of **963 the alleged injury to shareholders, which is the wrongful diminution of the corporate treasury and the consequent diminution in the value of each Tri-Star share. An injury of that kind affects equally the value of the shares held by all Tri-Star stockholders, including Coca-Cola. *Cf. Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246, 248-49 (1970); *Brook v. Acme Steel Co.,* Del.Ch., C.A. No. 10276, Chandler, V.C., Mem.Op. at 4-5 (May 11, 1989); *Rosen v. Navarre,* Del.Ch., C.A. No. 7098, Hartnett, V.C., Mem.Op. at 5 (October 29, 1985). That the plaintiffs and the public shareholders did not benefit by the alleged wrongdoing does not, in these circumstances, transform them into a separate shareholder class entitled to a recovery distinct from that to which the corporation is entitled. *Taormina v. Taormina Corp.,* Del.Ch., 78 A.2d 473, 476 (1951). The only entity that can recover for an injury to Tri-Star is Tri-Star itself. *Bokat,* 262 A.2d at 250.

**\*6** Fourth, plaintiffs assert that where, as here, it is alleged that a corporate transaction between a corporation and its fiduciary fails to meet the standard of entire fairness, that claim may be brought individually or on behalf of a class. For that *ipse dixit* plaintiffs cite no authority, and understandably so because no such rule of law exists. What gives rise to an individual or a class claim is not the nature of the fiduciary duty owed. Rather, it is the nature of the injury flowing from a violation of the duty. An attack upon the fairness of a transaction gives rise to an individual cause of action if the harm to the shareholders involves an injury to, or loss of, the shareholders' membership rights, be they financial or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 5
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)

contractual. A cash-out or exchange merger is a common example of such a transaction. See *e.g.,* *Kramer,* 546 A.2d at 351-352; *Cede,* 542 A.2d at 1188, and n. 10. No such harm is alleged in Count I of the amended complaint.

Lastly, plaintiffs contend that Count I is not derivative, because the amended complaint seeks an award of damages for the class. (Pl.Br. at 21). However, the plaintiffs are entitled to seek damages for themselves, or for a class, only if the underlying claims are not derivative. For plaintiffs to argue that Count I is not derivative because they seek damages for the class, stands logic on its head.

### B. *Count V*

Count V alleges that Coca-Cola and HBO used their control of Tri-Star and manipulated its corporate machinery to bring about a series of transactions that increased their control at the public **964 shareholders' expense. The plaintiffs argue that because that manipulation injured both the stockholders and Tri-Star, they are entitled to sue both individually and on behalf of Tri-Star's stockholders. The defendants respond that the claim is solely derivative.

In my view, Count V is derivative for the identical reasons set forth in connection with Count I. There are no averments of specific fact showing how Coca-Cola's and HBO's alleged misuse of control specially injured the plaintiffs or affected their (or the remaining stockholders') membership or contract rights. Because the plaintiffs have pled no direct injury to themselves or the class, as distinguished from injury to the corporation, Count V is derivative and must be dismissed, *See Moran,* 490 A.2d at 1070.

### C. *Count VII*

Count VII alleges that Coca-Cola conspired, aided, abetted, and knowingly participated in the above-described breaches of fiduciary duty by Tri-Star's directors. For Coca-Cola to be liable for aiding and abetting (*i.e.,* for conspiracy), Tri-Star's directors must have committed an underlying breach of fiduciary duty. *See Gilbert v. El Paso Co.,* Del.Ch., 490 A.2d 1050, 1057 (1984); *aff'd,* Del.Supr., --- A.2d ---- (May 16, 1990); *Weinberger v. Rio Grande Indus. Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Logic indicates that an aiding and abetting claim should take on the same character as the fiduciary duty claim that underlies it. Accordingly, insofar as Coca-Cola is charged with having aided and abetted Tri-Star's directors in the fiduciary duty violations alleged in Counts I, V, and VII, those conspiracy

claims are derivative and will be dismissed. However, the aiding and abetting claim that corresponds to the claims alleged in Count II will be maintainable as a class claim for the reasons next discussed.

### D. *Counts II and IV*

*7 Counts II and IV Counts are considered together, because they are grounded in alleged misdisclosures in the proxy statement furnished to the Tri-Star shareholders in connection with the December 15, 1987 stockholders' meeting. Count II alleges that the proxy statement misdisclosures constitute a breach of the defendants' fiduciary duty of candor. Count IV alleges that those disclosure violations constitute common law fraud. Count IV is the more easily disposed of, since the plaintiffs have not alleged actual reliance upon the proxy disclosures. Because reliance is an indispensable element **965 of common law fraud, *Stephenson v. Capano Development, Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983), Count IV is dismissed on that basis.

That leaves Count II. For the reasons now discussed, I reject defendants' argument that Count II is wholly derivative, but I reject also the argument that Count II, as plaintiffs broadly define it in their brief, is a class claim. The aspect of Count II that is found to be properly maintainable as a class claim is far narrower in scope than the claim as plaintiffs seek to define it.

The plaintiffs argue that the disclosure claims implicate a "membership right" of the Tri-Star shares, specifically, their right to vote on the Combination, which flowed from the requirement that shareholders approve the proposed certificate amendments. See *8 Del. C. § 242.* The plaintiffs also contend that because the fiduciary duty of candor is owed directly to stockholders, a claim for breach of that duty is necessarily maintainable individually or on behalf of a class.

The defendants respond that the plaintiffs' position is flawed, because it assumes that the derivative or individual nature of a claim flows from the nature of the duty allegedly breached, rather than from the nature of the injury allegedly sustained. What is critical, defendants urge, is the nature of the injury, which in this case was inflicted solely upon Tri-Star. Defendants emphasize that although the plaintiffs' cited disclosure cases were brought as class actions [FN7], they do not support plaintiffs' argument that a disclosure violation is inherently and invariably an individual or class claim as a matter of law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 6
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)

Defendants point out that those authorities involved a merger or tender offer where the substantive transaction itself caused the shareholders to incur an injury distinct from the corporation (*i.e.,* loss of their share membership in exchange for inadequate and unfair consideration), apart from and irrespective of any disclosure.

In short, the defendants take the position that where the alleged disclosure violation has not caused direct harm to a membership right of the shareholders, a claim to redress that violation must be brought derivatively. They argue that the disclosure claims alleged here are derivative, because (i) the underlying substantive transaction **966 that is the subject of the disclosure claim injured only Tri-Star, and (ii) even if a class claim were otherwise permissible in circumstances such as these, no class claim is maintainable here because the plaintiffs did not rely upon the disclosures complained of. In support of that latter point, the defendants cite federal decisions appearing to require reliance as a prerequisite to bringing a disclosure claim on behalf of a shareholder class.

**\*8** The solution to this question is far from obvious. Our case law has not yet addressed how properly to characterize a disclosure claim in a situation where the class representatives did not rely upon the complained of disclosures, and where the direct economic injury is solely to the corporation. Moreover, the disclosure claims here possess both derivative and class aspects. Having considered the arguments of both sides, I conclude that the disclosure claims here may be maintained as class claims, but only if their scope is considerably narrowed as described below.

To treat the disclosure claims as wholly derivative would be unsound. Those claims do implicate a membership (and in this case also a contractual) right of the shareholders, namely, their right to exercise an informed vote on the Combination. Moreover, to characterize the claims as derivative would create two anomalies. First, if the disclosure claim were truly corporate, logic suggests that the party wrongfully induced to approve the Combination would be the corporation acting in its capacity as a shareholder. Yet the claim here is that Tri-Star's shareholders were the parties improperly induced to approve the transaction. Second, if the disclosure claims were derivative, they would be subject to the demand requirement of Rule 23.1, which is rooted in business judgment rule considerations. *Aronson v. Lewis,* Del.Supr. 473 A.2d 805, 812 (1984). Yet,

that result would be inconsistent with Delaware case law holding that the business judgment rule does not apply to "... the question whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made...." *In Re Anderson, Clayton Shareholders' Litigation,* Del.Ch., 519 A.2d 669, 675 (1986).

On the other hand, to say that the disclosure claims are not wholly derivative does not mean that they are entirely class claims either. Critical to the analysis is the nature of the relief being sought. If, for example, the claims are defined as being ones for compensatory damages for the purely economic harm caused by the Combination, it is difficult to perceive how claims so defined could be other than **967 derivative. That is because the underlying compensation claim for the transaction-caused financial injury belongs to the corporation, not to the shareholders who no longer possess an economic interest in the corporation. Thus, to determine whether, in these circumstances, the disclosure claim is a class claim, a distinct inquiry must be made: to what relief, if any, would the class be entitled as a consequence of the disclosure claim?

That inquiry is what reveals the infirmities in the plaintiffs' position, because with one exception, no meaningful relief could be granted to the shareholder class in consequence of the alleged disclosure violations. Injunctive relief cannot be granted, because the Combination has been an accomplished fact for over two years. Rescission is conceded to be impracticable both for that reason and because Tri-Star is now merged into Sony. Punitive damages are not recoverable in equity, and, as earlier stated, compensatory damages to redress the economic harm occasioned by the underlying substantive transaction itself are available only to the corporation. [FN8] That leaves but one alternative: compensatory damages to the class for being deprived of their right to exercise an informed vote. That deprivation is the only identifiable harm that the amended complaint reveals was visited upon the shareholder class.

**\*9** There is precedent for awarding monetary damages to a shareholder class for being deprived of its right to cast an informed vote on a corporate transaction. *Weinberger v. UOP, Inc.,* Del.Ch., C.A. No. 5642, Brown, C. (Jan. 30, 1985). However, that decision indicates that where the harm consists solely of disclosure violations unaccompanied by any other cognizable financial injury, there is a significant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 7
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
**(Cite as: 1990 WL 82734 (Del.Ch.), 16 Del. J. Corp. L. 951)**

prospect that the damage recovery will be nominal. Such was the result in *Weinberger,* where the Court awarded damages of $1 per share. And where, as here, the underlying substantive claim is derivative (as contrasted with *Weinberger,* which involved a class claim arising out of a "cash out" merger) the measure and amount of the recovery, if any, is even more problematic.

Accordingly, Count II is an individual and class claim, but only insofar as it is defined as a claim for wrongful deprivation or loss **\*\*968** of the shareholders' right to cast an informed vote. To the extent that plaintiffs seek to define the disclosure claims more broadly to seek rescissory or other damage relief, such claims cannot be maintained, because no such broader damage or equitable relief could be awarded to the shareholder class.

\* \* \*

For the foregoing reasons, the defendants' renewed motion to dismiss will be granted as to all Counts, except as to Count II as defined above, and as to that portion of Count VII (the conspiracy claim) that corresponds to Count II. Counsel shall submit an appropriate form of order implementing these rulings.

FN1. Although Tri-Star's name was changed to Columbia Pictures Entertainment, Inc. in December, 1987, for simplicity it will be referred to as "Tri-Star."

FN2. The *Epstein* action (C.A. No. 9565) was filed in January 8, 1988, one month after the filing of the *Siegman* action. The two actions were not consolidated until August 3, 1989. Although the pre-consolidation activity was generated by plaintiff Siegman, for ease of reference, neither of the plaintiffs will be referred to separately.

FN3. The plaintiffs conceded that the Article Sixth claim was moot from the date of the merger. However, they argued that any premerger claims involving the validity of Article Sixth remained viable, both by definition and because Tri-Star's stockholders had not been permitted to vote on Article Sixth separately, but, rather, were required to vote on the amendments as a package. The Court rejected those arguments on the basis that (a) the complaint alleged no facts from which it could be concluded that any premerger claims

involving the validity of Article Sixth have or will be asserted, and (b) the fact that the shareholders were not allowed to vote separately on Article Sixth would not require a determination of, and indeed is logically unrelated to, the validity of that Article.

FN4. Except for Count III, which has been dismissed.

FN5. There are limited exceptions to that rule, but they are not applicable here, and plaintiffs do not contend otherwise. See *Lewis v. Anderson,* 477 A.2d at 1046, n. 10.

FN6. The value of the assets to be transferred would be based upon the ratio of the aggregate book value of the Entertainment Sector as of the closing, to the aggregate book value of Tri-Star. That ratio was 745 to 245, and was based upon the market value of those assets. No appraisal of those companies' assets made prior to the closing. The Transfer Agreement provided that the amount of assets to be transferred could be adjusted after the closing to satisfy the 745 to 245 ratio requirement. (Amended Compl., ¶ 19(d)).

FN7. *e.g., Smith v. Van Gorkom,* Del.Supr. 488 A.2d 858 (1985) (cash out merger); *Weinberger v. UOP, Inc,* Del.Supr., 457 A.2d 701 (1983); *Rand v. Western Airlines,* Del.Ch., C.A. No. 8632, Berger V.C., (Sept. 11, 1989) (merger) *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* Del.Ch., 532 A.2d 1324 (1987) (cash out merger), *Kahn v. United States Sugar Corp.,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) (tender offer).

FN8. Plaintiffs assert that the Court has the power to award rescissory damages or, alternatively, to direct Coca-Cola to disgorge to the class the gain that Coca-Cola is alleged to have wrongfully obtained in the Combination. However, plaintiffs cite no authority to support an award to a class for economic harm that the corporation alone sustained. The entitlement to such a recovery, in these circumstances, would belong to the corporation.

1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 8
1990 WL 82734 (Del.Ch.), Fed. Sec. L. Rep. P 95,319, 16 Del. J. Corp. L. 951
**(Cite as: 1990 WL 82734 (Del.Ch.),  16 Del. J. Corp. L. 951)**


95,319, 16 Del. J. Corp. L. 951

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Not Reported in A.2d

Page 1

1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)**

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Joseph SIEGMAN, as Custodian for Gregory
SIEGMAN and Michelle Siegman,
Plaintiff,
v.
TRI-STAR PICTURES, INC., a Delaware
Corporation, CPI Film Holdings, Inc., a
Delaware Corporation, the Coca-Cola Company, a
Delaware Corporation, Home Box
Office, Inc., a Delaware Corporation, Victor A.
Kaufman, Martin J. Fuchs, David
A. Matalon, E. Thayer Bigalow, Jr., Joseph J.
Collins, Patrick M. Williamson,
Judd A. Weinberg, Ira C. Herbert, Dan W. Lufkin,
and Francis T. Vincent, Jr.,
Defendants.
**CIV. A. No. 9477.**

Submitted: Sept. 16, 1988.
Decided: May 5, 1989.
Revised: May 30, 1989.
**\*\*223** William Prickett, Michael Hanrahan,
Elizabeth M. McGeever, and Philip B. Obbard,
Prickett, Jones, Elliott, Kristol & Schnee,
Wilmington, and Arthur T. Susman and Terry R.
Saunders, Susman, Saunders & Buehler, Chicago,
Ill., of counsel, for plaintiff.

James F. Burnett, Donald J. Wolfe, Jr., and Peter J.
Walsh, Jr., Potter Anderson & Corroon, Wilmington,
for defendant Columbia Pictures Entertainment, Inc.,
formerly Tri-Star Pictures, Inc.

Lawrence C. Ashby and Stephen E. Jenkins, Ashby,
McKelvie & Geddes, Wilmington, and Allen
Kezsbom, Debra M. Torres, Abraham Rappaport, and
Mark S. Cohen, Fried, Frank, Harris, Schriver &
Jacobson, New York City, of counsel, for defendants,
Victor A. Kaufman, David A. Matalon, Patrick M.
Williamson, Judd A. Weinberg, and Dan W. Lufkin.

Lawrence A. Hamermesh, Thomas C. Grimm, and
Leone L. Ciporin, Morris, Nichols, Arsht & Tunnell,
of Wilmington, and Frank C. Jones and L. Joseph
Loveland, King & Spalding, Atlanta, Ga., of counsel,
for defendants, The Coca-Cola Company, CPI Film

Holdings, Inc., Ira C. Herbert, and Francis T.
Vincent, Jr.

Allen M. Terrell, Jr. and Michael J. Feinstein,
Richards, Layton & Finger, Wilmington, and Robert
C. Myers and Rick Bodgan, Dewey, Ballantine,
Bushby, Palmer & Wood, of counsel, for defendants,
Home Box Office, Inc., Michael J. Fuchs, E. Thayer
Bigelow, Jr., and Joseph J. Collins.

OPINION

**\*\*224** JACOBS, Vice Chancellor.

**\*1** Plaintiff brings this action individually,
derivatively, and on behalf of a class of shareholders
of Tri-Star Pictures, Inc. ("Tri-Star"). The subject of
the complaint is a December, 1987 transaction
(referred to as "the Combination") where Tri-Star
acquired the entertainment business and related assets
(the "Entertainment Sector") of The Coca-Cola
Company ("Coca-Cola"). In exchange, Coca-Cola
received common stock and other securities of Tri-
Star. Named as defendants are Tri-Star, Coca-Cola,
CPI Film Holdings, Inc., a subsidiary of Coca-Cola
("CPI"), Home Box Office, Inc. ("HBO"), and the
directors of Tri-Star as of December 15, 1987.

The complaint was filed on December 15, 1987, and
amended on April 5, 1988. On June 7, 1988, the
defendants filed motions to dismiss for failure to
claim upon which relief can be granted pursuant to
Rule 12(b)(6) and for failure to satisfy the demand
requirements of Rule 23.1. This is the Opinion of
the Court on those motions.

*I. THE RELEVANT FACTS*

On a Rule 12(b)(6) motion to dismiss for failure to
state a claim, the movant must demonstrate with
reasonable certainty that the nonmoving party cannot
prevail and would not be entitled to the relief sought
under any set of facts that could be proven to support
his claims. *Harman v. Masoneilan Int'l, Inc.,*
Del.Supr., 442 A.2d 487, 502 (1982). All well
pleaded factual allegations (as distinguished from
legal conclusions) will be accepted as true and
deemed admitted, and all well supported inferences
will be construed in favor of the non-moving party.
*Id.; Weinberger v. UOP, Inc.,* Del.Ch., 409 A.2d
1262, 1263-1264 (1979). What follows is a
summary of the pertinent, well-pleaded facts alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

in the amended complaint.

Tri-Star was incorporated on April 8, 1985, and on June 3, 1985, it succeeded to the business of a joint venture formed in 1982 by CBS, Inc., Coca-Cola (CPI), and an affiliate of HBO. Tri-Star is principally engaged in the production, distribution, and exploitation of feature-length motion pictures and television programs. As of November 10, 1987, Tri-Star had 34,554,583 shares of common stock issued and outstanding. [FN1]

**225 Coca-Cola first became involved in the entertainment business in 1982, when it acquired Columbia Pictures Industries, Inc., the assets and operations of which became Coca-Cola's Entertainment Sector. For several years Coca-Cola was Tri-Star's largest single stockholder, owning 12,708,333 shares (36.8%) of Tri-Star's outstanding common stock.

HBO, a wholly owned subsidiary of Time Incorporated ("Time"), is engaged in programming and marketing pay-television services. HBO co-founded Tri-Star, together with Coca-Cola and CBS, Inc. From the outset, HBO has continued to have significant business relationships with Tri-Star and Coca-Cola. Before the Combination, HBO owned 3,125,000 shares (9%) of Tri-Star's common stock.

Tri-Star had two other major stockholders in addition to Coca-Cola and HBO: Technicolor, Inc. ("Technicolor"), which owned 7.2% of Tri-Star's stock, and Rank America, Inc. ("Rank"), which owned 3.6%. The combined holdings of those four shareholders was 56.6%. [FN2] The plaintiff alleges that by reason of that combined stock ownership, as well as certain contractual arrangements involving those stockholders, Coca-Cola and HBO controlled Tri-Star.

*2 The contractual arrangements among Tri-Star, Technicolor, and Rank obligated Technicolor and Rank to vote their Tri-Star shares in favor of all recommendations made by Tri-Star's board of directors. The shareholders' agreement among Coca-Cola, Tri-Star, and HBO (i) allowed Coca-Cola and HBO (as "Principal Shareholders") each to designate four nominees to Tri-Star's ten director board, (ii) required Coca-Cola and HBO to vote for each other's director nominees, (iii) gave Coca-Cola and HBO a right of first refusal if either Principal Shareholder desired to sell its Tri-Star stock, (iv) prohibited Coca-Cola and HBO from soliciting proxies in opposition to any recommendation by Tri-Star's board, or from

subjecting their Tri-Star shares to voting arrangements, such as a voting trust, and (v) prohibited Tri-Star from entering into certain transactions with a Principal Shareholder without the consent of all other Principal Shareholders.

**226 The Combination originated at a meeting in August, 1987, at which Coca-Cola's President proposed to Tri-Star's Chief Executive Officer that the two companies explore a transaction to combine Tri-Star and Coca-Cola's Entertainment Sector. Further negotiations and discussions resulted in an agreement (the "Transfer Agreement") whereby Tri-Star would acquire certain of the assets comprising Coca-Cola's Entertainment Sector. [FN3] In exchange, Coca-Cola would receive shares of newly issued Tri-Star common stock that, when added to the Tri-Star shares it already owned, would increase Coca-Cola's equity interest in Tri-Star to 80%. [FN4] Shortly thereafter, and as part of the transaction, Coca-Cola would declare a dividend to its stockholders, consisting of 31,400,000 of the approximately 75,000,000 Tri-Star shares it would receive in the Combination. As a result, the total number of Tri-Star shares that Coca-Cola beneficially owned would be reduced to approximately 49% of Tri-Star's outstanding common stock.

The Transfer Agreement also provided that Tri-Star would amend its Certificate of Incorporation and by-laws in certain respects. Those Certificate amendments were to be an integral part of the Combination presented to shareholders for their approval. An important condition for shareholder approval was that Coca-Cola would not vote its Tri-Star shares in favor of the Combination, unless a majority of the shares not owned by Coca-Cola first voted in favor.

The Combination as described was unanimously approved by the seven directors who attended the Tri-Star Board meeting held on September 30, 1987. Not attending or voting at that meeting were directors Francis T. Vincent, Jr. and Ira C. Herbert, who were both senior officers of Coca-Cola, and Martin Fuchs, who was a senior officer of HBO. Shortly thereafter, Tri-Star and Coca-Cola executed the written Transfer Agreement embodying the terms of the Combination.

**227 The Combination was submitted to Tri-Star shareholders for approval at a special stockholders meeting held on December 15, 1987. A proxy statement was sent to Tri-Star shareholders on November 24, 1987 in connection with that meeting. The Combination (including the Certificate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                           Page 3
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

amendments) was approved by the requisite number of stockholder votes at the December 15, 1987 meeting. The formal closing on the Combination occurred on January 27, 1988.

## II. *MOTION TO DISMISS THE CLAIMS AGAINST HBO*

**\*3** The first matter addressed is HBO's motion to dismiss all claims as to it. Those claims, which are found in Counts I, II, and VI, [FN5] are that (i) HBO breached its fiduciary duties to Tri-Star and its shareholders in connection with the Combination, and that (ii) HBO aided and abetted fiduciary duty breaches by Coca-Cola and Tri-Star's directors. For the reasons now discussed, neither claim alleged against HBO in the complaint is legally sufficient.

### A. *Fiduciary Duty Claims*

The fiduciary duty claims against HBO are insufficient, because the complaint, which incorporates the proxy statement by reference, [FN6] alleges no facts from which it can be inferred that HBO was a fiduciary of Tri-Star or its shareholders. For a shareholder to occupy the status of a fiduciary, it must either have majority stock control or exercise actual domination and control over the corporation's business affairs. *Aronson v. Lewis,* Del.Supr., **\*\*228**473 A.2d 805, 815 (1984); *In Re Sea-Land Corp. Shareholders Litig.,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 22, 1987) at 9-10, ("*Sea-Land I*"). As a 9% stockholder before the Combination and a 3% stockholder thereafter, HBO was manifestly not a majority stockholder. The question becomes whether it is inferable from the complaint's well pleaded allegations that HBO actually exercised domination and control over Tri-Star's directors. *In Re Sea-Land Corp. Shareholders Litig.,* Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 13, 1988), ("*Sea-Land II*"). That question must be answered in the negative.

Plaintiff argues that the actual exercise of control may be inferred from HBO's (a) participation in the negotiations leading up to the Transfer Agreement, (b) exercise of its voting power, and (c) grant of consent to the Combination. These arguments lack merit on several grounds. First, HBO had no pwoer to exercise actual board control. It had only three designees on Tri-Star's ten person board, one of whom was absent from the meeting at which the Transfer Agreement was approved. Second, factually it cannot be inferred that HBO participated in the negotiations leading up to the Transfer Agreement: the proxy statement discloses that the

negotiations were conducted solely between Tri-Star and Coca-Cola. [FN7] Third, the requirement that HBO's consent to the Combination under the Coca-Cola-HBO-Tri-Star shareholders' agreement does not, without more, create an inference that HBO dominated and controlled Tri-Star. *See Sea-Land I, supra,* at 10. Finally, HBO's voting in favor of the transaction could not constitute the actual exercise of control. Even if HBO's votes were added to those owned by Technicolor, Rank, and Tri-Star's management, 3,523,126 additional shares were still needed to reach the required affirmative vote of 10,923,126 shares (a majority of the shares not owned by Coca-Cola) for Coca-Cola to be entitled to vote its shares.

### B. *Aiding and Abetting Claims*

Alternatively, the plaintiff alleges that HBO aided and abetted breaches of fiduciary duty committed by Coca-Cola and Tri-Star directors. Those allegations also are legally insufficient.

**\*4 \*\*229** To state a claim for aiding and abetting, a plaintiff must allege (in addition to resulting damage or harm): (1) the existence of a fiduciary relationship and duty, (2) a breach of that duty, and (3) a knowing participation in that breach by defendants who are not fiduciaries. *Gilbert v. El Paso Co.,* 490 A.2d at 1057; *Weinberger v. Rio Grande Indus., Inc.,* Del.Ch., 519 A.2d 116, 131 (1986). Here, the third element, *i.e.,* "knowing participation," has not been adequately pled because the complaint alleges no facts from which knowing participation can be inferred. *See Sea-Land II, supra,* at 9; *Greenfield v. National Medical Care, Inc.,* Del.Ch., C.A. No. 7720, Berger, V.C. (June 6, 1986) at 10. It cannot be inferred that HBO or its representatives were aware of or conspired in any fiduciary breaches committed by Coca-Cola or Tri-Star's directors. HBO was not (to repeat) a party to the negotiations leading up to the Transfer Agreement. And, although three Tri-Star directors were HBO's designees, there is no particularized allegation that any of them was aware of any fiduciary duty breaches by Tri-Star's remaining directors or by Coca-Cola.

For these reasons, the plaintiff has not stated a claim against HBO upon which relief can be granted.

### III. *MOTION TO DISMISS THE CERTIFICATE AMENDMENT CLAIMS*

The defendants also move for dismissal of Count III, which seeks a judicial declaration that Articles Fifth, Sixth, and Seventh of Tri-Star's Certificate of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

Page 4

Incorporation are invalid under Delaware law. As previously stated, those amendments (the "Certificate amendments") were adopted by shareholders in connection with and as part of their approval of the Combination. The defendants argue that Count III should be dismissed in its entirety because it is not ripe for adjudication, and also because, in any event, the Certificate amendments are valid as a matter of law.

A. *Ripeness*

A critical requirement to properly invoke declaratory judgment jurisdiction is that "the issue involved in the controversy must be ripe for judicial determination." *Stroud v. Milliken Enterprises, Inc.,* Del.Supr., 552 A.2d 476, 479, (1989); *Schick, Inc. v. Amalgamated Clothing and Textile Workers Union,* Del.Ch., **230 533 A.2d 1235, 1238 (1987). [FN8] The defendants argue that Count III is not ripe for determination, because no action under the Certificate amendments is presently being taken or alleged to be imminent, and because the plaintiff does not claim that the Certificate amendments infringe any right that he presently seeks to exercise.

In determining whether a given claim is ripe for determination:

... a practical evaluation of the legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may threaten is a major concern. Other necessary considerations include the prospect of future factual development that might affect the determination to be made; the need to conserve scarce resources; and a due respect for identifiable policies of the law touching upon the subject matter of the dispute.

*5 *Schick,* 533 A.2d at 1239.* (footnote omitted).

Applying those criteria, and weighing the reasons for not rendering a hypothetical opinion against the benefits to be derived from a declaratory judgment (*Stroud, supra,* 552 A.2d at 480), I conclude that the Certificate amendment claims are clearly ripe for determination.

At issue under Count III is the facial validity of Articles Fifth, Sixth, and Seventh of the newly adopted Certificate amendments. Article Fifth confers exclusive power upon the directors to fill board vacancies and newly created directorships. That delegation of exclusive power to directors is said to be proscribed by 8 *Del.C.* § 223. Article

Sixth purports (*inter alia*) to eliminate the liability of Tri-Star's directors for breaches of fiduciary duty in specified circumstances involving the taking of corporate opportunities belonging to Tri-Star. That exemption from fiduciary liability is claimed to exceed the exemptive authority permitted by 8 *Del.C.* § 102(b)(7). **231 Article Seventh also is claimed to violate § 102(b)(7), insofar as it incorporates all future amendments to the Delaware General Corporation Law ("DGCL") that would authorize corporate action further limiting or eliminating the personal liability of directors.

Given the nature of these declaratory claims, their determination would not be affected by "future factual developments," *Schick,* 533 A.2d at 1239. Moreover, the declaratory claims implicate fundamental policies, *i.e.,* the accountability of directors to shareholders for breaches of fiduciary duty and the shareholders' inherent power to elect directors. The importance of those policies and the practicalities of the situation, counsel that the Certificate amendment claims be decided promptly.

Under Article Sixth, certain Tri-Star directors would arguably be free to engage in conduct (usurpation of a corporate opportunity) that would normally be proscribed, and that could financially harm the corporation. The very enactment of that Article creates a real (and present) possibility that such conduct would occur without prior notice to shareholders. A principal purpose of the Declaratory Judgment Act is to prevent harm before it actually occurs. [FN9] That preventive purpose would not be furthered by a delayed adjudication. Of importance also is the imperative that corporate fiduciaries be given clear notice of what conduct is and is not permitted. No beneficial purpose is served by continued uncertainty in that regard, or by the increased risk of harm occurring to the corporation because of a delayed determination of that issue. The same concerns are posed if an adjudication of the corporate governance issue posed by Article Fifth were delayed. Shareholders and directors are entitled to know which group will be empowered to fill board vacancies and newly created directorships. Where possible, that issue should be resolved before, not after, such directors are selected. To do otherwise risks disrupting the corporation's affairs as well as expensive, time-consuming litigation--a result that would run counter to the purposes of the Declaratory Judgment Act. [FN10]

*6 **232 I now turn to the disputed Certificate amendment claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

B. *The Certificate Amendments*

1. *Article Fifth*

Article Fifth, the first of the challenged Certificate amendments, pertinently states that:

... Subject to the rights of the holders of any series of Preferred Stock, and unless the Board of Directors otherwise determines, all vacancies on the Board of Directors and newly created directorships resulting from any increase in the authorized number of directors shall be filled exclusively by a majority of the directors then in office, although less than a quorum, or by a sole remaining director, and shall not be filled by the stockholders.

The plaintiff contends that exclusive power to fill board vacancies and newly created directorships cannot validly be transferred to the board. He reasons that the inherent power to elect directors is vested in the shareholders, and is made subject only to the exceptions specified in 8 *Del.C.* § 223. Those statutory exceptions, plaintiff asserts, do not authorize a wholesale abdication of the shareholders' power to the directors.

The defendants concede that the shareholders have the inherent power to elect directors to fill vacancies and newly created directorships. Their position is that nothing in the DGCL prohibits shareholders from divesting themselves of that power by means of an appropriate certificate amendment. Defendants conclude that because Article Fifth does nothing more than that, it is valid as a matter of law. I concur.

8 *Del.C.* § 102(b)(1) authorizes provisions in a certificate of incorporation "... creating, defining, *limiting* and regulating **233 *the powers of* the corporation, the directors, and *the stockholders* ... if such provisions are not contrary to the laws of this State." (emphasis added). No provision of the DGCL or case authority is cited that would prohibit shareholders from adopting a certificate amendment divesting themselves of the power to fill board vacancies and newly created directorships and vesting that power exclusively in the board. The statutory provision which bears relevantly on that subject is 8 *Del.C.* § 223(a), which reads:

(a) Unless otherwise provided in the certificate of incorporation or by-laws:

(1) vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director ...

Plaintiff argues that while § 223 does not expressly prohibit a delegation of such power exclusively to the board, § 223 compels that result implicitly, because if the legislature had intended for directors to have that power exclusively, the statute would have so provided. That argument, however, finds no support in the statute or case authority, and amounts to *ipse dixit*. The permissive language of § 223, [FN11] coupled with the more general authority of § 102(b)(1), is sufficient to authorize a certificate provision that vests exclusive power in the board to fill board vacancies and newly created directorships. *See also Campbell v. Loew's, Inc.,* Del.Ch., 134 A.2d 852, 857 (1957) (where this Court observed that although § 223 did not specifically address whether stockholders could divest themselves of the power to fill newly created directorships, that result could be attained by appropriate "strong by-law language"). [FN12]

*7 **234 The plaintiff's challenge to the validity of Article Fifth is found to be without legal merit.

2. *Article Sixth*

The plaintiff next challenges Article Sixth which, because of its length and complexity, must be described here in summary form. [FN13] Article Sixth contains three sections. Section A recites the Article's purposes, including:

... *to regulate and define the* conduct of certain affairs of [Tri-Star] as they may involve [Coca-Cola and Time] and their respective officers and directors, *and the powers, rights, duties and liabilities of [Tri-Star] and its* officers, *directors* and stockholders in connection therewith. (emphasis added).

Section B, broadly speaking, describes circumstances where Coca-Cola and Time, in their capacity as Tri-Star shareholders, will not be deemed liable to Tri-Star or its stockholders for breach of fiduciary duty as a result of having engaged in the same line of business as Tri-Star or having pursued a corporate opportunity belonging to Tri-Star.

Finally, Section C specifies, (*inter alia*) circumstances where a Tri-Star director who is also a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 6
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)**

director of Coca-Cola or Time will not be deemed liable for breach of fiduciary duty to Tri-Star or its shareholders. Those circumstances generally include cases where Coca-Cola or Time acquires a corporate opportunity that would belong, but is not made available, to Tri-Star.

Plaintiff contends that Article Sixth is invalid as a matter of law, because it eliminates or restricts the directors' liability to the corporation or its shareholders for breaches of their fiduciary duty of loyalty, in violation of 8 *Del.C.* § 102(b)(7). The defendants respond that Article Sixth does not purport to exonerate the Tri-Star directors from liability for breaching their fiduciary duty of loyalty. All Article Sixth does, defendants say, is define "those areas of business opportunity in which the corporation does and does not have an interest," and "those situations in which Tri-Star directors receiving an offer of a corporate opportunity will be deemed to have received such an [offer] in his capacity as a Tri-Star director." (Def. Reply Br. p. 45). I cannot agree.

**\*\*235** As previously indicated, a motion to dismiss under Rule 12(b)(6) will not be granted unless it appears to a certainty that under no state of facts would the plaintiff be entitled to relief. *Harman v. Masoneilan Int'l, Inc.,* 442 A.2d at 502-503. That standard, as applied in this somewhat unique context, requires that the motion must be denied if under any plausible construction or operation, Article Sixth arguably would contravene 8 *Del.C.* § 102(b)(7).

§ 102(b)(7) explicitly authorizes a provision in the certificate of incorporation "... eliminating or limiting the personal liability of a director to the corporation to its stockholders for monetary damages for breach of fiduciary duty as a director ..." But that statute also admonishes that any such certificate provision

**\*8** ... shall not eliminate or limit the liability of a director (i) for any breach of the directors' duty of loyalty to the corporation or its stockholders....

The question is whether under at least one plausible state of facts, Article Sixth would arguably operate to eliminate or limit the directors' liability for breach of their duty of loyalty to Tri-Star or its shareholders. I conclude that it would.

Section C of Article Sixth concerns Tri-Star directors who are also directors of Coca-Cola or Time and who learn of a transaction that would be a potential corporate opportunity both for Tri-Star and

Coca-Cola or Time. Section C provides that if the opportunity is acquired by Coca-Cola or Time, or is not directed to Tri-Star, the Tri-Star director "shall not be liable to Tri-Star or its stockholders for breach of any fiduciary duty," so long as he acts in a manner consistent with the policies specified in subsections (i) through (iii). Subsection (ii) relevantly states that:

> ... a corporate opportunity offered to any person who is a director but not an officer of [Tri-Star], and who is also a director or officer of [Coca-Cola or Time] shall belong to [Tri-Star] if such opportunity is expressly offered to such person in writing solely in his or her capacity as a director of [Tri-Star], and otherwise shall belong to [Coca-Cola or Time], respectively ...

Under this intricately drafted provision, a case could possibly arise where a Tri-Star director who is also a director of Coca-Cola or Time (a) learns of a corporate opportunity that should otherwise be directed to Tri-Star, (b) causes that opportunity to be offered to himself, but not "in writing," (c) alternatively, causes the opportunity **\*\*236** to be offered to himself in writing but not "solely in his ... capacity as a [Tri-Star] director," and then (d) directs the opportunity to Coca-Cola or Time but not to Tri-Star. By negative implication, under Article Sixth that director would not be liable to Tri-Star or its shareholders "for breach of *any* fiduciary duty" arising out of that conduct.

Thus, at least one scenario (and perhaps others) could plausibly be constructed where Article Sixth would eliminate or limit the liability of Tri-Star directors for breach of their fiduciary duty of loyalty--a result proscribed by § 102(b)(7). That possibility alone is sufficient to warrant the denial of defendants' motion to dismiss. In this narrow procedural setting the Court need go no further. Any more comprehensive or definitive declaration of the validity of Article Sixth must await a later procedural stage where the merits may be explored in greater depth than was done here.

*3. Article Seventh*

Finally, plaintiff challenges the validity of a portion of Article Seventh. That Article, in full text, reads as follows:

> A director of the Corporation shall not be personally liable to [Tri-Star] or its stockholders for monetary damages for breach of fiduciary duty as a director,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

except for liability (i) for any breach of the director's duty of loyalty to [Tri-Star] or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived any improper personal benefit. *If the Delaware General Corporation Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of [Tri-Star] shall be eliminated or limited to the fullest extent permitted by the Delaware General Corporation Law, as so amended.* Any repeal or modification of this Article SEVENTH by the stockholders of [Tri-Star] shall not adversely affect any right or protection of a director of [Tri-Star] existing at the time of such repeal or modification.

**\*9** The plaintiff contends that the underscored language runs afoul of 8 *Del.C.* § 102(b)(7), because that statute "does not authorize an open ended and non-specific limitation or liability based **\*\*237** upon whatever additional authority the DGCL may confer at some unspecified point in the future." (Pl.Br., p. 64). Plaintiff further argues that Article Seventh is inconsistent with Article Eleventh, which requires a two thirds vote to amend the restated Certificate.

Plaintiff's position is not supported by § 102(b)(7) or any other authority cited to the Court. Neither the statute or its underlying policy forbids a corporation from exempting its directors from liability as may be authorized by future amendatory legislative enactments. Nor has plaintiff established a conflict between Article Seventh and Article Eleventh, which requires a two thirds vote for amendment. Under Article Seventh, the authority permitting the corporation automatically to take advantage of future amendments to the DGCL is itself a part of the restated Certificate. Should the shareholders desire to amend that provision (or even to repeal Article Seventh), the two thirds vote requirement would apply.

Accordingly, the plaintiff has failed to demonstrate any plausible application or operation of Article Seventh that would contravene the DGCL or other provision of Delaware law.

## IV. *MOTION TO DISMISS UNDER RULE 23.1*
Finally, the defendants have moved to dismiss the complaint pursuant to Chancery Court Rule 23.1. The basis for the motion is that because certain claims alleged in the amended complaint are

derivative, they are subject to dismissal for failure to make a demand upon the directors or to allege facts demonstrating why no demand was required. The plaintiff responds that the claims are not derivative and that, in any event, no demand was required in these circumstances.

These colliding positions frame two issues: (a) whether one or more of the plaintiff's claims is derivative in character, and (b) if so, whether the complaint adequately establishes that no demand was required under Delaware law. Those issues have engendered dozens of pages of learned debate in the briefs, devoted to such intricate and subtle questions as the derivative status of each of the seven counts in the complaint, and the merits of the plaintiff's multitudinous reasons why demand is excused. Having considered all these arguments, the Court has concluded, with gratitude, that the motion can be decided on narrow grounds, thereby avoiding further imposition upon the already prolific literature in this abstract and highly conceptual area of the law. Even assuming without deciding that the complaint alleges derivative claims, the facts pleaded here excuse the making of a demand.

**\*\*238** Any derivative claims in the complaint are subject to Chancery Court Rule 23.1, which pertinently requires the plaintiff:

... [to] allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

**\*10** The plaintiff admits that he made no demand. He contends that no demand was required. The burden of satisfying the requirements for demand excusal rests upon the plaintiff. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988). To satisfy those requirements on this motion, the particularized allegations of the complaint must create a reasonable doubt as to (i) the directors' disinterest or independence, or (ii) whether the directors exercised proper business judgment in approving the challenged transaction. *Grobow,* 539 A.2d at 186; *Aronson,* 473 A.2d at 812. The disinterestedness and independence of the board are determined as of the time the complaint was filed. *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 624 (1984). In this case no full-blown *Aronson* analysis is required, because the motion is determinable on the basis of director disinterestedness.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

Page 8

The entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. *Aronson, 473 A.2d at 812.* As the Supreme Court held in *Aronson,* the protection of the business judgment rule can only be claimed "by disinterested directors whose conduct otherwise meets the tests of business judgment." *Id.* The *Aronson* Court also stated:

... From the standpoint of interest, this means that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally. *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971); *Cheff v. Mathes,* Del.Supr., 199 A.2d 548, 554 (1964); *David J. Greene & Co. v. Dunhill International, Inc.,* Del.Ch., 249 A.2d 427, 430 (1968). *See also,* 8 Del.C. § 144. Thus, if such director interest is present, and the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application whatever in determining demand futility. *See* 8 Del.C. § 144(a)(1).

**\*\*239** *Id.*

The Tri-Star board, at the time it approved the Combination (September 30, 1987) and at the time this action was filed (December 15, 1987), consisted of ten directors. Thus, for that board to be capable of functioning properly (*i.e.,* impartially) in considering a demand, six of those directors (a majority) must have been free of any disabling conflict of interest. The question is whether the particularized factual allegations of the complaint create a reasonable doubt that a majority of Tri-Star directors were disinterested. In my opinion, two circumstances create such a reasonable doubt.

The first is the fact that three of Tri-Star's directors, Messrs. Ira C. Herbert, Francis T. Vincent, Jr., and Patrick M. Williamson, were senior executives of either Coca-Cola or (in the case of Mr. Williamson) a Coca-Cola affiliate. Those relationships would cause one reasonably to question whether these directors were economically motivated to favor the interests of their employer, Coca-Cola, in considering a shareholder demand. That is because any such demand would be that the board take remedial action that could be adverse to Coca-Cola's interests. As persons arguably beholden to Coca-Cola, those Tri-Star directors would have been on both sides of a transaction where the interests of Tri-Star and Coca-

Cola were in conflict. [FN14] *See Aronson, supra; Weinberger v. UOP, Inc.,* 457 A.2d at 710. Hence, those directors would have "divided loyalties" that would negate the presumption of disinterest that normally would protect their decision. *Pogostin,* 480 A.2d at 624.

**\*11** There is a second, independent circumstance that creates a reasonable doubt as to the disinterestedness of Messrs. Herbert, Vincent, and Williamson, as well as three other Tri-Star directors, Judd A. Weinberg, Dan W. Lufkin, and David A. Matalon. These six directors owned substantial shares of Coca-Cola. As Coca-Cola stockholders, they would be receiving a *pro rata* share of the special (31,400,000 Tri-Star share) dividend that Coca-Cola would pay to **\*\*240** its stockholders as part of the Combination. In that manner, those six directors stood to gain a personal financial benefit from the challenged transaction that would not be equally shared by Tri-Star's other stockholders. *Aronson,* 473 A.2d at 812; *Pogostin,* 480 A.2d at 624. On that basis, the complaint creates a reasonable doubt as to the ability of a majority of the board to consider impartially a demand.

In response, the defendants have interposed an array of arguments, all aimed towards their proffered conclusion that the special dividend did not create a disabling financial conflict of interest in these six recipients. The defendants argue that (i) Messrs. Williamson, Herbert, and Vincent owned only a *de minimis* equity interest in Coca-Cola, and directors Weinberg, Lufkin, and Matalon owned a proportionately greater equity interest in Tri-Star than in Coca-Cola; [FN15] (ii) the dividend did not add to those directors' personal wealth, because it did not increase the value of their Coca-Cola shares but "... merely redistributed assets between Coca-Cola and its shareholders," (Def. Reply Br., p. 34) and that therefore (iii) "... any injury allegedly suffered by Tri-Star as a result of the Combination allegedly affected recipients of the [dividend] as much as it allegedly affected plaintiff." *Id.*

These arguments labor under two infirmities. The first is that for the defendants' position to prevail, the Court must conclude as a matter of law that the dividend could not have increased the personal wealth of these six directors, and therefore could not have constituted a financial inducement capable of creating a conflict of interest. However, on this record such a legal conclusion would be pure *ipse dixit.* The defendants' proposition is not conceded by the complaint, nor is it compelled by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 9
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
(Cite as: 1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218)

complaint's particularized factual allegations.

That leads to the second, and conceptually more significant, infirmity, which is that at this procedural stage the defendants' arguments miss the mark. In reality they are affirmative evidentiary **241 contentions going to the merits of the entire "director disinterest" issue. As such they are inappropriate on a motion to dismiss the complaint under Rule 23.1. In this limited procedural context, the question is not whether the dividend was, as a matter of adjudicated fact, an inducement sufficient to impair these directors' impartiality in considering a demand. Rather, it is simply whether there is a *reasonable doubt,* based solely upon the particularized allegations of the complaint, that the board was disinterested. If such a reasonable doubt is found, that finding would authorize further exploration of that and other issues (including the merits of the derivative claim itself), by allowing the case to go forward into the discovery stage.

*12 It follows that on a Rule 23.1 motion to dismiss, a finding that a reasonable doubt exists as to the directors' disinterest in the challenged transaction, has very limited significance. Such a tentative conclusion is not, nor could it represent, an adjudication that a majority of Tri-Star's directors were, in fact, interested in the challenged transaction because of the anticipated dividend. Indeed, and in fact, the opposite may be true. However, any such determination must be made at a later procedural stage, after the parties have been afforded an opportunity to develop a proper evidentiary record and to present their affirmative factual arguments on both sides of the question. [FN16] It is at that later stage that arguments of the kind defendants advance here will be entertained and appropriately weighed.

* * *

For the above reasons, I conclude that the plaintiff has alleged facts that excuse his failure to make a demand.

## V. CONCLUSION

To summarize the rulings made herein: (1) HBO's motion to dismiss pursuant to Rule 12(b)(6) is granted; (2) the defendants' motion to dismiss Count III pursuant to Rule 12(b)(6) is granted with respect to Articles Fifth and Seventh of the Restated Certificate of Incorporation, and is denied with respect to Article Sixth; and **242 (3) the defendants' motion to dismiss pursuant to Rule 23.1 is denied. IT IS SO ORDERED.

FN1. Following the Combination, Tri-Star's name was changed to Columbia Pictures Entertainment, Inc., but for purposes of clarity, it will be referred to as "Tri-Star."

FN2. Broken down as follows: Coca-Cola (36.8%), HBO (9%), Technicolor (7.2%), and Rank (3.6%).

FN3. Most, but not all, of the assets of the Entertainment Sector would be transferred to Tri-Star. Carved out of the transaction was a dividend that Coca-Cola declared to itself from the Entertainment Sector's assets, consisting of $300 million in cash plus an inter-company receivable of $240 million. Coca-Cola elected also to retain the stock of certain real estate companies, as well as certain real estate and data processing assets that were also part of the Entertainment Sector.

FN4. Coca-Cola would also (i) receive an additional 500,000 shares of Tri-Star common stock, (ii) the right to purchase $100 million of a newly created Tri-Star Preferred stock that was superior to the common stock as to dividends and liquidation rights.

FN5. The remaining Counts either do not allege a claim against HBO or do so in a facially invalid manner. Count III challenges the validity of the amendments to Tri-Star's Certificate of Incorporation, but does not charge HBO with culpability or seek relief against HBO. Count IV challenges certain disclosures made in the proxy statement, but its allegations do not fairly charge HBO with culpability therefor. Count V alleges that Coca-Cola and HBO manipulated Tri-Star's corporate machinery to the detriment of the public stockholders. However, the complaint does not specify what role HBO played in the alleged manipulation. Moreover, HBO was not a party to the Transfer Agreement, and the proxy statement clearly discloses that as a result of the Combination, HBO lost its right to nominate directors to the Tri-Star Board and to withhold its consent to certain transactions involving Tri-Star. Finally, HBO's ownership percentage declined from 9% to 3% of Tri-Star's outstanding shares. For those reasons, HBO's motion to dismiss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Counts III, IV, and V as to it, is granted.

FN6. *Lewis v. Straetz*, Del.Ch., C.A. No. 7859, Hartnett, V.C. (February 12, 1986).

FN7. Even if HBO's representatives had participated in those negotiations, plaintiff cites not authority that would equate that participation with the actual exercise of board control. *See Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050, 1055 (1984).

FN8. Ripeness is one of four prerequisites for invoking declaratory relief:
[The action] ... (1) ... must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between the parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.
*Stroud v. Milliken Enterprises, Inc.*, 552 A.2d at 479-480, quoting *Rollins Int'l Hydronics Corp.*, Del.Supr., 303 A.2d 660 (1973).

FN9. *Hampson v. State*, Del.Supr., 233 A.2d 155 (1967); *Clemente v. Greyhound Corp.*, Del.Super., 155 A.2d 316 (1959).

FN10. A similar "ripeness" argument was made and rejected in *Moran v. Household Int'l, Inc.*, Del.Ch., 490 A.2d 1059, 1072 (1985), *aff'd*, Del.Supr., 500 A.2d 1346 (1985). *Moran* involved a claim for a declaration that a "poison pill" rights plan, adopted as a preventive antitakeover measure (and not in the context of any specific hostile bid), was invalid under Delaware law. The defendants argued that the declaratory claims were not ripe because no event had occurred that would trigger the Rights Plan. In language applicable to this case, this Court held that the declaratory action had not been:
... instituted to resolve the future effect of contingent events. [Here] the plaintiffs ... are seeking a declaration that the Rights Plan, because of its deterrent features, presently affects shareholders' fundamental rights and is illegal under Delaware Law.

*Moran,* 490 A.2d at 1072.

FN11. § 223(a) provides that vacancies and newly created directorships "... *may* be filled by a majority of directors then in office ... or by a sole remaining director ..." (emphasis added).

FN12. In his Report to the 1967 Corporation Law Revision Committee, Professor Ernest L. Folk, III suggested that § 223 "could be clarified" to make it explicit that the shareholders' inherent power to fill board vacancies and newly created directorships can be vested in the board. Plaintiff asserts that the General Assembly's reenactment of § 223 without any such clarifying language means that that body did not intend to permit shareholders to divest themselves of that power. That argument also finds no support in legal precedent or rule of statutory construction of which this Court is aware.

FN13. The full text of Article Sixth is attached as an addendum to this Opinion.

FN14. In a similar vein, plaintiff argues that prior employment relationships of directors Kaufman, Matalon and Lufkin with Coca-Cola also created a disabling conflict. Those three persons were officers or directors of Columbia Pictures or its affiliates before Coca-Cola acquired Columbia Pictures in 1982. All three left Columbia Pictures shortly thereafter. At the time the Combination was approved in December, 1987, those directors were no longer officers or directors of any Coca-Cola subsidiary or affiliate. Plaintiff advances no cogent reason, and cites no authority, for his position that these past associations create a reasonable doubt as to the disinterest of Messrs. Kaufman, Matalon, and Lufkin.

FN15. While in no way essential to this Court's ruling, it should be noted that the proxy statement discloses other facts that, in an evidentiary hearing, would arguably detract from the force of defendants' statement that these directors' holdings in Coca-Cola were *de minimis*. Although that is correct from a control standpoint, those directors' Coca-Cola shares did represent a substantial investment. With the exception of Mr. Lufkin, the dollar value of those

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218
**(Cite as: 1989 WL 48746 (Del.Ch.),  15 Del. J. Corp. L. 218)**

directors' investment in Coca-Cola exceeded the value of their investment in Tri-Star. *See* Proxy Statement, pp. 41, 86-87, 96 and F-42.

FN16. For example, the defendants' arguments in support of their position that the dividend could not have caused the Tri-Star directors to have a conflict of interest, could be presented on a motion for summary judgment pursuant to Rules 23.1 and 56. On such a motion the parties would be entitled to develop an evidentiary record in affidavit or other appropriate form.

1989 WL 48746 (Del.Ch.), 15 Del. J. Corp. L. 218

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.