IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANK D. SEINFELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 05-298-JJF |
| | ) | |
| CRAIG R. BARRETT, CHARLENE | ) | |
| BARSHEFSKY, E. JOHN P. BROWNE, | ) | |
| D. JAMES GUZY, REED E. HUNDT, | ) | **PUBLIC VERSION** |
| PAUL S. OTELLINI, DAVID S. POTTRUCK, | ) | |
| JANE E. SHAW, JOHN L. THORNTON, | ) | |
| DAVID B. YOFFIE, ANREW S. GROVE, | ) | |
| and INTEL CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF KEVIN J. MURPHY
IN SUPPORT OF DEFENDANTS' OPPOSITION
TO MOTION FOR SUMMARY JUDGMENT**

OF COUNSEL:

Michael D. Torpey
James N. Kramer
Susan D. Resley
Kenneth P. Herzinger
Erin L. Bansal
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, California 94105
(415) 773-5700

Dated: July 25, 2005
Public Version dated: August 1, 2005

POTTER ANDERSON & CORROON LLP
Stephen C. Norman (#2686)
Brian C. Ralston (#3770)
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899
(302) 984-6000
E-mail: snorman@potteranderson.com
E-mail: bralston@potteranderson.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRANK D. SEINFELD,<br><br>                Plaintiff,<br><br>    vs.<br><br>CRAIG R. BARRETT, CHARLENE BARSHEFSKY, E. JOHN P. BROWNE, D. JAMES GUZY, REED E. HUNDT, PAUL S. OTELLINI, DAVID S. POTTRUCK, JANE E. SHAW, JOHN L. THORNTON, DAVID B. YOFFIE, ANDREW S. GROVE, and INTEL CORPORATION,<br><br>                Defendants. | Case No.: 05-298 (JJF)<br><br>FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER<br><br>Jury Trial Demanded |

## DECLARATION OF PROFESSOR KEVIN J. MURPHY IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I, Kevin J. Murphy, declare as follows:

1. I have personal knowledge of the facts stated in this declaration, except where such facts are stated to be based on information and belief and those facts I believe to be true. If called as a witness, I could and would testify competently to those facts.

### Background

2. I am currently the Vice Dean of Faculty and Academic Affairs at the University of Southern California Marshall School of Business, where I hold the E. Morgan Stanley Chair in Business Administration. I have been a full professor of the Department of Finance and Business Economics at the USC Marshall School since 1995. In addition, I hold joint appointments in the USC School of Law (as Professor of Business and Law) and in the USC College of Letters, Arts, and Sciences (as Professor of Economics). From 1991 to 1995, I was an

Associate Professor of Business Administration at the Harvard Business School, and from 1983 to 1991, I was an Assistant and Associate Professor at the University of Rochester's William E. Simon Graduate School of Business Administration.

3. I received a Ph.D. in Economics from the University of Chicago in 1984, where my honors included a National Science Foundation Fellowship, Milton Friedman Fund Fellowship, and a Social Science Foundation Dissertation Fellowship. I also have an M.A. in Economics from the University of Chicago, and a B.A. degree (summa cum laude) from the University of California, Los Angeles. I am a member of Phi Beta Kappa, the American Economic Association, and the American Finance Association. I am an associate editor of the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Journal of Corporate Finance* and *Managerial and Decision Economics*, and serve as referee to over thirty professional and academic journals. I am the former chairman of the Academic Research Committee of the American Compensation Association. Attached as Exhibit A is a true and correct copy of my resume.

4. I have written and published on issues related to executive compensation. During 1992 and 1993, I conducted annual surveys of executive compensation practices in the 1,000 largest U.S. corporations. The surveys, sponsored by the United Shareholders' Association, were used extensively by institutional investors and large shareholders in evaluating and comparing the effectiveness of compensation policies. I also advised the SEC in formulating their 1992 disclosure rules for top management pay, and was a prominent member of the 1992 and 2003 National Association of Corporate Directors' Blue Ribbon Commissions on Executive Compensation, which issued reports calling for the overhaul of CEO pay practices. I have written more than forty articles, cases, or book chapters relating to compensation and incentives in organizations. Results from my research on executive compensation have been widely cited in the press (including the *Wall Street Journal, New York Times, Washington Post, Los Angeles*

*Times*, *Chicago Tribune*, *USA Today*, *Economist*, *Fortune*, *Forbes*, *Business Week*, and *Time*) and on national television (including CNN and CBS news). I have given speeches and presentations on compensation and incentives to a variety of academic and practitioner audiences, including the Conference Board, the American Compensation Association, and the Board of Governors of the Federal Reserve.

5. My university teaching encompasses a wide variety of courses at the undergraduate, MBA, Ph.D., and executive levels. At USC, I have taught undergraduate, MBA, and Ph.D. courses in corporate finance and have developed and taught MBA courses on compensation, incentives, and corporate governance. At Harvard, I taught courses on compensation and incentives in organizations, human resource management, and on the coordination, control, and management of organizations. At Rochester, I taught MBA, Ph.D. and executive courses in microeconomics, pricing policies, organizational theory, and developed and taught a course focusing on compensation for top-level managers.

6. I have consulted with organizations and conducted research on compensation and incentives in professional partnerships and corporations. I have consulted with, or given speeches to, top managers and compensation committees at several large corporations, including IBM, AT&T, Merck, Bristol-Myers-Squibb, Genzyme, Proctor & Gamble, Philip Morris, General Motors, Prudential, and Chubb. I spent the 1994-1995 academic year on leave from Harvard as the Visiting Scholar and Consultant at Towers Perrin, a major benefits and compensation consulting firm, where my activities included making formal presentations and leading informal roundtable discussions on executive compensation to clients nationwide, as well as being involved in a variety of consulting engagements.

7. In the course of preparing this declaration, I have relied on the following documents: Intel's Proxy Statements from 1994-2005 (filed 3/22/1994, 3/14/1995, 4/4/1996, 4/7/1997, 4/6/1998, 4/6/1999, 4/12/2000, 4/11/2001, 4/10/2002, 4/2/2003, 3/31/2004, and

-3-

3/29/2005); minutes and attachments for the Intel Compensation Committee meetings on January 21, 2004 and February 2, 2005; summary plan documents for the broad-based Intel Employee Bonus Plan ("EB"); and Gabrielle Thompson's "Declaration in Support of Defendants' Opposition to Motion for Summary Judgment."

### Providing Cash Incentive Opportunities is Critical for Intel's Success

8. As described in Intel's 2005 Definitive Proxy Statement ("Proxy Statement"), p. 15, "Intel's general compensation philosophy is that total cash compensation should vary with Intel's performance in achieving financial and non-financial objectives, and that any long-term incentive compensation should be closely aligned with the stockholders' interests." Intel implements this philosophy by providing cash compensation through below-market base salaries coupled with above-market cash incentive opportunities based on Intel's operating profits or net income. Longer-term incentives are provided through stock options.

9. Most publicly traded corporations offer an annual cash incentive plan covering their top executives and providing annual cash payments based on a single-year's performance. While companies use a variety of financial and non-financial performance measures in their plans, many companies rely on some measure of net income or operating profits. These plans are routinely used in conjunction with equity-based plans that provide longer-term payouts based on changes in company stock prices. Intel's reliance on a combination of short-term and longer-term incentive plans is consistent with best practices in compensation design. Intel's strategy of coupling lower-than-market base salaries with higher-than-market bonus opportunities is in the interest of Intel shareholders.

10. Providing cash incentive opportunities is a competitive necessity. In order to attract and retain executive talent, Intel must provide total cash compensation opportunities that are competitive relative to other companies in the labor market. Given Intel's below-market base

salaries, providing such opportunities is critical to Intel's ability to attract, retain, and motivate its executives.

11. Annual incentive plans based on accounting performance have several advantages over longer-term plans based on movements in company stock prices. A basic tenet of compensation design is that individuals should be rewarded based on performance measures they understand and that they can affect. Stock prices are influenced by a wide array of market forces outside of management control, and it is therefore often difficult for managers to understand how their actions influence these prices. In contrast, managers can better understand how their actions affect operating results, and incentive plans based on these results help focus managers on critical day-to-day operating performance.

12. Moreover, the rewards from equity-plans are often variable and only convertible into cash when the executives sell the underlying shares. The market often reacts poorly to stock sales by executive officers. Providing cash opportunities through its annual bonus plan mitigates the needs of executives to sell shares in order to access cash, and is therefore in the interest of shareholders.

### Intel's EOIP is a Well-Designed Pay-for-Performance Plan

13. Intel's compensation philosophy is to provide competitive total cash compensation by coupling below-market base salaries with above-market cash incentive opportunities. In my view, Intel's Executive Officer Incentive Plan ("EOIP") and base salary structure is consistent with its articulated philosophy. Moreover, the EOIP is a pay-for-performance plan, providing highly variable payouts tied directly to the company's operating performance.

14. Under the terms of the EOIP, cash incentive payouts (before discretionary downward adjustments by the Compensation Committee) are determined by the formula:

$$\text{Maximum Payout} = \binom{\text{Baseline}}{\text{Incentive}} \times \binom{\text{Performance}}{\text{Factor}} \times \binom{\text{Earnings}}{\text{per Share}}$$

where "Earnings" is the maximum of operating income or net income, after certain adjustments made by the Compensation Committee in compliance with IRS regulations. By the nature of this formula, each penny change in earnings per share ("EPS") will have a direct and multiplicative impact on the incentive calculation.

15. To illustrate the sensitivity of the EOIP to performance, consider the 2004 incentive calculation for Intel's Chief Executive Officer in 2004, Craig Barrett. Mr. Barrett's "Baseline Incentive" was equal to his base salary of $610,000 and the 2004 performance factor was 2.98.

**REDACTED**

16. Intel's 2005 Proxy Statement (p. 39) provides evidence of the sensitivity of cash compensation to performance under the EOIP: "In 2001, our EPS declined 87%, and, as we intended, the average total cash compensation of our top five most highly compensated executives declined by 51%." Cash compensation includes not only EOIP payouts but also base salaries and other pay not tied to EPS performance. (Indeed, the EOIP by design will produce 87% declines in maximum cash incentives when earnings--in this case operating earnings--decline by 87%.) Therefore, the fact that total cash compensation fell in half following the 87% decline in EPS is evidence that cash compensation is tightly linked to Intel's financial performance.

17. In the course of my research and consulting activities, I have analyzed and/or designed hundreds of annual incentive plans. There is no "perfect" plan and plans are rarely exactly alike. However, the critical elements of Intel's EOIP are well within "best practices" for incentive design. First, from an incentive standpoint, it is appropriate that Intel's plan has a very

high "cap" ($5,000,000) and a fairly low "floor" (EOIP payouts are zero only if earnings are negative). Second, it is apparent from the Proxy Statements, including the Compensation Committee Report, that the committee exercises care and diligence in setting the "Performance Factor." Third, the EOIP allows executives to calculate throughout the year how their actions will affect their ultimate incentive payment. Fourth, the EOIP provides "retention incentives" by requiring executives to be employed by Intel on the last day of the year in order to be eligible for incentive payouts.

18. Most importantly, performance measures in annual plans should be directly affected by managerial actions and devoid of factors outside of management control, including uncontrollable unanticipated events that arise over the course of the year. The EPS component of Intel's EOIP is designed to adjust for such factors, including (at the Compensation Committee's discretion): asset write-downs; litigation; claim judgments, settlements or tax settlements; the effects of tax law changes, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; gains or losses on investments; acquisition-related costs; and any extraordinary non-recurring items. Making such adjustments is consistent with best practices in compensation design. To do otherwise would effectively be changing "the rules of the game" for the executives participating in the plan.

19. Under the terms of the EOIP, and consistent with IRS regulations, the Compensation Committee can exercise discretion to reduce (but not increase) the payments prescribed by the EOIP formula.

**REDACTED**

-7-

**REDACTED**

### The Material Details of the EOIP are Disclosed in Intel's Proxy Statements

20. In my opinion, the material terms of the EOIP are fully disclosed in the proxy statement. First, Intel's 2005 proxy statement (the "Proxy") discloses that EOIP participation is limited to the company's 14 executive officers. Second, the proxy discusses the bonus formula and the calculation of EPS, and even (beyond that required by regulation) discloses the Performance Factor and EPS used to determine prior-year bonuses. Finally, the EOIP articulates that $5,000,000 is the maximum amount that can be paid to any individual under the plan.

21. In the course of my research and consulting over the past twenty-five years, I have read descriptions of bonus plans in thousands of corporate proxy statements. It is my opinion that Intel is forthcoming relative to most companies in disclosing the details of its incentive plans. For example, while under 26 C.F.R. §162-27(e)(4)(vi) the material terms need only be disclosed when they are changed by the Compensation Committee, it is the practice of Intel to fully disclose the details of the EOIP each year. Also, while 26 C.F.R. §162-27(e)(4)(iii)(A) explains that disclosure "need not include the specific targets that must be achieved under the performance goal," it is the practice of Intel to disclose the Performance Factor used to determine prior-year bonuses. In addition, Intel provides a chart showing the

-8-

DOCSSFI:825907.1
5545-2002 S2R

relation between cash compensation and EPS performance over the prior seven years. This chart is not required by either the Treasury Regulations or the Securities and Exchange Commission, but supports the conclusion that the EOIP is a performance-based plan in the interest of Intel shareholders.

22. In my opinion and experience, shareholders are primarily interested in whether an incentive plan aligns the interests of executives with those of shareholders, and not whether the amounts paid under the plan are deductible. Shareholders are interested in the performance measures in the plan, the sensitivity of payouts to changes in these performance measures, and how much executives might receive based on the plan. Shareholders are interested in the overall design of the plan, and unintended consequences that can occur from poorly designed plans with problematic metrics. Whether the payments under the plan are deductible for corporate tax purposes is, at most, a second-order consideration for shareholders.

23. To put the deductibility issue in context, the benefits of providing a well-designed incentive plan (and the costs of providing a poorly designed plan) are large compared to the dollar savings from providing a deductible plan. In 2004, only three of the proxy-named executives at Intel received total cash compensation in excess of $1 million, derived from base salary, EOIP payments, and other Intel bonus plans: Craig Barrett ($2,454,000), Paul Otellini ($1,809,700), and Andy Bryant ($1,218,500).

**REDACTED**

A reasonable shareholder would not consider the deductibility issue material relative to the critical incentive aspects of the plan.

24. In my opinion, Intel provides sufficient details on the EOIP to fully inform any reasonable shareholder voting on the plan; any remaining omitted details are immaterial. For

-9-

example, the 2005 Proxy (p. 18) meticulously defines EPS, and outlines the set of adjustments the Committee might make to EPS for EOIP purposes "in compliance with IRS regulations." The Proxy also discloses the adjusted EPS achieved in 2004. In my opinion, a reasonable shareholder reading the plan as disclosed in the Proxy would have sufficient information on how EPS is calculated (and potentially adjusted) to vote on the plan.

25. In addition, the 2005 Proxy (p. 18) discloses that individual incentive baseline amounts range from $100,000 to $610,000 for each of the 14 EOIP-eligible executive officers. The Proxy further discloses that this baseline amount represents between 32% to 50% of baseline cash compensation (defined as base salary plus the baseline incentive); put differently, the baseline incentive amounts range from 50% to 100% of base salaries. The Proxy does not disclose individual baseline amounts for each of the 14 eligible executives. However, knowing exactly how the baselines are distributed across the 14 executives is not material from the standpoint of a reasonable shareholder deciding whether to vote in favor or against the incentive plan.

26. Finally, while the 2005 Proxy (p. 18) discloses the Performance Factor used to determine 2004 bonuses, it does not disclose the Performance Factor approved by the Compensation Committee for the 2005 performance period. In my opinion, this omission is reasonable and appropriate, since revealing the Performance Factor provides information to Intel's competitors about Intel's performance goals and outlook for the year, and could therefore have an adverse effect on Intel C.F.R. §162-27(e)(3)(iii)(B). Omitting this information is consistent with the example in 26 C.F.R. §162-27(e)(3)(iii)(A): "if a bonus plan provides that a bonus will be paid if earnings per share increases by 10 percent, the 10-percent figure is a target that need not be disclosed to shareholders." In any case, the exact Performance Factor for a single fiscal year is not information that a reasonable shareholder would require in determining whether to vote in favor or against the incentive plan

-10-

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 21, 2005 in Los Angeles, California

_____
Professor Kevin J. Murphy

-11-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I do hereby certify that, on July 25, 2005, the within document was filed under seal with the Clerk of Court using CM/ECF which will send notification of such filing to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

### HAND DELIVERY

Francis G.X. Pileggi, Esquire
Sheldon K. Rennie, Esquire
Fox Rothschild LLP
919 North Market Street, Suite 1300
Wilmington, Delaware 19801

_____
Stephen C. Norman (#2686)
Brian C. Ralston (#3770)
Potter Anderson & Corroon LLP
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
E-mail: snorman@potteranderson.com
E-mail: bralston@potteranderson.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I do hereby certify that, on August 1, 2005, the within document was filed with the Clerk of Court using CM/ECF which will send notification of such filing to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

    Francis G.X. Pileggi, Esquire
    Sheldon K. Rennie, Esquire
    Fox Rothschild LLP
    919 North Market Street, Suite 1300
    Wilmington, Delaware 19801

                                   /s/ Stephen C. Norman
                                   Stephen C. Norman (#2686)
                                   Brian C. Ralston (#3770)
                                   Potter Anderson & Corroon LLP
                                   Hercules Plaza, 6th Floor
                                   P.O. Box 951
                                   Wilmington, DE 19899
                                   (302) 984-6000
                                   E-mail: snorman@potteranderson.com
                                   E-mail: bralston@potteranderson.com