# EXHIBIT B
# CONTINUED

Table of Contents
EXECUTIVE COMPENSATION

The following tables set forth the annual compensation for our Chief Executive Officer and our five other most highly compensated executive officers in 2004

*SUMMARY COMPENSATION TABLE*

| Name and Principal Position | Year | Annual Compensation | | | Long-Term Compensation Awards | All Other Compensation ($)(3) |
|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($)(1) | Other Annual Compensation ($) | Securities Underlying Options (#)(2) | |
| Craig R. Barrett | 2004 | 610,000 | 1,844,000 | — | 350,000 | 170,700 |
| Chief Executive Officer | 2003 | 610,000 | 1,512,100 | — | 1,350,000 | 134,800 |
| | 2002 | 610,000 | 1,070,400 | — | 584,000 | 134,900 |
| Paul S. Otellini | 2004 | 450,000 | 1,359,700 | — | 300,000 | 106,400 |
| President and Chief Operating Officer | 2003 | 350,000 | 867,600 | — | 900,000 | 77,200 |
| | 2002 | 350,000 | 612,600 | — | 664,000 | 73,000 |
| Andy D. Bryant | 2004 | 305,000 | 913,500 | — | 200,000 | 84,600 |
| Executive Vice President | 2003 | 290,000 | 746,700 | — | 200,000 | 66,000 |
| Chief Financial and Enterprise Services Officer | 2002 | 280,000 | 532,300 | — | 1,332,852 | 59,900 |
| F. Thomas Dunlap, Jr. (4) | 2004 | 270,000 | 671,200 | — | 100,000 | 69,300 |
| Former Senior Vice President and General Counsel | 2003 | 270,000 | 590,100 | — | 100,000 | 51,800 |
| | 2002 | 270,000 | 375,500 | — | 569,568 | 50,300 |
| Sean M. Maloney | 2004 | 250,000 | 716,000 | — | 200,000 | 63,600 |
| Executive Vice President | 2003 | 225,000 | 538,500 | — | 200,000 | 44,100 |
| General Manager, Mobility Group | 2002 | 225,000 | 325,100 | — | 1,333,707 | 46,500 |
| Arvind Sodhani | 2004 | 215,000 | 681,500 | — | 60,000 | 65,600 |
| Senior Vice President and | 2003 | 210,000 | 603,800 | — | 75,000 | 47,800 |
| President, Intel Capital | 2002 | 210,000 | 386,600 | — | 413,568 | 46,000 |

(1)    This amount includes the annual performance incentive payments earned under the EOIP and as semiannual cash awards for 2002, 2003 and 2004. The incentive payment paid under the EOIP and the semiannual cash awards program for the second half of the relevant year are typically paid in the first quarter of the year following the year in which they were earned. See "Report of the Compensation Committee on Executive Compensation" for a description of the EOIP, the semiannual cash awards and the other major aspects of our executive compensation program. We awarded Mr. Sodhani an additional $50,000 bonus for 2004 in recognition of certain services performed during the year, and we awarded each of the executive officers a special $1,000 year-end bonus, as further described in "Year-End Bonus" in that report.

(2)    Indicates the number of shares of common stock underlying options.

(3)    All amounts listed in this column are composed of tax-qualified discretionary company contributions to the Profit Sharing Plan of $16,400 in 2004 ($16,000 in each of 2003 and 2002) for each of the named executives, plus discretionary company contributions made under Intel's non-tax-qualified SERPLUS. These amounts are to be paid out to the named executives only upon retirement, termination, disability or death.

(4)    A portion of these grants terminated upon Mr. Dunlap's retirement from the company in January 2005.

Table of Contents
*OPTION GRANTS IN LAST FISCAL YEAR*

| | Individual Grants | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term ($)(4) | |
|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted (#)(1) | Percent of Total Options Granted to Employees in Fiscal Year (2) | Exercise or Base Price ($/Share)(3) | Expiration Date | 5% | 10% |
| C. Barrett | 350,000 | 0.31 | 27.00 | 4/15/14 | 5,942,000 | 15,058,100 |
| P. Otellini | 300,000 | 0.26 | 27.00 | 4/15/14 | 5,093,100 | 12,906,900 |
| A. Bryant | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| T. Dunlap (5) | 100,000 | 0.09 | 27.00 | 4/15/14 | 1,697,700 | 4,302,300 |
| S. Maloney | 200,000 | 0.17 | 27.00 | 4/15/14 | 3,395,400 | 8,604,600 |
| A. Sodhani | 60,000 | 0.05 | 27.00 | 4/15/14 | 1,018,600 | 2,581,400 |

(1)  Options granted to executives on April 15, 2004 are exercisable in 25% annual increments beginning on April 15, 2005.

(2)  Based on a total of 115 million shares subject to options granted to employees under our option plans in 2004.

(3)  Under all stock option plans, the option purchase price is equal to the market price at the date of the grant. We granted options to executives on April 15, 2004.

(4)  In accordance with SEC rules, these columns show gains that could accrue for the respective options, assuming that the market price of our common stock appreciates from the date of grant over a period of 10 years at an annualized rate of 5% and 10%, respectively. For example, the options that we granted to Dr. Barrett would produce a pre–tax gain of $15,058,100 only if Intel's stock price appreciates by 10% per year for the next 10 years and rises from $27.00 to $70.02 per share before Dr. Barrett exercises his options. Such an increase in share price of 159% would result in a significant increase in Intel's aggregate market capitalization. If the stock price does not increase above the exercise price at the time of exercise, realized value to the named executives from these options will be zero.

(5)  A portion of this grant terminated upon Mr. Dunlap's retirement from the company in January 2005.

*AGGREGATED OPTION EXERCISES IN LAST FISCAL YEAR*
*AND FISCAL YEAR–END OPTION VALUES*

| | | | Number of Securities Underlying Unexercised Options at December 25, 2004 (#)(1) | | Value of Unexercised In–the–Money Options at December 25, 2004 ($)(2) | |
|---|---|---|---|---|---|---|
| Name | Shares Acquired on Exercise (#) | Value Realized ($) | Exercisable | Unexercisable | Exercisable | Unexercisable |
| C. Barrett | 384,000 | 10,667,300 | 2,666,200 | 3,142,500 | 21,771,000 | 10,636,800 |
| P. Otellini | 192,000 | 5,356,700 | 1,608,600 | 2,345,000 | 11,478,500 | 6,799,500 |
| A. Bryant | 400,000 | 5,390,100 | 852,100 | 1,714,400 | 7,181,800 | 1,942,800 |
| T. Dunlap | — | — | 866,900 | 941,800 | 7,573,200 | 1,046,100 |
| S. Maloney | — | — | 840,600 | 1,701,800 | 4,903,200 | 1,944,200 |
| A. Sodhani | 628,000 | 10,274,700 | 1,059,700 | 680,000 | 9,400,500 | 765,400 |

(1)  These amounts represent the total number of shares subject to stock options held by the named executives at December 25, 2004. These options were granted on various dates during the years 1995 through 2004. Unexercisable options are those that are not yet vested.

(2)  These amounts represent the difference between the exercise price of the stock options and the price of our common stock on December 24, 2004 (the last day of trading for the fiscal year ended December 25, 2004) for all in–the–money options held by the named executive. The in–the–money stock option exercise prices range from $5.71 to $20.23. These stock options were granted at the market price of the stock on the grant date.

Table of Contents
*PENSION PLAN TABLE*

| | Years of Service | | | | |
|---|---|---|---|---|---|
| Eligible Compensation | 15 | 20 | 25 | 30 | 35 |
| $205,000 and above | 38,537 | 51,383 | 64,229 | 77,075 | 89,920 |

The Pension Plan provides for minimum pension benefits determined by a participant's years of service credited under the plan and final average compensation (taking into account the participant's social security wage base), reduced by the participant's balance in the Profit Sharing Plan If the pension benefit exceeds the participant's balance in the Profit Sharing Plan, the participant will receive a combination of pension and profit sharing amounts equal to the pension benefit However, the participant will receive only the benefit from the Profit Sharing Plan if that benefit is greater than the value of the pension benefit Compensation includes regular earnings and most cash incentives However, maximum eligible compensation for 2004 is $205,000, in accordance with Section 401(a)(17) of the Tax Code This amount is subject to cost–of–living adjustments in accordance with Section 415(d) of the Tax Code

The table above illustrates the estimated annual benefits payable in the form of a straight–life annuity upon retirement at age 65 under the Pension Plan to persons in the specified compensation and years of service classifications for social security benefits The Employee Retirement Income Security Act of 1974 limits the amount of benefits that may be paid under pension plans qualified under the Tax Code The amounts shown are subject to reduction to the extent that they exceed such limits

The majority of our employees, including executive officers, are not expected to receive a pension benefit upon separation Historically, we have contributed 8% to 12 5% of participants' eligible compensation to the Profit Sharing Plan on an annual basis, which has caused the value of our employees' Profit Sharing Plan accounts to typically exceed their Pension Plan benefits, resulting in no payments being made from the Pension Plan

For each of our employees named in the Summary Compensation Table, the years of credited service as of year–end 2004 under the Pension Plan are: Dr Barrett (30), Mr Otellini (30), Mr Bryant (23), Mr Dunlap (30), Mr Maloney (22) and Mr Sodhani (23) Credited service equals the actual number of years the named executives have been fully employed at Intel; our executive officers do not receive extra or bonus credits for this purpose

## REPORT OF THE AUDIT COMMITTEE

The ultimate responsibility for good corporate governance rests with the Board, whose primary roles are oversight, counseling and direction to Intel's management in the best long–term interests of the company and its stockholders The Audit Committee has been established for the purpose of overseeing Intel's accounting and financial reporting processes and audits of Intel's annual financial statements and internal control over financial reporting

The Audit Committee is made up solely of independent directors, as defined in the applicable NASDAQ and SEC rules, and it operates under a written charter adopted by the Board, a copy of which is included in this proxy statement as Exhibit C. Intel intends for the composition of the Audit Committee, and the attributes of its members and its responsibilities, as reflected in its charter, to be in accordance with applicable requirements for corporate audit committees The Audit Committee reviews and assesses the adequacy of its charter on an annual basis, and the Board last revised the charter in February 2005.

As described more fully in its charter, the purpose of the Audit Committee is to assist the Board in its general oversight of Intel's financial reporting, internal controls and audit functions. Management is responsible for the preparation, presentation and integrity of Intel's financial statements; accounting and financial reporting principles; internal controls; and procedures designed to reasonably assure compliance with accounting standards, applicable laws and regulations Intel has a full–time Internal Audit department that reports to the Audit Committee and to management. This department is responsible for objectively reviewing and evaluating the adequacy, effectiveness and quality of Intel's system of internal controls relating, for example, to the reliability and integrity of Intel's financial information and the safeguarding of Intel's assets. Ernst & Young LLP, Intel's independent registered public accounting firm, is responsible for performing an independent audit of Intel's consolidated financial statements in accordance with generally accepted auditing standards and expressing opinions on management's assessment of the effectiveness of Intel's internal control over financial reporting and the effectiveness of Intel's internal control over financial reporting. In accordance with law, the Audit Committee has ultimate authority and responsibility to select, compensate, evaluate and, when appropriate, replace Intel's independent audit firm. The Audit Committee has the authority to engage its own outside advisers, including experts in particular areas of accounting, as it determines appropriate, apart from counsel or advisers hired by management

**Table of Contents**
The Audit Committee members are not professional accountants or auditors, and their functions are not intended to duplicate or to certify the activities of management and the independent audit firm, nor can the Audit Committee certify that the independent audit firm is indeed "independent" under applicable rules. The Audit Committee serves a board–level oversight role, in which it provides advice, counsel and direction to management and the auditors on the basis of the information it receives, discussions with management and the auditors, and the experience of the Audit Committee's members in business, financial and accounting matters.

The Audit Committee has an agenda for the year that includes reviewing Intel's financial statements, internal control over financial reporting and audit matters. The Audit Committee meets each quarter with Ernst & Young, the Chief Audit Executive and management to review Intel's interim financial results before the publication of Intel's quarterly earnings press releases. Management's and the independent audit firm's presentations to and discussions with the Audit Committee cover various topics and events that may have significant financial impact and/or are the subject of discussions between management and the independent audit firm. In addition, the Audit Committee generally oversees Intel's internal compliance programs. In accordance with law, the Audit Committee is responsible for establishing procedures for the receipt, retention and treatment of complaints received by Intel regarding accounting, internal accounting controls or auditing matters, including the confidential, anonymous submission by Intel's employees, received through established procedures, of any concerns regarding questionable accounting or auditing matters.

Among other matters, the Audit Committee monitors the activities and performance of Intel's internal and independent auditors, including the audit scope, external audit fees, auditor independence matters and the extent to which the independent audit firm may be retained to perform non–audit services. Intel's independent audit firm provides the Audit Committee with the written disclosures and the letter required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees," and the Audit Committee discusses with the independent audit firm and management that firm's independence.

The Audit Committee has reviewed and discussed with management its assessment and report on the effectiveness of Intel's internal control over financial reporting as of December 25, 2004, which it made using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control–Integrated Framework. The Audit Committee has also reviewed and discussed with Ernst & Young its attestation report on management's assessment of internal control over financial reporting and its review and report on Intel's internal control over financial reporting. Intel published these reports in its Annual Report on Form 10–K for the year ended December 25, 2004.

In accordance with Audit Committee policy and the requirements of law, the Audit Committee pre–approves all services to be provided by Ernst & Young. Pre–approval includes audit services, audit–related services, tax services and other services. In some cases, the full Audit Committee provides pre–approval for up to a year, related to a particular defined task or scope of work and subject to a specific budget. In other cases, the Chairman of the Audit Committee has the delegated authority from the Audit Committee to pre–approve additional services, and the Chairman then communicates such pre–approvals to the full Audit Committee. To avoid certain potential conflicts of interest, the law prohibits a publicly traded company from obtaining certain non–audit services from its independent audit firm. Intel obtains these services from other service providers as needed. The Audit Committee has been reducing the scope and amount of permissible non–audit services obtained from Ernst & Young and obtaining other providers for those services. This activity continued in 2004 and will continue in 2005. See "Proposal 2: Ratification of Selection of Independent Registered Public Accounting Firm" for more information regarding fees paid to Ernst & Young for services in fiscal years 2004 and 2003.

28

Table of Contents
The Audit Committee has reviewed and discussed the consolidated financial statements for fiscal year 2004 with management and Ernst & Young; management represented to the Audit Committee that Intel's consolidated financial statements were prepared in accordance with generally accepted accounting principles; and Ernst & Young represented that their presentations included the matters required to be discussed with the independent registered public accounting firm by Statement on Auditing Standards No. 61, as amended, "Communication with Audit Committees." This review included a discussion with management of the quality, not merely the acceptability, of Intel's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosure in Intel's financial statements, including the disclosures related to critical accounting estimates. In reliance on these views and other discussions, and the reports of Ernst & Young, the Audit Committee has recommended to the Board, and the Board has approved, the inclusion of the audited financial statements in Intel's Annual Report on Form 10-K for the year ended December 25, 2004 which Intel filed with the SEC on February 22, 2005.

Audit Committee:
Jane E. Shaw, Chairman
E. John P. Browne
D. James Guzy

## PROPOSAL 2: RATIFICATION OF SELECTION OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

Ernst & Young has been our independent audit firm since our incorporation in 1968, and the Audit Committee has selected Ernst & Young as our independent audit firm for the fiscal year ending December 31, 2005. Among other matters, the Audit Committee concluded that current requirements for audit partner rotation, auditor independence through limitation of services and other regulations affecting the audit engagement process substantially assist in supporting auditor independence despite the long-term nature of Ernst & Young's services to us. In accordance with applicable regulations on partner rotation, Ernst & Young's primary engagement partner for our audit has changed for 2005, and the concurring/reviewing partner for our audit was changed in 2004.

Ernst & Young has recently notified the SEC, the Public Company Accounting Oversight Board and our Audit Committee that certain non-audit work that Ernst & Young previously performed in China (for us and other companies) has raised questions regarding Ernst & Young's independence with respect to its performance of audit services. With respect to us, during fiscal years 2001 and 2002, Ernst & Young's affiliated firm in China performed tax calculation and return preparation services for a small number of employees of one of our representative offices in China. Ernst & Young's China affiliate made payment of the relevant taxes on our behalf, which involved the handling of our funds in the amount of approximately $65,000 in 2001 and $41,000 in 2002. The fees that we paid to Ernst & Young's China affiliate for the performance of these services were approximately $1,200 in 2001 and $600 in 2002. These services were discontinued in 2002. Ernst & Young has also informed us that in 2002, when Ernst & Young acquired the New Zealand practice of the firm Arthur Andersen, the Andersen firm had been providing a cash handling service to us in connection with fringe benefit tax returns. Ernst & Young stopped providing this service to us in June 2003, and from the time of the acquisition until June 2003, total fees that we paid to Ernst & Young with respect to this service totaled approximately $9,000, and Ernst & Young handled a total of approximately $90,000 in cash for us. Our Audit Committee has reviewed the facts surrounding these services provided by Ernst & Young, and is monitoring the outcome of the SEC's consideration of the China matter. Ernst & Young has informed the Audit Committee that Ernst & Young does not believe that performance of these services impaired its independence. Subject to the SEC completing its consideration of the China matter, neither we nor our Audit Committee believes that Ernst & Young's independence was impaired by the performance of these services in light of the de minimis fees paid to Ernst & Young, the ministerial nature of the actions performed by Ernst & Young, and the fact that the revenue, operating profit and total assets of our representative offices involved were not material to our consolidated financial statements and not subject to any audit procedures by Ernst & Young.

As a matter of good corporate governance, the Audit Committee has determined to submit its selection of independent audit firm to stockholders for ratification. In the event that this selection of Ernst & Young is not ratified by a majority of the shares of common stock present or represented at the annual meeting and entitled to vote on the matter, the Audit Committee will review its future selection of an independent registered public accounting firm.

Representatives of Ernst & Young attended all meetings of the Audit Committee in 2004. The Audit Committee pre-approves and reviews audit and non-audit services performed by Ernst & Young as well as the fees charged by Ernst & Young for such services. In its pre-approval and review of non-audit service fees, the Audit Committee considers, among other factors, the possible effect of the performance of such services on the auditors' independence. To avoid certain

29

Table of Contents
potential conflicts of interest in maintaining auditor independence, the law prohibits a publicly traded company from obtaining certain non–audit services from its independent registered public accounting firm. Except as noted above, in recent years, we have not obtained any of these prohibited services from Ernst & Young, and we are able to obtain such services from other large registered public accounting firms and other service providers. We use Deloitte & Touche LLP, KPMG LLP and PricewaterhouseCoopers LLP for various types of non–audit services. The Audit Committee has been reducing the scope and amount of permissible non–audit services obtained from Ernst & Young and has been moving this work to the other firms named above. This activity continued in 2004 and continues in 2005. For additional information concerning the Audit Committee and its activities with Ernst & Young, see "The Board, Board Committees and Meetings" and "Report of the Audit Committee."

We expect that a representative of Ernst & Young will attend the annual meeting, and the representative will have an opportunity to make a statement if he or she so desires. The representative will also be available to respond to appropriate questions from stockholders.

Fees Paid to Ernst & Young

The following table shows the fees that we paid or accrued for audit and other services provided by Ernst & Young for fiscal years 2004 and 2003. All figures are net of Value Added Tax and other similar taxes assessed by certain non–U.S. jurisdictions on the amount billed by Ernst & Young. All of the services described in the following fee table were approved in conformity with the Audit Committee's pre–approval process.

|                    | 2004          | 2003          |
| ------------------ | ------------- | ------------- |
| Audit Fees         | $ 11,167,000  | $ 7,867,000   |
| Audit–Related Fees | $    743,000  | $ 1,647,000   |
| Tax Fees           | $  1,305,000  | $ 1,905,000   |
| All Other Fees     | $    135,000  | $   162,000   |
| Total              | $ 13,350,000  | $ 11,581,000  |

*Audit Fees* ($11,167,000; $7,867,000). This category includes the audit of our annual financial statements, the audit of management's assessment of our internal control over financial reporting and Ernst & Young's own audit of our internal control over financial reporting, review of financial statements included in our Form 10–Q quarterly reports, and services that are normally provided by the independent registered public accounting firm in connection with statutory and regulatory filings or engagements for those fiscal years. This category also includes advice on accounting matters that arose during, or as a result of, the audit or the review of interim financial statements, statutory audits required by non–U.S. jurisdictions and the preparation of an annual "management letter" on internal control matters.

*Audit–Related Fees* ($743,000; $1,647,000). This category consists of assurance and related services provided by Ernst & Young that are reasonably related to the performance of the audit or review of our financial statements and are not reported above under "Audit Fees." The services for the fees disclosed under this category include benefit plan audits, vendor compliance audits, royalty audits and distributor count compliance audits.

*Tax Fees* ($1,305,000; $1,905,000). This category consists of tax services generally for tax compliance and tax preparation. In 2004, $1,171,000 was for tax compliance and preparation services rendered by Ernst & Young, including the preparation of original and amended tax returns, claims for refunds, support during income tax audits or inquiries, and tax payment planning in certain overseas jurisdictions. The remaining $134,000 was for tax advice and transfer pricing studies.

*All Other Fees* ($135,000; $162,000). This category consists of fees for the following: an audit of an investment fund owned by us and a group of corporations that manufacture and/or use 64–bit Intel® Itanium®–based systems (as the managing partner of the fund, we are responsible for coordinating the fund's financial audit); agreed–upon procedures for a research and development grant program audit in Ireland; agreed–upon procedures as required by the State of California for companies handling hazardous waste materials; translation services for certain statutory financial filings outside the U.S.; and an annual subscription fee to Ernst & Young for accounting literature.

Recommendation of the Board

The Board of Directors recommends that you vote "FOR" the ratification of the appointment of Ernst & Young as our independent registered public accounting firm for 2005.

Table of Contents
PROPOSAL 3: APPROVAL OF AMENDMENT AND EXTENSION OF THE 2004 EQUITY INCENTIVE PLAN

In 2004, we first asked our stockholders to approve the Intel Corporation 2004 Equity Incentive Plan (the "2004 Plan"), and we said that we planned to submit the 2004 Plan to our stockholders for re–approval on an annual basis  Annual approval of the 2004 Plan affords our stockholders the opportunity to consider and review our equity compensation program on a yearly basis, and to evaluate and vote on continuation of the plan  The approval in 2004 covers the 2004 Plan to 2006, and we are now asking for our first annual re–approval, which will extend the 2004 Plan to 2007

We are requesting that our stockholders vote in favor of amendments to the 2004 Plan to extend the term of the plan by an additional year, through June 30, 2007; provide for the addition of 130 million shares to cover awards under the 2004 Plan through its amended term; allow for grants of restricted stock and stock units to our non–employee directors should we elect to use these instruments; provide for the use of up to 100,000 shares for employee recognition stock awards having no minimum vesting period; and clarify our share–counting methodology  We continue to firmly believe that a broad–based stock option program is a necessary and powerful employee incentive and retention tool that benefits all of our stockholders, and we also believe that the amendments to the 2004 Plan are in the best interests of our stockholders and the company  The following summary of the amendments to the 2004 Plan is subject to the specific provisions contained in the full text of the 2004 Plan, as amended and restated, set forth as Exhibit A

We are seeking approval of the following amendments to the 2004 Plan:

1  **Extension of the term of the 2004 Plan until June 30, 2007.** The 2004 Plan is currently scheduled to expire on June 30, 2006  Approval of this amendment would extend the expiration date of the 2004 Plan by an additional year, until June 30, 2007  As indicated in our 2004 proxy statement, the Board and management intend to submit annually for stockholder approval an extension of the 2004 Plan  Given the limited two–year duration of the 2004 Plan, this annual renewal cycle gives our stockholders more frequent opportunities to evaluate and vote on continuation of the plan  This short duration also will give us greater flexibility should future revisions be considered necessary to respond to market–competitive changes in equity compensation practices

2  **The addition of a sufficient number of shares to provide for awards under the 2004 Plan for an additional year.** The total number of shares currently authorized for issuance under the 2004 Plan is 240 million  The Board is recommending the addition of 130 million shares to the total shares available under the 2004 Plan to enable us to meet our expected annual needs over the next two years  Of the 130 million additional shares, we would allot 2 million shares to long–term executive retention stock option grants having a term no longer than 10 years

We grant the majority of our options early in the second quarter of the year in conjunction with our annual employee performance evaluation program  At the time of our annual meeting, we estimate that we will have granted approximately 125 million options pursuant to the 2004 Plan  If approved, the additional shares will provide us with an estimated 245 million shares available for issuance under the 2004 Plan over the next two years  The following table illustrates the net effect of this amendment on the shares available for issuance under the 2004 Plan:

| Share Reservation Under the 2004 Equity Incentive Plan | |
| --- | --- |
| Initial shares approved by stockholders in 2004 | 240 million |
| Estimated shares awarded (May 2004–May 2005) | (125 million) |
| Estimated shares available for issuance (as of May 2005) | 115 million |
| Additional shares requested in this proposal (May 2005) | 130 million |
| Estimated total shares available for issuance (2005–2007) | 245 million |

We do not expect the additional shares that we are requesting stockholders to approve to significantly impact our "overhang" from equity plans  Overhang is the total number of shares related to options granted but not yet exercised, plus shares available for grant, divided by total shares outstanding at the end of the reporting period  We expect that overhang will decline over time, as the majority of the options issuable under the 2004 Plan will have a maximum term of seven years  Historically, options granted under our stock option programs have generally had a term of 10 years

3  **The ability to utilize various equity vehicles, including stock options, restricted stock or stock units, performance–based stock awards or stock appreciation rights, in making awards to non–employee directors.** The 2004 Plan currently allows us to grant a limited number of restricted stock and stock unit awards to employees, but provides for only stock option grants to non–employee directors  This amendment would expand the types of awards that

31

Table of Contents
we could make to non–employee directors, subject to the 2004 Plan's share limitations on non–employee director awards. We have historically utilized stock options as our sole form of equity compensation for non–employee directors. The Board is currently undertaking a comprehensive review of our director compensation programs (see "Directors' Compensation"); accordingly, we are seeking to amend the 2004 Plan to provide the flexibility to use other forms of equity compensation as appropriate in light of the results of that review.

4. **The ability to use up to 100,000 shares for employee recognition stock awards having no minimum vesting period.** We have programs that we use to recognize and reward the outstanding achievements of our employees with awards of small amounts of stock (typically no more than 100–150 shares per recipient) that vest immediately. NASDAQ rules now require that any equity awards to employees be approved by stockholders or be made pursuant to a plan approved by stockholders. We want to continue to use stock awards as part of these recognition programs, and we are requesting approval of an amendment to the 2004 Plan to allow the use of up to an aggregate of 100,000 shares for employee recognition awards having no minimum vesting period. The amendment would not increase the shares available for issuance under the 2004 Plan; rather, we would take the shares used for such recognition awards from the shares allocated to restricted stock and stock unit awards.

5. **Clarification of our share–counting methodology.** Our policy is that the following types of shares are not available for future issuance as awards under our equity plans: (1) shares not issued or delivered as a result of the net share settlement of outstanding stock appreciation rights, (2) shares used to pay the exercise price or withholding taxes in connection with the exercise of an outstanding stock option or receipt of an award, and (3) shares acquired in the open market using the proceeds from the payment of the exercise price in connection with the exercise of an outstanding stock option. The amendment would put this policy into the written provisions of the 2004 Plan and make clear that such practices are expressly prohibited.

### Background on Stock Compensation at Intel

The use of stock options has long been a vital component of our overall compensation philosophy, which is premised on the principle that any long–term pay–for–performance incentive compensation should be closely aligned with stockholders' interests. We believe that over the years, we have been very successful in achieving this objective through the use of fixed–price stock options for the majority of our employees. Fixed–price stock options align employees' interests directly with those of our other stockholders, because an increase in stock price after the date of award is necessary for employees to realize any value, thus rewarding employees only upon improved stock price performance.

We believe that stock options, the core of our long–term employee incentive and retention program, have been very effective in enabling us to attract and retain the talent critical for an innovative and growth–focused company. We believe that broad–based stock options focus employees at every level of the company on the same performance improvement goals, and have embedded in our culture the necessity for employees to think and act as stockholders. Our general compensation philosophy is that total cash compensation should vary with our performance in achieving financial and non–financial objectives, and that any long–term incentive compensation should be closely aligned with stockholders' interests. Our total compensation goal is to deliver lower total compensation than our peer groups in periods of poor company performance, but provide a premium for superior company performance (see "Report of the Compensation Committee on Executive Compensation" for additional information on our pay–for–performance compensation programs). Without the ability to award equity compensation, we would need to consider cash replacement alternatives to provide a market–competitive total compensation package necessary to attract, retain and motivate the employee talent that is critical to our future success.

We have a long history of linking employee compensation to our long–term stock performance. For more than 25 years, we have been granting stock options to our officers and other key employees. Beginning in 1997, we expanded our stock option program by making it broad–based as well as global. As a result, under our current stock option program, all general full–time and part–time employees are eligible for stock option grants, with annual grants made to more than 90% of the eligible employee population. While we grant employee stock options from time to time during the year, we make most of our option grants in the second quarter of each year as part of our company–wide employee performance evaluation program. We strongly believe that stock–based compensation should not be limited to senior management and that all employees, regardless of role or responsibility, should have a stake in our future. Accordingly, Compensation Committee policy limits grants to our five most highly compensated executive officers (six in 2004) to no more than 5% of total options granted in any one year. Over the last five years, we awarded only 1.2% of all option grants to our five most highly compensated executive officers (six in 2004).

32

Table of Contents

Although we believe that employee stock ownership is a significant contributing factor in achieving superior corporate performance, we recognize that the expansion to a broad–based stock option program has led to an increase in our stock overhang. Our fiscal 2004 stock overhang was 17.7%. The following factors have contributed to the increase in overhang: (1) historically long stock option vesting periods, with stock option grants made in the years up to and including 2002 generally vesting five years from grant date; and (2) long employee exercise periods, with grants generally having 10–year terms. We have a long–term goal to limit our annual dilution (total stock options or equity awards granted less cancellations, divided by shares outstanding at the beginning of the year) to less than 2%. Over the last five years, our annual dilution from stock options has averaged 1.8%. We expect that overhang will decline over time, as the majority of options issuable under the 2004 Plan will have a maximum term of seven years.

We strongly believe that our stock option programs and emphasis on employee stock ownership have been integral to our success in the past and will be important to our ability to achieve consistently superior performance in the years ahead. We believe that consistently superior performance is achieved through the ability to attract, retain and motivate the employee talent critical to attaining long–term improved company performance and stockholder returns. Therefore, we consider approval of the amendments to the 2004 Plan vital to our future success in that it will enable us to continue offering equity awards to our employees.

In 2004, we granted 114.7 million options to our employees, including executive officers, and non–employee directors, with approximately 99% of the options granted to employees other than our Chief Executive Officer and the next five most highly compensated executive officers. The 2004 burn rate, defined as the total options granted in a year divided by our common shares outstanding at the beginning of the year, was 1.77%, which was higher than the 2003 burn rate of 1.67%, primarily due to growth in our employee population. Our 2004 annual dilution was 1.3%.

As of March 25, 2005, we have granted approximately 23.8 million options under the 2004 Plan to our employees, 0.1 million options to our non–employee directors and 0.8 million options to executive officers (including 0.4 million options to Mr. Otellini, Intel's President and Chief Operating Officer and CEO–elect). Because we grant the majority of our stock options in the second quarter in conjunction with our annual employee performance evaluation program, we estimate that at the time of the annual meeting we will have granted approximately 125 million options to our employees, including our executive officers, pursuant to the 2004 Plan.

**Equity Compensation Plan Information**

The 2004 Plan replaced our stockholder–approved 1984 Stock Option Plan, which expired in 2004, and our non–stockholder–approved 1997 Stock Option Plan (the "1997 Plan"). We will not make future awards under either of those plans.

Information as of December 25, 2004 regarding equity incentive plans approved and not approved by stockholders is summarized in the following table (shares in millions):

| Plan Category | (A) Number of Shares to Be Issued Upon Exercise of Outstanding Options | (B) Weighted Average Exercise Price of Outstanding Options | (C) Number of Shares Remaining Available for Future Issuance Under Equity Incentive Plans (Excluding Shares Reflected in Column A) |
|---|---|---|---|
| Equity incentive plans approved by stockholders | 154.6 | $ 18.73 | 287.9 (1) |
| Equity incentive plans not approved by stockholders (2) | 722.8 | $ 27.97 | — |
| Total | 877.4 (3) | $ 26.34 | 287.9 |

———

(1) Includes 67.5 million shares available under our 1976 Employee Stock Participation Plan.

(2) Consists of shares underlying options granted under the 1997 Plan.

(3) Total excludes 6.5 million shares issuable under outstanding options, with a weighted average exercise price of $16.26, originally granted under plans we assumed in connection with acquisitions. The 1997 Plan was terminated as to future grants when the 2004 Plan was approved by stockholders in May 2004.

Table of Contents

The 1997 Plan provided for the grant of stock options to employees other than officers and directors When our stockholders approved the 2004 Plan in May 2005, we terminated this plan, which was not approved by stockholders The Compensation Committee administers the 1997 Plan, and it has the power to determine matters relating to outstanding option awards under the plan, including conditions of vesting and exercisability Options granted under the 1997 Plan expire no later than 10 years from the grant date Options granted under this plan generally vest within five years, with some options granted in 2003 and 2004 vesting in increments over four or five years from the date of grant, and certain grants to key employees having delayed vesting generally beginning six years from the date of grant

## Purpose of the 2004 Plan

As amended and restated, the 2004 Plan will allow us to make broad−based grants of stock options, restricted stock, stock units and stock appreciation rights, any of which may or may not require the satisfaction of performance objectives, to employees and to non−employee directors through June 30, 2007 The purpose of these stock awards is to attract and retain talented employees and non−employee directors, further align employee and stockholder interests, continue to closely link employee compensation with company performance, and maintain a culture based on employee stock and company ownership

## Key Terms

The following is a summary of the key provisions of the 2004 Plan, as amended and restated The proposed amendments to the 2004 Plan are in bold type in the following table

| | |
|---|---|
| *Plan Term* | May 19, 2004 to **June 30, 2007** |
| *Eligible Participants*: | All of our full−time and part−time employees, where legally eligible to participate, and our non−employee directors |
| *Shares Authorized* | **370,000,000** over the three−year term of the plan, subject to adjustment only to reflect stock splits and similar events; **includes 130,000,000 shares in addition to the 240,000,000 shares approved by stockholders in 2004.** |
| *Award Types (available to all eligible participants, including non−employee directors):* | (1) Stock options<br>(2) Restricted stock<br>(3) Stock units<br>(4) Stock appreciation rights |
| *Award Terms*: | Stock options and stock appreciation rights will have a term no longer than seven years, except that up to **10 million** shares may be utilized for long−term executive retention stock option grants having a term no longer than 10 years; **includes 2 million shares allocated to long−term retention grants in addition to the 8 million shares approved by stockholders in 2004.** |
| *162(m) Share Limits*: | So that awards may qualify under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), which permits performance−based compensation meeting the requirements established by the IRS to be excluded from the limitation on deductibility of compensation in excess of $1 million paid to certain specified senior executives, the 2004 Plan limits awards to an individual participant in any calendar year to:<br><br>(1)   No more than 3 million shares subject to stock options or stock appreciation rights to an individual participant annually, or<br><br>(2)   No more than 2 million shares subject to restricted stock or stock unit awards to an individual participant annually.<br><br>These limits are greater than the number of options that we have granted to any individual in the past. |

34

**Table of Contents**

| | |
|---|---|
| *Other Share Limitations:* | (1)   No more than 35 million shares may be issued under restricted stock and restricted stock unit awards |
| | (2)   No more than 30,000 shares may be subject to awards granted to a non–employee director in any calendar year |
| *Vesting:* | Determined by the Compensation Committee or the Board of Directors within the following limits (subject to exceptions for death, disability or retirement): |
| | (1)   Restricted stock or stock units shall not vest in less than pro rata installments over three years unless vesting is based on the achievement of performance criteria, in which case such awards shall not vest in less than one year. **Up to an aggregate of 100,000 shares may be used for employee recognition stock awards having no minimum vesting period.** |
| | (2)   Stock options or stock appreciation rights shall not first become exercisable in less than one year. |
| | (3)   Performance vesting criteria, if any, will be established by award at grant date. |
| *Not Permitted:* | (1)   Granting stock options or stock appreciation rights at a price below the market value of Intel stock on the date of grant. |
| | (2)   Repricing, or reducing the exercise price of a stock option or stock appreciation right without stockholder approval. |
| | (3)   Reload grants or the granting of options conditional upon delivery of shares to satisfy the exercise price and/or tax withholding obligation under another employee stock option. |
| | (4)   **Adding shares back to the number available for issuance when a stock appreciation right is net settled, when shares are retained or delivered to us to pay the exercise price and/or tax obligations associated with an award, or when we repurchase shares on the open market using the proceeds from payment of the exercise price in connection with the exercise of an outstanding stock option.** |

**Eligibility**

Only employees of Intel and its subsidiaries and our non–employee directors are eligible to receive awards under the 2004 Plan. The Compensation Committee determines which employees will participate under the 2004 Plan, and the Board determines the terms of grants to non–employee directors. As of February 25, 2005, there were approximately 85,400 employees and eight non–employee directors eligible to participate in the 2004 Plan.

**Awards**

The 2004 Plan allows the grant of stock options, stock appreciation rights, restricted stock or stock units, any or all of which may be made contingent upon the achievement of performance criteria. Subject to plan limits, the Compensation Committee has the discretionary authority to determine the size of awards to employees. The use of performance–based requirements will be considered in the context of our total compensation program and the significant level of pay–for–performance requirements already incorporated into our compensation practices.

**Non–Employee Director Awards**

Each year, non–employee directors may receive award(s) for a number of shares established by the Board, but no more than 30,000 shares annually. Subject to limits in the plan terms applicable to awards under the 2004 Plan, the Board has the discretion to determine the form and terms of awards to non–employee directors. We granted each non–employee director options for 15,000 shares in 2004, except for Ms. Barshefsky, to whom we awarded an additional prorated grant of 5,000 stock options for the period from the date of her appointment (January 21, 2004) to the annual election of directors in May 2004.

**Vesting and Exercise of Stock Options**

The exercise price of stock options granted under the 2004 Plan may not be less than the market value (the average of the high and low market price) of the common stock on the date of grant. For example, on February 24, 2005, the average

35

Table of Contents
of the highest and lowest quoted sales prices of our common stock was $23.44 per share, which would have been the grant price for any stock options granted on that date. The option term may not be longer than seven years in the case of stock options vesting in full in less than five years, and may not be longer than 10 years in the case of stock options vesting in full in five or more years (long–term executive retention grants). The Compensation Committee (or, for non–employee director awards, the Board) will determine when each stock option becomes exercisable, including the establishment of required performance vesting criteria, if any, and provided that no stock option may be exercised less than one year from the date of grant (except upon the death, disability or retirement of the participant). We may require, prior to issuing common stock under the 2004 Plan, that the participant remit an amount in cash or common stock sufficient to satisfy tax withholding requirements

**Vesting of Restricted Stock and Stock Unit Awards**

The Compensation Committee (or, for non–employee director awards, the Board) may make the grant, issuance, retention and/or vesting of restricted stock and stock unit awards contingent upon continued employment with Intel, the passage of time, or such performance criteria and the level of achievement versus such criteria as it deems appropriate. Except in the case of death, disability or retirement of the participant, stock issued upon exercise or settlement of options or stock appreciation rights, restricted stock and stock unit awards that are contingent upon the achievement of performance objectives shall not vest in less than one year from the date of grant, and awards that are contingent upon continued employment or the passage of time shall not fully vest in less than pro rata installments over three years from the date of grant. Notwithstanding the limitations of the preceding sentence, up to 100,000 shares shall be available for use as employee recognition stock awards having no minimum vesting period.

**Eligibility Under Section 162(m)**

Awards may, but need not, include performance criteria that satisfy Section 162(m) of the Tax Code. To the extent that awards are intended to qualify as "performance–based compensation" under Section 162(m), the performance criteria will be based on one or more of the factors set forth in the 2004 Plan (which may be adjusted as provided in the plan), applied either individually, alternatively or in any combination, to either the company as a whole or to a business unit or subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of years, on an absolute basis or relative to a pre–established target, to previous years' results or to a designated comparison group, in each case as specified by the Compensation Committee in the award

To the extent that an award under the 2004 Plan is designated as a "performance award," but is not intended to qualify as performance–based compensation under Section 162(m), the performance criteria can include the achievement of strategic objectives as determined by the Board

Notwithstanding satisfaction of any performance criteria to the extent specified at the time of grant of an award, the number of shares of common stock, stock options or other benefits granted, issued, retainable and/or vested under an award on account of satisfaction of performance criteria may be reduced by the Compensation Committee on the basis of such further considerations as the Compensation Committee in its sole discretion determines.

**Transferability**

Awards granted under the 2004 Plan are transferable by will or the laws of descent and distribution, or to the extent otherwise determined by the Compensation Committee. The Compensation Committee has sole discretion to permit the transfer of an award.

**Administration**

The Compensation Committee, which is made up entirely of independent directors, administers the 2004 Plan. The Compensation Committee will select the employees who receive awards, determine the number of shares covered thereby, and, subject to the terms and limitations expressly set forth in the 2004 Plan, establish the terms, conditions and other provisions of the grants. The Compensation Committee may interpret the 2004 Plan and establish, amend and rescind any rules relating to the 2004 Plan. The Compensation Committee may delegate to a committee of one or more directors the ability to grant awards and take certain other actions with respect to participants who are not executive officers, and may delegate certain administrative or ministerial functions under the 2004 Plan to an officer or officers. The Compensation Committee has delegated authority to the CEO–elect, one of our directors, to grant awards to non–executive employees within limits and a budget pre–approved by the Compensation Committee

36

Table of Contents
**Amendments Requiring Stockholder Approval**

The Board may terminate, amend or suspend the 2004 Plan, provided that no action may be taken by the Board (except those described in "Adjustments") without stockholder approval to:

- Increase the number of shares that may be issued under the 2004 Plan;

- Permit granting of stock options at less than the market value;

- Permit the repricing of outstanding stock options;

- Amend the maximum shares set forth that may be granted as stock options, stock appreciation rights, restricted stock or stock units to any participant or in total;

- Extend the term of the 2004 Plan;

- Change the class of persons eligible to participate in the 2004 Plan; or

- Otherwise implement any amendment required to be approved by stockholders under NASDAQ rules.

**Adjustments**

In the event of a stock dividend, recapitalization, stock split, combination of shares, extraordinary dividend of cash or assets, reorganization, or exchange of our common stock or any similar event affecting our common stock, the Compensation Committee shall adjust the number and kind of shares available for grant under the 2004 Plan, and subject to the various limitations set forth in the 2004 Plan, the number and kind of shares subject to outstanding awards under the 2004 Plan, and the exercise or settlement price of outstanding stock options and of other awards.

The impact of a merger or other reorganization of Intel on outstanding stock options, stock appreciation rights, restricted stock and stock units granted under the 2004 Plan shall be specified in the agreement relating to the merger or reorganization, subject to the limitations and restrictions set forth in the 2004 Plan. Such agreement may provide for, among other things, assumption of outstanding awards, accelerated vesting or accelerated expiration of outstanding awards, or settlement of outstanding awards in cash.

**U.S. Tax Consequences**

Stock option grants under the 2004 Plan may be intended to qualify as incentive stock options under Section 422 of the Tax Code or may be non–qualified stock options governed by Section 83 of the Tax Code. Generally, no federal income tax is payable by a participant upon the grant of a stock option and no deduction is taken by the company. Under current tax laws, if a participant exercises a non–qualified stock option, he or she will have taxable income equal to the difference between the market price of the common stock on the exercise date and the stock option grant price. We will be entitled to a corresponding deduction on our income tax return. A participant will have no taxable income upon exercising an incentive stock option after the applicable holding periods have been satisfied (except that alternative minimum tax may apply), and we will receive no deduction when an incentive stock option is exercised. The treatment for a participant of a disposition of shares acquired through the exercise of an option depends on how long the shares were held and on whether the shares were acquired by exercising an incentive stock option or a non–qualified stock option. We may be entitled to a deduction in the case of a disposition of shares acquired under an incentive stock option before the applicable holding periods have been satisfied.

Restricted stock is also governed by Section 83 of the Tax Code. Generally, no taxes are due when the award is initially made, but the award becomes taxable when it is no longer subject to a "substantial risk of forfeiture" (i.e., becomes vested or transferable). Income tax is paid on the value of the stock or units at ordinary rates when the restrictions lapse, and then at capital gain rates when the shares are sold.

The American Jobs Creation Act of 2004 added Section 409A to the Tax Code, generally effective January 1, 2005. The IRS has so far issued only limited guidance on the interpretation of this new law. Section 409A covers most programs that defer the receipt of compensation to a succeeding year. It provides strict rules for elections to defer (if any) and for timing of payouts. There are significant penalties placed on the individual employee for failure to comply with Section 409A. However, it does not impact our ability to deduct deferred compensation.

Section 409A does not apply to incentive stock options, non–qualified stock options (that are not discounted) and restricted stock (provided there is no deferral of income beyond the vesting date). Section 409A also does not cover stock

Table of Contents

appreciation right plans if the stock appreciation rights are issued by a public company on its traded stock, the exercise price is never less than the fair market value of the underlying stock on the date of grant, the rights are settled in such stock and no features defer the recognition of income beyond the exercise date

Section 409A does apply to restricted stock units, performance units and performance shares. Grants under such plans will continue to be taxed at vesting but will be subject to new limits on plan terms governing when vesting may occur.

As described above, awards granted under the 2004 Plan may qualify as "performance-based compensation" under Section 162(m) of the Tax Code in order to preserve our federal income tax deductions with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of our five most highly compensated executive officers. To so qualify, options and other awards must be granted under the 2004 Plan by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations) and satisfy the 2004 Plan's limit on the total number of shares that may be awarded to any one participant during any calendar year. In addition, for awards other than options to qualify, the grant, issuance, vesting or retention of the award must be contingent upon satisfying one or more of the performance criteria, as established and certified by a committee consisting solely of two or more "outside directors."

For a discussion of our executive compensation philosophy, see "Report of the Compensation Committee on Executive Compensation."

**Recommendation of the Board**

**The Board of Directors recommends that you vote "FOR" approval of amendment and extension of the Intel Corporation 2004 Equity Incentive Plan.**

PROPOSAL 4: APPROVAL OF AMENDMENT AND EXTENSION OF THE EXECUTIVE OFFICER INCENTIVE PLAN

Introduction

Our Executive Officer Incentive Plan (EOIP) was established in 1994, amended and restated in 1995, and our stockholders last approved it in 2000. The EOIP is a cash-based, pay-for-performance incentive program, and its purpose is to motivate and reward our executive officers, including our Chief Executive Officer (CEO), for their contributions to our performance. To ensure that performance-based compensation over $1,000,000 payable to the CEO and our four other most highly compensated executive officers is tax-deductible and qualifies under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Tax Code"), the material terms of performance-based compensation plans, including the employees eligible to receive compensation under the plan, a description of the business criteria on which the performance goal is based and the maximum amount of compensation that could be paid to any employee under the plan (or the formula used to calculate the amount of compensation to be paid to the employee), must be approved by our stockholders. The EOIP is designed to provide for this type of performance-based compensation.

In accordance with current tax laws, stockholder approval lasts for approximately five years, and this plan now needs re-approval to be tax qualified. We are asking our stockholders to extend qualification of the EOIP under Section 162(m) of the Tax Code for incentives established within five years from the date of the 2005 Annual Stockholders' Meeting, to approve amendments to the EOIP to clarify the Compensation Committee's authority under the EOIP, and to address the terms and conditions for executive officer participation in the EOIP.

Our EOIP is a cash-based, pay-for-performance incentive program that effectively links our financial performance with the total cash compensation paid to our executive officers. This is accomplished through our executive officers having a lower percentage of their total cash compensation in base salary and a higher percentage of their total cash compensation in variable pay through the EOIP program, which is linked to our earnings per share ("EPS"). As a result, our executive officers have a large percentage of their total cash compensation at risk, and their total cash compensation varies with our financial performance.

The Board's Compensation Committee, which consists solely of independent directors, determines payments under this plan. The Compensation Committee recommends that our stockholders re-approve this plan, and, as described below,

Table of Contents
it has utilized the plan to set 2005 incentive baseline amounts for our executive officers. If our stockholders do not approve the EOIP at the annual meeting, we will terminate the EOIP plan, and we will not pay any incentives under this plan for the 2005 performance year. However, we expect to make incentive payments to the executive officers in amounts similar to those that would have otherwise been paid under the EOIP; the difference is that we will lose a portion of the tax deductibility that would have otherwise been available to us. The Compensation Committee has not adopted a policy that all compensation paid must be tax-deductible and qualified under Section 162(m) of the Tax Code. If we cannot deduct incentives from our taxes, it will increase the overall cost of these incentive payouts to us and thus to our stockholders through reduced net income.

The full text of the amended and restated EOIP appears in Exhibit B. The principal features are outlined below and should be reviewed along with the information in the text of the plan.

Purpose of the EOIP

The EOIP is a cash-based, pay-for-performance incentive program, and its purpose is to motivate and reward eligible employees for their contributions to our performance by making a large portion of their cash compensation variable and dependent upon our performance. As a result of having a lower percentage of their total cash compensation in base salary and a higher percentage of their total cash compensation in performance-based incentives, our executives generally have more compensation risk than executives of our peer groups. As an example, in 2004 the total cash compensation of CEO Craig R. Barrett was $2,454,000, of which $1,756,800, or 72%, of his total cash compensation was performance-based under the EOIP. This is compared to CEOs at our peer groups who have on average 61% of their total cash compensation incentive performance-based. As previously described in "Report of the Compensation Committee on Executive Compensation," our peer groups (also referred to as "the market") consist of a cross-industry subset of Fortune 50 companies as well as a technology industry subset of companies generally considered to be comparable to Intel.

We believe that we have effectively linked our executive officers' total cash compensation to our financial performance through the EOIP, and as a result of lower-than-market base salary and higher-than-market incentive payouts. In times of poor financial performance, our total cash compensation is lower than market. Conversely, in times of sustained excellent financial performance, our higher variability yields higher-than-market total cash compensation, motivating and rewarding executive officers for excellent performance.

In support of our pay-for-performance philosophy, we intend for the actual EOIP payouts to be closely linked to our financial performance for the fiscal year. The pay-for-performance variability in the EOIP is illustrated in the following graph. From 1998 to 2000, average total cash compensation of our top five most highly compensated executive officers increased 38%, while our EPS grew 76%. In 2001, our EPS declined 87%, and, as we intended, the average total cash compensation of our top five most highly compensated executives declined by 51%. Since 2001, the average total cash compensation of our top five most highly compensated executives (top six for 2004) has grown 26% and our EPS has grown 511% in the same time period.



*†EPS is net income divided by Intel's weighted average common shares outstanding, assuming dilution.*
*††Represents the total cash compensation average for the top six most highly compensated executive officers*

39

Table of Contents
Eligibility

Our executive officers, as determined by the Compensation Committee, are eligible to participate in the EOIP. Currently, each of our 14 executive officers participates in the EOIP. Executive officer eligibility is defined more broadly than the Section 162(m) requirements of the Tax Code to ensure consistent alignment of our executives to our financial goals

Payout Formula/Maximum Payout

The EOIP includes a formula to calculate the maximum annual incentive payout for each executive officer; however, we cannot pay EOIP incentives in excess of $5,000,000 annually to any executive officer In 1997, Andrew S Grove earned $2,669,100, the highest payout under the EOIP to date. The EOIP formula is composed of three variables: (1) the executive officer's annual incentive baseline amount, which the Compensation Committee determines annually; (2) our EPS; and (3) a factor pre-established each year by the Committee (the "Performance Factor") At the end of each year, we multiply the individual's incentive baseline amount by our EPS for the year and the Performance Factor to calculate the maximum EOIP incentive for that year.

For purposes of the EOIP incentive formula, "EPS" means the greater of our operating income or our net income per weighted average common shares outstanding, assuming dilution Operating income does not include gains or losses on equity securities or interest or other income we earned, and does not include a deduction for interest expense or income taxes; as a result, EPS based on operating income generally exceeds EPS based on net income The Compensation Committee, in its sole discretion and in compliance with IRS regulations, may adjust our operating income or net income for unusual, extraordinary or one-time events. These adjustments may include but are not limited to asset write-downs; acquisition-related charges; litigation, claim judgments, settlements or tax settlements; the effects of changes in tax law, changes in accounting principles or other such laws or provisions affecting reported results; accruals for reorganization and restructuring programs; gains or losses on investments (realized or unrealized); and any extraordinary non-recurring items as described in Accounting Principles Board Opinion No .30 and/or in management's discussion and analysis of financial condition and results of operations appearing in the annual report to stockholders for the applicable year. Adjustments made in the past have generally been made to eliminate the impact on EPS of large non-recurring expenses or settlements that cannot be planned for, such as acquisition-related expenses and tax or legal settlements, among other things

The Committee determines the Performance Factor annually for all participants in the EOIP When determining the annual Performance Factor, the Committee considers Intel's past financial performance, its internal estimates of current year financial performance, and the competitiveness of its executive officers' base salary and incentive baseline amounts compared to its peer groups

Actual Awards

Under the EOIP, the Compensation Committee has discretion to reduce, but not to increase, an individual's maximum incentive payout. The EOIP does not specify the factors that the Compensation Committee evaluates in the exercise of its discretion to reduce nor does it require the Compensation Committee to make such a reduction In past years, the Compensation Committee has traditionally exercised its discretion and has reduced the incentive payouts below what the EOIP formula yielded For an example, see the "Report of the Compensation Committee on Executive Compensation" for a discussion on the reduction made in 2004.

U.S. Income Tax Consequences

As described above, we intend incentives granted under the EOIP to qualify as "performance-based compensation" under Section 162(m) of the Tax Code By so doing, we preserve our federal income tax deductions with respect to annual compensation required to be taken into account under Section 162(m) that is in excess of $1 million and paid to one of our five most highly compensated executive officers To qualify, incentive awards must be granted under the stockholder-approved EOIP by a committee consisting solely of two or more "outside directors" (as defined under Section 162 regulations) In addition, the performance criteria must be set by a committee consisting solely of two or more "outside directors" within the first ninety (90) days of the service period, and the extent to which amounts payable under the performance criteria must likewise be certified by the committee.

Effective generally January 1, 2005, plans that are not tax-qualified under which compensation may be deferred must comply with Section 409A of the Tax Code (as added by The American Jobs Creation Act of 2004) Section 409A

Table of Contents
provides specific rules for deferral elections, distributions and funding mechanisms under non−qualified deferred compensation plans. Failure to comply would result in significant penalties and interest for the individual but would not impact our tax deduction for deferred compensation.

## Amendments to the EOIP

We are also requesting that our stockholders approve amendments to the EOIP. The purpose of these amendments is to clarify the Compensation Committee's authority under the EOIP and to address our executive officers' terms and conditions of participation. The full text of the amendments appears in Exhibit B. The principal features of the EOIP, including the proposed amendments, are outlined below (other than those features that have already been discussed in the preceding pages) and should be reviewed along with the text of the plan.

- *Section 5. Payment of Incentive:* Requires that the executive officer be employed by Intel on the last day of the EOIP performance period in order to be eligible for incentive payouts. The Compensation Committee, in its sole discretion, can make exceptions to this requirement in the case of death, disability or retirement.

- *Section 6. Amendment and Termination:* The Board of Directors or the Compensation Committee can amend or terminate the EOIP at any time, but stockholder approval will be required for amendments to change the class of executives eligible to participate in the plan, change the performance criteria on which amounts payable under the plan are conditioned, change the maximum amount of compensation that can be paid to any one employee under the plan, or otherwise, in each case to the extent required to satisfy Section 162(m) of the Tax Code.

- *Section 7. Income Tax Withholding:* We have the right to make all incentive payouts under the EOIP net of any federal, state or local taxes.

- *Section 8. Severability:* If a court or other regulatory body declares any term or condition of the EOIP to be unlawful, the other terms and conditions of the EOIP will remain in effect.

- *Section 9. Non−assignability:* No executive officer may sell, assign or gift any incentives under the EOIP until these incentives have actually been paid.

- *Section 10. Non−exclusivity of Plan:* The adoption of the EOIP by the Board of Directors and submission of the EOIP to stockholders for approval do not create any limitation on the power of the Compensation Committee or the Board to adopt other cash or equity−based compensation programs.

- *Section 11. Employment at Will:* Executive officers who participate in the EOIP are not guaranteed continued employment; we have the sole discretion to discharge any participant in the EOIP.

- *Section 12. No Vested Interest or Right:* Executive officers do not accrue or receive a vested right in their EOIP payout until the actual payout is made to the executive officer. We have no obligation to treat participants identically under the EOIP.

- *Section 13. Governing Law:* The EOIP will be interpreted under the laws of the State of Delaware and applicable federal law.

We are requesting that our stockholders approve the amended and restated EOIP so that incentive payments under the EOIP qualify as performance−based compensation and continue to be deductible for federal income tax purposes. We believe that this is in the best interests of the company and our stockholders.

## Recommendation of the Board

**The Board of Directors recommends that you vote "FOR" amendment and extension of the Intel Corporation Executive Officer Incentive Plan.**

Table of Contents
ADDITIONAL MEETING INFORMATION

*Meeting Proposals* There are no other matters that the Board intends to present, or has reason to believe others will present, at the annual meeting If other matters are properly presented for voting at the annual meeting, the persons named as proxies will vote in accordance with their best judgment on such matters

*Proxy Solicitation.* We will bear the expense of soliciting proxies, and we have retained D. F. King & Co., Inc. for a fee of $15,000 plus a reasonable amount to cover expenses Certain of our directors, officers and other employees, without additional compensation, may also solicit proxies personally or in writing, by telephone, e-mail or otherwise We are required to request that brokers and nominees who hold stock in their names furnish our proxy material to the beneficial owners of the stock, and we must reimburse such brokers and nominees for the expenses of doing so in accordance with certain statutory fee schedules We currently estimate that this reimbursement will cost us more than $4.5 million The actual amount will depend on variables such as the number of proxy materials, the number of stockholders receiving electronic delivery and postage cost See "Electronic Delivery of Our Stockholder Communications" for information on how you can help us reduce printing and mailing costs

OTHER MATTERS

*Section 16(a) Beneficial Ownership Reporting Compliance* Section 16(a) of the Securities Exchange Act of 1934, as amended, requires our directors and executive officers, among others, to file with the SEC and NASDAQ an initial report of ownership of our stock on a Form 3 and reports of changes in ownership on a Form 4 or a Form 5 Persons subject to Section 16 are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file Under SEC rules, certain forms of indirect ownership and ownership of company stock by certain family members are covered by these reporting requirements As a matter of practice, our administrative staff assists our executive officers and directors in preparing initial ownership reports and reporting ownership changes, and typically files these reports on their behalf.

Based solely on a review of the copies of such forms in our possession, and on written representations from certain reporting persons, we believe that during fiscal 2004, all of our executive officers and directors filed the required reports on a timely basis under Section 16(a), except that Dr. Moore made a gift of 227,200 shares to the California Institute of Technology in 2001 that was not timely reported A corrective filing has since been made

*2006 Stockholder Proposals or Nominations.* From time to time, our stockholders submit proposals that they believe should be voted on at the annual meeting or recommend persons who they believe should be nominated for election to the Board. Pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, some stockholder proposals may be eligible for inclusion in our 2006 proxy statement Any such stockholder proposals must be submitted, along with proof of ownership of our stock in accordance with Rule 14a-8(b)(2), to our principal executive offices, in care of our Corporate Secretary, via e-mail at *corporate secretary@intel.com*, by fax to (408) 653-8050 or mailed to Cary Klafter, Intel Corporation, M/S SC4-203, 2200 Mission College Blvd , Santa Clara, California 95052-8119 Failure to deliver a proposal by one of these means may result in it not being deemed timely received We must receive all submissions no later than November 29, 2005 We strongly encourage any stockholder interested in submitting a proposal to contact our Corporate Secretary in advance of this deadline to discuss the proposal, and stockholders may want to consult knowledgeable counsel with regard to the detailed requirements of applicable securities laws. Submitting a stockholder proposal does not guarantee that we will include it in our proxy statement. The Corporate Governance and Nominating Committee reviews all stockholder proposals and makes recommendations to the Board for action on such proposals. For information on recommending individuals for consideration as nominees, see "The Board, Board Committees and Meetings."

Alternatively, under our Bylaws, if a stockholder does not want to submit a proposal for the 2006 annual meeting in our proxy statement under Rule 14a-8, or intends to nominate a person as a candidate for election to the Board, the stockholder may submit the proposal or nomination not less than 45 days or more than 120 days prior to the anniversary of the date on which we first mailed our proxy materials for the 2005 annual meeting, unless the date of the 2006 annual meeting is advanced by more than 30 days or delayed (other than as a result of adjournment) by more than 30 days from the anniversary of the 2005 annual meeting For our 2006 annual meeting, we must receive such proposals and nominations no earlier than November 29, 2005 and no later than February 12, 2006. If the date of the 2006 annual meeting is advanced by more than 30 days or delayed (other than as a result of adjournment) by more than 30 days from the anniversary of the 2005 annual meeting, the stockholder must submit any such proposal or nomination no later than the close of business on the later of the 60th day prior to the 2006 annual meeting or the 10th day following the day on which public announcement of the date of such meeting is first made The stockholder's submission must include certain specified information concerning the proposal or nominee, as the case may be, and information as to the stockholder's ownership of our stock. We will not entertain any proposals or nominations at the annual meeting that do not meet these

42

Table of Contents
requirements If the stockholder does not also comply with the requirements of Rule 14a–4(c)(2) under the Securities Exchange Act of 1934, we may exercise discretionary voting authority under proxies that we solicit to vote in accordance with our best judgment on any such stockholder proposal or nomination To make a submission or to request a copy of our Bylaws, stockholders should contact our Corporate Secretary via e–mail at *corporate secretary@intel.com*, by fax to (408) 653–8050 or by mail to Cary Klafter, Intel Corporation, M/S SC4–203, 2200 Mission College Blvd , Santa Clara, California 95052–8119. Our Bylaws are also available on our web site at *www intel.com/intel/finance/docs/bylaws pdf*. We strongly encourage stockholders to seek advice from knowledgeable counsel before submitting a proposal or a nomination

*Financial Statements* Our financial statements for the year ended December 25, 2004 are included in our 2004 Annual Report to Stockholders, which we are sending to our stockholders at the same time as this proxy statement. We encourage our stockholders to conserve natural resources, as well as reduce mailing and printing costs, by signing up for electronic delivery of our stockholder communications For more information, see "Electronic Delivery of Our Stockholder Communications " If you have not received or had access to the annual report, please call our Investor Relations department at (408) 765–1480, and we will send a copy to you Our annual report and this proxy statement are available on the Internet at *www intel.com/intel/annualreports/2004*.

## COMMUNICATING WITH US

From time to time, we receive calls from stockholders asking how they can communicate with us The following communication options are available.

If you would like to *receive information* about us, you may use one of the following methods:

1. Our main Internet site, located at *www intel.com,* contains product and marketing information as well as job listings. Our Investor Relations site, located at *www.intc.com*, contains press releases, earnings releases, financial information and stock quotes, as well as corporate governance information and links to our SEC filings. This proxy statement and our 2004 Annual Report to Stockholders are both available on the Internet at *www intel com/intel/annualreports/2004*

2. To have information such as our latest Form 10–Q or annual report mailed to you, please call our transfer agent, Computershare Investor Services, LLC, at (800) 298–0146 (within the U S. and Canada) or (312) 360–5123 (outside the U.S. and Canada) You can view your Intel stock holdings electronically and perform other transactions by enrolling in Computershare's Investor Center at *www computershare com*

If you would like to *contact us,* call our Investor Relations department at (408) 765–1480, or send correspondence to Intel Corporation, Attn: Investor Relations, M/S RN5–24, 2200 Mission College Blvd , Santa Clara, California 95052–8119.

## STOCKHOLDERS SHARING THE SAME LAST NAME AND ADDRESS

In accordance with notices that we sent to certain stockholders, we are sending only one copy of our annual report and proxy statement to stockholders who share the same last name and address, unless they have notified us that they want to continue receiving multiple copies. This practice, known as "householding," is designed to reduce duplicate mailings and save significant printing and postage costs as well as natural resources.

If you received a householded mailing this year and you would like to have additional copies of our annual report and/or proxy statement mailed to you, or you would like to opt out of this practice for future mailings, please submit your request to our Corporate Secretary via e–mail at *corporate secretary@intel com*, by fax to (408) 653–8050 or by mail to Cary Klafter, Intel Corporation, M/S SC4–203, 2200 Mission College Blvd , Santa Clara, California 95052–8119, or call our Investor Relations department at (408) 765–1480. We will promptly send additional copies of the annual report and/or proxy statement upon receipt of such request You may also contact us if you received multiple copies of the annual meeting materials and would prefer to receive a single copy in the future.

Table of Contents

Unfortunately, householding for bank and brokerage accounts is limited to accounts within the same bank or brokerage firm. For example, if you and your spouse share the same last name and address, and you and your spouse each have two accounts containing Intel stock at two different brokerage firms, your household will receive two copies of our annual meeting materials—one from each brokerage firm. To reduce the number of duplicate sets of annual meeting materials your household receives, you may want to enroll some or all of your accounts in our electronic delivery program. See "Electronic Delivery of Our Stockholder Communications."

By Order of the Board of Directors

By: Cary I. Klafter
*Corporate Secretary*

Santa Clara, California
March 29, 2005

---

*Intel, the Intel logo, Pentium and Itanium are trademarks or registered trademarks of Intel Corporation or its subsidiaries in the United States and other countries. *Other names and brands may be claimed as the property of others.*

44

**Table of Contents**

EXHIBIT A

INTEL CORPORATION

2004 EQUITY INCENTIVE PLAN

AS AMENDED AND RESTATED, EFFECTIVE MAY 18, 2005

## 1. PURPOSE

The purpose of this Intel Corporation 2004 Equity Incentive Plan (the "Plan") is to advance the interests of Intel Corporation, a Delaware corporation, and its Subsidiaries (hereinafter collectively "Intel" or the "Corporation"), by stimulating the efforts of employees who are selected to be participants on behalf of Intel, aligning the long-term interests of participants with those of stockholders, heightening the desire of participants to continue in working toward and contributing to the success of Intel, assisting Intel in competing effectively with other enterprises for the services of new employees necessary for the continued improvement of operations, and to attract and retain the best available individuals for service as directors of the Corporation. This Plan permits the grant of stock options, stock appreciation rights, restricted stock and stock units, each of which shall be subject to such conditions based upon continued employment, passage of time or satisfaction of performance criteria as shall be specified pursuant to the Plan.

## 2. DEFINITIONS

(a) "Award" means a stock option, stock appreciation right, restricted stock or stock unit granted to a Participant pursuant to the Plan.

(b) "Board of Directors" means the Board of Directors of the Corporation.

(c) "Code" shall mean the Internal Revenue Code of 1986, as such is amended from time to time, and any reference to a section of the Code shall include any successor provision of the Code.

(d) "Committee" shall mean the committee appointed by the Board of Directors from among its members to administer the Plan pursuant to Section 3.

(e) "Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time, and any reference to a section of the Exchange Act shall include any successor provision of the Exchange Act.

(f) "Outside Director" shall mean a member of the Board of Directors who is not otherwise an employee of the Corporation.

(g) "Participants" shall mean those individuals to whom Awards have been granted from time to time and any authorized transferee of such individuals.

(h) "Performance Award" means an Award that vests only upon the satisfaction of one or more of the Qualifying Performance Criteria specified in Section 10(b).

(i) "Plan" means this Intel Corporation 2004 Equity Incentive Plan.

(j) "Share" shall mean a share of common stock, $.001 par value, of the Corporation or the number and kind of shares of stock or other securities which shall be substituted or adjusted for such shares as provided in Section 11.

(k) "Subsidiary" means any corporation or entity in which Intel Corporation owns or controls, directly or indirectly, fifty percent (50%) or more of the voting power or economic interests of such corporation or entity.

## 3. ADMINISTRATION

(a) *Composition of Committee.* This Plan shall be administered by the Committee. The Committee shall consist of two or more Outside Directors who shall be appointed by the Board of Directors. The Board of Directors shall fill vacancies on the Committee and may from time to time remove or add members of the Committee. The Board of Directors, in its sole discretion, may exercise any authority of the Committee under this Plan in lieu of the Committee's exercise thereof, and in such instances references herein to the Committee shall refer to the Board of Directors.

(b) *Delegation and Administration.* The Committee may delegate to one or more separate committees (any such committee a "Subcommittee") composed of one or more directors of the Corporation (who may but need not be members

A-1

Table of Contents
of the Committee) the ability to grant Awards and take the other actions described in Section 3(c) with respect to Participants who are not executive officers, and such actions shall be treated for all purposes as if taken by the Committee. Any action by any such Subcommittee within the scope of such delegation shall be deemed for all purposes to have been taken by the Committee, and references in this Plan to the Committee shall include any such Subcommittee. The Committee may delegate the administration of the Plan to an officer or officers of the Corporation, and such administrator(s) may have the authority to execute and distribute agreements or other documents evidencing or relating to Awards granted by the Committee under this Plan, to maintain records relating to the grant, vesting, exercise, forfeiture or expiration of Awards, to process or oversee the issuance of Shares upon the exercise, vesting and/or settlement of an Award, to interpret the terms of Awards and to take such other actions as the Committee may specify, provided that in no case shall any such administrator be authorized to grant Awards under the Plan. Any action by any such administrator within the scope of its delegation shall be deemed for all purposes to have been taken by the Committee and references in this Plan to the Committee shall include any such administrator, provided that the actions and interpretations of any such administrator shall be subject to review and approval, disapproval or modification by the Committee.

(c) *Powers of the Committee*. Subject to the express provisions and limitations set forth in this Plan, the Committee shall be authorized and empowered to do all things necessary or desirable, in its sole discretion, in connection with the administration of this Plan, including, without limitation, the following:

    (i)    to prescribe, amend and rescind rules and regulations relating to this Plan and to define terms not otherwise defined herein;

    (ii)    to determine which persons are Participants, to which of such Participants, if any, Awards shall be granted hereunder and the timing of any such Awards, and to grant Awards;

    (iii)    to grant Awards to Participants and determine the terms and conditions thereof, including the number of Shares subject to Awards and the exercise or purchase price of such Shares and the circumstances under which Awards become exercisable or vested or are forfeited or expire, which terms may but need not be conditioned upon the passage of time, continued employment, the satisfaction of performance criteria, the occurrence of certain events, or other factors;

    (iv)    to establish or verify the extent of satisfaction of any performance goals or other conditions applicable to the grant, issuance, exercisability, vesting and/or ability to retain any Award;

    (v)    to prescribe and amend the terms of the agreements or other documents evidencing Awards made under this Plan (which need not be identical);

    (vi)    to determine whether, and the extent to which, adjustments are required pursuant to Section 11;

    (vii)    to interpret and construe this Plan, any rules and regulations under this Plan and the terms and conditions of any Award granted hereunder, and to make exceptions to any such provisions in good faith and for the benefit of the Corporation; and

    (viii)    to make all other determinations deemed necessary or advisable for the administration of this Plan.

(d) *Effect of Change in Status*. The Committee shall have the discretion to determine the effect upon an Award and upon an individual's status as an employee under the Plan (including whether a Participant shall be deemed to have experienced a termination of employment or other change in status) and upon the vesting, expiration or forfeiture of an Award in the case of (i) any individual who is employed by an entity that ceases to be a Subsidiary of the Corporation, (ii) any leave of absence approved by the Corporation or a Subsidiary, (iii) any transfer between locations of employment with the Corporation or a Subsidiary or between the Corporation and any Subsidiary or between any Subsidiaries, (iv) any change in the Participant's status from an employee to a consultant or member of the Board of Directors, or vice versa, and (v) at the request of the Corporation or a Subsidiary, any employee who becomes employed by any partnership, joint venture, corporation or other entity not meeting the requirements of a Subsidiary.

(e) *Determinations of the Committee*. All decisions, determinations and interpretations by the Committee regarding this Plan shall be final and binding on all Participants. The Committee shall consider such factors as it deems relevant to making such decisions, determinations and interpretations including, without limitation, the recommendations or advice of any director, officer or employee of the Corporation and such attorneys, consultants and accountants as it may select. A Participant or other holder of an Award may contest a decision or action by the Committee with respect to such person or Award only on the grounds that such decision or action was arbitrary or capricious or was unlawful, and any review of such decision or action shall be limited to determining whether the Committee's decision or action was arbitrary or capricious or was unlawful.

Table of Contents
## 4. PARTICIPANTS

Awards under the Plan may be granted to any person who is an employee or Outside Director of the Corporation. Outside Directors may be granted Awards only pursuant to Section 8(i)9 of the Plan. The status of the Chairman of the Board of Directors as an employee or Outside Director shall be determined by the Committee. Any person designated by the Corporation as an independent contractor shall not be treated as an employee and shall not be eligible for Awards under the Plan.

## 5. EFFECTIVE DATE AND EXPIRATION OF PLAN

(a) *Effective Date*. This Plan was approved by the Board of Directors on February 20, 2004 and will become became effective on May 19, 2004, subject to approval by the affirmative vote of the holders of a majority of the votes cast at the 2004 Annual Meeting of Stockholders.

(b) *Expiration Date*. The Plan shall remain available for the grant of Awards until June 30, 2006 2007 or such earlier date as the Board of Directors may determine. The expiration of the Committee's authority to grant Awards under the Plan will not affect the operation of the terms of the Plan or the Corporation's and Participants' rights and obligations with respect to Awards granted on or prior to the expiration date of the Plan.

## 6. SHARES SUBJECT TO THE PLAN

(a) *Aggregate Limits*. Subject to adjustment as provided in Section 11, the aggregate number of Shares authorized for issuance as Awards under the Plan is 240,000,000 370,000,000, of which no more than an aggregate of 35,000,000 Shares may be issued as restricted stock or stock units and no more than an aggregate of 8,000,000 10,000,000 Shares shall be available for issuance as stock options under any program providing for stock option grants that vest in full in five or more years and that have a maximum term of ten years. The Shares subject to the Plan may be either Shares reacquired by the Corporation, including Shares purchased in the open market, or authorized but unissued Shares. Any Shares subject to an Award which for any reason expires or terminates unexercised or is not earned in full may again be made subject to an Award under the Plan. The following Shares may not again be made available for issuance as Awards under the Plan: (i) Shares not issued or delivered as a result of the net settlement of an outstanding Stock Appreciation Right, (ii) Shares used to pay the exercise price or withholding taxes related to an outstanding Award, or (iii) Shares repurchased on the open market with the proceeds of the option exercise price.

(b) *Tax Code Limits*. The aggregate number of Shares subject to stock options or stock appreciation rights granted under this Plan during any calendar year to any one Participant shall not exceed 3,000,000. The aggregate number of Shares subject to restricted stock or stock unit Awards granted under this Plan during any calendar year to any one Participant shall not exceed 2,000,000. Notwithstanding anything to the contrary in this Plan, the foregoing limitations shall be subject to adjustment under Section 11, but only to the extent that such adjustment will not affect the status of any Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code. The aggregate number of Shares issued pursuant to incentive stock options granted under the Plan shall not exceed 240,000,000 370,000,000, which limitation shall be subject to adjustment under Section 11 only to the extent that such adjustment is consistent with adjustments permitted of a plan authorizing incentive stock options under Section 422 of the Code.

## 7. PLAN AWARDS

(a) *Award Types*. The Committee, on behalf of the Corporation, is authorized under this Plan to grant, award and enter into the following arrangements or benefits under the Plan provided that their terms and conditions are not inconsistent with the provisions of the Plan: stock options, stock appreciation rights, restricted stock and stock units. Such arrangements and benefits are sometimes referred to herein as "Awards." The Committee, in its discretion, may determine that any Award granted hereunder shall be a Performance Award.

(i) *Stock Options*. A "Stock Option" is a right to purchase a number of Shares at such exercise price, at such times, and on such other terms and conditions as are specified in or determined pursuant to the document(s) evidencing the Award (the "Option Agreement"). The Committee may grant Stock Options intended to be eligible to qualify as incentive stock options ("ISOs") pursuant to Section 422 of the Code and Stock Options that are not intended to qualify as ISOs ("Non-qualified Stock Options"), as it, in its sole discretion, shall determine.

(ii) *Stock Appreciation Rights*. A "Stock Appreciation Right" or "SAR" is a right to receive, in cash or stock (as determined by the Committee), value with respect to a specific number of Shares equal to or otherwise based on the excess of (i) the market value of a Share at the time of exercise over (ii) the exercise price of the right, subject to such terms and conditions as are expressed in the document(s) evidencing the Award (the "SAR Agreement").

(iii) *Restricted Stock*. A "Restricted Stock" Award is an award of Shares, the grant, issuance, retention and/or vesting of which is subject to such conditions as are expressed in the document(s) evidencing the Award (the "Restricted Stock Agreement").

A-3

Table of Contents

(iv) *Stock Unit* A "Stock Unit" Award is an award of a right to receive, in cash or stock (as determined by the Committee) the market value of one Share, the grant, issuance, retention and/or vesting of which is subject to such conditions as are expressed in the document(s) evidencing the Award (the "Stock Unit Agreement")

(b) *Grants of Awards* An Award may consist of one of the foregoing arrangements or benefits or two or more of them in tandem or in the alternative

## 8. ~~GRANT, TERMS AND CONDITIONS OF STOCK OPTIONS AND SARS~~ EMPLOYEE PARTICIPANT AWARDS

### (a) *Grant, Terms and Conditions of Stock Options and SARs*

The Committee may grant Stock Options or SARs at any time and from time to time prior to the expiration of the Plan to eligible employee Participants selected by the Committee. No Participant shall have any rights as a stockholder with respect to any Shares subject to Stock Options or SARs hereunder until said Shares have been issued. Each Stock Option or SAR shall be evidenced only by such agreements, notices and/or terms or conditions documented in such form (including by electronic communications) as may be approved by the Committee. Each Stock Option grant will expressly identify the Stock Option as an ISO or as a Non–qualified Stock Option. Stock Options or SARs granted pursuant to the Plan need not be identical but each must contain or be subject to the following terms and conditions:

(i) *Price* The purchase price (also referred to as the exercise price) under each Stock Option or SAR granted hereunder shall be established by the Committee. The purchase price per Share shall not be less than 100% of the market value of a Share on the date of grant. For purposes of the Plan, "market value" shall mean the average of the high and low sales prices of the Corporation's common stock. The exercise price of a Stock Option shall be paid in cash or in such other form if and to the extent permitted by the Committee, including without limitation by delivery of already owned Shares, withholding (either actually or by attestation) of Shares otherwise issuable under such Stock Option and/or by payment under a broker–assisted sale and remittance program acceptable to the Committee.

(ii) *No Repricing*. Other than in connection with a change in the Corporation's capitalization (as described in Section 11 of the Plan), the exercise price of ~~an~~ a Stock Option or SAR may not be reduced without stockholder approval

(iii) *No Reload Grants* Stock Options shall not be granted under the Plan in consideration for and shall not be conditioned upon the delivery of Shares to the Corporation in payment of the exercise price and/or tax withholding obligation under any other employee stock option.

(iv) *Duration, Exercise and Termination of Stock Options and SARs*. Each Stock Option or SAR shall be exercisable at such time and in such installments during the period prior to the expiration of the Stock Option or SAR as determined by the Committee. The Committee shall have the right to make the timing of the ability to exercise any Stock Option or SAR subject to continued employment, the passage of time and/or such performance requirements as deemed appropriate by the Committee. At any time after the grant of a Stock Option, the Committee may reduce or eliminate any restrictions on the Participant's right to exercise all or part of the Stock Option, except that no Stock Option shall first become exercisable within one (1) year from its date of grant, other than upon the death, disability or retirement of the person to whom the Stock Option was granted, in each case as specified in the Option Agreement

Each Stock Option or SAR that vests in full in less than five (5) years (standard grants) must expire within a period of not more than seven (7) years from the grant date and each Stock Option or SAR that vests in full in five (5) or more years (long–term retention grants) must expire within a period of not more than ten (10) years from the grant date. In each case, the Option Agreement or SAR Agreement may provide for expiration prior to the end of the stated term of the Award in the event of the termination of employment or service of the Participant to whom it was granted.

(v) *Suspension or Termination of Stock Options and SARs*. If at any time (including after a notice of exercise has been delivered) the Committee, including any Subcommittee or administrator authorized pursuant to Section 3(b) (any such person, an "Authorized Officer"), reasonably believes that a Participant, other than an Outside Director, has committed an act of misconduct as described in this Section, the Authorized Officer may suspend the Participant's right to exercise any Stock Option or SAR pending a determination of whether an act of misconduct has been committed. If the Committee or an Authorized Officer determines a Participant, other than an Outside Director, has committed an act of embezzlement, fraud, dishonesty, nonpayment of any obligation owed to Intel, breach of fiduciary duty or deliberate disregard of Corporation rules resulting in loss, damage or injury to the Corporation, or if a Participant makes an unauthorized disclosure of any Corporation trade secret or confidential information, engages in any conduct constituting unfair competition, induces any customer to breach a contract with the Corporation or

A–4

Table of Contents

induces any principal for whom Intel acts as agent to terminate such agency relationship, neither the Participant nor his or her estate shall be entitled to exercise any Stock Option or SAR whatsoever. Any determination by the Committee or an Authorized Officer with respect to the foregoing shall be final, conclusive and binding on all interested parties. For any Participant who is an "executive officer" for purposes of Section 16 of the Exchange Act, the determination of the Committee or of the Authorized Officer shall be subject to the approval of the Board of Directors.

(vi) *Conditions and Restrictions Upon Securities Subject to Stock Options or SARs.* Subject to the express provisions of the Plan, the Committee may provide that the Shares issued upon exercise of a Stock Option or SAR shall be subject to such further conditions or agreements as the Committee in its discretion may specify prior to the exercise of such Stock Option or SAR, including, without limitation, conditions on vesting or transferability, forfeiture or repurchase provisions. The obligation to make payments with respect to SARs may be satisfied through cash payments or the delivery of Shares, or a combination thereof as the Committee shall determine. The Committee may establish rules for the deferred delivery of Common Stock upon exercise of a Stock Option or SAR with the deferral evidenced by use of "Stock Units" equal in number to the number of Shares whose delivery is so deferred.

(vii) *Other Terms and Conditions.* Stock Options and SARs may also contain such other provisions, which shall not be inconsistent with any of the foregoing terms, as the Committee shall deem appropriate.

(viii) *ISOs.* Stock Options intending to qualify as ISOs may only be granted to employees of the Corporation within the meaning of the Code, as determined by the Committee. No ISO shall be granted to any person if immediately after the grant of such Award, such person would own stock, including stock subject to outstanding Awards held by him or her under the Plan or any other plan established by the Corporation, amounting to more than ten percent (10%) of the total combined voting power or value of all classes of stock of the Corporation. To the extent that the Option Agreement specifies that a Stock Option is intended to be treated as an ISO, the Stock Option is intended to qualify to the greatest extent possible as an "incentive stock option" within the meaning of Section 422 of the Code, and shall be so construed; provided, however, that any such designation shall not be interpreted as a representation, guarantee or other undertaking on the part of the Corporation that the Stock Option is or will be determined to qualify as an ISO. If and to the extent that any Shares are issued under a portion of any Stock Option that exceeds the $100,000 limitation of Section 422 of the Code, such Shares shall not be treated as issued under an ISO notwithstanding any designation otherwise. Certain decisions, amendments, interpretations and actions by the Committee and certain actions by a Participant may cause a Stock Option to cease to qualify as an ISO pursuant to the Code and by accepting a Stock Option the Participant agrees in advance to such disqualifying action.

(ix) ~~Outside Director Stock Options. Each Outside Director shall be granted a Non-qualified Stock Option (an "Outside Director Option") once each fiscal year for not more than 30,000 Shares, as determined by the Board of Directors, provided that if an Outside Director is elected to begin serving as a director on a date not coincident with the grant date for such annual grant, then he or she will be granted an initial Outside Director Option as of the date of the first meeting of the Board of Directors at which he or she serves for a prorated number of Shares based on the number of months remaining until the next annual Outside Director Option grant. Notwithstanding anything to the contrary in this Plan, the foregoing limitations shall be subject to adjustment under Section 11. The number of Shares subject to each Outside Director Option, or the formula pursuant to which such number shall be determined, the date of grant and the vesting, expiration and other terms applicable to such Stock Options shall be specified from time to time by the Board of Directors, subject to the terms of this Plan applicable to Stock Options in general.~~

## 9. ~~GRANT, TERMS AND CONDITIONS OF RESTRICTED STOCK AND STOCK UNITS~~

(b) *Grant, Terms and Conditions of Restricted Stock and Stock Units.*

The Committee may grant Restricted Stock or Stock Units at any time and from time to time prior to the expiration of the Plan to eligible <u>employee</u> Participants selected by the Committee. A Participant shall have rights as a stockholder with respect to any Shares subject to a Restricted Stock Award hereunder only to the extent specified in this Plan or the Restricted Stock Agreement evidencing such Award. Awards of Restricted Stock or Stock Units shall be evidenced by such agreements, notices and/or terms or conditions documented in such form (including by electronic communications) as may be approved by the Committee. Awards of Restricted Stock or Stock Units granted pursuant to the Plan need not be identical but each must contain or be subject to the following terms and conditions:

(i) *Terms and Conditions.* Each Restricted Stock Agreement and each Stock Unit Agreement shall contain provisions regarding (a) the number of Shares subject to such Award or a formula for determining such, (b) the purchase price of the Shares, if any, and the means of payment for the Shares, (c) the performance criteria, if any, and level of achievement versus these criteria that shall determine the number of Shares granted, issued, retainable and/or

A-5

Table of Contents

vested, (d) such terms and conditions on the grant, issuance, vesting and/or forfeiture of the Shares as may be determined from time to time by the Committee, (e) restrictions on the transferability of the Shares and (f) such further terms and conditions as may be determined from time to time by the Committee, in each case not inconsistent with this Plan.

(ii) *Sale Price*. Subject to the requirements of applicable law. the Committee shall determine the price, if any, at which Shares of Restricted Stock or Stock Units shall be sold or awarded to a Participant, which may vary from time to time and among Participants and which may be below the market value of such Shares at the date of grant or issuance.

(iii) *Share Vesting*. The grant, issuance, retention and/or vesting of Shares under Restricted Stock or Stock Unit Awards shall be at such time and in such installments as determined by the Committee or under criteria established by the Committee. The Committee shall have the right to make the timing of the grant and/or the issuance, ability to retain and/or vesting of Shares under Restricted Stock or Stock Unit Awards subject to continued employment, passage of time and/or such performance criteria and level of achievement versus these criteria as deemed appropriate by the Committee, which criteria may be based on financial performance and/or personal performance evaluations. <u>Up to 100,000 Shares shall be available for issuance to employee Participants as Awards having no minimum vesting period.</u> No condition that is based on performance criteria and level of achievement versus such criteria shall be based on performance over a period of less than one year, and no condition that is based upon continued employment, or the passage of time shall provide for vesting in full of a Restricted Stock or Stock Unit Award in less than pro rata installments over three years from the date the Award is made, other than with respect to such Awards that are issued upon exercise or settlement of Stock Options or SARs or upon the death, disability or retirement of the Participant, in each case as specified in the agreement evidencing such Award. Notwithstanding anything to the contrary herein, the performance criteria for any Restricted Stock or Stock Unit that is intended to satisfy the requirements for "performance-based compensation" under Section 162(m) of the Code shall be a measure based on one or more Qualifying Performance Criteria selected by the Committee and specified at the time the Restricted Stock Award is granted.

(iv) *Termination of Employment*. The Restricted Stock or Stock Unit Agreement may provide for the forfeiture or cancellation of the Restricted Stock or Stock Unit Award, in whole or in part, in the event of the termination of employment or service of the Participant to whom it was granted.

(v) *Stock Units*. Except to the extent this Plan or the Committee specifies otherwise, Stock Units represent an unfunded and unsecured obligation of the Corporation and do not confer any of the rights of a stockholder until Shares are issued thereunder. Settlement of Stock Units upon expiration of the deferral or vesting period shall be made in Shares or otherwise as determined by the Committee. The number of Shares, or other settlement medium, to be so distributed may be increased by an interest factor or by dividend equivalents. Until a Stock Unit is so settled, the number of Shares represented by a Stock Unit shall be subject to adjustment pursuant to Section 11. Any Stock Units that are settled after the Participant's death shall be distributed to the Participant's designated beneficiary(ies) or, if none was designated, the Participant's estate.

## 9. OUTSIDE DIRECTOR AWARDS

<u>Each Outside Director may be granted Awards (each an "Outside Director Award") each fiscal year for up to 30,000 Shares, as determined by the Board of Directors. Notwithstanding anything to the contrary in this Plan, the foregoing limitation shall be subject to adjustment under Section 11. The number of Shares subject to each Outside Director Award, or the formula pursuant to which such number shall be determined, the type or types of Awards included in the Outside Director Awards, the date of grant and the vesting, expiration and other terms applicable to such Outside Director Awards shall be specified from time to time by the Board of Directors, subject to the terms of this Plan, including the terms specified in Section 8. If the Board of Directors reasonably believes that an Outside Director has committed an act of misconduct as specified in Section 8(a)(v), the Board of Directors may suspend the Outside Director's right to exercise any Stock Option or SAR and/or the vesting of any Restricted Stock or Stock Unit Award pending a determination of whether an act of misconduct has been committed. If the Board of Directors determines that an Outside Director has committed an act of misconduct, neither the Outside Director nor his or her estate shall be entitled to exercise any Stock Option or SAR whatsoever and shall forfeit any unvested Restricted Stock or Stock Unit Award.</u>

## 10. OTHER PROVISIONS APPLICABLE TO AWARDS

(a) *Transferability*. Unless the agreement or other document evidencing an Award (or an amendment thereto authorized by the Committee) expressly states that the Award is transferable as provided hereunder, no Award granted

A-6

Table of Contents

under this Plan, nor any interest in such Award, may be sold, assigned, conveyed, gifted, pledged, hypothecated or otherwise transferred in any manner prior to the vesting or lapse of any and all restrictions applicable thereto, other than by will or the laws of descent and distribution. The Committee may grant an Award or amend an outstanding Award to provide that the Award is transferable or assignable (a) in the case of a transfer without the payment of any consideration, to any "family member" as such term is defined in Section 1(a)(5) of the General Instructions to Form S–8 under the Securities Act of 1933, as such may be amended from time to time, and (b) in any transfer described in clause (ii) of Section 1(a)(5) of the General Instructions to Form S–8 under the 1933 Act as amended from time to time, *provided* that following any such transfer or assignment the Award will remain subject to substantially the same terms applicable to the Award while held by the Participant to whom it was granted, as modified as the Committee shall determine appropriate, and as a condition to such transfer the transferee shall execute an agreement agreeing to be bound by such terms; *provided further*, that an ISO may be transferred or assigned only to the extent consistent with Section 422 of the Code Any purported assignment, transfer or encumbrance that does not qualify under this Section 10(a) shall be void and unenforceable against the Corporation

(b) *Qualifying Performance Criteria*. For purposes of this Plan, the term "Qualifying Performance Criteria" shall mean any one or more of the following performance criteria, either individually, alternatively or in any combination, applied to either the Corporation as a whole or to a business unit or Subsidiary, either individually, alternatively or in any combination, and measured either annually or cumulatively over a period of years, on an absolute basis or relative to a pre−established target, to previous years' results or to a designated comparison group, in each case as specified by the Committee in the Award: (a) cash flow, (b) earnings per share, (c) earnings before interest, taxes and amortization, (d) return on equity, (e) total stockholder return, (f) share price performance, (g) return on capital, (h) return on assets or net assets, (i) revenue, (j) income or net income, (k) operating income or net operating income, (l) operating profit or net operating profit, (m) operating margin or profit margin, (n) return on operating revenue, (o) return on invested capital, (p) market segment share, (q) product release schedules, (r) new product innovation, (s) product cost reduction through advanced technology, (t) brand recognition/acceptance, (u) product ship targets, or (v) customer satisfaction. The Committee may appropriately adjust any evaluation of performance under a Qualifying Performance Criteria to exclude any of the following events that occurs during a performance period: (i) asset write−downs, (ii) litigation or claim judgments or settlements, (iii) the effect of changes in tax law, accounting principles or other such laws or provisions affecting reported results, (iv) accruals for reorganization and restructuring programs and (v) any extraordinary non−recurring items as described in Accounting Principles Board Opinion No. 30 and/or in management's discussion and analysis of financial condition and results of operations appearing in the Corporation's annual report to stockholders for the applicable year. Notwithstanding satisfaction of any completion of any Qualifying Performance Criteria, to the extent specified at the time of grant of an Award, the number of Shares, Stock Options, SARs, Stock Units or other benefits granted, issued, retainable and/or vested under an Award on account of satisfaction of such Qualifying Performance Criteria may be reduced by the Committee on the basis of such further considerations as the Committee in its sole discretion shall determine.

(c) *Dividends* Unless otherwise provided by the Committee, no adjustment shall be made in Shares issuable under Awards on account of cash dividends that may be paid or other rights that may be issued to the holders of Shares prior to their issuance under any Award The Committee shall specify whether dividends or dividend equivalent amounts shall be paid to any Participant with respect to the Shares subject to any Award that have not vested or been issued or that are subject to any restrictions or conditions on the record date for dividends

(d) *Documents Evidencing Awards* The Committee shall, subject to applicable law, determine the date an Award is deemed to be granted. The Committee or, except to the extent prohibited under applicable law, its delegate(s) may establish the terms of agreements or other documents evidencing Awards under this Plan and may, but need not, require as a condition to any such agreement's or document's effectiveness that such agreement or document be executed by the Participant, including by electronic signature or other electronic indication of acceptance, and that such Participant agree to such further terms and conditions as specified in such agreement or document The grant of an Award under this Plan shall not confer any rights upon the Participant holding such Award other than such terms, and subject to such conditions, as are specified in this Plan as being applicable to such type of Award (or to all Awards) or as are expressly set forth in the agreement or other document evidencing such Award.

(e) *Additional Restrictions on Awards* Either at the time an Award is granted or by subsequent action, the Committee may, but need not, impose such restrictions, conditions or limitations as it determines appropriate as to the timing and manner of any resales by a Participant or other subsequent transfers by a Participant of any Shares issued under an Award, including without limitation (a) restrictions under an insider trading policy, (b) restrictions designed to delay and/or coordinate the timing and manner of sales by the Participant or Participants, and (c) restrictions as to the use of a specified brokerage firm for such resales or other transfers

A−7

**Table of Contents**

(f) *Subsidiary Awards*. In the case of a grant of an Award to any Participant employed by a Subsidiary, such grant may, if the Committee so directs, be implemented by Intel issuing any subject Shares to the Subsidiary, for such lawful consideration as the Committee may determine, upon the condition or understanding that the Subsidiary will transfer the Shares to the Participant in accordance with the terms of the Award specified by the Committee pursuant to the provisions of the Plan. Notwithstanding any other provision hereof, such Award may be issued by and in the name of the Subsidiary and shall be deemed granted on such date as the Committee shall determine.

## 11. ADJUSTMENT OF AND CHANGES IN THE COMMON STOCK

(a) The existence of outstanding Awards shall not affect in any way the right or power of the Corporation or its shareholders to make or authorize any or all adjustments, recapitalizations, reorganizations, exchanges, or other changes in the Corporation's capital structure or its business, or any merger or consolidation of the Corporation or any issuance of Shares or other securities or subscription rights thereto, or any issuance of bonds, debentures, preferred or prior preference stock ahead of or affecting the Shares or other securities of the Corporation or the rights thereof, or the dissolution or liquidation of the Corporation, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise. Further, except as expressly provided herein or by the Committee, (i) the issuance by the Corporation of shares of stock or any class of securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Corporation convertible into such shares or other securities, (ii) the payment of a dividend in property other than Shares, or (iii) the occurrence of any similar transaction, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to Stock Options or other Awards theretofore granted or the purchase price per Share, unless the Committee shall determine, in its sole discretion, that an adjustment is necessary or appropriate.

(b) If the outstanding Shares or other securities of the Corporation, or both, for which the Award is then exercisable or as to which the Award is to be settled shall at any time be changed or exchanged by declaration of a stock dividend, stock split, combination of shares, extraordinary dividend of cash and/or assets, recapitalization, reorganization or any similar event affecting the Shares or other securities of the Corporation, the Committee may appropriately and equitably adjust the number and kind of Shares or other securities which are subject to this Plan or subject to any Awards theretofore granted, and the exercise or settlement prices of such Awards, so as to maintain the proportionate number of Shares or other securities without changing the aggregate exercise or settlement price.

(c) No right to purchase fractional Shares shall result from any adjustment in Stock Options or SARs pursuant to this Section 11. In case of any such adjustment, the Shares subject to the Stock Option or SAR shall be rounded down to the nearest whole share.

(d) Any other provision hereof to the contrary notwithstanding (except Section 11(a)), in the event Intel is a party to a merger or other reorganization, outstanding Awards shall be subject to the agreement of merger or reorganization. Such agreement may provide, without limitation, for the assumption of outstanding Awards by the surviving corporation or its parent, for their continuation by Intel (if Intel is a surviving corporation), for accelerated vesting and accelerated expiration, or for settlement in cash.

## 12. LISTING OR QUALIFICATION OF COMMON STOCK

In the event that the Board of Directors determines in its discretion that the listing or qualification of the Shares available for issuance under the Plan on any securities exchange or quotation or trading system or under any applicable law or governmental regulation is necessary as a condition to the issuance of such Shares, a Stock Option or SAR may not be exercised in whole or in part and a Restricted Stock or Stock Unit Award shall not vest unless such listing, qualification, consent or approval has been unconditionally obtained.

## 13. TERMINATION OR AMENDMENT OF THE PLAN

The Board of Directors may amend, alter or discontinue the Plan and the Board or the Committee may to the extent permitted by the Plan amend any agreement or other document evidencing an Award made under this Plan, provided, however, that the Corporation shall submit for stockholder approval any amendment (other than an amendment pursuant to the adjustment provisions of Section 11) required to be submitted for stockholder approval by NASDAQ or that otherwise would:

   (a) Increase the maximum number of Shares for which Awards may be granted under this Plan;

   (b) Reduce the price at which Stock Options may be granted below the price provided for in Section 8(a);

A–8

Table of Contents

(c) Reduce the option price of outstanding Stock Options;

(d) Extend the term of this Plan;

(e) Change the class of persons eligible to be Participants; or

(f) Increase the limits in Section 6.

In addition, no such amendment or alteration shall be made which would impair the rights of any Participant, without such Participant's consent, under any Award theretofore granted, provided that no such consent shall be required with respect to any amendment or alteration if the Committee determines in its sole discretion that such amendment or alteration either (i) is required or advisable in order for the Corporation, the Plan or the Award to satisfy any law or regulation or to meet the requirements of any accounting standard, or (ii) is not reasonably likely to significantly diminish the benefits provided under such Award, or that any such diminishment has been adequately compensated.

## 14. WITHHOLDING

To the extent required by applicable federal, state, local or foreign law, the Committee may and/or a Participant shall make arrangements satisfactory to the Corporation for the satisfaction of any withholding tax obligations that arise with respect to any Stock Option, SAR, Restricted Stock or Stock Unit Award, or any sale of Shares. The Corporation shall not be required to issue Shares or to recognize the disposition of such Shares until such obligations are satisfied. To the extent permitted or required by the Committee, these obligations may or shall be satisfied by having the Corporation withhold a portion of the Shares of stock that otherwise would be issued to a Participant under such Award or by tendering Shares previously acquired by the Participant.

## 15. GENERAL PROVISIONS

(a) *Employment At Will*. Neither the Plan nor the grant of any Award nor any action by the Corporation, any Subsidiary or the Committee shall be held or construed to confer upon any person any right to be continued in the employ of the Corporation or a Subsidiary. The Corporation and each Subsidiary expressly reserve the right to discharge, without liability but subject to his or her rights under this Plan, any Participant whenever in the sole discretion of the Corporation or a Subsidiary, as the case may be, its interest may so require.

(b) *Governing Law*. This Plan and any agreements or other documents hereunder shall be interpreted and construed in accordance with the laws of the State of Delaware and applicable federal law. The Committee may provide that any dispute as to any Award shall be presented and determined in such forum as the Committee may specify, including through binding arbitration. Any reference in this Plan or in the agreement or other document evidencing any Award to a provision of law or to a rule or regulation shall be deemed to include any successor law, rule or regulation of similar effect or applicability.

(c) *Unfunded Plan*. Insofar as it provides for Awards, the Plan shall be unfunded. Although bookkeeping accounts may be established with respect to Participants who are granted Awards under this Plan, any such accounts will be used merely as a bookkeeping convenience. The Corporation shall not be required to segregate any assets which may at any time be represented by Awards, nor shall this Plan be construed as providing for such segregation, nor shall the Corporation or the Committee be deemed to be a trustee of stock or cash to be awarded under the Plan.

## 16. NON-EXCLUSIVITY OF PLAN

Neither the adoption of this Plan by the Board of Directors nor the submission of this Plan to the shareholders of the Corporation for approval shall be construed as creating any limitations on the power of the Board of Directors or the Committee to adopt such other incentive arrangements as either may deem desirable, including, without limitation, the granting of stock options, stock appreciation rights, restricted stock or stock units otherwise than under this Plan, and such arrangements may be either generally applicable or applicable only in specific cases.

## 17. COMPLIANCE WITH OTHER LAWS AND REGULATIONS

This Plan, the grant and exercise of Awards thereunder, and the obligation of the Corporation to sell, issue or deliver Shares under such Awards, shall be subject to all applicable federal, state and local laws, rules and regulations and to such approvals by any governmental or regulatory agency as may be required. The Corporation shall not be required to register in a Participant's name or deliver any Shares prior to the completion of any registration or qualification of such Shares under any federal, state or local law or any ruling or regulation of any government body which the Committee shall

Table of Contents
determine to be necessary or advisable. To the extent the Corporation is unable to or the Committee deems it infeasible to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Corporation's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, the Corporation shall be relieved of any liability with respect to the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained. No Stock Option shall be exercisable and no Shares shall be issued and/or transferable under any other Award unless a registration statement with respect to the Shares underlying such Stock Option is effective and current or the Corporation has determined that such registration is unnecessary.

**18. LIABILITY OF CORPORATION**

The Corporation shall not be liable to a Participant or other persons as to: (a) the non−issuance or sale of Shares as to which the Corporation has been unable to obtain from any regulatory body having jurisdiction the authority deemed by the Corporation's counsel to be necessary to the lawful issuance and sale of any Shares hereunder; and (b) any tax consequence expected, but not realized, by any Participant or other person due to the receipt, exercise or settlement of any Stock Option or other Award granted hereunder.

A−10