# EXHIBIT C

Westlaw.

2002 WL 32817147                                                                    Page 1
2002 WL 32817147 (3rd Cir.)

United States Court of Appeals,
Third Circuit.
David B. SHAEV, Appellant,
v.
Lawrence SAPER; Alan B. Abramson; David Altschiller; Joseph Grayzel, M.D.;
George Heller; Arno Nash; and Datascope Corp., Appellees.
No. 02-2206.
August 21, 2002.
Appeal From the United States District Court for the District of New Jersey

Brief for Appellant and Appendix Volume I of II (Pages A-1 - A-14)
Irving Bizar, A. Arnold Gershon, Ballon, Stoll, Bader & Nadler, 1450 Broadway, 14th Floor, New York, New York 10018, (212) 575-7900, Attorneys for Appellant.

*TABLE OF CONTENTS*

Table of Cases and Authorities ... (ii)-(v)

PRELIMINARY STATEMENT ... 1

JURISDICTIONAL STATEMENT ... 1

ISSUES PRESENTED FOR REVIEW ... 1

STATEMENT OF THE CASE ... 3

STATEMENT OF FACTS ... 4

STATEMENT OF RELATED CASES AND PROCEEDINGS ... 7

STATEMENT OF STANDARD OF REVIEW ... 8

SUMMARY OF ARGUMENT ... 8

ARGUMENT

POINT I: THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER § 14(a) OF THE EXCHANGE ACT AND S.E.C. RULE 14a-9 ... 9

  A. The Proxy Statement Contains Misrepresentations and Omissions. ... 10

  B. The Misrepresentations And Omissions Were Material ... 15

POINT II: THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER STATE LAW. ... 20

POINT III: DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED ... 22

CONCLUSION ... 27

TABLE OF CASES AND AUTHORITIES

Aronson v. Lewis, 473 A.2d 805 (Del. 1984) ... 24, 26

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                      Page 2
2002 WL 32817147 (3rd Cir.)

*Benerofe v. Cha*, 1998 WL 83081 (Del.Ch. February 20, 1998) ... 21

*Beneville v. York*, 769 A.2d 80 (Del.Ch. 2000) ... 22

*Bilunka v. Sanders*, 1994 WL 447156 (N.D.Cal. March 2, 1994) ... 22

*Commonwealth of Pennsylvania v. Pepsico. Inc.*, 836 F.2d 173 (3rd Cir. 1988) ... 18, 19

*Fendelman v. Fenco Handbag Mfg. Co.*, 482 S.W.2d 461 (Mo. 1972) ... 21

*Galef v. Alexander*, 615 F.2d 51 (2nd Cir. 1980) ... 15, 26

*Gallin v. National City Bank*, 273 N.Y.S. 87 (Sup.Ct. N.Y. Co. 1934) ... 20

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2nd Cir. 2000) ... 15

*Gould v. American-Hawaiian S.S. Co*, 535 F.2d 761 (3rd Cir. 1976) ... 9

*J.I. Case Co. v. Borak*, 377 U.S. 425 (1964) ... 9

*Johnsrud v. Carter*, 620 F.2d 29 (3rd Cir. 1980) ... 12

*Kahn v. Tremont Corp.*, 1994 WL 162613 (Del.Ch. April 22, 1994) ... 24

*Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991) ... 26

*Kaufman v. Beal*, 1983 Del.Ch. LEXIS 391 (Del.Ch. February 25, 1983) ... 22

*Kershner v. Mazurkiewicz*, 670 F.2d 440 (3rd Cir. 1982) ... 15

*Kohls v. Duthie*, 2000 WL 1041219 (Del.Ch. July 26, 2000) ... 24

*Kohn v. American Metal Climax, Inc.*, 458 F.2d 255 (3rd Cir.), cert. denied, 409 U.S. 874 (1972) ... 15

*Koppel v. 4987 Corp.*, 167 F.3d 125 (2nd Cir. 1999) ... 14, 15

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2nd Cir. 1991) ... 15

*Lacos Land Co. v. Arden Group, Inc.*, 517 A.2d 271 (Del.Ch. 1986) ... 22

*Maldonado v. Flynn*, 597 F.2d 789 (2nd Cir. 1979) ... 15, 18

*Morse v. Lower Merion School Dist.*, 132 F.3d 902 (3rd Cir. 1977) ... 18, 19

*Olson Brothers, Inc. v. Engelhart*, 245 A.2d 166 (Del. 1968) ... 20

*Oran v. Stafford*, 226 F.3d 275 (3rd Cir. 2000) ... 8

*In re Ply Gem Industries, Inc. Sh.Lit.*, 2001 WL 755133 (Del.Ch. June 26, 2002) ... 23

*RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318 (2nd Cir. 1991) ... 26

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) ... 23

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Sanders v. Wang*, 1999 WL 1044880 (Del.Ch. Nov. 8, 1999) ... 16, 25

*Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3rd Cir. 1992) ... 15, 19

*Sierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992 (2002) ... 19

*Smith v. Dunlap*, 111 So.2d 1 (Ala. 1959) ... 20

*Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144 (3rd Cir. 1997) ... 8

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ... 9, 10, 16, 19

*In re Warfarin Sodium Antitrust Lit.*, 214 F.3d 395 (3rd Cir. 2000) ... 8, 14

*Wilderman v. Wilderman*, 315 A.2d 610 (Del.Ch. 1974) ... 20

*Williams v. Geier*, 671 A.2d 1368 (Del. 1996) ... 22

*Zell v. Intercapital Income Securities, Inc.*, 675 F.2d 1041 (9th Cir. 1982) ... 18

STATUTES

FRAP Rule 4(a)(1)(A) ... 1

17 C.F.R. § 240.14a-101 (Item 10(a)(1) and (2)(i) ... 16, 17

28 U.S.C. § 1291 ... 1

28 U.S.C. § 1367(a) ... 1

42 U.S.C. § 1983 ... 19

Fed.R.Civ.P. 12(b)(6) ... 4, 8, 14

23.1 ... 4, 25

Securities Exchange Act of 1934

§ 14(a) ... 1, 9, 19, 26

F15 U.S.C. § 78aa ... 1

§ 27 ... 1

14a-9, 17 C.F.R. § 240.14a-9 ... 1, 9, 18

Treasury Regulations, 26 C.F.R.

§ 1.162-27 ... 10, 11, 12, 13, 16, 17, 22

Internal Revenue Code, 26 U.S.C. § 162(m) ... 10, 17

*PRELIMINARY STATEMENT*

This is an appeal from an order of the United States District Court for the District of New Jersey, dismissing the action (Pisano, D.J.) (A. 1-2). The decision is unreported, and it is designated "Not for Publication".

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*JURISDICTIONAL STATEMENT*

Jurisdiction below was based upon § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, in that the defendants distributed in interstate commerce a proxy statement containing material misstatements and omissions of fact, and on 28 U.S.C. § 1367(a), in that the individual defendants breached their fiduciary duties. The claims arise under § 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, and the laws of the several states.

This court's jurisdiction is based upon 28 U.S.C. § 1291. The lower court entered a final order dismissing the federal claims with prejudice, the state claims without prejudice, and closing the case. The final order was entered April 2, 2002. The notice of appeal was timely filed on April 26, 2002. Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure.

*ISSUES PRESENTED FOR REVIEW*

1. Is a proxy statement materially false and misleading which solicits stockholder approval of a bonus plan that includes a $3 million bonus, and represents it to be tax deductible by the company, when in fact the plan provided a maximum bonus of only $2 million, and it (a) omits to disclose that the increase of the $2 million limit was done 6 1/2 weeks before the end of the fiscal year, (b) threatens to pay the CEO a bonus anyway, even if the stockholders disapprove it, and (c) omits to disclose that the bonus formula pays him all but $200,000 at the rate of 83 percent of the company's earnings, up to the $2 million limit?

Answer Below: No (A. 8-12).

2. Does the complaint state a claim for relief for excess compensation of the CEO when he has done much better financially over the years than the company and its stockholders and much better financially than other CEOs at other companies of similar size and in similar businesses with better financial results?

Answer Below: Not reached (A. 2)

3. In a stockholder's derivative action is demand on the board of directors excused as futile when (a) half the members of an even numbered board are interested or not independent, (b) the other half act in an extremely improper way, and (c) they all are accused of violating federal law in the solicitation of stockholders' proxies.

Answer Below: Not reached (A. 4)

*STATEMENT OF THE CASE*

In this action a stockholder of Datascope Corp. challenges the conduct of its entire board of directors in distributing a proxy statement by which they sought and obtained the stockholders' approval of an incentive plan and the payment of a bonus under it for the fiscal year ended June 30, 2000 to the Chief Executive Officer ("CEO"), who is also the board chairman and largest stockholder. As the record at bar now reveals, that proxy statement (the "Proxy Statement") materially overstated the size of the fiscal year 2000 bonus payable under that plan (the "Plan") by more than $1,000,000 (A.53). It also falsely represented that the company would get an income tax deduction for the bonus, if the stockholders approved it (A.55). But it threatened the stockholders that if they disapproved the Plan, then the CEO might get paid a bonus anyway that would not be deductible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(A.53).

The stockholder also challenges the excessive compensation paid to the CEO during fiscal years 1996 through 2000. The grounds for this challenge are that, over the years, the CEO's financial results have far exceeded those of Datascope Corp. and its stockholders (A.29-30). Moreover, the CEO of Datascope Corp. has done much better financially than other CEOs of other companies of similar size in similar businesses (A.30-31).

Datascope Corp. ("Datascope" or the "Company") is a Delaware corporation with its principal office in New Jersey (A.24). Its CEO is defendant Lawrence Saper (A.25).

The defendants made a motion to dismiss the amended complaint ("Com." or the "Complaint"), pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure (sometimes "FRCP") (A.4). The lower court granted the FRCP 12(b)(6) motion only as to the federal claims and dismissed the state claims on jurisdictional grounds. It did not reach the FRCP 23.1 motion (A.2).

*STATEMENT OF FACTS*

An annual meeting of Datascope's stockholders was held on December 12, 2000. For that meeting the individual defendants, acting as the Company's board of directors, distributed a Proxy Statement that solicited the stockholders' proxies to be voted in favor of the re-election to the board of defendants Saper and Nash and in favor of the approval of the Plan. (Com. ¶ 8; A.25).

The Proxy Statement represents that the Plan was initially adopted in December 1999 and then amended and restated on May 16, 2000. (Corn. ¶ 20; A.28). It also represents that "Under the Management Incentive Plan, Mr. Saper's total bonus compensation was $3,285,714 for fiscal year 2000" (A.53) and that it will be fully deductible by Datascope for federal income tax purposes if the stockholders approve the Plan. (Com. ¶ 19; A.27). The Proxy Statement contains the text of the Amended and Restated May 16, 2000 Plan (A.59-63). However, the text of the Plan in its initial December 7, 1999 form, (A. 117-21) was omitted from the Proxy Statement, but the defendants have placed it in the record, making it public for the first time, and it is, we agree with defendants, highly material at bar, for it discloses, as the Proxy Statement did not, that the maximum Saper bonus was $2,225,000 instead of $3,285,714, as proposed to the stockholders and paid to the CEO (A. 119).

Also in the record is the certification of the stockholders' vote approving that Plan (A.122) under which the bonus of $3,285,714 was paid.

The December 7, 1999 Plan expressly provides "the precise terms and provisions of the performance goals" to calculate defendant Saper's bonus, but the May 16, 2000 Plan does not. (Com. ¶ 22; A.28). In the December 7, 1999 Plan, defendant Saper's bonus was to be based on the Company's earnings per share, determined in accordance with generally accepted accounting principles and measured before extraordinary and/or special items. (A. 118).

For example, it states that if the earnings per share equal $1.50, his bonus is to be $200,000. If the earnings per share equal $1.58, his bonus is to be $1,200,000, or an additional million dollars to the $1.50 earnings per share bonus. It also provides that if the Company's earnings per share is more than $1.50, but less than $1.58, his bonus will be proportionately adjusted, i.e., an additional $125,000 for each additional cent per share. Since Datascope has only approximately 15 million shares outstanding, each cent per share is $150,000. (Com. ¶ 7; A.24). This Plan gives the CEO $125,000 out of each additional $150,000. Defendant Saper's maximum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bonus under the December 7, 1999 Plan was $2,225,000, not the $3,285,714 as reported in the Proxy Statement. All of these data were omitted from the Proxy Statement.

In the fiscal years 1996 through 2000, defendant Saper was paid excessive amounts. (Com. ¶¶ 12-14; A.25-26). His compensation has increased at a higher rate than has the Company's earnings, assets, and stockholders' equity. (Com. ¶ 25; A.29). It has increased at a higher rate than has an investment in the Company's stock. (Com. ¶ 26; A.30). And it is substantially higher than the compensation of other chief executive officers at companies of comparable size in similar businesses. (Com. ¶¶ 27-29; A.30-31).

Defendant Saper is a member of Datascope's board of directors, and he is financially interested in the approval of the Plan and in the excessive compensation paid to him in the fiscal years 1996-2000. Two other members of the board, defendants Altschiller and Grayzel, are paid consultants of the Company. They lack independence, for defendant Saper has engaged their services and determined their compensation. Moreover, he can change their compensation and even terminate their consulting arrangements. (Com. ¶ 15-17; A.26-27). The other three directors, while having the appearance of independence and disinterest, have acted with such indifference to their duty to protect the interests of Datascope and its stockholders, that further inquiry is appropriate. We refer, of course, to their decision to solicit stockholder approval of the Plan and the payment thereunder to defendant Saper of $3,285,714 when his maximum bonus was $2,225,000. This, we submit, is extreme conduct, sufficient to justify judicial review. It raises substantial questions as to their approval or even toleration of defendant Saper's past compensation.

STATEMENT OF RELATED *CASES AND PROCEEDINGS*

This case has never been before this court, and we are unaware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this court, or any other court or agency, state or federal, except for a stockholder's derivative action, entitled *Shaev v. Saper*, pending in New York Supreme Court, New York County, Index No. 605302/00, filed December 6, 2000. As the result of discussions between counsel for the parties in the New York State case, we became aware of federal questions and thereupon commenced the action below on August 7, 2001. (A.15, 18). The parties have orally agreed to litigate the federal action before proceeding in the state action.

STATEMENT OF STANDARD OF REVIEW

This court's review of a decision on a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6) is plenary, taking all factual allegations as true and drawing all reasonable inferences in plaintiffs favor. *In re Warfarin Sodium Antitrust Liti.*, 214 F.3d 395, 397 (3rd Cir. 2000). However, this court can consider the original December 7, 1999 Plan (A. 117-21), for it is indisputably authentic, and the Complaint is based on it, and it is attached to defendants' motion papers. *Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 145 (3rd Cir. 1997). The court can consider the Proxy Statement, but it is "relevant not to prove the truth of... [its] contents but only to determine what the document stated." *Oran v. Stafford*, 226 F.3d 275, 289 (3rd Cir. 2000). The same rule applies to the Form 10K. The second and third issues were presented below, but not decided. We brief them in an abundance of caution.

SUMMARY OF ARGUMENT

It was materially false and misleading to represent that the bonus would be tax deductible, for the performance goals were established too late, and the threat to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                                Page 7
2002 WL 32817147 (3rd Cir.)

pay the bonus, even if the stockholders disapproved, rendered even an approved bonus non deductible.

The Proxy Statement's omission of the performance goals in the original December 7, 1999 Plan was material. The CEO's compensation over the past several years is excessive when measured by the usual legal standards and against the Company's financial performance and the compensation of similar CEO's. Demand on the board is excused, for half are interested or not independent, and the other half have committed egregious wrongs. They all are accused of violating the proxy provisions of the 1934 Act.

ARGUMENT
POINT I
THE COMPLAINT STATES A CLAIM FOR RELIEF UNDER § 14(a) OF THE *EXCHANGE ACT AND S.E.C. RULE 14a-9*

In *J.I. Case Co. v. Borak*, 377 U.S. 425, 431-32 (1964), the Supreme Court first upheld the implied cause of action by a stockholder to seek relief when a false or misleading proxy statement interfered with "fair corporate suffrage ... an important right." This Court agrees. *Gould v. American-Hawaiian S.S. Co*, 535 F.2d 761 (3rd Cir. 1976). In addressing the requisite quality of disclosure in a proxy statement, the Supreme Court, in *Virginia Bankshares. Inc. v. Sandberg*, 501 U.S. 1083 (1991) held that the principal purpose of a proxy statement "should be to inform, not to challenge the reader's critical wits." 501 U.S. at 1097. The Proxy Statement at bar is so misleading and deficient that the stockholders are made "unwitting agents of self-inflicted damage." 501 U.S. at 1103 (Com., ¶ 18; A.27).

A. The Proxy Statement Contains *Misrepresentations and Omissions*.

Under the Internal Revenue Code, 26 U.S.C. § 162(m), and the Treasury Regulations, 26 C.F.R. § 1.162-27, the compensation to defendant Saper, in excess of $1 million per year, is deductible by the Company only if it is performance based and approved by the Company's stockholders. At bar, the individual defendants sought stockholder approval of the Plan, and the bonus would be payable if the Plan were to be approved. (A.41, 53).

The complaint alleges that the Proxy Statement falsely represents that the Saper bonus would qualify for an income tax deduction for the Company, if the stockholders approved it (Com., ¶ 19; A.27). The deduction was unavailable, we allege, for the Plan was adopted too late for the necessary performance goals to be established. 26 C.F.R. § 1.162-27(e)(2)(performance goal must be established not later than the 90th day of the performance period or before 25% of the performance period has elapsed). In addition, the fact that the Saper bonus could be paid even if the stockholders voted against it, would preclude the deduction. 26 C.F.R. § 1.162-27(e)(4)(i) ("The requirements of this paragraph (e)(4) [entitled *Shareholder approval requirement*] are not satisfied if the compensation would be paid regardless of whether the material terms are approved by shareholders.") (Com. ¶ 20; A.28).

The lower court held (A.10-11) that the Plan was adopted well within the necessary time limit, *i.e.*, less than 25% of the way through the performance period, on December 7, 1999, the 68th day of a 274-day period, from October 1, 1999 to June 30, 2001. Even assuming that a performance period can be less than a year, the $3,285,714 bonus under the Plan (A.53) was not in conformity with the performance goal that was established on December 7, 1999. Under the December 7, 1999 standards, the maximum Saper bonus was $2,225,000 (A. 119). Moreover, if there is discretion to increase the calculated bonus, the deduction is lost. 26 C.F.R. § 1.162-27(e)(2)(iii)(A) ("The terms of an objective formula or standard must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

preclude discretion to increase the amount of compensation payable that would otherwise be due upon attainment of the goal.") After the initial Plan was adopted, it was amended and restated on May 16, 2000, 6 1/2 weeks before the end of the period and much too late to set performance goals for this nine-month performance period. Accordingly, the Proxy Statement made a false representation when it stated that the Company would get a $3,285,714 income tax deduction for the Saper bonus, if the stockholders approved it. The lower court committed error in holding that a $3 million bonus had been timely pre-established.

The lower court committed additional error in holding that, under the facts at bar, the directors could establish a nine months performance period. Although the lower court correctly observed that Treas.Reg. 26 C.F.R. § 1.162-27(e)(2)(i) allows a performance goal to be established not later than 90 days or 25% of the way into a period, it erred in holding, as a matter of law, that a nine month performance period was proper at bar. We submit that the one year performance period is always required except for companies newly organized in the middle of the year and except for cases where the company changes its fiscal year in good faith. Significantly, we submit, nothing in the statute and regulations expressly allows a short period, and none of the examples given in the regulations addresses a short period. Given the requirement that the "outcome" of a performance goal must be "substantially uncertain at the time the compensation committee actually establishes the goal," 26 C.F.R. § 1.162-27(e)(2)(i) (the second sentence), a court should be suspicious of a short period by a seasoned company. At a minimum, the defendants should be required to establish good faith in using a short period, for the rule in this Circuit is that "summary disposition on the merits is disfavored and the burden is on the moving party." *Johnsrud v. Carter*, 620 F.2d 29, 33 (3rd Cir. 1980). In the case at bar, the lower court cited no authority except for a rule of statutory construction that all parts of a regulation must be considered. We submit that the lower court misapplied that rule too narrowly, for the entire statute and regulations -- with all the examples -- reject such a result.

And no suggestion is raised that the deduction is available in the face of the threat to pay the Saper bonus, even if the stockholders disapprove it. 26 C.F.R. § 1.162-27(e)(4)(i) (Com. ¶ 20) (A.28). That threat cancels the stockholder approval, for the second sentence of that Regulation expressly provides that the stockholder approval requirements "are not satisfied if the compensation would be paid regardless of whether the material terms are approved by shareholders." Nowhere is there any showing that the allegation concerning the threat to pay it anyway fails to state a claim, and the lower court was in error to dismiss it.

The complaint also alleges that the amount of the Saper bonus was $3,285,714 (Com. ¶ 12, 19; A.25, 27), and "as to ... the Saper bonus, the Proxy Statement omitted the precise terms and provisions of the performance goals. As a result, the Company's stockholders were unable to determine for themselves whether the performance goals had been met and whether the bonuses were merited." (Com. ¶ 22; A.28). We submit that this is a straightforward allegation, and that its correctness is unchallenged in the lower court. A review of the Proxy Statement reveals these omissions.

Actually, the present record, including the text of the initial December 7, 1999 Plan (A.117-21), which is omitted from the Proxy Statement, underscores how correct this allegation is. It shows that the Saper bonus as calculated under the applicable performance goals was not to exceed $2,225,000 (A.119). Yet the stockholders were asked to approve a much greater amount, the Proxy Statement having represented that the greater amount was correct (Com. ¶ 19; A.27). No explanation appears anywhere in the record as to how and why the Saper bonus was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 32817147                                                          Page 9
2002 WL 32817147 (3rd Cir.)

increased, but if the Proxy Statement had disclosed the performance goals, the stockholders would have known that defendant Saper had not earned a three million-dollar bonus. Nor does the Proxy Statement contain any discussion of the old 1997 plan and what estimates there were as to how the new Plan would compare with the old. (Com. ¶ 22; A.28).

This court held, In re Warfarin Sodium Antitrust Lit., supra. 214 F.3d at 398, that FRCP "Rule 12(b)(6) instructs that the District Court draw inferences in favor of plaintiffs, not the proponent of the motion." And, when a complaint challenges a proxy statement under the Exchange Act, the court should construe that proxy statement in the light most favorable to the plaintiff, who need not support the allegations with proof or evidence. Koppel v. 4987 Corp., 167 F.3d 125, 133 (2nd Cir. 1999).

B. The Misrepresentations And *Omissions Were Material.*

This court has held that a federal securities law complaint should not be dismissed on materiality grounds unless "the alleged misrepresentations and omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280-81, n.11 (3rd Cir. 1992). Other cases agree. Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2nd Cir. 2000); Koppel v. 4987 Corp., 167 F.3d 125, 133 (2nd Cir. 1999). This court has also held that the amount of benefit that flows to an insider from a transaction proposed to the stockholders must be fairly disclosed. Kohn v. American Metal Climax, Inc., 458 F.2d 255, 265 (3rd Cir.), cert. denied, 409 U.S. 874 (1972) partially overruled on other grounds, Kershner v. Mazurkiewicz, 670 F.2d 440, 448 (3rd Cir. 1982). Other cases, addressing questions of compensation and other benefits to insiders all agree that the amount of the benefit is material. Kramer v. Time Warner. Inc., 937 F.2d 767, 777 (2nd Cir. 1991); Galef v. Alexander, 615 F.2d 51, 65 (2nd Cir. 1980); Maldonado v. Flynn, 597 F.2d 789, 796-98 (2nd Cir. 1979).

Under these cases the amount and deductibility of the Saper bonus were material, for the stockholders were solicited to approve the Plan to pay the Saper bonus, and the Proxy Statement represented that it would be deductible. It was to be paid pursuant to the precise formula expressed by the original December 7, 1999 Plan. The board had no discretion to increase it, retroactively. Sanders v. Wang, 1999 WL 1044880 (Del.Ch. Nov. 8, 1999). Moreover, the board's decision to increase the bonus causes the Company to lose its income tax deduction, 26 C.F.R. § 1.162-27(e)(2)(iii)(A), something that the board was supposed to preserve.

The complaint at ¶ 22 (A.28), alleges that among the material omissions were reasonable estimates of bonuses payable and the number of persons eligible under the Plan. The lower court held that the omissions were immaterial as a matter of law because the Proxy Statement did disclose the maximum bonus (A. 11). But the lower court erred, for that was a maximum for each person (A.56, 61). We submit that the disclosure is useless without reporting the number of eligible participants, and the regulations so provide. 17 C.F.R. § 240.14a-101 (Item 10(a)(1)) (Identify each eligible class of persons and the approximate number in each class.) The Proxy Statement, however, reveals only half of what a stockholder should know to be informed under Virginia Bankshares, Inc. v. Sandberg, supra. The lower court erred in holding this omission to be immaterial.

The complaint also alleges that it was material to omit "the precise terms and provisions of the performance goals." Com. ¶ 22 (A.28). Those terms and provisions conclusively establish that the Saper bonus, at its maximum, was more than $1 million less than the stockholders were solicited to approve. Since this is

2002 WL 32817147                                                              Page 10
2002 WL 32817147 (3rd Cir.)

compensation, it is material *per se,* we submit.

The lower court committed error in holding that the performance goal omissions were immaterial. It held that 17 C.F.R. § 240.14a-101 provides that "registrants do not need to disclose specific targets upon which bonuses are contingent." (A.12). That regulation does not so provide, but it does, at Item 10(a)(1), require that when stockholders are solicited to approve a compensation plan the proxy statement must "[d]escribe briefly the material features of the plan," and Item 10(a)(2)(i) requires disclosure of the amount of the benefit, if determinable.

The lower court also relied, erroneously, on Treas.Reg. 26 C.F.R. § 1.162-27(e)(4) as authority that "specific business criteria upon which bonuses are contingent need not be disclosed." We submit that such a regulation cannot stand, for it is in direct conflict with the statute that requires the opposite. The Internal Revenue Code, 26 U.S.C. § 162(m)(4)(C)(ii), requires that the deduction is available only if "the material terms ... including the performance goals, are disclosed to shareholders and approved by a majority of the vote."

Moreover, the Treasury Regulation leads to an unconscionable result here. The example in 26 U.S.C. § 162(m)(4)(iii)(A) states, "For example, if a bonus plan provides that a bonus will be paid if earnings per share increase by 10 percent, the 10-percent figure is a target that need not be disclosed to shareholders." At bar, the December 7, 1999 Plan pays a bonus of $125,000 for each $150,000 added to earnings. We submit that this is so shocking a result that no regulation should be read to allow it. Nor should this Treasury Regulation preempt the 1934 Act, for it is the SEC, not the IRS, that administers the 1934 Act. Two Circuits, the Second and the Ninth, have held that meeting the minimum SEC regulatory disclosure standards "does not necessarily guarantee that a proxy statement satisfies Rule 14a-9." *Maldonado v. Flynn,* 597 F.2d 789, 796 n.9 and accompanying text (2nd Cir. 1979); *Zell v. Intercapital Income Securities, Inc.,* 675 F.2d 1041, 1044 (9th Cir. 1982). Similarly, barebones standards of the Treasury Regulations should not compromise protection of investors.

Finally, the lower court committed error in holding that the allegations of materiality were "conclusory recitations of law," in reliance upon *Commonwealth of Pennsylvania v. Pepsico, Inc.,* 836 F.2d 173 (3rd Cir. 1988) and *Morse v. Lower Merion School Dist.,* 132 F.3d 902 (3rd Cir. 1977). Neither case is applicable at bar. In *Commonwealth,* the complaint failed because it did not allege facts to support a civil conspiracy, for which this court has consistently required a particularized statement of facts. 836 F.2d at 181-82.

The *Morse* case was an action under 42 U.S.C. § 1983 under the state-created danger theory where a "mentally unstable" person entered a "school building" through an "unlocked back entrance" and murdered a teacher with a ".38 revolver." (132 F.3d at 908). This court held that "defendants, as a matter of law, could not have foreseen" the danger and that the "tragic harm which ultimately befell Diane Morse was too attenuated from defendant's actions to support liability." *Idem.* We submit that *Morse* was less a case of pleading "legal conclusions" *Id.* than an obvious impossibility, akin to the "obviously unimportant" test for lack of materiality expressed by this court in *Shapiro v. UJB Financial Corp.,* 964 F.2d at 280-81 n. 11. In *Morse,* the factual allegations of the complaint refuted the allegations of foreseeability and fairly direct harm. 132 F.3d at 908. At bar, the omitted performance goals reveal that the proposed Saper bonus was 50 percent greater than what was legitimately even possible, and that it was calculated at an egregiously excessive rate.

Neither *Commonwealth* nor *Morse* addresses pleading of materiality. Under § 14(a) of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the 1934 Act, proof of materiality imposes such a light burden *(Virginia Bankshares, Inc. v. Sandberg*, supra, 501 U.S. at 1097-98), that the pleading requirement should be equally simple. *Sierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 997 (2002).

POINT II
THE COMPLAINT STATES A CLAIM *FOR RELIEF UNDER STATE LAW.*

The lower court did not decide the state law issues. We nevertheless brief this point in an abundance of caution.

The Chief Executive Officer of a Delaware corporation is a fiduciary, and therefore his compensation must be reasonable. *Wilderman v. Wilderman*, 315 A.2d 610, 615 (Del.Ch. 1974); see *Olson Brothers, Inc. v. Engelhart*, 245 A.2d 166, 168 (Del. 1968). Other courts agree with this principle, e.g., *Smith v. Dunlap*, 111 So.2d 1, 4 (Ala. 1959)("equity will intervene on behalf of a minority stockholder ... [to correct] ... receipt of excessive compensation by the officers of a corporation").

The reasonableness of compensation is a question of fact, and courts have used a variety of factors to decide it. In *Wilderman*, supra, the court considered *inter alia*, "what other executives similarly situated received. ... whether the salary bears a reasonable relation to the success of the corporation ... [and] whether increases are geared to increases in the value of services rendered." In *Smith v. Dunlap*, supra, the court cited *Gallin v. National City Bank*, 273 N.Y.S. 87, 114 (Sup.Ct. N.Y. Co. 1934) and considered, *inter alia*, the "success achieved, amounts under jurisdiction, corporate earnings, profits and prosperity, increase in volume or quality of business."

In *Fendelman v. Fenco Handbag Mfg. Co.*, 482 S.W.2d 461, 464-65 (Mo. 1972) the court considered these same factors and added "a comparison of salaries paid with the gross income and the net income ... [and] the prevailing rates of compensation for comparable positions in comparable concerns."

Applying the foregoing factors to the allegations of the complaint, defendant Saper's compensation from 1996 to 2000 increased nearly four times faster than Datascope's earnings and ten times faster than its assets and stockholders' equity. (Com. ¶ 25; A.29). Moreover, in that same period, the relevant stock market indices performed 50% better than did Datascope's stock (Com. ¶ 26; A.30) and when defendant Saper's compensation is compared to that of other executives similarly situated, he has received several times more than they have. (Com. ¶ 27-29; A.30-31) See *Benerofe v. Cha*, 1998 WL 83081 at *4 (Del.Ch. February 20, 1998) where the court sustained a claim of waste upon allegations that a corporation sold its products to a controlling stockholder at prices less than those prevailing in the open market. We further suggest that a bonus plan that pays $125,000 for each additional $150,000 of Company profit, *i.e.*, 83%, is confiscatory on its face.

Finally, defendants improperly coerced the stockholders to vote in favor of the Plan and the Saper bonus. They threatened that if the stockholders failed to approve the deductible bonus, the defendants might give Saper a bonus that was not deductible. (Com. ¶ 19-20; A.27-28). It is improper to coerce stockholders to vote "for some reason other than the merits." *Williams v. Geier*, 671 A.2d 1368, 1382-83 (Del. 1996). The threat at bar is that the board is prepared to pay this bonus even if it is not deductible and therefore against the Company's best interest. *Lacos Land Co. v. Arden Group, Inc.*, 517 A.d 271, 276, 278-79 (Del.Ch. 1986). At bar, this threat is not a truthful representation of some consequence that necessarily follows, for the board is not bound to reject the wishes of the stockholders. Moreover, the fact that the directors might ignore the stockholders' expressed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

desire not to pay the bonus makes the bonus not deductible in any event. 26 C.F.R. § 1.162-27(e)(4)(i).

POINT III
DEMAND ON THE BOARD OF *DIRECTORS IS EXCUSED.*
The lower court did not decide the demand issue. We nevertheless brief this point in an abundance of caution.

Under Delaware law demand is excused where half the members of an even numbered board are alleged to be interested or to lack independence. *Bilunka v. Sanders*, 1994 WL 447156 (N.D.Cal. March 2, 1994); *Beneville v. York*, 769 A.2d 80 (Del.Ch. 2000); *Kaufman v. Beal*, 1983 Del.Ch. LEXIS 391 at *25-*26 (Del.Ch. February 25, 1983) (Where only ten members of twenty-member board are disinterested an "even split is sufficient to excuse demand because, at best, the plaintiffs would face a Board of Directors deadlocked on the response to the demand [citation omitted]").

We submit that three board members, i.e., Saper, Altschiller, and Grayzel, are not disinterested and independent and that the other three, i.e., Abramson, Nash, and Heller, though having the surface appearance of independence, have conducted themselves in such an extremely improper way that further judicial inquiry is needed. In *Rales v. Blasband*, 634 A.2d 927, 936-37 (Del. 1993) the court held that an interested director is one who receives a financial benefit from the corporate transaction (We submit that defendant Saper is an interested director.) and that a director lacks independence where he or she receives compensation from an employer that is controlled by the interested director. We submit that the consulting compensation, controlled by defendant Saper, paid to defendants Altschiller ($134,500 per year plus bonus and stock options, (Com. ¶ 16; A.26-27) and Grayzel ($161,700 per year plus bonuses and stock options (Com. ¶ 17; A.27), destroys their independence. *In re Ply Gem Industries, Inc. Sh.Lit.*, 2001 WL 755133 at *9 (Del.Ch. June 26, 2002) (annual consulting fee of $25,000 might not conflict a director, but $48,000 will.)

Accordingly, we submit that the protections of the business judgment rule are unavailable to defendants Saper, Altschiller, and Grayzel, regardless of the position of defendants Abramson, Nash and Heller.

Although the complaint does not address the possible interest or lack of independence of defendants Abramson, Nash, and Heller, we suggest that the state of the record strongly does. In *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), the court held that a director's independence must be judged by "the care, attention and sense of individual responsibility to the performance of one's duties." In *Kahn v. Tremont Corp.*, 1994 WL 162613 at *6 (Del.Ch. April 22, 1994) the court addressed facts where "despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review." The facts were that seemingly independent, disinterested directors had approved a corporate purchase of an illiquid block of shares at a high price to accommodate a controlling stockholder.

In *Kohls v. Duthie*, 2000 WL 1041219 at *8 (Del.Ch. July 26, 2000) the court held that the facts, where nominally disinterested, independent directors failed to respond to "a particularly striking 'opportunity' for the corporation to benefit its stockholders, would seem to present a sufficiently substantial question of fiduciary misconduct to survive a motion to dismiss."

In *Sanders v. Wang*, 1999 WL 1044880 at *5 (Del. Ch. November 8, 1999), the court held that a reasonable doubt was cast upon the board of directors' valid exercise of business judgment where the "board violated an express KESOP [i.e., key employee

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stock ownership plan] provision limiting the number of shares they were authorized to award." We submit that *Sanders* is on all fours with the conduct of the board at bar. Here, not only did they pay out $3,285,714, when the maximum amount was only $2,225,000, but they went further and solicited stockholder approval for it and at the same time omitted to disclose the correct numbers. This conduct is so extreme and unbusiness-like that it calls into question all the compensation for defendant Saper from fiscal year 1966 through 2000. (Com. ¶ ¶ 22, 25; A.25-26, 29).

Three board members at bar are neither disinterested nor independent, and the other three, though having the surface appearance of independence, have conducted themselves in such an extreme and improper way that further inquiry and judicial review are needed.

The complaint also alleges, ¶ 5(b) and (c) (A.24), that, in addition to state law, demand is excused under federal law. Although FRCP 23.1 is a rule of pleading, and the substance of the demand rule is left to state law, yet an exception is made upon a "finding that application of state law would be inconsistent with a federal policy underlying a federal claim in the actions." *RCM Securities Fund, Inc. v. Stanton*, 928 F.2d 1318, 1330 (2nd Cir. 1991); see also, *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98 (1991).

If Delaware law could possibly be interpreted to require demand at bar, it would be inconsistent with federal policy. In *Galef v. Alexander, supra,* 615 F.2d at 62-64, the court held that federal policy prevents corporate directors from invoking the business judgment rule to obtain summary dismissal against themselves of well pleaded § 14(a) claims. In reaching this conclusion, the court held that "[o]bviously" the vital goal of § 14(a) was to obtain accurate and complete disclosures from management to stockholders and that the goal should not be "frustrated" by permitting directors who were accused of violating § 14(a) to use their own business judgment to dismiss the complaint. *Galef*, 615 F.2d at 63.

Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." *Aronson v. Lewis, supra,* 473 A.2d at 812. Accordingly, to require demand at bar under Delaware law would inject into the process that which federal policy forbids.

*CONCLUSION*

For the reasons stated herein, plaintiff respectfully submits that the court should reverse the lower court's order and remand for further proceedings.

Appendix not available.
David B. SHAEV, Appellant, v. Lawrence SAPER; Alan B. Abramson; David Altschiller; Joseph Grayzel, M.D.; George Heller; Arno Nash; and Datascope Corp., Appellees.
2002 WL 32817147
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.