# EXHIBIT 1

H.R. CONF. REP. 103-213                                              Page 526
H.R. CONF. REP. 103-213, H.R. Conf. Rep. No. 213, 103RD Cong., 1ST Sess.
1993, 1993 U.S.C.C.A.N. 1088, 1993 WL 302291 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 103-213, 1993 U.S.C.C.A.N. 1088)

as to the exact number of options that are granted to an executive, provided that the maximum number of options that the individual executive may receive during a specified period is predetermined.

Stock-based compensation is not treated as performance-based if it is dependent on factors other than corporate performance. For example, if a stock option is granted to an executive with an exercise price that is less than the current fair market value of the stock at the time of grant, then the executive would have the right to receive compensation on the exercise of the option even if the stock price decreases or stays the same. Thus, stock options that are granted with an exercise price that is less than the fair market value of the stock at the time of grant do not meet the requirements for performance-based compensation. Similarly, if the executive is otherwise protected from decreases in the value of the stock (such as through automatic repricing), the compensation is not performance-based.

In contrast to options or other stock appreciation rights, grants of restricted stock are not inherently performance-based because the executive may receive compensation even if the stock price decreases or stays the same. Thus, a grant of restricted stock is treated like cash compensation and does not satisfy the definition of performance-based compensation unless the grant or vesting of the restricted stock is based upon the attainment of a performance goal and otherwise satisfies the standards for performance-based compensation under the bill.

Compensation does not qualify for the performance-based exception if the **executive has a right** to **receive** the compensation notwithstanding the failure of (1) the compensation committee to certify attainment of the performance goal (or goals) or (2) the shareholders to approve the compensation.

Definition of outside directors.-For purposes of the exception for performance-based compensation, a director is considered an outside director if he or she is not a current employee of the corporation (or related entities), is not a former employee of the corporation (or related entities) who is receiving compensation for prior services (other than benefits under a tax-qualified pension plan), was not an officer of the corporation (or related entities) at any time, and is not currently receiving compensation for personal services in any capacity (e.g., for services as a consultant) other than as a director.

Shareholder approval and adequate disclosure.-In order to meet the shareholder approval requirement, the material terms under which the compensation is to be paid must be disclosed and, after disclosure of such terms, the compensation must be approved by a majority of shares voting in a separate vote.

In the case of performance-based compensation paid pursuant to a plan (other than a stock option plan), the shareholder approval **1277 *588 requirement generally is satisfied if the shareholders approve the specific terms of the plan, including the class of executives to which it applies. In the case of a stock option plan, the shareholders generally must approve the specific terms of the plan, the class of executives to which it applies, the option price (or formula under which the price is determined), and the maximum number of shares subject to option that can be awarded under the plan to any executive. Further shareholder approval of payments under a plan or grants of options is not required after the plan has been approved. Of course, if there are material changes to the plan, shareholder approval would have to be obtained again in order for the exception to apply to payments under the modified plan.

It is intended that not all the details of a plan (or agreement) need be disclosed in all cases. In developing standards as to whether disclosure of the terms of a plan or agreement is adequate, the Secretary should take into account

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

H.R. CONF. REP. 103-213                                                    Page 527
H.R. CONF. REP. 103-213, H.R. Conf. Rep. No. 213, 103RD Cong., 1ST Sess.
1993, 1993 U.S.C.C.A.N. 1088, 1993 WL 302291 (Leg.Hist.)
(Cite as: H.R. CONF. REP. 103-213, 1993 U.S.C.C.A.N. 1088)

the SEC rules regarding disclosure. To the extent consistent with those rules, however, disclosure should be as specific as possible. It is expected that shareholders will, at a minimum, be made aware of the general performance goals on which the executive's compensation is based and the maximum amount that could be paid to the executive if such performance goals were met. For example, it would not be adequate if the shareholders were merely informed that an executive would be awarded $x "if the executive meets certain performance goals established by the compensation committee."

Under present law, in the case of a privately held company that becomes publicly held, the prospectus is subject to the rules similar to those applicable to publicly held companies. Thus, if there has been disclosure that would satisfy the rules described above, persons who buy stock in the publicly held company will be aware of existing compensation arrangements. No further shareholder approval is required of compensation arrangements existing prior to the time the company became public unless there is a material modification of such arrangements. It is intended that similar rules apply in the case of other business transactions.

Compensation payable under a written binding contract

Remuneration payable under a written binding contract which was in effect on February 17, 1993, and at all times thereafter before such remuneration was paid is not subject to the deduction limitation.

Compensation paid pursuant to a plan qualifies for this exception provided that the right to participate in the plan is part of a written binding contract with the covered employee in effect on February 17, 1993. For example, suppose a covered employee was hired by XYZ Corporation on January 17, 1993, and one of the terms of the written employment contract is that the executive is eligible to participate in the "XYZ Corporation Executive Deferred Compensation Plan" in accordance with the terms of the plan. Assume further that the terms of the plan provide for participation after 6 months of employment, amounts payable under the plan are not subject to discretion, and the corporation does not have the right to amend materially the plan or terminate the plan (except on a prospective basis before any services are performed with respect *589 **1278 to the applicable period for which such compensation is to be paid). Provided that the other conditions of the binding contract exception are met (e.g., the plan itself is in writing), payments under the plan are grandfathered, even though the employee was not actually a participant in the plan on February 17, 1993. [FN47]

The fact that a plan was in existence on February 17, 1993, is not by itself sufficient to qualify the plan for the exception for binding written contracts.

The exception for remuneration paid pursuant to a binding written contract ceases to apply to amounts paid after there has been a material modification to the terms of the contract. The exception does not apply to new contracts entered into or renewed after February 17, 1993. For purposes of this rule, any contract that is entered into on or before February 17, 1993, and that is renewed after such date is treated as a new contract entered into on the day the renewal takes effect. A contract that is terminable or cancelable unconditionally at will by either party to the contract without the consent of the other, or by both parties to the contract, is treated as a new contract entered into on the date any such termination or cancellation, if made, would be effective. However, a contract is not treated as so terminable or cancelable if it can be terminated or cancelled only by terminating the employment relationship of the covered employee.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

# W. H. AUDEN

## Selected Poems
### *New Edition*

*Edited by Edward Mendelson*

VINTAGE INTERNATIONAL
VINTAGE BOOKS
A DIVISION OF RANDOM HOUSE, INC.
NEW YORK

# 46

## The Unknown Citizen

*To JS/07/M/378*
*This Marble Monument is Erected by the State*

He was found by the Bureau of Statistics to be
One against whom there was no official complaint,
And all the reports on his conduct agree
That, in the modern sense of an old-fashioned word,
                                              he was a saint,
For in everything he did he served the Greater Community.
Except for the War till the day he retired
He worked in a factory and never got fired,
But satisfied his employers, Fudge Motors Inc.
Yet he wasn't a scab or odd in his views,
For his Union reports that he paid his dues,
(Our report on his Union shows it was sound)
And our Social Psychology workers found
That he was popular with his mates and liked a drink.
The Press are convinced that he bought a paper every day
And that his reactions to advertisements were normal in
                                               every way.
Policies taken out in his name prove that he was fully insured,
And his Health-card shows he was once in hospital but
                                               left it cured.
Both Producers Research and High-Grade Living declare
He was fully sensible to the advantages of the Installment Plan
And had everything necessary to the Modern Man,
A gramophone, a radio, a car and a frigidaire.
Our researchers into Public Opinion are content
That he held the proper opinions for the time of year;
When there was peace, he was for peace; when there
                                             was war, he went.
He was married and added five children to the population,
Which our Eugenist says was the right number for a parent of
                                             his generation.

And our teachers report that he never interfered with
                                                      their education.

Was he free? Was he happy? The question is absurd:
Had anything been wrong, we should certainly have heard.
                                                             *March 1939*

# EXHIBIT 3

# ANDREW S. GROVE

CHAIRMAN OF THE BOARD OF INTEL CORPORATION

# ONLY THE PARANOID SURVIVE

HOW TO EXPLOIT THE CRISIS POINTS THAT CHALLENGE EVERY COMPANY

INCLUDES A NEW CHAPTER ON THE IMPACT OF STRATEGIC INFLECTION POINTS ON YOUR CAREER

1997 TIME MAGAZINE MAN OF THE YEAR

A Currency Book
PUBLISHED BY DOUBLEDAY
a division of Random House, Inc.

1540 Broadway, New York, New York 10036

Currency and Doubleday are trademarks of Doubleday, a division of Random House, Inc.

*Only the Paranoid Survive* was originally published in hardcover by Currency, a division of Bantam Doubleday Dell Publishing Group, Inc., in 1996.

Third-party trademarks and brands are the property of their respective owners.

Book design by Chris Welch

The Library of Congress has cataloged the hardcover edition of this book as follows:

Grove, Andrew S.
Only the paranoid survive: how to exploit the crisis points that challenge every company / Andrew S. Grove. — 1st ed.
    p.    cm.
1. Organizational change.   2. Strategic planning.
3. Technological innovations—Economic aspects.   I. Title.
        HD58.8.G765   1996
    658.4'06—dc20              96-13509
                    CIP

ISBN 0-385-48382-1

Copyright © 1996, 1999 by Andrew S. Grove

All Rights Reserved

Printed in the United States of America

First Currency Paperback Edition: April 1999

9   10

I'm often credited with the motto, "Only the paranoid survive." I have no idea when I first said this, but the fact remains that, when it comes to business, I believe in the value of paranoia. Business success contains the seeds of its own destruction. The more successful you are, the more people want a chunk of your business and then another chunk and then another until there is nothing left. I believe that the prime responsibility of a manager is to guard constantly against other people's attacks and to inculcate this guardian attitude in the people under his or her management.

The things I tend to be paranoid about vary. I worry about products getting screwed up, and I worry about products getting introduced prematurely. I worry about factories not performing well, and I worry about having too many factories. I worry about hiring the right people, and I worry about morale slacking off.

And, of course, I worry about competitors. I worry about other people figuring out how to do what we do better or cheaper, and displacing us with our customers.

But these worries pale in comparison to how I feel about what I call strategic inflection points.

I'll describe what a strategic inflection point is a bit later in this book. For now, let me just say that a strategic inflection point is a time in the life of a business when its fundamentals are about to change. That change can mean an opportunity to rise to new heights. But it may just as likely signal the beginning of the end.

3

But data are about the past, and strategic inflection points are about the future. By the time the data showed that the Japanese memory producers were becoming a major factor, we were in the midst of a fight for our survival.

At the risk of sounding frivolous, you have to know when to hold your data and when to fold 'em. You have to know when to argue with data. Yet you have to be able to argue *with* the data when your experience and judgment suggest the emergence of a force that may be too small to show up in the analysis but has the potential to grow so big as to change the rules your business operates by. The point is, when dealing with emerging trends, you may very well have to go against rational extrapolation of data and rely instead on anecdotal observations and your instincts.

### Fear

Constructively debating tough issues and getting somewhere is only possible when people can speak their minds without fear of punishment.

The quality guru W. Edwards Deming advocated stamping out fear in corporations. I have trouble with the simplemindedness of this dictum. The most important role of managers is to create an environment in which people are passionately dedicated to winning in the marketplace. Fear plays a major role in creating and maintaining such passion. Fear of competition, fear of bankruptcy, fear of being wrong and fear of losing can all be powerful motivators.

How do we cultivate fear of losing in our employees? We can only do that if we feel it ourselves. If we fear that someday, any day, some development somewhere in our environment will change the rules of the game, our associates will sense and share that dread. They will be on the lookout. They will be constantly scanning their radar screens. This may bring a lot of spurious

warnings of strategic inflection points that turn out to be false alarms, but it's better to pay attention to these, to analyze them one at a time and make an effort to dispose of them, than to miss the significance of an environmental change that could damage your business forever.

It is fear that makes me scan my e-mail at the end of a long day, searching for problems: news of disgruntled customers, potential slippages in the development of a new product, rumors of unhappiness on the part of key employees. It is fear that every evening makes me read the trade press reports on competitors' new developments and leads me to tear out particularly ominous articles to take to work for follow-up the next day. It is fear that gives me the will to listen to Cassandras when all I want to do is cry out, "Enough already, the sky *isn't* falling," and go home.

Simply put, fear can be the opposite of complacency. Complacency often afflicts precisely those who have been the most successful. It is often found in companies that have honed the sort of skills that are perfect for their environment. But when their environment changes, these companies may be the slowest to respond properly. A good dose of fear of losing may help sharpen their survival instincts.

That's why in a way I think that we at Intel were fortunate to have gone through the terrible times in 1985 and 1986 that I described in Chapter 5. Most of our managers still remember what it felt like to be on the losing side. Those memories make it easy to conjure up the lingering dread of a decline and generate the passion to stay out of it. It may sound strange but I'm convinced that the fear of repeating 1985 and 1986 has been an important ingredient in our success.

But if you are a middle manager you face an additional fear: the fear that when you bring bad tidings you will be punished, the fear that your management will not want to hear the bad news from the periphery. Fear that might keep you from voicing your

real thoughts is poison. Almost nothing could be more detrimental to the well-being of the company.

If you are a senior manager, keep in mind that the key role of Cassandras is to call your attention to strategic inflection points, so under no circumstances should you ever "shoot the messenger," nor should you allow any manager who works for you to do so.

I can't stress this issue strongly enough. It takes many years of consistent conduct to eliminate fear of punishment as an inhibitor of strategic discussion. It takes only one incident to introduce it. News of this incident will spread through the organization like wildfire and shut everyone up.

Once an environment of fear takes over, it will lead to paralysis throughout the organization and cut off the flow of bad news from the periphery. An expert in market research once told me how at her company every layer of management between her and the chief executive watered down her fact-based research. "I don't think they want to hear that" was the byword with which bad news was eliminated, bit by bit, data point by data point, as her information was advanced along the management chain. Senior management in this company didn't have a chance. Bad news never reached them. This company has gone from greatness to real tough times. Watching them from the outside, it seemed that management didn't have a clue as to what was happening to them. I firmly believe that their tradition of dealing with bad news was an integral part of their decline.

I have described how our Asia-Pacific sales manager and a key technologist came to see me with their warnings and/or perceptions. Both of them were long-term employees, self-confident and comfortable with Intel's culture. They were results-oriented and familiar with constructive confrontation; they understood how these help us collectively to make better decisions and come to better solutions. They knew how we go about doing things and

how we don't—rules that you don't find written down anywhere. Both overcame their hesitation and took what might be seen as a risk. One came to tell me a piece of news that he felt was a serious problem; it might have been a valid warning or he might have thought he was foolish to raise it but he knew he could mention his misgivings without fear of repercussion. The other could explain his views on RISC designs with the unstated premise of, "Hey, Grove, you're out of your depth here, let me teach you a few things."

From our inception on, we at Intel have worked very hard to break down the walls between those who possess knowledge power and those who possess organization power. The salesperson who knows his territory, the computer architect and engineer who are steeped in the latest technology possess knowledge power. The people who marshal or shuffle resources, set budgets, assign staff and remove them from projects possess organizational power. One is not better than the other in managing strategic change. Both of them need to give their best to guide the corporation to good strategic results. Ideally, each will respect the other for what he or she brings to the party and will not be intimidated by the other's knowledge or position.

An environment like this is easy to describe but hard to create and maintain. Dramatic or symbolic moves do nothing. It requires living this culture, promoting constant collaborative exchanges between the holders of knowledge power and the holders of organizational power to create the best solutions in the interest of both. It requires rewarding those who take risks when pursuing their jobs. It requires making adherence to the values by which we operate part of the formal management performance process. And, as a last recourse, it requires parting ways with those who can't find it in themselves to adapt. I think whatever success we have had in maintaining our culture has been instrumental in Intel's success in surviving strategic inflection points.