# TAB 1

Westlaw.

Not Reported in F.Supp.2d
2001 WL 34367296 (D.Del.)
**(Cite as: 2001 WL 34367296 (D.Del.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
AES CORPORATION, Plaintiff,
v.
DOW CHEMICAL COMPANY, Defendant.
**No. Civ.A. 99-673-JJF.**

Jan. 19, 2001.
Michael D. Goldman and Stephen C. Norman, of
Potter Anderson & Corroon, LLP, Wilmington,
Delaware. Dennis E. Glazer and Frances E. Bivens,
of Davis Polk & Wardwell, New York, New York,
for Plaintiff, of counsel.

David C. McBride and John W. Shaw, of Young
Conaway Stargatt & Taylor, LLP, Wilmington,
Delaware. Herbert L. Zarov and Daniel J. Delaney, of
Mayer, Brown & Platt, LLP, Chicago, Illinois, for
Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Presently before the Court are Defendant's
Motion to Dismiss the Amended Complaint (D.I.72)
pursuant to Federal Rules of Civil Procedure 9(b),
12(b)(6), 12(b)(7) and 19, and the Private Securities
Litigation Reform Act, codified in relevant part at 15
U.S.C. § 78u-4; and Defendant's Motion for Leave to
File a Supplemental Appendix to its Motion to
Dismiss (D.I.98). For the reasons stated below,
Defendant's Motion To Dismiss the Amended
Complaint (D.I.72) will be granted in part and denied
in part; and Defendant's Motion for Leave to File a
Supplemental Appendix to its Motion to Dismiss
(D.I.98) will be denied.

BACKGROUND
AES Corporation ("AES") filed its original
complaint in this action against Dow Chemical
Company ("Dow") in the Southern District of Texas
alleging securities fraud claims under the Securities
Exchange Act of 1934 (the "Exchange Act"), and the
Texas Securities Act, a claim under section 27.01 of
the Texas Business and Commerce Code, and
common law claims for fraud and conspiracy. Dow

moved to dismiss for improper venue or, in the
alternative, to transfer the action to the District of
Delaware. Dow also moved to dismiss the complaint
in its entirety for failure to state a claim. The
Honorable Vanessa D. Gilmore granted Dow's
motion to transfer the action to the District of
Delaware but did not decide Dow's motion to dismiss
for failure to state a claim.

After the transfer to the District of Delaware, AES
sought and obtained leave to file an amended
complaint. The Amended Complaint (D.I.67) asserts
the same claims against Dow and adds a few
additional allegations and a new claim against Dow
based on agency. Dow moves to dismiss all claims
asserted against it in the Amended Complaint.

STANDARD OF REVIEW
Pursuant to Rule 12(b)(6), the Court may dismiss a
complaint for failure to state a claim upon which
relief may be granted. Fed.R.Civ.P. 12(b)(6). The
purpose of a motion to dismiss is to test the
sufficiency of a complaint, not to resolve disputed
facts or decide the merits of the case. *See Kost v.
Kozakiewicz*, 1 F.3d 176, 183 (3d Cir.1993). Thus,
when considering a motion to dismiss, a court must
accept as true all allegations in the complaint and
must draw all reasonable factual inferences in the
light most favorable to the plaintiff. *See Neitzke v.
Williams*, 490 U.S. 319, 326 (1989); *Piecknick v.
Pennsylvania*, 36 F.3d 1250, 1255 (3d Cir.1994).
However, the court is "not required to accept legal
conclusions either alleged or inferred from the
pleaded facts." *Kost*, 1 F.3d at 183 (citation omitted).
Dismissal is only appropriate when "it appears
beyond doubt that the plaintiff can prove no set of
facts in support of his claims which would entitle him
to relief." *Conley v. Gibson*, 355 U.S. 41, 45 (1957).

DISCUSSION
In support of its Motion to Dismiss the Amended
Complaint, Dow contends: (1) the Amended
Complaint's claims against Dow violate the pleading
requirements of Rule 9(b) and the Reform Act; (2)
AES fails to state a "control person" claim against
Dow; (3) AES cannot claim that it relied on, or is
barred from complaining about, the alleged
projections; (4) the state law claims should be
dismissed for lack of supplemental jurisdiction; (5)
the choice of law provisions specifying Delaware law
bar AES's claims arising under Texas statutes; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(6) the Amended Complaint should be dismissed for
failure to join indispensable parties.

I. Failure to Plead Fraud with Particularity

**\*2** Dow contends that the Amended Complaint fails
to comply with the particularity requirement of Rule
9(b) of the Federal Rules of Civil Procedure. That
rule provides: "In all averments of fraud or mistake,
the circumstances constituting fraud or mistake shall
be stated with particularity. Malice, intent,
knowledge, and other condition of mind of a person
may be averred generally." Fed. R. Civ. Pro. 9(b).

Dow also cites the pleading requirements of the
Private Securities Litigation Reform Act ("Reform
Act"), which provides:
   In any private action arising under this chapter in
   which the plaintiff may recover money damages
   only on proof that the defendant acted with a
   particular state of mind, the complaint shall, with
   respect to each act or omission alleged to violate
   this chapter, state with particularity facts giving
   rise to a strong inference that the defendant acted
   with the required state of mind.
   15 U.S.C.A. 78u-4(b)(2) (West Supp.1999).

In *In re Advanta Corp. Securities Litigation,* the
Court of Appeals for the Third Circuit adopted an
interpretation of this provision that followed the
standard for pleading securities fraud adopted by the
Second Circuit before the enactment of the Reform
Act. *See In re Advanta Corp. Securities Litigation,
180 F.3d 525, 534 (3d Cir.1999).* That standard
requires Plaintiff to establish a "strong inference" of
fraud by (a) alleging facts to show that the
Defendants had both motive and opportunity to
commit fraud; or (b) alleging facts that constitute
circumstantial evidence of either reckless or
conscious behavior. *See id.* The Second Circuit
standard is enhanced by the Reform Act to require
that such facts be stated with particularity. *See id.* at
535-36.

After reviewing the Amended Complaint in a light
most favorable to Plaintiff, the Court is satisfied that
Plaintiff has met this stringent pleading burden. The
Amended Complaint asserts the who, what, where,
when and how of Defendants' actions (including
Dow) that are the bases of Plaintiff's claims. *See id.* at
534; (D .I. 67, ¶ ¶ 35-45). The allegations in the
Amended Complaint outline in detail matters that
were allegedly fraudulently omitted from the
documents provided to AES in connection with the
transaction. (D.I.67, ¶ ¶ 63-65). AES quotes

extensively from internal Destec documents in an
effort to demonstrate that Dow and Destec either
knew the statements they were making regarding the
Elsta project were false, or at a minimum, that Dow
and Destec acted recklessly in making those
statements. *Id.* Thus, the Court concludes that
Plaintiff's allegations of securities fraud are sufficient
to withstand a motion to dismiss.

Second, Dow asserts that AES has not met its
obligation to plead "all" facts that underlie its
allegations made on information and belief. If
allegations are made on "information and belief",
Plaintiff must "state with particularity all facts on
which that belief is founded." 15 U.S.C. § 78u-
4(b)(1). The Court concludes that the Amended
Complaint contains sufficient information regarding
the basis for Plaintiff's belief that Dow defrauded it.
The allegations contain citations to and quotes from
specifically identified documents and conversations.
(D.I.67, ¶ ¶ 35-45, 62-65). Thus, the Court concludes
that the Amended Complaint satisfies the
requirements for pleading on "information and
belief."

**\*3** Third, Dow asserts that AES failed to allege with
particularity a representation by Dow. Dow argues
that the Amended Complaint fails to allege that Dow
committed a primary violation of Section 10(b). A
primary liability claim is presented if "a party
significantly participated in the alleged manipulative
or deceptive scheme." *Levine v. Metal Recovery
Technologies, Inc.,* 182 F.R.D. 102, 106
(D.Del.1998) (citing *Primavera Familienstiftung v.
Askin,* Civ. A. No. 95-8905, 1996 WL 494904, at \*7
(S.D.N.Y. August 30, 1996)); *see also SEC v. United
States Envtl. Inc.,* 155 F.3d 107, 112 (2d Cir.1998),
*cert. denied, Romano v. SEC,* 119 S.Ct. 1755 (1999).
The Amended Complaint alleges that Dow was a
direct participant in the fraudulent scheme to sell
Destec at an artificially inflated price, in violation of
Rule 10b-5. In addition, AES asserts that the sale of
Destec and DEI's stock was initiated and conducted
for the benefit of Dow. (D.I.67, ¶ ¶ 32-33, 36-37,
48). Thus, the Court concludes that the Amended
Complaint adequately pleads facts to support a §
10(b) claim against Dow.

Dow also argues that neither agency nor conspiracy
are viable theories of liability under § 10(b) since the
United States Supreme Court decision in *Central
Bank of Denver, N.A. v. First Interstate Bank of
Denver, N.A.,* 511 U.S. 164 (1994). In *Central Bank,*
the Supreme Court determined that Congress did not
intend to create a cause of action for "aiding and

Not Reported in F.Supp.2d
2001 WL 34367296 (D.Del.)
(Cite as: 2001 WL 34367296 (D.Del.))

Page 3

abetting" a violation of Rule 10b-5. *Central Bank, 511 U.S. at 184.* Notably, in a dissenting opinion, Justice Stevens opined that imposition of secondary liability under respondeat superior and other common law agency principles "appear unlikely to survive the Court's decision." *Id . at 200-01 n. 12.*

In *AT & T Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421 (3d Cir.1994),* the Court of Appeals for the Third Circuit considered the impact of *Central Bank* on established doctrines of vicarious liability under the Lanham Act. The Third Circuit in *AT & T* held that courts applying vicarious liability theories "are not expanding the category of affirmative conduct proscribed by the relevant statute; rather, they are deciding on whose shoulders to place responsibility for conduct indisputably proscribed by the relevant statute." *AT & T, 42 F.3d at 1430-31.* The Court of Appeals concluded that "*Central Bank's* discussion of aiding and abetting should not be transplanted into the more settled realm of agency law." *Id. at 1432.* While other circuits courts have rendered decisions inconsistent with *AT & T,* the Court is compelled to follow *AT & T* and conclude that agency liability is still available under securities laws in this circuit.

The Court further concludes that conspiracy liability survives the *Central Bank* decision. The Court finds *Wenneman v. Brown,* 49 F.Supp. 1283 (D.Utah 1999) instructive on this issue. The *Wenneman* court noted that "[w]hile Central Bank eliminated a cause of action against an aider and abettor, it did not preclude a plaintiff from bringing a claim against members of a conspiracy to defraud so long as the plaintiff sufficiently alleges facts which would support a finding that a particular participant could be primarily liable as a co-conspirator under Rule 10b-5." *Wenneman,* 49 F.Supp. at 1289; *see also Central Bank, 511 U.S. at 191.* The Court concludes that the allegations of the Amended Complaint, taken in the light most favorable to Plaintiff, do not merely place Dow in the role of aider and abettor, but as a co-conspirator, and, therefore, as a primary violator of Section 10(b). Thus, the Court will not dismiss the Amended Complaint against Dow on this claim.

**\*4** Fourth, Dow contends that AES has not pleaded sufficient facts to state a claim for liability for "forward-looking statements." Dow asserts that the challenged statements are shielded from liability under the "safe harbor" doctrine of the Reform Act, which provides that a party challenging such statements made by issuers of publicly-traded securities must allege "actual knowledge" of falsity

by the corporate officer making a false statement. *15 U.S.C. § 78u-5(c)(1)(B).* Dow asserts that the challenged statements are forward-looking because they relate to the completion date and profitability of the Elsta project, or statements of the assumptions underlying such predictions.

"Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act." *In re Mobilemedia Sec. Litig., 28 F.Supp.2d 901, 930 (D.N.J.1998)* (holding that company's statement alleged to be misleading on the basis of omissions of facts known to company at the time statement was made was not protected under safe harbor) (citing *In re Valujet, Inc. Sec. Litig., 984 F.Supp. 1472, 1479 (N.D.Ga.1997); Voit v. Wonderware Corp., 977 F.Supp. 363, 371 (E.D.Pa.1997)); see also In re Cendant Corp., 60 F.Supp.2d 354, 376 (D.N.J.1999)* (holding that because plaintiffs alleged that defendant knew statement was false at the time it was made, statement did not fall within safe harbor of Reform Act). Here, AES contends that the statements regarding the Elsta project were untrue when they were made, based on information known to Dow and Destec at the time they made the statements. The Court concludes that the "safe harbor" of the Reform Act does not apply to the instant case because the statements at issue are alleged statements of then-present fact. Thus, AES is under no obligation to plead any allegations particular to Dow or Destec's executive officers. Therefore, the Court concludes that the Amended Complaint meets the pleading requirements of *Rule 9(b)* and the Reform Act.

## II. Section 20(a) "Control Person" Claim

Section 20(a) of the Exchange Act imposes joint and several liability upon any person who controls a person liable under any provision of the Exchange Act. *In re Aetna, Inc. Sec. Litig., 34 F.Supp.2d 935, 957 (E.D.Pa.1999).* AES asserts that Dow acted as a controlling person of Destec under Section 20(a). Section 20(a) requires proof that "one person controlled another person," and that "the 'controlled person' is liable under the Act." *Shapiro v. UJB Financial Corp., 964 F.2d 272, 279 (3d Cir.1992).* Dow has moved for dismissal of this claim on the grounds that there cannot be liability under Section 20(a) against Dow where AES has failed to state a claim under Section 10(b) against Destec, the "controlled person." In support of its motion, Dow contends that the pleadings of AES are based solely on information and belief, and that the fraudulent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 34367296 (D.Del.)
(Cite as: 2001 WL 34367296 (D.Del.))

Page 4

statements and omissions fall within the "safe harbor" of the Reform Act. Dow's arguments with respect to Destec's alleged violation of § 10(b) fail for the same reasons discussed above with respect to Dow's alleged violation of § 10(b). Thus, the Court concludes that the Amended Complaint adequately asserts a primary violation of § 10(b) by Destec.

*5 In addition, Dow asserts that AES has failed to adequately plead "culpable participation" by Dow. In order to impose control person liability, Plaintiff must allege at least potential control and culpable participation. See *Rochez Bros. Inc. v. Rhoades*, 527 F.2d 880, 890 (3d Cir.1975); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981). The heightened pleading requirements of Fed.R.Civ.P. 9(b) do not apply to a claim under Section 20(a) for control person liability. *In re Tel-Save Sec. Litig.*, 1999 WL 999427 at *6 (E.D.Pa. Oct. 19, 1999). Allegations that "support a reasonable inference that [defendant] had the potential to influence and direct the activities of the primary violator" suffice to plead control person liability. *Id.* (citing *In re Health Mgmt. Inc. Sec. Litig.*, 970 F.Supp. 192, 205 (E.D.N.Y.1997)). The Amended Complaint contains allegations that Dow controlled Destec and that Dow was integrally involved in the scheme to defraud. (D.I.67, ¶¶ 95,96) Thus, the Court concludes that the allegations of the Amended Complaint satisfy the culpable participation requirement. Therefore, Dow's motion to dismiss the Section 20(a) "control person" claim will be denied.

III. Reliance

Dow asserts that all of AES's claims should be dismissed because AES cannot claim that it relied on, or AES is barred from complaining about, the alleged projections. In support of this argument, Dow urges the Court to review various clauses contained in certain agreements between the parties. For purposes of the instant motion, however, the Court is only concerned with the sufficiency of the Complaint and will not look to documents possibly more appropriate to the summary judgment stage of this case. For this reason, the Court will not dismiss Defendant on this basis and Defendant's Motion For Leave to File a Supplemental Appendix to its Motion to Dismiss (D.I.98) will be denied.

IV. Supplemental Jurisdiction

Because Dow argues that the federal claims should be dismissed in their entirety, Dow claims that the state law claims should be dismissed as well for lack of supplemental jurisdiction. Because the Court concludes that the federal securities laws claims remain in the Amended Complaint, supplemental jurisdiction exists over the state law claims. *See* 28 U.S.C. § 1367(a).

V. Claims Arising Under Texas Law

AES asserts four claims against Dow arising under Texas statutes (§ § 33A(2), 33F(1) and 33F(2) of the Texas Securities Act ("TSA") (Counts Four, Six and Seven of the Amended Complaint) and § 27.01 of the Tex. Bus. and Com.Code (Count Eight)). Dow contends that the Texas statutory claims must be dismissed because the Merger Agreement signed by Dow and Asset Purchase Agreement signed by AES both state that the "[a]greement shall be governed and construed in accordance with the laws of the State of Delaware without giving effect to the principles of conflicts of law thereof." (D.I.75, Ex. B, § 9.11, Ex. C, § 9.11). In response, AES asserts that it cannot be bound by the choice of law provisions in the Merger Agreement and the Asset Purchase Agreement because AES was not a party to the Merger Agreement and Dow was not a party to the Asset Purchase Agreement. The Court concludes that AES can be bound by the choice of law provisions in the Merger Agreement and the Asset Purchase Agreement because the Destec sale, involving contracts between Dow, NGC, and AES was all part of one transaction. AES acknowledges that the sale of Destec was part of a single integrated transaction, as AES and NGC negotiated an agreement to "jointly submit a bid for the purchase of Destec." (D.I.67, ¶ 36). Thus, the Court must consider whether Plaintiff's claims arising under the Texas statutes are within the scope of the choice of law provision.

*6 Following a transfer initiated by a defendant pursuant to 28 U.S.C. § 1404(a), the transferee court must apply the choice of law rules that would have been applied by the transferor court. *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Absent an applicable stipulation, a federal district court sitting in diversity must apply the choice of law rules of the state in which the district court sits in determining which state's laws govern. *See* *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Hionis Int'l Enter., Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D.Del.1994). This rule applies as well when a court exercises its pendent jurisdiction. *System Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir.1977) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 34367296 (D.Del.)
(Cite as: 2001 WL 34367296 (D.Del.))

Page 5

Because this case was transferred to the District of Delaware from the Southern District of Texas pursuant to 28 U.S.C. § 1404(a), the Court will apply Texas choice of law rules. Under Texas law, where the wrongs arise from misrepresentations inducing a party to execute the contract and not from breach of the contract, remedies and limitations specified by the contract do not apply. See *Busse v. Pacific Cattle Feeding Fund No. 1, Ltd.*, 896 S.W.2d 807, 813 (Tex.App.1995) (citing *Caton v. Leach Corp.*, 896 F.2d 939, 942-43 (5th Cir.1990)). This case does not involve an interpretation or construction of the contracts but rather the alleged misrepresentations and fraud in the inducement to sign the contracts. The rights, obligations and causes of action do not arise from the contracts but from the Texas Securities Act, the Texas Business and Commerce Code and the common law. The Court concludes that the choice of law provision in the contracts does not apply to these claims. Thus, the Court must consider Texas' background choice of law rules to resolve the parties' choice of law dispute.

In Texas, "the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Caton*, 896 F.2d at 942 (quoting *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984)). The rule in fraud and misrepresentation cases is seen in Restatement (Second) of Conflict of Laws § 148 (1971). See *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 310 (Tex.App.), set aside on other grounds, 840 S.W.2d 384 (Tex.1992). Under § 148, a court considers the following contacts in determining which state has the most significant relationship to the occurrence and the parties:
(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.
*7 Restatement (Second) of Conflicts § 148(2) (1971).

According to the allegations in the Amended Complaint, a substantial portion of the alleged fraud occurred in Texas. Alleged misrepresentations were

made at a presentation held in Houston, Texas, the document room provided by Dow and Destec was located in Destec's facilities in Houston, documents containing alleged misrepresentations were sent to AES from Houston and AES interviewed Destec employees in Houston. (D.I.67, ¶ ¶ 10, 37, 40, 41, 43). The Court concludes that Texas is the state with the most significant relationship with the fraud and, therefore, Plaintiff may properly assert the causes of action arising under Texas statutes and common law. Thus, the Court will not dismiss Defendant's claims on this basis.

VI. Failure to Join Indispensable Parties

Defendant's final contention is that Plaintiff's claims should be dismissed because it failed to join NGC to the litigation. Defendant bases its argument on its claim that rescission is the exclusive remedy under Section 33(A) of the Texas Securities Act. Section 33(A)(2) provides that a buyer "may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." Tex.Rev.Civ. Stat. Ann. art. 581-33(A)(2) (Vernon Supp.1999). Texas courts are divided on the issue of whether monetary damages are available as a remedy under Section 33(A) if plaintiff still owns the security. See *Lutheran Bhd. v. Kidder Peabody & Co.*, 829 S.W.2d 300, 307 (Tex.App.1992) (holding that Section 33(A) did not intend to limit the buyer only to rescission), set aside on other grounds, 840 S.W.2d 384 (Tex.1992). Cf. *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 231-32 (Tex.App.1996) (holding that rescission is the exclusive remedy when plaintiff still owns stock at commencement of suit); *Anheuser-Busch Cos. v. Summit Coffee Co.*, 858 S.W.2d 928 (Tex.App.1993), reversed on other grounds, 514 U.S. 1001 (1995). The decisions in *Summers* and *Anheuser-Busch* were based in part on the parallel between Section 33(A) of the Texas Securities Act and Section 12(2) of the Securities Act of 1933. Section 33(A) "should be applied in accordance with the federal provision." *Anheuser-Busch*, 858 S.W.2d at 939; see also *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1091 n. 16 (5th Cir.1996) ("Because of the obvious similarities between the TSA and the federal securities acts, Texas courts look to decisions of the federal courts to aid in the interpretation of the TSA."). Under § 12(2), "federal courts have held that rescission is the exclusive remedy when the plaintiff still owns the stock." *Anheuser-Busch*, 858 S.W.2d at 939 (citing *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1035 (2d Cir.1979)). For the reasons set forth in *Summers* and *Anheuser-Busch*, the Court concludes that rescission is the exclusive remedy under Section 33(A) of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 6

2001 WL 34367296 (D.Del.)

**(Cite as: 2001 WL 34367296 (D.Del.))**

Texas Securities Act.

In this case, however, Plaintiff does not seek a rescission of the stock purchase. (D.I. 67, at 60, D.I. 88, at 48). Because the Court has concluded that rescission is the exclusive remedy under Section 33(A) and Plaintiff does not seek a rescission of the stock purchase, the Court will dismiss Plaintiff's claim under Section 33(A). Likewise, the Court will also dismiss Plaintiff's claims that arise under Section 33(F)(1) and 33(F)(2) of the Texas Securities Act because a necessary element for such claims is a viable claim under Section 33(A). Also, a successful plaintiff under these sections is entitled to the same remedies against the control person and/or aider and abettor as if they were a primary violator under Section 33(A), i.e., a buyer who still owns the securities would only be entitled to the remedy of rescission. Therefore, the Court will dismiss Plaintiff's claims that arise under Sections 33(A)(2), 33(F)(1) and 33(F)(2) of the Texas Securities Act.

### CONCLUSION

*8 For the reasons stated above, Defendant's Motion to Dismiss the Amended Complaint (D.I.72) will be granted in part and denied in part. The Court will deny Defendant's Motion to Dismiss as to all claims except Plaintiff's claims arising under Sections 33(A)(2), 33(F)(1) and 33(F)(2) of the Texas Securities Act.

An appropriate Order will be entered.

### ORDER

WHEREAS, presently before the Court are Defendant's Motion to Dismiss the Amended Complaint (D.I.72) and Defendant's Motion to For Leave to File a Supplemental Appendix to its Motion to Dismiss (D.I.98),

NOW THEREFORE, for the reasons set forth in the accompanying memorandum opinion, IT IS HEREBY ORDERED this 19 day of January 2001 that:

1. Defendant's Motion to Dismiss the Amended Complaint (D.I.72) is *GRANTED* as it pertains to Plaintiff's claims under Sections 33(A)(2), 33(F)(1) and 33(F)(2) of the Texas Securities Act.

2. Defendant's Motion to Dismiss the Amended Complaint (D.I.72) is *DENIED* as it pertains to all other claims asserted by Plaintiff in the Amended Complaint.

3. Defendant's Motion For Leave to File a Supplemental Appendix to its Motion to Dismiss (D.I.98) is *DENIED*.

2001 WL 34367296 (D.Del.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in A.2d                                                                    Page 1
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
In re: PLY GEM INDUSTRIES, INC.
SHAREHOLDERS LITIGATION
No. CIV.A. 15779-NC.

Submitted: Dec. 28, 2000.
Decided: June 26, 2001.

Joseph A. Rosenthal, Esquire, of Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington,
Delaware; of counsel: Judith L. Spanier, Esquire, of
Abbey, Gardy & Squitieri, LLP, New York, New
York, and Stull, Stull & Brody, New York, New
York, Attorneys for Plaintiffs.

A. Gilchrist Sparks, III, Esquire, Alan J. Stone,
Esquire and Stephanie L. Nagel, Esquire, of Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware; of
counsel: Mitchell A. Lowenthal, Esquire, and Dylan
D. Smith, Esquire, of Cleary, Gottlieb, Steen &
Hamilton, New York, New York, Attorneys for
Defendants Herbert P. Dooskin, Joseph M.
Goldenberg, Albert Hersh, William Lilley III, Elihu
H. Modlin, Dana R. Snyder, and Jeffrey S.
Silverman.

Kevin G. Abrams, Esquire, of Richards, Layton &
Finger, Wilmington, Delaware; of counsel: John D.
Donovan, Jr., Esquire, Michael P. Allen, Esquire, and
Christopher G. Green, Esquire, of Ropes & Gray,
Boston, Massachusetts, Attorneys for Defendant Ply
Gem Industries, Inc.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

\*1 Plaintiffs, former shareholders of Ply Gem
Industries, Inc. ("Ply Gem" or the "Company"), bring
their Consolidated Amended Class Action Complaint
(the "Complaint") asserting, on behalf of themselves
and their fellow former shareholders, that the merger
of Ply Gem into a subsidiary of Nortek, Inc.
("Nortek"), pursuant to an agreement entered on July
24, 1997, was the product of breaches by the then-
directors of Ply Gem of their fiduciary duties of
loyalty and due care. Defendants have moved to

dismiss. They contend that (1) Plaintiffs lack
standing to pursue their claims, which can be
asserted, if at all, only in a derivative action and not
through an individual action and (2) in any event, the
allegations of the Complaint do not, under Court of
Chancery Rule 12(b)(6), state a claim upon which
relief can be granted.

I conclude that the claims which Plaintiffs seek to
assert are individual in nature and that Plaintiffs have
alleged sufficiently that the merger was not approved
by a disinterested and independent majority of the
directors. I also find that one director defendant is
entitled to dismissal of all claims against him because
Plaintiffs' allegations do not raise sufficient doubt as
to his loyalty and because Plaintiffs' duty of care
claims against him are barred by the exculpatory
provision in Ply Gem's certificate of incorporation.
Accordingly, I grant in part and deny in part
Defendants' motion to dismiss.

I. PARTIES
Plaintiffs, Herman Smilow, Adele Brody and
Andrew Klotz, allege that they were shareholders of
Ply Gem at all times relevant to this action.

The individual defendants were directors of Ply
Gem:

1. Defendant Jeffrey S. Silverman ("Silverman"),
who owned more than one-quarter of the outstanding
Ply Gem stock, was the Chief Executive Officer and
Chairman of the Board, positions that he had held for
more than a decade.

2. Defendant Dana R. Snyder ("Snyder") was the
President and Chief Operating Officer of Ply Gem.
He held approximately 6% of the Ply Gem stock.
Snyder's 1996 compensation included a salary of
$440,000, a bonus of $890,000, and a long-term
compensation award of options. With the Nortek
merger, Snyder received more than $3.6 million for
all of his options.

3. Defendant Herbert P. Dooskin ("Dooskin") was
Ply Gem's Executive Vice President and owned more
than 3% of its stock.

4. Defendant Elihu H. Modlin ("Modlin") had been
General Counsel of Ply Gem for more than three
decades. He was a partner in a law firm with his son,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

Page 2

Charles M. Modlin, who was the Secretary of Ply Gem. During 1996, Ply Gem paid Modlin's law firm almost one million dollars for professional services.

5. Defendant Joseph M. Goldenberg ("Goldenberg") was a co-founder of a wholly-owned subsidiary of the Company and served as a consultant to the Company, for which he was paid approximately $287,000 in 1996.

6. Defendant Albert Hersh ("Hersh") was a co-founder of the Company and provided consulting services to the Company. In 1996, he was paid approximately $90,000 for those consulting services.

*2 7. Defendant William Lilley III ("Lilley") was the President of Policy Communications, Inc., a business consulting firm, that received $25,000 from Ply Gem in 1996 for its consulting services.

Ply Gem was a manufacturer and distributor of building materials.

## II. BACKGROUND [FN1]

> FN1. The factual background is taken from the Complaint, the well-pleaded allegations of which, for present purposes, must be taken as true. *Vanderbilt Income and Growth Assocs., L.L.C., v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 612-13 (1996).

In August 1995, Ply Gem announced that it had hired an investment banking firm to explore various strategic alternatives, one of which was the sale of Ply Gem. During the next several months, Ply Gem discussed a potential acquisition with several parties. Some of these parties entered into confidentiality and standstill agreements; some also received non-public information about the Company. Nortek was one of those parties that received confidential information and entered into a standstill agreement with Ply Gem.

In February 1996, Ply Gem received an indication of interest in purchasing the Company at a price of $17 per share from an unidentified third party. Nortek at that time also raised the possibility of a merger with Ply Gem. Although Silverman and Snyder discussed a stock-for-stock merger with Nortek for several months, nothing came of the discussions; and, in July 1996, the Ply Gem board announced that it had decided not to sell the Company but, instead, to move forward with the development of Ply Gem's business.

Silverman and Snyder, however, had not given up on finding a buyer. They even considered a recapitalization of Ply Gem that would result in the termination of Silverman's employment relationship and in the appointment of Snyder as Ply Gem's new chief executive officer.

In March 1997, Silverman, without informing the board, retained another investment banking firm to explore the possibility of a leveraged buyout of Ply Gem and to identify potential partners for Silverman if he elected to participate in such an effort. The investment banker approached six leveraged buyout firms. All six committed to a two-year standstill provision which required, at Silverman's insistence, that they would not propose to acquire Ply Gem except with Silverman's, or the Ply Gem board's, prior approval.

Silverman's employment with Ply Gem was governed by an employment contract extending to 2007. Silverman informed the potential buyout firms that he did not want to continue in his position after any buyout and that they should assume that he would receive termination compensation of $25 million, $2 million per year for a non-compete covenant spanning five years, and cancellation of his indebtedness ($17.4 million plus accrued interest) to Ply Gem. Unless these demands were met, there would be no transaction. Silverman's existing agreement with Ply Gem contained a non-compete covenant that would not survive both a change in corporate control and Silverman's termination as a result thereof.

Silverman and Snyder (who wanted to become the chief executive officer of the surviving entity) selected Hicks, Muse, Tate & Furst ("Hicks, Muse") for negotiations from among the many potential buyout firms. Hicks, Muse was discussing a price range of $17-19 per share in May 1997. One of the possibilities was that Silverman would retain an equity position in the venture. While discussions were ongoing with Hicks, Muse, Silverman and Snyder continued to discuss the possibility of a combination with Nortek, which was floating a price of $17 per share. Hicks, Muse, however, was prepared to offer to Silverman $10 million more than was Nortek to resolve the issues posed by Silverman's employment agreement and non-competition agreement.

*3 On or about June 10, 1997, the Ply Gem board was told about the Hicks, Muse and the Nortek expressions of interest in acquiring the Company.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 3
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

The board designated Silverman and Lilley to meet with and select an investment banking firm to advise the board. Silverman identified the firms to be considered, and Lilley and he chose Furman Selz & Co. ("Furman Selz").

The board, notwithstanding Silverman's extensive personal financial interest in any transaction, did not appoint a special committee. Instead, it allowed Silverman to continue as Ply Gem's negotiator with both Hicks, Muse and Nortek.

On June 16, 1997, Nortek advised Silverman that it was willing to pay $20 per share, but was not prepared to enhance its proposal to Silverman for his personal contractual requirements.

On June 20, 1997, Furman Selz met with the Ply Gem board and indicated that it would provide a favorable fairness opinion at that time on the Hicks, Muse offer of $18 per share, which, unlike the Nortek offer, also satisfied Silverman's demands. Two days later, Hicks, Muse increased its offer to $18.75 per share while Nortek remained interested at $20 per share or perhaps slightly more.

On June 24, 1997, Silverman provided Nortek with copies of the proposed agreements with Hicks, Muse, including those dealing with his personal employment arrangements. Silverman, in essence, was attempting to induce Nortek to meet his personal demands while also securing a better price for the Ply Gem shares. Silverman informed the Ply Gem board that he anticipated a proposal from Nortek at up to $21 per share in definitive form by June 25, 1997. The board, however, on June 24, 1997, chose to accept the Hicks, Muse offer (through an affiliate, Atrium Acquisition Holdings Inc.) of $18.75 per share. Later the same day, Nortek submitted an offer to purchase Ply Gem at $20.25 per share, but it withdrew that offer the next day when the Hicks, Muse agreement was announced.

On July 14, 1997, Nortek offered $19.50 per share to acquire Ply Gem. Its offer also satisfied Silverman's personal demands concerning the termination of his employment agreement, his non-competition agreement, and the forgiveness of his debt to the Company. Nortek's offer, accordingly, was $0.75 per share less than its offer of two weeks earlier, allegedly reflecting the cost to Ply Gem's shareholders of Nortek's meeting Silverman's specific demands. [FN2]

FN2. Complaint, ¶ 42.

Later in July 1997, the Ply Gem board approved a merger agreement with Nortek and terminated the Hicks, Muse agreement, paying Hicks, Muse (or its affiliate) $12 million as a termination fee and for reimbursement of its expenses. The board also received a fairness opinion from Furman Selz. Plaintiffs allege that the fairness opinion was inadequate because it failed to consider the consequences of Silverman's "side" deal.

Nortek, Ply Gem, and Silverman executed, concurrently with the merger agreement, an agreement providing for the termination of Silverman's employment, a non-competition covenant, payment to Silverman of more than $22 million (reduced by amounts paid to Silverman before his termination as a bonus for 1997) and forgiveness of Silverman's over $17 million debt to the Company, plus any accrued interest on the debt.

*4 The merger of Ply Gem with a Nortek subsidiary was consummated thereafter.

## III. THE CONTENTIONS

Plaintiffs allege that Silverman used his status as chief executive officer and director and as the principal, if not sole, negotiator to enrich himself at the expense of the other Ply Gem shareholders. They contend that Silverman's conduct tainted the merger process and denied Ply Gem's shareholders a fair price for their stock. Plaintiffs further allege that by acquiescing in Silverman's conduct, the directors breached their duties of loyalty and due care to the Company and its shareholders. At oral argument and in correspondence following oral argument, Plaintiffs also invoked *McMullin v. Beran* [FN3] to advance the contention that the board improperly delegated responsibility for the negotiation process to Silverman.

FN3. *McMullin v. Beran*, Del Supr., 765 A.2d 910 (2000).

In response, Defendants first argue that the claims asserted by Plaintiffs are derivative in nature. They contend that if the claims are derivative, then Plaintiffs lost standing to assert those claims when their status as shareholders of Ply Gem was terminated as a result of the merger. [FN4] Second, Defendants maintain that the merger was approved by an informed and independent board and that as a result the directors' actions are to be evaluated under the business judgment rule. The Defendants also seek to invoke an exculpatory charter provision that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

protects the directors from monetary liability for breaches of their duty of care. Finally, they contest Plaintiffs' characterization of *McMullin v. Beran* as establishing a prohibition against merger negotiations conducted by an interested corporate officer who has a substantial personal financial interest, independent of his interest as a shareholder, in the merger agreement. [FN5]

> FN4. *See Lewis v. Anderson,* Del.Supr., 477 A.2d 1040, 1049 (1984).

> FN5. Defendants, at p. 16, n. 6 of Defendant's Joint Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, invite the Court to dismiss the Complaint because Plaintiffs lost standing when they tendered their shares or accepted the benefit of the cash out merger. *See Bershad v. Curtiss-Wright Corp.,* Del.Supr., 535 A.2d 840, 848 (1987). In addition to relying upon facts not alleged in the Complaint, Defendants have failed to demonstrate that those who accepted the merger benefits (under either format) did so knowingly. *See Norberg v. Security Storage Co. of Washington,* Del. Ch., C.A. No. 12885, Steele, J. (Sept. 19, 2000).

## IV. ANALYSIS

### A. *Applicable Standard.*

A motion to dismiss under Court of Chancery Rule 12(b)(6) requires the Court "to take the facts alleged as true and view all inferences from those facts in the light most favorable to plaintiff" and "to determine with reasonable certainty, under any set of facts that could be proved" that the Plaintiffs would not be entitled to relief. [FN6] If Defendants do not meet this rigorous standard, then the Court must deny their motion to dismiss.

> FN6. *McMullin v. Beran,* 765 A.2d at 916; *Wagner v. Selinger,* Del. Ch., C.A. No. 16740, Steele, V.C. (Jan. 18, 2000).

### B. *Individual or Derivative Claims.*

The line that separates an individual action from a derivative action is sometimes difficult to discern. [FN7] When the challenged conduct is part of the merger process, characterization of the claim as derivative is fatal to the prosecution of the claim. [FN8] Here, Plaintiffs allege that Silverman manipulated the merger process to favor his own

personal purposes. They assert that Silverman used his position to assure himself an extravagant personal compensation package to the detriment of the shareholders' best interests. Examples cited by Plaintiffs as evidence of Silverman's self-dealing and the unfairness of the merger process include his exercising full control over all negotiations, pursuing negotiations despite the board's decision that Ply Gem was not for sale, failing to advise the board of his efforts to negotiate a sale, and insisting that his unjustified personal demands be met as a condition to any agreement.

> FN7. *Parnes v. Bally Entertainment Corp.,* Del.Supr., 722 A.2d 1243 (1999); *Behrens v. Aerial Communications, Inc.,* Del. Ch., C .A. No. 17436, mem. op. at 8, Jacobs, V.C. (May 18, 2001); *Turner v.. Bernstein,* Del. Ch., C.A. No. 16190, mem. op. at 28, Jacobs, V.C. (Feb. 9, 1999); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* ¶ 9-2(a) at 9-4-5 (2000).

> FN8. *See* n. 4, *supra,* and accompanying text.

**\*5** Although Plaintiffs allege in conclusory fashion that the price paid to them for their shares was "unfair," [FN9] the specific factual allegation in the Complaint is that Nortek reduced its offer by $0.75 per share in order to satisfy Silverman's unjustified personal demands. [FN10]

> FN9. Complaint, ¶ 47. See *Parnes v. Bally Entertainment Corp.,* 722 A.2d at 1246-47, for its discussion of "unfair" price in a similar context.

> FN10. Complaint, ¶ 42. A fundamental difficulty with Plaintiffs' case is that it is likely that some substantial payment could properly have been made to Silverman and they have not articulated clearly their split on how much was appropriate and how much was not appropriate. They rely upon the $0.75 reduction in the Nortek offer to accommodate Silverman's side deal, but it is conceivable, on further proof, that the side arrangement was reasonable and fair to the shareholders. That, however, is a question for another day because, based on the allegations of the Complaint, the Court must draw the inference in favor of Plaintiffs that

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

Page 5

Silverman was not entitled to insist upon a termination of his employment agreement on his own initiative and, further, to receive substantial payments for the termination. The record before the Court does not support any contention that Nortek (or Hicks, Muse for that matter) insisted that Silverman leave the business. If Silverman was going to exit because he wanted to exit, the basis for his right to demand termination compensation cannot be gleaned from the Complaint, and Plaintiffs have alleged that he was not entitled to such payments.

*Parnes v. Bally Entertainment Corp.* teaches that, in the merger context, the presentation of a direct claim requires that the "stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price." [FN11] The attack on Silverman's conduct during the course of the merger negotiations, and the board's acquiescence in it, is a challenge by Plaintiffs to the fairness of the merger process. Accordingly, *Parnes* dictates that Plaintiffs' claims must be treated as individual claims and not as derivative claims. [FN12]

> FN11. *Parnes v. Bally Entertainment Corp.,* 722 A.2d at 1245.

> FN12. *See also Crescent/Mach I Partners, L.P. v. Turner,* Del. Ch ., C.A. No. 17455, Steele, J. (Sept. 29, 2000); *Chaffin v. GNI Group, Inc.,* Del. Ch., C.A. No. 16211, Jacobs, V.C. (Sept. 3, 1999).

Defendants rely extensively upon *Golaine v. Edwards,* [FN13] but that case does not dictate a different result. In *Golaine,* this Court commented on *Parnes'* analysis of what a plaintiff must allege about the merger process in order to plead an individual claim, as follows:

> FN13. *Golaine v. Edwards,* Del. Ch., C.A. No. 15404, Strine, V.C. (Dec. 21, 1999).

"It is not quite clear whether the door is open for a plaintiff to state an individual claim by alleging that the negotiation of side transactions tainted the merger negotiations by unfairly diverting merger consideration that would have otherwise gone to the target stockholders into the pockets of target company fiduciaries." [FN14]

> FN14. *Id.,* mem. op. at 15.

The *Golaine* Court then posited the following circumstances, remarkably similar to those alleged here:
  1. The CEO of the target company learned that the acquirer would pay $10,000,000 more.
  2. The CEO agreed to this proposal but on the condition that $2,000,000 of the additional payment would be diverted to him.
  3. The final consideration was fair, but the shareholders would have received an additional $2,000,000 if the CEO had not negotiated for his own account.

The *Golaine* Court's conclusion was that, in these hypothetical circumstances, it was probable that under *Parnes* the $2 million payment could be attacked individually as the product of unfair dealing that tainted the final merger terms. [FN15] The issue became whether an individual claim could exist only if the process were so unfair as to have resulted in an unfair price, or whether an individual claim could exist where the unfair process resulted in a less than the best reasonably available, but not unfair, price. *Parnes* makes clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price *and/or* unfair process. [FN16] Thus, given the disjunctive nature of the standard, it is difficult to imprint an unfair price concept on the process side of the *Parnes* evaluation. [FN17] As *Golaine* frames it, "the real question underlying the teaching of *Parnes* [is] whether the Complaint states a claim that the side transactions caused legally compensable harm to the target's stockholders by improperly diverting consideration from them to their fiduciaries." [FN18]

> FN15. *Id.*

> FN16. *Parnes v. Bally Entertainment Corp.,* 722 A.2d at 1245 (emphasis added).

> FN17. Fairness considerations of price and process are not necessarily considered separately. *See Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983).

> FN18. *Golaine v. Edwards,* mem. op. at 16-17. In *Golaine,* the payment to KKR of $20 million was deemed immaterial when measured against the $8.3 billion transaction. Here, the benefits flowing to Silverman, to some of which he may well have been entitled, constituted in excess of 10% of the total transactional value (i.e., approximately $37 million out of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 6
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

transaction valued at roughly $275 million).

**\*6** In short, the Complaint can be read fairly to allege that, as the result of the unfair process orchestrated by Silverman, Nortek reduced the per share price that it was willing to pay to the Ply Gem shareholders in order to increase the amount that it was willing to pay Silverman on his side transaction. [FN19] *Parnes* teaches that such conduct will serve as the basis for individual or direct claims.

        FN19. Complaint, ¶ 42.

Although the Complaint may directly challenge the merger, "it does not necessarily follow that the Complaint adequately states a claim for relief" under Court of Chancery Rule 12(b)(6). [FN20] Thus, by putting fairly before the Court the contention that they are challenging the fairness of the merger price or the merger process, Plaintiffs can survive the derivative-individual obstacle yet still fail to assert a claim that would allow them to move beyond a Rule 12(b)(6) confrontation. With this in mind, I now turn to the issue of whether Plaintiffs' claims are legally sufficient.

        FN20. *Parnes v. Bally Entertainment Corp.,*
        722 A.2d at 1246.

*C. The Duty of Loyalty Claims.*

The Ply Gem directors, became obligated to seek "the best value reasonably available for all stockholders when they joined the process for a complete sale of the Company." [FN21]

        FN21. *McMullin v. Beran,* 765 A.2d at 918;
        *Paramount Communications, Inc. v. QVC
        Network, Inc.,* Del.Supr., 632 A.2d 34, 44
        (1993).

Plaintiffs assert that the Ply Gem board breached its duty of loyalty to the shareholders and that, as a consequence of that breach, Silverman received the benefits of an "exorbitant" and improper "side" deal at the expense of the Ply Gem shareholders. [FN22] Because Ply Gem's directors are presumed to have exercised disinterested and independent business judgment in approving the Nortek merger, [FN23] the Plaintiffs must allege facts sufficient to overcome that presumption. As this Court has held:

        FN22. Complaint, ¶ 44.

        FN23. *Chaffin v. GNI Group,* mem. op. at

13.

"The Delaware Supreme Court broadly set forth the inquiry for questions regarding director disinterest and independence in *Aronson v. Lewis.* There, the Court held that a director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or when a corporate decision will have a materially detrimental impact on a director, but not the corporation or its stockholders. Independence, the *Aronson* Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized." [FN24]

        FN24. *In re Western National Corp.
        Shareholders Litig.,* Del. Ch., C.A. No.
        15927, mem. op. at 28, Chandler, C. (May
        22, 2000) (footnotes omitted).

Thus, unless the Nortek merger was approved by a majority of disinterested and independent directors, the Defendants must bear the burden of proving that the transaction was entirely fair to Ply Gem's shareholders. [FN25]

        FN25. *Cinerama, Inc. v. Technicolor, Inc.,*
        Del. Ch., 663 A.2d 1134 (1994), *aff'd,*
        Del.Supr., 663 A.2d 1156 (1995).

*1. Interested in the Transaction.*

A director is considered interested in a transaction if he receives "a personal benefit from a transaction that is not equally shared by the shareholders." [FN26] Here, Plaintiffs allege, Silverman received payment for the termination of his employment contract and his non-competition agreement and the forgiveness of his debt to Ply Gem. All of these benefits were unique to him and were not shared with the other stockholders. Thus, for purposes of this motion, Silverman must be considered "interested."

        FN26. *Rales v. Blasband,* Del.Supr., 634
        A.2d 927, 936 (1993); *Aronson v. Lewis,*
        Del.Supr., 473 A.2d 805, 812 (1984).

**\*7** There is no allegation that any of the remaining directors obtained any improper benefit whatsoever

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

Page 7

from the merger other than from their entitlement, as shareholders, to receive the merger consideration. They received the merger consideration on the same terms as any other shareholder. [FN27] Thus, the Complaint does not allege that any of the other six directors were "interested" in the Nortek merger transaction.

> FN27. Although Snyder received significant compensation for his options, I do not read the Complaint to allege any impropriety with respect to such payment.

2.  *Independence from Silverman's Alleged Domination.*

Plaintiffs' challenge to the independence of the other directors from Silverman's domination presents a more difficult question. [FN28]

> FN28. "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran,* 765 A.2d at 923.

The focus of Plaintiffs' attack on the loyalty of the directors is directed to Silverman's status both as the holder of 25% of the Ply Gem stock and as Ply Gem's Chairman and Chief Executive Officer. The inference, which Plaintiffs seek the Court to draw in their favor under the pleading standards of Court of Chancery Rule 12(b)(6), is that Silverman, by virtue of his position, was able to induce the directors to place Silverman's personal interests ahead of the stockholders' interests in approving the Nortek merger and the related Silverman agreement.

In *Friedman v. Beningson,* the chairman, chief executive officer and president held 36% of the outstanding stock. The Court observed that "[f]rom a practical perspective, this confluence of voting control with directorial and official decision making authority, while not itself sufficient under the cases to support a conclusion of reasonable doubt [citing *Aronson* ], is nevertheless itself quite consistent with control of the board." [FN29] That Silverman's status is consistent with an ability to override fellow director independence may well be an accurate assessment, but, as noted in *Friedman,* Silverman's status alone is not sufficient to overcome the presumption that the other directors, in fact, performed their duties loyally. Indeed, in *Aronson,* the Supreme Court acknowledged that a 47%

shareholder would not be presumed to dominate the corporation's board of directors. [FN30]

> FN29. *Friedman v. Beningson,* Del. Ch., C.A. No. 12232, mem. op. at 10, Allen, C. (Dec. 4, 1995), *appeal refused,* Del.Supr., 676 A.2d 900 (1996) (TABLE).

> FN30. *Aronson v. Lewis,* 473 A.2d at 815.

Plaintiffs are confronted with the challenge of pleading facts that create, at a minimum, a reasonable doubt that the board members could not honestly and objectively evaluate the Nortek merger, with its related Silverman agreement, because of their relationship with Silverman. "Speculation on the motives for undertaking corporate action" will not satisfy Plaintiffs' burden. [FN31] Similarly, the mere assertion of personal or business relationships will not defeat the presumption of independence. [FN32]

> FN31. *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988).

> FN32. *In re Walt Disney Co. Derivative Litig.,* Del. Ch., 731 A.2d 342, 355 (1998), *aff'd in part and rev'd in part sub nom. Brehm v. Eisner,* Del.Supr., 746 A.2d 244 (2000); *In re Grace Energy Corp. Shareholders Litig.,* Del. Ch., C.A. No. 12464, Hartnett, V.C. (June 26, 1992).

Although Plaintiffs' allegations of lack of independence may be far from compelling, the facts alleged in the Complaint supply the Court with a basis for a reasonable doubt as to whether five of the other six directors were independent. [FN33] Although discovery and development of the factual record may well prove that the directors discharged their duties with absolute propriety and free of any control by Silverman, at this stage, "the existence of [the other directors' interests and relationships with Silverman] is enough to defeat a motion to dismiss and warrant further inquiry. [FN34]

> FN33. The Complaint does not allege how many directors voted for the merger. Plaintiffs must allege sufficiently that the merger would not have been approved without the vote of the directors who were interested or disqualified. *See Beneville v. York,* Del. Ch., C.A. No. 17638, Strine, V.C. (July 10, 2000); *Aronson v. Lewis,* 473 A.2d at 815.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
(Cite as: 2001 WL 755133 (Del.Ch.))

Page 8

FN34. *In re New Valley Corp. Derivative Litig.*, Del. Ch., C.A. No. 17649, mem. op. at 19-20, Chandler, C. (Jan. 11, 2001).

**\*8** A review of the status of each of the other directors follows.

a. *The Employee Directors.*

(i) *Dooskin.* In addition to having been a director of Ply Gem since 1986, Dooskin was also its Executive Vice President. However, his status as an officer does not necessarily support the inference that he was under the control of Silverman, and his ownership of more than 3% of the then-outstanding Ply Gem stock would suggest a high level of personal self-interest in maximizing the merger value of Ply Gem. On the other hand, not only was Silverman Dooskin's supervisor, but also he was the largest stockholder in Ply Gem. [FN35] As such, Silverman was "in a position to exercise considerable influence" [FN36] over Dooskin, and, therefore, Plaintiffs, under the pleading standards of Chancery Rule 12(b)(6), have created a reasonable doubt as to Dooskin's capacity to consider impartially the Nortek merger agreement and the related Silverman agreement.

FN35. *See Mizel v. Connelly,* Del. Ch., C.A. No. 16638, mem. op. at 7, Strine, V.C. (July 22, 1999).

FN36. *See Rales v. Blasband,* 634 A.2d at 937. I acknowledge that Dooskin had an employment contract extending into 2000 and that Plaintiffs do not allege that Dooskin received "substantial remuneration" for his position. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357 ("reasonable possibility that they are more beholden to").

(ii) *Snyder.* Snyder was also both President and Chief Operating Officer of Ply Gem. He had joined the Company in 1995 and had acquired approximately 6% of its common stock. In addition to a long-term compensation award consisting of options, Snyder, in 1996, received a salary of $440,000 and a bonus of $890,000. Plaintiffs allege that Snyder received substantial compensation for his services to Ply Gem, and, thus, Silverman, as with Dooskin, was "in a position to exercise considerable influence" over Snyder. Accordingly, the Complaint has raised a reasonable doubt as to Snyder's capacity to consider impartially the Nortek transaction with its benefits for Silverman. [FN37]

FN37. But see text accompanying n. 46, *infra.* (Defendants assert that Snyder abstained from voting on the Nortek transaction.)

b. *The Outside Directors.* [FN38]

FN38. Although three of these directors were not employees of Ply Gem, they were intimately connected to the Company. Modlin had been the Company's lawyer for years and Goldenberg and Hersh had been Company executives.

(i) *Modlin.* Modlin had been general counsel for Ply Gem for almost four decades, apparently predating Silverman's arrival. In 1996, his law firm received almost $1 million in fees from Ply Gem. That a director's law firm receives fees from the corporation does not, by itself, demonstrate a lack of independence. [FN39] However, the Complaint alleges that Modlin "was a partner in the firm of Messrs. Elihu H. Modlin and Charles M. Modlin," [FN40] from which it can be inferred that his was a small law firm. The Chancellor's analysis of a case involving comparable facts is instructive:

FN39. *See McMillan v. Intercargo Corp.,* Del. Ch., 768 A.2d 492, 503 (2000) (as to interestedness).

FN40. Complaint, ¶ 6.

Director Goodman is an attorney employed by a law firm, not Telxon itself. Defendants characterize him as an outside independent director, beyond the influence of Telxon's CEO. According to the complaint, Goodman's law firm, however, received nearly $1 million in 1993 for services provided to Telxon. Goodman's firm is a small one. Realism of the kind signaled by *Rales* requires one to acknowledge the possibility that a partner at a small law firm bringing in close to $1 million in revenues from a single client in one year may be sufficiently beholden to, or at least significantly influenced by, that client as to affect the independence of his judgment.... As Myerson is Telxon's chief executive officer, he undoubtedly possesses the authority to hire and fire the corporation's legal counsel. For this reason, the pleadings raise a reasonable doubt concerning Goodman's independence in assessing the merits of a demand letter attacking the [subject] agreements. [FN41]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                         Page 9
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

FN41. *Steiner v. Myerson,* Del. Ch., C.A. No. 13139, mem. op. at 24-25, Allen, C. (July 18, 1995).

**\*9** Thus, Modlin's firm's receipt of substantial fees over a period of years for professional services raises a reasonable doubt as to the independence of his judgment. [FN42]

FN42. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357-58 (architectural services); *but see Tabas v. Mullane,* D.N.J ., 608 F.Supp. 759, 768 (1985) (legal services). Although lawyers are subject to unique and demanding professional standards, *see e.g., The Delaware Lawyers' Rules of Professional Conduct,* I am not persuaded that, for present purposes, the nature of professional fees (*e.g.,* architectural, medical, or legal) supports a differential analysis based on the specific profession.

I also note that Modlin's son was Ply Gem's corporate secretary. Whether the position of corporate secretary carried any material benefit or whether it was simply an accommodation provided as part of his firm's legal services to Ply Gem is not clear from the Complaint. Thus, I infer nothing from the son's status. *See Chaffin v. GNI Group, Inc., supra; Mizel v. Connelly, supra.*

(ii) *Goldenberg.* Goldenberg served as a consultant to Ply Gem from 1994, after he ceased serving as its chairman. In 1996, he received consulting fees of almost $300,000. The receipt of substantial consulting fees, in the context where Silverman was the largest shareholder and the chief executive officer provides a sufficient factual basis to create a reasonable doubt as to whether Goldenberg was independent of Silverman. [FN43]

FN43. *See In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 357-58; *See Kahn v. Dairy Mart Convenience Stores, Inc.,* Del. Ch ., C.A. No. 12489, mem. op. at 14, Jacobs, V.C. (Mar. 29, 1996).

(iii) *Hersh.* Hersh, a co-founder of the corporation and a director since 1954, is alleged to have received $91,000 in consulting fees during 1996 from Ply Gem. Although the allegations against Hersh may fairly be characterized as skimpy, given my disposition as to other directors against whom the allegations are not compelling and the Chancellor's conclusion in *Friedman v. Beningson* that consulting fees of $48,000 in one year could provide the basis for the finding of impairment of ability to exercise non-conflicted business judgment, I conclude that the Complaint does state a reasonable basis to question Hersh's independence. [FN44]

FN44. *See Friedman v. Beningson, supra.* Although the Chancellor in *In re Walt Disney Co. Derivative Litig.,* 731 A.2d at 360, concluded that allegations of payment of a consulting fee of $50,000 in one year to Senator Mitchell did not justify a reasonable doubt as to his independence, the Court, in so ruling, focused on his status as "a nationally known legal and political figure," which seemingly reduced the potential that such a payment might affect his judgment.

(iv) *Lilley.* The only allegation regarding Lilley, who had been a director for less than three years, was that his firm was paid $25,000 for consulting services. In the absence of some allegation that this was material to Lilley, I am satisfied that the Plaintiffs have not stated any basis to doubt Lilley's independence.

Because, Plaintiffs have been successful in alleging the necessary factual basis for a reasonable doubt as to the disinterestedness or independence of six of the seven directors, Defendants' Motion to Dismiss the Complaint, except as to Lilley, as to the duty of loyalty claims must be denied. This result does not reflect any judgment on the ultimate merits of these claims. It is the product solely of their status and their relationships with both the Company and Silverman. At this stage of the proceedings, the Court is required to afford Plaintiffs every reasonable inference from their well-pled factual allegations. The Court's scope of inquiry is also limited because, subject to certain exceptions not relevant here, it may not look beyond the Complaint. [FN45] For example, I cannot consider Defendants' assertions that Snyder abstained from voting on the Nortek transaction [FN46] and that the outside directors all lost their legal or consulting fees as a result of the Nortek merger. [FN47] These issues, and others, can all be addressed on a more complete factual record and must wait for another day. [FN48]

FN45. *In re Sante Fe Pac. Corp. Litig.,* Del.Supr., 669 A.2d 59, 68 (1995).

FN46. Affidavit of Mitchell A. Lowenthal in

Not Reported in A.2d                                                                           Page 10
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

Support of Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Lowenthal Aff."), Ex. A, Schedule 14D-9 at 19, 25-26.

FN47. *See* Defendants' Joint Reply Brief in Support of their Motion to Dismiss Plaintiffs' Consolidated Amended Complaint, at 2 (also chastising Plaintiffs for their "apparent decision to avoid reference to publicly disclosed (but inconvenient) facts."). In addition, Defendants have apprised the Court that one of the Plaintiffs in this action filed an action in New York against Furman Selz in which he alleged that an independent Ply Gem board relied upon a fairness opinion negligently prepared by Furman Selz in approving the Nortek merger. The plaintiff in the New York proceedings suggested that the five directors (other than Silverman and Snyder) operated independently as an *ad hoc* special committee:
"Lilley and the rest of the Ply Gem board (other than Silverman and Snyder who had conflicting interests) occupied a role substantially equivalent to that of a special committee."
Letter from A. Gilchrist Sparks, III, Esquire, dated Dec. 5, 2000, *quoting* at 2, Plaintiffs' Memorandum of Law in Opposition to Defendant Furman Selz LLC'C (sic) Motion to Dismiss or, in the Alternative, to Stay this Action. Exhibit at p 19, as filed in the New York proceedings.

FN48. *See McMullin v. Beran,* 765 A.2d at 924-25; *In re Western National Corp. Shareholders Litig., supra.; In re New Valley Corp. Derivative Litig., supra; Parnes v. Bally Entertainment Corp.,* Del. Ch., C.A. No. 15192, Chandler, C. (Feb. 20, 2001).

D. *The Duty of Care Claims.*

The breach of duty of care claims, alleged by Plaintiffs without preciseness or enthusiasm, seem to be a combination of two considerations: (i) that the directors agreed to a payment to Silverman that was substantially more than any amount to which he was entitled, and (ii) that the directors were not appropriately involved in the negotiations and failed to acquire adequate information regarding the merger agreement, including the side benefits to Silverman.

*10 Article VIII of Ply Gem's Certificate of Incorporation provides in part:
A director of this corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit. [FN49]

FN49. Lowenthal Aff., Ex. D.

This provision, authorized by 8 Del. C. § 102(b)(7), generally shields directors from monetary liability for a breach of their duty of due care. [FN50]

FN50. Section 102(b)(7), of course, does not shield directors from personal liability for breach of their duty of loyalty. *See, e.g., McMullin v. Beran,* 765 A.2d at 926.

Because the Section 102(b)(7) provision cannot be found in the Complaint, there may be doubt as to whether the Court may consider the exculpatory provision in the Certificate of Incorporation in the context of a motion to dismiss. [FN51] The established Chancery practice, which I will follow until instructed otherwise, is to address the Section 102(b)(7) defense in resolving motions to dismiss through the taking of judicial notice of the applicable provision in the certificate of incorporation. I do so because it promotes the efficient allocation of the Court's and the parties' resources. [FN52]

FN51. *Id.,* at 926; *Emerald Partners v. Berlin,* Del.Supr., 726 A.2d 1215, 1223-24 (1999) (§ 102(b)(7) provision "is in the nature of an affirmative defense.").

FN52. *In Re Frederick's of Hollywood, Inc. Shareholders Litigation,* Del. Ch., C.A. No. 15944, Jacobs, V.C. (Jan. 31, 2000), *appeal pending sub nom. Malpiede v. Townson,* Del.Supr., No. 80, 2000; *McMillan v. Intercargo Corp.,* 768 A.2d at 501 n. 40; *In Re Lukens, Inc. Shareholders Litig.,* Del. Ch., 757 A.2d 720, 724 n. 1 & 732-34 (1999); *see In re BHC Communications, Inc. Shareholders Litig.,* Del. Ch., Consol.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

18209, mem. op. at 15 n. 4, Lamb, V.C. (June 4, 2001).

Accordingly, because Lilley is entitled to the shield of Section 102(b)(7) and because the Complaint fails to state a claim as to any breach of his duty of loyalty, he is entitled to dismissal of the action against him.

Plaintiffs' allegations of disloyalty as to the other directors, however, have survived the motion to dismiss. "[I]f a complaint adequately alleges... disloyalty... or if the nature of the alleged breach of duty is unclear, the complaint will not be dismissed on a motion made under Rule 12(b)(6) on the basis of an exculpatory charter provision." [FN53] Thus, I need not determine if the imprecise allegations of breaches of the duty of care would, if they stood alone, be dismissed under Section 102(b)(7).

> FN53. _In re Lukens, Inc. Shareholders Litig., 757 A.2d at 734._ "Because the nature of the defendants' breach of fiduciary duty remains unclear at this time, I may not now properly consider exculpatory provisions. The defendants will have the opportunity to present their affirmative defenses as the case progresses. At this stage of the proceedings, I can not conclude as a matter of law that the Board acted in good faith and that their actions constituted no more than mere carelessness." _Sanders v. Wang,_ Del. Ch., C.A. No. 16640, mem. op. at 28, Steele, V.C. (Nov. 8, 1999).

E. _Delegation of Authority to Negotiate._

At oral argument, and in correspondence following oral argument, Plaintiffs attempted to make the claim that the directors improperly delegated to Silverman the responsibility for negotiating the merger transaction. [FN54] There is nothing inherently wrong with an interested chief executive officer negotiating a merger transaction. In most instances, the chief executive officer is the person most knowledgeable about the company, its value, and the industry in which it operates. Moreover, because Silverman was Ply Gem's largest shareholder, he also had a significant personal incentive to maximize the value of his shares. [FN55] As noted in _McMullin,_ the Ply Gem board "could properly rely on the majority shareholder to conduct preliminary negotiations." [FN56] Plaintiffs, however, contend that Silverman did more than "conduct preliminary negotiations." Even if that is true, the issue becomes

whether the Ply Gem board satisfied its "ultimate statutory duty and fiduciary responsibility to make an informed and independent decision" on whether to enter into the Nortek merger transaction. [FN57]

> FN54. This contention is addressed separately, not because it is not to be analyzed under the triad of the duty of care, the duty of loyalty, and the duty of good faith, but because the parties have addressed it separately.

> FN55. _McMillan v. Intercargo Corp., 768 A.2d at 503._

> FN56. _McMullin v. Beran, 765 A.2d at 924._

> FN57. _Id._

**\*11** If an informed and disinterested majority of the board had duly approved the Nortek merger and the related Silverman agreement, Silverman's interest in the transaction and his involvement in the negotiations would not have provided the basis for a challenge. Here, however, the Plaintiffs' Complaint sufficiently alleges that a majority of the board approving the merger was not independent of Silverman's domination. Thus, Plaintiffs' loyalty claims survive, not so much because negotiation authority was delegated to a conflicted officer and director, but because it is sufficiently alleged that the directors who ultimately reviewed and approved the transaction were not independent of that interested officer and director.

IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted as to Lilley, but it is denied in all other respects.

An Order will be entered in accordance with this Memorandum Opinion.

ORDER

NOW, this 26th day of June, 2001, for the reasons set forth in the Court's Memorandum Opinion of this date,

IT IS HEREBY ORDERED:

1. Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Complaint is granted, without prejudice, as to Defendant William Lilley III.

2. Defendants' Motion to Dismiss Plaintiffs'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937
**(Cite as: 2001 WL 755133 (Del.Ch.))**

Page 12

Consolidated Amended Complaint is otherwise
denied.

 2001 WL 755133 (Del.Ch.), 27 Del. J. Corp. L. 937

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
**(Cite as: 2004 WL 1960130 (D.Kan.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
STATE OF NEW JERSEY AND ITS DIVISION OF
INVESTMENT, Plaintiff,
v.
SPRINT CORPORATION; William T. Esrey;
Ronald T. LeMay; Harold S. Hook; Charles
E. Rice; Louis W. Smith; Linda Koch Lorimer;
Stewart Turley; DuBose Ausley;
Warren L. Batts; Irvine O. Hockaday, Jr.; Arthur
Krause; and J.P. Meyer,
Defendants.
**No. 03-2071-JWL.**

Sept. 3, 2004.

Allyn Z. Lite, Bruce D. Greenberg, Joseph J.
DePalma, Mary Jean Pizza, Lite, DePalma,
Greenberg & Rivas LLC, Newark, NJ, Christopher L.
Nelson, Jacob A. Goldberg, Richard S. Schiffrin,
Schiffrin & Barroway LLC, Bala Cynwyd, PA, Linda
C. McFee, Thomas R. Buchanan, McDowell, Rice,
Smith & Buchanan, PC, Kansas City, MO, for
Plaintiff.

James M Webster, III, Mark C. Hansen, Kellogg,
Huber, Hansen, Todd & Evans, Washington, DC,
Charles W. German, Lawrence A. Rouse, Rouse
Hendricks German May PC, Clayton L. Barker, Mark
A. Thornhill, Spencer Fane Britt & Browne, Kansas
City, MO, David N. Greenwald, Francis P. Barron,
Michael A. Paskin, Ronald S. Rolfe, Cravath, Swaine
& Moore LLP, New York, NY, for Defendants.

Don R. Lolli, Dysart, Taylor, Lay, Cotter &
McMonigle, P.C., Kansas City, MO, for Interested
Party.

*MEMORANDUM & ORDER*

LUNGSTRUM, J.

**\*1** Plaintiff filed this proposed class action suit on
behalf of persons who purchased or acquired Sprint
FON common stock or Sprint PCS common stock on

the open market from March 1, 2001 through January
29, 2003 (the "Class Period"). In its second amended
complaint, [FN1] plaintiff alleges violations of
Section 10(b) of the Securities Exchange Act of 1934
(the "Exchange Act"), 15 U.S.C. § 78j(b), and the
SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R.
§ 240.10b-5 (fraud in connection with the sale of
securities); and violations of Section 14(a) of the
Exchange Act, 15 U.S.C. § 78n(a), and the SEC's
Rule 14a-9 promulgated thereunder, 17 C.F.R. §
240.14a-9 (proxy statement misrepresentations).
Plaintiff also asserts against the individual defendants
claims under Section 20(a) of the Exchange Act, 15
U.S.C. § 78t(a), which imposes secondary liability
upon persons who control persons primarily liable for
violations of Section 10(b) and Rule 10b-5.

> FN1. On April 23, 2004, this court granted
> in part and denied in part defendant Sprint
> Corporation and the individual defendants'
> motion to dismiss the first amended
> complaint and, in doing so, permitted
> plaintiff to file a second amended complaint.
> *See State of New Jersey and its Div. of
> Investment v. Sprint Corp.,* 314 F.Supp.2d
> 1119 (D.Kan.2004). At the same time, the
> court granted in its entirety defendant Ernst
> & Young's motion to dismiss the first
> amended complaint. *See id.*

This matter is presently before the court on
defendant Sprint and the individual defendants'
motion to dismiss the second amended complaint
(doc. # 84). As described below, the motion is
granted in part and denied in part.

I. Background

The following facts are taken from plaintiff's second
amended complaint and, for purposes of analyzing
defendants' motion to dismiss, the court assumes the
truth of these facts. Defendant Sprint Corporation is a
global communications company that provides local,
long distance and wireless services. During the Class
Period, defendant William T. Esrey was Sprint's
Chairman and Chief Executive Officer; defendant
Ronald T. LeMay was its President and Chief
Operating Officer; defendant Arthur Krause was
Sprint's Executive Vice President and Chief Financial
Officer; and defendant J.P. Meyer was Sprint's Senior
Vice President and Controller. The remaining

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

Page 2

individual defendants served on Sprint's Board of Directors during the Class Period. According to the second amended complaint, Mssrs. Esrey and LeMay, who both joined Sprint in 1985, were primarily responsible for transforming Sprint from a rural local telephone company into one of the nation's largest local, long distance and wireless telecommunications companies.

During the Class Period, two classes of Sprint's common stock were actively traded on the New York Stock Exchange--FON common stock (intended to track the economic performance of Sprint's FON Group division) and PCS common stock (intended to track the economic performance of Sprint's PCS Group division). Like many other publicly traded companies, Sprint paid its executives and certain employees, including Mssrs. Esrey and LeMay, a portion of their compensation in the form of Sprint common stock options. This case arises out of events that occurred after Mssrs. Esrey and LeMay exercised certain options during 1999 and 2000. According to plaintiff, Mssrs. Esrey and LeMay exercised options during 1999 and 2000 with an aggregate taxable gain of $287 million. As a result of Mssrs. Esrey's and LeMay's option exercises, Sprint derived significant tax benefits in the form of deductions from its taxable income. Plaintiff does not suggest that the options were improperly granted or exercised or that Sprint acted improperly in taking the resulting tax deductions.

*2 Because the exercise of options results in tax liability on the gain realized thereby, the options exercised by Mssrs. Esrey and LeMay subjected them to significant personal tax liability. According to plaintiff, Mssrs. Esrey and LeMay would have needed more than $100 million in cash, collectively, to pay the taxes associated with their option exercises. Plaintiff alleges that Mssrs. Esrey and LeMay wanted to avoid this tax liability entirely and, thus, approached Ernst & Young, the accounting firm that served as Sprint's auditor, to seek advice as to how to go about avoiding paying taxes on their option gains. Thereafter, Mssrs. Esrey and LeMay purchased from Ernst & Young certain "tax shelters" which were designed to eliminate Mssrs. Esrey's and LeMay's tax obligations with respect to the gains realized through the option exercises. According to plaintiff, the shelters involved a two-part transaction. First, Mssrs. Esrey and LeMay used the options to engage in a swap-based transaction that was designed to turn income from the options exercises into capital gains, which are taxed at a rate of 20 percent rather than the significantly higher ordinary-income rate of

closer to 40 percent. The second part of the transaction, according to plaintiff, was designed to appear to generate a loss for tax purposes by raising the costs of the assets--the Sprint shares--through the use of partnerships and trades in currency options.

On September 5, 2000, after Mssrs. Esrey and LeMay had entered into the transactions constituting the tax shelters, the IRS issued Cumulative Bulletin Notice 2000-36, which contained Notice 2000-44. That Notice, in turn, outlined the IRS's position that tax shelters similar to the ones that Ernst & Young sold to Mssrs. Esrey and LeMay were invalid and subject to challenge. [FN2] Specifically, the Notice stated that the "purported losses resulting from the transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes." The Notice further stated that participants in such transactions may be subjected to appropriate penalties.

> FN2. Notice 2000-44 did not address the specific transactions entered into by Mssrs. Esrey and LeMay; it addressed in general terms transactions similar to the ones used by Mssrs. Esrey and LeMay.

Notwithstanding the IRS's position, neither Mr. Esrey nor Mr. LeMay took any steps to satisfy their tax liabilities. According to plaintiff, Ernst & Young advised Mssrs. Esrey and LeMay not to sell shares to satisfy their tax obligations even though, by that point, Ernst & Young and Mssrs. Esrey and LeMay knew that the losses generated by the tax shelters would likely be disallowed by the IRS and that Mssrs. Esrey and LeMay would be liable for the taxes due on the exercise of their stock options.

In late 2000, Mssrs. Esrey and LeMay, according to plaintiff's second amended complaint, disclosed their "tax avoidance problem" to Sprint's Board of Directors. In December 2000, Sprint and Ernst & Young approached the SEC for guidance on whether Sprint could "unwind" or rescind the option exercises, thereby nullifying Mssrs. Esrey's and LeMay's tax liability. The SEC advised Sprint that the ramifications of unwinding the transactions would be disastrous for Sprint in that Sprint would lose the tax deductions it had taken upon Mssrs. Esrey's and LeMay's option exercises and, thus, would have to restate its earnings and refile its tax returns to pay back taxes at a time when its cash was limited. Thus, Sprint rejected the possibility of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

unwinding the option exercises.

**\*3** According to plaintiff, then, Sprint and the individual defendants knew by March 2001 (the beginning of the Class Period) that Mssrs. Esrey and LeMay had entered into improper tax shelters in an attempt to avoid paying over $100 million in taxes on their option exercises; that the decline in the market prices of Sprint's common stock precluded Mssrs. Esrey and LeMay from satisfying their tax liabilities through the sale of Sprint stock; that Mssrs. Esrey and LeMay were unable to satisfy their likely tax liability and were facing certain financial ruin; and that the only method by which Sprint could bail out its top two executives would have involved materially restating Sprint's results of operations for 1999 and 2000, refiling its tax returns and paying back taxes. Plaintiff alleges that, in light of these facts, it was clear to defendants by the start of the Class Period that there was a material possibility or, more likely, a substantial probability that Mssrs. Esrey and LeMay would no longer be able to run Sprint. As alleged by plaintiff in the second amended complaint, a source close to Sprint was quoted in a *Wall Street Journal* article dated February 6, 2003 as stating "Have you ever heard of a bankrupt CEO?"

Defendants did not disclose any of this information to investors. Instead, as alleged by plaintiff, defendants "boasted" about the expected continued employment of Mssrs. Esrey and LeMay. In Sprint's March 15, 2001 proxy statement filed with the SEC, Sprint stated that it had "entered into new employment contracts with Mr. Esrey and Mr. LeMay, each dated February 26, 2001, *designed to insure their long-term employment with Sprint,* to provide competitive compensation, and to link their compensation to shareholder value." (Emphasis added in plaintiff's second amended complaint). According to plaintiff, this statement concerning the long-term employment of Mssrs. Esrey and LeMay-- without any reference to the tax shelters and the "no-win situation they had caused for Sprint"--was misleading when it was made because it was "clearly predictable" that Sprint was going to lose Mssrs. Esrey and LeMay as a result of the tax avoidance problem discussed above.

Between late 2000, when defendants met with the SEC to discuss the possibility of unwinding the transactions, and late 2001, defendants took no action to address the problems presented by Mssrs. Esrey's and LeMay's "tax avoidance problem." In late 2001, however, Mssrs. Esrey and LeMay applied for and received tax amnesty from the IRS and thus were

immune from any penalties the IRS might levy if it ultimately concluded that the tax shelters utilized by Mssrs. Esrey and LeMay were invalid. Mssrs. Esrey and LeMay, however, were still liable for any unpaid taxes on the gains realized as a result of their option exercises (again, assuming the IRS ultimately concluded that the shelters were invalid). By this time, however, Mssrs. Esrey and LeMay could not sell their shares to cover their potential tax liability because Sprint's common stock price had declined dramatically such that Mssrs. Esrey's and LeMay's potential tax liability far exceeded the total value of their Sprint holdings. Thus, according to plaintiff, Mssrs. Esrey and LeMay still faced financial ruin as of late 2001.

**\*4** During 2002, Sprint's Board of Directors held over twenty meetings dedicated to discussing the tax problems and the "dismal financial condition" faced by Mssrs. Esrey and LeMay, as well as the role Ernst & Young played in promoting and selling the tax shelters to Mssrs. Esrey and LeMay. In contrast, the Board held only nine meetings during all of 2000 and only seven meetings during 2001. Notwithstanding these numerous meetings concerning Mssrs. Esrey and LeMay (and, according to plaintiff, the "termination of Esrey and LeMay"), defendants again touted the long-term employment prospects of Mssrs. Esrey and LeMay. In that regard, in Sprint's March 15, 2002 proxy statement filed with the SEC, Sprint stated that it had "entered into new employment contracts with Mr. Esrey and Mr. LeMay, each dated February 26, 2001, *designed to insure their long-term employment with Sprint,* to provide competitive compensation, and to link their compensation to shareholder value." (Emphasis added in plaintiff's second amended complaint). Sprint made a virtually identical statement in a Form 10-K filed with the SEC on March 4, 2002 and in an amended Form 10-K filed with the SEC on March 5, 2002. According to plaintiff, these statements concerning the long-term employment of Mssrs. Esrey and LeMay--without any reference to the tax shelters and the "no-win situation they had caused for Sprint"--were misleading when they were made because defendants knew by that time that it was inevitable or, at a minimum, a material possibility, that Mssrs. Esrey and LeMay would no longer serve as Sprint's top executives as a result of the tax problems discussed above.

In June 2002, the Board learned that the IRS had begun formally investigating Mssrs. Esrey and LeMay in connection with the specific tax shelters utilized by them. [FN3] At that time, the Board hired

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

Page 4

the law firm of Davis Polk & Wardwell to assess what action Sprint should take. By October 2002, Davis Polk & Wardwell recommended to the Board the dismissal of Mssrs. Esrey and LeMay in light of the tax shelter problems and the resulting conflict between Mssrs. Esrey and LeMay and Ernst & Young. During this same time frame, the Board hired an executive search firm to begin searching for a new CEO. Defendants still did not disclose to the public any information concerning the tax problems faced by Mssrs. Esrey and LeMay.

> FN3. The IRS's audit of the tax shelters utilized by Mssrs. Esrey and LeMay is apparently ongoing and no determination has been made about the validity of those shelters.

On January 29, 2003, the *Wall Street Journal* reported on its website that both Mr. Esrey and Mr. LeMay were leaving Sprint. In response to this news, the market prices of both FON common stock and PCS common stock fell considerably. In early February 2003, the Wall Street Journal reported that Mssrs. Esrey and LeMay were forced out by Sprint as a result of the tax shelter situation and its resulting effects on the executives' financial condition.

## II. Standard Governing Motion to Dismiss Pursuant to Rule 12(b)(6)

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his [or her] claims which would entitle him [or her] to relief," *Poole v. County of Otero, 271 F.3d 955, 957 (10th Cir.2001)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)*), or when an issue of law is dispositive. *Neitzke v. Williams, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).* The court accepts as true all well-pleaded facts, as distinguished from conclusory allegations, and all reasonable inferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati, 258 F.3d 1167, 1174 (10th Cir.2001).* The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)*).

**\*5** In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action

deals primarily with "fact-specific inquiries" such as materiality. *Grossman v. Novell, Inc., 120 F.3d 1112, 1118 (10th Cir.1997)* (citations omitted). Nonetheless, "courts do not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial, where the plaintiff has failed to allege with particularity circumstances that could justify an inference of fraud under Rule 9(b)," or where the defendant has no duty to disclose the information allegedly omitted. *Id. at 1118-19* (affirming district court's Rule 12(b)(6) dismissal of securities fraud case where the defendant had no duty to disclose the information allegedly omitted). Ultimately, when evaluating defendants' motions to dismiss pursuant to Rule 12(b)(6), the court must evaluate "the totality of the pleadings" to determine if plaintiff has stated an actionable claim of securities fraud. *See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1092 (10th Cir.2003)* (citing *City of Philadelphia v. Fleming Cos., Inc. , 264 F.3d 1245, 1261-62 (10th Cir.2001)*).

## III. Discussion

Defendants move to dismiss plaintiff's second amended complaint in its entirety. Specifically, defendants move to dismiss all claims on the grounds that they had no duty to disclose that the termination of Mssrs. Esrey and LeMay was "inevitable" or a "material possibility;" that the claims are precluded by the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995 ("PSLRA"); and that the allegations contained in plaintiff's second amended complaint do not permit a strong inference of scienter as required by the PSLRA. Defendants move to dismiss plaintiff's section 14(a) claim for the additional reason that plaintiff fails to allege any causal connection between any transaction for which approval was sought through a proxy statement and any alleged injury. Finally, defendants move to dismiss any claims based on Sprint's statements concerning Mr. Esrey's cancer diagnosis. As explained below, defendants' motion is granted to the extent plaintiff's claims are based on Sprint's statements concerning Mr. Esrey's cancer diagnosis and is otherwise denied.

### A. Duty to Disclose

Plaintiff's claims are based on defendants' failure to disclose, in connection with Sprint's statements concerning the long-term employment of Mssrs. Esrey and LeMay, any information about the tax shelter situation and the fact that, as a result of that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

situation, the termination of the employment of Mssrs. Esrey and LeMay was either inevitable or a significant possibility. Absent an independent duty to disclose, however, nondisclosure cannot serve as the basis for liability under the federal securities laws. *See Grossman v. Novell, Inc.,* 120 F.3d 1112, 1125 (10th Cir.1997) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *see also In re Time Warner Inc. Securities Litig.,* 9 F.3d 259, 267 (2d Cir.1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."). Courts have recognized an independent duty to disclose in only a handful of circumstances--when disclosure is necessary to make statements that have been made not misleading, *see Grossman,* 120 F.3d at 1125 ("if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement"); *Connett v. Justus Enterprises of Kansas, Inc.,* 68 F.3d 382, 385 (10th Cir.1995) (in order to be actionable, an omission must render *misleading* the affirmative statements actually made) (citing *Jensen v. Kimble,* 1 F.3d 1073, 1077 (10th Cir.1993)), when disclosure is mandated by statute or regulation, *see, e.g., Backman v. Polaroid Corp.,* 910 F.2d 10, 20 (1st Cir.1990), and when disclosure is required by virtue of a fiduciary-type relationship, *see SEC v. Cochran,* 214 F.3d 1261, 1264 (10th Cir.2000) (citing *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)).

**\*6** According to plaintiff's theory of the case, defendants had a duty to disclose information about the tax shelters and the significant possibility or inevitability that Mssrs. Esrey's and LeMay's employment would be terminated because, in the absence of such disclosures, Sprint's statements about the long-term employment of Mssrs. Esrey and LeMay were misleading. Defendants contend that dismissal of plaintiff's case is appropriate because they simply had no duty to disclose that the termination of Mssrs. Esrey's and LeMay's employment was a significant possibility or inevitable. In that regard, defendants first maintain that disclosure was not required because the termination of Mssrs. Esrey's and LeMay's employment was not under "active and serious consideration" at the times of Sprint's statements concerning the long-term employment of Mssrs. Esrey and LeMay.

Defendants' argument that the termination of Mssrs. Esrey's and LeMay's employment must have been under "active and serious consideration" at the times of the statements before Sprint was required to disclose the information flows from the Second Circuit's decision in *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259 (2d Cir.1993), a case on which this court relied in resolving defendants' initial motion to dismiss. As the court summarized in its previous order, Time Warner, saddled with over $10 billion in debt as a result of a recent merger, made several public statements about its efforts to find "strategic partners" who would infuse billions of dollars of capital into the company. *See id. at 262.* During the same period of time that the company was making these statements (and other statements concerning the status of ongoing strategic partnership discussions), the company was also considering (and ultimately chose) an alternative method of raising capital--a new stock offering that substantially diluted the rights of the existing shareholders. *See id.* The plaintiffs filed a section 10(b) claim against the company based, among other things, on the company's failure to disclose that it was considering an alternative method of raising capital. *See id.*

The district court concluded that the statements concerning the search for strategic partnerships were accurate when made and that subsequent events did not obligate Time Warner to correct or update those statements. *See id.* at 263. On appeal, the Second Circuit reversed the district court's decision. Specifically, the court held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *Id.* at 268.

Looking to the *Time Warner* case for guidance, this court concluded in its prior order that because plaintiff had articulated during oral argument the theory that Sprint was considering an alternative (indeed, a mutually exclusive alternative--the termination of Mssrs. Esrey's and LeMay's employment) at the time it made statements touting the long-term employment of Mssrs. Esrey and LeMay, plaintiff would be permitted to amend its complaint to clarify that theory and, assuming plaintiff could support the theory with the requisite facts, that the theory was sufficient to survive defendants' motion to dismiss. Now, defendants essentially contend that the allegations in plaintiff's

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
**(Cite as: 2004 WL 1960130 (D.Kan.))**

second amended complaint are insufficient, under *Time Warner*, to support the theory articulated by plaintiff during oral argument. That is, defendants contend that the allegations in the second amended complaint, even if true, simply do not permit the conclusion that the termination of Mssrs. Esrey's and LeMay's employment was under "active and serious consideration" in March 2001 or even in March 2002, when the challenged statements were made.

*7 The court disagrees. Assuming that the "active and serious consideration" standard is the appropriate standard by which to measure defendants' conduct, the question of what defendants were considering in March 2001 and March 2002, and to what extent they were considering any particular subjects, is not one that can be resolved on a motion to dismiss. Stated another way, the court cannot say as a matter of law that plaintiff will be unable to prove any set of facts which would entitle it to relief. In the second amended complaint, plaintiff specifically alleges that defendants, by March 2001, knew that Mssrs. Esrey and LeMay had entered into tax shelters in an attempt to avoid paying over $100 million in taxes on their option exercises; knew that the IRS in all likelihood would conclude that the tax shelters were improper and, thus, that Mssrs. Esrey and LeMay would face massive tax liabilities; knew that Mssrs. Esrey and LeMay would be unable to satisfy their tax liabilities through the sale of Sprint stock; and knew that Sprint was not going to "bail out" Mssrs. Esrey and LeMay by unwinding the option exercises.

It is reasonable to infer from these allegations that defendants knew that Mssrs. Esrey's and LeMay's ability to continue to lead Sprint was in jeopardy. *See Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir.2001) (on a Rule 12(b)(6) motion, court accepts as true all well-pleaded facts and all reasonable inferences from those facts are viewed in favor of the plaintiff). Whether and to what extent defendants were "considering" the termination of Mssrs. Esrey's and LeMay's employment (and, at a more basic level, what type of conduct might constitute "active and serious consideration") are fact questions to be resolved on a motion for summary judgment, if appropriate, or by a jury.

Defendants also maintain that plaintiff's claims must be dismissed because the claims are based on the inaccurate assumption that Mssrs. Esrey and LeMay would be "financially ruined" if the IRS concluded that the tax shelters were improper. According to defendants, Mssrs. Esrey and LeMay were not necessarily facing financial ruin because Sprint

considered extending loans to the executives to cover their tax liabilities. In that regard, defendants highlight language in the employment contracts dated February 26, 2001 stating that "It is the current intent of the Board to view favorably the Executive's request for a Loan Arrangement," and that loans could be extended "to pay taxes associated with the retaining ownership of Sprint stock" or "to pay taxes associated with the acquisition of Sprint stock." While Sprint did not ultimately extend such loans, defendants contend that this language shows that any "financial ruin" of Mssrs. Esrey and LeMay was not a foregone conclusion and, consequently, the inference that plaintiff draws in the second amended complaint is unwarranted.

Like defendants' previous argument, the court concludes that this argument cannot be resolved in the context of a Rule 12(b)(6) motion. A reasonable inference can be drawn from the allegations in plaintiff's complaint that tax liabilities of $100 million would, in all likelihood, force Mssrs. Esrey and LeMay into "financial ruin." Despite the fact that Mssrs. Esrey's and LeMay's employment contracts left open the possibility that Sprint would extend loans to the executives, Sprint never did extend the loans and a reasonable inference can be drawn from the allegations in plaintiff's complaint that it was highly unlikely that Sprint was going to extend loans of $100 million to the executives. At the very least, plaintiff is entitled to discovery concerning the extent to which Sprint actually considered extending such loans to its executives. [FN4]

> FN4. In a related argument, defendants assert that plaintiff's claims are based on another inaccurate assumption--the assumption that Mssrs. Esrey and LeMay would necessarily be fired because they faced financial ruin. Again, the court cannot resolve this argument on a motion to dismiss. Suffice it to say, the allegations in plaintiff's second amended complaint support the inference that Mssrs. Esrey's and LeMay's personal financial status would affect their continued employment as Sprint's top two executives.

*8 Finally, defendants assert that they had no duty to disclose the possible or inevitable termination of Mssrs. Esrey's and LeMay's employment because Sprint's statements concerning Mssrs. Esrey and LeMay did not "foreclose the possibility" that the executives might later be terminated. In support of this argument, defendants rely on the Second

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

Page 7

Circuit's decision in *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, 75 F.3d 801 (2d Cir.1996)*. In *San Leandro*, Philip Morris, through the first quarter of 1993, engaged in a marketing strategy to increase sales of its premium cigarette brands. *See id.* at 805. That strategy consisted of narrowing the price gap between premium and discount cigarettes by increasing the prices of both premium and discount brands and by increasing discount brand prices by an even greater margin to make the discount brands less attractive and thereby induce customers to buy premium brands. *Id.* The plan was unsuccessful and, thus, at the end of the first quarter of 1993, Philip Morris adopted a new marketing strategy that involved reducing the price of its most popular and largest selling premium brand by $0.40 per pack, a move estimated to reduce its earnings by $2 billion in 1993. *Id.* Following this announcement, Philip Morris stock dropped almost 25 percent. *Id.*

The plaintiffs filed a section 10(b) claim against Philip Morris and contended that Philip Morris had a duty to disclose its consideration of the alternative business plan in order to prevent various prior statements from becoming misleading. *See id.* at 804. The Second Circuit affirmed the dismissal of the plaintiffs' complaint, in large part because the Circuit was "concerned ... about interpreting the securities laws to force companies to give their competitors advance notice of sensitive pricing information." *See id.* at 809. Ultimately, the Circuit held that Philip Morris did not have a duty to disclose the alternative plan because the "single, vague statement" pertinent to plaintiffs' claim (that the company's "main focus this year would be on profits, not market share") "cannot have led any reasonable investor to conclude that Philip Morris had committed itself to a particular marketing strategy and had foreclosed all alternatives." *See id.* at 810.

According to defendants, then, San Leandro requires dismissal of plaintiff's second amended complaint because Sprint's statements cannot reasonably be read to have foreclosed the possibility that Mssrs. Esrey's and LeMay's employment might be terminated. The court rejects this argument. As an initial matter, the *San Leandro* case is readily distinguishable from this one as the Circuit's decision in *San Leandro* was based in large part on its reluctance to require a company to disclose its marketing plans to its competitors. In any event, while Sprint's statements concerning its employment contracts with Mssrs. Esrey and LeMay may not have foreclosed the possibility that at some point in the future Mssrs.

Esrey and LeMay might not be employed with Sprint, the statement that the contracts were "designed to insure" long-term employment can reasonably be read to convey the message that, at least in Sprint's view, Mssrs. Esrey's and LeMay's long-term employment was certain. *See, e.g., Webster's Third New International Dictionary* 1173 (1986) (defining "insure" as "to declare to with confidence" or "to promise solemnly"); *American Heritage Dictionary* 667 (2d College ed.1985) (defining "insure" as to make "sure" or "certain"). Stated another way, unlike the statement in *San Leandro*, Sprint's statement that the contracts were "designed to insure" the long-term employment of Mssrs. Esrey and LeMay could reasonably have led an investor to conclude that the termination of Mssrs. Esrey's and LeMay's employment (at least in the near future) was simply not an option from Sprint's perspective.

**\*9** In sum, the court rejects, at least at this juncture, defendants' arguments that it did not have a duty to disclose information concerning the possible or inevitable termination of Mssrs. Esrey's and LeMay's employment.

*B. Safe Harbor for Forward-Looking Statements*

Defendants also move to dismiss plaintiff's second amended complaint on the grounds that the specific statements that plaintiff alleges were misleading constitute "forward-looking statements" protected by the PSLRA's safe harbor provision. *See* 15 U.S.C. § 78u-5. A "forward-looking statement" is defined as:

  (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items;

  (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

  (C) a statement of future economic performance, including any statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

  (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

  (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

Page 8

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.
*Id.* § 78u-5(i)(1)(A)--(F).

The safe harbor has two independent prongs--one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. *See Southland Securities Corp. v. INSpire Insurance Solutions, Inc.,* 365 F.3d 353, 371 (5th Cir.2004) (citing 15 U.S.C. § § 78u-5(c)(1)(A) & (B)). Under the first prong, there is no liability if, and to the extent that, the forward-looking statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). [FN5] Under the second prong, there is no liability if the plaintiff fails to prove that the statement, if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading. *Id.* at § 78u-5(c)(1)(B)(ii). [FN6]

> FN5. Under the first prong, a defendant can also avoid liability if the forward-looking statement is immaterial. *See id.* § 78u-5(c)(1)(A)(ii). Defendants do not raise the materiality issue in their motion to dismiss.

> FN6. Although the second prong is written as a safe harbor, "the effect is to change the elements of a fraud action" in that actual knowledge of falsity or misleading character is required as opposed to a showing of recklessness as sufficient scienter. *See* 3 Alan R. Bromberg & Lewis D. Lowenfels, *Securities Fraud and Commodities Fraud* § 6.36 (2d ed.2004).

Assuming, without deciding, that the statements concerning Sprint's employment contracts with Mssrs. Esrey and LeMay fall within the statutory definition of "forward-looking statements," [FN7] the court nonetheless denies defendants' motion on this issue. It is undisputed that Sprint did not identify the statements as forward-looking and that the statements were not accompanied by any cautionary statements. Accordingly, plaintiff may properly allege a claim based on these statements if they were made with actual knowledge that they were false or misleading. The court concludes that plaintiff has adequately pled in its second amended complaint that

defendants knew that the statements concerning Sprint's employment contracts with Mssrs. Esrey and LeMay were misleading because the statements were made at a time when the continued employment of Mssrs. Esrey and LeMay was in serious doubt. Thus, the court cannot say as a matter of law that defendants are entitled to the protections of the safe harbor. *See In re AOL Time Warner, Inc. Securities and "ERISA" Lit.,* 2004 WL 992991, at *19 (S.D.N.Y. May 5, 2004) (denying motion to dismiss on safe harbor grounds where plaintiff pled that defendant either knew or recklessly disregarded the true financial condition of AOL when he spoke publicly).

> FN7. While the court need not decide at this juncture whether the statements constitute "forward-looking statements," the court questions whether the statements would qualify as "forward-looking statements," particularly as plaintiff alleges that the statements were rendered misleading due to Sprint's omissions concerning the tax shelter situation. *See, e.g., In re MobileMedia Securities Lit. .,* 28 F.Supp.2d 901, 930 (D.N.J.1998) ("Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor of the Securities Act); *accord AES Corp. v. Dow Chem. Corp.,* 2001 WL 34367296, at *4 (D.Del. Jan.19, 2001). Moreover, the statements that Sprint "entered into new employment contracts ... designed to insure their long-term employment" are arguably statements of present fact rather than forward-looking statements. *See* 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* 477 (4th ed.2002) (a statement of present fact is not a forward-looking statement subject to the protection of the safe harbor); *In re AOL Time Warner, Inc. Securities & "ERISA" Lit.,* 2004 WL 992991, at *19 (S.D.N.Y. May 5, 2004) (prediction concerning rising revenues fell outside the scope of the safe harbor because prediction was combined with statements of existing facts).

*10 Defendants maintain that plaintiff's allegations of actual knowledge in the second amended complaint are conclusory and, thus, insufficient to withstand a motion to dismiss. The court disagrees. Plaintiff has alleged that the defendants knew the potential tax liability that Mssrs. Esrey and LeMay

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1960130 (D.Kan.)
(Cite as: 2004 WL 1960130 (D.Kan.))

Page 9

faced; knew that, in all likelihood, the IRS would one day determine that the shelters were invalid and come to collect the liability; and knew that the liability would bankrupt Mssrs. Esrey and LeMay and that, as a result, Mssrs. Esrey's and LeMay's continued ability to lead Sprint was in grave doubt. These allegations, then, "raise the possibility--no greater confidence is possible before discovery"--that defendants knew that circumstances existed that made the long-term employment of Mssrs. Esrey and LeMay questionable (even unlikely) but omitted those circumstances from the statements concerning the long-term employment of Mssrs. Esrey and LeMay in order to (misleadingly) assure investors (who, according to the second amended complaint, believed that Mssrs. Esrey and LeMay's leadership was critical to Sprint's continued success) that Sprint's future included Mssrs. Esrey and LeMay at the helm. *See Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734-35 (7th Cir.2004) (reversing district court's dismissal of securities fraud complaint on safe harbor grounds; allegations in complaint were sufficient to raise possibility that defendant had actual knowledge of falsity and no more is required, or even possible, at pleading stage). Thus, the complaint cannot be dismissed under the safe harbor. *See id.*

*C. Scienter*

Defendants next move to dismiss plaintiffs' section 10(b) and section 14(a) claims on the grounds that plaintiff has failed to allege facts permitting a strong inference that defendants failed to disclose material facts with the requisite state of mind as required by the PSLRA. To satisfy the pleading requirements of the Reform Act, plaintiff "must (1) specify all allegedly misleading statements and the reasons why those statements are misleading, and (2) state with particularity facts giving rise to a strong inference that defendants made those statements with the requisite scienter." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1188 (10th Cir.2003) (citing 15 U.S.C. § 78u-4(b)). The appropriate level of scienter for a primary violation of section 10(b) is "a mental state embracing intent to deceive, manipulate, or defraud, which includes recklessness." *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1259-60 (10th Cir.2001) (citations omitted). Thus, to establish scienter in a section 10(b) securities fraud case alleging non-disclosure of potentially material facts, plaintiffs "must demonstrate: (1) the defendant[s] knew of the potentially material fact, and (2) the defendant[s] knew that failure to reveal the potentially material fact would likely mislead investors." *Pirraglia*, 339 F.3d at 1191 (quoting

*Fleming*, 264 F.3d at 1261). The requirement of knowledge in this context "may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Fleming*, 264 F.3d at 1261. [FN8]

> FN8. Defendants concede that the applicable state of mind with respect to plaintiff's section 14(a) claim is negligence rather than fraud or recklessness. *See* 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* 428-29 (4th ed.2002) (negligence is sufficient to state a claim under the proxy rule's antifraud provisions) (collecting cases). Defendants argue in their brief that dismissal of plaintiff's section 14(a) claim is appropriate for failure to allege facts supporting the conclusion that defendants acted negligently.

*11 In their motion to dismiss, defendants contend that plaintiff does not plead with the requisite particularity facts tending to show that defendants knew that their failure to disclose the significant possibility or the inevitability that the employment of Mssrs. Esrey and LeMay would be terminated would likely mislead investors. The court disagrees. As explained above in connection with defendants' safe harbor argument, plaintiff has alleged facts sufficient to raise the possibility that defendants knew that the long-term employment of Mssrs. Esrey and LeMay was improbable and failed to disclose this information in an effort to convince investors that Sprint's future included its brightest stars, Mssrs. Esrey and LeMay. Defendants' motion is denied on this issue.

*D. Section 14(a) Claim*

Defendants assert that plaintiff's section 14(a) claim fails for the additional reason that plaintiff has not alleged a causal connection between any transaction for which approval was sought through a proxy statement and any alleged injury. The only transactions for which authorization was sought through the challenged 2001 and 2002 proxy statements were (1) the approval of the appointment of Ernst & Young as Sprint's independent auditor; and (2) the election of Mssrs. Esrey and LeMay as directors. Plaintiff's claim is based upon the appointment of Ernst & Young and, according to defendants, plaintiff cannot identify any loss

Not Reported in F.Supp.2d                                                    Page 10
2004 WL 1960130 (D.Kan.)
**(Cite as: 2004 WL 1960130 (D.Kan.))**

stemming from this transaction. Defendants, however, raised this argument in connection with their previous motion to dismiss and the court, in resolving that argument, concluded that plaintiff adequately pled a loss stemming from the appointment of Ernst & Young as Sprint's auditor. Thus, for the reasons set forth in the court's previous memorandum and order, this argument is rejected.

*E. Statements Regarding Mr. Esrey's Cancer Diagnosis*

Finally, defendants move to dismiss plaintiff's second amended complaint to the extent it asserts a claim based on statements made concerning Mr. Esrey's cancer diagnosis. In that regard, plaintiff alleges that Sprint, in a November 2002 article in the *Kansas City Star,* stated that Mr. Esrey had been diagnosed with lymphoma, that his illness was considered "highly treatable," and that Mr. Esrey would "continue his full day-to-day responsibilities while he undergoes chemotherapy." Plaintiff further alleges that defendants made essentially the same statement in a Form 10-Q filed with the SEC in November 2002. According to plaintiff, these statements were misleading because defendants, at the time the statements were made, knew that "Mr. Esrey was about to be fired for reasons unrelated to his unfortunate health condition."

Defendants contend that dismissal of these allegations is appropriate because the statements, unlike the statements concerning Sprint's employment contract with Mr. Esrey, make no reference to Mr. Esrey's "long-term employment," do not purport to make any kind of "guarantees" with respect to Mr. Esrey's future at Sprint and do not suggest how much longer Mr. Esrey would remain with Sprint. To the contrary, the statements suggest only that Mr. Esrey was continuing his "day-to-day" management of Sprint and, according to defendant, there are no allegations that Mr. Esrey was not fulfilling his day-to-day responsibilities at that time. Plaintiff's response to defendants' motion to dismiss does not address these arguments in any fashion. Thus, the court deems plaintiff to have abandoned any claim based on statements concerning Mr. Esrey's cancer diagnosis and defendants' motion to dismiss is granted on this issue. [FN9]

FN9. In resolving defendants' motion to dismiss the first amended complaint, the court noted that plaintiff had alluded in its briefing to the statements concerning Mr. Esrey's cancer but that it was unclear

whether plaintiff intended to state a claim based on those statements. The court then stated that "to the extent an argument can be made that this statement is analogous to the 'long-term employment' statements discussed above, the court will permit plaintiffs to amend their complaint to include these allegations should they choose to do so."

To the extent that plaintiff, in responding to the motion to dismiss the second amended complaint, declined to address the merits of defendants' arguments concerning the statements about Mr. Esrey's cancer diagnosis based on a perception that the court already concluded that the statements would survive such a motion because they were analogous to the "long-term employment" statements, that perception would be inaccurate. Significantly, defendants have presented compelling arguments that the statements concerning Mr. Esrey's cancer diagnosis are, in fact, not analogous to the "long-term employment" statements. Thus, plaintiff's failure to respond is not excused by the court's order regarding the first motion to dismiss.

**\*12** IT IS THEREFORE ORDERED BY THE COURT THAT defendant Sprint Corporation and the individual defendants' motion to dismiss the second amended consolidated class action complaint (doc. # 84) is granted in part and denied in part. The parties are hereby referred to paragraphs 5 and 6 of the First Phase Scheduling Order for further scheduling in this case.

IT IS SO ORDERED.

2004 WL 1960130 (D.Kan.)

**Motions, Pleadings and Filings (Back to top)**

•        2:03cv02071        (Docket) (Feb. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.