# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
**(Cite as: Not Reported in F.Supp.2d)**

▷

Not Reported in F.Supp.2d, 2000 WL 1371317
<u>Briefs and Other Related Documents</u>
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In re: TRUMP HOTELS SHAREHOLDER
DERIVATIVE LITIGATION
**Nos. 96 Civ. 7820 DAB, 96 Civ. 8527 DAB.**

Sept. 21, 2000.

Milberg Weiss Bershad Hynes & Lerach LLP , New York, New York, <u>Melvyn I. Weiss</u> , <u>Steven G. Schulman</u> , <u>Janine L. Pollack</u> , Wechsler Harwood Halebian & Feffer LLP , New York, New York, <u>Robert I. Harwood</u> , <u>Jeffrey M. Haber</u> , Stull, Stull & Brody , New York, New York, <u>Jules Brody</u> , Mark Levine, for Plaintiff, of counsel.
Shereff, Friedman, Hoffman & Goodman, LLP, New York, New York, for Defendants, Donald J. Trump and Nicholas L. Ribis, Shari L. Steinberg, of counsel.
Willkie Farr & Gallagher , New York, New York, for Defendants Trump's Castle Associates, TC/GP, Inc., Trump's Casino, Inc., Wallace B. Askins, Don M. Thomas and Peter M. Ryan ; and Nominal Defendants Trump Hotels & Casino Resorts, Inc. and Trump Hotels & Casino Resorts Holdings, L.P., Richard L. Posen, Thomas H. Golden, Annette Haselhoff, of counsel.
Cravath, Swaine & Moore , New York, New York, for Defendant Salomon Brothers Inc., <u>Frederick A.O. Schwarz, Jr.</u> , <u>David A Stoll</u>, of counsel.

*OPINION and ORDER*

<u>BATTS</u>, J.
**\*1** This is a stockholders' derivative action brought by stockholders of Trump Hotels & Casino Resorts, Inc. ("THCR"), against the individual members of THCR's Board of Directors and other corporate entities controlled and/or owned by Defendant Donald J. Trump, and against the Board's financial advisor, Salomon Brothers, Inc. In short, Plaintiffs claim violations of § 14(a) of the Securities Exchange Act, breach of contract, breach of fiduciary duties, negligent misrepresentation and waste.

Defendants move to dismiss Plaintiffs' Third Consolidated Amended Stockholders' Derivative Complaint for failure to make a demand on the Board

and failure to state a claim. Plaintiffs cross-move for leave to amend the Complaint. For the reasons stated below, Defendants' motions to dismiss Plaintiffs' Complaint are GRANTED in part and DENIED in part. Plaintiffs' motion for leave to amend the Complaint is GRANTED.

## I. PROCEDURAL BACKGROUND

This derivative action was commenced upon the filing of two separate actions in federal court, which were later consolidated under the above caption. Pursuant to a stipulated Pretrial Order, Plaintiffs filed a consolidated Complaint on January 17, 1997. Plaintiffs later amended their consolidated Complaint to address ongoing conduct. Then, due to unanticipated events, Plaintiffs filed another Amended Complaint, withdrawing the allegations previously added. This latest Complaint, Plaintiffs' Third Consolidated Amended Derivative Complaint, filed June 26, 1997, is the subject of the instant motions.

By a letter brief of April 2, 1998, Plaintiffs sought leave of Court to amend the Third Consolidated Amended Derivative Complaint in order to add two demand-related sub-paragraphs. *See* Weiss Ltr. of April 2, 1998 ("Pls.' Ltr."). Plaintiffs attached the proposed amendment, designated as new paragraphs 43(i) and 43(j), as "Exhibit A." *See id.* at Ex. A. Defendants Salomon Brothers and Trump's Castle Associates, et al. opposed Plaintiffs' request both procedurally and substantively in letter briefs dated April 6, 1998 and April 9, 1998, respectively. *See* Schwarz Ltr. of April 6, 1998 ("Salomon Ltr.") and Posen Ltr. of April 9, 1998 ("Trump Ltr.").

<u>Fed.R.Civ.P. 15(a)</u> provides that "leave [to amend] shall be freely given when justice so requires." "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be granted. <u>Foman v. Davis, 371 U.S. 178, 182 (1962)</u> ; <u>State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.1981)</u>.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs argue that the proposed paragraphs, 43(i) and 43(j), provide substantive factual allegations relevant to the "pivotal threshold determination" of excuse from pre-suit demand. *See* Pls.' Ltr. at 2 (citing *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984)). Plaintiffs must allege the futility of pre-suit demand with particularized facts if the litigation is to proceed. *See Grobow v. Perot,* 526 A.2d 914, 920 (Del. Ch.1987), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000) (modifying the standard of appellate review).

**\*2** Plaintiffs claim the information contained in the proposed amendments was recently uncovered by Plaintiffs' counsel. *See* Pls.' Ltr. at 2. Defendants dispute this allegation and claim that the information contained in the amendments was previously available. *See* Salomon Ltr. at 1 , n. 1; Trump Ltr. at 1. Defendants further argue that the motion to amend is untimely, as it came several months after the completion of briefing of the motion to dismiss. Finally, Defendants argue that the amendment is futile as even the proposed Amended Complaint will not withstand the 12(b)(6) motions. *See* Salomon Ltr. at 1 ; Trump Ltr. at 1-3

As Plaintiffs assert the information in the proposed amendment was recently discovered, the Court finds there was no undue delay in incorporating this new information in the Complaint. The Court finds no assertions or evidence of bad faith or dilatory motive. If, as the Defendants assert, the new information was readily available, the Court concludes the Defendants will be neither unfairly surprised nor unduly prejudiced by the proposed addition of the information. To underscore the lack of prejudice to any Defendants, the Court notes that the proposed amendment adds no new legal claims.

In the interest of all parties in a fair and speedy resolution of this case, Plaintiffs' motion for leave to amend the complaint is GRANTED. The Third Consolidated Amended Derivative Complaint is hereby deemed to incorporate paragraphs 43(i) and 43(j). *See* Pls' Ltr. at Ex. A. Plaintiffs shall file the proposed Amended Complaint with the Clerk of the Court and serve all parties.

For the purpose of judicial efficiency, the Court deems both motions to dismiss to be directed toward the Third Consolidated Amended Derivative Complaint as amended by incorporation of proposed paragraphs 43(i) and 43(j).

## II. BACKGROUND

Plaintiffs' claim centers around the sale of Trump's Castle, a casino owned by Donald Trump, to the corporation in which Plaintiffs hold stock. FN1 Plaintiffs allege that in a self-serving stock transaction, Trump sold the casino in order to dispose of a losing business and escape all the attendant risks of default on the large debt held by the casino's parent company.

> FN1. The factual allegations set forth and considered herein are taken from Plaintiffs' Third Consolidated Amended Stockholders' Derivative Complaint and proposed paragraphs 43(i)-(j) of Plaintiffs' proposed Fourth Consolidated Amended Stockholders' Derivative Complaint (hereinafter referred to as the "Complaint"). *See* Pls.' Ltr. April 2, 1998, Ex. A. The facts as stated are presumed to be true for the purpose of deciding the instant motion to dismiss

Plaintiffs are shareholders in THCR, a holding company with no independent operations. (Compl.¶ 19(a).) THCR's principal asset is a general partnership interest in THCR Holdings. (*Id.* ¶ 19(a).) THCR Holdings has no independent business operations and operates through wholly-owned subsidiaries which, in turn, own and operate the Trump Plaza Hotel and Casino, the Trump Taj Mahal Resort and the Indiana Riverboat Casino. (*Id.* ¶ 20(b).) Defendant Donald J. Trump ("Trump") and entities he owns or controls are limited partners of THCR Holdings. (*Id.* ¶ 20(a).)

Trump is the Chairman of the THCR Board of Directors. (*Id.* ¶ 22(a).) As of May 7, 1996, the 1000 shares of THCR Class B common stock, Trump held 800 shares individually and held the remaining 200 shares through the wholly owned entity Trump Casino, Inc. (*Id.* ¶¶ 19(c), 22(c).) Prior to the events alleged herein, Trump's beneficial ownership of all of the Class B stock gave him 25.08% of the voting power of THCR. (*Id.* ¶ 22.)

**\*3** Trump's Castle is a casino hotel resort located in the Marina District of Atlantic City, New Jersey. (*Id.* ¶¶ 45-46.) Prior to its sale, Trump owned 61.5% of Castle Associates, the parent company that owned and operated Trump's Castle. (*Id.* ¶¶ 22(b), 23(a).) Trump owned an additional 37.5% interest in Castle Associates through his wholly-owned corporation TC/GP, Inc., (*Id.* ¶ 24.) Trump, as well as Trump's

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Page 3

Castle Associates, TC/GP, Inc., Trump's Castle Hotel & Casino, Inc., Trump Casino (collectively the "Trump-related Defendants"), entities owned or controlled by Trump, are named as Defendants. (Id ¶¶ 22-26.)

Trump's Castle has lost money for the past several years, and by the end of 1995 the total accumulated deficit of the Castle Associates' operations was $67,582,000. (Id ¶ 46.) Castle Associates' financial situation continued to be poor in 1996, and the casino reported the biggest drop in gross gaming revenue of any of the Atlantic City casinos. (Id ¶ 50.) In addition, Castle Associates faced increasing competition from Mirage Resorts, Inc., which planned to develop a large casino resort complex in the Marina District. (Id ¶ 52)

On or about May 10, 1996, THCR issued a proxy statement (the "May 1996 Proxy Statement") to Plaintiffs and all stockholders of THCR. (Id ¶ 57.) The May 1996 Proxy Statement was silent as to the possibility of a transaction between Castle Associates and THCR, although Plaintiffs contend that such a transaction was already being planned. (Id ¶ 57.) This proxy statement solicited the votes for, among other things, the election of Trump and Defendants Nicholas A. Ribis ("Ribis"), Wallace B. Askins ("Askins"), Don M. Thomas ("Thomas"), and Peter M. Ryan ("Ryan") (collectively, the "Director Defendants") to THCR's Board. (Id ¶¶ 30-34,59.) On June 12, 1996, all four Director Defendants and Trump were re-elected to THCR's Board. (Id ¶ 63.)

Prior to the election, on May 21, 1996, THCR publicly announced that THCR Holdings had purchased approximately $59.3 million, or 90%, of Castle Associates' Pay-In-Kind (PIK) notes for $38.7 million. (Id ¶ 60(a).) In exchange, THCR entered into an agreement with Castle Associates and Trump, which granted THCR Holdings a six-month exclusive right to negotiate with Castle Associates and Trump with respect to the acquisition of Trump's Castle by THCR. (Id ¶ 60(b).) Plaintiffs allege that there was no valid business purpose for the purchase of the PIK notes. (Id ¶ 61(a).)

By May 28, 1996, the Board formed a Special Committee to discuss a potential acquisition of Castle Associates by THCR. (Id ¶ 62.) The Committee planned to retain Defendant Salomon Brothers as financial advisors for the transaction. (Id ¶ 62.) On June 13, 1996, the day after the board election, counsel for Trump delivered to counsel for the Special Committee a formal proposal to sell Castle

Associates to THCR for $600 million, including the assumption of debt. (Id ¶ 64.) On June 24, 1996, a deal was struck: THCR was to acquire Castle Associates, including the assumption of debt, in exchange for a limited partnership interest in THCR Holdings exchangeable into 5,837,700 shares of THCR common stock and approximately $885,000 in cash (hereinafter the "Trump Transaction"). (Id ¶ 66.) The total reported value of the Transaction, including assumption of debt, was $525 million at the time of the June 24, 1996 announcement. (Id ¶ 66.) At close of trading on June 26, 1996, the stock declined noticeably, by over $100 million dollars. (Id.¶ 68.) By September 30, 1996, the date the Transaction closed, the value of the Transaction had decreased to $485 million due to the decrease in the price of THCR stock. (Id ¶ 68.) The Transaction was subject to the affirmative vote of a majority of the outstanding shareholders of THCR and the receipt of various third-party approvals and consents, including the receipt of a "Fairness Opinion" prepared by Defendant Salomon Brothers. (Id ¶ 67.)

*4 On August 29, 1996, THCR issued a proxy statement (the "August 1996 Proxy Statement") soliciting stockholder approval of the Trump Transaction in connection with a special meeting of THCR stockholders to vote on the Transaction scheduled for September 30, 1996. (Id ¶ 70.) The proxy statement described Trump's Castle as an attractive property with excellent growth prospects and represented that THCR intended to expand Trump's Castle with a luxury yacht, to be moored in the Marina and connected to the casino-hotel. (Id ¶ 72(a).) Plaintiffs contend that this expansion was highly unlikely to succeed and unfeasible due to physical constraints and administrative hurdles. (Id ¶ 72(c).)

The August Proxy Statement also disclosed that Defendant Salomon Brothers had concluded that the transaction was "fair, from a financial point of view to THCR and THCR Holdings." (Id ¶ 73.) Plaintiffs allege that the representations made by Salomon Brothers in their Fairness Opinion were materially false and misleading because Salomon Brothers "lacked a reasonable basis or did not, in fact, believe in good faith that 'the [Trump Transaction] ... [was] fair, from a financial point of view, to [THCR] and THCR Holdings.' " (Id ¶ 74.) Plaintiffs allege that the methodologies used in the Fairness Opinion were contradicted or unsupported by the actual facts. (Id ¶ 74.)

Shortly before the Special Meeting to vote on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Trump Transaction, there were rumors in the marketplace of a possible deal with third party, Rank Organization PLC ("Rank"), a British hotel and entertainment company, and owner of 58 Hard Rock Cafe restaurants worldwide. (*Id* ¶ ¶ 5,88.) The purported deal involved the investment by Rank of approximately $50 million to remodel Trump's Castle with a Hard Rock theme along with a possible additional equity investment. (*Id* ¶ 88.) Plaintiffs allege that this rumor of a re-theming by Rank made the sale of Trump's Castle more attractive to the THCR stockholders and was fostered by Trump and the Trump-related Defendants in order to encourage approval of the Trump Transaction. (*Id.* ¶ 88.) Rumored negotiations between Trump's Castle and Rank were reported by *Reuters, The Wall Street Journal, The Daily News* and *AFX News.* (*Id* ¶ ¶ 89-92.)

Castle Associates' financial condition continued to deteriorate after the second fiscal quarter of 1996 and prior to the Special Meeting of September 30, 1996. (*Id* ¶ 85.) Salomon Brothers did not update their Fairness Opinion based on any new available financial data from Castle Associates. (*Id* ¶ 82.) At the Special Meeting, THCR's stockholders approved the Trump Transaction. (*Id* ¶ 87.)

On October 3, 1996, days after the approval vote, *The Wall Street Journal* reported that Rank would invest $50 million to redesign the casino in a rock and roll theme. (*Id* ¶ 91(a).) However, according to the news report, the physical expansion of Trump's Castle and the addition of a yacht, as previously presented in the August 1996 Proxy Statement, would not take place. (*Id* ¶ 91(a).) Plaintiffs allege that since this disclosure came three days after the Special Meeting approving the Trump Transaction, Defendants either knew or should have known at the time of the Special Meeting that the expansion would not take place. (*Id* ¶ 91(a).) Defendant Salomon Brothers had relied upon this planned expansion in its financial analysis. (*Id* ¶ 91(a).)

**\*5** On November 14, 1996, *Reuters* reported that the change-of-theme deal between Rank and THCR would not include an equity investment, but would instead provide that Rank would receive a percentage of gaming profits and Trump would receive a percentage of profits from a Hard Rock store and restaurant, (*Id* ¶ 92), presumably to be located within the casino. However, the official announcement of the deal was delayed and on December 2, 1996, *Reuters* reported that THCR and Rank had ended their negotiations and no deal had

been made. (*Id* ¶ 94.) Upon this announcement, THCR stock subsequently dropped to $12.25 per share, almost 65% below its high of $34 on June 6, 1996, just six months earlier. (*Id* ¶ 97.)

Six weeks after the announcement that the Rank deal was not going forward, on January 20, 1997, THCR issued a press release announcing that they had signed a Letter of Intent to form a joint venture partnership with third party Colony Capital Inc. ("Colony"). (Compl.¶ 98.) The press release stated that Colony would invest $125 million to fund the expansion and re-theming of Trump's Castle through the purchase of a 51% equity interest in the property. (*Id* ¶ 98.) Plaintiffs allege that the terms of this proposed deal were "fundamentally unfair and wasteful" and that the proposed deal was designed to validate the price paid for Trump's Castle in the Trump Transaction. (*Id* ¶ ¶ 98, 102.) The Colony deal was never consummated: on March 27, 1997, Colony announced that it was terminating the proposed deal. (*Id* ¶ 121.) According to Plaintiffs THCR has never fully recovered since its stock dip of December 2, 1996. (*Id* ¶ 96.)

### III. DISCUSSION

"On a motion to dismiss under Rule 12(b)(6), the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). "The district court should grant such a motion only if, after viewing the plaintiff's allegations in this most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* Accordingly, the factual allegations set forth and considered herein are presumed to be true for the purpose of deciding the motion to dismiss.

### A. Demand Futility

Defendants move to dismiss the Complaint for failure to make a demand upon the Board requesting the action or relief sought before filing suit, pursuant to Fed.R.Civ.P. 23.1. FN2 Plaintiffs argue that demand should be excused as demand would have been futile.

> FN2. Fed.R.Civ.P. 23.1 states, in part: "The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." This rule is effectively identical to Delaware Chancery Court Rule 23.1

Unlike a claim brought by a plaintiff on his own behalf to enforce a right he personally possesses, a derivative claim is brought on behalf of a corporation to remedy an injury suffered by the corporation. *Ross v. Bernhard, 396 U.S. 531, 538 (1970)* It is, therefore, the corporation and not the shareholder plaintiff who is the real plaintiff. *Id*

*6 Since claims asserted in a shareholder derivative suit belong to the corporation, it is incumbent upon the shareholder plaintiff to make a demand upon the corporation's board of directors prior to commencing the action. *Spiegel v. Buntrock, 571 A.2d 767, 773 (Del.1990)*. This requirement stems from the well-settled principle that directors, rather than shareholders, manage the affairs of the corporation and the decision to bring or not to bring a lawsuit on behalf of a corporation is a decision concerning the management of the corporation. *Id. at 772-73.* Therefore, a motion to dismiss for failure to make a demand "is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." *Levine v. Smith, 1989 WL 150784, 16 Del. J. Corp. L. 333, 345 (Del. Ch.1989), aff'd 591 A.2d 194 (Del.1991), overruled on other grounds by Brehm, see supra* (modifying the standard of appellate review).

Defendants make their motions to dismiss pursuant to Fed. R. Civ. P. 23.1 for failure to make a pre-suit demand of the THCR Board. Rule 23.1, however, is a pleading rule, requiring the plaintiff to plead with particularity the claimed basis for excusing the demand requirement. The substantive aspect of demand futility is governed by applicable state law, and thus determinations of when demand will be excused are evaluated according to the law of the state in which the company is incorporated. *Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 99 (1991)*. As THCR is a Delaware corporation, Delaware law governs the demand requirement.

Under Delaware law, the demand requirement is predicated upon the presumption that directors

manage the corporation with the good faith belief that their actions are in the best interest of the company. *Grobow v. Perot, 539 A.2d 180, 187 overruled on other grounds by Brehm, see supra* "The premise of a shareholder claim of futility of demand is that a majority of the board of directors either has a financial interest in the challenged transaction or lacks independence or otherwise failed to exercise due care." *Levine v. Smith, 591 A.2d 194, 205 overruled on other grounds by Brehm, see supra* Under the well-settled rule, demand will be excused if a reasonable doubt is created that: (1) the directors were disinterested and independent or; (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Aronson v. Lewis, 473 A.2d 805, 814 (Del.1984), overruled on other grounds by Brehm, see supra* (affirming the test but modifying the standard of appellate review). *See also Levine, 591 A.2d at 205-206* (clarifying that a reasonable doubt under either prong of the test will excuse demand) *overruled on other grounds by Brehm, see supra* The Delaware Supreme Court has not defined what degree of factual specificity is required to establish reasonable doubt sufficient to excuse a demand; however, particularized facts are required, thus the pleading requirements are more stringent than they would be on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Grobow v. Perot, 526 A.2d 914, 920 overruled on other grounds by Brehm, see supra*

### 1. The Board's Lack of Disinterestedness or Independence

*7 The gravamen of Plaintiffs' claim is that, while the Defendants may not have directly benefited from the Transaction, each was beholden to Trump, the alleged controlling shareholder, Chairman of the THCR Board and interested beneficiary, such that they lacked the requisite independence. "To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized." *In re Western Nat'l Shareholders Litig., 2000 WL 710192, at *11 (Del.Ch. May 22, 2000) (citing Aronson 473 A.2d at 815; Levine, 591 A.2d at 205).

#### a. Trump and Ribis

Defendants do not seriously contest that Trump is and was the controlling shareholder of THCR and Chairman of the Board of Directors. FN3 Nor do they

Not Reported in F Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

discredit Plaintiffs' allegation that Trump, as 99 percent owner of Castle Associates, was the primary and interested beneficiary of the Trump's Castle sale. Prior to the Transaction, Trump held over 25 percent of the THCR voting power. After the sale, Trump controlled over 36 percent of the THCR voting power. Compl. ¶ 22. According to the Complaint, both prior to and after the Transaction, Trump served as Chairman of the Board and enjoyed "long and extensive relationships with the Director Defendants." Compl. ¶ 55.

> FN3. In an eleventh hour attempt to rewrite their position, Defendants wrote to the Court citing cases holding that significant stock ownership alone is insufficient to support alleged domination. See Trump Ltr. dated August 30, 2000 at 2 (citing *In re Delta Pine & Land Company*, 2000 Del. Ch. LEXIS 91 (Del. Ch. June 21, 2000); *In re Western National Shareholders Litig.*, 2000 Del Ch. LEXIS 82 (Del. Ch. May 22, 2000); and *Solomon v. Armstrong*, 747 A.2d 1098 (Del. Ch.1999), aff'd, 746 A.2d 277 (Del.2000). Plaintiffs responded to this letter on September 11, 2000. However, as discussed above, Plaintiffs allege more than significant stock ownership in support of their allegation of control.

"From a practical perspective, [the] confluence of voting control with directorial and official decision making authority ... is ... itself quite consistent with control of the board." *Friedman v. Beningson*, 1995 WL 716762, at *5, 21 Del. J. Corp. L. 659 (Del. Ch.1995). Delaware courts have found substantial minority interests, ranging from 20% to 40% sufficient to grant the holder working control. See e.g., *Robbins and Co. v. A.C. Israel Enter., Inc.*, 1985 WL 149627, at *5, 11 Del. J. Corp. L. 968 (Del. Ch.1985) (citations omitted). Trump clearly yielded significant and controlling power over THCR.

"The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction." *Pogostin v. Rice*, 480 A .2d 619, 624 (citing *Aronson*, 473 A.2d at 814, 816, overruled on other grounds by Brehm, see supra ). To establish lack of independence, Plaintiffs must show that the directors are "beholden" to Trump or so under his influence that the Board would not be willing or able to use its own discretion. See Aronson

at 815. See also, *Grobow*, 539 A.2d at 189 (finding lack of independence where the "directors were dominated or otherwise controlled by an individual or entity interested in the transaction.") overruled on other grounds by Brehm, see supra

Plaintiffs allege that because the transaction benefited Trump directly, he exerted dominance over the other Board members, impairing the Board's ability to exercise valid business judgment and rendering it incapable of reaching an independent decision on the Transaction. Plaintiffs claim that the Board members were beholden to Trump because they received payments, benefits, and other rewards by virtue of their membership on the THCR Board, their control of THCR, and their service on the boards of other companies that THCR and/or Trump controls. Compl. ¶ 43. Accordingly, Plaintiffs argue, the Board members have all benefited from the wrongdoing alleged, and were incapable of exercising independent judgment Id. However, such conclusory allegations are insufficient. Plaintiffs must allege specific facts detailing why board members lacked independence or were beholden to Trump with respect to the challenged transaction.

*8 Defendants concede that Trump and Ribis, a member of the THCR board who also served as an officer of Castle Associates, were arguably interested in the transaction, as they sat on both sides of the sale. See Defs.' Mem. Law at 16; Compl ¶ 43(f). See also *Ryan v. Aetna Life Ins. Co.*, 765 F.Supp. 133, 138 (S.D.N.Y.1991) (addressing Delaware law excusing demand where directors are also parties on the opposite side of a transaction) (citing *In re NVF Co. Litigation*, 1989 Del. Ch., 1989 WL 146237 (Del. Ch. Nov. 22, 1989) ; *Siegman v.Tri-Star Pictures, Inc.*, No. 9050, 1989 WL 48746 (Del. Ch. May 30, 1989)). Ribis is the President, Chief Executive Officer, and Director of THCR and a member of the Castle Board. Compl. ¶ 30. In addition, Ribis serves on the boards of eleven other companies or subsidiaries controlled by Trump for which he receives millions of dollars in compensation. Compl. ¶ 43(f). Ribis was clearly conflicted and was likely incapable of rendering an unbiased decision.

b. Remaining Directors

To establish demand futility based on lack of independence, Plaintiffs must raise a reasonable doubt that a *majority* of the directors were interested or controlled. See *Aronson*, 473 A.2d at 812. The Board has five members, including Trump. Compl. ¶

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

¶ 22(a), 30-33. Therefore, the question becomes whether all of the three remaining members of the board, Askins, Thomas and Ryan, were disinterested and independent.

Plaintiffs allege that Askins, Thomas, and Ryan were beholden to Trump at the time a demand would have been made because they served on other Trump-controlled boards. Specifically, Askins, Thomas, and Ryan also served on the board of THCR Funding, a THCR subsidiary, along with Defendants Trump and Ribis. Compl. ¶ 43(f); Pls' Mem Law at 31, n. 13. Askins and Thomas served on the boards of AC Funding, Plaza Funding and AC Holding, all THCR subsidiaries. FN4 Compl. ¶ 43(f), Pls.' Mem Law at 31, n. 13.

> FN4. The Court may take judicial notice of the fact that THCR Funding, AC Funding, Plaza Funding and AC Holding are all wholly-owned subsidiaries of THCR Holdings. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (permitting judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") *See also,* Pls.' Mem Law at 31, n. 13.

However, Plaintiffs do not allege that Askins, Thomas, or Ryan received additional compensation for their board positions on any of the subsidiaries. Standing alone, these allegations are insufficient to raise a reasonable doubt. *See Langner v. Brown,* 913 F.Supp. 260, 266 (S.D.N.Y.1996) (rejecting claim of demand futility for multiple directorships where "there is no pleading that a majority of the directors are beholden to [the controlling shareholder] for their livelihoods or a material portion of their incomes.").

It is reasonable to infer, however, that all three directors knew that successful service on the board of THCR and its subsidiaries might lead to future positions on other Trump-controlled entities as it had for Ribis. Courts have considered the possibility of future influence or remuneration as a factor when weighing director independence. *See, e g , Kahn v. Tremont Corp.,* 694 A.2d 422, 430-31 (Del.1997) ; *Kahn v. Tremont Corp.,* No. 12339, 1994 WL 162613 (Del. Ch. Apr. 21, 1994) *rev'd on other grounds,* 694 A .2d 422 (Del.1997).

*9 Plaintiffs allege additional facts concerning the independence of both Askins and Thomas. Plaintiffs claim Thomas was interested and conflicted because he won a contract for his primary employer as a result of his appointment as a director of THCR. As of May 1994 and continuing today, Thomas was Senior Vice President of Corporate Affairs of the Pepsi-Cola Bottling Company. Compl. ¶ 43(i). In May 1994, one year after Thomas joined the THCR Board, Pepsi was awarded the exclusive contract to supply its beverages to Trump's Taj Mahal Casino, a THCR subsidiary. *Id* Previously, Coca-Cola had enjoyed the exclusive contract, which provides approximately $500,000 in annual revenues. *Id* Plaintiffs allege that this contract made Thomas beholden to Trump because Thomas would have been "averse to taking any actions that would endanger Pepsi's relationship with the Taj Mahal or Trump." *Id* Thus, Plaintiffs argue, Thomas lacked independence with respect to the challenged transaction.

The ability of controlling officers to affect the compensation or influence of a director is one factor that may support a finding of reasonable doubt. *See Rales v. Blasband,* 634 A.2d 927, 937 (Del.1993) ; *Tremont Corp.,* 694 A.2d at 429-30. Plaintiffs analogize the Pepsi contract to the payment of consulting fees. Pls.' Ltr. at 3. An interested director's ability to control payment of consulting fees to another director was sufficient to find the receiving director interested in one case cited by Plaintiffs. *See Friedman v. Beningson,* No. 12232, 1995 WL 716762 (Del. Ch. Dec. 4, 1995). However, Plaintiffs have not alleged that Thomas received a personal financial benefit as in *Friedman* At best, Thomas may have received increased compensation or influence from Pepsi for his role in securing the contract. Because any link to Trump is attenuated at best, the presence of the contract alone is insufficient to raise a reasonable doubt. However, the presence of the contract as well as the possibility of future contracts, given the totality of the circumstances raises a reasonable doubt as to Thomas' independence from Trump.

Finally, Plaintiffs allege Askins lacked independence because he previously served on boards on the Trump's Castle side of the transaction. Askins served on the boards of Trump's Castle and TC/GP, the company that owned 37.5 percent of Castle Associate's the casino's parent company prior to the sale. Compl. ¶ 43(f). Significantly, Askins worked on both boards with Trump and Ribis, the two THCR board members most interested in the transaction. *Id* Askins' prior board membership on the very property sold to THCR as well as his directorship in TC/GP

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

necessarily provided him with additional information, which arguably made him a less than neutral decisionmaker. Further, Askins' history of personally beneficial affiliation with Trump-controlled entities, and specifically with Trump and Ribis, both clearly interested THCR Board leaders, diminishes the possibility that Askins had only the corporation's interests in mind when evaluating the transaction. *See Tremont,* 694 A.2d at 429-30. *See also Brehm,* 746 A.2d 244, 256 n. 31 (Del.2000) ("Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences ") (quoting *Aronson* 473 A.2d at 816). Again, given the totality of the circumstances Plaintiffs raise a reasonable doubt as to Askins' independence from Trump.

*10 Defendants argue that the Board's formation of a Special Committee, composed of allegedly independent and non-interested board members, to consider the transaction compels dismissal. *See* Defs' Mem. Law at 28 (citing *Grobow* 526 A.2d 914). However, the Delaware Supreme Court made it clear in *Tremont* that a board's creation of an ostensibly independent special committee is meaningless when, as here, the court finds members of the special committee to be interested and lack independence. *See Tremont,* 694 A.2d 422, 429-30. Accordingly, the Court assigns little weight to the Special Committee.

Plaintiffs have alleged sufficient particularized facts to raise a reasonable doubt that the majority of the THCR Board were disinterested and independent. Plaintiffs have met their burden under the first prong of the *Aronson* test and have thus established that pre-suit demand would have been futile.

### 2. Business Judgment

It is not necessary to examine whether the transaction was a valid exercise of business judgment under the second prong of *Aronson. See Levine,* 591 A.2d at 205-206. However, the Court notes that although a finding of demand futility under the second prong of *Aronson* is limited to "extreme cases," *Kahn,* 1994 WL 162613 at *6, Plaintiffs have also raise a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson,* 473 A.2d at 814. "Allegations which raise a reasonable doubt as to whether a transaction constitutes a waste of corporate assets in turn create a reasonable doubt that the transaction was the product of a valid exercise of business

judgment." *Lewis v. Aronson,* No. 6919, 1985 WL 11553,*6 (Del. Ch. May 1, 1985). As discussed *infra,* Plaintiffs have stated a claim for waste. Accordingly, demand is also excused under the second business judgment prong of *Aronson.*

### 3. Demand and Salomon Brothers

Plaintiffs have asserted five claims against Salomon Brothers, the Board's financial advisors, for the alleged faulty advice and misstatements issued in Salomon's Fairness Opinion. Specifically, Plaintiffs allege violations of Section 14(a) of the Exchange Act, breach of fiduciary duties of due care, loyalty and good faith, breach of fiduciary duty of candor, negligence and negligent misrepresentation. Plaintiffs' derivative claims against Salomon challenge the Fairness Opinion rather than the actual sale of Trump's Castle. Accordingly, Plaintiffs were equally required to make a pre-suit demand on the Board before bringing a derivative suit against third-party Salomon Brothers. FN5 *See, e.g., Rales* 634 A.2d 927, 934 n. 9 (addressing requirement of demand for derivative third party breach of contract suits); *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del.1988) (upholding standing of third-party defendant to assert defense of failure to make demand). Plaintiffs argue that because demand would have been futile for the claims against the Trump and Director Defendants, demand is necessarily excused for the third-party claims against Salomon Brothers.

> FN5. It is well settled law that a Section 14(a) claim may be brought directly or derivatively. *See Koppel v. 4987 Corp.,* 167 F.3d 125, 131 (2d Cir.1999) (citing *J.I. Case Co. v. Borak,* 377 U.S. 426, 431 (1964). However, the demand requirement applies to Plaintiffs' claims against Salomon, including the 14(a) claim, because Plaintiffs bring their 14(a) claim derivatively. *See* Compl. ¶ 141. *See also,* Pls.' Mem. Law at 4 (stating Plaintiffs are "[p]roceeding in a purely derivative capacity in the right and for the benefit of the Company").

*11 As the Delaware Supreme Court has suggested, pre-suit demand is essential where the acts of third parties are at issue because the demand requirement draws the attention of the board to its managerial duties where it may not have previously considered action. *Rales,* 634 A.2d at 934, n. 9. However,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Page 9

Plaintiffs argue that an interested or beholden Board would be unable to consider fairly a demand against its financial advisors.

Where the subject of the derivative suit concerns breach by a third party, it is appropriate to examine whether the board can impartially consider the merits of the demand without being influenced by improper considerations; whether the board could properly exercise its independent and disinterested business judgment in responding to the demand. *Rales v. Blasband,* 634 A.2d 927, 933-34 (Del.1993).

Defendant Salomon Brothers argues that Plaintiffs cannot rely upon the alleged unclean hands of the Board to excuse its failure to make a demand upon the Board before initiating suit against Salomon Brothers. *See* Salomon Reply at 12. However, Salomon presents no case law to support this conclusion. FN6

> FN6. In fact, Salomon Brothers cites to only one case involving a derivative suit against a third party defendant and that case did not address the question presented here. *See Ryan v. Aetna Life Ins. Co.,* 765 F.Supp. 133 (S.D.N.Y.1991); Salomon Reply at 7.

On the facts of this case, because the Board could not have been expected to exercise independent business judgment with respect to the Trump Transaction, it follows that the Board would also be unable to consider impartially the merits of a demand against a third party, Salomon Brothers, whose Fairness Opinion was critical to the success of the Transaction. Accordingly, initiating a demand would have been futile and Plaintiffs' failure to make a demand upon the Board before initiating suit against Salomon Brothers is excused.

## B. Federal Proxy Claims

Federal Proxy rules apply to all companies with securities registered under § 12 of the 1934 Securities Exchange Act. *Katz v. Pels,* 774 F.Supp. 121, 124 (S.D.N.Y.1991). Section 14(a) of the Federal proxy rules was enacted to prevent abuses in the proxy solicitation process. *J.I. Case Co. v. Borak,* 377 U.S. 426 (1964). Section 14(a) provides that it is unlawful to solicit a proxy contrary to rules established by the Securities and Exchange Commission. *In re American Express Co. Shareholder Litigation,* 840 F.Supp. 260, 267 (S.D.N.Y.1993). The objectives of this section are to encourage full disclosure and prevent fraud. *Katz,* 774 F.Supp. at 124.

To state a claim under Section 14(a) and Rule 14a-9, a shareholder must allege that (1) his proxy was solicited for authorization of a corporate action; and (2) the proxy solicitation was materially false or misleading. *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384-85 (1970). Material information is information that, if disclosed in a proxy statement, would likely be viewed by a reasonable investor as having "significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," *TSC Indus.,* 426 U.S. at 449, "even if it would not have changed the investor's decision on whether to consummate the transaction." *Folger Adam Co. v. PMI Industries, Inc.,* 938 F.2d 1529, 1535 (2d Cir.1991).

*12 Under the federal rules, this action may not be dismissed unless the Court concludes that Plaintiffs can prove no set of facts to support their contention that THCR's May 1996 and August 1996 proxy statements misrepresented and/or omitted material facts. *Katz v. Pels,* 774 F.Supp. 121, 124 (S.D.N.Y.1991).

### 1. *The May 1996 Proxy Statement*

Count I concerns the May 1996 Proxy Statement and Annual Meeting, and claims violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. Specifically, Plaintiffs claim that the May 1996 Proxy Statement, seeking, *inter alia,* reelection of the Board of Directors, was false and misleading because it was "entirely silent, as to the likely transaction between Castle Associate and THCR, although at the time the Individual Defendants and the Trump Defendants were planning to consummate the Trump Transaction." Compl. ¶ 57. Defendants counter that Count I is moot, as the terms of the Board members elected pursuant to the May 1996 Proxy Statement expired in July 1997, after which the same Board Members were re-elected after the precise terms of the Castle Transaction were fully disclosed. Trump Reply Mem. at 23.

"[S]elf-dealing presents opportunities for abuse of a corporate position of trust, the circumstances

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Page 10

surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company." *Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979) Thus, "related transactions," defined, *inter alia,* as transactions between directors or board nominees and their corporations, are matters explicitly addressed by the SEC disclosure regulations *See* Schedule 14A, Item 7 (incorporating 17 C.F.R § 229.404a (Item 404)).

SEC regulations require that an election proxy include disclosure of any recent or "currently proposed" transaction whose value exceeds $60,000 involving a director or board nominee and the corporation. *See* 17 C.F.R. § 229.404 (Item 404). While the Second Circuit Court of Appeals has made clear that compliance with Schedule 14A "does not necessarily guarantee that a proxy statement satisfies Rule 14a-9(a) ... the regulation does provide us with the Commission's expert view of the types of involvement ... that are most likely to be matters of concern to shareholders in a proxy contest." *GAF Corp. v. Heyman,* 724 F.2d 727, 739 (2d Cir.1983) (applying comparable Item 103 regarding legal proceeding disclosure in an election proxy) Thus, in the view of the SEC, "related transactions" of over $60,000 are material facts that must be disclosed in a proxy statement. 17 C.F.R. § 229.404 (Item 404).

As has already been established above, the Trump Transaction was a "related transaction" valued far above $60,000. The remaining statutory interpretation concerns whether the Trump Transaction was "currently proposed" within the meaning of the regulation at the time of the May 10, 1996 proxy issuance. Plaintiffs cite to a number of material steps taken within days of the proxy issuance to establish that the Transaction was "basically a foregone conclusion" at the time of the Proxy issuance *See* Compl. ¶ ¶ 58-60 Only days after the Proxy was issued, THCR purchased the PIK notes and announced it had entered into exclusive negotiation for purchase of Trump's Castle. *Id* Further circumstantial evidence supports this allegation, in particular, on June 13, 1996, *one* day after election of the Board, Trump issued a formal proposal to sell Castle Associates. Compl. ¶ 64.

*13 Although the Trump Transaction had not yet been formally proposed prior to issuance of the May Proxy Statement, such a narrow statutory interpretation would permit Directors to postpone "formal proposal" of related transactions and thus

evade the spirit of the SEC Regulation. In addition, even if such a manipulation were permitted by SEC Regulation, this does not guarantee the Proxy Statement satisfies Rule 14a-9(a) *See GAF Corp.,* 724 F.2d at 739.

Defendants argue that proxy statements do not require predictions of future activity or pending negotiations citing *Krauth v. Executive Telecard, Ltd.,* 890 F.Supp. 269, 288 (S.D.N.Y.1995) and *Reiss v. Pan Am. World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983). However, both cases involved the unpredictable actions of unrelated third parties. Unlike the facts in *Krauth* and *Reiss,* Plaintiffs allege that all the parties to the Trump Transaction were insiders. Consequently, the eventual outcome of negotiations could hardly be said to be "inherently fluid" or "shrouded in uncertainty." *See Reiss,* 711 F.2d at 14. Furthermore, the language of Item 404 makes clear that when related transactions are involved, even incomplete but "currently proposed" transactions must be disclosed. *See* 17 C.F.R § 229.404a (Item 404).

Finally, Defendants argue that the May Proxy claim must be dismissed as moot as the terms of the officers expired in July 1997. When a shareholder "challenges the solicitation of proxies for the election of directors to a term now complete, courts addressing the question of mootness have looked to the nature of the relief sought." *Sanders v. Thrall Car. Mfg. Co.,* 582 F.Supp. 945, 955 (S.D.N.Y.1983), *aff'd,* 730 F.2d 910 (2d Cir.1984) Plaintiffs seek equitable and declaratory relief including removal of the present directors, a new election, and voiding of an increase in the number of THCR shares available in the Stock Incentive Plan, also approved by the May 1996 Proxy Statement. Thus, because the relief sought is more than a declaration of law "without implications for practical enforcement upon the parties" the cause of action is not moot. *See Sanders,* 582 F.Supp. at 955 (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 524 F.2d 811, 817 (2d Cir.1975)).

Assuming, as the Court must on a motion to dismiss, that Defendants were planning to consummate the Trump Transaction prior to issuance of the May Proxy Statement, omission of this fact was material. Disclosure of the pending Transaction would have "significantly altered the 'total mix' of information made available." *TSC Indus.,* 426 U.S. at 449. Thus, Plaintiffs have stated a viable and continuing federal proxy cause of action concerning the May 1996 Proxy Statement. Accordingly, Defendants motion to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

dismiss the May 1996 Proxy claim is DENIED.

### 2. *The August 1996 Proxy Statement*

#### a. Against the Trump and Director Defendants

**\*14** Count III, in essence, alleges that by misrepresenting the terms of the sale of Trump's Castle to THCR and plans for renovation, and by reporting Castle Associates' aggregate financial results for the six-month period ending June 30, 1996, the August 1996 Proxy Statement was false and misleading. FN7 Defendants argue that the Proxy Statement fully disclosed the relevant business uncertainties attending the expansion of Trump's Castle, and fully disclosed the casino's financial information.

> FN7. The Proxy Statement did disclose that Trump was the "beneficial owner of 100% of the outstanding equity interests of Castle Associates." Aff. Posen, Ex. C (August Proxy Statement).

Contrary to Plaintiffs' allegations, the Proxy Statement disclosed the pertinent and significant losses. Specifically, the Proxy Statement disclosed that Castle Associates lost nearly $19 million in the first six months of 1996. *See* Aff. Posen, Ex C at 10 (August 1996 Proxy Statement). FN8 Consequently, Plaintiffs' argument that an aggregate quarterly break down of Castle Associate's finances was required is both unsupported by authority and unpersuasive.

> FN8. The Court's consideration of this document is appropriate on this 12(b)(6) motion, notwithstanding the fact that it was not attached by Plaintiffs as an exhibit to the pleadings, because it was clearly incorporated by reference to the Complaint. *See Stuto v. Fleishman*, 164 F.3d 820, 826 n. 1 (2d Cir.1999) (document could be considered on a 12(b)(6) motion because it was part of another document sent to plaintiff, and was discussed in the complaint, thereby incorporating it by reference.) Moreover, the Proxy statements constitute the basis upon which Plaintiffs' claims rest. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991) (court may consider documents of which

Plaintiffs had notice and which were integral to their claim).

Likewise, the Proxy Statement disclosed the zoning, lease, and permit hurdles necessary to the Trump's Castle Expansion with sufficient detail to foreclose Plaintiffs' allegations that further disclosure was necessary as a matter of law. *See* Aff. Posen, Ex. C at 48 (August 1996 Proxy Statement). Specifically, the Proxy Statement disclosed that the expansion was subject to a number of contingencies and that there was "no assurance that Castle Associates [would] be able to obtain all the necessary financing, consents, licenses and regulatory approvals to complete the Trump's Castle Expansion." *Id.*

However, Plaintiffs' allegations concerning the likelihood and feasibility of the expansion disclosed in the August Proxy deserve closer scrutiny. According to the Plaintiffs, shortly before the September 30, 1996 shareholder vote, Trump and certain other Trump and Director Defendants "fostered rumors in the marketplace" about a possible Hard Rock re-theming and infusion of equity from Rank PLC (the "Rank rumors") Compl ¶ 88. On October 3, 1996, just days after Shareholders approved the Transaction, the *Wall Street Journal* announced the Rank investment and reported that the expansion of Trump's Castle and the addition of a yacht, as disclosed in the August Proxy, would not go forward. Compl. ¶ 91(a). Plaintiffs allege, based upon the timing of this disclosure, that prior to the Special Meeting, the Trump and Director Defendants knew or should have known the expansion of Trump's Castle, which formed the basis of the Fairness Opinion, would not take place as described in the August Proxy Statement. Compl. ¶ 91(b). The fact that the expansion, described in the August Proxy Statement and relied upon by Salomon Brothers, would not take place, was a material fact which could have influenced a shareholder's vote.

In addition, Plaintiffs allege that even if the expansion had gone forward, the disclosures concerning the addition of a luxury yacht were materially false. Plaintiffs contend that the depth of the water necessary to accommodate the proposed yacht would require its moorage in the middle of the Marina, approximately one-quarter mile from Trump's Castle. (Compl.¶ 72(c)(iii)). Thus, Plaintiff's argue, it was highly unlikely the boat could be "physically connected to the casino-hotel and accessible to the main casino" as stated in the Proxy Statement. Aff. Posen, Ex. C at 5, 48 (August 1996 Proxy Statement). Plaintiffs claim that such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 12
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

information was material because, they contend, "a casino expansion located on a boat and physically separated and distant from the existing Trump's Castle would be much less productive than an expansion of a land-based casino." Compl. ¶ 72(c)(iii).

*15 Contrary to Defendants' argument, the distance from the proposed yacht to the casino and casino-hotel was not self-evident. The August Proxy Statement did not contain any physical maps of the Marina. To assume that the proximity of the waterfront from the casino was self-evident is to assume that all stockholders were familiar with the area. The proximity of the yacht expansion to the casino is a material fact which could have influenced a shareholder's vote, as it would likely be an indicator of the expansion site's estimated profitability.

Accordingly, on this claim, Plaintiffs state a federal proxy cause of action against the Trump and Director Defendants. Accordingly, Defendants' motion to dismiss the August 1996 Proxy claim is DENIED.

### b. Against Salomon Brothers

Count III makes a separate allegation against Salomon Brothers for allegedly false and materially misleading statements and methodologies contained in its Fairness Opinion and annexed to the August Proxy Statement. Specifically, Plaintiffs allege Salomon's statement that "the [Trump Transaction] ... is fair, from a financial point of view, to the Company and THCR Holdings" was materially false, and further that Salomon Brother's did not, in fact, believe in good faith that the Transaction was fair. Compl. ¶ 74. In short, Plaintiffs allege that the false conclusion was based upon, 1) a financial analysis contradicted or unsupported by the actual facts, Compl. ¶¶ 74-76, 78-81 and; 2) a failure by Salomon Brothers to reissue and reevaluate its Opinion after new and unfavorable financial information was disclosed by Castle Associates just six days after the Opinion was issued. Compl. ¶ 82.

Regarding Plaintiffs' allegations of flawed financial analysis, Plaintiffs allege that Salomon Brothers' analysis comparing the Trump's Castle to 20 other public gaming companies failed to reflect Trump's Castle's net losses; overestimated its growth prospects, and overvalued anticipated synergies between TCHR and Trump's Castle. Compl. ¶¶ 75-76; 78-81. To support the allegation that the analysis was flawed, Plaintiffs assert that "Salomon Brothers'

gaming analyst, W. Bruce Turner, who regularly follows gaming stocks such as THCR's, was at no time consulted by the Special Committee and Salomon Brothers never made use of his services in connection with this engagement." Compl. ¶ 43(j). Defendant Salomon Brothers responds that its methodologies were disclosed within the Fairness Opinion, thus providing the opportunity for open discussion and criticism.

Plaintiffs also assert that the Fairness Opinion was misleading because Salomon Brothers failed to update its Opinion to incorporate new negative financial information disclosed after the second fiscal quarter ended June 30, 1996, just six days after the Opinion was issued. Compl. ¶ 82. The second quarter results disclosed that Castle Associate's quarterly income from operations declined by 80% from the prior year's second quarter. Compl. ¶ 83.

*16 Finally, Plaintiffs allege that Salomon Brothers issued the misleading statements because it was to receive loan fees from Trump, which made the financial advisors incapable of providing an unbiased opinion. Compl. ¶ 43(j).

On a motion to dismiss, the Court must assume the truth of the facts asserted by Plaintiffs. Thus, if Salomon Brothers issued a Fairness Opinion based on faulty methodology and stating conclusions not actually held in good faith, the August Proxy Statement, annexed to and based upon that Opinion, may have been false and misleading in its conclusion that the Transaction was "fair, from a financial point of view." Compl. ¶ 74. If, as Plaintiffs allege, the Corporation's financial advisors did not find the Transaction to be financially fair, this would clearly be a fact a "reasonable shareholder would consider ... important". *TSC Indus.*, 426 U.S. at 449. Accordingly, Plaintiffs have stated a proxy claim against Salomon Brothers for its role in issuing the annexed Fairness Opinion and Defendants' motion is DENIED.

### C. Remaining State Claims

Defendants also move to dismiss all of the Plaintiffs' state law claims for failure to state a claim.

#### 1. *Ultra Vires Acts*

Plaintiffs allege all actions taken by the Board are voidable as *ultra vires* acts because the Board was

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

never properly elected as they were elected pursuant to a false and misleading proxy statement. Compl. ¶¶ 136-37. Defendants move to dismiss this claim on the grounds that the election Proxy was valid.

Under Delaware law, a director who assumes office "pursuant to an irregular election ... achieves only [d]e facto status which may be successfully attacked by the stockholders." *Prickett v. American Steel & Pump Corp.*, 253 A.2d 86, 88 (Del. Ch.1969). Where stockholders challenge officer conduct not primarily involving third parties, courts may void those actions. *Dillon v. Scotten, Dillon Co.*, 335 F.Supp. 566, 569 (D. Del 1971) (citing 2 Fletcher, *Cyclopedia of Corporations* § 383).

The Court has determined that there may have been material omissions or misstatements in the May 1996 election Proxy Statement, thus the Board's election may be voidable. Accordingly, to the extent the Trump Transaction did not involve third parties, the Transaction may also be voidable. Accordingly, Plaintiffs state a claim for *ultra vires* conduct and Defendants' motion is DENIED.

### 2. Breach of Contract and Fiduciary Duty of Candor

Plaintiffs allege that Defendants Trump, TC/GP, and TCHI breached their contract with THCR because the Defendants violated the provision of the Transaction Agreement stating that information to be supplied to THCR shareholders in connection with the August 1996 Proxy Statement would be free of any material misstatements or omissions. Compl. ¶¶ 151-153.

In addition, Plaintiffs allege Trump and the Director Defendants breached their duty of candor through the same alleged misstatements and omissions. Defendants move to dismiss these claims on the grounds that no materially misleading statements were included in the August Proxy Statement.

**\*17** The "Duty of Candor" is the "well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud v. Grace*, 606 A.2d 75, 84 (Del.1992). This duty of disclosure is based on the materiality standard advanced by the court in *TSC Industries*. directors must disclose all facts which, "under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable shareholder." *Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del.1994)

(quoting *TSC Industries*, 426 U.S. at 449).

As this Court has found that at least three claims for misrepresentation or omission of material facts under Section 14(a) survive this motion to dismiss, Plaintiffs have stated a state law claim for breach of contract against Trump, TC/GP, and TCHI. Plaintiffs also state a breach of the duty of candor claim against Trump and the Director Defendants. Accordingly, Defendants' motion to dismiss Plaintiffs' breach of contract and fiduciary duty of candor claims against the above Defendants is DENIED.

### 3. Breach of Fiduciary Duties of Due Care, Loyalty, and Good Faith

Directors are bound to protect the interests of the corporation through exercise of the duties of due care, good faith, and loyalty. *Malone v. Brincat*, 722 A.2d 5, 10 (Del.1998). This obligation has been described as a duty "not only affirmatively to protect the interests of the corporation committed to [an officer's] charge, but also to refrain from doing anything that would work injury to the corporation." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993) (subsequent history omitted). Plaintiffs allege facts of fostering and facilitating self-dealing and compromising corporate interests sufficient to state a claim for breach of the fiduciary duties of due care, good faith, and loyalty.

Defendants correctly argue that a vote by the fully-informed shareholders ratifies a challenged transaction and extinguishes any claim that a disinterested director breached his duty of care in connection with it. *See Smith v. Van Gorkom*, 488 A.2d 858, 890 (Del.1985). However, as the Court has determined that the shareholders were not fully informed and material facts were omitted from the August 1996 Proxy Statement, the shareholder vote does not extinguish Plaintiffs' fiduciary duty of due care claim.

Finally, Trump and the Director Defendants also argue that all breach of fiduciary duty claims against them for money damages should be dismissed because THCR's certificate of incorporation includes an indemnification provision. Trump Mem. Law at 54.

"In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 14
Not Reported in F.Supp.2d, 2000 WL 1371317
**(Cite as: Not Reported in F.Supp.2d)**

by reference in the complaint. If a judge looks to additional materials, the motion should be converted into a motion for summary judgment." *Hayden v. County of Nassau,* 180 F .3d 42, 53 (2d Cir.1999) (citations omitted). Unless a nonmovant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment, a court must ordinarily give notice and an opportunity to respond before converting a motion to one for summary judgment. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999)

**\*18** THCR's certificate of incorporation and the indemnification provision therein are clearly outside of the pleadings. However, both sides have briefed the issue, Plaintiffs were thus clearly on notice, and this point is ripe for determination.

The indemnification provision is pursuant to 8 Del Code Ann. § 102(b)(7), which allows a corporation to limit or eliminate directors' liability for monetary damages for breach of fiduciary duty by including an exculpatory provision in its certificate of incorporation. However, the statute is strictly limited, prohibiting indemnification for any breach of the director's duty of loyalty to the corporation or its stockholders, for acts or omissions not in good faith or involving intentional misconduct or for any transaction for which the director derived an improper personal benefit. *See* 8 Del.Code Ann. § 102(b)(7). As Plaintiffs' claims for breach of fiduciary duty involve breach of due care, loyalty, good faith and candor, these claims are not prohibited by the indemnification provision. Accordingly, Defendants' motion to dismiss Plaintiffs' breach of fiduciary duties claim as against Trump and the Director Defendants is DENIED.

### 4. *Fiduciary Duty Claims Against the Remaining Defendants*

Plaintiffs also allege that Defendant Salomon Brothers as well as the remaining Trump Defendants breached their alleged duties of candor, due care, loyalty, and good faith through the same alleged misstatements, actions, and omissions.

Plaintiffs allege Defendant Trump Casino, Inc, as owner of 200 shares of THCR Class B common stock, owed the corporation fiduciary duties. However, "a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Communications Systems, Inc.,* 638 A.2d

1110, 1113 (Del.1994) (quoting *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del.1987). Plaintiffs have failed to allege facts supporting the alleged controlling or majority shareholder status of Defendant Trump Casino, Inc. Accordingly, Plaintiffs' fiduciary duty claims are DISMISSED as to Trump Casino, Inc.

As to the remaining Trump Defendants and Salomon Brothers, Delaware courts have consistently rejected the notion of fiduciary duties for third parties. *See, e g , Lewis v. Leaseway Transp. Corp.,* No. 8720, 1990 WL 67383 (Del. Ch. May 16, 1990) ("Plaintiffs do not claim, nor could they, that Citicorp or Drexel owed a fiduciary duty to Leaseway shareholders "); *In re Shoe-Town, Inc. Stockholders Litig.,* No. 9483, 1990 WL 13475, at \*7, 16 Del. J. Corp. L. 404,\*417 (Del. Ch. Feb. 12, 1990) ("because a fairness opinion or an outside valuation is not an absolute requirement under Delaware law, it makes little sense to strap those investment banks, who are retained, with the duties of a fiduciary.") Accordingly, Plaintiffs fail to state a claim for failure of fiduciary duties against Trump's Castle Associates, TC/GP, TCHI, and Salomon Brothers and Defendants' motions to dismiss these claims are GRANTED.

**\*19** However, Plaintiffs also allege the fiduciary duty claims in the alternative, under a theory of aiding and abetting. Delaware Courts have permitted third party fiduciary duty claims to proceed for aiding and abetting a parent company's breach of fiduciary duties. *See, e g , Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1284 n. 33 (Del.1989) (finding "the conduct of one who knowingly joins with a fiduciary, including corporate officials, in breaching a fiduciary obligation, is equally culpable.").

To state a claim for aiding and abetting breach of fiduciary duties, a plaintiff must allege "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that breach by the defendant." *Shoe-Town,* 1990 WL 13475, at \*7-8 (citing *Penn Mart Realty Co. v. Becker,* 298 A.2d 349, 351 (Del. Ch.1972) ; *Gilbert v. El Paso Co.,* 490 A .2d 1050, 1057 (Del. Ch.1984)). Plaintiffs have alleged a concerted effort on the part of all the Defendants to carry out the insider deal for the benefit of Defendant Trump, despite their knowledge that the Transaction was not in the best interests of the corporation or its shareholders. Thus, Plaintiffs have alleged the requisite knowledge for the third party aiding and abetting claims against the remaining Trump Defendants and Salomon Brothers Accordingly,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Defendants' motions to dismiss these claims are DENIED.

### 5. Waste

The judicial standard for determination of corporate waste entails "an exchange of corporate asset for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del. Ch 1997). "If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky." *Id. See also Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000) (describing the "stringent requirements of the waste test").

Plaintiffs bring a claim for waste against Trump and the Director Defendants under two separate theories. Compl. ¶ ¶ 193-99. Plaintiffs first allege that Trump and the Director Defendants should be liable for the alleged wasted resources necessary to explore renovation plans with non-party Colony. Plaintiffs cite no authority supporting their claim that the expenses incurred in exploratory discussions may be recouped by the corporation when those plans fail. Further, Plaintiffs fail to provide a factual basis for this claim.

Defendants argue that the Complaint is internally inconsistent because it states that the proposed Colony Transaction was a windfall for Colony but also that Colony withdrew from the deal based on economic concerns, suggesting, Defendants argue, that the deal may have been beneficial to THCR as well. *See* Trump Mem. Law at 60; Compl. ¶ ¶ , 117, 122. Defendants argue simply that "reasonable minds might differ" as to the value of the negotiations thus precluding a claim of waste as a matter of law. *See* Trump Mem. Law at 60 (citing *Uni-Marts, Inc. v. Stein,* No. 14713, 1996 WL 466961, at *6 (Del. Ch. Aug. 12 1996)).

**\*20** Plaintiffs have failed to assert factual allegations to support their claim and cannot meet the high burden for claims of waste based upon the conclusory allegations before the Court. Accordingly, Plaintiffs' waste claim concerning the Colony-related expenses is DISMISSED.

Plaintiffs next claim that no person of sound business

judgment would deem Castle Associates worth what THCR agreed to pay or actually paid and thus, that Trump and the Director Defendants are liable for waste. Trump and the Director Defendants counter that the final purchase price was "only about 20 percent higher" than the $400 million valuation cited in the Complaint and was thus a reasonable business judgment. Trump Mem. Law at 26.

Plaintiffs' waste claim is frustrated by the absence of an independent financial evaluation of the Trump Transaction. However, Plaintiffs offer substantial circumstantial evidence to support their claim of waste. For example, even at closing, when THCR paid $485 million for Castle Associates, Richard Sokol, Vice President of Equity Research for Massachusetts Financial Services stated in *The Wall Street Journal:* "The bottom line is, we think the deal is mispriced. I think they paid about $100 million too much. [Trump's Castle] is worth about $400 million." Compl. ¶ 69. Plaintiffs now claim that even this figure, cited in their Complaint, was an "optimistic valuation" and may overstate the value of Trump's Castle. Pls.' Mem. Law at 46.

Plaintiffs point out that the value of Trump's Castle slumped further during the three months between the date of agreement and the date of shareholder approval. Compl. ¶ ¶ 83, 85. THCR had originally agreed to pay $525 million, which reflected the greater value of THCR stock at the time of the deal's announcement. Compl ¶ 66. Thus, TCHR agreed to pay approximately $125 million more than the $400 million estimate cited in the Complaint and now deemed "optimistic" by the Plaintiffs. In addition, according to the Complaint, the original $525 million price tag was said to be almost 10 times Trump's Castle's annual estimated 1996 cash flow of $55 million, which was substantially higher than reflected in several other then-recent gambling acquisitions. Compl. ¶ 69.

Further, Plaintiffs cite to both the Rank and Colony deals, which collapsed in the months just after the Transaction, to support their allegation that THCR overpaid for Trump's Castle. Compl. ¶ 123. Specifically, Plaintiffs suggest that the unwillingness of Rank and Colony to enter into business agreements demonstrates "the poor future prospects for Trump's Castle." *Id.*

Finally, the price of THCR stock dropped over 20 percent after the announcement of the Trump's Castle deal. Compl. ¶ 68. Plaintiffs attribute this drop in THCR's stock price to the announcement of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
(Cite as: Not Reported in F.Supp.2d)

Trump Transaction and allege the drop reflected shareholder disapproval of the proposed Transaction. *Id.*

Plaintiffs have alleged facts from which this Court could ascertain that " '*no* business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." ' *Brehm v. Eisner*, 746 A.2d 244, 263 (Del.2000) (quoting *Glazer v. Zapata Corp.*, 658 a.2d 176, 183 (Del. Ch.1993) (emphasis added) (internal citation omitted). Accordingly, Defendants' motion to dismiss Plaintiffs' waste claim concerning the Trump Transaction is DENIED.

### 6. *Remaining Claims Against Salomon Brothers*

**\*21** Finally, Plaintiffs bring claims for negligence and negligent misrepresentation against Defendant Salomon Brothers. In its defense Salomon Brothers raises an indemnification contract between THCR and Salomon that requires indemnification for all suits except those "finally and judicially determined to have resulted primarily from [Salomon Brothers'] willful misconduct, bad faith or gross negligence." *See* Daniels Aff. Ex. A at 1.

Defendant Salomon Brothers argues that Plaintiffs are "stepping into the shoes" of the Company and thus are bound by THCR's waiver of suit precluding, *inter alia*, the negligence and negligent misrepresentation claims. Salomon Brothers' Reply Mem. at 13 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984)).

However, the indemnification clause is a matter outside of the pleadings. Unlike the clause previously addressed, the parties have not fully briefed this issue.

Salomon Brothers placed a clandestine footnote raising the defense in its initiating motion papers, but Plaintiff failed to respond to this defense in their papers. Thus, it appears from a reading of Plaintiffs' opposition, that they were not substantively on notice of Salomon's indemnification defense.

In the alternative, Defendants also urge the Court to deem the indemnity contract integrated into the Complaint citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991). However, Defendants do not offer sufficient citation to the Complaint to justify the alleged integration.

Accordingly, Defendants' motion to dismiss the negligence claims based on their indemnification clause defense is DENIED at this time without prejudice to renew if appropriate after discovery.

### III. CONCLUSION

Plaintiffs have sufficiently alleged the futility of demand upon the Board with respect to their claims against the Trump and Director Defendants and Salomon Brothers. With respect to the claims against the Trump and Director Defendants, the Court hereby GRANTS the motion to dismiss as to the claim of waste for expenses related to the Colony transaction. In addition, the motion to dismiss the direct fiduciary claims as against Trump Casino and the other nonfiduciary Trump Defendants is GRANTED. The remainder of the Trump and Director Defendants' motion to dismiss is DENIED.

With respect to the claims against Salomon Brothers, the Court hereby GRANTS the motion to dismiss as to the direct fiduciary duty claims and DENIES the motion as to the federal proxy and fiduciary aiding and abetting claims. Further, the Court DENIES the motion to dismiss the negligence claims against Salomon Brothers.

Plaintiffs shall file and serve their Fourth Amended Complaint in accordance with this Opinion within 20 days of the date of this Order. Defendants shall answer the Complaint within 20 days of service. FN9

> FN9. Ordinarily, a Defendant retains the right to move or answer as to an amended complaint. *See* Fed.R.Civ.P. 15. However, because this Opinion resolves all of the pending issues raised by Plaintiffs' limited amendment and because the Court has fully considered Defendants' procedural and substantive arguments in opposition to the amendment submitted by letter brief, Defendants are now directed to answer the remaining claims. *See* Salomon Ltr. of April 6, 1998; Trump Ltr. of April 9, 1998.

SO ORDERED.

S.D.N.Y.,2000.
In re Trump Hotels Shareholder Derivative Litigation
Not Reported in F.Supp.2d, 2000 WL 1371317

Briefs and Other Related Documents (Back to top)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1371317
**(Cite as: Not Reported in F.Supp.2d)**

- • 1:96cv08527 (Docket) (Nov. 13, 1996)
- • 1:96cv07820 (Docket) (Oct. 16, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2005 WL 1773686
**(Cite as: Slip Copy)**

**H**
Slip Copy, 2005 WL 1773686
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
HALPERT ENTERPRISES, INC., derivatively on
behalf of nominal defendant J.P. Morgan Chase &
Co., Plaintiff,
v.
William B. HARRISON, Jr., Hans W. Becherer,
Riley P. Bechtel, Frank A. Bennack, Jr., Lawrence A.
Bossidy, M. Anthony Burns, H. Laurance Fuller,
Ellen V. Futter, William H. Gray, III, Helene L.
Kaplan, Lee R. Raymond, John R. Stafford, Lloyd D.
Ward and Marina v .N. Whitman, Defendants,
and J.P. MORGAN CHASE & CO., a Delaware
Corporation, Nominal Defendant.
No. 02CIV9501SHS.

July 26, 2005.

*OPINION & ORDER*

STEIN, J.
*1 On March 28, 2005, this Court issued an Opinion
and Order dismissing the amended complaint in this
action for failure to plead the futility of making a
demand upon the Board of Directors of J.P. Morgan
Chase & Co. in conformity with the requirements of
Fed.R.Civ.P. 23.1. *See Halpert Enters., Inc. v.
Harrison, 362 F.Supp.2d 426 (S.D.N.Y.2005).* The
Court granted plaintiff Halpert Enterprises, Inc. leave
to file a second amended complaint, which it has
done. Defendants have now moved to dismiss that
Verified Second Amended Shareholder Derivative
Complaint ("Second Amended Complaint"). That
motion is granted because Halpert has failed to
remedy the deficiencies set forth in this Court's
March 28, 2005 Opinion.

The Second Amended Complaint contains, as did its
predecessor, claims against members of the Board of
Directors of J.P. Morgan Chase & Co. (the
"Directors," the "Board" or "defendants") for: 1)
violating Section 14(a) of the Securities Exchange
Act of 1934, 15 U.S.C. § 78n(a), in failing to
disclose material liabilities in filings submitted to the
Securities and Exchange Commission; 2) breaching
fiduciary duties in failing to supervise and monitor
J.P. Morgan Chase's operations and in failing to seek
legal redress for harm to the company; 3) grossly

mismanaging the bank; and 4) wasting the bank's
assets. Halpert purports to bring all of its claims
derivatively on behalf of the corporation, thereby
triggering an obligation to adhere to the requirements
of Fed.R.Civ.P. 23.1.

The Directors now move to dismiss the Second
Amended Complaint-which is 147 pages long-on the
ground that Halpert has not pled with requisite
particularity that it would have been futile for Halpert
to have made a demand on the Directors that J.P.
Morgan Chase itself bring this action. In addition, the
Directors urge that Halpert's Section 14(a) claim is
merely a garden-variety breach of fiduciary duty
claim and is, in part, moot. Defendants' motion to
dismiss the Second Amended Complaint is granted,
because Halpert has failed to allege with the
necessary particularity that it would have been futile
to have made a demand on the Board. FN1

> FN1. The parties dispute whether Halpert
> must plead futility of demand with respect to
> the Board as it existed as of the date of the
> filing of the original complaint in this action
> or with respect to the Board as it existed as
> of the filing of the Second Amended
> Complaint. The Court need not reach that
> issue, however, because regardless of what
> date is operative for futility pleading
> purposes, Halpert has failed to satisfy the
> requirements of Fed.R.Civ.P. 23 .1.

The previously dismissed complaint contained
allegations relating to J.P. Morgan Chase's
transactions with the Enron Corporation. The Second
Amended Complaint includes supplemented
allegations relating to Enron, as well as a laundry list
of newly alleged instances of purported breaches of
fiduciary duties. As Halpert has characterized it, the
Second Amended Complaint asserts allegations
concerning:
(a) a myriad of unlawful financial arrangements
with Enron to ensure the Company's lucrative
relationship with Enron[;] ...
(b) failing to conduct due diligence that would
have uncovered the extensive fraud at WorldCom
in conjunction with underwriting the issuance of
$18 billion in WorldCom bonds[;] ...
(c) funding and thereby profiting from the illegal
practice of market timing in connection with the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trading of mutual funds[;] ...

**\*2** (d) violating National Association of Securities Dealers ("NASD") rules by making recommendations and sales of mutual funds to their customers without considering or adequately disclosing, on a consistent basis, that an equal investment in Class A shares would generally have been more economically advantageous for their customers by providing a higher overall rate of return[;] ...

(e) violating Securities and Exchange Commission ("SEC"), NASD and New York Stock Exchange ("NYSE") rules by failing to adequately separate the Analyst functions of the Company from the Investment Banking business of the Company that resulted in improper influence of the Investment Banking business over analyst functions[;] ...

(f) violating SEC and NASD rules in connection with the underwriting of IPOs [;] ... and

(g) failing to preserve documents requested by the SEC in relation to an investigation into J.P. Morgan.

(Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss the Second Amended Complaint at 3-4); *see also* Second Amended Complaint. Halpert maintains that making a demand on the Board would have been futile, but the Second Amended Complaint contains allegations relating to the putative futility of demand that are substantially identical to those that the Court previously held insufficient to satisfy the particularity requirement of Fed.R.Civ.P. 23.1. *See* Halpert, 362 F.Supp.2d 426.

Halpert contends that even though it has not meaningfully augmented its demand futility allegations, it has alleged a gallimaufry of new misdeeds on the part of J.P. Morgan Chase that relate not only to the Enron debacle, but also to several other corporate scandals. According to Halpert, those alleged misdeeds constitute "red flags," of which the Directors should have been aware. Halpert maintains that those "red flags" evince the futility of demand. Halpert's litany of new substantive allegations fails to demonstrate that "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984), *overruled on other grounds by* Brehm v. Eisner, 746 A.2d 244, 253-54 (Del.2000).

Halpert's allegations do not overcome the presumption of the business judgment rule. *See* Aronson, 473 A.2d at 812. Halpert has failed to

"plead with particularity what obvious danger signs were ignored or what additional measures the directors should have taken." *In re* Baxter Int'l, Inc. Sec. Litig., 654 A.2d 1268, 1271 (Del.Ch.1995); *see also* Simon v. Becherer, 7 A.D.3d 66, 72-73, 775 N.Y.S.2d 313 (1st Dep't 2004) ; *In re* Citigroup Inc. S'holders Litig., No. 19827, 2003 WL 21384599, at \*2 (Del. Ch. June 5, 2003); *see also* Rattner v Bidzos, No. Civ.A 19700, 2003 WL 22284323, at \*12-13 (Del. Ch. Oct. 7, 2003) ; *Guttman v. Huang,* 823 A.2d 492, 506-07 & n. 36 (Del. Ch.2003). Indeed, Halpert never proffers more than conclusory allegations that the directors should have known about alleged wrongdoing. *See* In re Citigroup, 2003 WL 21384599, at \*2; *Fink v. Komansky,* No. 03CV0388, 2004 WL 2813166, at \*4-5 (S.D.N.Y. Dec. 8, 2004) In other words, the Second Amended Complaint lacks particularized allegations suggesting that any red flags were hoisted within the Board's field of vision. *See* In re Citigroup, 2003 WL 21384599, at \*2 ("Red flags 'are only useful when they are either [waved] in one's face or displayed so that they are visible to the careful observer.").

**\*3** It is beyond cavil that J.P. Morgan Chase suffered losses as a result of scandals reflected in the Second Amended Complaint. "The fact of those losses, however, is not alone enough for a court to conclude that a majority of the corporation's board of directors is disqualified from considering a demand that [J.P. Morgan Chase] bring suit against those responsible." *In re* Citigroup, 2003 WL 21384599, at \*3. The Second Amended Complaint must be dismissed because it fails to allege with particularity the futility of making a demand on the Board.

Halpert denominated its complaint a "Shareholder Derivative Complaint" and specifically set forth that each claim is a "derivative claim." (*See* Second Amended Complaint ¶ ¶ 355-374) Accordingly, Halpert's claim pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), is dismissed-as are Halpert's other claims-for failure to plead demand futility with adequate particularity. *See* Fed.R.Civ.P. 23.1. Nevertheless, even were Halpert's claim pursuant to Section 14(a) to be construed as one brought directly rather than derivatively on behalf of J.P. Morgan Chase, it would still merit dismissal, because it merely alleges that members of the Board failed to accuse themselves of wrongdoing for allegedly being oblivious to improprieties perpetuated by others. *See* Koppel v. 4987 Corp., 167 F.3d 125, 133-34 (2d Cir.1999) ; *Field v. Trump,* 850 F.2d 938, 947 (2d Cir.1988). Given the absence of any specific allegations against

Slip Copy

Slip Copy, 2005 WL 1773686

**(Cite as: Slip Copy)**

any individual defendant for actively engaging in any wrongdoing, Halpert's Section 14(a) claim amounts to nothing more than an attempt to dress up an ordinary state breach of fiduciary duty claim in federal securities law clothing, a maneuver that the caselaw plainly prohibits. *See Field,* 850 F.2d at 947.

Defendants' motion to dismiss the Second Amended Complaint is granted in light of Halpert's failure to comply with the particularity requirement of Fed.R.Civ.P. 23.1. After several years and three complaints, Halpert has demonstrated an inability to proffer allegations substantiating demand futility. Thus, Halpert's request for leave to submit yet another amended complaint in the event of dismissal is denied, as re-pleading would be futile. *See Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

S.D.N.Y.,2005.

Halpert Enterprises, Inc. v. Harrison

Slip Copy, 2005 WL 1773686

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 97125
(Cite as: Not Reported in F.Supp.)

**C**
Not Reported in F.Supp., 1994 WL 97125
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
OMNI FINANCIAL CORPORATION, Plaintiff,
v.
Arthur G. COHEN, Stephen Shalom and Baldwin
Securities Corporation, Defendants.
No. 91 Civ. 6837 (RO) (THK).

March 22, 1994.

MEMORANDUM OPINION AND ORDER

THEODORE H. KATZ, United States Magistrate
Judge.
*1 The Complaint in this action alleges two claims
under the Investment Company Act of 1940 (the
"ICA"), 15 U.S.C. § § 80a-1, et seq., for deviation
from the defendant company's investment policy
without required shareholder approval, and state law
claims based upon common law fraud, negligent
misrepresentation, breach of fiduciary duty and
breach of contract. Federal jurisdiction is alleged
under Section 44 of the ICA, 15 U.S.C. § 80a-43,
and under principles of pendent or supplementary
jurisdiction. Complaint ¶ 3. The parties have
consented to trial before me, pursuant to 28 U.S.C. §
636(c). Currently before the Court is Defendants'
Motion to Dismiss the Complaint pursuant to Rule
12(b)(6) of the Federal Rules of Civil Procedure.
For the reasons that follow, I conclude that the
motion should be granted.

BACKGROUND

Plaintiff Omni Financial Corporation brought this
action on behalf of itself and three classes of
shareholders FN1 of Defendant Baldwin Securities
Corporation ("Baldwin" or the "Company") against
Baldwin, Arthur G. Cohen, Chairman of the Baldwin
Board of Directors, and Stephen Shalom, Baldwin's
President and a director of the Company. The
following factual history, alleged in the Complaint
and accepted as true for the purpose of deciding
Defendants' Motion to Dismiss, forms the basis for
Plaintiff's federal claims. FN2

Prior to 1987, Baldwin operated as a closed-end,
diversified management investment company
registered under the ICA. According to the
Company's Form N-2 Registration Statement, dated
June 2, 1986, which was filed with the Securities and
Exchange Commission (the "SEC"), one of Baldwin's
fundamental investment policies was not to invest
more than 25% of the value of its assets in any
particular company or industry (the "25% Policy").
Complaint ¶ ¶ 1, 11.

On September 22, 1986, Defendants Cohen and
Shalom entered into a Stock Purchase Agreement
(the "Agreement") for the purpose of acquiring
control of Baldwin. Complaint ¶ 12. Cohen and
Shalom each purchased 750,000 shares of Baldwin
stock which gave them, together, a controlling
interest in the Company. Id They also agreed to
convert Baldwin from an investment company into an
operating company. Id

On November 24, 1986, the Company made a tender
offer for its own shares (the "Tender Offer").
Complaint ¶ 14. Cohen and Shalom sent to
Baldwin's shareholders, along with the Tender Offer
documents, a letter signed by Shalom (the "Letter")
disclosing their purchase of a controlling interest in
the Company and outlining their business plan for
Baldwin. Complaint ¶ 14. According to the Letter,
Baldwin would continue to be publicly owned and
traded on the American Stock Exchange but would
"cease to be an investment company" under the ICA
and would instead become an operating company.
Complaint ¶ 15. The Letter stated that Baldwin
would now "actively seek to acquire and operate
suitable businesses" and that Cohen and Shalom had
already begun reviewing potential acquisitions.
Complaint ¶ 16. The Letter further stated that
Baldwin would continue to invest in securities with
growth potential in order to maintain liquidity and
that Baldwin might "participate" with others in the
acquisition and management of undervalued
companies. Complaint ¶ ¶ 17, 18. These
representations were substantially reiterated in the
Tender Offer documents. Complaint ¶ 19.

*2 By a proxy statement dated January 16, 1987,
Defendants called a special meeting of shareholders
for the purpose of seeking shareholder approval of
proposals (i) to change the nature of Baldwin's
business, converting it from an investment company

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 97125
**(Cite as: Not Reported in F.Supp.)**

to an operating company, and (ii) to seek "control positions" in operating companies which maintain strong competitive positions in their respective markets.    Complaint ¶ ¶  21-22.    The proxy statement also discussed deregistration under the ICA and its anticipated consequences, as well as Defendants' proposal to "amend the company's investment guidelines" in accordance with the changes in the nature of its business.    Complaint ¶ 21.    These proposals were approved at the shareholders' meeting, which took place on January 28, 1987.  Complaint ¶ 22.

On January 29, 1987, defendants filed an application with the SEC (the "Application"), under Sections 8(f) and 3(b)(2) of the ICA, for an order declaring that Baldwin ceased to be an investment company.  In the cover letter transmitting the Application, the Company stated that it "plans to embark on a program of acquisitions and other investments as part of the process by which it changes its business from an investment company to an operating company." Complaint ¶ 23.  In the Application, Baldwin stated that its shareholders had approved the proposed changes in the nature of the Company's business and investment policies, and that "substantially all of the management's time would go to identifying potential targets for control."  Complaint ¶ 24.

On April 14, 1987, Defendants filed an amendment to the Application, stating that in the event the Company deregistered Baldwin under the ICA, the Company would not, "at any time thereafter, acquire any investment securities other than securities or entities which are, at the time of such acquisition, controlled by [the Company]."  On May 20, 1987, the SEC granted Baldwin's application for deregistration. Complaint ¶ 25.

The gravamen of Plaintiff's federal claims, Counts I and II of the Complaint, is the allegation that Defendants intentionally misled shareholders and the SEC concerning Baldwin's future investment plans. Complaint ¶ ¶ 42-43.  This allegation is stated most pointedly in paragraph 26 of the Complaint, which reads (in pertinent part):

[D]efendants never intended nor attempted to acquire control or operating interests in companies. Instead, they continued to make ever larger non-diversified passive investments in related companies.  Thus, the defendants did not intend to, and did not implement the change in Baldwin's investment policy as stated in the Letter, the Tender Offer Documents, the Proxy Statement and the Application.    They sought approval of that change in an illegal effort to continue to operate as an investment company without the limitations, restrictions and fiduciary obligations imposed upon investment companies by ICA.

Complaint ¶ 26.    Alleged examples of passive investments made by Baldwin in contravention of its new stated objectives included minority interests in The First Women's Bank, Handy and Harman and Bilzerian Partners Limited Partnership 1.  Complaint ¶ ¶ 27-31.    In at least one instance, that of the Bilzerian Partnership purchase in January, 1988, Baldwin's investment in one company violated the 25% Policy in Baldwin's 1986 registration statement. Complaint ¶ 43.

*3 Baldwin's financial position deteriorated, and on January 31, 1991, the Company was delisted from the American Stock Exchange.    Complaint ¶ ¶  28-39. Within four years, the Company was "totally destroyed," resulting in "millions of dollars" of losses for its shareholders.  Complaint ¶ 1.

Plaintiff instituted this action for damages alleging, *inter alia,* violations of its rights under the Investment Company Act:   Count I alleges that Baldwin deviated from the 25% Policy in its 1986 SEC registration statement without valid shareholder authorization, thereby violating ICA § 13(a)(3), 15 U.S.C. § 80a-13(a)(3) ;  Count II alleges that by causing Baldwin to violate § 13(a)(3), Defendants Cohen and Shalom violated § 48 of the ICA, 15 U.S.C. § 80a-47.  Counts I and II are alleged to have injured the Class A shareholders.  Counts III through VI allege state law claims of common law fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract.

Defendants have moved to dismiss Counts I and II pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds that:   (1) they did not violate § 13(a)(3) of the ICA because at the time of the challenged purchases, Baldwin was no longer a registered investment company subject to the ICA; and    (2) Plaintiff's claims are time-barred. Defendants have moved to dismiss Counts III through VI (the state law claims) for lack of subject matter jurisdiction.

## DISCUSSION

In deciding a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., the Court must construe the allegations of the complaint in plaintiff's favor.    *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).    Only if "it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 3
Not Reported in F.Supp., 1994 WL 97125
**(Cite as: Not Reported in F.Supp.)**

appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief" is dismissal warranted. _Conley v. Gibson,_ 355 U.S. 41, 45-46 (1957).

## I. ICA § 13(a)(3)

Section 13(a)(3) of the Investment Company Act states that

> No registered investment company shall, unless authorized by the vote of a majority of its outstanding voting securities ... deviate from its policy in respect of concentration of investments in any particular industry or group of industries as recited in its registration statement, deviate from any investment policy which is changeable only if authorized by shareholder vote, or deviate from any policy recited in its registration statement pursuant to section 80a-8(b)(3) of this title.

15 U.S.C. § 80a-13(a)(3). Plaintiff's § 13(a)(3) claim-Count I-alleges that "Baldwin deviated from [the 25% Policy recited in the Company's 1986 registration statement] ..., particularly with respect to the Bilzerian Partnership, and such deviation was not approved by the stockholders." Complaint ¶ 43.

Plaintiff's allegation that Baldwin made an investment in Bilzerian, on January 13, 1988, that deviated from the 25% Policy will be accepted as true for the purpose of the instant motion. It remains to be determined, however, whether this assumed fact could constitute a violation of ICA § 13(a)(3).

**\*4** By its terms, § 13(a)(3) applies only to _registered_ investment companies. Further, the statute does not absolutely forbid deviations from the enumerated policies; only deviations that are not authorized by the vote of a majority of outstanding voting securities are proscribed. It follows that for Plaintiff to have stated a claim under § 13(a)(3) it must be possible to find, based upon the allegations of the Complaint: (1) that Baldwin was, at the time of the deviation, a "registered investment company" subject to the restrictions of the 25% Policy; and (2) that the alleged deviation from that policy was not authorized as required by § 13(a)(3).

### A. Baldwin was not subject to the 25% Policy at the time of the alleged deviations

For the reasons that follow, I find that Baldwin was not a registered investment company subject to the 25% Policy after May 20, 1987, and therefore a §

13(a)(3) claim cannot arise from the Company's actions thereafter.

Upon application by Baldwin, pursuant to ICA § § 3(b)(2) and 8(f), the SEC issued an order, on May 20, 1987, declaring that Baldwin was no longer an investment company as defined under the Act. Complaint ¶ ¶ 23 and 25. Section 8(f) provides that "[w]henever the Commission, on its own motion or upon application finds that a registered investment company has ceased to be an investment company, it shall so declare by order and upon the taking effect of such order the registration of such company shall cease to be in effect." 15 U.S.C. § 80a-8(f). Accordingly, the effect of the SEC's order of May 20, 1987 was to cause Baldwin's registration as an investment company to cease to be in effect from that day forward.

Plaintiff contends, however, that the deregistration order should be deemed null and void. The Complaint alleges that shareholder approval of the proposed conversion of Baldwin's business from an investment company to an operating company and corresponding change in Baldwin's investment policies was fraudulently procured, because Defendants never intended to implement the conversion, and therefore should be deemed invalid. Complaint ¶ ¶ 1, 24, 26, 42. Plaintiff further alleges that the deregistration order was a nullity because the SEC, in granting the Application, had relied upon the statement in it that shareholders had approved the changes, _Id.,_ and upon false representations, in the amendment to the Application, concerning the investment policy that Baldwin would implement following deregistration. Complaint ¶ 25. Plaintiff then argues that because the shareholder approvals and the deregistration order were nullities, Baldwin remained subject to the constraints of the ICA and its initial registration statement. Complaint ¶ ¶ 1, 42; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, at 10, 11, 22.

In effect, Plaintiff asks this Court to invalidate or disregard the SEC deregistration order. I find, as a matter of law, that such relief is unavailable. First, the Investment Company Act contains no express grant of authority for this Court to invalidate, at the behest of a private party, an order of the SEC declaring that a company ceased to be an investment company subject to the ICA, upon a finding of fraudulent misrepresentation in the application for such order. Furthermore, no cases have been cited to the Court, and none have been found, holding that a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 97125
**(Cite as: Not Reported in F.Supp.)**

court has such authority. In fact, recognition of a private right of action on the part of shareholders to sue in district court for invalidation of orders of the SEC affecting the companies in which they hold stock is inconsistent with the existing statutory scheme.

**\*5** ICA Section 3(b) exempts certain persons from the provisions of the Act. Subsection 3(b)(2) (pursuant to which the SEC issued the Baldwin deregistration order) exempts "[a]ny issuer which the Commission, upon application by such issuer, finds and by order declares to be primarily engaged in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities either directly or (A) through majority-owned subsidiaries or (B) through controlled companies conducting similar types of businesses." 15 U.S.C. § 80a-3(b)(2). Subsection 3(b)(2) further provides: "Whenever the Commission, upon its own motion or upon application, finds that the circumstances which gave rise to the issuance of an order granting an application under this paragraph no longer exist, the Commission shall by order revoke such order." Section 42(a) of the ICA enables shareholders to seek review of SEC orders in United States Courts of Appeals, but only after the objection to an order has been "urged before the Commission ... unless there were reasonable grounds for failure so to do." 15 U.S.C. § 80a-42(a). *See Phillips v. Tobin*, 403 F.Supp. 89, 93 (S.D.N.Y.1975) (Dismissing a count attacking as void an order of the SEC deregistering the defendant company under the ICA, the court observed: "Review of such orders rests with the courts of appeal; this Court lacks subject matter jurisdiction. 15 U.S.C. § 80a-42."). Thus, the statute provides the SEC, in the first instance, the opportunity and authority to revoke its deregistration order, and provides for subsequent objections to SEC actions in the Court of Appeals.

Viewed in another way, the relief Plaintiff seeks would require this Court to retroactively reinstate Baldwin's 1986 ICA registration that ceased to be in effect as a result of the SEC's order. The ICA does not expressly grant shareholders a right to seek such a remedy, and the parties have not cited, nor has the Court found, any cases implying a cause of action that would support such a shareholder remedy. Rather, related cases weigh heavily against implication of such a right. Courts have held, and Plaintiff does not dispute, that a shareholder has no private cause of action to require the registration of an unregistered investment company. *See M.J. Whitman & Co. Pension Plan v. American Fin.*

*Enterprises, Inc.*, 552 F.Supp 17 (S.D.Ohio 1982), *aff'd on different grounds*, 725 F.2d 394 (6th Cir.1984) ; *Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, 918-19 (S.D.N.Y.1986); *accord Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944 (1st Cir.1991), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172 (1992) (ICA does not compel registration; instead it forbids a public offering without registration and SEC approval). A right of shareholders to compel retroactive registration after the SEC has deregistered a company suggests a power greater, and more intrusive on the regulatory authority of the SEC, than a right to seek registration prospectively; if the lesser right has been found not to exist, then, *a fortiori,* the greater right cannot be implied.

**\*6** Plaintiff could have sought, but did not seek, SEC revocation of its deregistration order and, if denied, could have obtained Court of Appeals review of such denial. 15 U.S.C. § § 80a-3(b)(2) , 80a-42(a). Plaintiff having failed to pursue those remedies, this Court must give effect to the SEC deregistration order as issued. Accordingly, Baldwin's 1986 registration statement was not in effect as of May 20, 1987, and no § 13(a)(3) violation can be claimed based upon actions of the Company thereafter. *Cf Greenberg v. Institutional Investor Systems, Inc.*, Fed.Sec.L.Rep. ¶ 95,231, 1975 WL 402, at \*2 (S.D.N.Y.1975) (proper remedy for injury resulting from fraudulently procured deregistration is to seek relief by attacking fraud directly rather than proceeding under statute that no longer applies). *Compare Entel v. Allen*, 270 F.Supp. 60, 66 (S.D.N.Y.1967) (SEC order deregistering company did not relieve company of liability for violations of ICA committed prior to deregistration (citing *Breswick & Co. v. Briggs*, 135 F.Supp. 397 (S.D.N.Y.1955))).

The only deviation from the 25% Policy that is specifically alleged in the Complaint is Baldwin's acquisition of an interest in the Bilzerian Partnership in January, 1988. Complaint ¶ 43; *see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint, at 10-11, characterizing the Complaint's challenges to Baldwin's post-deregistration conduct. Having occurred well after the Company ceased to be registered under the ICA, this deviation cannot serve as the basis for a § 13(a)(3) claim.

*B. Plaintiff has failed to allege a violation of the requirements of § 13(a)(3)*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 97125
(Cite as: Not Reported in F.Supp.)

Plaintiff's real and only claim with respect to the alleged deviations from the Company's 25% Policy is that shareholder approval was fraudulently procured. This, by itself, does not give rise to a claim under § 13(a)(3). This is so because the requirements of § 13(a)(3) were met. The statute requires only that a simple majority of outstanding voting securities approve a deviation from the Company's enumerated policies. There is no allegation here that the proposed changes in the nature of Baldwin's business and in its investment policies were not approved by a majority of shareholders, nor could there be, for it is uncontested that Defendants Cohen and Shalom collectively held 55% of Baldwin's outstanding voting shares on January 28, 1987, and they undoubtedly voted their shares in favor of their proposals. Nor has Plaintiff alleged that the Company deviated from the 25% Policy in ways that fell outside the scope of the authorization conferred by shareholders at the January 28, 1987 meeting.

Plaintiff's contention that fraudulent information was disseminated in connection with the shareholder meeting and vote and submitted to the SEC is more properly viewed as an alleged violation of § 20(a) FN3 or § 34(b) FN4 of the ICA, the statutes that proscribe false and misleading information in proxy statements and other documents filed pursuant to the Act. Section 20(a), as is true of its counterpart in the Securities Exchange Act of 1934, Section 14(a), is intended to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations. *See J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964)* ; *Cohen v. Colvin, 266 F.Supp. 677, 683-84 (S.D.N.Y.1967)* ; *Krinsk v. Fund Asset Management, Inc., 654 F.Supp. 1227, 1231-33 (S.D.N.Y.1987), aff'd, 875 F.2d 404 (2d Cir.), cert denied, 493 U.S. 919 (1989).*

*7 In *Potomac Capital Markets Corp. v. Prudential-Bache Corporate Dividend Fund, Inc., 726 F.Supp. 87, 94 n. 6 (S.D.N.Y.1989)*, the Court explained the difference between issues addressed by § 13(a)(3) and those addressed by § § 20(a) and 34(b), observing that "Section 13(a)(3) regulates the application of statements contained in documents" while "Section 20a and 34(b) proscribe misleading omissions in documents." Given this distinction, the *Potomac* court found no contradiction between: (1) its decision to grant defendants' motion to dismiss claims under § § 20(a) and 34(b), because it found that the proxy statement and prospectus at issue were not materially misleading, and (2) its decision to deny defendants' motion to dismiss a claim under § 13(a)(3) because there was an issue of fact as to whether actions taken by the company that admittedly deviated from its stated investment policies were within the scope of authority granted by shareholder approval of statements in proxy materials. *Id* at 93-94.

I see no basis for departing from the distinction drawn in the *Potomac* decision. The caselaw determining claims under § 13(a)(3) is sparse, but consistent; causes of action under § 13(a)(3) are recognized where there is a claim that a registered investment company did not obtain the required shareholder approval prior to departing from the investment policy set forth in its still effective registration statement, *see, e.g., Monheit v. Carter, 376 F.Supp. 334, 339 (S.D.N.Y.1974)*, or that its actions following approval were not within the authority granted, *see, e.g., Potomac, 726 F.Supp. at 93-94. Cf Green v. Brown, 276 F.Supp. 753, 756 (S.D.N.Y.1967)* (whether plaintiff or defendant was entitled to grant of summary judgment on claim under ICA § 13(a)(3) depended upon whether the policy violated without shareholder approval was encompassed by that section). There is no authority for the proposition that investors have a cause of action under § 13(a)(3) where holders of a majority of outstanding shares are found to have approved the alleged deviation from policy and the only remaining basis for relief is that the defendants had provided shareholders misleading information in materials soliciting shareholder votes. FN5

II. *§ 20(a) of the ICA*

Even if Plaintiff's § 13(a)(3) claim was recast as a claim under ICA § 20(a), it would still fail for two reasons. First, Plaintiff is unable, as a matter of law, to prove causation. Second, even if Plaintiff could prove causation, the claim would be barred by the applicable statute of limitations.

A. *Causation*

A claim does not 'arise under' federal law unless there is a causal relationship between an alleged violation of federal law and the injury that is the basis of the claim. *See, e.g., Barnett v. Anaconda Co., 238 F.Supp. 766, 770-73 (S.D.N.Y.1965)*, and cases cited therein. Thus, in order to state a claim for violation of a federal statute proscribing misleading information in a proxy statement, the damage

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1994 WL 97125
**(Cite as: Not Reported in F.Supp.)**

complained of must be causally related to the alleged misleading information. _Monheit v. Carter_, 376 F.Supp. at 339; _Robbins v. Banner Indus., Inc._, 285 F.Supp. 758, 762 (S.D.N.Y.1966) ; _Barnett_, 238 F.Supp. at 769; _Hoover v. Allen_, 241 F.Supp. 213, 230-33 (S.D.N.Y.1965).

\*8 In _Hoover v. Allen_, the court held that minority stockholders could not show causation, and thus failed to state a claim under either § 20(a) of the Investment Company Act of 1940 or § 14(a) of the Securities and Exchange Act of 1934, where defendants owned more than the requisite number of shares to effect a change in the company's charter regardless of the other shareholders' votes. This was because the alleged false and misleading statements in the proxy solicitation at issue, though a statutory violation, could not have been the proximate cause of the plaintiff's injury. The holding of _Hoover_ is consistent with the Supreme Court's decision in _Virginia Bankshares, Inc. v. Sandberg_, 501 U.S. 1083, 111 S.Ct. 2749 (1991), an action brought pursuant to the Securities and Exchange Act of 1934, in which the district court awarded damages to minority shareholders based upon a finding of materially misleading statements in a proxy statement soliciting shareholder approval of a "freeze-out" merger. The Supreme Court reversed, holding that a shareholder whose vote was not required by law or corporate bylaw to effect the challenged transaction could not demonstrate causation sufficient to invoke the implied right of action for damages compensable under § 14(a) of the 1934 Act, where there was no indication in law or the facts of the case that the deceptive statement resulted in a shareholder's loss of a state remedy. _Virginia Bankshares, Inc. v. Sandberg_, 111 S.Ct. at 2761-66.

Proxy regulation under the ICA § 20(a) parallels that under § 14 of the 1934 Act. _See, e.g._, _Katz v. Pels_, 774 F.Supp. 121, 127 n. 6 (S.D.N.Y.1991) ; _Krinsk v. Fund Asset Management, Inc._, 654 F.Supp. at 1233. The conduct addressed in Rule 14a-9, promulgated pursuant to Section 14 of the 1934 Act and made applicable to registered investment companies by incorporation under ICA § 20(a), is closely analogous to the claim Plaintiff here might frame under ICA § 20(a). _See_ discussion at pages 13-14 and note 3, _supra_. In light of this, I can see no good reason why the rule of _Virginia Bankshares_ does not control in the case at bar. As discussed above, all that remains of Plaintiff's federal claims is a claim for relief based solely upon the allegedly deceptive statements in Defendants' proxy statement and other documents relied on in connection with the

shareholder vote. Plaintiff's votes were unnecessary for authorization of the actions approved in the January 28, 1987 meeting and there is no allegation or evidence that Plaintiff will be precluded from pursuing state law remedies for the alleged deception if this Court denies relief. Plaintiff therefore has no federal cause of action under the ICA based upon statements distributed by the Defendants in connection with the vote.

### B. _Statute of limitations_

Even if Plaintiff could show causation, any claim under § 20(a) of the ICA arising from the fraudulent statements alleged in the Complaint would be time-barred. No period of limitations is provided in § 20(a); however, application of the required analysis for determining a limitations period, which is set forth in _Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson_, 501 U.S. 350, 111 S.Ct. 2773 (1991), and its progeny, FN6 leads to the conclusion that the appropriate period is the one year from discovery/three years from repose rule that has been applied to causes of action brought under Section 14(a) of the Securities Exchange Act of 1934.

\*9 There is a clear need for a uniform federal statute of limitations for causes of action under ICA § 20(a), in order to protect investors' interests in predictability and fairness, to discourage forum shopping, and to promote judicial economy in securities litigation in which claims are generally multistate in nature. _See generally_, _Ceres Partners v. GEL Assoc._, 918 F.2d 349, 353-60 (2d Cir.1990) ; _In re Taxable Mun. Bond Securities Litigation_, Fed.Sec.L.Rep. ¶ 96,834, 1992 WL 124783, \*6 (E.D.La.1992).

Further, there is no "comparable express remedial provision" in the statute of origin, the ICA, that contains an express limitation period that should be borrowed in this instance. The only express limitation periods in the ICA are found in § 36, 15 U.S.C. § 80a-35. Under § 36(a), the SEC is empowered to bring an action against specified management personnel who "engaged within the five years of the commencement of the action in any act or practice constituting a breach of fiduciary duty." 15 U.S.C. § 80a-35(a). Section 36(b) affords both the SEC and, derivatively, "security holder[s] of [an] investment company," a right of action against investment advisers or management personnel for breach of fiduciary duty, and provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted." 15

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1994 WL 97125
(Cite as: Not Reported in F.Supp.)

U.S.C. § 80a-35(b). The express right of action under § 36(b) is narrow; the conduct that may be challenged is limited to "compensation or payments ... to such investment advisor or person." _Id_. The problems § 36 focuses on are not comparable to the focus of ICA § 20(a). Section 36 generally addresses "gross misconduct or gross abuse of trust not otherwise specifically dealt with in the Act," _Brown v. Bullock_, 194 F.Supp. 207, 250 n. 1 (S.D.N.Y.), aff'd, 294 F.2d 415 (2d Cir.1961), and specifically addresses compensation of advisors and certain managers, a problem distinct from that addressed by § 20(a), _see Schuyt v. Rowe Price Prime Reserve Fund, Inc._, 622 F.Supp. 169, 177 (S.D.N.Y.1985) (unlike § 20(a), terms of statute and caselaw show § 36(b) does not provide redress for material misstatements in or omissions from proxy statements); _Krinsk_, 654 F.Supp. at 1232-33. As already discussed, proxy regulations address infringements of shareholder voting rights; they are intended to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." _J.I. Case Co. v. Borak_, 377 U.S. at 431. FN7 Accordingly, § 36 is not a comparable express remedial provision in the statute of origin to which _Lampf_ would direct this court for a limitation period applicable to causes of action implied under § 20(a).

The "commonality of purpose and similarity of elements," _Lampf_, 111 S.Ct. at 2779, between ICA § 20(a) and § 14(a) of the 1934 Act, argue in favor of a common statute of limitations. As discussed above, proxy regulation under Section 14 of the 1934 Act, parallels regulation under § 20(a) of the ICA in purpose and form. _See supra_, page 17; _see also In re Taxable Mun. Bond Securities Litigation_, 1992 WL 124783, at *6-7. Further, Plaintiff's potential ICA § 20(a) claim is closely analogous to a violation of Rule 14a-9, promulgated under § 14(a) of the Securities Exchange Act of 1934 and incorporated in ICA § 20(a). _See supra_, note 3. Although the 1934 Act imposes no specific limitation period for a § 14 claim, it has been well accepted that the one-year/three-year rule applies to claims brought under that section. _See, e.g., Westinghouse Elec. Corp. v. Franklin_, 789 F.Supp. 1313, 1318 n. 11 (D.N.J.1992) (applying _Lampf_), rev'd on other grounds, 993 F.2d 349 (1993); _Ceres Partners v. GEL Assoc._, 918 F.2d 349 (pre-_Lampf_). It follows that a suit premised on an implied private right of action under ICA § 20(a) must be commenced within one year from the date of discovery or three years of the violation.

**\*10** Since the allegedly false and misleading statements complained of in connection with the shareholder vote on January 28, 1987 were made on or before January 27, 1987, Plaintiff would have had to commence an action under § 20(a) by January 27, 1990, at the latest, to escape the bar of the three years from repose rule. Having been filed on October 10, 1991, Plaintiff's Complaint was clearly untimely. Plaintiff's claims fare no better under the one year from discovery rule. Where fraud is alleged in a federal cause of action, the limitations period begins to run on the date of the discovery of the fraud or on the date the fraud, upon reasonable inquiry, should have been discovered. _Dodds v. Cigna Securities, Inc._, 12 F.2d 346, 350 (2d Cir.1993); _Korn v. Merrill_, 403 F.Supp. 377, 387 (S.D.N.Y.1975), aff'd, 538 F.2d 310 (2d Cir.1976). All of the events and actions alleged by Plaintiffs as proof that Defendants' representations to shareholders concerning Baldwin's business plans were false when made, were made known in various filings with the SEC and in annual reports to the shareholders in 1987, 1988 and 1989. _See_ Complaint ¶ ¶ 27-34. Thus Plaintiff knew or should have known by that time of the alleged falsity of Defendants' representations, and the Complaint, filed more than one year later, was untimely.

### III. _ICA § 48_

Count II of the Complaint alleges that Section 48 of the Investment Company Act was violated when Defendants Cohen and Shalom caused Baldwin to violate Section 13(a)(3). Complaint ¶ 46. The pertinent part of Section 48, Subsection (a), makes it unlawful to procure a violation of the Act or any rule, regulation or order under it. 15 U.S.C. § 80A-47(a). FN8 It is apparent that Plaintiff's claim under § 48 depends upon finding a predicate violation in the first instance. Having found that Plaintiff's allegations fail to state a claim under § 13(a)(3) and other potentially applicable sections of the ICA, this Court must also find that Plaintiff's § 48 claim fails for want of a predicate violation.

### IV. _Pendent State Law Claims_

Counts III through VI of the Complaint assert claims based upon common law fraud, negligent misrepresentation, breach of fiduciary duty and breach of contract. Complaint ¶ ¶ 47-59. The subject matter jurisdiction of this Court over these non-federal claims is predicated upon principles of pendent jurisdiction, Complaint ¶ 3, and there is no basis for diversity jurisdiction, Complaint ¶ ¶ 5-8.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 97125
(Cite as: Not Reported in F.Supp.)

In the absence of diversity jurisdiction, where claims arising under federal law are dismissed on motion for failure to state a claim upon which relief can be granted, as a general rule the remaining pendent state law claims should be dismissed as well. *See, e.g., United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ; *Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994) ; *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1179-80 (2d Cir.1974) ; *Greenberg v. Institutional Investor Systems, Inc.,* 1975 WL 402, at *2*. Accordingly, with dismissal of Plaintiff's federal claims, Plaintiff's pendent state law claims also will be dismissed. Thus, Defendants' motion to dismiss the Complaint in its entirety is granted. FN9

***11** SO ORDERED.

FN1. The three Plaintiff classes are: (i) those Baldwin shareholders who owned Baldwin common stock from the period January 28, 1987 through June 26, 1991 (the "Class A shareholders"); (ii) those Baldwin shareholders who owned Baldwin common stock on December 24, 1986 (the "Class B shareholders"); and (iii) those Baldwin shareholders who owned Baldwin common stock on November 20, 1986 (the "Class C shareholders"). Defendants, members of their families, affiliates, successors or assigns are excluded from all classes.

FN2. Plaintiff's state law claims are not discussed because my conclusion that the federal claims must be dismissed results in a decision not to exercise pendent jurisdiction.

FN3. Section 20(a) of the ICA, 15 U.S.C. § 80a-20(a), makes it unlawful to solicit any proxy in respect of a security issued by a registered investment company, such as Baldwin, in contravention of the rules and regulations prescribed by the SEC. All SEC rules and regulations adopted pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78n , apply to solicitations made by registered investment companies, under Rule 20a-1, 17 C.F.R. § 270.20a-1(a). Plaintiff's allegation of fraudulent proxy solicitation may fall under Rule 14a-9(a), which states:
No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....
17 C.F.R. § 240.14a-9(a).

FN4. Section 34 of the ICA, 15 U.S.C.A. § 80a-33(b), contains a similar prohibition regarding documents filed pursuant to the ICA, making it "unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record or other document filed or transmitted pursuant to this subchapter." 15 U.S.C.A § 80a-33(b). It has been held that proxy statements fall within this section. *Brown v. Bullock,* 194 F.Supp. 207, 230 (S.D.N.Y.), *aff'd,* 294 F.2d 415 (2d Cir.1961).

FN5. In light of this decision, I do not address the question of whether a claim under § 13(a)(3) would be time-barred. The appropriate statute of limitations is addressed, however, in the discussion of § 20(a) of the ICA. *See infra* pp. 18-23.

FN6. In *Lampf,* the Supreme Court set forth a three-step methodology to be employed by courts in determining the appropriate limitations period for federal causes of action for which no period has been specified by Congress. First, the court should determine whether there is a need for a single, uniform statute of limitations; second, if a uniform period is desirable, the court must decide whether the period should derive from a state or a federal source; and, third, if federal borrowing is preferred, the court must still determine that the analogous federal source "truly affords a 'closer fit' with the cause of action at issue than does any available state-law source." *Lampf,* 111 S.Ct. at 2779. For this last test, the Supreme Court stated that factors to consider in comparing the cause of action with its available state and federal analogues were "commonality of purpose and similarity of elements." *Id.*
In the *Lampf* case itself, the Supreme Court addressed a claim arising under § 10(b) of the Securities Exchange Act of 1934. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 97125
(Cite as: Not Reported in F.Supp.)

cause of action in *Lampf* was implied under a statute that also contained various express causes of actions with articulated periods of limitation. The Supreme Court stated that, in such cases, the statute of origin must first be examined "to ascertain the proper limitations period" from any existing "comparable express remedial provisions." *Lampf,* 111 S.Ct. at 2780. The Supreme Court then followed its own three-part test, holding that "[o]nly where no analogous counterpart is available should a court then proceed to apply state-borrowing principles." *Id*

FN7. As Plaintiff's brief makes clear, the elements of Defendants' alleged wrongful conduct that suggest a cause of action under ICA § 36 are those comprising the basis for Plaintiff's state law claim of breach of fiduciary duty. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, at 13-14.

FN8. Section 48 provides, in pertinent part: "It shall be unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation or order thereunder." 15 U.S.C.A. § 80a-47(a).

FN9. This order of dismissal is subject to one exception. While the motion to dismiss was pending, the parties reached a tentative settlement of the claims set forth in Count VI of the Complaint, regarding Defendants' obligation to distribute a portion of a Baldwin tax refund for the year 1983 to Class C shareholder members. The Court held an evidentiary hearing on issues related to Defendants' present ability to effect such a refund to Class C shareholders. If the parties still intend to present for approval of the Court a settlement of this claim, in the interests of judicial economy, convenience and fairness, the Court may exercise its discretion to retain jurisdiction over Count VI solely for settlement purposes. *Cf Rounseville,* 13 F.3d at 631 (recognizing that in certain circumstances, "some Second Circuit precedents suggest that it is not necessarily an abuse of discretion for a district court to continue to exercise

jurisdiction over a state claim when the federal claim to which it is pendent has been dismissed before trial"); *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536, 545 (2d Cir.1989) (observing that when judicial economy may be served "even when federal claims are resolved before trial, comity does not automatically mandate dismissal of pendent state claims"). Within fourteen days of receipt of this decision and order, the parties shall inform the Court of whether they intend to submit a settlement agreement regarding the breach of contract claim in Count VI, and shall submit a proposed order for notification and approval of any such settlement.

S.D.N.Y.,1994.
Omni Financial Corp. v. Cohen
Not Reported in F.Supp., 1994 WL 97125

Briefs and Other Related Documents (Back to top)

• 1:91cv06837 (Docket) (Oct. 10, 1991)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.